# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

## CASE NO. 22 - __
### Related Case No. 20-12659 (RBK-SAK)
**Pending in the United States District Court for the District of New Jersey Camden Vicinage**

**Related Case *General Motors LLC v FCA, LLC*, bearing case no. 19-cv-13429 (Dismissed)**
**United States District Court for the Eastern District of Michigan**
**Southern Division**

**GENERAL MOTORS LLC et al.,**

     **Plaintiffs,**

**v.**

**JOSEPH ASHTON,**

     **Defendant.**

_____/

| | |
|---|---|
| James E. Marina | Rodman E. Honecker |
| KIRKLAND & ELLIS LLP | Ben J. Kusmin |
| Attorneys for Plaintiffs | Windels Marx Lane & Mittendorf, LLP |
| 601 Lexington Avenue | Attorneys for Joseph Ashton |
| New York, NY 10022 | 120 Albany Street Plaza |
| (212) 446-4800 | New Brunswick, NY 08901 |
| Jmarina@kirkland.com | (732) 846-7600 |
| | rhonecker@windelsmarx.com |
| | |
| Hariklia Karis PC | NEDELMAN LEGAL GROUP PLLC |
| Jeffrey Willian PC | By:   Michael A Nedelman (P35433) |
| Casey McGushin | Attorneys for Susanne Iacobelli |
| Attorneys for Plaintiffs | 28580 Orchard Lake Road, Suite 140 |
| KIRKLAND & ELLIS LLP | Farmington Hills, MI 48334 |
| 300 North LaSalle | (248) 855-8888 |
| Chicago, IL 60654 | mnedelman@nglegal.com |
| (312) 862-2000 | |
| Hariklia.karis@kirkland.com | |
| Jeffrey.willian@kirkland.com | |
| Casey.mcgushin@kirkland.com | |

1

## MOTION TO QUASH SUBPOENA *DUCES TECUM*

Susanne Iacobelli, through her attorneys, submits the following Motion to Quash the Subpoena *duces tecum* issued November 10, 2021, a copy of which is attached as **Exhibit 1**.

1. This Motion is brought pursuant to Fed. R. Civ. P. 45(d).

2. For the reasons set forth in the accompanying Brief, Susanne Iacobelli seeks the entry of this Court's Order quashing the subpoena *duces tecum* to Susanne Iacobelli to the extent that it seeks her deposition upon oral examination.

3. This Motion is made without prejudice to, and expressly preserving in the event that she is required to appear for her deposition, any and all other privileges that may exist in favor of Susanne Iacobelli preventing involuntary disclosure including, but not limited to, the spousal communication privilege, the marital privilege (however denominated), the attorney-client privilege and Susanne Iacobelli's privileges under the Fifth and Fourteenth Amendments to the United States Constitution.

4. Pursuant to Local Rule 7.1(a), the undersigned conferred by telephone with counsel for Plaintiffs on January 10, 2022, seeking concurrence in the relief sought herein. Concurrence was denied, thereby necessitating this Motion.

WHEREFORE, Susanne Iacobelli prays that this Court enter its Order:

    A. Quashing Plaintiffs' Subpoena *duces tecum* to the extent it seeks the deposition testimony of Susanne Iacobelli;

175116216.009

2

B.  Awarding in favor of Susanne Iacobelli and against Plaintiffs and their counsel those costs, including actual attorneys' fees, incurred in bringing this Motion; and

C.  Awarding in favor of Susanne Iacobelli and against Plaintiffs such other relief as may be just and equitable under the circumstances.

Respectfully submitted,
NEDELMAN LEGAL GROUP PLLC
/s/ Michael A. Nedelman
Michael A. Nedelman (P35433)
Attorneys for Susanne Iacobelli
28580 Orchard Lake Road, Suite 140
Farmington Hills, Michigan  48334
(248) 855-8888

Dated: January 10, 2022          mnedelman@nglegal.com

## **BRIEF IN SUPPORT**

## **CONCISE STATEMENT OF ISSUE PRESENTED**

Should this Court quash the Subpoena *duces tecum* to Susanne Iacobelli requiring her attendance at a deposition upon oral examination, for the reason that such examination is in this action prohibited by MCL 600.2162(1), as made applicable by Fed. R. Evid. 501?

## CONTROLLING AUTHORITIES

Fed. R. Evid. 501

MCL 600.2162(1)

*People v. Hamacher*, 160 Mich. App. 759; 408 NW2d 549 (1987)

*People v Fisher*, 442 Mich. 560; 503 NW2d 50 (1993)

## INTRODUCTION

The subpoena *duces tecum* served upon Susanne Iacobelli was issued in bad faith, and (like those served upon Business Advisory Group, LLC and Alphons Iacobelli) reflect the improper efforts of General Motors LLC and General Motors Company (collectively "Plaintiffs") to conduct discovery in two different cases, each previously having been <u>dismissed with prejudice</u>, i.e., *General Motors LLC v FCA, LLC*, bearing case no. 19-cv-13429 in this Court (the "Michigan Federal Case") and *General Motors LLC v Iacobelli, et al*, bearing case no. 20-011998-CB in the Wayne County (Michigan) Circuit Court (the "Michigan State Court Case") (sometimes collectively the "Michigan Cases"); the Michigan State Court Case has been "revived" by reason of the state Court's grant in favor of General Motors LLC (but not General Motors Company) leave to file its Second Amended Complaint, but is the subject of pending Motions to dismiss.

Plaintiffs have improperly sought to use the discovery process in this third case, *General Motors LLC v Ashton*, bearing case no. 20-12659 (RBK-SAK) in the United

States District Court for the District of New Jersey (the *Ashton* New Jersey Action), to obtain from non-party Susanne Iacobelli discovery that is not relevant to the claims in the *Ashton* New Jersey Action or proportional to the needs of that case, and conduct the discovery that Plaintiffs were denied in the Michigan Federal Case and not yet permitted to conduct (and may never be permitted to conduct) in the Michigan State Court Case.

As more fully described below, the *Ashton* case involves two <u>state law</u> claims against Mr. Ashton: a claim for fraud, and a claim for breach of fiduciary duty.[1] The first claim is that Ashton committed fraud and a breach of his fiduciary duties to "GM"[2] by participating in a "criminal kickback scheme" that siphoned money from the UAW-GM Center for Human Resources (the "CHR"), a Michigan nonprofit corporation[3], with the damages allegedly having been suffered by the CHR[4]; the second theory of Mr. Ashton's alleged liability to "GM" is based upon alleged misconduct by Mr. Ashton

---

[1]  Plaintiffs have asserted in their July 12, 2021 Supplemental Brief filed in the *Ashton* Federal Court Action (Doc 39, page ID 809) that "GM believes that Michigan law likely applies to the breach of fiduciary duty claim, pending further development of facts through discovery." While GM is clearly hedging, Michigan law would clearly apply to the privilege issue before the Court.

[2]  In a continuing effort to create confusion and a cause of action where none exists, Plaintiffs in this case improperly blur the distinction between General Motors Company, the publicly traded company that was the alleged object of the so-called "takeover" efforts, and General Motors LLC, the automaker allegedly "harmed" by the results of the collective bargaining process.

[3]  The CHR has been dissolved, and is currently liquidating its assets. See Exhibit 2.

[4]  Neither Plaintiff appears to have standing to assert a claim for recovery of damages suffered, if at all, by the Center for Human Resources, Inc. – an entity that was legally distinct from each Plaintiff.

while serving as the nominee of the UAW Trust to the General Motors Company Board of Directors,[5] with Plaintiffs asserting that Mr. Ashton acted improperly in his role on GM's board during GM's 2015 collective bargaining negotiations. The Amended Complaint in the *Ashton* New Jersey Action,[6] while inferring that Alphons Iacobelli engaged in wrongful conduct vis-à-vis "GM," does not mention, let alone even attempt to state a claim for relief against, Susanne Iacobelli.

The relief sought is based upon the fact that even if the discovery sought from Susanne Iacobelli is within the permissible scope of discovery (which it is not), Susanne Iacobelli cannot be called to testify in this matter for the reason that Plaintiffs assert that Alphons Iacobelli, Susanne Iacobelli's husband, is an alleged "co-conspirator" with Mr. Ashton and did engage in unlawful conduct. As a result, absent the consent of Alphons Iacobelli to permit the testimony of Susanne Iacobelli, she is pursuant to MCL 600.2162 statutorily barred from being called as a witness.[7]

---

[5]  Certainly, General Motors <u>LLC</u> does not have a claim against Mr. Ashton for any defalcation by Mr. Ashton while serving on the Board of Directors of General Motors <u>Company</u>. It is also unclear from the Amended Complaint if the Board seat that Mr. Ashton occupied was occupied by him individually, or by Mr. Ashton as the nominee and representative of the UAW Trust. To the extent the latter, any claim of breach of fiduciary duty would necessarily be made by General Motors Company against the UAW Trust (since the duty would be owed by the Trust to General Motors Company, not by Mr. Ashton individually).

[6]  A copy of the Plaintiffs' Amended Complaint in the *Ashton* New Jersey Action is attached as **Exhibit 3**.

[7]  This Motion is brought without waiving, and expressly preserving, all other testimonial and production privileges that may exist in favor of Susanne Iacobelli including, but not limited to, the spousal communication privilege; the attorney-

## ARGUMENT

### 1.  Statement of Facts.

To avoid any risk of dispute over the operative facts, the following are (until the end of the quotation, as expressly noted) repeated from the June 22, 2021 Opinion and Order (Doc. 35) of Judge Kubler entered in the primary *Ashton New Jersey Action* case, a copy of which Opinion and Order is attached as **Exhibit 4**:

"In this case, Plaintiff General Motors LLC ("GM") alleges that Defendant Joseph Ashton committed fraud and a breach of his fiduciary duty to GM. During the relevant period, Ashton was an official at the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), the Vice President of the UAW's GM Department, and a director on GM's Board of Directors. The Complaint alleges that during his tenure in the aforementioned positions, "Ashton sat at the center of two sprawling and long-running criminal schemes" that "cause[d] massive harm to GM." (Doc. 7, "FAC" ¶2.) GM brings the present suit seeking to recover for that harm. The factual and procedural posture of this case is lengthy; as such, the Court recites only what is necessary to determine the currently pending motion to dismiss.

### A. Ashton's Role at GM

Ashton served as Vice President of the UAW's GM Department from 2010 to

---

client privilege; and her Fifth Amendment privilege against self-incrimination, that are appropriately asserted only if she is first required to appear for her examination.

2014. (FAC¶58.) The Complaint alleges that, as UAW Vice President, Ashton was involved in negotiating and implementing collective bargaining agreements between the UAW and GM and influencing the terms of the UAW's collective bargaining agreements with Fiat Chrysler ("FCA"). (FAC ¶31.) In 2014, Ashton joined the GM Board of Directors and held this position until 2017. (FAC ¶33). Ashton additionally was a member of the UAW-GM Center for Human Resources ("CHR") Board. The Complaint pleads that the CHR's primary purpose is to educate and train GM's domestic union workforce. (FAC ¶20). It is governed by an eight-director board, with four members appointed by GM and four by the UAW. GM is the sole source of funding for the CHR. (FAC ¶¶3,53.)

### B. Written Director Questionnaire

The Complaint alleges that, upon joining GM's Board, Ashton signed a written director questionnaire and agreed to comply with his fiduciary duties to GM. (FAC ¶34.) In this questionnaire, Ashton made several written representations:

- He had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry;

- He had not received or been offered anything of value in consideration for his Board service;

- He would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM";

- There was no "special arrangement or understanding between [him] and any other personpursuant to which" he was nominated to the Board; and

- He adhered to GM's Code of Conduct, which, among other things, prohibits bribery andreceiving improper payments.

(FAC ¶¶ 34, 119, 128.)

### C. Ashton's Alleged Misconduct

GM's claims in this case arise from two separate theories of misconduct by Ashton. The first theory is that Ashton committed fraud and a breach of his fiduciary duties to GM by participating in a "criminal kickback scheme" that siphoned money from the CHR.[8] The Complaint alleges that Ashton and several co-conspirators "deceptively solicited, influenced, and obtained contracts for CHR vendors to provide clothing and other items to UAW members." (Opp. at 7 (citing FAC ¶38.)) In return, they "demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value."(FAC ¶38.) As an example, the Complaint alleges that the CHR purchased 50,000 "Team UAW- GM" jackets for plant employees. (FAC ¶44.) Ashton and his co-conspirators recommended a specific vendor as the sole source of the contract, and Ashton received $300,000 in kickbacks. (FAC ¶44). As another example, the Complaint pleads that Ashton convinced an associate to loan $250,000 to a

---

[8]  [fn. 1 in original].  For ease of reference, the Court refers to this theory of liability as the "criminal kickback scheme" throughout the Opinion."

construction company. (FAC ¶46). When the company stopped paying the loan, "Ashton proposed that his associate could recoup the loan money by forming a company to sell watches to the CHR." (Opp. at 8.) The Complaint alleges that Ashton used his position at the CHR to ensure that the CHR purchased watches from this company, and Ashton received $250,000 in kickback money for the contract. (FAC ¶48) According to GM, "Ashton never disclosed the kickback scheme" and instead "affirmatively concealed the scheme through fraudulent checks, sham vendors, and other fraudulent means." (Opp. at 9) (citing FAC ¶¶ 51, 102–05.)) In November 2019, Ashton was criminally charged for his participation in the criminal kickback scheme involving the purchase of "commemorative watches" that the Court outlines above. (FAC ¶43.) Ashton pled guilty on December 4, 2019, and a court sentenced him to 30 months imprisonment. (FAC ¶43.) According to the Complaint, Ashton "admitt[ed] that he demanded and accepted hundreds of thousands of dollars in kickbacks and improperly used his position to enrich himself[.]" (FAC ¶43.)

The second theory of liability asserts that Ashton acted improperly in his role on GM's board during GM's 2015 collective bargaining negotiations. [2] As part of this theory, the Complaint alleges that Ashton disclosed confidential information discussed in GM board meetings to Fiat Chrysler ("FCA") and Fiat Chrysler Automobiles N.V. ("FCA NV.") The Complaint alleges that FCA and FCA NV gave millions of dollars to UAW officials to obtain advantages for FCA and secure disadvantages for GM in

negotiating and implementing collective bargaining agreements. (Opp. at 9 (citing FAC ¶¶4, 55, 75–99.)) GM pleads that the scheme was two-fold. First, in return for its bribes, "FCA obtained labor cost advantages while ensuring such advantages were denied to GM[.]" (Opp. at 9 (citing FAC ¶72.)) Second, FCA and its CEO leveraged the bribery scheme in order to assist FCA NV in trying to "force a merger with GM." (FAC ¶¶75, 99–100.) GM pleads that Ashton, "as Vice President of the UAW's GM Department," could "directly influence and control the labor relations between GM and the UAW." (FAC ¶71.) Therefore, the Complaint alleges that Ashton ensured that GM did not receive the same labor advantages as FCA. GM also pleads that Ashton "acted clandestinely on FCA's behalf from inside GM's Boardroom" (FAC ¶¶33– 34, 90) by receiving detailed information about GM and sharing that information with "corrupt UAW leaders and FCA and FCA NV executives[.]" (Opp. at 11.)[9]

In 2017, the federal government began unsealing indictments related to the aforementioned conduct. (FAC ¶35.) GM alleges that to date "more than a dozen FCA and UAW officials have been criminally charged, and every one of them has pleaded guilty" to the "years-long pattern of corruption and racketeering activity[.]" (FAC ¶35.) GM asserts that these officials have "admitted to numerous racketeering acts, including millions of dollars in bribes designed to corrupt the negotiation, implementation, and administration of the collective bargaining process." (Opp. at 12

---

[9] [fn. 2 in original]. For simplicity, the Court refers to this theory of liability as the "2015 collective bargaining" theory throughout the Opinion.

(citing FAC ¶¶2–4.)) After the first indictments were unsealed in 2017, Ashton resigned from GM's Board. (FAC ¶36.)

### D. Related Cases and Procedural Posture

In November 2019, GM filed suit in the United States District Court for the Eastern District of Michigan. *See General Motors LLC v. FCA*, Case No. 19-cv-13429 (E.D. Mich.).[10] In that case, GM sued FCA, FCA NV, and three former FCA employees and UAW officials—Alphons Iacobelli, Jerome Durden, and Michael Brown. The complaint in that case pleaded causes of action for violation of RICO, unfair competition, and civil conspiracy. Ashton was not a named defendant in that suit. The defendants in that case filed motions to dismiss. The motions were heard by the Honorable Paul D. Borman. Judge Borman dismissed the RICO claim after finding that GM had failed to plead sufficient facts to show that the defendants' RICO violations proximately caused GM's injuries. *General Motors LLC v. FCA US LLC*, No. 19-13429, 2020 WL 3833058 (E.D. Mich., July 8, 2020). After dismissing the only federal cause of action, Judge Borman declined to exercise supplemental jurisdiction over the state law claims. *See id.* at *7. Following the dismissal, GM moved to amend its complaint based on newly discovered evidence regarding the existence of foreign bank accounts. *See General Motors LLC v. FCA US LLC*, No. 19-13429, 2020 WL 4726941 (E.D. Mich. Aug. 14, 2020). Judge Borman denied that

---

[10]   [fn. 3 in original].   The Court refers to this action throughout the Opinion as the Eastern District of Michigan action.

motion, finding that the "newly discovered evidence [was] too speculative to warrant reopening th[e] case." *Id.* at *1. GM has since appealed, and the appeal is pending before the Sixth Circuit.

Because Judge Borman declined to exercise jurisdiction over GM's state law claims, GM subsequently filed a new lawsuit against FCA, FCA NV, and several individual defendants in Michigan state court, alleging claims of fraud, breach of fiduciary duty, and unfair competition.[11] Ashton is not a defendant in that case. FCA removed the action to federal court, *General Motors LLC v. Iacobelli*, Case No. 20-cv-12668 (E.D. Mich.), but Judge Robert H. Cleland remanded the case back to Michigan state court. On September 14, 2020, GM filed the present suit against Ashton in this Court. (Doc. 1.) The Court ordered GM to cure jurisdictional pleading deficiencies and to file an Amended Complaint. (Doc. 5.) GM did so and filed the operative complaint, the First Amended Complaint, on September 24, 2020. (Doc. 7.) On November 23, 2020, Ashton filed the presently pending motion to dismiss. (Doc. 17, "Mot. to Dismiss.") GM opposed (Doc. 20, "Opp."), and Ashton replied (Doc. 21, "Reply")." [**end of quotation from Doc. 35, Opinion and Order in Ashton New Jersey Action**].

In his June 22, 2021 Opinion and Order, Judge Kugler denied in part Mr. Aston's Motion to Dismiss, but reserved judgment on the statute of limitations

---

[11]  [fn. 4 in original].  The Court refers to this as the "Michigan state court action" throughout the Opinion.

argument regarding the breach of fiduciary duty claim. Among the issues left to be decided (Judge Kugler has not yet issued a further opinion) is the determination of the substantive law that applies to those claims, although as noted above Plaintiffs in their supplemental brief (*Ashton* case, Doc. 39, page ID 809) admit that "based on the information presently known, GM believes that Michigan law likely applies to the breach of fiduciary duty claim, pending further development of facts through discovery." *Id*. at p. 2.  In the interim, Judge Allen of the Wayne County Circuit Court dismissed with prejudice Plaintiffs' Amended Complaint against Alphons Iacobelli, FCA, FCA NV, and Mr. Durden; but upon Plaintiffs' Motion for Reconsideration, granted leave for Plaintiff General Motors LLC to file its Second Amended Complaint which Second Amended Complaint is the subject of pending Motions to dismiss.

Plaintiffs in this *Ashton* Federal Court Action issued, and ultimately served, a subpoena *duces tecum* upon Susanne Iacobelli (**Exhibit 1**). Objections to the *duces tecum* portion of the subpoena *duces tecum* were timely served (see **Exhibit 5**), with Plaintiffs agreeing that no appearance was then-required by Mrs. Iacobelli, and agreeing that "any arguments that you [Mrs. Iacobelli] have to oppose those appearances (including privilege issues) are reserved and can be raised when we are working out dates at a later time." Following a meet and confer, amended objections were served by Mrs. Iacobelli. See **Exhibit 6**. By email dated January 5, 2022,

Plaintiffs indicated that notwithstanding the written objections and included explanations in response to the *duces tecum* portion of the subpoena *duces tecum*, Plaintiffs nevertheless wished to pursue taking the deposition of Susanne Iacobelli. This Motion is brought in response to that advice, and is therefore timely.

**2. <u>Argument</u>**

A. **The deposition of Susanne Iacobelli cannot occur due to the lack of <u>consent from Alphons Iacobelli</u>.**

Federal Rule of Evidence 501 provides that in a civil case involving claims based on state law, the existence of a privilege is to be determined in accordance with state, not federal, law. *Jewell v Holzer Hosp. Foundation, Inc*., 899 F. 2d. 1507 (1990). In considering the propriety of the subpoena *duces tecum* to Susanne Iacobelli, this Court should apply Michigan law.

The deposition of Susanne Iacobelli is prohibited under Michigan law, because Susanne Iacobelli is the spouse of Alphons Iacobelli, and Alphons Iacobelli has not consented to that deposition. See **Exhibit 7**, Statement of Alphons Iacobelli. Under MCL 600.2162(1):

> In a civil action . . . a husband shall not be examined as a witness for or against his wife without her consent or <u>a wife for or against her husband without his consent</u>, except as provided in subsection (3):

MCL 600.2162(1)(emphasis added). There are no other exceptions to MCL 600.2162(1) other than those enumerated in MCL 600.2162(3), which are inapplicable to this case; *see also People v Fisher*, 442 Mich. 560, 567; 503 NW2d 50 (1993) (noting

that MCL 600.2162 is controlled by the statutory language, and not by the common law); *People v. Hamacher*, 160 Mich. App. 759, 761-62; 408 NW2d 549 (1987) (noting that the only exceptions are "those exceptions enumerated in the statute"). MCL 600.2162(1) is the codification of the common law "spousal privilege" which is a separate and distinct privilege from the "communication privilege." *Hamacher*, *supra* at 761-62. The spousal privilege, as codified in MCL 600.2162 "precludes all testimony regardless of whether the events at issue occurred before or during the marriage." *People v DeWitt*, 173 Mich. App. 261, 266; 433 NW2d 325 (1989) (emphasis added).

When interpreting a statute, the Court must follow the established rules of statutory construction. As the Michigan Supreme Court has most recently reiterated:

> … the foremost [rule] … is to discern and give effect to the intent of the Legislature. To do so, we begin by examining the most reliable evidence of that intent, the language of the statute itself. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted. Effect should be given to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or rendered nugatory. Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent.

*Whitman v City of Burton*, 493 Mich. 303, 311-312; 831 NW 2d 223 (2013)(footnotes omitted).

Although in bringing the *Ashton* Federal Court Action Plaintiffs did not join Alphons Iacobelli as a defendant, there is no genuine dispute that the testimony sought from Susanne Iacobelli is, or must reasonably be construed to be intended to be, either

175116216.009                                    14

for or against Alphons Iacobelli. In the *Ashton* Federal Court Action Amended Complaint, Plaintiffs allege criminal bribery involving Alphons Iacobelli, and a "scheme" that allegedly involves both Mr. Ashton and Mr. Iacobelli, among others. The *Ashton* Amended Complaint, fairly read, identifies Mr. Iacobelli as an alleged co-conspirator with Mr. Ashton in certain of the alleged wrongful conduct and alleges:

A. at Amended Complaint ¶12, that Mr. Iacobelli is a "significant non-party;"

B. at Amended Complaint ¶ 35, that "[t]he indictment detailed a years-long pattern of illicit payments to and bribery of union officials by Iacobelli on behalf of FCA and FCA NV."

C. at Amended Complaint ¶54 that GM only recently "discovered Ashton's role in advancing FCA and FCA NV's bribery scheme to harm GM and force it to merge with FCA NV" [which scheme allegedly included Mr. Iacobelli];

D. at Amended Complaint ¶¶ 57-58, the existence of foreign bank accounts "actively concealed" by the "co-conspirators," by which reference Plaintiffs clearly intend to include Mr. Iacobelli, since in the subpoenas *duces tecum* to Mr. Iacobelli and Mrs. Iacobelli Plaintiffs seek information related not just to the alleged foreign accounts mentioned in the *Ashton* Amended Complaint ¶¶57-58, but the alleged foreign bank accounts described in the Second Amended Complaint filed in the Michigan State Court Action against Mr. Iacobelli, and previously mentioned in the proposed Second Amended

Complaint with respect to which leave to file was denied in the (dismissed) Michigan Federal Court Action against Mr. Iacobelli, among others;

E.  at Amended Complaint ¶60, that "… upon information, belief and clear inference, other FCA and UAW office is connected to the Ashton-FCA conspiracy as described herein [which as described, included Mr. Iacobelli] received FCA/FCA NV bribes through foreign accounts;"

F.  at Amended Complaint ¶63, that "[t]he central purpose of the bribery scheme Marchionne, FCA, and FCANV enacted was to harm GM in an effort to induce it to merge with FCA to achieve synergies and a higher return on capital" (which "bribery scheme" Plaintiffs allege in the Michigan Actions included Alphons Iacobelli);

G.  at Amended Complaint ¶107, that "…Ashton and the other conspirators [which as described, included Mr. Iacobelli] also adopted extraordinary measures to conceal FCA's bribery scheme. As described herein and as admitted in the criminal plea agreements, the co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing," including allegedly holding "millions of dollars in illicit funds in foreign bank accounts in countries suchas Switzerland, Luxembourg, Liechtenstein, Panama, the

Cayman Islands, and others" (at subparagraph (a)) and describing, at subparagraphs (b) through (e) and (g), the alleged misconduct of Mr. Iacobelli as an alleged co-conspirator; and

H. at Amended Complaint ¶127, reiterating the allegation of an alleged "criminal scheme to corrupt the bargaining process to benefit FCA and harm GM" (which alleged scheme Plaintiffs allege in the Michigan Actions included the active participation of Alphons Iacobelli).

In addition, counsel for Plaintiffs has in writing confirmed - in response to the initial objections made by Susanne Iacobelli, Business Advisory Group and Alphons Iacobelli to the subpoenas *duces tecum* served upon them in this matter - that:

> "Specifically, GM has alleged [in the Ashton Action] that FCA (acting through agents such as Mr. Iacobelli) directed improper payments to Mr. Ashton and others in a direct effort to harm GM, and that FCA employees (such as Mr. Iacobelli) also maintained such accounts. (See e.g. First Am. Compl. at ¶¶ 12, 54-101.) The subpoenas to Ms. Iacobelli and BAG seek relevant information and documents they may possess about the overall scheme and these dealings by Mr. Iacobelli, including information concerning foreign accounts held in the name of Ms. Iacobelli or BAG for the benefit of Mr. Iacobelli."

> \*\*\*

> "Given the overlap in factual allegations underlying GM's state law claims against Mr. Ashton and the federal and state law claims asserted against FCA and Mr. Iacobelli, it should come as no surprise that the information GM seeks in discovery in the New Jersey Action covers some of the same issues that would be the subject of discovery in the Michigan Actions."

See **Exhibit 8**. By letter dated December 5, 2021, counsel for Plaintiffs reiterated that "[a]lthough GM's claims against Joe Ashton are based in state law, the factual underpinnings for those claims include the FCA-UAW bribery scheme" (citing to Ashton First Amended Complaint ¶¶ 58, 54-61, 114 and 121, which are alleged to include Mr. Iacobelli).

In light of Plaintiffs' allegations that Mr. Iacobelli was a participant in the alleged criminal conduct and "scheme" of which Plaintiffs' complaint, and Plaintiffs' admission of the overlap between the Michigan Actions (in which Mr. Iacobelli is a named defendant) and the *Ashton* Federal Court Action that mentions Mr. Iacobelli not less than fifty-six times in the 131 paragraph Amended Complaint (mostly as an alleged co-conspirator or other wrongdoer), it is beyond reasonable dispute that Susanne Iacobelli's testimony in this case would be either for or against Alphons Iacobelli. Since Susanne Iacobelli and Alphons Iacobelli remain married as of this writing, the spousal privilege set forth at MCL 600.2162(1) – since none of the exceptions to the spousal privilege are applicable[12] – absolutely prohibits Susanne Iacobelli from being called to testify absent Alphons Iacobelli's consent, which has not been provided. (See **Exhibit 7**).

---

[12]  None of the exceptions apply to this matter, as it is not: 1) a suit for divorce; 2) a prosecution for bigamy; 3) a prosecution for a crime against a minor; 4) a suit concerning wrongs done between Mark and Susanne Iacobelli; 5) a case of desertion; or 6) a real property dispute between and Susanne Iacobelli. See MCL 600.2162(3).

Finally, the absence of any good faith belief by Plaintiffs that Susanne Iacobelli has any discoverable information – even if her deposition testimony could be compelled despite the spousal privilege that prohibits it – is belied by the Initial Disclosures served by Plaintiffs in this Ashton Federal Court Action. Those Initial Disclosures unsurprisingly fail to identify Susanne Iacobelli as an individual "likely to have discoverable information that GM may use to support its claims." See **Exhibit 9** at pages 1-13 (in contrast, Plaintiffs describe at length the information that they believe Alphons Iacobelli possesses).

## **CONCLUSION**

For the reasons set forth above, Susanne Iacobelli prays that this Court enter its Order:

A. Quashing Plaintiffs' Subpoena *duces tecum* to the extent it seeks the deposition testimony of Susanne Iacobelli;

B. Awarding in favor of Susanne Iacobelli and against Plaintiffs and their counsel those costs, including actual attorneys' fees, incurred in bringing this Motion; and

C.   Awarding in favor of Susanne Iacobelli and against Plaintiffs such other

relief as may be just and equitable under the circumstances.

Respectfully submitted,
NEDELMAN LEGAL GROUP PLLC
/s/ Michael A. Nedelman
Michael A. Nedelman (P35433)
Attorneys for Susanne Iacobelli
28580 Orchard Lake Road, Suite 140
Farmington Hills, Michigan  48334
(248) 855-8888
mnedelman@nglegal.com

Dated: January 10, 2022

## **INDEX OF EXHIBITS**:

1. Subpoena *duces tecum* to Susanne Iacobelli
2. UAW-GM Center for Human Resources Cert. of Amendment
3. Amended Complaint
4. June 22, 2021 Opinion in *Ashton* Action
5. 2021.11.26 Objections to Subpoena *duces tecum*
6. 2021.12.24 Amended objections to Subpoena *duces tecum*
7. Alphons Iacobelli denial of consent to testify
8. 2021.12.03 GM email re scope of discovery
9. Plaintiffs' 2021.08.12 Initial Disclosures in *Ashton* Action

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

**CASE NO. 22-**

**Related Case No. 20-12659 (RBK-SAK)**
**Pending in the United States District Court for the District of New Jersey Camden Vicinage**
**Related Case *General Motors LLC v FCA, LLC*, bearing case no. 19-cv-13429 (Dismissed)**
**United States District Court for the Eastern District of Michigan**
**Southern Division**

GENERAL MOTORS LLC et al.,

    Plaintiffs,

v.

JOSEPH ASHTON,

    Defendant.

_____/

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via the e-filing portal to all counsel of record in that action entitled General Motors LLC v Ashton, bearing case no. 20-12659 (RBK-SAK) in the United States District Court for the District of New Jersey.

I declare that the above statement is true to the best of my knowledge, information and belief on this 12th day of January, 2022.

/s/ Michelle K Watler
Michelle K. Watler

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | |
|---|---|
| GENERAL MOTORS LLC et al. | ) |
| _Plaintiff_ | ) |
| v. | )   Civil Action No.   Civil No. 20-12659 (RBKISAK) |
| JOSEPH ASHTON | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                             Susanne Iacobelli
                        1749 Piccadilly Ct., Rochester, MI 48309
                        _(Name of person to whom this subpoena is directed)_

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:
See Exhibit A

| Place: Bienenstock Court Reporting & Video, a U.S. Legal Support Company 535 Griswold, Suite 2600, Detroit, MI 48226 | Date and Time: 12/10/2021 9:00 am |
|---|---|

The deposition will be recorded by this method:   video, stenography, and/or audio recording

☑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      11/10/2021

                    _CLERK OF COURT_
                                                        OR
                                                              /s/ James E. Marina
     _____                    _____
         _Signature of Clerk or Deputy Clerk_                      _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
General Motors LLC and General Motors Company
, who issues or requests this subpoena, are:
James Marina, Kirkland & Ellis, 601 Lexington Ave., New York, NY 10022, james.marina@kirkland.com, 212-446-4800

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT 1**

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   Civil No. 20-12659 (RBKISAK)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____   on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____                     _____
                                                            *Server's signature*

                                                    _____
                                                            *Printed name and title*

                                                    _____
                                                            *Server's address*

Additional information regarding attempted service, etc.:

**EXHIBIT 1**

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT 1**

# **EXHIBIT A**

## **INSTRUCTIONS**

1.      In accordance with Rule 45 of the Federal Rules of Civil Procedure, the documents and things to which this Subpoena and the Requests herein relate include any and all documents and things that are in your "possession, custody or control."

2.      Any document to which you claim privilege or exemption from discovery shall be identified by the document's title, date, author(s), recipient(s), length, general subject matter, the nature of the privilege asserted, the holder of the privilege, and the factual and legal basis for asserting the privilege or exemption from discovery.

3.      If a document contains both privileged and non-privileged material, the non-privileged material should be disclosed to the fullest extent possible without thereby disclosing the privileged material.  If a privilege is asserted with regard to part of the material contained in a document, you must clearly indicate the portions as to which the privilege is claimed, in accordance with the procedure outlined above, and produce all portions of the document as to which no privilege is claimed.

4.      You may produce an electronic copy of a document in lieu of producing the original.  When so doing, the electronic copy should be legible and in the same format as the original, and you should preserve the original.

**EXHIBIT 1**

5.      Documents attached to each other in their original form should not be separated when produced.  Any attachments to electronic mail messages should be produced with, and linked to, the attaching email.

6.      The singular form of a word means and includes the plural, and the plural form of a word means and includes the singular, whenever necessary, to bring within the scope of these Requests any and all documents that might otherwise be construed to be outside their scope.

7.      Unless otherwise set forth herein, the Requests are for the period commencing January 1, 2009 to present.

8.      These Requests are without prejudice to, or waiver of, plaintiff GM's right to conduct further discovery.

## **DEFINITIONS**

These Requests use terms that shall have the following meanings:

1.      "Communication" means any transmission or exchange of information between two or more persons, orally or in writing, and includes, without limitation, any conversation or discussion, whether face-to-face or by means of any telephone, telecopies, electronic or other online media, including but not limited to text messages, messages sent through applications and other electronic means, and postings and messages on Internet social media such as Facebook, Twitter, or LinkedIn.

**EXHIBIT 1**

2.     "Complaint" refers to the First Amended Complaint filed by GM against Joseph Ashton on September 24, 2020 in the United States District Court for the District of New Jersey, Case No. 1:20-cv-12659.

3.     "Documents," as used herein, shall have its broadest possible meaning under the Federal Rules of Civil Procedure and the caselaw interpreting it.  The term "document" shall also include all "electronically stored information" as defined below.  The term "document" shall also include all copies of each document if the copies contain any additional matter or are not identical copies of the originals.

4.     "Electronically stored information" ("ESI") includes all electronic information permitted under the Federal Rules of Civil Procedure and the caselaw interpreting it.

5.     "FCA" means FCA US LLC and/or Stellantis N.V., including any and all of its current or former affiliates, subsidiaries, predecessor entities, directors, officers, employees, agents, and other persons acting on their behalf.

6.     "GM" means General Motors LLC and General Motors Company.

7.     "Joseph Ashton" means the Defendant Joseph Ashton.

8.     "NTC" means the UAW-Chrysler Skill Development and Training Program, including any and all of the current or former directors, officers, boards, employees, agents, advisors, or other persons acting on its behalf.

3

**EXHIBIT 1**

9.     "Person" means natural persons, corporations, partnerships, sole proprietorships, unions, associations, federations, or any other kind of entity.

10.     "UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, including any and all of its current or former affiliates, subsidiaries, directors, officers, boards, employees, agents, members, and other persons acting on its behalf.

11.     "You" or "Your" means Susanne Iacobelli and any other persons acting on her behalf, including but not limited to Alphons Iacobelli.

12.     "All" and "each" shall be broadly construed as all and each.

13.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

**EXHIBIT 1**

## DOCUMENTS REQUESTED

1.     Documents and Communications relating to any effort by You, FCA, or Joseph Ashton, or any person acting on their behalf, to impose higher costs or other financial harm on GM by directly or indirectly providing bribes or unlawful payments of money or things of value to the UAW, its current or former officers or employees, and/or current or former managers, directors, or employees of FCA.

2.     Documents and Communications relating to You, FCA, the NTC, or any person acting on their behalf providing any "money or other thing of value" (within the meaning of that phrase as set forth in Section 302 of the Labor Management Relations Act) to the UAW, its current or former officers, employees, or their relatives, or any charitable organization or other entity associated with the UAW or its current or former officers, employees, or their relatives, either directly or indirectly.

3.     Documents reflecting, referencing, or describing Sergio Marchionne's knowledge that any money or other thing of value (including but not limited to cash, debts paid, home improvements, gifts, automobiles, entertainment, travel, meals, retirement and other parties, personal items, and promises of future items of value) were provided by You, FCA, the NTC, or any person acting on their behalf to the UAW, its current or former officers, employees, or their relatives, either directly or

**EXHIBIT 1**

indirectly (including but not limited to Joseph Ashton, Ron Gettelfinger, Dennis Williams, Gary Jones, Norwood Jewell, and General Holiefield).

4.       Documents relating to any of the foreign bank accounts identified in the Complaint, including those held by or for Dennis Williams in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank); Joseph Ashton in Japan (Shinsei Bank) and the Cayman Islands (Cayman National Bank); Alphons Iacobelli in Switzerland (UBS and Credit Suisse), Italy (Deutsche Bank), Liechtenstein (VP Bank Vaduz), and Singapore (DBS Bank); Jerome Durden in Liechtenstein (LGT Bank Vaduz) and the Cayman Islands (Cayman National Bank); Colin Lightbody in Luxembourg (Fortuna Bank); Linda Knoll in Luxembourg (Lombard Odier Europe) and Switzerland (Banquet Pictet & Cie SA); and Peter Glenn Shagena in Switzerland (UBS Geneva and Itau Private Bank), including any payments or transfers of funds into or that ended up in such accounts, whether directly or indirectly.

5.       Documents and Communications relating to any foreign bank accounts with which You are or have ever been affiliated in any way, directly or indirectly, including but not limited to as title holder, beneficiary, proxy, or with the apparent or actual capacity to direct, control, deposit, withdraw, or transfer funds from the foreign bank account.

**EXHIBIT 1**

6.     Documents reflecting any deposits or transfers into a United States financial institution where the source of funds directly or indirectly came from a foreign bank.

7.     Documents sufficient to identify all accounts that You have maintained directly or indirectly at financial institutions inside or outside of the United States.

8.     Documents reflecting or relating to Communications with any bank, financial institution, or financial advisor located outside the United States.

9.     Documents reflecting Your control over any safe deposit box at any financial institution, including the contents of that safe deposit box.

10.     Documents relating to FCA, the NTC, or any person acting on their behalf directly or indirectly paying or directing the payment of funds or proceeds into foreign bank accounts for the benefit of current or former FCA managers, directors, employees, or their relatives (including You, Jerome Durden, Colin Lightbody, Linda Knoll, and Peter Glenn Shagena), or any charitable organization or other entity (including JAD Enterprises and Business Advisory Group) associated with any of current or former FCA managers, directors, employees, or their relatives (other than ordinary compensation and benefits paid for service as a manager, director, or employee), including but not limited to Documents relating to opening, closing, or depositing funds into such foreign bank accounts.

**EXHIBIT 1**

11.     Documents relating to FCA, the NTC, or any person acting on their behalf directly or indirectly paying or directing the payment of funds or proceeds into foreign bank accounts for the benefit of the UAW, its current or former officers, employees, or their relatives (including Joseph Ashton, Alphons Iacobelli, and Dennis Williams), or any charitable organization or other entity (including the Ashton Fund and Williams Charity Fund) associated with the UAW or any of its current or former officers, employees, or their relatives, including but not limited to Documents relating to opening, closing, or depositing funds into such foreign bank accounts.

12.     Documents and Communications in Your possession that relate to the investigation conducted by the U.S. Attorney's Office for the Eastern District of Michigan into the UAW, FCA, and Joseph Ashton.

13.     Documents and Communications You provided to the U.S. Attorney's Office for the Eastern District of Michigan in connection with that office's investigation into the UAW, FCA, and Joseph Ashton.

14.     Documents and Communications in Your possession that relate to any investigation conducted by any government authority or agency into the UAW, FCA, and Joseph Ashton.

15.     Communications in Your possession between Alphons Iacobelli and Peter DeLorenzo.

**EXHIBIT 1**

16.    Your communications with Joseph or Denise Ashton.

17.    Your Communications with Peter DeLorenzo.

18.    Documents and Communications that Alphons Iacobelli showed to Peter DeLorenzo and/or that Alphons Iacobelli brought to Alphons Iacobelli's meetings with Peter DeLorenzo in 2018.

19.    All book outlines in Your possession that Alphons Iacobelli created, as referenced in Paragraph 21 of the Peter DeLorenzo Declaration filed in *General Motors et al. v. Alphons Iacobelli et al.*, No. 20-011998-CB (Wayne County Circuit Court).

20.    Documents and Communications with any FCA representative including outside counsel to FCA during the time period after Alphons Iacobelli ceased employment at FCA.

21.    Documents and Communications directly, through counsel, or through any third party with Jerome Durden or his agents or representatives.

22.    Documents sufficient to show all electronic devices that Alphons Iacobelli used to communicate with any third parties since he ceased working at FCA.

23.    Documents sufficient to show the business purpose and activities of Business Advisory Group (and any affiliates).

**EXHIBIT 1**

24.     Documents sufficient to identify other affiliates of Business Advisory Group over which You or Business Advisory Group had an overlapping ownership or interest.

25.     A copy of Your United States Passport.

26.     All USB drives that Alphons Iacobelli used during his employment with GM.

**EXHIBIT 1**



Form Revision Date 07/2016

## CERTIFICATE OF AMENDMENT TO THE ARTICLES OF INCORPORATION

For use by DOMESTIC NONPROFIT CORPORATION

*Pursuant to the provisions of Act 162, Public Acts of 1982, the undersigned corporation executes the following Certificate:*

The identification number assigned by the Bureau is:

800818598

The name of the corporation is:

UAW-GM CENTER FOR HUMAN RESOURCES

The Articles of Incorporation is hereby amended to read as follows:

Use the space below for additional Articles or for continuation of previous Articles. Please identify any Article being continued or added.

ARTICLE VII

IN CONNECTION WITH DISSOLUTION OF THE CORPORATION, THE BOARD OF TRUSTEES SHALL, AFTER PAYING OR MAKING PROVISION FOR PAYMENT OF ALL THE LIABILITIES OF THE CORPORATION, DISPOSE OF ALL THE ASSETS OF THE CORPORATION EXCLUSIVELY FOR THE PURPOSES OF THE CORPORATION IN SUCH A MANNER, OR TO SUCH ORGANIZATION OR ORGANIZATIONS AS SHALL AT THE TIME BE ORGANIZED AND OPERATED SO AS TO QUALIFY AS AN EXEMPT ORGANIZATION OR ORGANIZATIONS UNDER SECTION 501(C)(5) OR SECTION 501(C)(9), OF THE INTERNAL REVENUE CODE OF 1986 (OR THE CORRESPONDING PROVISION OF ANY FUTURE UNITED STATES REVENUE LAW), PURSUANT TO THE MEMORANDUM OF UNDERSTANDING – JOINT ACTIVITIES.

2. The foregoing amendment to the Articles of Incorporation was duly adopted on: 06/22/2021      by the

written consent of all directors pursuant to Section 525 of the Act.

This document must be signed by an authorized officer or agent:

Signed this 26th Day of October, 2021 by:

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Patricia Allerton | Authorized Agent | |
| | | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

ʃ Decline      ʃ Accept

**EXHIBIT 2**

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the**   CERTIFICATE OF AMENDMENT TO THE ARTICLES OF
INCORPORATION

*for*

UAW-GM CENTER FOR HUMAN RESOURCES

**ID Number:**      800818598

**received by electronic transmission on**   October 26, 2021     **, is hereby endorsed.**

**Filed on**    October 26, 2021    **, by the Administrator.**

**The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.**



In testimony whereof, I have hereunto set my
hand and affixed the Seal of the Department,
in the City of Lansing, this 26th day
of October, 2021.

*Linda Clegg*

Linda Clegg, Director

Corporations, Securities & Commercial Licensing Bureau

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

**James E. Marina (N.J. Bar No. 050791996)**
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

| | |
|---|---|
| GENERAL MOTORS LLC, GENERAL MOTORS COMPANY, | CASE NO. 20-12659 |
| Plaintiffs, | |
| against | FIRST AMENDED COMPLAINT |
| JOSEPH ASHTON, | DEMAND FOR JURY TRIAL |
| Defendant. | |

**EXHIBIT 3**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

FIRST AMENDED COMPLAINT ...........................................................................3

INTRODUCTION ....................................................................................................3

THE PARTIES..........................................................................................................6

JURISDICTION AND VENUE .............................................................................16

DETAILED ALLEGATIONS .................................................................................17

I.      ASHTON IS APPOINTED TO GM'S BOARD OF DIRECTORS. ............17

II.     GM LEARNS OF ASHTON'S WRONGDOING AT THE CHR...............19

III.    GM LEARNS OF ASHTON'S INVOLVEMENT IN FCA AND FCA
NV'S BRIBERY SCHEME. .........................................................................25

        A.     Marchionne Prepares on Behalf of FCA and FCA NV to Force
a Takeover of GM by Merger ..............................................................28

        B.     Defendant Ashton and President Williams Are Key Players in
the Takeover Conspiracy......................................................................31

        C.     FCA Initiates Operation Cylinder .......................................................33

        D.     2015 CBA Negotiations .......................................................................35

IV.    ASHTON AND THE OTHER CO-CONSPIRATORS TOOK STEPS
TO FRAUDULENTLY CONCEAL THEIR WRONGDOING AND
RESULTING DAMAGE. ..............................................................................42

CAUSES OF ACTION ...........................................................................................52

REQUESTS FOR RELIEF .....................................................................................60

**EXHIBIT 3**

## FIRST AMENDED COMPLAINT

General Motors LLC and General Motors Company (individually or collectively, "GM") for their First Amended Complaint, allege as follows:[1]

## INTRODUCTION

1.      From August 2014 to December 2017, Joseph Ashton, a former high-ranking officer of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), served as a director on the Board of General Motors Company. In that role, Ashton owed unqualified fiduciary duties including the highest duties of loyalty, care, confidentiality, and disclosure to GM. Ashton collected from GM hundreds of thousands of dollars in compensation for his service as a director.

2.      GM recently discovered that before and during his tenure as a director, Ashton sat at the center of two sprawling and long-running criminal schemes. Each scheme was intended to and did cause massive harm to GM. Despite his fiduciary duties, Ashton failed to disclose and in fact affirmatively concealed these schemes from detection while serving as a director on GM's Board. GM discovered these schemes only recently, following dozens of indictments and guilty pleas involving Ashton and his co-conspirators.

---

[1]     Pursuant to Local Civil Rule 10.1, GM's principal place of business is located at 300 Renaissance Center, Detroit, Michigan. Defendant Joseph Ashton resides and is domiciled in Ocean View, New Jersey.

**EXHIBIT 3**

3.     On December 4, 2019, Ashton pled guilty to conspiring to commit wire fraud and money laundering. As Ashton admitted, between 2012 and 2016, he and two other high-level UAW officials, Michael Grimes and Jeffery Pietrzyk, orchestrated a criminal kickback scheme to siphon money from the UAW-GM Center for Human Resources ("CHR"), where they served on the Board and were responsible for or had influence over the approval of contracts. The CHR was established primarily to educate and train UAW-represented GM employees. All funding for the CHR came from GM. Ashton and his co-conspirators abused their CHR positions by, among other ways, inflating contracts and demanding hundreds of thousands of dollars in kickbacks from vendors. The CHR money used to pay vendors was funded by GM pursuant to the UAW-GM National Agreement and should have been used to educate and train GM's employees. Instead, the inflated payments were improperly used to line the pockets of Ashton and his co-conspirators.

4.     Ashton also played a central role in another scheme to harm GM while serving as a GM director. The United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA US LLC ("FCA") and Fiat Chrysler Automobiles N.V. ("FCA NV") on the one hand and certain former union leaders on the other. As has been repeatedly admitted, starting no later than July 2009, FCA and FCA NV paid

4

**EXHIBIT 3**

millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and, in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." FCA and FCA NV authorized these bribes specifically to harm GM and to advance their long-term goal to force higher costs on GM and assist FCA NV in forcing a merger with GM. Very recently, GM learned that FCA and FCA NV established and used offshore bank accounts to further their scheme. As described below, Ashton was the recipient of one or more of these funded accounts.

5.      Ashton was uniquely situated to further this scheme. From 2010 to 2014, Ashton was one of the five highest-ranking UAW officers serving as Vice President of the UAW's GM Department. Based on reasonable belief and inference, in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton used his influence to deny GM specific structural labor concessions it should have otherwise received but for FCA and FCA NV's bribes. After he joined GM's Board in 2014, Ashton was privy to detailed highly confidential information concerning GM's view of and strategic response to FCA and FCA NV's ongoing merger inquiries, as well as GM's approach and expectations for collective bargaining negotiations. Again in return for secret compensation from FCA and FCA NV through foreign accounts and while owing GM the highest duties of loyalty,

**EXHIBIT 3**

care, confidentiality, and disclosure, Ashton passed confidential GM information to the UAW and FCA and FCA NV. Ashton never disclosed this criminal scheme or his role in the scheme to anyone at GM. In part due to Ashton's disloyalty and breaches of confidence, GM was forced to incur billions of dollars in increased labor costs.

6.     In sum, as described in detail below, while serving as a GM director Ashton embezzled CHR funds, provided by GM, and participated in a criminal scheme to harm GM through higher labor costs and assist FCA NV in forcing a merger. Ashton's criminal conduct violated every conceivable duty owed to GM. Through this action, GM seeks to recoup monies paid by GM to Ashton for service as a director on GM's Board. In addition, GM seeks to determine the full extent to which Ashton breached his fiduciary duties to GM and the full extent of the resulting damages caused to GM, and to recover for the same.

## THE PARTIES

### Plaintiffs

7.     **General Motors LLC**: Plaintiff General Motors LLC is a citizen of the States of Delaware and Michigan. General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC. The sole member of General Motors Holdings LLC is

**EXHIBIT 3**

Plaintiff General Motors Company, which is a Delaware corporation with its principal place of business in Detroit, Michigan. General Motors LLC is thus a citizen of Delaware and Michigan. General Motors LLC is a subsidiary of General Motors Holdings LLC, which is a wholly owned subsidiary of Plaintiff General Motors Company. General Motors LLC is the largest automaker in the U.S. and an iconic American company that manufactures and sells automobiles in the U.S. under brands including Chevrolet, Cadillac, Buick, and GMC.

8.     **General Motors Company**: Plaintiff General Motors Company is a citizen of the States of Delaware and Michigan. General Motors Company is a Delaware corporation with its principal place of business in Detroit, Michigan, and is the ultimate parent of General Motors LLC.

**Defendant**

9.     **Joseph Ashton**:  Ashton is a citizen of New Jersey. Ashton is domiciled in the city of Ocean View, New Jersey, where he maintains a primary residence. Ashton served on the UAW's Executive Board from 2006 to 2014, including as Vice President of the UAW's GM Department from 2010 to 2014, and previously as the Regional Director for Region 9 from 2006 to 2009. From 2014 to December 2017, following his retirement from the UAW, Ashton served as the UAW Trust's[2]

---

[2]  The UAW Trust was established as a result of the 2007 CBAs between the UAW, FCA, GM, and Ford, which assigned retiree health care liabilities to an independent Voluntary Employee Beneficiary Association. Pursuant to

**EXHIBIT 3**

designee on General Motors Company's Board of Directors. In December 2017, Ashton abruptly resigned that position. On December 4, 2019, Ashton pled guilty to conspiracy to commit honest services wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h).

**Significant Non-Parties and Other Entities**

10. **FCA US LLC (formerly known as Chrysler Group LLC):** FCA is an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA is a wholly owned subsidiary of FCA NV, a publicly traded foreign entity listed on the New York Stock Exchange. FCA manufactures and sells automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram.

11. **Fiat Chrysler Automobiles N.V. (formerly known as Fiat):** FCA NV, the successor of the Italian automotive company formerly known as Fiat S.p.A. ("Fiat"), is the ultimate parent company and owner of FCA US LLC. FCA NV is organized under the laws of the Netherlands, as a Naamloze Venootschap, and its principal executive offices are in London, England.

---

restructuring following the 2008 financial crisis, the UAW Trust obtained the right to appoint a director to GM's Board.

**EXHIBIT 3**

12. **Alphons Iacobelli:** Iacobelli was employed as the Vice President of Employee Relations at FCA and as the Co-Chairman of the UAW-Chrysler joint training center (National Training Center or "NTC") and its Joint Activities Board from 2008 to 2015. In this role, Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW. Through his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and FCA to direct the financial affairs of and approve payments made by the NTC. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution.

13. **Jerome Durden:** Durden was employed as a financial analyst at Chrysler and FCA in its corporate accounting department beginning in 1985. In 2008, he was assigned by Chrysler to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and FCA, had the authority to approve and did approve payments made by the NTC. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution.

**EXHIBIT 3**

14. **Michael Brown:** Brown was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national collective bargaining agreements ("CBAs") between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Complaint, Brown was an agent of Chrysler and/or FCA.

15. **Dennis D. Williams:** Williams served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010–2014). Prior to 2010, Williams served on the UAW International Executive Board as the Director of Region 4 (2001 to 2010) during which time he had direct dealings with Sergio Marchionne in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction equipment, which is commonly controlled by Exor NV. On August 27, 2020, the United States Attorney for the Eastern District of Michigan charged Williams with conspiracy to embezzle union funds in violation of 18 U.S.C. § 371 and 29 U.S.C. § 501(c). He is scheduled to admit responsibility and plead guilty on September 30, 2020.

**EXHIBIT 3**

16.     **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)**: The UAW is the union that exclusively represents the labor forces for both GM and FCA. From 2009 to 2019, the UAW represented approximately 50,000 GM employees and between 23,000 and 47,000 FCA employees. As such, the UAW has a significant degree of market power to force labor terms on either competitor including not only through the ability to call strikes but also through the ability to control the day-to-day activities of its work force.

17.     The UAW has an unusual and limited governance structure where only five officers of the UAW—the President, the Secretary-Treasurer, and three Vice Presidents of the International Executive Board—control its central decision-making regarding the negotiation and administration of CBAs. These UAW officers possess particularly strong powers as well, including the power to negotiate CBAs, call special conventions, authorize strikes, and issue and revoke charters, among other powerful tools. While these UAW officers operate in the context of an International Executive Board that includes eleven "Regional Directors," these officers effectively control the overall decision-making, policy, director and officer elections, and negotiation and administration of the CBAs. There are minimal checks and balances on the President and the other four officers as they have no oversight board, committee, or trustee that exists to oversee and ensure the integrity of the

11

**EXHIBIT 3**

International Executive Board and take action to address malfeasance. In addition, these officers, who had nearly complete control over UAW affairs, are elected only every four years and implemented practices to exercise substantial control over elections to perpetuate their role on the International Executive Board. If any of these officers or directors act corruptly, they have the power and influence to inflict direct harm on any given competitor.

18. **Sergio Marchionne:** Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–2018, the Chairman (2011–2014) and CEO (2009–2014) of Chrysler, and the COO of FCA North America (2011–2018). Marchionne also served as the CEO of CNH Industrial (2004-2018), commonly controlled by Exor NV, which directly and indirectly is the largest shareholder of FCA NV.

19. **NTC:** NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were inherited by FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA. The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's FCA

**EXHIBIT 3**

Department served as Co-Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

20.     **CHR:** Non-party CHR is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The CHR was formed under the terms of prior CBAs between UAW and General Motors Corporation ("Old GM"). The CHR's primary purpose is to educate and train GM's represented workforce. The CHR is governed by an eight-director board, four appointed by GM and four by the UAW. As part of the 2019 CBA negotiations, GM and the UAW agreed to dissolve the CHR.

21.     **General Holiefield:** Holiefield (deceased in 2015) served as the UAW Vice President for the FCA Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA. From 2007 to 2014, Holiefield also served on the UAW International Executive Board. Millions of dollars from Chrysler/FCA were diverted through NTC and charities to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

**EXHIBIT 3**

22.    **Norwood H. Jewell:** Jewell served on the UAW's International Executive Board from 2011 to 2017, most recently as UAW's Vice President of the FCA Department (2014–2017) and previously as Regional Director (2010–2014). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371 and was sentenced to fifteen months in prison.

23.    **Virdell King:** King was a senior official in the UAW FCA Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW's committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to two months in prison and a $5,500 fine.

24.    **Nancy Johnson:** Johnson was the top administrative assistant to Jewell, then the UAW's Vice President for the FCA Department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On July 23, 2018, Johnson pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

25.    **Keith Mickens:** Mickens was a senior official in the UAW FCA Department from 2010 through 2015. In 2011, Mickens served on the UAW

**EXHIBIT 3**

committee responsible for negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC's Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

26. **Michael R. Grimes:** Grimes was a senior official at the UAW, serving as the top administrative assistant[3] to Ashton from 2006 to 2014, and then continuing to work in the UAW's GM Department after Ashton retired and joined the GM Board. On September 4, 2019, Grimes pled guilty to conspiracy to commit honest services wire fraud and conspiracy to commit money laundering and was thereafter sentenced to twenty-eight months in prison and forfeited money and real property totaling over $1.5 million.

27. **Jeffery Pietrzyk:** Pietrzyk was a senior official at the UAW, serving as an administrative assistant to Ashton from 2010 and 2014. Pietrzyk served on the CHR's Board from 2010 to 2014. On September 20, 2019, the government charged

---

[3] Administrative assistants play the role of "right hand persons" to Vice Presidents of the UAW for each of the FCA, Ford, and GM Departments. In that capacity, they act as senior leaders of the UAW. They also typically have long tenures in the UAW, playing a staff leader role across various Vice Presidents. "Top" administrative assistants generally have a "chief of staff" role, while other administrative assistants work with the top administrative assistant to perform more specialized functions.

**EXHIBIT 3**

Pietrzyk with conspiracy to commit honest services wire fraud and conspiracy to commit money laundering while he was a senior UAW official. Pietrzyk pled guilty on October 22, 2019.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. Complete diversity exists; Ashton is a citizen of New Jersey, and Plaintiffs are citizens of Delaware and Michigan. The amount in controversy is greater than $75,000, as GM seeks to recoup Ashton's compensation for his service on GM's Board, while Ashton was simultaneously violating his fiduciary duties, which compensation totaled hundreds of thousands of dollars. Finally, GM seeks damages for the harm that Ashton imposed on GM, including through increased labor costs, as a result of Ashton's breaches of his fiduciary duties.

29.    Venue is proper in this Court as a substantial part of the events or omissions giving rise to the claim occurred in this district. Ashton committed multiple breaches of fiduciary duty, including receiving kickbacks and bribes and committing other acts described herein, while located in New Jersey. In addition, Ashton resides and is domiciled in this district.

30.    This Court has personal jurisdiction over Ashton because he is a resident of New Jersey, is domiciled in New Jersey, and has transacted affairs in this

**EXHIBIT 3**

district. In addition, on September 17, 2020, Ashton was served with a summons and GM's Complaint in Ocean View, New Jersey.

## DETAILED ALLEGATIONS

## I.     ASHTON IS APPOINTED TO GM'S BOARD OF DIRECTORS.

31.     Defendant Ashton was a longtime UAW member, eventually rising to the powerful position of Vice President of the UAW's GM Department. Ashton also served on the International Executive Board of the UAW. In his role as Vice President, Ashton had primary oversight of negotiating and implementing CBAs between the UAW and GM and influencing the terms of the UAW's CBAs with FCA.

32.     Ashton's role as Vice President of the UAW's GM Department provided Ashton with substantial influence over the operations of the CHR, as he served on the CHR's Executive Board. The CHR is a tax-exempt corporation, created by the UAW and GM to develop, deliver, coordinate, and administer joint strategies and programs designed to educate and train UAW-represented GM employees. All funding for the CHR came from GM, as required by GM's CBA with the UAW.

33.     In 2014, after serving on the UAW's International Executive Board for many years, Ashton was tapped to join General Motors Company's Board of Directors by the UAW Trust, which had the right to appoint one representative to

**EXHIBIT 3**

GM's Board. Ashton served on General Motors Company's Board from 2014 to 2017, during which he owed fiduciary duties to GM. GM carefully reviewed Ashton's credentials and fitness for Board service and took appropriate steps to prevent any conflicts of loyalty. Among other steps, GM determined that Ashton would be ineligible to join the Board until he retired from the UAW and Ashton received in-depth training upon joining the Board.

34.     For example, when he joined the Board, Ashton received an orientation on his rights and obligations as a director and signed an agreement to comply with his fiduciary duties to GM. Ashton repeatedly made numerous misrepresentations to GM. For example, in written director questionnaires Ashton completed each year from 2014 to 2017, Ashton repeatedly disclaimed in writing that he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or been offered anything of value by a "third party" "in consideration" for his service as a GM director. Ashton falsely warranted that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." Ashton falsely claimed there was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board. Ashton further falsely affirmed that he "adhere[d]" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal

**EXHIBIT 3**

activity. Despite possessing and knowing of his fiduciary duties, including the duty of full disclosure, Ashton never disclosed to anyone at GM any of the past and ongoing schemes that could and did harm GM as described herein.

35. In July 2017, the federal government unsealed a superseding indictment against Alphons Iacobelli, a then-GM employee who had previously been FCA's highest-ranking labor relations executive and led FCA's labor negotiations for many years. The indictment detailed a years-long pattern of illicit payments to and bribery of union officials by Iacobelli on behalf of FCA and FCA NV. Iacobelli's indictment did not discuss or suggest any wrongdoing occurred while Iacobelli was employed at GM, or any wrongdoing at the CHR. Iacobelli was terminated from GM once the indictment was made public.

36. In 2017, after the Iacobelli indictment, GM sought to interview Ashton related to the government's investigation into the CHR. Despite GM policy requiring that Ashton submit to such an interview, Ashton refused and hired criminal counsel. GM advised Ashton that if he did not submit to an interview he would be acting inconsistent with his obligations as a director. Shortly thereafter, in December 2017, Ashton resigned.

## II. GM LEARNS OF ASHTON'S WRONGDOING AT THE CHR.

37. Only in the last year did GM learn of Ashton's criminal scheme involving the CHR, as the federal government unsealed several indictments against

**EXHIBIT 3**

Ashton and his co-conspirators. Before this information was revealed in criminal indictments and plea agreements, GM had no knowledge of the kickback scheme or Ashton's involvement. Ashton never disclosed this information to anyone at GM, even while serving as a director owing GM fiduciary duties.

38.    On August 14, 2019, the government charged Grimes with conspiracy to commit wire fraud and money laundering. Grimes' indictment described a scheme involving Grimes and two unnamed co-conspirators, "Union Official 1" and "Union Official 2," to steal from the CHR (and ultimately from GM, which funded the CHR) through inflated vendor contracts and kickbacks. According to the indictment, the object of the scheme was for Grimes, Union Official 1, and Union Official 2 "to use their positions with the UAW and CHR to personally enrich themselves by deceptively soliciting, influencing, and obtaining contracts for [CHR vendors] . . . to provide clothing and other products to the CHR and to UAW members. In return, Michael Grimes, Union Official 1, and Union Official 2 demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value."[4]

39.    For instance, the indictment alleged that Grimes and these two unnamed UAW officials illegally profited from several transactions, including: (1) a 2011

---

[4]    *See* Grimes Information at 5.

**EXHIBIT 3**

contract for 50,000 "Team UAW-GM" jackets distributed to all plant employees, purchased for $6 million; (2) a 2013 contract for over 50,000 watches purchased for approximately $4 million; and (3) a 2016 contract for approximately 55,000 backpacks purchased for approximately $5.8 million.

40.     On September 4, 2019, Grimes pled guilty and was thereafter sentenced to twenty-eight months in prison and forced to forfeit more than $1.5 million.

41.     On September 20, 2019, the government charged Pietrzyk—"Union Official 2" in Grimes' indictment—with conspiracy to commit wire fraud and money laundering. Like Grimes' indictment, Pietrzyk's indictment described a scheme among Grimes, Pietrzyk, and an unnamed co-conspirator, "Union Official 1," to siphon GM funds from the CHR through fraudulent contracts and kickbacks. Again, the object of the scheme was to deceptively obtain contracts for CHR and receive hundreds of thousands of dollars in kickbacks.

42.     On October 22, 2019, Pietrzyk pled guilty. He is awaiting sentencing.

43.     On November 6, 2019, the government identified "Union Official 1" as Ashton, charging him with conspiracy to commit wire fraud and money laundering in connection with the same CHR scheme. Ashton pled guilty on December 4, 2019, admitting that he demanded and accepted hundreds of thousands of dollars in kickbacks and improperly used his position to enrich himself and his co-conspirators.

**EXHIBIT 3**

44.     As described in the indictments and admitted in the plea agreements, Ashton orchestrated a years-long scheme to steal GM funds through inflated vendor contracts and kickbacks. For example, in 2011, Ashton proposed the purchase of 50,000 "Team UAW-GM" jackets for all plant employees. Grimes recommended a specific vendor as the sole source for the contract. That vendor was awarded the contract and Pietrzyk told Grimes that Ashton wanted a cut of the proceeds. Pietrzyk directed Grimes to demand approximately $300,000 in kickbacks for Ashton from the vendor. The vendor agreed to pay it, and Ashton received the $300,000. Ashton paid Pietrzyk approximately $30,000 of that amount.

45.     Grimes similarly benefited, having also demanded $525,000 in kickbacks from the vendor so that he could purchase a house in Fenton, Michigan. When the vendor initially refused, Grimes threatened to cancel the contract. The vendor ultimately relented and paid Grimes $530,000 through a check made payable to one of his relatives.[5]

46.     As another example of CHR-related frauds, in 2010, Ashton convinced an associate, Cohen, to loan $250,000 to a construction company. When the construction company stopped paying the loan, Ashton proposed to Cohen that he could recoup the loan money by forming a company to sell watches to the CHR.

---

[5]     *See* Grimes Information at 8–9.

**EXHIBIT 3**

Cohen agreed and formed USA Countrywide for this purpose in August or September 2012.

47.    In late 2012 or early 2013, Cohen located a subcontractor to manufacture 58,000 custom watches. Ashton actively participated in the design, production, and pricing of the watches. Ashton also negotiated and approved for USA Countrywide/Cohen to purchase the watches from the manufacturer for approximately $2.3 million. Ashton then directed USA Countrywide/Cohen to submit a bid for the watches to Pietrzyk listing a higher price of almost $4 million. Both Pietrzyk and Ashton then successfully used their positions of power in the CHR and UAW to make sure that USA Countrywide was awarded the contract.

48.    In May 2013, Ashton demanded $250,000 from USA Countrywide/Cohen as a kickback for the contract. Cohen agreed, and began to deliver the kickback in installments. Ashton also directed USA Countrywide/Cohen to pay kickbacks to Pietrzyk, fraudulently described as "antique furniture" or "furniture" in the memo line of the checks to conceal the criminal kickbacks.[6]

---

[6]    *See* Ashton Information at 9.

**EXHIBIT 3**

49.     The CHR received the 58,000 watches from USA Countrywide/Cohen in January 2014, but Ashton advocated that it was not an appropriate time to hand them out. Thus, the watches were held at the CHR.[7]

50.     Ashton's illegal conduct continued even after he joined GM's Board of Directors. In particular, Cohen personally delivered cash to Ashton at Ashton's home, delivering between $5,000–$30,000 several times from May 2013 through early 2015, *i.e.*, after Ashton joined the Board. In 2016, while Ashton was serving on the Board, he continued to receive these payments in the form of checks from Cohen. Ashton received at least $30,000 in such payments in 2016.[8]

51.     Even though Ashton was receiving these kickbacks while serving on the Board of GM, and knowing that such payments directly harmed GM by causing GM to unwittingly fund over-priced expenses at the CHR, Ashton never disclosed this kickback scheme, or the rampant kickbacks occurring at the CHR generally, to anyone at GM.

52.     Following the news of a federal investigation into the UAW and FCA and FCA NV in the fall of 2016, Ashton met with USA Countrywide/Cohen to stop the payments due to the investigation.[9]

---

[7]  *See* Ashton Information at 9.

[8]  *See* Ashton Information at 7-9.

[9]  *See* Grimes Information at 13.

**EXHIBIT 3**

53.     In sum, Ashton, Grimes, and Pietrzyk conspired to inflate contracts between CHR and vendors and then accept kickbacks from those vendors totaling over $2 million. This defrauded GM, which funds the CHR under the terms of its CBA with the UAW. Ashton, Grimes, and Pietrzyk hid from GM the manner in which the contracts were actually awarded and implemented involving bribes and kickbacks, including while Ashton was serving as a director on GM's Board.

## III.   GM LEARNS OF ASHTON'S INVOLVEMENT IN FCA AND FCA NV'S BRIBERY SCHEME.

54.     In addition to Ashton's involvement in the fraud at the CHR, GM recently discovered Ashton's role in advancing FCA and FCA NV's bribery scheme to harm GM and force it to merge with FCA NV.

55.     On January 22, 2018, Iacobelli pled guilty in connection with the bribery scheme. Iacobelli's guilty plea revealed for the first time that FCA's illegal payments to certain UAW officials were made "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiations, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[10] At this time, Ashton was not openly identified as being a participant in the scheme.

---

[10]  7/13/18 Iacobelli Plea Agreement at 7. (Iacobelli pled guilty on January 22, 2018, and his plea agreement was filed the next day. Due to a scrivener's error, a corrected version was filed on July 13, 2018.)

**EXHIBIT 3**

56.     After thorough investigation, including witness interviews, review of publicly available information regarding criminal developments, close monitoring of the criminal proceedings against Defendants and their co-conspirators, review and analysis of internal GM documents and communications, the engagement of consulting experts, and an in-depth analysis of collective bargaining negotiations and related agreements among GM, FCA, and the UAW, GM brought suit in November 2019 against FCA, FCA NV, and certain individual defendants in the United States District Court for the Eastern District of Michigan. Ashton was not a defendant in that suit.

57.     GM was denied formal discovery in that action. Only very recently, after several months of additional investigation, did GM come to learn of certain foreign financial accounts in the Cayman Islands (Cayman National Bank) and Japan (Shinsei Bank) held in the name of Ashton and/or Ashton's charity. These accounts held or currently hold substantial funds that, upon information, belief, and clear and reasonable inference, were ultimately provided to Ashton by FCA NV. Before this information came to light, GM had no way to know of Ashton's involvement in FCA and FCA NV's bribery scheme. This information could not have been discovered earlier despite due diligence, including because the co-conspirators actively concealed the misconduct and by its very nature the information is self-concealing.

**EXHIBIT 3**

58.     Ashton was not alone in receiving such funds. FCA and FCA NV bought the control of other UAW leaders to ensure that their bribery scheme achieved its goal of targeting and harming GM. For example, upon information, belief, and clear and reasonable inference, as part of the conspiracy with Ashton, FCA NV directed illicit bribes to at least Ashton (UAW Vice President 2010-2014), General Holiefield (UAW Vice President 2006-2014), and past UAW Presidents including Dennis Williams (UAW Officer 2010-2018), by granting those individuals control or a beneficial interest over undisclosed foreign financial accounts with substantial funds. For Williams, such accounts exist in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank) in his name and in the name of a business entity he controls. Upon information, belief, and clear and reasonable inference, FCA and FCA NV enabled, funded, and provided control to these individuals' above-identified accounts.

59.     FCA and FCA NV's funding of these offshore accounts is further supported by their proven and admitted pattern of bribing UAW officials, FCA NV's (through predecessor Fiat S.p.A.) admitted use of offshore accounts to bribe Italian politicians in the past, and the commercial power and influence these entities possess to cause such banks and other facilitators to open and maintain these foreign accounts for third parties as identified herein. Further, the only reasonable explanation that this closely connected group of individuals would have such foreign

**EXHIBIT 3**

accounts in countries and financial institutions known for money laundering is that they were facilitated and funded by FCA and FCA NV. The notion that a closely tied group of FCA and UAW executives would possess undisclosed foreign bank accounts unrelated to their admitted participation in a multi-year bribery scheme is simply not plausible.

60.     In addition, upon information, belief and clear inference, other FCA and UAW officials connected to the Ashton-FCA conspiracy as described herein received FCA/FCA NV bribes through foreign accounts.

61.     It was only through discovering the existence of these foreign accounts, including those held by Ashton, that GM learned the true extent of FCA and FCA NV's scheme, described below, and Ashton's involvement in it.

### A.     Marchionne Prepares on Behalf of FCA and FCA NV to Force a Takeover of GM by Merger

62.     Sergio Marchionne held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008:  "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[11]

---

[11]  Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, REUTERS (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idUSTRE4B738Z20081208.

**EXHIBIT 3**

63.     The central purpose of the bribery scheme Marchionne, FCA, and FCA NV enacted was to harm GM in an effort to induce it to merge with FCA to achieve synergies and a higher return on capital. With the scheme well underway and having its desired effect, in October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA NV proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a combination. But Marchionne remained resolute in his quest to force an FCA NV-GM combination.

64.     By 2013, Chrysler had only two shareholders:  (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

65.     In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent. Fiat and the UAW Trust apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge

**EXHIBIT 3**

the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[12]

66.   On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

67.   Although not a party to the foregoing transaction, the UAW itself entered into an "enforceable" Memorandum of Understanding with FCA promising to "actively assist in the achievement of FCA US's long-term business plan." In short, this agreement was an attempt by FCA and its co-conspirators to paper over— and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

> FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's

---

[12]   Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17, 2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale.

**EXHIBIT 3**

manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[13]

68.     Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne at the helm of the combined entity.

69.     After taking full control of Chrysler, Marchionne set his sights on forcing a merger with another one of the "Big Three" North American automakers. Given the ownership structure of Ford, with the substantial share of voting power held by the Ford family, Ford would never be a logical target for Marchionne's merger ambitions. GM was the only viable target, and thus Marchionne had long focused his efforts on GM.

### B.     Defendant Ashton and President Williams Are Key Players in the Takeover Conspiracy

70.     In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne turned to weaponizing FCA's bribery of the UAW towards GM, in an effort to pressure GM to agree to merge with FCA.

71.     By this time, upon information and belief, FCA and FCA NV had been bribing Ashton and UAW Secretary-Treasurer and President Dennis Williams

---

[13] FCA, 2014 ANNUAL REPORT, at 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_reports/files/FCA_2014_Annual_Report.pdf.

**EXHIBIT 3**

(among others) and turned to them for assistance. As the Vice President for the GM Department of the UAW, Ashton could directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA in the form of structural concessions granted to FCA. For example, under Ashton's direction, FCA was provided and GM was denied certain structural programs, including genuine support from UAW leaders for GM's worker efficiency program, Global Manufacturing System ("GMS"), manipulation of contractual limits on Tier Two and temporary employees, support for FCA's "long-term business plan," and other "side letter" agreements between FCA and the UAW.

72.     By 2014, FCA and FCA NV found an even more valuable use for Ashton. Through Williams, Ashton was chosen to be the UAW Trust's designee on GM's Board.

73.     Marchionne and FCA also received support from new UAW President and longtime friend, Dennis Williams. Williams cooperated with the goals and plans of FCA and FCA NV and took concrete actions to support those goals as his cooperation had been purchased many times over. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at Fiat-affiliated CNH Industrial. Williams has affirmed that he tries "not to second-guess

32

**EXHIBIT 3**

Sergio," and that the pair have a "very good relationship," which was secured through bribery of Williams.

### C. FCA Initiates Operation Cylinder

74. By 2014, GM had rejected multiple overtures from FCA NV regarding a merger. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, Marchionne, FCA, and FCA NV believed it was in a much stronger position to force a GM merger.

75. With Marchionne as the lead, FCA schemed that it could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world.[14] In part for this very reason, Marchionne, on behalf of FCA and FCA NV, had authorized the bribery of UAW leaders, including Ashton. The support of those UAW leaders was essential to the success of Operation Cylinder because, among other reasons, the UAW could effectively block a merger under certain terms in the CBA. Marchionne and Williams were well aware that the UAW wielded this veto power over any potential merger.

---

[14] Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

**EXHIBIT 3**

76. FCA NV initiated its takeover plans in March 2015, when Marchionne wrote to GM's Board and management, formally proposing the merger between GM and FCA NV.

77. GM vetted the proposal with management, its advisors, and its Board, and ultimately rejected the offer on April 14, 2015. Crucially, at this point, Ashton was no longer a UAW officer—instead, he was much better positioned as a GM director to receive and pass on to the UAW (and ultimately FCA and FCA NV) relevant information. As a GM director at the time, Ashton was included in the Board's confidential discussions surrounding the merger and was privy to GM's detailed analysis of and response to FCA NV's most recent merger invitation. Ashton passed this information to the UAW and FCA, in violation of his fiduciary duties to GM and the confidentiality provisions he signed annually.

78. On June 18, 2015, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM's lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, Ashton's successor, who relayed and championed Marchionne's merger proposition. Working at Marchionne's behest as a result of the bribery scheme, Williams used his position to press for GM to consider the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

**EXHIBIT 3**

79.    The next day, the GM Board, including Ashton, was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a merger and apparently had tapped Williams as FCA NV's messenger. They were also told that the day before, Williams relayed that Marchionne had told him the GM Board had not seriously considered the FCA NV merger proposal—an untrue statement.

**D.    2015 CBA Negotiations**

80.    A key to Marchionne's Operation Cylinder scheme was the longstanding practice in the automotive industry known as pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts. The UAW describes pattern bargaining as "a core part of [its] bargaining strategy"[15] and a "powerful strategic tool."[16]  Pattern bargaining is a potent force multiplier: through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams weaponized pattern bargaining, not to protect the interests of the UAW's members, but to advance FCA interests by promoting Marchionne's merger to the detriment of GM. FCA and FCA NV sought

---

[15]  UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[16]  Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

**EXHIBIT 3**

to leverage pattern bargaining to impose asymmetrical costs on GM, with the goal of harming GM by imposing massive labor costs on GM and making it more likely to favorably consider a merger with FCA given the synergies touted by Marchionne.

81.     Approximately every four years, each Detroit-based automaker negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same time, resulting in simultaneous negotiation. The UAW begins negotiations with each automaker through subcommittees in July.

82.     Months later, and shortly before contract expiration, the UAW selects one of the automakers as a "lead" or "target" company, with which the UAW negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike.

83.     Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[17]

---

[17]    *UAW President Dennis Williams Roundtable* (June 18, 2015).

**EXHIBIT 3**

84.     In the 2011 negotiations, GM was the "lead" or "target" company and negotiated the first tentative agreement with the UAW. But FCA and FCA NV had already been bribing the UAW thus corrupting the collective bargaining process.

85.     In 2015 bargaining, based on past practices and having conducted a detailed analysis of the negotiation dynamics, GM reasonably believed that it would be the target. Industry analysts also did not believe that FCA was a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest percentage of lower-paid entry-level workers seeking higher wages," which would "make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[18]

86.     Between July and mid-September 2015, prior to the "lead" being named, GM bargained with the UAW through its subcommittees. The GM Board gave its negotiators authority to negotiate within a particular range.

87.     During these negotiations, Williams gave his list of "Presidential Demands" to GM. Based on GM's calculations, Williams's "Presidential Demands" reflected a CBA with a total cost increase of just under a billion dollars over the 2011 CBA.

---

[18] Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

**EXHIBIT 3**

88.     Prior to September 13, 2015 and before selecting the target for pattern bargaining, both the UAW and GM had made various concessions in their negotiations. Those concessions decreased the total incremental costs for the new potential deal by more than 20 percent compared to the UAW's initial demand of nearly $1 billion. The UAW's principal negotiators represented to GM that they could "sell it"—that is, the deal that was on the table—to the UAW's members.

89.     Unbeknownst to GM, while serving on GM's Board, Ashton was playing a key role in advancing FCA and FCA NV's scheme to harm GM through the 2015 negotiations.

90.     Through his membership on the GM Board and his close relationship with the UAW, Ashton was able to provide the UAW, FCA, and FCA NV with unparalleled access to information on both sides of the ongoing UAW-GM CBA negotiations. For example, Ashton had access to extensive information concerning sensitive topics including, as most relevant here, negotiation strategy and progress in connection with GM's negotiations with the UAW over the 2015 CBA, and GM's consideration of and response to merger inquiries from FCA NV. In 2015, a key period both for CBA negotiations and GM's response to FCA's merger request, Ashton received information showing detailed information on GM's actual performance and goals for 2015; early information showing what GM viewed as the greatest risks in the coming CBA negotiations (specifically identifying the two-

**EXHIBIT 3**

tiered wage structure); much more detailed discussions of risks and opportunities from the coming CBA negotiations, including specific discussions around the tier-two wage structure; and specific discussions of FCA's merger proposal, including GM's detailed strategies for defending against what it viewed as an unattractive proposal. Passing this confidential information to the UAW and/or failing to disclose the ongoing schemes involving FCA and the UAW, in which Ashton was a longstanding participant, was a clear breach of Ashton's fiduciary duties to GM.

91. Ashton, a sitting member of GM's Board, owed the highest duties of loyalty, care, confidentiality, and disclosure to GM—and no duties whatsoever to the corrupt UAW leaders who had appointed him or FCA and FCA NV leaders who had bought his loyalty. However, while serving on GM's Board as a fiduciary, not only did Ashton fail to disclose the ongoing scheme between FCA and FCA NV and the UAW to directly harm GM, Ashton proceeded to pass confidential GM information to the corrupt UAW leaders and FCA and FCA NV executives. This confidential information included GM's strategies and internal positions in connection with the 2015 CBA negotiations.

92. On September 13, 2015, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between FCA, FCA NV, and UAW leaders.

**EXHIBIT 3**

93.    Williams had near complete control over the selection of the lead. Williams chose FCA as the lead, at Marchionne's bidding, in order to use the FCA pattern agreement to harm GM and seek to force a merger with GM.

94.    On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[19]

95.    Marchionne explained that the "economics of the deal are almost irrelevant" because the costs "pale in comparison given the magnitude of the potential synergies and benefits" of a combination, and cemented a "philosophical approach that [FCA] wants to use going forward." The facts indicate that Marchionne was referring to using the collective bargaining process to pressure a merger between FCA and GM.[20]

96.    On September 30, 2015 and despite the richness of the tentative agreement, the UAW's FCA workforce rejected the tentative agreement negotiated

---

[19] Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS (Sept. 16, 2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

[20] *FCA US LLC and UAW Reach a Tentative Contract Agreement Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=Ep_4PHdN0Xs&list=ULUmkhHvDUvH0.

**EXHIBIT 3**

by the FCA and UAW leaders.[21] Various press reports attributed the rejection to distrust of the union's leadership by its members.

97.     On October 8, 2015, FCA and the UAW announced a new tentative agreement, which was similar to the initial tentative agreement in terms of structure and total cost to FCA.[22] The deal was specifically tailored to, and in fact ultimately did, disproportionately harm GM.

98.     On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval.

99.     On October 25, 2015, GM, selected as the next target, reached a tentative deal with the UAW based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern, the threatened

---

[21] During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

[22] As demonstrated by their actions with respect to the second tentative agreement, the UAW leadership recognized that the failure of the first tentative agreement was caused by the UAW's failure in messaging and process more than issues with the substance of the agreement.  *See* Tracy Samilton, *UAW hopes second time's the charm for new contract with FCA,* MICHIGAN RADIO (October 19, 2015), https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contract-fca.

**EXHIBIT 3**

risk of a strike proved too great. As had been intended by the various conspirators, the coercive economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern. The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015 and was effective as of November 23, 2015.

100. Ultimately, the final CBA between GM and the UAW caused GM to incur approximately $1.9 billion in incremental labor costs over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

101. Through his work to further FCA and FCA NV's scheme while serving on the GM Board, Ashton inflicted substantial harm on GM, in violation of his fiduciary duties.

## IV. ASHTON AND THE OTHER CO-CONSPIRATORS TOOK STEPS TO FRAUDULENTLY CONCEAL THEIR WRONGDOING AND RESULTING DAMAGE.

102. As recounted above, GM had no way to know of the ongoing CHR scheme perpetrated by Ashton. It was not until the summer of 2019, with the indictment of Grimes, that GM first learned of the existence and scope of wrongdoing at the CHR by Ashton. Prior to that time, GM did not know and could not reasonably have discovered the shakedown and kickback scheme that Grimes,

**EXHIBIT 3**

Pietrzyk, and Ashton committed with certain vendors of the CHR or that Ashton had been involved in and directed the fraud, including while serving on GM's Board.

103.   Ashton and his co-conspirators affirmatively concealed their wrongdoing and GM's resulting injury. For example, Ashton admitted that he, along with Grimes and Pietrzyk, "concealed and did not disclose the manner in which certain contracts between CHR and [USA Countrywide]. . . was obtained or the fact that [he, Grimes, and Pietrzyk] accepted bribes and kickbacks from [USA Countrywide]."[23] Grimes and Pietrzyk similarly admitted that they, along with Ashton, "concealed and did not disclose" the scheme, including the improperly inflated contracts and the bribes and kickbacks they received.[24]

104.   The lengths Ashton and others went to conceal their scheme from GM are detailed in the government's charges. To conceal his kickbacks received from a CHR vendor, Impressions, Grimes directed Impressions to make out checks payable to his wife or to "KKG Consulting," a sham company created by Grimes' wife for the purpose of concealing the bribes. Likewise, Ashton, Grimes, and Pietrzyk conspired with Cohen to set up a sham vendor, USA Countrywide, and then conceal bribes from that vendor with checks purportedly for "antique furniture" or

---

[23]   Ashton Plea Agreement at 6.

[24]   Grimes Plea Agreement at 6.

**EXHIBIT 3**

"furniture." Then, once Ashton learned that the government was investigating the NTC, Ashton met with Cohen and instructed him not to send further payments to avoid detection from the government investigation.

105. Meanwhile, although Ashton was a member of GM's Board of Directors from 2014 to 2017 and owed a fiduciary duty to GM to disclose any self-dealing or misuse of GM funds, Ashton concealed that over the same time period he was receiving regular cash payments and checks from Cohen and USA Countrywide of between $5,000 and $30,000 as bribes and kickbacks for causing CHR to enter an inflated contract with USA Countrywide for the purchase of 58,000 custom watches. Ashton furthered this concealment by refusing even to meet with or speak to GM in 2017 when GM first learned of a possible investigation into CHR.

106. Similarly, GM had no way to know of the existence or Ashton's involvement in the scheme directed by FCA and FCA NV to bribe key UAW officials to ensure FCA received illicit competitive advantages to GM's harm.

107. In addition, Ashton and the other conspirators also adopted extraordinary measures to conceal FCA's bribery scheme. As described herein and as admitted in the criminal plea agreements, the co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length,

**EXHIBIT 3**

complexity and sophistication of the scheme, these efforts successfully concealed the scheme and precluded suspicion of Ashton's or the other conspirators' conduct. For example:

(a) Ashton and other FCA and UAW executives hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, Panama, the Cayman Islands, and others.

(b) FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW";[25]

(c) Iacobelli, Durden, Morgan, and their co-conspirators used the charities to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[26]

(d) Iacobelli (on March 19, 2015), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on

---

[25] Brown Plea Agreement at 3.

[26] Iacobelli Indictment at 9.

**EXHIBIT 3**

November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e)    Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives";[27]

(f)    In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty bucks."[28] Marchionne then falsely denied the gift when questioned about it by federal investigators;

(g)    "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[29]

---

[27]  Durden Information at 6.

[28]  7/13/18 Iacobelli Plea Agreement at 8.

[29]  Iacobelli Indictment at 20.

**EXHIBIT 3**

(h)    On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials.";[30]

(i)    From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell and other officials.[31] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[32]

108.   After the U.S. Attorney's investigation began bringing this scheme to light, GM diligently monitored the criminal proceedings and other sources of

---

[30]  Brown Plea Agreement at 5.

[31]  Jewell Plea Agreement at 3–4.

[32]  *Id.* at 13.

**EXHIBIT 3**

available information, but GM did not have sufficient information to identify Ashton's involvement in this scheme or his breach of fiduciary duty with respect to the scheme until very recently, when GM first learned of the substantial accounts Ashton had been provided by FCA NV in multiple foreign financial institutions.

109.   In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams (all of whom were co-conspirators with Ashton) warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other "bad actors." As has now been revealed, these statements were false, and were designed to evade suspicion and prevent inquiry into their illegal conduct:

(a)    On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period*."[33]   In fact, Williams himself was directly involved

---

[33]   Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

**EXHIBIT 3**

in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

(b)     On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[34]  In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c)     Following a day later in what appears to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements:  "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that ***this conduct had nothing whatsoever to do with the collective***

---

[34] FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

**EXHIBIT 3**

*bargaining process, but rather involved two bad actors* . . . ."[35] Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA." In reality, Marchionne and Williams themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d)    On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, *it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements*, including the 2011 collective bargaining agreement between the UAW and Chrysler."[36]

(e)    On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating: "*[T]here is simply no truth to the claim that this misconduct compromised the*

---

[35] Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

[36] *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

**EXHIBIT 3**

*negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your collective bargaining agreement and no union funds were stolen or lost.*"[37]

(f)　　On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[38]

(g)　　On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process.*"[39]

---

[37] *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[38] *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[39] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

**EXHIBIT 3**

110.   These FCA bribery and CHR kickback schemes, and Ashton's role in those schemes, were inherently self-concealing, as secrecy was essential to perpetuate the schemes. Had either been exposed, Ashton would have been immediately removed from GM's Board, the perpetrators would have been investigated and prosecuted criminally, and the scheme would have been brought to an end.

111.   As alleged herein, GM could not have discovered these schemes or Ashton's role therein any earlier despite reasonable diligence.

## CAUSES OF ACTION

### First Cause of Action

Breach of Fiduciary Duty

112.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

113.   From 2014 to 2017, Ashton served on the Board of Directors of General Motors Company. In that role, Ashton owed GM fiduciary duties of loyalty, care, confidentiality, and disclosure. When he joined the Board, Ashton received an orientation on his rights and obligations as a director and signed an agreement to comply with his fiduciary duties to GM. As described above, Ashton repeatedly disclaimed any conflicts of loyalty and agreed to adhere GM's Code of Conduct, which prohibits "bribery," among other pertinent illegal activity.

**EXHIBIT 3**

114.   Ashton breached his fiduciary duties by, among other things, failing to disclose to GM the bribery scheme between FCA and UAW to harm GM and force a merger between GM and FCA NV and disclosing GM confidential information to UAW and/or FCA leaders while serving on the Board of Directors of General Motors Company.

115.   Separately, Ashton further breached his fiduciary duty by failing to disclose to GM the kickback scheme involving CHR and continuing to solicit and accept bribes from vendors to the CHR, knowing that such kickbacks directly harmed GM as the funding source of the CHR.

116.   As a direct result of these breaches of Ashton's fiduciary duty, GM was damaged.

117.   Ashton is accordingly liable to GM for this harm and, in addition, must forfeit any amounts paid to him by GM as a result of his service on the Board, which amounts total in the hundreds of thousands of dollars.

## Second Cause of Action

### Fraud

118.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

119.   As described above, Ashton intentionally or recklessly made numerous material misrepresentations to GM. For example, in annual written director

**EXHIBIT 3**

questionnaires that Ashton completed on April 15, 2014 ("2014 Questionnaire"), January 26, 2015 ("2015 Questionnaire"), December 1, 2015 ("2016 Questionnaire"), and January 10, 2017 ("2017 Questionnaire"), Ashton represented in writing:

(a)    That he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry (2016 Questionnaire, 2017 Questionnaire);

(b)    That he had not received anything of value by a third party in consideration for his service as a GM director (2015 Questionnaire, 2016 Questionnaire, 2017 Questionnaire);

(c)    That he "adhere[d]" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity (2017 Questionnaire);

(d)    That there was no special arrangement or understanding between Ashton and "any other person pursuant to which" he was nominated to the Board (2016 Questionnaire, 2017 Questionnaire); and

(e)    That he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM" (2014 Questionnaire, 2015 Questionnaire).

54

**EXHIBIT 3**

120.    These representations were false. At the time Ashton made these representations, he knew that he had received and/or continued to receive kickbacks from CHR vendors under inflated contracts ultimately funded by GM. Further, at the time Ashton made these representations, he knew that, in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton had agreed to pass and was passing GM's confidential information to UAW and/or FCA leaders.

121.    These fraudulent misrepresentations were intended to and did induce reliance by GM. For example, had GM known of the criminal kickback scheme involving the CHR and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

122.    Further, had GM known of FCA and FCA NV's bribery scheme and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

123.    Ashton's fraudulent misrepresentations were intended to and did cause harm to GM. For example, as a result of Ashton's fraudulent misrepresentations and omissions, Ashton was nominated to GM's Board and GM paid him compensation. GM continued to unknowingly fund inflated vendor contracts at the CHR that lined the pockets of Ashton and his co-conspirators. Once on the Board, Ashton betrayed GM's trust by funneling GM's confidential information to UAW and/or FCA leaders.

**EXHIBIT 3**

## **Third Cause of Action**

### Fraud by Omission

124.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

125.   Ashton owed GM a duty of disclosure. First, as a director on GM's Board, Ashton owed GM a duty of disclosure. Second, as described above, Ashton actively participated in meetings and discussions concerning strategy decisions involving the UAW and FCA. Having participated and provided input in these discussions, Ashton had a duty to make complete disclosures of facts where his partial disclosures would and did convey false impressions and mislead GM.

126.   By the time Ashton joined GM's Board, he had actively participated for years in a criminal kickback scheme involving the CHR, which was funded by GM. Ashton continued receiving these kickbacks after joining GM's Board. Ashton has pled guilty to his participation in this scheme. Despite knowing of and participating in this scheme, Ashton never disclosed the scheme to anyone at GM.

127.   Further, by the time Ashton joined GM's Board, he had actively participated in FCA and FCA NV's criminal scheme to corrupt the bargaining process to benefit FCA and harm GM. Ashton never disclosed this scheme to anyone at GM. Indeed, as described above, once on GM's Board, Ashton furthered this scheme by passing GM's confidential information to UAW and/or FCA leaders.

**EXHIBIT 3**

128. In addition, as described above, Ashton failed to disclose numerous additional material facts of which he was aware, the non-disclosure of which created a false impression for GM. For example, in the 2014, 2015, 2016, and 2017 Questionnaires, Ashton repeatedly represented in writing:

(a) That he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry (2016 Questionnaire, 2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(b) That he had not received anything of value by a third party in consideration for his service as a GM director (2015 Questionnaire, 2016 Questionnaire, 2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

**EXHIBIT 3**

(c)     That he "adhere[d]" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity (2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process, as well as the material fact that he received kickbacks through inflated contracts at the CHR funded by GM. Ashton was aware of these undisclosed material facts, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(d)     That there was no special arrangement or understanding between Ashton and "any other person pursuant to which" he was nominated to the Board (2016 Questionnaire, 2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process while serving as a GM director. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

**EXHIBIT 3**

(e)    That he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM" (2014 Questionnaire, 2015 Questionnaire). Ashton failed to disclose the material fact that he passed GM's confidential information to FCA, FCA NV, and the UAW. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

129.   These fraudulent omissions were intended to and did induce reliance by GM. For example, had GM known of the criminal kickback scheme involving the CHR and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

130.   Further, had GM known of FCA and FCA NV's bribery scheme and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

131.   Ashton's fraudulent omissions were intended to and did cause harm to GM. For example, as a result of Ashton's fraudulent misrepresentations and omissions, Ashton was nominated to GM's Board and GM paid him compensation. GM continued to unknowingly fund inflated vendor contracts at the CHR that lined the pockets of Ashton and his co-conspirators. Once on the Board, Ashton betrayed

**EXHIBIT 3**

GM's trust by funneling GM's confidential information to UAW and/or FCA leaders.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    Damages, in an amount to be determined at trial, including but not limited to, the recoupment of monies paid by GM to Ashton for service as a director on GM's Board and further damage GM suffered as a result of Ashton's breaches of fiduciary duty, fraudulent statements and omissions, and other unlawful acts;

B.    An award of punitive and/or exemplary damages as Ashton has acted with malice and willful disregard for GM's rights;

C.    An award of costs and fees incurred in pursuing this litigation, including attorney's fees, costs, and the fees and costs of experts;

D.    Equitable relief, including restitution; and

E.    Any other relief the Court deems just, fair, necessary, or equitable.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

**EXHIBIT 3**

Dated: September 24, 2020

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: s/James E. Marina
James E. Marina (N.J. Bar No. 050791996)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
jmarina@kirkland.com

Hariklia Karis, P.C. (*pro hac vice pending*)
Jeffrey Willian, P.C. (*pro hac vice pending*)
Casey McGushin  (*pro hac vice pending*)
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris  (*pro hac vice pending*)
2049 Century Park East
Los Angeles, CA 90067
Telephone:  (310) 552-4200
austin.norris@kirkland.com

Maisie Allison  (*pro hac vice pending*)
555 South Flower Street
Los Angeles, CA 90071
Telephone:  (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs General Motors LLC*
*and General Motors Company*

**EXHIBIT 3**

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

I hereby certify to the best of my knowledge pursuant to Local Civil Rule 11.2 that this matter in controversy is not the subject of any other action pending in any court, arbitration, or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of September, 2020.

s/James E. Marina

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1</u>

I hereby certify to the best of my knowledge pursuant to Local Civil Rule 201.1 that the matter in controversy is not subject to arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000 exclusive of interest and costs and any claim for punitive damages.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of September, 2020.

s/James E. Marina

**EXHIBIT 3**

# REDLINE VERSION

**EXHIBIT 3**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

**James E. Marina (N.J. Bar No. 050791996)**
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

| | |
|---|---|
| GENERAL MOTORS LLC,<br>GENERAL MOTORS COMPANY,<br><br>        Plaintiffs,<br><br>   against<br><br>JOSEPH ASHTON,<br><br>        Defendant. | CASE NO. 20-12659<br><br><br>FIRST AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

1

**EXHIBIT 3**

# **TABLE OF CONTENTS**

**Page**

FIRST AMENDED COMPLAINT ....................................................................... 3

INTRODUCTION ............................................................................................... 3

THE PARTIES ................................................................................................... 6

JURISDICTION AND VENUE ......................................................................... 16

DETAILED ALLEGATIONS ............................................................................ 167

I.    ASHTON IS APPOINTED TO GM'S BOARD OF DIRECTORS. ............ 167

II.   GM LEARNS OF ASHTON'S WRONGDOING AT THE CHR. ............... 19

III.  GM LEARNS OF ASHTON'S INVOLVEMENT IN FCA AND FCA
NV'S BRIBERY SCHEME. ................................................................... 245

     A.    Marchionne Prepares on Behalf of FCA and FCA NV to Force
a Takeover of GM by Merger ....................................................... 28

     B.    Defendant Ashton and President Williams Are Key Players in
the Takeover Conspiracy ............................................................. 31

     C.    FCA Initiates Operation Cylinder .............................................. 323

     D.    2015 CBA Negotiations ............................................................. 345

IV.  ASHTON AND THE OTHER CO-CONSPIRATORS TOOK STEPS
TO FRAUDULENTLY CONCEAL THEIR WRONGDOING AND
RESULTING DAMAGE. ........................................................................ 42

CAUSES OF ACTION ...................................................................................... 52

REQUESTS FOR RELIEF ................................................................................ 5960

**EXHIBIT 3**

## **FIRST AMENDED COMPLAINT**

General Motors LLC and General Motors Company (individually or collectively, "GM") for their First Amended Complaint, allege as follows:[1]

### **INTRODUCTION**

1.      From August 2014 to December 2017, Joseph Ashton, a former high-ranking officer of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), served as a director on ~~GM's~~the Board of General Motors Company. In that role, Ashton owed unqualified fiduciary duties including the highest duties of loyalty, care, confidentiality, and disclosure to GM. Ashton collected from GM hundreds of thousands of dollars in compensation for his service as a director.

2.      GM recently discovered that before and during his tenure as a director, Ashton sat at the center of two sprawling and long-running criminal schemes. Each scheme was intended to and did cause massive harm to GM. Despite his fiduciary duties, Ashton failed to disclose and in fact affirmatively concealed these schemes from detection while serving as a director on GM's Board. GM discovered these schemes only recently, following dozens of indictments and guilty pleas involving Ashton and his co-conspirators.

---

[1]      Pursuant to Local Civil Rule 10.1, GM's principal place of business is located at 300 Renaissance Center, Detroit, Michigan. Defendant Joseph Ashton resides and is domiciled in Ocean View, New Jersey.

**EXHIBIT 3**

3.     On December 4, 2019, Ashton pled guilty to conspiring to commit wire fraud and money laundering. As Ashton admitted, between 2012 and 2016, he and two other high-level UAW officials, Michael Grimes and Jeffery Pietrzyk, orchestrated a criminal kickback scheme to siphon money from the UAW-GM Center for Human Resources ("CHR"), where they served on the Board and were responsible for or had influence over the approval of contracts. The CHR was established primarily to educate and train UAW-represented GM employees. All funding for the CHR came from GM. Ashton and his co-conspirators abused their CHR positions by, among other ways, inflating contracts and demanding hundreds of thousands of dollars in kickbacks from vendors. The CHR money used to pay vendors was funded by GM pursuant to the UAW-GM National Agreement and should have been used to educate and train GM's employees. Instead, the inflated payments were improperly used to line the pockets of Ashton and his co-conspirators.

4.     Ashton also played a central role in another scheme to harm GM while serving as a GM director. The United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA US LLC ("FCA") and Fiat Chrysler Automobiles N.V. ("FCA NV") on the one hand and certain former union leaders on the other. As has been repeatedly admitted, starting no later than July 2009, FCA and FCA NV paid

**EXHIBIT 3**

millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and, in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." FCA and FCA NV authorized these bribes specifically to harm GM and to advance their long-term goal to force higher costs on GM and assist FCA NV in forcing a merger with GM. Very recently, GM learned that FCA and FCA NV established and used offshore bank accounts to further their scheme. As described below, Ashton was the recipient of one or more of these funded accounts.

5.     Ashton was uniquely situated to further this scheme. From 2010 to 2014, Ashton was one of the five highest-ranking UAW officers serving as Vice President of the UAW's GM Department. Based on reasonable belief and inference, in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton used his influence to deny GM specific structural labor concessions it should have otherwise received but for FCA and FCA NV's bribes. After he joined GM's Board in 2014, Ashton was privy to detailed highly confidential information concerning GM's view of and strategic response to FCA and FCA NV's ongoing merger inquiries, as well as GM's approach and expectations for collective bargaining negotiations. Again in return for secret compensation from FCA and FCA NV through foreign accounts and while owing

**EXHIBIT 3**

GM the highest duties of loyalty, care, confidentiality, and disclosure, Ashton passed confidential GM information to the UAW and FCA and FCA NV. Ashton never disclosed this criminal scheme or his role in the scheme to anyone at GM. In part due to Ashton's disloyalty and breaches of confidence, GM was forced to incur billions of dollars in increased labor costs.

6.      In sum, as described in detail below, while serving as a GM director Ashton embezzled CHR funds, provided by GM, and participated in a criminal scheme to harm GM through higher labor costs and assist FCA NV in forcing a merger. Ashton's criminal conduct violated every conceivable duty owed to GM. Through this action, GM seeks to recoup monies paid by GM to Ashton for service as a director on GM's Board. In addition, GM seeks to determine the full extent to which Ashton breached his fiduciary duties to GM and the full extent of the resulting damages caused to GM, and to recover for the same.

## THE PARTIES

**Plaintiffs**

7.      **General Motors LLC**: Plaintiff General Motors LLC is a citizen of the States of Delaware and Michigan. General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is. The sole member of General Motors LLC is

**EXHIBIT 3**

General Motors Holdings LLC. The sole member of General Motors Holdings LLC is Plaintiff General Motors Company, which is a Delaware corporation with its principal place of business in Detroit, Michigan. General Motors LLC is thus a citizen of the States of Delaware and Michigan. General Motors LLC is a subsidiary of General Motors Holdings LLC, which is a wholly owned subsidiary of Plaintiff General Motors Company. General Motors LLC is the largest automaker in the U.S. and an iconic American company that manufactures and sells automobiles in the U.S. under brands including Chevrolet, Cadillac, Buick, and GMC. General Motors LLC is an employer in the automotive industry, which has a substantial effect on interstate commerce.

8. **General Motors Company**: Plaintiff General Motors Company (herein referred to as "GMis a citizen of the States of Delaware and Michigan. General Motors Company" or "New GM") is a Delaware corporation with its principal place of business in Detroit, Michigan, and is the ultimate parent of General Motors LLC.

**Defendant**

9. **Joseph Ashton**: Ashton is an individual currently residing ina citizen of New Jersey. Ashton is domiciled in the city of Ocean View, New Jersey, where he maintains a primary residence. Ashton served on the UAW's Executive Board from 2006 to 2014, including as Vice President of the UAW's GM Department

7

**EXHIBIT 3**

from 2010 to 2014, and previously as the Regional Director for Region 9 from 2006 to 2009. From 2014 to December 2017, following his retirement from the UAW, Ashton served as the UAW Trust's[12] designee on ~~GM's~~General Motors Company's Board of Directors. In December 2017, Ashton abruptly resigned that position. On December 4, 2019, Ashton pled guilty to conspiracy to commit honest services wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h).

### Significant Non-Parties and Other Entities

10. **FCA US LLC (formerly known as Chrysler Group LLC):** FCA is an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA is a wholly owned subsidiary of FCA NV, a publicly traded foreign entity listed on the New York Stock Exchange. FCA manufactures and sells automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram.

11. **Fiat Chrysler Automobiles N.V. (formerly known as Fiat):** FCA NV, the successor of the Italian automotive company formerly known as Fiat

---

[12] The UAW Trust was established as a result of the 2007 CBAs between the UAW, FCA, GM, and Ford, which assigned retiree health care liabilities to an independent Voluntary Employee Beneficiary Association. Pursuant to restructuring following the 2008 financial crisis, the UAW Trust obtained the right to appoint a director to GM's Board.

8

**EXHIBIT 3**

S.p.A. ("Fiat"), is the ultimate parent company and owner of FCA US LLC. FCA NV is organized under the laws of the Netherlands, as a Naamloze Venootschap, and its principal executive offices are in London, England.

12. **Alphons Iacobelli:** Iacobelli was employed as the Vice President of Employee Relations at FCA and as the Co-Chairman of the UAW-Chrysler joint training center (National Training Center or "NTC") and its Joint Activities Board from 2008 to 2015. In this role, Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW. Through his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and FCA to direct the financial affairs of and approve payments made by the NTC. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution.

13. **Jerome Durden:** Durden was employed as a financial analyst at Chrysler and FCA in its corporate accounting department beginning in 1985. In 2008, he was assigned by Chrysler to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and

**EXHIBIT 3**

FCA, had the authority to approve and did approve payments made by the NTC. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution.

14. **Michael Brown:** Brown was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national collective bargaining agreements ("CBAs") between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Complaint, Brown was an agent of Chrysler and/or FCA.

15. **Dennis D. Williams:** Williams served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010–2014). Prior to 2010, Williams served on the UAW International Executive Board as the Director of Region 4 (2001 to 2010) during which time he had direct dealings with Sergio Marchionne in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction equipment, which is commonly controlled by Exor NV. On

**EXHIBIT 3**

August 27, 2020, the United States Attorney for the Eastern District of Michigan charged Williams with conspiracy to embezzle union funds in violation of 18 U.S.C. § 371 and 29 U.S.C. § 501(c). He is scheduled to admit responsibility and plead guilty on September 30, 2020.

16. **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)**: The UAW is the union that exclusively represents the labor forces for both GM and FCA. From 2009 to 2019, the UAW represented approximately 50,000 GM employees and between 23,000 and 47,000 FCA employees. As such, the UAW has a significant degree of market power to force labor terms on either competitor including not only through the ability to call strikes but also through the ability to control the day-to-day activities of its work force.

17. The UAW has an unusual and limited governance structure where only five officers of the UAW—the President, the Secretary-Treasurer, and three Vice Presidents of the International Executive Board—control its central decision-making regarding the negotiation and administration of CBAs. These UAW officers possess particularly strong powers as well, including the power to negotiate CBAs, call special conventions, authorize strikes, and issue and revoke charters, among other powerful tools. While these UAW officers operate in the context of an International Executive Board that includes eleven "Regional

**EXHIBIT 3**

Directors," these officers effectively control the overall decision-making, policy, director and officer elections, and negotiation and administration of the CBAs. There are minimal checks and balances on the President and the other four officers as they have no oversight board, committee, or trustee that exists to oversee and ensure the integrity of the International Executive Board and take action to address malfeasance. In addition, these officers, who had nearly complete control over UAW affairs, are elected only every four years and implemented practices to exercise substantial control over elections to perpetuate their role on the International Executive Board. If any of these officers or directors act corruptly, they have the power and influence to inflict direct harm on any given competitor.

18. **Sergio Marchionne:** Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–2018, the Chairman (2011–2014) and CEO (2009–2014) of Chrysler, and the COO of FCA North America (2011–2018). Marchionne also served as the CEO of CNH Industrial (2004-2018), commonly controlled by Exor NV, which directly and indirectly is the largest shareholder of FCA NV.

19. **NTC:** NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were inherited by

**EXHIBIT 3**

FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA. The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's ~~Chrysler~~<u>FCA</u> Department served as Co-Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

20.    **CHR:** Non-party CHR is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The CHR was formed under the terms of prior CBAs between UAW and General Motors Corporation ("Old GM"). The CHR's primary purpose is to educate and train GM's represented workforce. The CHR is governed by an eight-director board, four appointed by GM and four by the UAW. As part of the 2019 CBA negotiations, GM and the UAW agreed to dissolve the CHR.

21.    **General Holiefield:** Holiefield (deceased in 2015) served as the UAW Vice President for the ~~Chrysler~~<u>FCA</u> Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA. From 2007 to 2014, Holiefield also served on the UAW International Executive Board. Millions of dollars from Chrysler/FCA were

**EXHIBIT 3**

diverted through NTC and charities to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

22.     **Norwood H. Jewell:** Jewell served on the UAW's International Executive Board from 2011 to 2017, most recently as UAW's Vice President of the FCA Department (2014–2017) and previously as Regional Director (2010–2014). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371 and was sentenced to fifteen months in prison.

23.     **Virdell King:** King was a senior official in the UAW ~~Chrysler~~FCA Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW's committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to two months in prison and a $5,500 fine.

24.     **Nancy Johnson:** Johnson was the top administrative assistant to Jewell, then the UAW's Vice President for the ~~Chrysler~~FCA ~~d~~Department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On July 23, 2018, Johnson pled

**EXHIBIT 3**

guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

25. **Keith Mickens:** Mickens was a senior official in the UAW ~~Chrysler~~FCA Department from 2010 through 2015. In 2011, Mickens served on the UAW committee responsible for negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC's Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

26. **Michael R. Grimes:** Grimes was a senior official at the UAW, serving as the top administrative assistant[23] to Ashton from 2006 to 2014, and then continuing to work in the UAW's GM Department after Ashton retired and joined the GM Board. On September 4, 2019, Grimes pled guilty to conspiracy to commit honest services wire fraud and conspiracy to commit money laundering and was

---

[23] Administrative assistants play the role of "right hand persons" to Vice Presidents of the UAW for each of the FCA, Ford, and GM Departments. In that capacity, they act as senior leaders of the UAW. They also typically have long tenures in the UAW, playing a staff leader role across various Vice Presidents. "Top" administrative assistants generally have a "chief of staff" role, while other administrative assistants work with the top administrative assistant to perform more specialized functions.

**EXHIBIT 3**

thereafter sentenced to twenty-eight months in prison and forfeited money and real property totaling over $1.5 million.

27. **Jeffery Pietrzyk:** Pietrzyk was a senior official at the UAW, serving as an administrative assistant to Ashton from 2010 and 2014. Pietrzyk served on the CHR's Board from 2010 to 2014. On September 20, 2019, the government charged Pietrzyk with conspiracy to commit honest services wire fraud and conspiracy to commit money laundering while he was a senior UAW official. Pietrzyk pled guilty on October 22, 2019.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. Complete diversity exists; Ashton is a ~~resident~~citizen of New Jersey, and ~~the~~ Plaintiffs are ~~residents~~citizens of Delaware and Michigan. The amount in controversy is greater than $75,000, as GM seeks to recoup Ashton's compensation for his service on GM's Board, while Ashton was simultaneously violating his fiduciary duties, which compensation totaled hundreds of thousands of dollars. Finally, GM seeks damages for the harm that Ashton imposed on GM, including through increased labor costs, as a result of Ashton's breaches of his fiduciary duties.

29. Venue is proper in this Court as a substantial part of the events or omissions giving rise to the claim occurred in this district. Ashton committed

16

**EXHIBIT 3**

multiple breaches of fiduciary duty, including receiving kickbacks and bribes and committing other acts described herein, while located in New Jersey. In addition, Ashton resides and is domiciled in this district.

30.     This Court has personal jurisdiction over Ashton because he is a resident of New Jersey, is domiciled in New Jersey, and has transacted affairs in this district. In addition, on September 17, 2020, Ashton was served with a summons and GM's Complaint in Ocean View, New Jersey.

## DETAILED ALLEGATIONS

## I.     ASHTON IS APPOINTED TO GM'S BOARD OF DIRECTORS.

31.     Defendant Ashton was a longtime UAW member, eventually rising to the powerful position of Vice President of the UAW's GM Department. Ashton also served on the International Executive Board of the UAW. In his role as Vice President, Ashton had primary oversight of negotiating and implementing CBAs between the UAW and GM and influencing the terms of the UAW's CBAs with FCA.

32.     Ashton's role as Vice President of the UAW's GM Department provided Ashton with substantial influence over the operations of the CHR, as he served on the CHR's Executive Board. The CHR is a tax-exempt corporation, created by the UAW and GM to develop, deliver, coordinate, and administer joint strategies and programs designed to educate and train UAW-represented GM

**EXHIBIT 3**

employees. All funding for the CHR came from GM, as required by GM's CBA with the UAW.

33.     In 2014, after serving on the UAW's International Executive Board for many years, Ashton was tapped to join ~~GM's~~General Motors Company's Board of Directors by the UAW Trust, which had the right to appoint one representative to GM's Board. Ashton served on ~~GM's~~General Motors Company's Board from 2014 to 2017, during which he owed fiduciary duties to GM. GM carefully reviewed Ashton's credentials and fitness for Board service and took appropriate steps to prevent any conflicts of loyalty. Among other steps, GM determined that Ashton would be ineligible to join the Board until he retired from the UAW and Ashton received in-depth training upon joining the Board.

34.     For example, when he joined the Board, Ashton received an orientation on his rights and obligations as a director and signed an agreement to comply with his fiduciary duties to GM. Ashton repeatedly made numerous misrepresentations to GM. For example, ~~Ashton~~ in written director questionnaires Ashton completed each year from 2014 to 2017, Ashton repeatedly disclaimed in writing that he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or been offered anything of value by a "third party" "in consideration" for his service as a GM director. Ashton falsely

**EXHIBIT 3**

warranted that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." Ashton falsely claimed there was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board. Ashton further falsely affirmed that he "adhered[d]" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity. Despite possessing and knowing of his fiduciary duties, including the duty of full disclosure, Ashton never disclosed to anyone at GM any of the past and ongoing schemes that could and did harm GM as described herein.

35.    In July 2017, the federal government unsealed a superseding indictment against Alphons Iacobelli, a then-GM employee who had previously been FCA's highest-ranking labor relations executive and led FCA's labor negotiations for many years. The indictment detailed a years-long pattern of illicit payments to and bribery of union officials by Iacobelli on behalf of FCA and FCA NV. Iacobelli's indictment did not discuss or suggest any wrongdoing occurred while Iacobelli was employed at GM, or any wrongdoing at the CHR. Iacobelli was terminated from GM once the indictment was made public.

36.    In 2017, after the Iacobelli indictment, GM sought to interview Ashton related to the government's investigation into the CHR. Despite GM policy requiring that Ashton submit to such an interview, Ashton refused and hired

**EXHIBIT 3**

criminal counsel. GM advised Ashton that if he did not submit to an interview he would be acting inconsistent with his obligations as a director.  Shortly thereafter, in December 2017, Ashton resigned.

## II.    GM LEARNS OF ASHTON'S WRONGDOING AT THE CHR.

37.    Only in the last year did GM learn of Ashton's criminal scheme involving the CHR, as the federal government unsealed several indictments against Ashton and his co-conspirators. Before this information was revealed in criminal indictments and plea agreements, GM had no knowledge of the kickback scheme or Ashton's involvement. Ashton never disclosed this information to anyone at GM, even while serving as a director owing GM fiduciary duties.

38.    On August 14, 2019, the government charged Grimes with conspiracy to commit wire fraud and money laundering. Grimes' indictment described a scheme involving Grimes and two unnamed co-conspirators, "Union Official 1" and "Union Official 2," to steal from the CHR (and ultimately from GM, which funded the CHR) through inflated vendor contracts and kickbacks. According to the indictment, the object of the scheme was for Grimes, Union Official 1, and Union Official 2 "to use their positions with the UAW and CHR to personally enrich themselves by deceptively soliciting, influencing, and obtaining contracts for [CHR vendors] . . . to provide clothing and other products to the CHR and to UAW members. In return, Michael Grimes, Union Official 1, and Union Official 2

20

**EXHIBIT 3**

demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value."[34]

39.    For instance, the indictment alleged that Grimes and these two unnamed UAW officials illegally profited from several transactions, including: (1) a 2011 contract for 50,000 "Team UAW-GM" jackets distributed to all plant employees, purchased for $6 million; (2) a 2013 contract for over 50,000 watches purchased for approximately $4 million; and (3) a 2016 contract for approximately 55,000 backpacks purchased for approximately $5.8 million.

40.    On September 4, 2019, Grimes pled guilty and was thereafter sentenced to twenty-eight months in prison and forced to forfeit more than $1.5 million.

41.    On September 20, 2019, the government charged Pietrzyk—"Union Official 2" in Grimes' indictment—with conspiracy to commit wire fraud and money laundering. Like Grimes' indictment, Pietrzyk's indictment described a scheme among Grimes, Pietrzyk, and an unnamed co-conspirator, "Union Official 1," to siphon GM funds from the CHR through fraudulent contracts and kickbacks. Again, the object of the scheme was to deceptively obtain contracts for CHR and receive hundreds of thousands of dollars in kickbacks.

---

[34]  *See* Grimes Information at 5.

**EXHIBIT 3**

42.     On October 22, 2019, Pietrzyk pled guilty. He is awaiting sentencing.

43.     On November 6, 2019, the government identified "Union Official 1" as Ashton, charging him with conspiracy to commit wire fraud and money laundering in connection with the same CHR scheme. Ashton pled guilty on December 4, 2019, admitting that he demanded and accepted hundreds of thousands of dollars in kickbacks and improperly used his position to enrich himself and his co-conspirators.

44.     As described in the indictments and admitted in the plea agreements, Ashton orchestrated a years-long scheme to steal GM funds through inflated vendor contracts and kickbacks. For example, in 2011, Ashton proposed the purchase of 50,000 "Team UAW-GM" jackets for all plant employees. Grimes recommended a specific vendor as the sole source for the contract. That vendor was awarded the contract and Pietrzyk told Grimes that Ashton wanted a cut of the proceeds. Pietrzyk directed Grimes to demand approximately $300,000 in kickbacks for Ashton from the vendor. The vendor agreed to pay it, and Ashton received the $300,000. Ashton paid Pietrzyk approximately $30,000 of that amount.

45.     Grimes similarly benefited, having also demanded $525,000 in kickbacks from the vendor so that he could purchase a house in Fenton, Michigan. When the vendor initially refused, Grimes threatened to cancel the contract. The

**EXHIBIT 3**

vendor ultimately relented and paid Grimes $530,000 through a check made payable to one of his relatives.[45]

46.     As another example of CHR-related frauds, in 2010, Ashton convinced an associate, Cohen, to loan $250,000 to a construction company. When the construction company stopped paying the loan, Ashton proposed to Cohen that he could recoup the loan money by forming a company to sell watches to the CHR. Cohen agreed and formed USA Countrywide for this purpose in August or September 2012.

47.     In late 2012 or early 2013, Cohen located a subcontractor to manufacture 58,000 custom watches. Ashton actively participated in the design, production, and pricing of the watches. Ashton also negotiated and approved for USA Countrywide/Cohen to purchase the watches from the manufacturer for approximately $2.3 million. Ashton then directed USA Countrywide/Cohen to submit a bid for the watches to Pietrzyk listing a higher price of almost $4 million. Both Pietrzyk and Ashton then successfully used their positions of power in the CHR and UAW to make sure that USA Countrywide was awarded the contract.

48.     In May 2013, Ashton demanded $250,000 from USA Countrywide/Cohen as a kickback for the contract. Cohen agreed, and began to

---

[45]  *See* Grimes Information at 8–9.

**EXHIBIT 3**

deliver the kickback in installments. Ashton also directed USA Countrywide/Cohen to pay kickbacks to Pietrzyk, fraudulently described as "antique furniture" or "furniture" in the memo line of the checks to conceal the criminal kickbacks.[56]

49.     The CHR received the 58,000 watches from USA Countrywide/Cohen in January 2014, but Ashton advocated that it was not an appropriate time to hand them out. Thus, the watches were held at the CHR.[67]

50.     Ashton's illegal conduct continued even after he joined GM's Board of Directors. In particular, Cohen personally delivered cash to Ashton at Ashton's home, delivering between $5,000–$30,000 several times from May 2013 through early 2015, *i.e.*, after Ashton joined the Board. In 2016, while Ashton was serving on the Board, he continued to receive these payments in the form of checks from Cohen. Ashton received at least $30,000 in such payments in 2016.[78]

51.     Even though Ashton was receiving these kickbacks while serving on the Board of GM, and knowing that such payments directly harmed GM by causing GM to unwittingly fund over-priced expenses at the CHR, Ashton never

---

[56] *See* Ashton Information at 9.

[67] *See* Ashton Information at 9.

[78] *See* Ashton Information at 7-9.

**EXHIBIT 3**

disclosed this kickback scheme, or the rampant kickbacks occurring at the CHR generally, to anyone at GM.

52.     Following the news of a federal investigation into the UAW and FCA and FCA NV in the fall of 2016, Ashton met with USA Countrywide/Cohen to stop the payments due to the investigation.[89]

53.     In sum, Ashton, Grimes, and Pietrzyk conspired to inflate contracts between CHR and vendors and then accept kickbacks from those vendors totaling over $2 million. This defrauded GM, which funds the CHR under the terms of its CBA with the UAW. Ashton, Grimes, and Pietrzyk hid from GM the manner in which the contracts were actually awarded and implemented involving bribes and kickbacks, including while Ashton was serving as a director on GM's Board.

## III.    GM LEARNS OF ASHTON'S INVOLVEMENT IN FCA AND FCA NV'S BRIBERY SCHEME.

54.     In addition to Ashton's involvement in the fraud at the CHR, GM recently discovered Ashton's role in advancing FCA and FCA NV's bribery scheme to harm GM and force it to merge with FCA NV.

55.     On January 22, 2018, Iacobelli pled guilty in connection with the bribery scheme. Iacobelli's guilty plea revealed for the first time that FCA's illegal payments to certain UAW officials were made "in an effort to obtain benefits,

---

[89] *See* Grimes Information at 13.

**EXHIBIT 3**

concessions, and advantages for FCA in the negotiations, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[910] At this time, Ashton was not openly identified as being a participant in the scheme.

56. After thorough investigation, including witness interviews, review of publicly available information regarding criminal developments, close monitoring of the criminal proceedings against Defendants and their co-conspirators, review and analysis of internal GM documents and communications, the engagement of consulting experts, and an in-depth analysis of collective bargaining negotiations and related agreements among GM, FCA, and the UAW, GM brought suit in November 2019 against FCA, FCA NV, and certain individual defendants in the United States District Court for the Eastern District of Michigan. Ashton was not a defendant in that suit.

57. GM was denied formal discovery in that action. Only very recently, after several months of additional investigation, did GM come to learn of certain foreign financial accounts in the Cayman Islands (Cayman National Bank) and Japan (Shinsei Bank) held in the name of Ashton and/or Ashton's charity. These

---

[910] 7/13/18 Iacobelli Plea Agreement at 7. (Iacobelli pled guilty on January 22, 2018, and his plea agreement was filed the next day. Due to a scrivener's error, a corrected version was filed on July 13, 2018.)

**EXHIBIT 3**

accounts held or currently hold substantial funds that, upon information, belief, and clear and reasonable inference, were ultimately provided to Ashton by FCA NV. Before this information came to light, GM had no way to know of Ashton's involvement in FCA and FCA NV's bribery scheme. This information could not have been discovered earlier despite due diligence, including because the co-conspirators actively concealed the misconduct and by its very nature the information is self-concealing.

58.    Ashton was not alone in receiving such funds. FCA and FCA NV bought the control of other UAW leaders to ensure that their bribery scheme achieved its goal of targeting and harming GM. For example, upon information, belief, and clear and reasonable inference, as part of the conspiracy with Ashton, FCA NV directed illicit bribes to at least Ashton (UAW Vice President 2010-2014), General Holiefield (UAW Vice President 2008\underline{6}-2012\underline{4}), and past UAW Presidents including Dennis Williams (UAW Officer 2010-2018), by granting those individuals control or a beneficial interest over undisclosed foreign financial accounts with substantial funds. For Williams, such accounts exist in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank) in his name and in the name of a business entity he controls. Upon information, belief, and clear and reasonable inference, FCA and FCA NV enabled, funded, and provided control to these individuals' above-identified accounts.

**EXHIBIT 3**

59.     FCA and FCA NV's funding of these offshore accounts is further supported by their proven and admitted pattern of bribing UAW officials, FCA NV's (through predecessor Fiat S.p.A.) admitted use of offshore accounts to bribe Italian politicians in the past, and the commercial power and influence these entities possess to cause such banks and other facilitators to open and maintain these foreign accounts for third parties as identified herein. Further, the only reasonable explanation that this closely connected group of individuals would have such foreign accounts in countries and financial institutions known for money laundering is that they were facilitated and funded by FCA and FCA NV. The notion that a closely tied group of FCA and UAW executives would possess undisclosed foreign bank accounts unrelated to their admitted participation in a multi-year bribery scheme is simply not plausible.

60.     In addition, upon information, belief and clear inference, other FCA and UAW officials connected to the Ashton-FCA conspiracy as described herein received FCA/FCA NV bribes through foreign accounts.

61.     It was only through discovering the existence of these foreign accounts, including those held by Ashton, that GM learned the true extent of FCA and FCA NV's scheme, described below, and Ashton's involvement in it.

**A.      Marchionne Prepares on Behalf of FCA and FCA NV to Force a Takeover of GM by Merger**

28

**EXHIBIT 3**

62.     Sergio Marchionne held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008:  "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[11]

63.     The central purpose of the bribery scheme Marchionne, FCA, and FCA NV enacted was to harm GM in an effort to induce it to merge with FCA to achieve synergies and a higher return on capital. With the scheme well underway and having its desired effect, in October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA NV proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a combination. But Marchionne remained resolute in his quest to force an FCA NV-GM combination.

64.     By 2013, Chrysler had only two shareholders:  (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

---

[11]     Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, REUTERS (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idUSTRE4B738Z20081208.

**EXHIBIT 3**

65.     In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent. Fiat and the UAW Trust apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[12]

66.     On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

67.     Although not a party to the foregoing transaction, the UAW itself entered into an "enforceable" Memorandum of Understanding with FCA promising to "actively assist in the achievement of FCA US's long-term business plan." In short, this agreement was an attempt by FCA and its co-conspirators to paper over—and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

---

[12]     Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17, 2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale.

**EXHIBIT 3**

FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[132̶13]

68.     Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne at the helm of the combined entity.

69.     After taking full control of Chrysler, Marchionne set his sights on forcing a merger with another one of the "Big Three" North American automakers. Given the ownership structure of Ford, with the substantial share of voting power held by the Ford family, Ford would never be a logical target for Marchionne's merger ambitions. GM was the only viable target, and thus Marchionne had long focused his efforts on GM.

---

[132̶13]   FCA, 2014 ANNUAL REPORT, at 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_reports/files/FCA_2014_Annual_Report.pdf.

**EXHIBIT 3**

**B.** **Defendant Ashton and President Williams Are Key Players in the Takeover Conspiracy**

70. In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne turned to weaponizing FCA's bribery of the UAW towards GM, in an effort to pressure GM to agree to merge with FCA.

71. By this time, upon information and belief, FCA and FCA NV had been bribing Ashton and UAW Secretary-Treasurer and President Dennis Williams (among others) and turned to them for assistance. As the Vice President for the GM Department of the UAW, Ashton could directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA in the form of structural concessions granted to FCA. For example, under Ashton's direction, FCA was provided and GM was denied certain structural programs, including genuine support from UAW leaders for GM's worker efficiency program, Global Manufacturing System ("GMS"), manipulation of contractual limits on Tier Two and temporary employees, support for FCA's "~~longer term~~long-term business plan," and other "side letter" agreements between FCA and the UAW.

**EXHIBIT 3**

72.    By 2014, FCA and FCA NV found an even more valuable use for Ashton. Through Williams, Ashton was chosen to be the UAW Trust's designee on GM's Board.

73.    Marchionne and FCA also received support from new UAW President and longtime friend, Dennis Williams. Williams cooperated with the goals and plans of FCA and FCA NV and took concrete actions to support those goals as his cooperation had been purchased many times over. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at a Fiat-affiliated truck and tractor company CNH Industrial. Williams has affirmed that he tries "not to second-guess Sergio," and that the pair have a "very good relationship," which was secured through bribery of Williams.

**C.    FCA Initiates Operation Cylinder**

74.    By 2014, GM had rejected multiple overtures from FCA NV regarding a merger. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, Marchionne, FCA, and FCA NV believed it was in a much stronger position to force a GM merger.

75.    With Marchionne as the lead, FCA schemed that it could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world.[13][14] In part for this very reason, Marchionne, on behalf of

[14]    Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019),

**EXHIBIT 3**

FCA and FCA NV, had authorized the bribery of UAW leaders, including Ashton. The support of those UAW leaders was essential to the success of Operation Cylinder because, among other reasons, the UAW could effectively block a merger under certain terms in the CBA. Marchionne and Williams were well aware that the UAW wielded this veto power over any potential merger.

76.     FCA NV initiated its takeover plans in March 2015, when Marchionne wrote to GM's Board and management, formally proposing the merger between GM and FCA NV.

77.     GM vetted the proposal with management, its advisors, and its Board, and ultimately rejected the offer on April 14, 2015. Crucially, at this point, Ashton was no longer a UAW officer—instead, he was much better positioned as a GM director to receive and pass on to the UAW (and ultimately FCA and FCA NV) relevant information. As a GM director at the time, Ashton was included in the Board's confidential discussions surrounding the merger and was privy to GM's detailed analysis of and response to ~~the~~ FCA NV's most recent merger invitation. Ashton passed this information to the UAW and FCA, in violation of his fiduciary duties to GM and the confidentiality provisions he signed annually.

*Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

**EXHIBIT 3**

78.    On June 18, 2015, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM's lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, Ashton's successor, who relayed and championed Marchionne's merger proposition. Working at Marchionne's behest as a result of the bribery scheme, Williams used his position to press for GM to consider the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

79.    The next day, the GM Board, including Ashton, was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a merger and apparently had tapped Williams as FCA NV's messenger. They were also told that the day before, Williams relayed that Marchionne had told him the GM Board had not seriously considered the FCA NV merger proposal—an untrue statement.

### D.    2015 CBA Negotiations

80.    A key to Marchionne's Operation Cylinder scheme was the longstanding practice in the automotive industry known as pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts. The UAW describes pattern bargaining as "a core part of

**EXHIBIT 3**

[its] bargaining strategy"[14][15] and a "powerful strategic tool."[15][16] Pattern bargaining is a potent force multiplier: through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams weaponized pattern bargaining, not to protect the interests of the UAW's members, but to advance FCA interests by promoting Marchionne's merger to the detriment of GM. FCA and FCA NV sought to leverage pattern bargaining to impose asymmetrical costs on GM, with the goal of harming GM by imposing massive labor costs on GM and making it more likely to favorably consider a merger with FCA given the synergies touted by Marchionne.

81.     Approximately every four years, each Detroit-based automaker negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same time, resulting in simultaneous negotiation. The UAW begins negotiations with each automaker through subcommittees in July.

82.     Months later, and shortly before contract expiration, the UAW selects one of the automakers as a "lead" or "target" company, with which the UAW

---

[14][15]  UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[15][16]  Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

**EXHIBIT 3**

negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike.

83.     Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[16][17]

84.     In the 2011 negotiations, GM was the "lead" or "target" company and negotiated the first tentative agreement with the UAW. But FCA and FCA NV had already been bribing the UAW thus corrupting the collective bargaining process.

85.     In 2015 bargaining, based on past practices and having conducted a detailed analysis of the negotiation dynamics, GM reasonably believed that it would be the target. Industry analysts also did not believe that FCA was a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest percentage of lower-paid entry-level workers seeking higher wages," which would "make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[17][18]

---

[16][17] *UAW President Dennis Williams Roundtable* (June 18, 2015), available at https://www.youtube.com/watch?v=bfS3EzxDXqI.

[18][18] Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, Detroit Free Press (Sept. 13, 2015),

**EXHIBIT 3**

86.     Between July and mid-September 2015, prior to the "lead" being named, GM bargained with the UAW through its subcommittees. The GM Board gave its negotiators authority to negotiate within a particular range.

87.     During these negotiations, Williams gave his list of "Presidential Demands" to GM. Based on GM's calculations, Williams's "Presidential Demands" reflected a CBA with a total cost increase of just under a billion dollars over the 2011 CBA.

88.     Prior to September 13, 2015 and before selecting the target for pattern bargaining, both the UAW and GM had made various concessions in their negotiations. Those concessions decreased the total incremental costs for the new potential deal by more than 20 percent compared to the UAW's initial demand of nearly $1 billion. The UAW's principal negotiators represented to GM that they could "sell it"—that is, the deal that was on the table—to the UAW's members.

89.     Unbeknownst to GM, while serving on GM's Board, Ashton was playing a key role in advancing FCA and FCA NV's scheme to harm GM through the 2015 negotiations.

---

*UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

**EXHIBIT 3**

90.     Through his membership on the GM Board and his close relationship with the UAW, Ashton was able to provide the UAW, FCA, and FCA NV with unparalleled access to information on both sides of the ongoing UAW-GM CBA negotiations. For example, Ashton had access to extensive information concerning sensitive topics including, as most relevant here, negotiation strategy and progress in connection with GM's negotiations with the UAW over the 2015 CBA, and GM's consideration of and response to merger inquiries from FCA NV. In 2015, a key period both for CBA negotiations and GM's response to FCA's merger request, Ashton received information showing detailed information on GM's actual performance and goals for 2015; early information showing what GM viewed as the greatest risks in the coming CBA negotiations (specifically identifying the two-tiered wage structure); much more detailed discussions of risks and opportunities from the coming CBA negotiations, including specific discussions around the tier-two wage structure; and specific discussions of FCA's merger proposal, including GM's detailed strategies for defending against what it viewed as an unattractive proposal. Passing this confidential information to the UAW and/or failing to disclose the ongoing schemes involving FCA and the UAW, in which Ashton was a longstanding participant, was a clear breach of Ashton's fiduciary duties to GM.

91.     Ashton, a sitting member of GM's Board, owed the highest duties of loyalty, care, confidentiality, and disclosure to GM—and no duties whatsoever to

**EXHIBIT 3**

the corrupt UAW leaders who had appointed him or FCA and FCA NV leaders who had bought his loyalty. However, while serving on GM's Board as a fiduciary, not only did Ashton fail to disclose the ongoing scheme between FCA and FCA NV and the UAW to directly harm GM, Ashton proceeded to pass confidential GM information to the corrupt UAW leaders and FCA and FCA NV executives. This confidential information included GM's strategies and internal positions in connection with the 2015 CBA negotiations.

92.    On September 13, 2015, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between FCA, FCA NV, and UAW leaders.

93.    Williams had near complete control over the selection of the lead. Williams chose FCA as the lead, at Marchionne's bidding, in order to use the FCA pattern agreement to harm GM and seek to force a merger with GM.

94.    On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[18][19]

---

[19][19]    Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS (Sept. 16, 2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

**EXHIBIT 3**

95.     Marchionne explained that the "economics of the deal are almost irrelevant" because the costs "pale in comparison given the magnitude of the potential synergies and benefits" of a combination, and cemented a "philosophical approach that [FCA] wants to use going forward." The facts indicate that Marchionne was referring to using the collective bargaining process to pressure a merger between FCA and GM.[19][20]

96.     On September 30, 2015 and despite the richness of the tentative agreement, the UAW's FCA workforce rejected the tentative agreement negotiated by the FCA and UAW leaders.[20][21] Various press reports attributed the rejection to distrust of the union's leadership by its members.

97.     On October 8, 2015, FCA and the UAW announced a new tentative agreement, which was similar to the initial tentative agreement in terms of

---

[19][20] *2015 UAW* FCA *US LLC and UAW Reach a Tentative Contract* Agreement *Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=YX8wWGi28rshttps://www.youtube.com/watch?v=Ep_4PHdN0Xs&list=ULUmkhHvDUvH0.

[21][21]     During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

**EXHIBIT 3**

structure and total cost to FCA.[21][22] The deal was specifically tailored to, and in fact ultimately did, disproportionately harm GM.

98.     On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval.

99.     On October 25, 2015, GM, selected as the next target, reached a tentative deal with the UAW based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern, the threatened risk of a strike proved too great. As had been intended by the various conspirators, the coercive economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern. The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015 and was effective as of November 23, 2015.

100.    Ultimately, the final CBA between GM and the UAW caused GM to incur approximately $1.9 billion in incremental labor costs over four years—over

---

[22][22]   As demonstrated by their actions with respect to the second tentative agreement, the UAW leadership recognized that the failure of the first tentative agreement was caused by the UAW's failure in messaging and process more than issues with the substance of the agreement. *See* Tracy Samilton, "*UAW hopes second time's the charm for new contract with FCA*", MICHIGAN RADIO (October 19, 2015), https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contract-fca.

**EXHIBIT 3**

$1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

101. Through his work to further FCA and FCA NV's scheme while serving on the GM Board, Ashton inflicted substantial harm on GM, in violation of his fiduciary duties.

## IV. ASHTON AND THE OTHER CO-CONSPIRATORS TOOK STEPS TO FRAUDULENTLY CONCEAL THEIR WRONGDOING AND RESULTING DAMAGE.

102. As recounted above, GM had no way to know of the ongoing CHR scheme perpetrated by Ashton. It was not until the summer of 2019, with the indictment of Grimes, that GM first learned of the existence and scope of wrongdoing at the CHR by Ashton. Prior to that time, GM did not know and could not reasonably have discovered the shakedown and kickback scheme that Grimes, Pietrzyk, and Ashton committed with certain vendors of the CHR or that Ashton had been involved in and directed the fraud, including while serving on GM's Board.

103. Ashton and his co-conspirators affirmatively concealed their wrongdoing and GM's resulting injury. For example, Ashton admitted that he, along with Grimes and Pietrzyk, "concealed and did not disclose the manner in which certain contracts between CHR and [USA Countrywide]. . . was obtained or the fact that [he, Grimes, and Pietrzyk] accepted bribes and kickbacks from [USA

**EXHIBIT 3**

Countrywide]."[22][23] Grimes and Pietrzyk similarly admitted that they, along with Ashton, "concealed and did not disclose" the scheme, including the improperly inflated contracts and the bribes and kickbacks they received.[23][24]

104.  The lengths Ashton and others went to conceal their scheme from GM are detailed in the government's charges. To conceal his kickbacks received from a CHR vendor, Impressions, Grimes directed Impressions to make out checks payable to his wife or to "KKG Consulting," a sham company created by Grimes' wife for the purpose of concealing the bribes. Likewise, Ashton, Grimes, and Pietrzyk conspired with Cohen to set up a sham vendor, USA Countrywide, and then conceal bribes from that vendor with checks purportedly for "antique furniture" or "furniture." Then, once Ashton learned that the government was investigating the NTC, Ashton met with Cohen and instructed him not to send further payments to avoid detection from the government investigation.

105.  Meanwhile, although Ashton was a member of GM's Board of Directors from 2014 to 2017 and owed a fiduciary duty to GM to disclose any self-dealing or misuse of GM funds, Ashton concealed that over the same time period he was receiving regular cash payments and checks from Cohen and USA Countrywide of between $5,000 and $30,000 as bribes and kickbacks for causing

---

[23][23]  Ashton Plea Agreement at 6.

[24][24]  Grimes Plea Agreement at 6.

**EXHIBIT 3**

CHR to enter an inflated contract with USA Countrywide for the purchase of 58,000 custom watches. Ashton furthered this concealment by refusing even to meet with or speak to GM in 2017 when GM first learned of a possible investigation into CHR.

106.    Similarly, GM had no way to know of the existence or Ashton's involvement in the scheme directed by FCA and FCA NV to bribe key UAW officials to ensure FCA received illicit competitive advantages to GM's harm.

107.    In addition, Ashton and the other conspirators also adopted extraordinary measures to conceal FCA's bribery scheme. As described herein and as admitted in the criminal plea agreements, the co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length, complexity and sophistication of the scheme, these efforts successfully concealed the scheme and precluded suspicion of Ashton's or the other conspirators' conduct. For example:

> (a)    Ashton and other FCA and UAW executives hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, Panama, the Cayman Islands, and others.

**EXHIBIT 3**

(b) FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW";[2425]

(c) Iacobelli, Durden, Morgan, and their co-conspirators used the charities to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[2526]

(d) Iacobelli (on March 19, 2015), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e) Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal

---

[2425] 5/25/18 Brown Plea Agreement, at 3.

[2526] 7/26/17 Iacobelli Indictment, at 9.

**EXHIBIT 3**

payments made by and on behalf of FCA to UAW officers and representatives";[2627]

(f)     In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty bucks."[2728] Marchionne then falsely denied the gift when questioned about it by federal investigators;

(g)     "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[2829]

(h)     On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials.";[2930]

---

[27][627] 6/13/17 Durden Information, at 6.

[28][728] 7/13/18 Iacobelli Plea Agreement, at 8.

[29][829] 7/26/17 Iacobelli Indictment, at 20.

[2930][5/25/18] Brown Plea Agreement, at 5.

**EXHIBIT 3**

      (i)     From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell and other officials.[~~30~~31] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[~~31~~32]

108.   After the U.S. Attorney's investigation began bringing this scheme to light, GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to identify Ashton's involvement in this scheme or his breach of fiduciary duty with respect to the scheme until very recently, when GM first learned of the substantial accounts Ashton had been provided by FCA NV in multiple foreign financial institutions.

---

[~~31~~30] ~~4/2/19~~ Jewell Plea Agreement~~,~~ at 3–4.

[~~32~~31] *Id.* at 13.

**EXHIBIT 3**

109.   In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams (all of whom were co-conspirators with Ashton) warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other "bad actors." As has now been revealed, these statements were false, and were designed to evade suspicion and prevent inquiry into their illegal conduct:

(a)   On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period*."33 In fact, Williams himself was directly involved in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

(b)   On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees

---

33   Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

**EXHIBIT 3**

that held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[3334] In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c)     Following a day later in what appears to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that ***this conduct had nothing whatsoever to do with the collective bargaining process, but rather involved two bad actors*** . . . ."[3435] Marchionne claimed that the wrongdoing was

---

[34334]  FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

[35435]  Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017),

**EXHIBIT 3**

"neither known nor sanctioned by FCA." In reality, Marchionne and Williams themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d)   On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, ***it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements***, including the 2011 collective bargaining agreement between the UAW and Chrysler."[~~35~~36]

(e)   On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating: "***[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your***

---

https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

[~~36~~36]   *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

**EXHIBIT 3**

*collective bargaining agreement and no union funds were stolen or lost."*[36][37]

(f)  On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[37][38]

(g)  On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process."*[38][39]

110.  These FCA bribery and CHR kickback schemes, and Ashton's role in those schemes, were inherently self-concealing, as secrecy was essential to perpetuate the schemes. Had either been exposed, Ashton would have been

---

[36][37] *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[38][37][38] *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[39][38][39] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* Detroit Free Press (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

**EXHIBIT 3**

immediately removed from GM's Board, the perpetrators would have been investigated and prosecuted criminally, and the scheme would have been brought to an end.

111.    As alleged herein, GM could not have discovered these schemes or Ashton's role therein any earlier despite reasonable diligence.

## CAUSES OF ACTION

### First Cause of Action

Breach of Fiduciary Duty

112.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

113.    From 2014 to 2017, Ashton served on the Board of Directors of ~~GM~~General Motors Company. In that role, Ashton owed GM fiduciary duties of loyalty, care, confidentiality, and disclosure. When he joined the Board, Ashton received an orientation on his rights and obligations as a director and signed an agreement to comply with his fiduciary duties to GM. As described above, Ashton repeatedly disclaimed any conflicts of loyalty and agreed to adhere GM's Code of Conduct, which prohibits "bribery," among other pertinent illegal activity.

114.    Ashton breached his fiduciary duties by, among other things, failing to disclose to GM the bribery scheme between FCA and UAW to harm GM and force a merger between GM and FCA NV and disclosing GM confidential

**EXHIBIT 3**

information to UAW and/or FCA leaders while serving on the Board of Directors of ~~GM~~General Motors Company.

115.  Separately, Ashton further breached his fiduciary duty by failing to disclose to GM the kickback scheme involving CHR and continuing to solicit and accept bribes from vendors to the CHR, knowing that such kickbacks directly harmed GM as the funding source of the CHR.

116.  As a direct result of these breaches of Ashton's fiduciary duty, GM was damaged.

117.  Ashton is accordingly liable to GM for this harm and, in addition, must forfeit any amounts paid to him by GM as a result of his service on the Board, which amounts total in the hundreds of thousands of dollars.

## Second Cause of Action

### Fraud

118.  Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

119.  As described above, Ashton intentionally or recklessly made numerous material misrepresentations to GM. For example, in annual written director questionnaires that Ashton completed ~~each year from 2014 through 2017, Ashton repeatedly~~on April 15, 2014 ("2014 Questionnaire"), January 26, 2015

**EXHIBIT 3**

("2015 Questionnaire"), December 1, 2015 ("2016 Questionnaire"), and January 10, 2017 ("2017 Questionnaire"), Ashton represented in writing:

    (a)    That he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry (2016 Questionnaire, 2017 Questionnaire);

    (b)    That he had not received or been offered anything of value by a third party "in consideration" for his service as a GM director (2015 Questionnaire, 2016 Questionnaire, 2017 Questionnaire);

    (c)    That he "adhered[d]" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity (2017 Questionnaire);

    (d)    That there was no "special arrangement or understanding between [him]Ashton and "any other person pursuant to which" he was nominated to the Board (2016 Questionnaire, 2017 Questionnaire); and

    (e)    That he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." (2014 Questionnaire, 2015 Questionnaire).

120.    These representations were false. At the time Ashton made these representations, he knew that he had received and/or continued to receive

**EXHIBIT 3**

kickbacks from CHR vendors under inflated contracts ultimately funded by GM. Further, at the time Ashton made these representations, he knew that, in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton had agreed to pass and was passing GM's confidential information to UAW and/or FCA leaders.

121.   These fraudulent misrepresentations were intended to and did induce reliance by GM. For example, had GM known of the criminal kickback scheme involving the CHR and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

122.   Further, had GM known of FCA and FCA NV's bribery scheme and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

123.   Ashton's fraudulent misrepresentations were intended to and did cause harm to GM. For example, as a result of Ashton's fraudulent misrepresentations and omissions, Ashton was nominated to GM's Board and GM paid him compensation. GM continued to unknowingly fund inflated vendor contracts at the CHR that lined the pockets of Ashton and his co-conspirators. Once on the Board, Ashton betrayed GM's trust by funneling GM's confidential information to UAW and/or FCA leaders.

**EXHIBIT 3**

### Third Cause of Action

Fraud by Omission

124. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

125. Ashton owed GM a duty of disclosure. First, as a director on GM's Board, Ashton owed GM a duty of disclosure. Second, as described above, Ashton actively participated in meetings and discussions concerning strategy decisions involving the UAW and FCA. Having participated and provided input in these discussions, Ashton had a duty to make complete disclosures of facts where his partial disclosures would and did convey false impressions and mislead GM.

126. By the time Ashton joined GM's Board, he had actively participated for years in a criminal kickback scheme involving the CHR, which was funded by GM. Ashton continued receiving these kickbacks after joining GM's Board. Ashton has pled guilty to his participation in this scheme. Despite knowing of and participating in this scheme, Ashton never disclosed the scheme to anyone at GM.

127. Further, by the time Ashton joined GM's Board, he had actively participated in FCA and FCA NV's criminal scheme to corrupt the bargaining process to benefit FCA and harm GM. Ashton never disclosed this scheme to anyone at GM. Indeed, as described above, once on GM's Board, Ashton furthered

**EXHIBIT 3**

this scheme by passing GM's confidential information to UAW and/or FCA leaders.

128. In addition, as described above, Ashton failed to disclose numerous additional material facts of which he was aware, the non-disclosure of which created a false impression for GM. For example, in ~~written director questionnaires that Ashton completed each year from 2014 through~~ the 2014, 2015, 2016, and 2017 Questionnaires, Ashton repeatedly represented in writing:

(a) That he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry (2016 Questionnaire, 2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(b) That he had not received ~~or been offered~~ anything of value by a third party "in consideration" for his service as a GM director (2015 Questionnaire, 2016 Questionnaire, 2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their

**EXHIBIT 3**

scheme to corrupt the bargaining process. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(c)     That he "adhered[d]" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity (2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process, as well as the material fact that he received kickbacks through inflated contracts at the CHR funded by GM. Ashton was aware of these undisclosed material facts, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(d)     That there was no "special arrangement or understanding between [him]Ashton and "any other person pursuant to which" he was nominated to the Board (2016 Questionnaire, 2017 Questionnaire). Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process while serving as a GM director. Ashton was aware of this undisclosed

59

**EXHIBIT 3**

material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(e)  That he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." (2014 Questionnaire, 2015 Questionnaire). Ashton failed to disclose the material fact that he passed GM's confidential information to FCA, FCA NV, and the UAW. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

129.  These fraudulent omissions were intended to and did induce reliance by GM. For example, had GM known of the criminal kickback scheme involving the CHR and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

130.  Further, had GM known of FCA and FCA NV's bribery scheme and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

131.  Ashton's fraudulent omissions were intended to and did cause harm to GM. For example, as a result of Ashton's fraudulent misrepresentations and omissions, Ashton was nominated to GM's Board and GM paid him compensation. GM continued to unknowingly fund inflated vendor contracts at the CHR that

**EXHIBIT 3**

lined the pockets of Ashton and his co-conspirators. Once on the Board, Ashton betrayed GM's trust by funneling GM's confidential information to UAW and/or FCA leaders.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    Damages, in an amount to be determined at trial, including but not limited to, the recoupment of monies paid by GM to Ashton for service as a director on GM's Board and further damage GM suffered as a result of Ashton's breaches of fiduciary duty, fraudulent statements and omissions, and other unlawful acts;

B.    An award of punitive and/or exemplary damages as Ashton has acted with malice and willful disregard for GM's rights;

C.    An award of costs and fees incurred in pursuing this litigation, including attorney's fees, costs, and the fees and costs of experts;

D.    Equitable relief, including restitution; and

E.    Any other relief the Court deems just, fair, necessary, or equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury.

**EXHIBIT 3**

Dated: September ~~1~~24, 2020

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: <u>s/James E. Marina</u>
James E. Marina (N.J. Bar No. 050791996)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
jmarina@kirkland.com

Hariklia Karis, P.C. (*pro hac vice pending*)
Jeffrey Willian, P.C. (*pro hac vice pending*)
Casey McGushin  (*pro hac vice pending*)
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris  (*pro hac vice pending*)
2049 Century Park East
Los Angeles, CA 90067
Telephone:  (310) 552-4200
<u>austin.norris@kirkland.com</u>

Maisie Allison  (*pro hac vice pending*)
555 South Flower Street
Los Angeles, CA 90071
Telephone:  (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs General Motors LLC
and General Motors Company*

**EXHIBIT 3**

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify to the best of my knowledge pursuant to Local Civil Rule 11.2 that this matter in controversy is not the subject of any other action pending in any court, arbitration, or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of September, 2020.

s/James E. Marina

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

I hereby certify to the best of my knowledge pursuant to Local Civil Rule 201.1 that the matter in controversy is not subject to arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000 exclusive of interest and costs and any claim for punitive damages.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of September, 2020.

s/James E. Marina

**EXHIBIT 3**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| GENERAL MOTORS LLC, et al., | : | |
| | : | Civil No. 20-12659 |
| Plaintiffs, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| JOSEPH ASHTON, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendant Joseph Ashton's Motion to Dismiss (Doc. 17, "Mot. to Dismiss."). For the reasons expressed below, the Motion is **DENIED IN PART,** and the Court reserves judgment in part. The Court declines to rule on the statute of limitations issue at this time and instead orders supplemental briefing in accordance with this Opinion and accompanying Order.

## I.  BACKGROUND

In this case, Plaintiff General Motors LLC ("GM") alleges that Defendant Joseph Ashton committed fraud and a breach of his fiduciary duty to GM. During the relevant period, Ashton was an official at the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), the Vice President of the UAW's GM Department, and a director on GM's Board of Directors. The Complaint alleges that during his tenure in the aforementioned positions, "Ashton sat at the center of two sprawling and long-running criminal schemes" that "cause[d] massive harm to GM." (Doc. 7, "FAC" ¶2.) GM brings the present suit seeking to

1

**EXHIBIT 4**

recover for that harm. The factual and procedural posture of this case is lengthy; as such, the Court recites only what is necessary to determine the currently pending motion to dismiss.

### A.  Ashton's Role at GM

Ashton served as Vice President of the UAW's GM Department from 2010 to 2014. (FAC ¶58.) The Complaint alleges that, as UAW Vice President, Ashton was involved in negotiating and implementing collective bargaining agreements between the UAW and GM and influencing the terms of the UAW's collective bargaining agreements with Fiat Chrysler ("FCA"). (FAC ¶31.) In 2014, Ashton joined the GM Board of Directors and held this position until 2017. (FAC ¶33). Ashton additionally was a member of the UAW-GM Center for Human Resources ("CHR") Board. The Complaint pleads that the CHR's primary purpose is to educate and train GM's domestic union workforce. (FAC ¶20). It is governed by an eight-director board, with four members appointed by GM and four by the UAW. GM is the sole source of funding for the CHR. (FAC ¶¶3, 53.)

### B.  Written Director Questionnaire

The Complaint alleges that, upon joining GM's Board, Ashton signed a written director questionnaire and agreed to comply with his fiduciary duties to GM. (FAC ¶34.) In this questionnaire, Ashton made several written representations:

- He had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry;

- He had not received or been offered anything of value in consideration for his Board service;

- He would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM";

**EXHIBIT 4**

- There was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board; and

- He adhered to GM's Code of Conduct, which, among other things, prohibits bribery and receiving improper payments.

(FAC ¶¶ 34, 119, 128.)

### C. Ashton's Alleged Misconduct

GM's claims in this case arise from two separate theories of misconduct by Ashton. The first theory is that Ashton committed fraud and a breach of his fiduciary duties to GM by participating in a "criminal kickback scheme" that siphoned money from the CHR.[1] The Complaint alleges that Ashton and several co-conspirators "deceptively solicited, influenced, and obtained contracts for CHR vendors to provide clothing and other items to UAW members." (Opp. at 7 (citing FAC ¶38.)) In return, they "demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value." (FAC ¶38.) As an example, the Complaint alleges that the CHR purchased 50,000 "Team UAW-GM" jackets for plant employees. (FAC ¶44.) Ashton and his co-conspirators recommended a specific vendor as the sole source of the contract, and Ashton received $300,000 in kickbacks. (FAC ¶44. As another example, the Complaint pleads that Ashton convinced an associate to loan $250,000 to a construction company. (FAC ¶46). When the company stopped paying the loan, "Ashton proposed that his associate could recoup the loan money by forming a company to sell watches to the CHR." (Opp. at 8.) The Complaint alleges that Ashton used his position at the CHR to ensure that the CHR purchased watches from this company, and Ashton received $250,000 in kickback money for the contract. (FAC ¶48) According to GM, "Ashton never disclosed the

---

[1] For ease of reference, the Court refers to this theory of liability as the "criminal kickback scheme" throughout the Opinion.

**EXHIBIT 4**

kickback scheme" and instead "affirmatively concealed the scheme through fraudulent checks, sham vendors, and other fraudulent means." (Opp. at 9) (citing FAC ¶¶ 51, 102–05.)) In November 2019, Ashton was criminally charged for his participation in the criminal kickback scheme involving the purchase of "commemorative watches" that the Court outlines above. (FAC ¶43.) Ashton pled guilty on December 4, 2019, and a court sentenced him to 30 months imprisonment. (FAC ¶43.) According to the Complaint, Ashton "admitt[ed] that he demanded and accepted hundreds of thousands of dollars in kickbacks and improperly used his position to enrich himself[.]" (FAC ¶43.)

The second theory of liability asserts that Ashton acted improperly in his role on GM's board during GM's 2015 collective bargaining negotiations.[2] As part of this theory, the Complaint alleges that Ashton disclosed confidential information discussed in GM board meetings to Fiat Chrysler ("FCA") and Fiat Chrysler Automobiles N.V. ("FCA NV.") The Complaint alleges that FCA and FCA NV gave millions of dollars to UAW officials to obtain advantages for FCA and secure disadvantages for GM in negotiating and implementing collective bargaining agreements. (Opp. at 9 (citing FAC ¶¶4, 55, 75–99.)) GM pleads that the scheme was two-fold. First, in return for its bribes, "FCA obtained labor cost advantages while ensuring such advantages were denied to GM[.]" (Opp. at 9 (citing FAC ¶72.)) Second, FCA and its CEO leveraged the bribery scheme in order to assist FCA NV in trying to "force a merger with GM." (FAC ¶¶75, 99–100.) GM pleads that Ashton, "as Vice President of the UAW's GM Department," could "directly influence and control the labor relations between GM and the UAW." (FAC ¶71.) Therefore, the Complaint alleges that Ashton ensured that GM did not receive the same labor advantages as FCA. GM also pleads that Ashton "acted clandestinely on FCA's behalf from inside GM's Boardroom" (FAC

---

[2] For simplicity, the Court refers to this theory of liability as the "2015 collective bargaining" theory throughout the Opinion.

**EXHIBIT 4**

¶¶33–34, 90) by receiving detailed information about GM and sharing that information with "corrupt UAW leaders and FCA and FCA NV executives[.]" (Opp. at 11).

In 2017, the federal government began unsealing indictments related to the aforementioned conduct. (FAC ¶35.) GM alleges that to date "more than a dozen FCA and UAW officials have been criminally charged, and every one of them has pleaded guilty" to the "years-long pattern of corruption and racketeering activity[.]" (FAC ¶35.) GM asserts that these officials have "admitted to numerous racketeering acts, including millions of dollars in bribes designed to corrupt the negotiation, implementation, and administration of the collective bargaining process." (Opp. at 12 (citing FAC ¶¶2–4.)) After the first indictments were unsealed in 2017, Ashton resigned from GM's Board. (FAC ¶36.)

### D. Related Cases and Procedural Posture

In November 2019, GM filed suit in the United States District Court for the Eastern District of Michigan. *See General Motors LLC v. FCA*, Case No. 19-cv-13429 (E.D. Mich.).[3] In that case, GM sued FCA, FCA NV, and three former FCA employees and UAW officials—Alphons Iacobelli, Jermone Durden, and Michael Brown. The complaint in that case pleaded causes of action for violation of RICO, unfair competition, and civil conspiracy. Ashton was not a named defendant in that suit. The defendants in that case filed motions to dismiss. The motions were heard by the Honorable Paul D. Borman. Judge Borman dismissed the RICO claim after finding that GM had failed to plead sufficient facts to show that the defendants' RICO violations proximately caused GM's injuries. *General Motors LLC v. FCA US LLC*, No. 19-13429, 2020 WL 3833058 (E.D. Mich., July 8, 2020). After dismissing the only federal cause of action, Judge Borman declined to exercise supplemental jurisdiction over the state law claims. *See id.* at *7. Following

---

[3] The Court refers to this action throughout the Opinion as the Eastern District of Michigan action.

**EXHIBIT 4**

the dismissal, GM moved to amend its complaint based on newly discovered evidence regarding the existence of foreign bank accounts. *See General Motors LLC v. FCA US LLC*, No. 19-13429, 2020 WL 4726941 (E.D. Mich. Aug. 14, 2020). Judge Borman denied that motion, finding that the "newly discovered evidence [was] too speculative to warrant reopening th[e] case." *Id.* at *1. GM has since appealed, and the appeal is pending before the Sixth Circuit.

Because Judge Borman declined to exercise jurisdiction over GM's state law claims, GM subsequently filed a new lawsuit against FCA, FCA NV, and several individual defendants in Michigan state court, alleging claims of fraud, breach of fiduciary duty, and unfair competition.[4] Ashton is not a defendant in that case. FCA removed the action to federal court, *General Motors LLC v. Iacobelli*, Case No. 20-cv-12668 (E.D. Mich.), but Judge Robert H. Cleland remanded the case back to Michigan state court, where the case is currently pending.

On September 14, 2020, GM filed the present suit against Ashton in this Court. (Doc. 1.) The Court ordered GM to cure jurisdictional pleading deficiencies and to file an Amended Complaint. (Doc. 5.) GM did so and filed the operative complaint, the First Amended Complaint, on September 24, 2020. (Doc. 7.) On November 23, 2020, Ashton filed the presently pending motion to dismiss. (Doc. 17, "Mot. to Dismiss.") GM opposed (Doc. 20, "Opp."), and Ashton replied (Doc. 21, "Reply").

## II. LEGAL STANDARD

When deciding a motion to dismiss a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court limits its review to the face of the complaint. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011). The court must accept as true all well-pleaded factual allegations and must construe them in the light most favorable to the nonmoving party. *Phillips v. Cty. of*

---

[4] The Court refers to this as the "Michigan state court action" throughout the Opinion.

**EXHIBIT 4**

*Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). In other words, a complaint is sufficient if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The inquiry is not whether plaintiff will ultimately prevail in a trial on the merits, but whether [he or she] should be afforded an opportunity to offer evidence in support of [his or her] claims. *In re Rockefeller Ctr. Prop., Inc.*, 311 F.3d 198, 215 (3d Cir. 2002). However, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

To determine whether a complaint is plausible on its face, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id*. (quoting *Iqbal*, 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A complaint cannot survive where a court can infer only that a claim is merely possible rather than plausible. *Id*. In deciding a motion to dismiss, the court may rely on "the complaint, attached exhibits, and matters of public record" without converting the motion to one of summary judgment. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).

**EXHIBIT 4**

## III.    ANALYSIS

Ashton's sixty-page brief in support of his motion to dismiss makes four primary arguments in support of dismissal: (1) collateral estoppel bars GM's claims; (2) the breach of fiduciary duty claim is time-barred; (3) GM's fraud claim fails; and (4) GM breach of fiduciary duty claim fails. The Court addresses each argument in turn.

### A.  Whether GM's Claims Are Barred by Collateral Estoppel

First, Ashton argues that the Court should dismiss the fraud and breach of fiduciary causes of action because GM is collaterally estopped from asserting these claims. (Mot. at 19.) The doctrine of collateral estoppel, or issue preclusion, prevents a party from relitigating issues that were adjudicated in a prior lawsuit. *See In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997). Collateral estoppel exists to promote judicial consistency, encourage reliance on court decisions, and protect defendants from being forced to relitigate the same issues in multiple lawsuits. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) ("Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."). Collateral estoppel applies when four elements are satisfied: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *Burlington N. R.R. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1231–32 (3d Cir. 1995) (alterations in original) (quoting *In re Graham*, 973 F.3d 1089, 1097 (3d Cir. 1992)).

Ashton asserts that collateral estoppel applies because "[a]ll of GM's claims in this lawsuit depend on the alleged existence of bribery and corporate espionage schemes which have already

**EXHIBIT 4**

been ruled implausible by the Michigan court, based on virtually identical factual allegations." (Mot. at 20.) In response, GM asserts that Ashton's collateral estoppel argument fails even the first element because the "RICO Action did not involve (let alone 'actually litigate') any of 'the same' issues presented here." (Opp. at 21.) Rather, GM contends that the Eastern District of Michigan action involved the litigation of (1) different claims, (2) necessitating different burdens of proof, (3) against different parties.

The Court agrees with GM. First, as Ashton concedes, "GM brings different causes of action here[.]" (Mot. at 20.) In the Eastern District of Michigan action, GM brought civil RICO claims. *See* 2020 WL 3833058, at *1. Here, GM asserts only state law fraud and breach of fiduciary duty claims. (*See generally* Compl.) While that is not to say that the doctrine of collateral estoppel may only apply in cases with identical causes of action, the requirements for civil RICO claims are decidedly different from state law fraud and breach of fiduciary claims brought under New Jersey law.[5] Moreover, GM's allegations related to Ashton's participation in the criminal kickback scheme were certainly not litigated in the Eastern District of Michigan action.

Second, Ashton was not a party to the Eastern District of Michigan action. As such, the Amended Complaint in this case contains far more allegations specifically related to Ashton's conduct both in the kickback schemes and the bribery schemes than did the complaint in the Eastern District of Michigan action. Accordingly, the pending litigation places Ashton's conduct in direct dispute. As GM points out, the question of whether "Ashton defrauded GM and breached

---

[5] For example, as discussed more fully below, to state a claim for fraud under New Jersey law, a plaintiff must allege "(1) a material misrepresentation [or omission] of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 367–368 (1997). Conversely, to state a claim for a civil RICO violation, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Poling v. K. Hovnanian Enterprises*, 99 F. Supp. 502, 508 (D.N.J. 2000) (citing *Sedima, S.P.R.L., v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985)).

**EXHIBIT 4**

his fiduciary duty to GM" was not a question before Judge Borman in the Eastern District of Michigan.

Third, and finally, the heart of the Eastern District of Michigan case was the alleged FCA-led bribery scheme. However, here, GM's claims against Ashton also include allegations related to the criminal kickback scheme, allegations which were not included or litigated in the Eastern District of Michigan case. As such, for all of these reasons, the Court concludes that GM's claims are not barred by the doctrine of collateral estoppel because the issues litigated are not identical.

### B. Whether the Breach of Fiduciary Duty Claim is Time-Barred

Next, Ashton argues that the breach of fiduciary duty claim is barred by the statute of limitations. (Mot. at 52.) In the Third Circuit, a statute of limitations defense may be raised under Rule 12(b)(6) only if the "time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975). However, at the motion to dismiss phase, it must be "apparent on the face of the complaint" that the statute of limitations bars the claim; otherwise "[the statute of limitations] may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978).

As a threshold issue, the parties disagree over which state's substantive law applies to the breach of fiduciary duty claim. Ashton asserts that Michigan law should apply to GM's breach of fiduciary duty claim. (Mot. at 53.) Conversely, GM asserts that it is not necessary to determine at this stage which forum's substantive laws apply—rather, it does not matter which state's substantive law applies because the claim is timely under both Michigan and New Jersey law. (Opp. at 44.)

**EXHIBIT 4**

New Jersey and Michigan law regarding the statute of limitations period differ in several important ways. First, New Jersey law provides for a six-year limitations period for a breach of a fiduciary duty claim. *Levitt v. Riddell Sports (In re MacGregor Sporting Goods)*, 199 B.R. 502, 512 (D.N.J. Bankr. Nov. 27, 1995). Conversely, Michigan law provides a shorter limitations period—claims must be brought within three-years. *Sports Mgmt. Network v. Busch*, 2019 U.S. Dist. LEXIS 35663, *21 (E.D. Mich. Mar. 6, 2019). Second, the tolling doctrines differ widely between the two jurisdictions—Michigan courts apply only statutory tolling mechanisms, while New Jersey applies the common law discovery rule. *Compare Caravaggio v. D'Agostini,* 765 A.2d 182, 186 (2001) *with Sports Mgmt.,* 2019 U.S. Dist. LEXIS 35663 at *22.

GM urges that the choice of law analysis is not necessary because, even under Michigan's shorter statute of limitations period, the claim is timely. GM avers that the statute of limitations was tolled due to Ashtons's fraudulent concealment of the facts giving rise to the claim. (Opp. at 46–47.) In his Reply, Ashton argues, for the first time, that fraudulent concealment does not toll the statute of limitations. (Reply at 20.) GM notes that Ashton does not address the "core dispositive argument" of fraudulent concealment in his opening brief and accuses Ashton of "sandbagging" the argument in order to prevent GM from having a genuine opportunity to respond to Ashton's arguments. (Opp. at 45.) GM argues that Ashton's failure to raise the fraudulent concealment issue in his opening brief prejudices GM, as it "will have no opportunity to respond to any arguments on fraudulent concealment that Ashton may present in his reply." (Opp. at 46.)

The Court is cognizant of GM's prejudice concerns, particularly because Ashton does, as predicted, make several new arguments related to fraudulent concealment in its reply brief. (*See* Reply at 19–29.) In fact, Ashton dedicates nearly ten pages, or one-third, of his entire reply brief to discussing the fraudulent concealment issue. The Court is also cognizant of the fact that the

**EXHIBIT 4**

outcome of the decision regarding the choice of law, tolling, and fraudulent concealment issue has the potential to be dispositive of the breach of fiduciary duty claim. Given these concerns, the Court finds that justice will be best served, and prejudice avoided, by reserving judgment on the issue until both parties have had an adequate chance to be heard. Thus, pursuant to the Order accompanying this Opinion, the Court directs the parties to submit supplemental briefing on (1) which forum's substantive law applies to the breach of fiduciary duty claim; (2) whether the claim is barred by the statute of limitations; and (3) whether the statute of limitations should be tolled.

### C.  Whether the Complaint States a Plausible Claim for Fraud

Ashton next argues that GM fails to state a claim for fraud. (Mot. at 24.) GM pleads two types of fraud claims: fraud and fraud by omission. To best address Ashton's arguments, the Court (1) begins its analysis with an overview of New Jersey fraud principles,[6] (2) gives a high-level overview of GM's fraud theories, and (3) then evaluates the merits of each of Ashton's arguments.

#### *Overview of New Jersey Fraud Principles*

In its most "general and fundamental conception" fraud "consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Ctr. of Sussex Cty. v. Whale*, 432 A.2d 521, 524 (N.J. 1981). To state a claim for fraud under New Jersey law, a plaintiff must allege "(1) a material misrepresentation [or omission] of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." *Gennari v. Weichert Co. Realtors,* 691 A.2d 350, 367–68 (N.J. 1997). A plaintiff pleading fraud by omission must allege the same elements. *See, e.g.*, *Gennari v. Weichert Realtors*, 691 A.2d 350 (N.J. 1997); *Coba v. Ford Motor Co.*, No. 12-1622, 2016 WL 5746361, at *12 (D.N.J. Sept. 30,

---

[6] Neither party disputes whether New Jersey substantive law applies to the fraud and breach of fiduciary duty claims. As such, the Court applies New Jersey principles to these claims.

**EXHIBIT 4**

2016). However, in addition, a plaintiff must plead that the defendant had a duty to disclose. *See Coba* 2016 WL 5746361, at *12. As the Third Circuit has clarified, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a special relationship." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The three types of relationship which establish a duty to disclose include: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.* (citation omitted).

Fraud claims are subjected to a more stringent pleading standard pursuant to Federal Rule of Civil Procedure 9(b). In order to satisfy Rule 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). Specifically, the complaint must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* Although fraud claims are subject to the strictures of Rule 9(b), courts within this district have held that the heightened pleading standard "is somewhat relaxed in a case based on a fraudulent omission." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 451 (D.N.J. 2012); *Weske v. Samsung Elecs., Am., Inc.*, 42 F. Supp. 3d 599, 614 (D.N.J. 2014).

### GM's Fraud Allegations

GM pleads two distinct underlying theories of liability for its fraud claim. As outlined more fully above, first there is the theory based on the criminal kickback scheme. In support of this

13

**EXHIBIT 4**

theory, GM pleads that Ashton represented in writing on a written questionnaire that he adhered to GM's Code of Conduct, which prohibited receiving improper payments and bribery. (FAC ¶119.) GM pleads that "Ashton failed to disclose numerous additional material facts of which he was aware, the non-disclosure of which created a false impression for GM." (FAC ¶128.) GM pleads that Ashton knew these statements were false because "[a]s Ashton admitted, between 2012 and 2016, he and two other high-level UAW officials . . . orchestrated a criminal kickback scheme to siphon money from the UAW-GM [CHR], where they served on the Board and were responsible for or had influence over the approval of contracts." (FAC ¶3.)

Second, GM pleads a theory of fraud based on the 2015 collective bargaining negotiations. In support of this theory, GM pleads that Ashton represented in writing on the same written questionnaire that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." (FAC ¶119.) Nevertheless, Ashton knew that this representation was false because, "in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton had agreed to pass and was passing GM's confidential information to UAW and/or FCA leaders." (FAC ¶120.) This scheme was for the purpose of manipulating the 2015 collective bargaining process with the UAW to weaken GM with inflated labor costs, which would then pressure GM into agreeing to a merger with FCA. GM pleads that together these "fraudulent misrepresentations were intended to and did cause harm to GM because GM continued to pay Ashton compensation as a board member." (FAC ¶123.)

### *Plausibility and Particularity*

With each of these fraud theories in mind, the Court now evaluates Ashton's numerous arguments regarding GM's fraud claims. First, Ashton asserts that the fraud claim fails the *Twombly/Iqbal* plausibility standard and Rule 9(b)'s particularly standard. Ashton argues that the

**EXHIBIT 4**

"convoluted" allegations surrounding the 2015 collective bargaining negotiations fraud theory are too implausible to survive a motion to dismiss. (Mot. at 2, 27.) In doing so, Ashton premises the majority of his argument on Judge Borman's reasoning from the Eastern District of Michigan action. (*See, e.g.*, Mot. at 26–27.) As an initial matter, the Court finds Ashton's numerous references and general reliance on Judge Borman's opinion largely unhelpful to the disposition of the current motion to dismiss. As discussed above in the section on collateral estoppel, the Eastern District of Michigan action involved different claims against different parties. Judge Borman's findings regarding the plausibility of GM's claims against unrelated defendants in that case are not incredibly relevant here. For example, Ashton argues in detail regarding Judge Borman's decision regarding the alleged offshore bank accounts. (Mot. at 17–18.) However, the offshore bank accounts are only a small portion of one of the theories of fraud liability in this case; therefore, they have little relevance to the relatively straightforward breach of fiduciary duty and fraud claims that GM asserts against Ashton in the present litigation. Accordingly, the Court declines to dismiss GM's claims based on Ashton's arguments that rely on Judge Borman's reasoning from the Eastern District of Michigan action.

The Court also notes that many of Ashton's "implausibility" arguments are inappropriately asserted at the motion to dismiss phase. Throughout his moving papers, Ashton argues that GM's claims are too "convoluted" to be plausible, that GM "distorts the facts" and presents misleading allegations, and that GM's pleadings cannot be taken at face value. Ashton asks the Court to view the Complaint with a "healthy dose of skepticism." (Mot. at 13.) In making these contentions, Ashton seemingly asks this Court to disregard the well-established standard of a motion to dismiss, in which courts must accept as true all well-pleaded factual allegations in the complaint. *See, e.g.*, *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring & Searchlight Minerals Corp.*,

**EXHIBIT 4**

441 F. Supp. 3d 23, 37 n.5 (D.N.J. 2020) ("accepting at face value the allegations within the complaint is precisely what a court is required to do at the motion-to-dismiss stage.") Therefore, the Court declines to consider any arguments Ashton makes requesting the Court to draw inferences in his favor or weigh factual allegations. *See, e.g.*, *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 233 (3d Cir. 2020). The Court rejects these arguments outright.[7]

With regard to Ashton's arguments surrounding implausibility, the Court finds that Ashton largely disregards GM's allegations related to the criminal kickback scheme. The Court finds that the allegations related to that scheme, as outlined above, combined with the fact that Ashton pleaded guilty to the commemorative watch scheme, establish that the criminal kickback scheme is sufficiently plausible to survive a 12(b)(6) motion to dismiss. GM pleads that Ashton negotiated and approved the purchase of watches from a vendor, directed the vendor to submit an inflated bid to the CHR, and used his position at the CHR to ensure that awarded the contract to that vendor. (FAC ¶¶46–47.) Ashton then demanded $250,000 as a kickback for the contract. (FAC ¶48.) Ashton failed to disclose the kickback to anyone at GM and affirmatively concealed the scheme through fraudulent checks, sham vendors, and other fraudulent means. (FAC ¶¶102–05.) These allegations support a straightforward claim of fraud, regardless of any introspection into the 2015 collective bargaining fraud theory.

However, the allegations supporting the 2015 collective bargaining theory are, at this stage, similarly sufficient to establish plausibility at the motion to dismiss stage. Although Ashton argues that GM's theory is "shot through with logical holes[] and lacks any factual support," the Court

---

[7] For example, Ashton also asks the Court to dismiss the claim because "there are obvious alternative explanations for the 2015 collective bargaining behavior of the UAW and FCA[.]" (Mot. at 27.) While that could potentially be true, the Rule 12(b)(6) standard does not allow a court to impose its own judgment to weigh which explanation is the most likely. *See Caspersen*, 441 F. Supp. at 37 n.5. Rather, the well-pleaded factual allegations *must* be accepted as true.

**EXHIBIT 4**

disagrees. GM's theories for fraud are supported by factual allegations and easy to follow. GM alleges that "Ashton was included in the Board's confidential discussions surround the merger and was privy to GM's detailed analysis of and response to FCA NV's merger invitation." (FAC ¶77.) Nevertheless, Ashton "passed this information to the UAW and FCA[.]" (FAC ¶78.) GM pleads specific facts to support this conclusion: (1) "Ashton had access to extensive information concerning sensitive topics including . . . negotiation strategy and progress in connection with GM's negotiations with the UAW over the 2015 CBA, and GM's consideration of and response to merger inquiries from FCA NV"; (2) Ashton "pass[ed] this confidential information to the UAW" and "fail[ed] to disclose the ongoing schemes involving FCA and the UAW"; (FAC ¶91); and (3) Ashton took "affirmative steps to evade suspicion and prevent inquiry into [his] illegal scheme[.]" (FAC ¶107.) The Complaint's allegations sufficiently detail the information Ashton received, when he received, what information he passed to FCA, and how he was compensated. (FAC ¶¶77, 90–91.) Just as Judge Cleland concluded in the remand proceedings from the Michigan litigation, "the detailed description of the alleged conspiracy provided in the complaint" contradicts the assertion that the fraud was implausible. (Remand Order at 10.)

Ultimately, the Court finds that the fraud claims based on both theories of liability—the criminal kickback scheme and the 2015 collective bargaining scheme—plead sufficient facts to survive a Rule 12(b)(6) motion to dismiss. The Complaint contains detailed descriptions of the alleged schemes. It is not for the Court to attempt to determine the veracity of these facts, nor would it be proper for the Court to decide whether the theories are too far-fetched to be true. Rather, the Court must accept all well-pleaded allegations. *See Iqbal*, 556 U.S. at 678. Having done so, the Court holds that the Complaint states a plausible claim for fraud.

**EXHIBIT 4**

The Court similarly finds that the aforementioned allegations clear the heightened particularity standard under Rule 9(b). Under this standard, GM needed to plead the date, time, and place of the alleged fraud. *Caspersen*, 441 F. Supp. 3d at 35. In particular, Ashton argues that the allegations regarding the offshore accounts are insufficient. (Mot. at 33.) However, as GM notes, the Complaint pleads the location and name of the financial institution in which the bribery payments were held in Ashton's names. It is unclear how much more information Ashton expects GM to plead at this stage of the litigation, prior to any relevant discovery. Moreover, "pleading upon information and belief is permissible where it can be shown that the requisite factual information is peculiarly within the Defendant's knowledge or control." *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 268 (3d Cir. 2016). Therefore, the Court finds that the pleadings included in the Complaint relying on "information and belief" are sufficient, as GM would have no way of knowing the precise details of Ashton's financial information.

### *Proximate Causation and Damages*

Ashton's next asserts that the fraud claims should be dismissed because they do not adequately plead proximate causation and damages. (Mot. at 38.) Ashton makes several distinct arguments on this point. Ashton contends that the fraud claims should be dismissed, first, because GM fails to show proximate causation. (Mot. at 39.) In order to establish proximate causation, a plaintiff must show that the defendant's conduct was "a substantial contributing factor in causing [a] loss." *McCabe v. Ernest & Young, LLP*, 494 F.3d 418, 439 (3d Cir. 2007) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 58, 691(1997)). Ashton argues that the representations made on the 2015 and 2017 questionnaires did not cause any harm because "these statements occurred *after* the consummation of the 2015 collective bargaining agreement which injured GM[.]" (Mot. at 40.) Thus, by the time Ashton responded to these questionnaires, the collective bargaining process was

**EXHIBIT 4**

over, and GM does not allege that the bribery payments continued beyond the 2015 collective bargaining process. (Mot. at 40.) Therefore, Ashton concludes that GM could not have entered into the 2015 CBA in reliance on Ashton's statements that were made later. (Mot. at 40.)

Ashton's arguments miss the point—as GM notes, it is immaterial whether the 2015 CBA had already been consummated because GM's claimed harm is not related to the 2015 CBA. Rather, GM alleges that it was harmed because it relied on Ashton's representations when it agreed to employ and then continued to employ Ashton as a member of its board. GM's damage, as pled in the Complaint, is the compensation it paid Ashton to serve on GM's board. (FAC ¶123.) GM would not have done this, but for Ashton's misrepresentations and omissions. Thus, the Court finds that it is immaterial whether the first set of statements post-dated the 2015 CBA because GM continued to rely on these statements by continuing to employ Ashton.

Ashton also argues that the 2014 and January 2015 questionnaire responses cannot form the basis of the fraud claim because "GM has not plausibly pled the existence of the underlying CB bribery scheme." (Mot. at 41.) This argument represents more of the same of Ashton's previously dismissed arguments related to the plausibility of the 2015 collective bargaining bribery scheme. As the Court explained above, the Court accepts as true the well-detailed factual allegations in support of the 2015 collective bargaining bribery scheme. Accordingly, the Court rejects this argument.

Ashton next argues that GM's fraud claim also fails because "it does not adequately allege that the theft of information and FCA's use of it proximately caused any damage to GM." (Mot. at 43–44.) Ashton avers that the alleged scheme could have still occurred because FCA could have found another "mole" to get information. (Mot. at 45.) These arguments again ignore GM's alternate theory of liability based on the criminal kickback scheme. GM pleads that Ashton's

**EXHIBIT 4**

fraudulent misrepresentations and omissions that obscured his role in the kickback scheme caused GM to continue to "fund the CHR with more than it would have cost but for Ashtons's scheme and continued to pay his director salary notwithstanding his concealed disloyalty." (Opp. at 36 (citing FAC ¶¶118–31.)) Therefore, GM has adequately pleaded causation, regardless of whether GM can also prove that Ashton's conduct caused the harm that GM suffered as a result of the corporate espionage scheme.

Finally, Ashton argues that the fraud claims fail because the claimed damages are too speculative. (Mot. at 50.) Ashton cites to New Jersey cases standing for the proposition that "profits which are too remote, speculative, or uncertain" may not be claimed damages. (Mot. at 50.) Ashton's arguments on this point again rely on the collective bargaining scheme fraud theory and ignore the criminal kickback fraud theory. For the criminal kickback theory of fraud, the damages are clear and traceable; GM seeks the "compensation Ashton received[], as well as the money GM spent in funding the CHR[.]" (Opp. at 42.) There is no dispute that these damages are certain enough to be calculated. Therefore, because at least one of GM's fraud theories includes traceable and calculable fraud theories, GM has stated a claim for fraud. Thus, the motion to dismiss the fraud claim is **DENIED**.

### D. Whether GM Sufficiently Pleads the Plausibility of the Breach of Fiduciary Duty Claim

In order to establish a claim for breach of fiduciary duty, a plaintiff must plead the following: (1) the defendant had a duty to the plaintiff, (2) the duty was breached, (3) injury to plaintiff occurred as a result of the breach, and (4) the defendant caused that injury. *Goodman v. Goldman, Sachs & Co.*, No. 10-1247 2010 WL 5186180, at *10 (D.N.J. Dec. 14, 2010). The Court finds that the Complaint adequately pleads each of the aforementioned elements. Ashton does not

**EXHIBIT 4**

dispute that he owed a duty to GM; nor could he. The Complaint pleads that, as a member of the GM Board, Ashton "owed GM fiduciary duties of loyalty, care, confidentiality, and disclosure." (FAC ¶113.) Moreover, the Complaint pleads adequate allegations to establish that Ashton breached his fiduciary duties; Ashton, by pleading guilty, has admitted his involvement in the criminal kickback scheme. (FAC ¶114–15.) He also failed to disclose the bribery scheme between FCA and UAW and disclosed confidential information to UAW and FCA leaders. (FAC ¶114.) These acts support a straightforward, plausible breach of fiduciary duty claim. As a result, GM pleads that it suffered financial injury as a result of Ashton's breach of fiduciary duty. (FAC ¶116.) Therefore, because all elements are pled, the Court finds that GM states a claim for breach of fiduciary duty.

## IV.  CONCLUSION

For each of the aforementioned reasons, the Motion to Dismiss is **DENIED IN PART** and the Court reserves judgment on the statute of limitations argument regarding the breach of fiduciary duty claim. In accordance with the Order accompanying this Opinion, the Court directs the parties to submit supplemental briefing on (1) which forum's substantive law applies to the breach of fiduciary duty claim; (2) whether the claim is barred by the statute of limitations; and (3) whether the statute of limitations should be tolled. Within twenty (20) days, both parties shall submit supplemental briefing on the items discussed above. Each party's supplement brief shall be no more than fifteen (15) pages in length; and within ten (10) days after receipt of such submission, each party may file a response totaling no more than ten (10) pages in length. An accompanying Order will issue.

Dated: 6/22/2020

/s/ Robert B. Kugler
ROBERT B. KUGLER
United States District Judge

**EXHIBIT 4**

# NEDELMAN LEGAL GROUP, PLLC
### ATTORNEYS AT LAW
PROFESSIONAL LIMITED LIABILITY COMPANY

28580 ORCHARD LAKE ROAD, SUITE 140
FARMINGTON HILLS, MICHIGAN 48334

32 SE 2ND AVE., STE 636
DELRAY BEACH, FL 33444
———————
TELEPHONE (248) 855-8888
MICHAEL A. NEDELMAN                    TELEPHONE: (561) 278-8855
ALSO ADMITTED IN FL & AZ                                                E-MAIL  mnedelman@nglegal.com

November 26, 2021

James Marina, Esq.
Kirkland & Ellis
601 Lexington Avenue                    Via email to: james.marina@kirkland.com
New York, New York 10022

Re: Susanne Iacobelli/ *General Motors v Ashton*
    *Case 20-12659 (USDC NJ)*
    Our File No. 1751.009

Dear Mr. Marina:

I write in my capacity as counsel for Susanne Iacobelli, and with reference to the Subpoena *duces tecum* dated November 10, 2021 and served upon Mrs. Iacobelli on November 14, 2021, in that action entitled *General Motors LLC v Ashton*, bearing case no. 20-12659 in the United States District Court for the District of New Jersey (the "Ashton New Jersey Action"). On behalf of Susanne Iacobelli, we object to the subpoena *duces tecum* in its entirety and your demand for her testimony. The request for documents seeks documents that are not relevant to any of the claims made in the above-referenced matter, nor are the requests proportional to the needs of the case; the requested discovery is clearly intended to conduct discovery in two cases that have each previously been <u>dismissed with prejudice</u>, *i.e.*, *General Motors LLC v FCA, LLC*, bearing case no. 19-cv-13429 in the United States District Court for the Eastern District of Michigan (the "Michigan Federal Court Action") and *General Motors LLC v Iacobelli, et al*, bearing case no. 20-011998-CB in the Wayne County (Michigan) Circuit Court (sometimes collectively the "Dismissed Cases"). Plaintiffs have improperly sought to use the discovery process in this third case, the Ashton New Jersey Action, to conduct the discovery that General Motors LLC and General Motors Company (collectively "Plaintiffs") were denied in each of the Dismissed Cases and, as a consequence of the dismissals, cannot lawfully be conducted. The subpoena *duces tecum* is not only issued by you for the benefit of Plaintiffs for an improper purpose but, as importantly, the attempted discovery imposes upon Ms. Iacobelli an undue burden. Neither the documents requested nor the testimony sought will be provided.

Federal Rule of Civil Procedure 45(d), Protecting a Person Subject to a Subpoena; Enforcement, states in relevant part as follows:

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **2** of **9**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

Pursuant to Fed. R. Civ. P. 45(d)(2)(B), Susanne Iacobelli makes the following objections to the *duces tecum* portion of the subpoena (Susanne Iacobelli may provide greater detail in support of her objections either in her own Motion to Quash, or in response to any Motion to Compel you may file):

**<u>Definitions</u>**:

Objections are made to the definition of "NTC" to the extent that it is defined as "including any and all of its current or former directors, officers, board, employees, agents, advisors, or other persons acting on its behalf," for the reason that the other persons and/or entities sought to be included are not identified, rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "UAW" to the extent that it is defined as "including any and all of its current or former affiliates, subsidiaries, directors, officers, board, employees, agents, members, and other persons acting on its behalf," for the reason that the other persons and/or entities sought to be included are not identified, rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "And" and "or" requiring the terms to be construed "to bring within the scope of the request responses that might otherwise be outside of the scope" –

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **3** of **9**

rendering the request impermissibly broad and incomprehensibly vague.

Susanne Iacobelli objects to the production of any of the documents requested pursuant to the subpoena *duces tecum*. The information sought from Susanne Iacobelli is certainly beyond the permissible scope of discovery, and reflects the bad faith efforts of Plaintiffs to use the Ashton New Jersey Action as a vehicle to conduct an intrusive, broad-ranging investigation into unrelated claims. In particular:

1.  Document request no. 1 seeks "documents and communications relating to any effort by You, FCA, or Joseph Ashton, or any person acting on their behalf, to impose higher costs or other financial harm on GM by directly or indirectly providing bribes or unlawful payments of money or things of value to the UAW, its current or former officers oremployees, and/or current or former managers, directors, or employees of FCA." There is no good faith basis for "GM" believing that Susanne Iacobelli could possibly have any non-privileged responsive documents, and the request reflects nothing more than an attempt to impose upon Susanne Iacobelli undue burden.

2.  Document request no. 2 seeks documents and communications relating to relating to You, FCA, the NTC, or any person acting on their behalf providing any "money or other thing of value" (within the meaning of that phrase as set forth in Section 302 of the Labor Management Relations Act) to the UAW, its current or former officers, employees,or their relatives, or any charitable organization or other entity associated with the UAW or its current or former officers, employees, or their relatives, either directly or indirectly.

    As Plaintiffs are well-aware, and in fact plead at Amended Complaint ¶12, Alphons Iacobelli pled guilty to conspiracy to violate the Labor Management Relations Act, based upon providing on behalf of FCA money or other things of value to UAW officials; FCA has also pled guilty. Any information that Susanne Iacobelli may have – and the emphasis is on the "may" – would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege.

3.  Document request no. 3 seeks documents "reflecting, referencing, or describing Sergio Marchionne's knowledge that any money or other thing of value (including but not limited to cash, debts paid, home improvements, gifts, automobiles, entertainment, travel, meals, retirement and other parties, personal items, and promises of future items of value) were provided by You, FCA, the NTC, or any person acting on their behalf to the UAW, its current or former officers, employees, or their relatives, either directly or indirectly (including but not limited to Joseph Ashton, Ron Gettelfinger, Dennis Williams, Gary Jones, Norwood Jewell, and General Holiefield)." There is no good faith basis upon which Plaintiffs could reasonably believe that Susanne Iacobelli would have any responsive documents reflecting Sergio Marchionne's knowledge, if any.

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **4** of **9**

4.  Plaintiffs' Amended Complaint in the Ashton New Jersey Action makes limited references to alleged "foreign accounts," limited to ¶¶57, 58, 60 and 107(a). Plaintiffs' First Amended Complaint at ¶57 references "certain foreign financial accounts in the Cayman Islands (Cayman National Bank) and Japan (Shisei Bank) held in the name of Ashton and/or Ashton's charity;" and at ¶58 references the alleged grant to Ashton, General Holifield and Dennis Williams control or a beneficial interest over account in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank).

    At subpoena *duces tecum* Request no. 4, however, Plaintiffs seek documents and communications relating to "any of the foreign bank accounts identified in the Complaint…", but then proceed to assume that the accounts identified in the Amended Complaint include (but they do not) "those held by or for … Alphons Iacobelli in Switzerland (UBS and Credit Suisse), Italy (Deutsche Bank), Liechtenstein (VP Bank Vaduz), and Singapore (DBS Bank); Jerome Durden in Liechtenstein (LGT Bank Vaduz) and the Cayman Islands (Cayman National Bank); Colin Lightbody in Luxembourg (Fortuna Bank); Linda Knoll in Luxembourg (Lombard Odier Europe)and Switzerland (Banquet Pictet & Cie SA); and Peter Glenn Shagena in Switzerland(UBS Geneva and Itau Private Bank), including any payments or transfers of funds into or that ended up in such accounts, whether directly or indirectly." Reference to those additional alleged accounts was made in both the (dismissed) Michigan Federal Court Action and the (dismissed) Michigan State Court Action), but is not made in the Amended Complaint in the Ashton New Jersey Action, clearly evidencing the improper efforts of Plaintiffs to use the Ashton New Jersey Action to conduct discovery relevant, if at all, only to the Dismissed Actions. As a result, the request seeks information that is not relevant or proportional to the needs of this case, and beyond the permissible scope of discovery in this case; and imposes undue burden on Susanne Iacobelli.

5.  Document request nos. 5-9 seek documents and communications relating to banking relationships (if any exist) with "any foreign bank accounts with which Susanne Iacobelli is or have ever been affiliated in any way, directly or indirectly" (Request no. 5), "deposits or transfers into a United States financial institute where the source of funds directly or indirectly came from a foreign bank" (Request no. 6), "accounts maintained directly or indirectly at financial institutions inside or outside of the United States" (Request no. 7), "communications with any bank, financial institution or financial advisor located outside the United States" (Request no. 8) and the location and contents of any safe deposit box at any financial institution (Request no. 9).

    Assuming, arguendo, that such foreign accounts exist, the request utterly fails to evidence any relationship, let alone relevance, between the claims in the Ashton New Jersey Action and the documents sought. Moreover, the request is not reasonably limited in time (extending back to January 1, 2009, per instruction no. 7), nor for example is Request no. 6 limited to deposits or transfers into accounts of any

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **5** of **9**

named individuals, rendering the request overly broad, not relevant to the claims made and not remotely proportional to the needs of the Ashton New Jersey Action. To the extent the request is construed to be limited to accounts in the name of Susanne Iacobelli (including accounts in US financial institutions), Plaintiffs' attempt to secure the personal financial information of Susanne Iacobelli seeks information that is not relevant to the claims made in the Ashton New Jersey Action or proportionate to the needs of the case, and therefore not within the permitted scope of discovery. In short, it is an unwarranted intrusion into the personal affairs of Susanne Iacobelli.

6.    Document request no. 10 seeks documents relating to alleged payments by FCA or the NTC into foreign bank accounts (how any such payments, other than perhaps to Mr. Ashton, could possibly be relevant to the claims is the Ashton New Jersey Action is a complete mystery. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

7.    Document request no. 11 seeks documents and communications relating to FCA or the NTC allegedly paying or directing the payment of funds or proceeds into foreign bank accounts for the benefit of the UAW, its current or former officers,employees, or their relatives (including Joseph Ashton, Alphons Iacobelli, and Dennis Williams), or any charitable organization or other entity (including the Ashton Fund and Williams Charity Fund) associated with the UAW or any of its current or former officers, employees, or their relatives, including but not limited toDocuments relating to opening, closing, or depositing funds into such foreign bank accounts. While we object to the request as being well outside the permissible scope of discovery given the limited nature of Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty, the request is not proportional to the needs of this case. In the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request

8.    Document request no. 12 seeks documents and communications relating to the investigation conducted by the U.S. Attorney's Office for the Eastern District of Michigan into the UAW, FCA, and Joseph Ashton. Again, while perhaps GM may be able to make an argument (we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty.

9.    Document request no. 13 seeks documents and communications provided to the U.S. Attorney's Office for the Eastern District of Michigan in connection with that office's

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **6** of **9**

investigation into the UAW, FCA, and Joseph Ashton. For the reasons stated in connection with our objections to Document request no. 12, above, while perhaps GM may be able to make an argument (we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty.

10.    Document request no. 14 seeks documents and communications relating to any investigation conducted by any government authority or agency into the UAW, FCA, and Joseph Ashton. Again, while perhaps GM may be able to make an argument (we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty. In addition, any documents that Susanne Iacobelli may have would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege

11.    Document request no. 15 seeks communications in Susanne Iacobelli's possession between Alphons Iacobelli and Peter DeLorenzo. The referenced communications have been raised in connection with Plaintiffs' attempts to further amend their complaint in the Michigan State Court Action, and bear no relationship or relevance to the claims in this case and are beyond the permitted scope of discovery in this case; Any documents that Susanne Iacobelli <u>may</u> have would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege.

12.    Document request no. 16 seeks documents relating to Susanne Iacobelli's communications (if any) with Joseph or Denise Ashton. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

13.    Document request no. 17 seeks documents relating to communications between Susanne Iacobelli and Peter DeLorenzo. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **7** of **9**

14.  Document request no. 18 seeks documents and communications that Alphons Iacobelli allegedly showed to Peter DeLorenzo and/or that Alphons Iacobelli allegedly brought to Alphons Iacobelli's meetings with Peter DeLorenzo in 2018 - again issues that have been raised in connection with Plaintiffs' attempts to amend the claims in the (dismissed) Michigan Federal Court Action and for reconsideration the Order dismissing the Michigan State Court Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

15.  Document request no. 19 seeks "[a]ll book outlines in Susanne Iacobelli's possession that Alphons Iacobelli created, as referenced in Paragraph 21 of the Peter DeLorenzo Declaration filed in *General Motors et al. v. Alphons Iacobelli et al.*, No. 20-011998-CB (Wayne County Circuit Court) – which clearly evidences that the request relates to the (dismissed) Michigan State Court Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

16.  Document request no. 20 seeks documents and communications "with any FCA representative including outside counsel to FCA during the time period after Alphons Iacobelli ceased employment at FCA," despite the wholesale absence of any relationship, let alone relevancy, of such potential communications to the Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty.

17.  Document request no. 21 seeks documents and communications "directly, through counsel, or through any third party with Jerome Durden or his agents or representatives." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

18.  Document request no. 22 seeks documents "sufficient to show" (whatever that means) all electronic devices that Alphons Iacobelli used to communicate with any third parties since he ceased working at FCA." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

19.  Document request no. 23 seeks documents and communications "sufficient to show" (again, whatever that means) "the business purpose and activities of Business Advisory Group (and any affiliates), notwithstanding the fact that Business Advisory Group is not a party to this action, or even identified as a person having discoverable information. While we object to the request as being well outside the permissible

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **8** of **9**

scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

20.   Document request no. 24 seeks documents and communications "sufficient to identify" (again, whatever that means) "other affiliates of Business Advisory Group over which You or Business Advisory Group had an overlapping ownership or interest," notwithstanding the fact that Business Advisory Group is not a party to this action, or even identified as a person having discoverable information. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

21.   Document request no. 25 seeks a copy of Susanne Iacobelli's passport – a document that has no conceivable relevance to Plaintiffs' claims against Mr. Ashton for fraud and breach of fiduciary duty. In addition, given your clients' admitted "spoofing" of Mr. Iacobelli's email address, and the likelihood that it also "spoofed" Susanne Iacobelli's email address, it is clear that your clients cannot be trusted to maintain the confidentiality of personally identifiable information.

22.   Document request no. 26 seeks "[a]ll USB drives that Alphons Iacobelli used during his employment with GM." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

Please note that the fact any specific request is not expressly objected to should not be construed as meaning that responsive items are in the possession, control or custody of my client.

Demand is hereby made that Plaintiffs immediately withdraw the subpoena *duces tecum*. In the event that you do not withdraw the subpoena *duces tecum*, this letter and the objections set forth herein are made without prejudice to, and expressly reserving, all additional objections and defenses that may exist in favor of Susanne Iacobelli to the subpoena *duces tecum*; and is not intended and shall not be construed and/or asserted to be a waiver of any such objections and/or defenses, or a waiver of any and all privileges that may exist in favor of Susanne Iacobelli or others including, but not limited to, the spousal communication privilege, the spousal privilege, the marital privilege and Susanne Iacobelli's privilege under the Fifth Amendment to the United States Constitution, all of which being expressly preserved.

Please be assured, however, that if you do not withdraw the subpoena *duces tecum*, and we are required to file a Motion to Quash and/or defend an Motion to Compel, we will seek appropriate sanctions against you and/or your client, as appropriate, since the subpoena *duces tecum* is a clear abuse of the discovery process in the Ashton New Jersey Action in the hopes of obtaining

**EXHIBIT 5**

James Marina, Esq.
November 26, 2021
Page **9** of **9**

information that is unavailable to your clients in the (dismissed) Michigan Federal Court Action
and (dismissed) Wayne County Circuit Court Action.

      If you would like to further discuss this matter, please do not hesitate to contact me.

                Very truly yours,

                NEDELMAN LEGAL GROUP PLLC

                Michael A. Nedelman

L/16220

**EXHIBIT 5**

# NEDELMAN LEGAL GROUP, PLLC
**ATTORNEYS AT LAW**
PROFESSIONAL LIMITED LIABILITY COMPANY

28580 ORCHARD LAKE ROAD, SUITE 140
FARMINGTON HILLS, MICHIGAN 48334

32 SE 2ND AVE., STE 636
DELRAY BEACH, FL 33444
———————
TELEPHONE (248) 855-8888
MICHAEL A. NEDELMAN          TELEPHONE: (561) 278-8855
ALSO ADMITTED IN FL & AZ                                              E-MAIL  mnedelman@nglegal.com

December 24, 2021

James Marina, Esq.
Kirkland & Ellis
601 Lexington Avenue                           Via email to: james.marina@kirkland.com
New York, New York 10022

Casey McGushin, Esq.
Kirkland & Ellis
300 North LaSalle
Chicago, IL 60654                               Via email to: casey.mcgushin@kirkland.com

Re: Susanne Iacobelli/ *General Motors v Ashton*
     *Case 20-12659 (USDC NJ)*
     Our File No. 1751.009

Gentlemen:

I write in my capacity as counsel for non-party Susanne Iacobelli, (a) with reference to the Subpoena *duces tecum* dated November 10, 2021 and served upon Mrs. Iacobelli on November 14, 2021, in that action entitled *General Motors LLC v Ashton*, bearing case no. 20-12659 in the United States District Court for the District of New Jersey (the "Ashton New Jersey Action"), and (b) as a follow-up to my letter (and the included objections) dated November 26, 2021 and our subsequent discussions. On behalf of Susanne Iacobelli and in light of the Order in *General Motors LLC v Iacobelli, et al*, bearing case no. 20-011998-CB in the Wayne County (Michigan) Circuit Court (the "Michigan State Court Action") permitting General Motors LLC to amend its Complaint, we amend our objections to the scope of the subpoena *duces tecum* and your demand for her testimony - despite our continued belief that (c) the request for documents seeks documents that are not relevant to any of the claims made in the Ashton New Jersey Action; (d) that the requests are not proportional to the needs of the case; (e) that the requested discovery is an improper attempt to conduct discovery in each of the Michigan State Court Action and that (dismissed) action entitled *General Motors LLC v FCA, LLC*, bearing case no. 19-cv-13429 in the United States District Court for the Eastern District of Michigan (the "Michigan Federal Court Action") (the Michigan Federal Court Action and the Michigan State Court Action are sometimes collectively referred to as the "Michigan Actions"); and (f) the request imposes upon Ms. Iacobelli

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **2** of **11**

an undue burden. Those objections notwithstanding, we respond as follows in an effort to narrow the scope of any remaining dispute, and reduce the attendant costs and expenses.

Although we believe that the information sought from Susanne Iacobelli is beyond the permissible scope of discovery in the Ashton New Jersey Action and reflects the bad faith efforts of Plaintiffs to use the Ashton New Jersey Action as a vehicle to conduct an intrusive, broad-ranging investigation into unrelated claims, Susanne Iacobelli is providing a more fulsome response (rather than simply objecting) solely to narrow any potential dispute and avoid costly and unnecessary Motion practice, including the cost and expense associated with her bringing a Motion to Quash and, if we were to only narrowly assert all available objections (including to the relevance of the requests themselves), the cost and expense associated with defending any Motion to Compel being brought by "GM."

Federal Rule of Civil Procedure 45(d), Protecting a Person Subject to a Subpoena; Enforcement, states in relevant part as follows:

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

Pursuant to Fed. R. Civ. P. 45(d)(2)(B), Susanne Iacobelli makes the following objections to the *duces tecum* portion of the subpoena (Susanne Iacobelli may provide greater detail in support of her objections either in her own Motion to Quash, or in response to any Motion to Compel you may file):

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **3** of **11**

**<u>Definitions</u>**:

Objections are made to the definition of "NTC" to the extent that it is defined as "including any and all of its current or former directors, officers, board, employees, agents, advisors, or other persons acting on its behalf," for the reason that the other persons and/or entities sought to be included are not identified, rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "UAW" to the extent that it is defined as "including any and all of its current or former affiliates, subsidiaries, directors, officers, board, employees, agents, members, and other persons acting on its behalf," for the reason that the other persons and/or entities sought to be included are not identified, rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "And" and "or" requiring the terms to be construed "to bring within the scope of the request responses that might otherwise be outside of the scope" – rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "You," for the reason that "GM's" broad definition of "You," would purport to include not just Mrs. Iacobelli but also her counsel within its definition, and arguably seek to include within the scope of this third-party subpoena *duces tecum* the work product and conduct of her counsel (whether or not her counsel was acting on her behalf); the definition is vague as a result, and renders each request unduly burdensome. Susanne Iacobelli objects to the definition of "You" extending to include her counsel.

Therefore, in response to the specific numbered requests:

1.    Document request no. 1 seeks "documents and communications relating to any effort by You, FCA, or Joseph Ashton, or any person acting on their behalf, to impose higher costs or other financial harm on GM by directly or indirectly providing bribes or unlawful payments of money or things of value to the UAW, its current or former officers or employees, and/or current or former managers, directors, or employees of FCA." There is no good faith basis for either "GM" believing that Susanne Iacobelli could possibly have any non-privileged responsive documents, and the request reflects nothing more than an attempt to impose upon Susanne Iacobelli undue burden. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request. The privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced, or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **4** of **11**

and will not be produced.

2.      Document request no. 2 seeks "documents and communications relating to You, FCA, the NTC, or any person acting on their behalf providing any 'money or other thing of value' (within the meaning of that phrase as set forth in Section 302 of the Labor Management Relations Act) to the UAW, its current or former officers, employees,or their relatives, or any charitable organization or other entity associated with the UAW or its current or former officers, employees, or their relatives, either directly or indirectly."

As Plaintiffs are well-aware, and in fact plead at Amended Complaint ¶12, Alphons Iacobelli pled guilty to conspiracy to violate the Labor Management Relations Act, based upon providing on behalf of FCA money or other things of value to UAW officials; FCA has also pled guilty to related charges. Any information that Susanne Iacobelli may have – and the emphasis is on the "may" – would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege and will not be produced.

As you are also aware, Mrs. Iacobelli was named as a party defendant in that action entitled *The UAW-Chrysler Skill Development and Training Program v Iacobelli, et al*, bearing case no. 18-166226-CZ in the Oakland County (MI) Circuit Court. Given the unduly broad nature of your request and although Susanne Iacobelli never provided any money or any other thing of value to any of the referenced persons or entities, it is possible that papers filed and discovery exchanged in that matter may be responsive to this request if construed to include allegations of such conduct. Ms. Iacobelli objects to the request; determining if any of the pleadings or other papers filed in that matter (all of which are publicly available) are responsive to your request would be unduly burdensome upon Mrs. Iacobelli and cause her to incur undue expense and will only be undertaken if ordered by the Court and Plaintiffs agree to compensate Mrs. Iacobelli for the time and expense (including that of the undersigned counsel) in conducting the necessary review.

.

3.      Document request no. 3 seeks documents "reflecting, referencing, or describing Sergio Marchionne's knowledge that any money or other thing of value (including but not limited to cash, debts paid, home improvements, gifts, automobiles, entertainment, travel, meals, retirement and other parties, personal items, and promises of future items of value) were provided by You, FCA, the NTC, or any person acting on their behalf to the UAW, its current or former officers, employees, or their relatives, either directly or indirectly (including but not limited to Joseph Ashton, Ron Gettelfinger, Dennis Williams, Gary Jones, Norwood Jewell, and General Holiefield)." There is no good faith basis upon which Plaintiffs could reasonably believe that Susanne Iacobelli would have any responsive documents reflecting Sergio Marchionne's knowledge, if any, on any subject. While we object

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **5** of **11**

to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request except to the extent, if any, that Mr. Marchione's alleged knowledge, if any, was referenced in the pleadings and/or papers filed, and discovery exchanged, in the NTC Action. For the reasons set forth above, determining if any of the pleadings or other papers filed in that matter (all of which are publicly available) are responsive to your request would be unduly burdensome upon Mrs. Iacobelli and cause her to incur undue expense and will only be undertaken if ordered by the Court and Plaintiffs agree to compensate Mrs. Iacobelli for the time and expense (including that of the undersigned counsel) in conducting the necessary review. The privileged documents are limited to any personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure and will not be produced.

4. Plaintiffs' Amended Complaint in the Ashton New Jersey Action makes limited references to alleged "foreign accounts," at ¶¶57, 58, 60 and 107(a). Plaintiffs' First Amended Complaint at ¶57 references "certain foreign financial accounts in the Cayman Islands (Cayman National Bank) and Japan (Shisei Bank) held in the name of Ashton and/or Ashton's charity;" and at ¶58 references the alleged grant to Ashton, General Holifield and Dennis Williams control or a beneficial interest over account in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank).

At subpoena *duces tecum* Request no. 4, however, Plaintiffs seek documents and communications relating to "any of the foreign bank accounts identified in the Complaint…", but then proceed to assume that the accounts identified in the Amended Complaint include (but they do not) "those held by or for … Alphons Iacobelli in Switzerland (UBS and Credit Suisse), Italy (Deutsche Bank), Liechtenstein (VP Bank Vaduz), and Singapore (DBS Bank); Jerome Durden in Liechtenstein (LGT Bank Vaduz) and the Cayman Islands (Cayman National Bank); Colin Lightbody in Luxembourg (Fortuna Bank); Linda Knoll in Luxembourg (Lombard Odier Europe)and Switzerland (Banquet Pictet & Cie SA); and Peter Glenn Shagena in Switzerland(UBS Geneva and Itau Private Bank), including any payments or transfers of funds into or that ended up in such accounts, whether directly or indirectly." Reference to those additional alleged accounts was made in both the (dismissed) Michigan Federal Court Action and the Michigan State Court Action, but is not made in the Amended Complaint in the Ashton New Jersey Action, clearly evidencing the improper efforts of Plaintiffs to use the Ashton New Jersey Action to conduct discovery relevant, if at all, only to the Michigan Actions. As a result, the request seeks information that is not relevant or proportional to the needs of this case, and beyond the permissible scope of discovery in this case. While we object to the request as being well outside the permissible scope of discovery, in the interests of

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **6** of **11**

narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; the privileged documents are limited to any personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure and will not be produced.

5. Document request nos. 5-9 seek documents and communications relating to banking relationships (if any exist) with "any foreign bank accounts with which You are or have ever been affiliated in any way, directly or indirectly" (Request no. 5), "deposits or transfers into a United States financial institute where the source of funds directly or indirectly came from a foreign bank" (Request no. 6), "accounts maintained directly or indirectly at financial institutions inside or outside of the United States" (Request no. 7), "communications with any bank, financial institution or financial advisor located outside the United States" (Request no. 8) and the location and contents of any safe deposit box at any financial institution (Request no. 9).

    Assuming, arguendo, that such foreign accounts exist, the request is made in the absence of any relationship, let alone relevance, between the claims in the Ashton New Jersey Action and the documents sought. Moreover, the request is not reasonably limited in time (extending back to January 1, 2009, per instruction no. 7), and Request no. 6 is not, for example, limited to deposits or transfers into accounts of any named individuals, rendering the request overly broad, not relevant to the claims made and not remotely proportional to the needs of the Ashton New Jersey Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

    With respect to Request nos. 7 and 9 and to the extent the requests are construed to be limited to accounts in the name of Susanne Iacobelli (including accounts in US financial institutions), Plaintiffs' attempt to secure the personal financial information of Susanne Iacobelli seeks information that is not relevant to the claims made in the Ashton New Jersey Action or proportionate to the needs of the case, and therefore not within the permitted scope of discovery. In short, it is an unwarranted intrusion into the personal affairs of Susanne Iacobelli and any responsive documents will not be produced.

6. Document request no. 10 seeks documents relating to alleged payments by FCA or the NTC into foreign bank accounts (how any such payments, other than perhaps to Mr. Ashton, could possibly be relevant to the claims is the Ashton New Jersey Action is a complete mystery). We object to the request for the reason that it seeks information that is not relevant to the claims made in the Ashton New Jersey Action or proportionate to the needs of the case, and therefore not within the permitted scope

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **7** of **11**

of discovery; and for the additional reason that given breadth of that request and without any guidelines as to how Mrs. Iacobelli could reasonably determine if any document "related to alleged payments," particularly in light of Susanne Iacobelli's status as a defendant in the NTC Action (and to the extent that any of the pleadings and papers filed, and discovery exchanged, might be responsive to the request), responding to the request as written would be unduly burdensome and costly. In the interests of narrowing the scope of any possible dispute, to the extent that the request is limited to payments to Mr. Ashton and the accounts identified in the Amended Complaint, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request and the privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced; and may include notes of her communications with her husband, which are also protected from involuntary disclosure and will not be produced.

7.    Document request no. 11 seeks documents and communications relating to FCA or the NTC allegedly paying or directing the payment of funds or proceeds into foreign bank accounts for the benefit of the UAW, its current or former officers, employees, or their relatives (including Joseph Ashton, Alphons Iacobelli, and Dennis Williams), or any charitable organization or other entity (including the Ashton Fund and Williams Charity Fund) associated with the UAW or any of its current or former officers, employees, or their relatives, including but not limited to Documents relating to opening, closing, or depositing funds into such foreign bank accounts. While we object to the request for the reason that it is well outside the permissible scope of discovery given the limited nature of Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty, and therefore the request is not proportional to the needs of this case, in the interests of narrowing the scope of any possible dispute we can advise that there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request. The privileged documents are limited to any personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure and will not be produced.

8.    Document request no. 12 seeks documents and communications relating to the investigation conducted by the U.S. Attorney's Office for the Eastern District of Michigan into the UAW, FCA, and Joseph Ashton. Again, while perhaps GM may be able to make an argument (we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **8** of **11**

to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty; and imposes an undue burden on Susanne Iacobelli, especially given the potential breadth of the request resulting from "GM/s" use of the vague phrase "relating to." Those objections notwithstanding, in the interests of narrowing the scope of any possible dispute, we can advise there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; and the privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure; and may include notes of her communications with her husband, which are also protected from involuntary disclosure and will not be produced.

9.  Document request no. 13 seeks documents and communications provided to the U.S. Attorney's Office for the Eastern District of Michigan in connection with that office's investigation into the UAW, FCA, and Joseph Ashton. For the reasons stated in connection with our objections to Document request no. 12, above, while perhaps GM may be able to make an argument (again, we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; and the privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced.

10.  Document request no. 14 seeks documents and communications relating to any investigation conducted by any government authority or agency into the UAW, FCA, and Joseph Ashton. Again, while perhaps GM may be able to make an argument (we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty. In addition, any documents that Susanne Iacobelli may have would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege and will not be produced.

11.  Document request no. 15 seeks communications in Susanne Iacobelli's possession

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **9** of **11**

between Alphons Iacobelli and Peter DeLorenzo. Any documents that Susanne Iacobelli <u>may</u> have would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege. With that limitation, and while we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, we can advise that there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; and the privileged documents are limited to her personal notes taken in connection with my provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced.

12. Document request no. 16 seeks documents relating to Susanne Iacobelli's communications (if any) with Joseph or Denise Ashton. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

13. Document request no. 17 seeks documents relating to communications between Susanne Iacobelli and Peter DeLorenzo. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

14. Document request no. 18 seeks documents and communications that Alphons Iacobelli allegedly showed to Peter DeLorenzo and/or that Alphons Iacobelli allegedly brought to Alphons Iacobelli's meetings with Peter DeLorenzo in 2018 - again issues that have been raised in connection with Plaintiffs' attempts to amend the claims in the (dismissed) Michigan Federal Court Action and in The Second Amended Complaint the Michigan State Court Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

15. Document request no. 19 seeks "[a]ll book outlines in Susanne Iacobelli's possession that Alphons Iacobelli created, as referenced in Paragraph 21 of the Peter DeLorenzo Declaration filed in *General Motors et al. v. Alphons Iacobelli et al.*, No. 20-011998-CB (Wayne County Circuit Court) – which clearly evidences that the request relates solely to the Michigan State Court Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **10** of 11

16.    Document request no. 20 seeks documents and communications "with any FCA representative including outside counsel to FCA during the time period after Alphons Iacobelli ceased employment at FCA," despite the wholesale absence of any relationship, let alone relevancy, of such potential communications by non-party Susanne Iacobelli to the Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request

17.    Document request no. 21 seeks documents and communications "directly, through counsel, or through any third party with Jerome Durden or his agents or representatives." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

18.    Document request no. 22 seeks documents "sufficient to show" (whatever that means) all electronic devices that Alphons Iacobelli used to communicate with any third parties since he ceased working at FCA." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

19.    Document request no. 23 seeks documents and communications "sufficient to show" (again, whatever that means) "the business purpose and activities of Business Advisory Group (and any affiliates), notwithstanding the fact that Business Advisory Group is not a party to this action, or even identified as a person having discoverable information. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

20.    Document request no. 24 seeks documents and communications "sufficient to identify" (again, whatever that means) "other affiliates of Business Advisory Group over which You or Business Advisory Group had an overlapping ownership or interest," notwithstanding the fact that Business Advisory Group is not a party to this action, or even identified as a person having discoverable information. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

21.    Document request no. 25 seeks a copy of Susanne Iacobelli's passport – a document

**EXHIBIT 6**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **11** of **11**

that has no conceivable relevance to Plaintiffs' claims against Mr. Ashton for fraud and breach of fiduciary duty. In addition, given your clients' admitted "spoofing" of Mr. Iacobelli's email address, and the likelihood that it also "spoofed" Susanne Iacobelli's email address, it is clear that your clients cannot be trusted to maintain the confidentiality of personally identifiable information. The requested copy will not be produced.

22.   Document request no. 26 seeks "[a]ll USB drives that Alphons Iacobelli used during his employment with GM." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

Please note that the fact any specific request is not expressly objected to should not be construed as meaning that responsive items are in the possession, control or custody of my client.

This letter and the objections set forth herein are made without prejudice to, and expressly reserving, all additional objections and defenses that may exist in favor of Susanne Iacobelli to the subpoena *duces tecum*; and is not intended and shall not be construed and/or asserted to be a waiver of any such objections and/or defenses, or a waiver of any and all privileges that may exist in favor of Susanne Iacobelli or others including, but not limited to, the spousal communication privilege, the spousal privilege, the marital privilege and Susanne Iacobelli's privilege under the Fifth and Fourteenth Amendments to the United States Constitution, all of which being expressly preserved.

In addition, this letter and the amended objections set forth herein, are made without prejudice to Susanne Iacobelli seeking such other relief, including but not limited to payment by each of "GM" of the costs to be incurred in any further response to the subpoena *duces tecum* and/or appearing for any testimony, if ordered by the Court following a determination of the obligation to testify in light of the spousal privileged, as may be appropriate under the circumstances.

If you would like to further discuss this matter, please do not hesitate to contact me.

Very truly yours,

NEDELMAN LEGAL GROUP PLLC

Michael A. Nedelman

L/16220_2

**EXHIBIT 6**

I do not consent to my wife, Susanne Iacobelli, testifying in that matter entitled *General Motors LLC v Ashton*, bearing case no. 20-12659 (RBK-SAK) in the United States District Court for the District of New Jersey.

Alphons A. Iacobelli
January 10, 2022

**EXHIBIT 7**

| From: | McGushin, Casey |
|---|---|
| To: | Michael Nedelman |
| Cc: | Willian, Jeffrey L.; Karis, Hariklia; Marina, James E.; Pagonis, Stacey G. |
| Subject: | RE: Iacobelli/ GM v Ashton - Subpoena duces tecum to Alphons Iacobelli; depositions of Susanne Iacobelli, Business Advisory Group |
| Date: | Friday, December 3, 2021 4:54:10 PM |

Mr. Nedelman,

I write in response to your letters concerning the subpoenas served on Business Advisory Group ("BAG") and Al and Susanne Iacobelli in the above-captioned matter.  As an initial matter, your claim that these subpoenas are an "abuse of the discovery process in the Ashton New Jersey Action" is completely unfounded.  Contrary to your assertion, the subpoenas seek information directly relevant to GM's allegations in the Ashton New Jersey Action.  Specifically, GM has alleged that FCA (acting through agents such as Mr. Iacobelli) directed improper payments to Mr. Ashton and others in a direct effort to harm GM, and that FCA employees (such as Mr. Iacobelli) also maintained such accounts.  (See e.g. First Am. Compl. at ¶¶ 12, 54-101.)  The subpoenas to Ms. Iacobelli and BAG seek relevant information and documents they may possess about the overall scheme and these dealings by Mr. Iacobelli, including information concerning foreign accounts held in the name of Ms. Iacobelli or BAG for the benefit of Mr. Iacobelli.

Your objection to the subpoenas rests on the claim that this discovery in the New Jersey Action is improper given it touches on facts at issue in the two Michigan Actions.  This argument is completely baseless.  Given the overlap in factual allegations underlying GM's state law claims against Mr. Ashton and the federal and state law claims asserted against FCA and Mr. Iacobelli, it should come as no surprise that the information GM seeks in discovery in the New Jersey Action covers some of the same issues that would be the subject of discovery in the Michigan Actions.  The Court in New Jersey has already denied Mr. Ashton's motion to dismiss GM's claims against him.  To the extent you have individual objections to the requests, we are willing to meet and confer on them, but the claim that the dismissal of similar suits forecloses GM from taking legitimate discovery in a pending action in federal court is not only without merit but now has been refuted by the Judge Allen ruling.

In addition to this overriding objection, your letters also suggest that certain information may be withheld on the basis of the spousal privileged or the Fifth Amendment privilege.  Please confirm the extent to which Mr. or Ms. Iacobelli intend to not produce relevant information on the basis of either privilege so we can begin to meet and confer on these privileges.  BAG has no such privileges.

Please provide a time early next week that you're available to meet and confer on these issues.  We are willing to delay the noticed depositions while the responsive documents are produced in December and we work through the remaining objections.  We look forward to your anticipated cooperation.

**Casey McGushin**
-----------------------------------------------------
**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3397  **M** +1 262 573 3699
**F** +1 312 862 2200

**EXHIBIT 8**

----------------------------------------------------

casey.mcgushin@kirkland.com

**From:** Michael Nedelman <mnedelman@nglegal.com>
**Date:** December 2, 2021 at 5:30:45 PM EST
**To:** "Marina, James E." <jmarina@kirkland.com>
**Subject: Iacobelli/ GM v Ashton - Subpoena duces tecum to Alphons Iacobelli; depositions of Susanne Iacobelli, Business Advisory Group**


Mr. Marina –
Please see the attached Objections on behalf of Mr. Alphons Iacobelli to the subpoena *duces tecum* that you served upon him.

In addition, please advise if you intend to proceed with the scheduled deposition of Susanne Iacobelli absent a prior resolution of the objections to the document request. If so, please advise of your availability tomorrow and Monday to discuss our anticipated Motion to Quash, so that we can satisfy the Court's meet and confer requirement.

We will also need to discuss the scheduled deposition of a representative of Business Advisory Group (and whether or not you intend to proceed without the documents). In addition, Mr. Iacobelli is the only representative and he is not lawfully permitted to appear as you have scheduled.

Michael A. Nedelman
Nedelman Legal Group PLLC

28580 Orchard Lake Rd. , Suite 140
Farmington Hills, MI 48334

32 SE 2nd Avenue, Ste. 636
Delray Beach, FL 33444

Phone: 248.855.8888 x117
Direct: 248.538.4543
Florida Main: 561.278.8855
Mobile: 248.561.4662
email: mnedelman@nglegal.com

This transmission may be protected from involuntary disclosure pursuant to the attorney client privilege and/or attorney work product doctrine. Any unauthorized disclosure and/or dissemination is expressly prohibited. The contact information set forth above is not intended and shall not be construed or asserted to be a signature or that the sender has subscribed to the content of the transmission.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis

**EXHIBIT 8**

International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

**EXHIBIT 8**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

**James E. Marina (N.J. Bar No. 050791996)**
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

| | |
|---|---|
| GENERAL MOTORS LLC,<br>GENERAL MOTORS COMPANY,<br><br>    Plaintiffs,<br><br> against<br><br>JOSEPH ASHTON,<br><br>    Defendant. | CASE NO. 1:20-cv-12659-RBK-SAK<br><br>**PLAINTIFFS' INITIAL DISCLOSURES**<br><br>Judge Robert B. Kugler<br>Magistrate Judge Sharon A. King |

**EXHIBIT 9**

<u>**PLAINTIFFS' RULE 26(a)(1) INITIAL DISCLOSURES**</u>

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Plaintiffs General Motors LLC and General Motors Company (together "GM"), by and through their undersigned attorneys, make the following initial disclosures:

I.   <u>**Fed. R. Civ. P. 26(a)(1)(A)(i)**</u>**: Individuals Likely to Have Discoverable Information That GM May Use to Support Its Claims**

GM states that the individuals below may have discoverable information that GM may use to supports its claims.[1] This list is based on information reasonably available to GM based on its investigation to date. Discovery regarding the facts and circumstances relating to this lawsuit has just begun, and GM may later identify additional individuals likely to have discoverable information that GM may use to support its claims. GM reserves the right to supplement or amend these disclosures as further information becomes available.

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Amex Construction | 1425 Adams Road Bensalem, PA 19020 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| Amex Leasing Company | 1425 Adams Road Bensalem, PA 19020 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |

---

[1]   FCA US LLC and Stellantis N.V. are referred to herein as "FCA."

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Denise Ashton | 5 Queen Anne Court Unit A Ocean View, NJ 08230 | Information regarding the Ashton Fund; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| Joseph Ashton | 5 Queen Anne Court Unit A Ocean View, NJ 08230 | Information regarding the improper disclosure of confidential GM information; fraudulent misrepresentations and omissions made to GM; the scheme to embezzle money from the UAW-GM Center for Human Resources; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and FCA; competitive advantages given to FCA and denied to GM by the UAW; FCA's attempts to merge with GM; the Ashton Fund; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| Patrick Ashton | 3 Melodie Court Hainesport, NJ 08036 | Information regarding the Ashton Fund; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| Ashton Fund | 5 Queen Anne Court Unit A Ocean View, NJ 08230 | Information regarding FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Garry Bernath | 7677 N. Saint Clair Road Elsie, MI 48831 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW; the Ashton Fund; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| Michael Brown | c/o Ben M. Gonek Ben Gonek Law, P.C. 14290 Northline Road Southgate, MI 48195 (313) 963-3377 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and/or GM; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's payment of money or things of value to UAW or FCA officers or employees (other than ordinary compensation and benefits paid for service as an employee). |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Catherine Clegg | c/o Counsel for GM<br>300 Renaissance Center<br>Detroit, MI 48243 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's attempts to merge with GM. |
| Marc Cohen | 14 Fairhaven Court<br>Cherry Hill, NJ 08003 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| Peter DeLorenzo | c/o Autoextremist.com | Information regarding FCA's payment of money or things of value to UAW or FCA officers or employees (other than ordinary compensation and benefits paid for service as an employee). |
| Jerome Durden | c/o Judith S. Gracey<br>The Gracey Law Firm<br>2200 Beechmont Street<br>Keego Harbor, MI 48320<br>(248) 221-7726 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's payment of money or things of value to UAW or FCA officers or employees, including through foreign bank accounts (other than ordinary compensation and benefits paid for service as an employee). |

4

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| FCA US LLC | c/o Steven Holley<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004<br>(212) 558-4000 | Information regarding the improper disclosure of confidential GM information; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's attempts to merge with GM; FCA's payment of money or things of value to UAW or FCA officers or employees, including through foreign bank accounts (other than ordinary compensation and benefits paid for service as an employee). |
| Michael Grimes | 10272 Gulfstone Court<br>Fort Myers, FL 33913<br>*Currently incarcerated*:<br>FDC Miami<br>33 NE 4th Street<br>Miami, FL 33132 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW. |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Estate of General Holiefield | | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's payment of money or things of value to UAW officers or employees. |
| Alphons Iacobelli | c/o Michael Nedelman Nedelman Legal Group PLLC 28580 Orchard Lake Road Suite 140 Farmington Hills, MI 48334 (248) 855-8888 | Information regarding the improper disclosure of confidential GM information; fraudulent misrepresentations and omissions made to GM; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's attempts to merge with GM; FCA's payment of money or things of value to UAW or FCA officers or employees, including through foreign bank accounts (other than ordinary compensation and benefits paid for service as an employee). |
| Monograms & More, Inc. (Impressions) | 8914 S. Telegraph Taylor, MI 48180 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Norwood Jewell | 2296 Macscott Court Swartz Creek, MI 48473 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and/or GM; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's payment of money or things of value to UAW officers or employees. |
| Nancy Johnson | 46771 High Meadows Court Unit 12 Macomb, MI 48044 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and/or GM; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's payment of money or things of value to UAW officers or employees. |
| KKG Consulting | c/o Karen Grimes | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| Bob King | 300 S. Revena Boulevard Ann Arbor, MI 48103 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's payment of money or things of value to UAW officers or employees. |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Virdell King | 15469 Ashton Road Detroit, MI 48223 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and/or GM; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's payment of money or things of value to UAW officers or employees. |
| Alexander Leveque | 317 S. Lafayette Street Dearborn, MI 48124 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| Louise Leveque | 317 S. Lafayette Street Dearborn, MI 48124 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| Estate of Sergio Marchionne | c/o Executors Roland Iseli and Alessandro Baldi | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's attempts to merge with GM; FCA's payment of money or things of value to UAW or FCA officers or employees, including through foreign bank accounts (other than ordinary compensation and benefits paid for service as an employee). |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| John E. McGovern CPA | John E. McGovern & Associates P.C. 4109 Main Street Philadelphia, PA 19127 | Information regarding the Ashton Fund; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| Keith Mickens | 16701 Woodingham Drive Detroit, MI 48221 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and/or GM; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's payment of money or things of value to UAW officers or employees. |
| Monica Morgan | 39768 Mazuchet Drive Harrison Township, MI 48045 | Information regarding FCA's payment of money or things of value to UAW officers or employees. |
| UAW-Chrysler National Training Center ("NTC") | 2500 E. Nine Mile Road Warren, MI 48091 (586) 427-4001 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and/or GM; competitive advantages given to FCA and/or denied to GM by the UAW; FCA's payment of money or things of value to UAW or FCA officers or employees (other than ordinary compensation and benefits paid for service as an employee). |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Kris Owen | | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW. |
| Andrew Paluszkiewicz | 2334 Riverton Road Cinnaminson, NJ 08077 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| Estate of Jeffrey Pietrzyk | | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW; the Ashton Fund. |
| RTP Properties LLC | 4745 Worth Street Philadelphia, PA 19124 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Scott Sandefur | c/o Counsel for GM<br>300 Renaissance Center<br>Detroit, MI 48243 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW. |
| John Stapleton | c/o Counsel for GM<br>300 Renaissance Center<br>Detroit, MI 48243 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and/or FCA; competitive advantages given to FCA and/or denied to GM by the UAW. |
| Stellantis N.V. | c/o Steven Holley<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004<br>(212) 558-4000 | Information regarding labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's attempts to merge with GM; FCA's payment of money or things of value to UAW or FCA officers or employees, including through foreign bank accounts (other than ordinary compensation and benefits paid for service as an employee). |

11

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| Sullivan Strategic | 1000 Haddonfield-Berlin Road Suite 206 Voorhees, NJ 08043 (856) 782-0098 | Information regarding the Ashton Fund; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| Superior Sitework, Inc. | 1425 Adams Road Bensalem, PA 19020 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") | c/o Elisabeth Oppenheimer Bredhoff & Kaiser, P.L.L.C. 805 Fifteenth Street, NW Suite 1000 Washington, DC 20005 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's attempts to merge with GM; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| UAW Retiree Medical Benefits Trust | c/o Plan Administrator, UAW Retiree Medical Benefits Trust P.O. Box 14309 Detroit, MI 48214 | Information regarding the improper disclosure of confidential GM information; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and GM and FCA; FCA's attempts to merge with GM. |

**EXHIBIT 9**

| Individual or Party | Address | Potential Types of Information |
|---|---|---|
| USA Countrywide LLC | 14 Fairhaven Court Cherry Hill, NJ 08003 | Information regarding the scheme to embezzle money from the UAW-GM Center for Human Resources. |
| Dennis Williams | 24455 Crestley Drive Corona, CA 92883 | Information regarding the improper disclosure of GM confidential information; labor relations, including the negotiation, implementation, and/or impact of labor agreements between the UAW and FCA and GM; competitive advantages given to FCA and denied to GM by the UAW; FCA's attempts to merge with GM; FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |
| Foreign and domestic financial institutions known to Mr. Ashton that contain/reflect illicit proceeds relating to allegations in the First Amended Complaint | | Information regarding FCA's payment of money or things of value to UAW officers or employees, including through foreign bank accounts. |

GM may also rely on expert witness testimony. The disclosures regarding experts will be made as provided by the Federal Rules of Civil Procedure and by Order of the Court. GM may also call the following categories of witnesses at trial:

**EXHIBIT 9**

(a) persons identified in Defendant's disclosures, and (b) all expert witnesses designated by any party in this action.

**II.**   **Fed. R. Civ. P. 26(a)(1)(A)(ii): Description of Documents, Electronically Stored Information, and Tangible Things That GM Has in Its Possession, Custody, or Control, and May Use to Support Its Claims**

A description of non-privileged/protected documents, electronically stored information ("ESI") and tangible things that GM believes it has, possesses, or controls at this time and that it may use to support its claims are:

- Documents filed in the Eastern District of Michigan without seal in the criminal actions against Defendant and third parties arising from the U.S. Attorney's investigation into some of the same underlying misconduct alleged in GM's First Amended Complaint;

- Documents and communications between and among GM employees and UAW officers regarding the negotiation of collective bargaining agreements, and the effects of those negotiations on GM;

- Documents and communications between and among GM employees and UAW officers regarding competitive advantages that were given to FCA and/or denied to GM by the UAW;

- Documents and communications between and among GM employees regarding Defendant's service on the Board of General Motors Company;

- Documents and communications between and among GM employees regarding FCA's attempts to force a takeover of GM by merger; and

- Documents regarding the damages suffered by GM as a result of Defendant's unlawful conduct.

These documents, ESI, and tangible items are in the possession of either GM in Detroit, Michigan, or GM's counsel at the Chicago, Illinois office of Kirkland & Ellis LLP. Some of these documents may be publicly available. In addition, GM may

14

**EXHIBIT 9**

rely on documents available through other sources or produced by other parties, including publicly available documents and documents produced by Defendant and third parties.

In making these disclosures, GM does not waive its right to assert attorney-client privilege, the work product doctrine, or any other applicable privilege with respect to the production of any particular document or any aspect of its investigation. As GM's investigation of this matter continues, GM may locate additional documents or categories of documents that GM may use to support its claims, and/or GM may determine that it may use additional documents in its possession, custody, or control to support its claims. GM expressly reserves the right to supplement, revise, amend, or otherwise modify this response in accordance with the Federal Rules of Civil Procedure.

### III.   <u>Fed. R. Civ. P. 26(a)(1)(A)(iii)</u>: Computation of Each Category of Damages Claimed by GM

As set forth in GM's First Amended Complaint, GM seeks all damages which it has sustained as a result of Defendant's conduct, including the following categories of damages:

- Compensatory damages and/or restitution for the hundreds of thousands of dollars in compensation GM paid to Defendant for his service on the Board of General Motors Company;

- GM is seeking to discover and will seek to recover for the full extent of damages caused to GM by Defendant's unlawful conduct, including by

**EXHIBIT 9**

seeking punitive and/or exemplary damages as Defendant has acted with malice and willful disregard for GM's rights.

In addition, GM reserves the right to seek the full range of fees and costs to which it may be legally entitled, including but not limited to expenses and attorney's fees. Moreover, discovery regarding the facts and circumstances relating to this lawsuit has just begun, and GM may later identify additional damages or categories of damages that GM has suffered resulting from Defendant's conduct. GM reserves the right to supplement or amend these disclosures as further information becomes available.

## IV.    <u>Fed. R. Civ. P. 26(a)(1)(A)(iv)</u>: Insurance Agreements

GM is not currently aware of any applicable insurance agreements that must be disclosed pursuant to Rule 26(a)(1)(A)(iv).

*     *     *     *     *

GM's disclosures are based on information reasonably and currently available to GM, and GM's investigation is ongoing. GM reserves the right to modify or supplement the information provided in these disclosures in accordance with the Federal Rules of Civil Procedure, the Local Rules, and any applicable Order of the Court. GM further reserves the right to use and introduce such supplemental information, or any subsequently produced documents, at the trial of this action.

GM, in addition, reserves the right to rely on individuals or documents identified in disclosures of any other party to this action to support GM's claims, and

16

<b>EXHIBIT 9</b>

incorporate those disclosures by reference without making any representations concerning the accuracy of the information contained therein. GM also reserves the right to use or object to the production or use of documents described in the previously mentioned categories. At this time, GM also invokes all privileges relating to this matter, including the work-product privilege and attorney-client privilege in connection with GM's investigation and the First Amended Complaint and related pleadings.

**EXHIBIT 9**

Dated:  August 12, 2021                    Respectfully submitted,

                                           **KIRKLAND & ELLIS LLP**

                                           By: _s/James E. Marina_
                                           James E. Marina (N.J. Bar No. 050791996)
                                           601 Lexington Avenue
                                           New York, New York 10022
                                           Telephone:  (212) 446-4800
                                           Facsimile:  (212) 446-4900
                                           jmarina@kirkland.com

                                           Hariklia Karis, P.C. (*pro hac vice*)
                                           Jeffrey Willian, P.C. (*pro hac vice*)
                                           Casey McGushin  (*pro hac vice*)
                                           300 North LaSalle
                                           Chicago, IL 60654
                                           Telephone:  (312) 862-2000
                                           hariklia.karis@kirkland.com
                                           jeffrey.willian@kirkland.com
                                           casey.mcgushin@kirkland.com

                                           Austin Norris  (*pro hac vice*)
                                           2049 Century Park East
                                           Los Angeles, CA 90067
                                           Telephone:  (310) 552-4200
                                           austin.norris@kirkland.com

                                           Maisie Allison  (*pro hac vice*)
                                           555 South Flower Street
                                           Los Angeles, CA 90071
                                           Telephone:  (213) 680-8400
                                           maisie.allison@kirkland.com

                                           *Attorneys for Plaintiffs General Motors LLC*
                                           *and General Motors Company*

18

**EXHIBIT 9**

## CERTIFICATE OF SERVICE

I, Laura Bay, hereby certify that, on the date set forth below, a true and correct courtesy copy of the foregoing document was served on behalf of Plaintiffs, General Motors LLC and General Motors Company (individually or collectively, "GM") in the above-referenced matter by e-mail or electronic transmission.  I caused the foregoing document to be served to the person at the e-mail address listed below.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**RODMAN E. HONECKER**
Windels, Marx, Lane & Mittendorf, LLP
120 Albany Street Plaza
New Brunswick, NJ 08901
Telephone:  (732) 846-7600
Email: rhonecker@windelsmarx.com

I further certify that I caused a copy of the foregoing document to be served via First-Class Mail to counsel listed above.

☒     **[FEDERAL]**  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed August 12, 2021, at Los Angeles, California.

Laura Bay

**EXHIBIT 9**