# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **GENERAL MOTORS LLC et al.,** | **CASE NO. 2:22-mc-50034-GCS-DRG** |
| **Plaintiffs,** | **Hon. George Caram Steeh**<br>**Magistrate Judge David R. Grand** |
| **v.** | |
| **JOSEPH ASHTON,** | **Related Case No. 20-12659 (RBK-SAK)**<br>**Pending in the United States District Court**<br>**for the District of New Jersey, Camden**<br>**Vicinage** |
| **Defendant.** | |
| | **Related Case** *General Motors LLC v FCA,*<br>***LLC***, **bearing case no. 19-cv-13429**<br>**(Dismissed)**<br>**United States District Court for the Eastern**<br>**District of Michigan, Southern Division** |

_____/

James E. Marina
KIRKLAND & ELLIS LLP
Attorneys for Plaintiffs
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
Jmarina@kirkland.com

Hariklia Karis PC
Jeffrey Willian PC
Casey McGushin
Attorneys for Plaintiffs
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
Hariklia.karis@kirkland.com
Jeffrey.willian@kirland.com
Casey.mcgushin@kirkland.com

Rodman E. Honecker
Ben J. Kusmin
Windels Marx Lane & Mittendorf, LLP
Attorneys for Joseph Ashton
120 Albany Street Plaza
New Brunswick, NY 08901
(732) 846-7600
rhonecker@windelsmarx.com

NEDELMAN LEGAL GROUP PLLC
By:  Michael A Nedelman (P35433)
Attorneys for Susanne Iacobelli
28580 Orchard Lake Road, Suite 140
Farmington Hills, MI 48334
(248) 855-8888
mnedelman@nglegal.com

## REPLY IN SUPPORT OF MOTION TO QUASH SUBPOENA *DUCES TECUM*

Susanne Iacobelli Replies as follows in support of her Motion to Quash.

1. Plaintiffs General Motors LLC and General Motors Company (collectively "Plaintiffs") are pursuing four concurrent, interrelated lawsuits: this *Ashton* Action; *General Motors, LLC v FCA US LLC, et al.*[1]; *General Motors, LLC v Iacobelli, et al*,[2]; and *General Motors, LLC v Williams*[3] (the last three cases were defined by this *Ashton* Court as "Related Actions"[4]). This case and the Related Actions each attempt to allege a broad conspiracy among Mr. Iacobelli (Mrs. Iacobelli's husband), Mr. Ashton, Mr. Williams, FCA and others in furtherance of an alleged single "scheme to bribe former UAW officials to benefit FCA and harm GM." See, *e.g*., Plaintiffs' Response at pages 2, 3; **Exh. 3**, *Ashton* Amended Complaint at ¶¶12,35,54,57-58,60,63,107 and 127; **Exh. 12**, Michigan State Court Action, Second Amended Complaint at ¶¶2,3,4,7,8,15-32,56,59-61,66-67,69(a),75,77,80,84,97,101,102,103-105,12,124,147-148, 150, 152, 157-161,172-176, 178, 188-189,199-200, and 209-212 (Civil Conspiracy Claim)[5]; and **Exh. 13**, Williams First Amended Complaint at ¶¶3,4,7,25,26,37,67-73,76,78,88,92,98,101,111 and 120.[6] The Second Amended Complaint in the Michigan

---

[1] Case no. 2:19-cv-13429-PDB-DRG (E.D. Mich.), the "Michigan Federal Court Action." A copy of the proposed First Amended Complaint is attached as **Exhibit 10**.

[2] Case no. 20-011998-CB (Wayne County), the "Michigan State Court Action."

[3] Case no. CVBR 12103181 in Superior Court of the State of California, County of Riverside, the "Williams Action"

[4] *General Motors LLC v Ashton*, Case No. 20-12659, United States District Court for the District of New Jersey, Camden Vicinage, Discovery Confidentiality Order, Doc. No. 61, page ID 955 at fn. 1. A copy of that Order is attached as **Exhibit 11**.

[5] **Exhibit 12**, Second Amended Complaint in the Michigan State Court Action.

[6] **Exhibit 13**, Williams First Amended Complaint.

State Court Action is based on substantially similar allegations to those made in the proposed Michigan Federal Court Action First Amended Complaint, with respect to which leave to amend was denied.

Plaintiffs have consistently alleged in the Related Actions that as an alleged co-conspirator, Mr. Iacobelli is liable for the alleged acts and conduct of Mr. Ashton, Mr. Williams, FCA and the other alleged co-conspirators. The deposition of Mrs. Iacobelli cannot be viewed in isolation but must instead be viewed in the context of this and the Related Actions which, although separately brought, are unquestionably interrelated by reason of the overlapping allegations of conspiratorial conduct in furtherance of a single scheme – and the testimony sought is thus either "for or against" Mr. Iacobelli.

2.  The alleged "scheme" was, according to Plaintiffs' allegations made upon "information and belief," facilitated by the alleged establishment of and "payments through foreign accounts." See Plaintiffs' Response at pages 2,3; **Exh. 3**, *Ashton* Amended Complaint at ¶¶57-58); **Exh. 12**, Michigan State Court Action, Second Amended Complaint at ¶¶67-69; **Exh. 13**, Williams First Amended Complaint at ¶¶85; and **Exh. 10**, Michigan Federal Court Action, proposed First Amended Complaint at ¶¶6,9,35,37,40, 43, 88, 101,176,198, 201(j), 221, 225(c). Against these allegations of a broad conspiracy involving imaginary foreign accounts, Plaintiffs at Response p. 2 (Doc. 10, page ID 248), alleged the need for Mrs. Iacobelli's testimony:

> "GM has reason to believe that multiple foreign financial accounts exist and are held by former FCA employees and former UAW officials, including

> Mr. Ashton and Alphons Iacobelli (Mrs. Iacobelli's husband), and that these foreign accounts were established in connection with FCA's underlying scheme to bribe former UAW officials to benefit FCA and harm GM."

Plaintiffs further assert that Plaintiffs have "reason to believe that Mrs. Iacobelli herself has foreign financial accounts in her name and directly facilitated other foreign accounts that are controlled by her or her husband," (Plaintiffs' Response at p. 2) and that "she is a percipient witness at least with respect to the existence and use of foreign account," (Plaintiffs' Response at p. 6)

3.   Against these allegations and averments of the broad conspiracy, Plaintiffs do not and in good faith could not, deny that the anticipated testimony of Susanne Iacobelli will either be for or against her husband, Alphons Iacobelli, since Plaintiffs have alleged that the alleged foreign accounts were part of a "scheme to bribe former UAW officials to benefit FCA and harm GM." Plaintiffs' Response at p. 2. In each of this and the Related Actions, Plaintiffs have alleged that each of Mr. Iacobelli, Mr. Ashton, Mr. Williams, FCA and others conspired, in return for payments by FCA to unidentified foreign bank accounts, to breach alleged duties to one or both of the Plaintiffs; and that each of Messrs. Iacobelli, Ashton and Williams (together with FCA and others) are, as alleged co-conspirators, liable for the alleged acts and omissions of each other. See **Exh. 13**, *Williams'* First Amended Complaint at, *e.g.*, ¶¶7,88, 92,122.

4.   The statutory spousal privilege codified at MCL 600.2162(1) is clear and unambiguous, and prohibits in a civil action the examination as a witness of a wife for

or against her husband without his consent. Plaintiffs' wishes to the contrary notwithstanding, and ignoring Plaintiffs' mischaracterization of this statute as "elegantly" solving Plaintiffs' problem "by applying in cases where the testifying witness's spouse is a party to the pending litigation" (it does not), the statutory proscription on Mrs. Iacobelli being called as a witness is not limited to and this Court cannot, as Plaintiffs request, re-write the statute to limit its application only where "the testifying witness's spouse is a party to the pending litigation." The statute contains no such qualification, and the policy underlying the unambiguous terms of the statute – the preservation of marital harmony – would be completely vitiated if the testimony of Mrs. Iacobelli was permitted. Even under their construction of the statute, Plaintiffs must admit that Mrs. Iacobelli's testimony would be barred if Mr. Iacobelli was a named party in this *Ashton* Action; the testimony cannot be elicited in this *Ashton* Action simply because Mr. Iacobelli is not named as a party since he is clearly identified as an alleged co-conspirator in the alleged wrongful conduct, and is either a named party and/or identified as a co-conspirator in the Related Actions.

5. Realizing that the plain text of MCL 600.2162(1) prohibits Mrs. Iacobelli from being examined in this civil action as a witness "for or against" Mr. Iacobelli, Plaintiffs instead create a straw man argument, arguing the unavailability of the federal adverse spousal testimonial privilege – a privilege that is inapplicable since it exists only under federal common law and is applicable only in criminal proceedings. *See,*

*e.g., US v Premises Known as 281 Syosset Woodbury Road,* 71 F. 3d 1067, 1070 (2nd Cir. 1995). The spousal privilege applicable to this case is the spousal privilege afforded under state (Michigan) statutory, not federal common, law.[7] Fed. R. Evid. 501. Mrs. Iacobelli could not and has not sought to avail herself of the benefit of the federal, common law criminal adverse spousal testimonial privilege discussed in each of the three cases cited by Plaintiffs at Response page 6, but instead relies (for purposes of this Motion, and reserving the right to assert all other available privileges if required to appear for examination) upon the statutory spousal privilege applicable to civil actions and codified at MCL 600.2162(1).

Even if the narrower federal adverse spousal testimony privilege were applicable to this case,[8] it would serve prevent to prevent Mrs. Iacobelli's testimony. In *In re Grand Jury Matter*, 673 F. 2d 688 (3d Cir. 1982), the Court permitted invocation of the narrower adverse spousal testimony privilege as a bar to a wife's testimony in a criminal case against a third party, holding:

> "the Government openly seeks one spouse's testimony concerning the activity of a third party, who is alleged to have engaged in a common criminal scheme with a husband and his wife, and the Government thereby hopes also to reach the nonwitness spouse, the testimony sought is sufficiently adverse to the interests of the absent spouse to permit invocation of the privilege against adverse spousal testimony." *Id*. at 692.

---

[7]  In the January 24, 2022 Order referenced by Plaintiffs at fn. 1 of their Response, Judge Kugler concluded that Michigan law applies to the state law breach of fiduciary duty claims in this *Ashton Action*.

[8]  Admittedly, to make that assumption, the Court would have to assume that, like the Michigan statutory privilege, the federal common law privilege extended to civil cases.

*See also In re Grand Jury Subpoena to C.D.*, 22 F. Supp. 2d. 507, 508 (D. Md. 1998) (allowing the testifying-spouse's invocation of the spousal privilege, despite the Government asserting that it was not seeking information against her husband but instead seeking information about her alleged dealings with other suspects under investigation. The Court concluded that invocation of the protection of the spousal privilege was appropriate since evidence that she may provide implicating other members of the criminal conspiracy would be imputed to her husband as a co-conspirator (*citing Pinkerton v. United States*, 328 U.S. 640, 647-48(1946)).

The rationale of the Courts in *In re Grand Jury Matter* and *In re Grand Jury Subpoena to C.D*, even though addressing the narrower federal adverse spousal testimony privilege, is equally applicable here. Certainly, if the government is not entitled to elicit adverse spousal testimony in a criminal case against a third party applying the narrower adverse spousal testimony privilege, Plaintiffs are not entitled to the testimony of Mrs. Iacobelli in a civil action against Mr. Ashton that similarly seeks to implicate Mr. Iacobelli. Plaintiffs aver and therefore cannot reasonably deny that the purpose of the testimony sought to be elicited from Mrs. Iacobelli is to establish the existence of alleged foreign accounts allegedly in her name and/or her alleged participation in "directly" facilitating "other foreign accounts that are controlled by her or her husband" (Plaintiffs' Response at p. 2), all in furtherance of Plaintiffs' efforts to prove the existence of an alleged unlawful bribery scheme in which they claim – in this

*Ashton* Action and each of the Related Actions – that Mr. Iacobelli is an integral part of such alleged conspiracy. The interrelatedness of this *Ashton* Action and the Related Actions is well-evidenced by the Discovery Confidentiality Order entered in this *Ashto*n Action, which expressly contemplates and permits use of Confidential Materials (as defined in the Discovery Confidentiality Order) obtained in the *Ashton* Action to be used in Plaintiffs' prosecution of the Related Actions, including the actions against Mr. Iacobelli. Mrs. Iacobelli's testimony concerning the alleged actions of Mr. Ashton and the alleged foreign accounts is clearly intended by Plaintiffs to establish the alleged conspiracy that Plaintiffs allege includes Mr. Iacobelli, and would therefore necessarily be for or against Mr. Iacobelli. The effect upon Mr. Iacobelli of Mrs. Iacobelli's testimony regarding Mr. Iacobelli's alleged co-conspirators or Mrs. Iacobelli herself – whether ultimately for or against Mr. Iacobelli - is therefore not in the least bit speculative and consideration of that effect not the least bit premature.

For the reasons set forth above and in her underlying Motion and supporting Brief, Susanne Iacobelli prays that this Court quash Plaintiffs' Subpoena *duces tecum*.

Respectfully submitted,
NEDELMAN LEGAL GROUP PLLC
/s/ Michael A. Nedelman
Michael A. Nedelman (P35433)
Attorneys for Susanne Iacobelli
28580 Orchard Lake Road, Suite 140
Farmington Hills, Michigan  48334
(248) 855-8888
Dated: February 1, 2022          mnedelman@nglegal.com

## <u>INDEX OF EXHIBITS</u>:

10.  Proposed First Amended Complaint in Case no. 2:19-cv-13429-PDB-DRG (E.D. Mich.) (Doc 84-2, beginning at page ID 3009)
11.  Discovery Confidentiality Order (Ashton Action)
12.  Second Amended Complaint in the Michigan State Court Action.
13.  Williams First Amended Complaint

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**GENERAL MOTORS LLC et al.,**          **CASE NO. 2:22-mc-50034-GCS-DRG**

      **Plaintiffs,**          **Hon. George Caram Steeh**
                                  **Magistrate Judge David R. Grand**

**v.**

**JOSEPH ASHTON,**          **Related Case No. 20-12659 (RBK-SAK)**
                                     **Pending in the United States District Court**
      **Defendant.**          **for the District of New Jersey, Camden**
                                     **Vicinage**

                                     **Related Case** *General Motors LLC v FCA,*
                                     *LLC,* **bearing case no. 19-cv-13429**
                                     **(Dismissed)**
                                     **United States District Court for the Eastern**
                                     **District of Michigan, Southern Division**

_____/

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via the e-filing portal to all counsel of record.

I declare that the above statement is true to the best of my knowledge, information and belief on this 1st day of February, 2022.

                                  /s/  Michelle K. Watler
                                  Michelle K. Watler

# Exhibit A

**EXHIBIT 10**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| GENERAL MOTORS LLC, GENERAL MOTORS COMPANY, | No. 19-cv-13429 |
| Plaintiffs, | Honorable Paul D. Borman District Court Judge |
| against | Honorable David R. Grand Magistrate Judge |
| FCA US LLC, FIAT CHRYSLER AUTOMOBILES N.V., DENNIS WILLIAMS, JOSEPH ASHTON, ALPHONS IACOBELLI, JEROME DURDEN, MICHAEL BROWN, | **FIRST AMENDED COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**EXHIBIT 10**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................... 1

THE PARTIES .............................................................................................. 13

    A.    FCA Group ................................................................... 14

    B.    Corrupt FCA Officials ................................................. 15

    C.    Dennis Williams - Corrupted Former UAW Officer and President ...................................................................... 18

    D.    Joseph Ashton - Corrupt Former UAW Vice President and UAW Trust Designated Director on GM's Board ............ 19

    E.    Significant Non-Parties and Other Entities ................... 20

FCA-UAW CONTROL ENTERPRISE ............................................ 27

FCA-NTC ENTERPRISE .............................................................. 29

JURISDICTION AND VENUE ..................................................... 31

DETAILED ALLEGATIONS ......................................................... 33

I.    OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER FOR NO CASH ........................... 33

    A.    Financial Crisis Threatens U.S. Auto Industry ............. 33

    B.    Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler .................................................................... 34

    C.    FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW ................................................. 41

II.    FCA FUNNELS MILLIONS TO THE UAW AND CERTAIN UAW LEADERS. ............................................................................... 42

**EXHIBIT 10**

III.   FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW
       LEADERS TO DAMAGE GM AND ACHIEVE LABOR PEACE
       FOR FCA FOR YEARS. ...............................................................52

IV.    FCA GROUP CONSPIRED WITH UAW LEADERS TO ATTEMPT
       A TAKEOVER OF GM BY MERGER .......................................59

       A.    Marchionne Prepares on Behalf of FCA to Force a Takeover of
             GM by Merger ...................................................................60

       B.    President Williams and Defendant Ashton Are Key Players in
             the Takeover Conspiracy ..................................................64

       C.    FCA Undertakes "Operation Cylinder"...............................67

V.     CO-CONSPIRATORS ASHTON AND IACOBELLI SERVED AS
       INFORMANTS TO FCA CAUSING HARM TO GM. .............84

VI.    FCA NV'S HISTORIC CULTURE OF CORRUPTION AND
       BRIBERY AS A BUSINESS TOOL. ........................................88

VII.   U.S. ATTORNEY IN DETROIT'S CRIMINAL INVESTIGATION
       STARTS TO REVEAL THE CORRUPTION ...........................93

VIII.  FCA GROUP AND ITS CO-CONSPIRATORS CONCEALED THE
       CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM
       FROM DISCOVERING ITS EARLIER INJURY. .....................94

CAUSES OF ACTION ...................................................................106

REQUESTS FOR RELIEF .............................................................124

EXHIBIT 10

# AMENDED COMPLAINT

General Motors LLC and General Motors Company (individually or collectively, "GM" or "Company") for their Amended Complaint, allege as follows:

## INTRODUCTION

1. This lawsuit is categorically not against the hard-working women and men who are members of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"). The UAW and its current officials are not Defendants to this lawsuit. This lawsuit does not seek to alter or reduce in any respect the wages and other benefits of any UAW worker in the past or into the future. In fact, this lawsuit is intended to build a stronger future for GM's employees, the UAW, and the Company. That future depends on a collective bargaining process and labor relations grounded in integrity, good faith, and arm's-length negotiations, which the law requires and this lawsuit is intended to vindicate.

2. This case is about an Italian company, Fiat Chrysler Automobiles N.V. ("FCA NV"), which managed to win the support of the U.S. government in obtaining operational control, for no cash, over an iconic U.S. auto company, Chrysler Group LLC. Shortly after this government approved acquisition, FCA Group[1] betrayed our

---

[1] "FCA Group" means, collectively, FCA US LLC ("FCA"), its parent FCA NV, along with their predecessors, including FCA predecessors Chrysler LLC and Chrysler Group LLC ("Chrysler") and FCA NV predecessor Fiat S.p.A. ("Fiat").

1

**EXHIBIT 10**

government's and the U.S. auto industry's trust and embarked on a systemic and near decade-long conspiracy to bribe senior union officials to corrupt the collective bargaining process and labor relations and directly harm GM. Only recently through continued investigation during this lawsuit has GM learned, upon information and belief, that this FCA-Group-perpetrated-scheme was significantly broader, even more direct, and deeper than has been publicly revealed to date.

3.     As initially revealed starting with the first indictment in July 2017, the United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA Group and certain former union leaders. This investigation has resulted in criminal charges against fourteen individuals with three FCA officials and ten former UAW officials (and one UAW official's spouse) pleading guilty to a years-long bribery scheme. As has been repeatedly admitted, starting no later than July 2009, FCA paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and the UAW itself including through the UAW-FCA joint training center (the National Training Center or "NTC") and, in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and

---

"FCA Group" is not a term created by GM.  It is consistent with how these Defendants refer to themselves in public.  *See, e.g.*, fcagroup.com. Where appropriate and distinguishable, the Complaint refers to the particular entity or entities at issue.

**EXHIBIT 10**

administration of the collective bargaining agreements between FCA and the UAW." [2] During the course of this audacious bribery scheme, two collective bargaining agreements ("CBAs") were negotiated with FCA—in 2011 and 2015—both subject to corruption in those negotiations and the implementation such that they directly harmed GM.

4.     Through this lawsuit, GM seeks recourse against FCA Group and the individuals responsible for this long-running bribery scheme. While a full accounting of the damage inflicted from this scheme directly on GM is unknowable at this time without discovering additional details of the scheme, GM estimates that it has incurred massive monetary damage, on the order of billions of dollars (before trebling) that an economist can readily calculate in the form of higher costs that were unique to GM and that only GM incurred, and which it would not have incurred but for the bribery scheme. This damage is the direct, substantial, and foreseeable consequence of this bribery scheme orchestrated by FCA Group and the many acts of racketeering that fueled the scheme. As has been revealed by GM's ongoing investigations and as discussed further herein, GM was the intended and targeted victim of FCA's and FCA NV's criminal scheme.

---

[2]   7/13/18 Iacobelli Plea Agreement, at 7. The individual criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden, et al.*, Case No. 2:17-cr-20406-PDB-RSW, unless specified otherwise.

**EXHIBIT 10**

5.     FCA Group did not perpetrate this long-running scheme with the intended purpose to merely gain a general edge (in the form of lower labor costs) on the market or to increase its market share. Instead, FCA Group's scheme was directed specifically at harming GM as part of FCA Group's long-term goal to force higher costs on GM causing it to be weakened and assist FCA NV in forcing a merger with GM—a long standing objective of FCA NV and its former CEO, Sergio Marchionne, since before FCA NV entered the US automobile manufacturing market. This specific targeting of GM is exemplified by FCA Group's placement (aided by corrupt UAW officials) of two individuals within GM who were positioned to obtain and share with FCA Group confidential GM information.

6.     In 2014, using his power to name the UAW Trust's designee to the GM Board, Defendant Dennis Williams selected and placed Joseph Ashton, a corrupt then-UAW Vice President for the GM Department, on GM's Board. Upon information and belief, despite Ashton owing fiduciary duties to GM, Ashton instead used his position to pass confidential GM information to the UAW and FCA Group. Upon information and belief, in return for his conspiring with FCA Group, Ashton was the beneficiary of substantial payments overseas in at least one foreign bank account in Ashton's name or a business entity controlled by Ashton.

7.     After GM rejected FCA Group's formal merger offer in April 2015, unrelenting, FCA Group doubled-down on its infiltration efforts by then

4

**EXHIBIT 10**

purposefully placing its former employee, Alphons Iacobelli, in GM's Labor Relations Department. Alphons Iacobelli, who along with Marchionne was at the center of the scheme at FCA Group, left FCA in 2015 and immediately sought employment at GM. Because of the substantial efforts by all of the Defendants to conceal their scheme, GM was unaware of FCA's role in Iacobelli's placement or of Iacobelli's crimes at the time he was hired by GM; nor was GM aware that Iacobelli was under investigation by the Department of Justice when he reached out and was hired into GM's Labor Relations Department. Upon information and belief, after his departure from FCA in June 2015 and continuing during his later employment with GM, Iacobelli continued his involvement in the scheme by receiving payoffs from FCA Group in return for sharing GM's confidential information with FCA Group to further harm GM. These actions were not done to nor did they harm the UAW; instead they were intended to and did cause harm to GM, the intended target of the FCA bribery scheme.

8.     The appointment of Ashton to GM's Board by Williams through the UAW Trust allowed FCA Group, through its bribes of UAW officials, to further tailor its scheme to directly harm GM. No other party or entity could have been directly harmed as a result of this scheme. On GM's Board, Ashton was privy to detailed highly confidential information concerning GM's view of and strategic

**EXHIBIT 10**

response to FCA Group's ongoing merger inquiries, as well as GM's approach and expectations for the 2015 CBA negotiations.

9.      Both FCA and FCA NV have failed to conduct an independent or meaningful investigation to identify, root out and discipline those involved in the bribery scheme that has been admitted to in public since January 2018. GM only recently learned the real reason for this blatant FCA and FCA NV governance failure. Upon information and belief, the FCA-UAW bribery scheme is much broader and deeper than previously suspected or revealed as it involved FCA Group apparently using various accounts in foreign countries, including Switzerland, Luxembourg, Liechtenstein, Italy, Singapore and the Cayman Islands, to control corrupt individuals by compensating and corrupting those centrally involved in the scheme to harm GM. The beneficiaries of such offshore accounts include former top UAW leaders, such as former UAW President, Treasurer and Secretary Dennis Williams (2010-2018), and former UAW Vice President Joe Ashton (2010-2014), subsequently selected by Williams and appointed by the UAW Trust to be a director on GM's Board (2014-2017), as well as other FCA Group personnel. Upon information and belief, tens of millions of dollars have been moved through these offshore accounts to help perpetrate and protect the described scheme.

10.     This bribery scheme was authorized at the highest levels of both FCA NV and FCA. According to criminal plea agreements alone by former FCA Group

**EXHIBIT 10**

Case 2:22-mc-50024-GCS-DRG  ECF No. 34-2 PageID.880 Filed 02/01/23 Page 21 of 304
Case 2:19-cv-13429-POB-DRG  ECF No. 34-2 filed 08/08/20  PageID.3018  Page 13 of
129

executives, senior FCA Group executives "knowingly and voluntarily joined a conspiracy in which FCA US LLC and its executives agreed to pay and deliver, and willfully paid and delivered, more than $1.5 million in prohibited payments and things of value to officers and employees of the UAW."[3] But, as alleged herein, the actual amount of the bribes and the hush money paid is exponentially higher.  These FCA Group bribes were authorized, at least, by its then CEO Sergio Marchionne (now deceased) to General Holiefield, the UAW Vice President and International Executive Board Member (now deceased) and to other UAW officials who oversaw the FCA business relationship. FCA executive Alphons Iacobelli has admitted (at least in part) to this scheme and currently is in prison for some of these illegal acts. Michael Brown, Director of Employee Relations at FCA and Co-Director of the NTC, likewise has admitted (at least in part) to this scheme. Marchionne authorized these bribes, and additional things of value to UAW officials, so that FCA could cause GM to be at a disadvantage by driving up GM's costs, invade its board room and labor relations team, and, as detailed below, ultimately attempt to force a merger with GM.

11.     The purpose of the scheme ultimately was to harm GM by causing it to incur higher labor costs that it otherwise would not have incurred and assist FCA

---

[3]   7/13/18 Iacobelli Plea Agreement, at 3; *see also* 5/25/18 Brown Plea Agreement, at 3; 8/8/17 Durden Plea Agreement, at 4.

**EXHIBIT 10**

Group in forcing a merger. The object of the agreement between FCA and UAW was not to reduce the absolute labor costs of FCA or deprive UAW-FCA or UAW-GM workers of higher wages or better benefits. Rather, the object of the scheme was to harm GM by causing its overall labor costs to increase as a result of the UAW purposefully denying it certain structural programs such as Global Manufacturing System ("GMS") support or the same formulary agreements, described below, that would otherwise have been granted to GM but for the bribery. While GM suffered increased labor costs, UAW members were not harmed by this scheme as FCA-UAW employees received market-based wages and GM-UAW employees received above-market wages to the direct detriment of GM.

12.   The structural changes that FCA Group bribed the UAW to deny to GM included, at least, genuine support from UAW leaders for GM's GMS program, and manipulation of certain contractual limits on Tier Two and temporary employees, and other "side letter" agreements between FCA and the UAW.

13.   Beyond denying the above structural changes to GM, the scope of the scheme between the UAW leadership and FCA Group is further demonstrated by the UAW agreeing to support FCA's "longer term business plan," which included securing UAW support of FCA NV's scheme to force a merger with GM. We now know that was the result of bribery and the racketeering scheme.

**EXHIBIT 10**

14.   In 2015, with cooperation of UAW leadership purchased through bribes, Marchionne schemed with then-UAW President Dennis Williams to use the 2015 CBA negotiations to increase the pressure on GM to merge.

15.   After years of telegraphing his desire to merge GM and FCA (including by approaching GM in 2012 about such a merger), in the spring of 2015, Marchionne formally solicited GM for a merger, on behalf of FCA NV, and was rejected.

16.   In the ensuing months, with the purchased support of certain former UAW officials including Dennis Williams, Marchionne proceeded to orchestrate a negotiation of the 2015 CBA designed, through the power of pattern bargaining, to cost GM billions of dollars and a billion dollars more than the UAW had sought from GM on its own.

17.   Williams and Marchionne were aware that the federal government was actively investigating the FCA-UAW bribery scheme, so FCA NV and FCA found a different means to convey bribes to the UAW.  FCA paid the equivalent of over a billion dollars more than the UAW's demand to GM in the 2015 CBA. The UAW had demanded under a billion dollars of increased costs for the 2015 CBA until Dennis Williams began negotiations with Marchionne.  Then, in a 48-hour period, the price tag more than doubled. FCA was giving the UAW a billion extra dollars in return for something of greater value.

**EXHIBIT 10**

18.     The one-billion-dollar bribe paid by FCA through the 2015 CBA to benefit the UAW was for the purpose of advancing the intended plan of FCA to secure the necessary support of the UAW for its attempt to takeover GM. This payment of a billion dollars was worth it to Marchionne and FCA, as they could recoup greater than that amount through cost savings and synergies as a result of an FCA-GM merger (in addition to the personal compensation Marchionne would reap from such a merger).

19.     Through a self-described "rich" FCA-UAW labor contract designed specifically to harm GM, Williams and certain corrupt UAW leaders could seek to hide their bribes from government investigators who would not have known the UAW's asking price and that FCA had paid more than double that price, while Marchionne could impose unanticipated costs on GM in order to force a merger.

20.     Through the power of pattern bargaining, which rendered GM unable to negotiate core labor cost terms, this contract was imposed upon GM at a price a billion dollars higher than the UAW's President's Demand.  This provided an easily-calculated over $1 billion direct harm from costs that GM would not have incurred but for the bribes paid by FCA.  UAW-represented workers were not harmed by GM's overpayment and instead benefited through the higher costs GM had to pay.

**EXHIBIT 10**

Case 2:22-mc-50024-GCS-DRG ECF No. 34-2, PageID.894 Filed 02/01/23 Page 25 of 304
Case 2:19-cv-10429-POB-DRG ECF No. 34-2 filed 08/03/20 PageID.3022 Page 15 of
129

21.     While GM ultimately resisted the takeover scheme, in the process Marchionne and FCA Group negotiated a 2015 CBA that, as designed, directly damaged GM as a result of the pattern of racketeering and the FCA Group's control over the UAW.

22.     FCA NV took active steps to facilitate and conceal its bribery scheme rather than address these systemic corruption issues.  Those steps include FCA NV (previously an Italian company) transferring its domicile to the Netherlands, which is well known for its lax governance requirements, in 2014.  FCA NV packed its board with insiders who allowed FCA Group to falsely claim, despite having conducted no meaningful internal investigation, that it found "no evidence that any FCA US employees senior to Alphons Iacobelli were aware of or participated in any illegal activities related to the" NTC.[4]

23.     The governance structure of FCA is likewise designed to allow such corruption as its board has no independent directors and is effectively overseen by FCA and FCA NV insiders.

24.     In light of the government investigation, the UAW has recognized the need to engage in active reform to ensure it is free of corruption. UAW Acting

---

[4]   Robert Snell and Nora Naughton, The Detroit News "FCA-UAW Conspiracy Ran Deeper, Longer, Lawyer Says" (August 13, 2018) https://www.detroitnews.com/story/business/autos/chrysler/2018/08/13/fca-uaw -conspiracy-ran-deeper-longer-lawyer-says/981325002/

**EXHIBIT 10**

President Rory Gamble announced "widespread ethics reforms," designed to "make clear the UAW is committed to establishing the right mechanisms and safeguards to protect the union from corruption and malfeasance." GM agrees with the spirit of the announced reforms, which are a necessary step towards "regaining the trust of [the UAW's] members, and ensuring the misconduct that has recently come to light will never happen again."[5] President Gamble is involved in ongoing meetings with U.S. Attorney Matthew Schneider to further address UAW reforms.

25.     FCA Group, on the other hand, refuses to come to terms with this stunning pattern of racketeering directed from its highest offices.  FCA Group had the NTC publicly claim that it was a "victim" rather than perpetrator of this fraud, only to have a federal court reject that claim and conclude the "NTC functioned as a willing co-conspirator with FCA."[6]

26.     As to Marchionne, who sat at the center of multiple fraudulent schemes as detailed below, FCA Group has chosen to embrace his wrongful conduct. Rather than acknowledge Marchionne's wrongdoing and that of other high-level FCA

---

[5]     UAW Press Release, *United Auto Workers Acting President Rory Gamble Enacts Immediate Nationwide Ethics Reforms* (Nov. 13, 2019), https://uaw.org/united-auto-workers-acting-president-rory-gamble-enacts-immediate-nationwide-ethics-reforms/.

[6]     *See United States v. Iacobelli*, No. CR 17-20406, 2019 WL 1508035, at *1 (E.D. Mich. Apr. 5, 2019).

**EXHIBIT 10**

Group executives and implement necessary governance reform, in 2019 FCA Group's Chairman declared that Marchionne stood for "responsibility and openness" and that "we . . . owe" Marchionne for helping make FCA Group what it is today.[7] FCA Group has chosen to essentially ratify years of its own racketeering.

27.     Thus, as described more fully in this Amended Complaint, FCA Group and its executives have engaged in a classic pattern of racketeering for nearly a decade, including by committing multiple violations of the Labor Management Relations Act of 1947 ("Taft-Hartley Act"), wire fraud, mail fraud, and money laundering. As the targeted victim that has been directly harmed by FCA Group's scheme, GM seeks to recover its damages from Defendants for the benefit of GM and its employees.

28.     The damages that GM recovers will be used for investment in the United States to grow jobs and for the benefit of its employees.

## THE PARTIES

**Plaintiffs**

29.     **General Motors LLC**: Plaintiff General Motors LLC is a Delaware limited liability company with its principal place of business located at 300

---

[7]   FCA, *Statement from FCA Chairman, John Elkann, on the One-Year Anniversary of the Loss of Sergio Marchionne* (July 24, 2019), https://www.fcagroup.com/en-US/media_center/fca_press_release/2019/july/Pages/statement_on_the_one_year_anniversary_of_the_loss_of_sergio_marchionne.aspx.

**EXHIBIT 10**

Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. General Motors LLC is a subsidiary of General Motors Holdings LLC, which is a wholly owned subsidiary of Plaintiff General Motors Company. General Motors LLC is the largest automaker in the U.S. and an iconic American brand that manufactures and sells automobiles in the U.S. under brands including Chevrolet, Cadillac, Buick, and GMC. General Motors LLC is an employer in the automotive industry, which has a substantial effect on interstate commerce.

30. **General Motors Company**: Plaintiff General Motors Company (herein referred to as "GM Company" or "New GM") is a Delaware corporation with its principal place of business in Detroit, Michigan, and the ultimate parent of General Motors LLC.

31. "GM" is used herein to refer individually or collectively to General Motors LLC and General Motors Company.

### **Defendants**

#### A. **FCA Group**

32. **FCA US LLC (formerly known as Chrysler Group LLC):** Defendant FCA US LLC ("FCA") is an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA is a wholly owned subsidiary of FCA NV, a publicly traded

**EXHIBIT 10**

foreign entity listed on the New York Stock Exchange ("NYSE"). FCA manufactures and sells automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram. FCA is an employer in the automotive industry, which has a substantial effect on interstate commerce.

33.     **Fiat Chrysler Automobiles N.V. (formerly known as Fiat):** Defendant Fiat Chrysler Automobiles N.V. ("FCA NV"), the successor of the Italian automotive company formerly known as Fiat S.p.A. ("Fiat"), is the ultimate parent company and owner of FCA US LLC. FCA NV is organized under the laws of the Netherlands, as a Naamloze Venootschap, and its principal executive offices are in London, England. Since October 2014, FCA NV's common stock has traded on the NYSE under the ticker symbol FCAU, and it regularly files with the SEC annual reports on Forms 20-F and furnishes Forms 6-K pursuant to Section 13(a) of the Exchange Act. FCA NV is an automotive group that, both directly and through its subsidiaries, designs, engineers, manufactures, distributes, and sells vehicles and components; provides retail and dealer financing, leasing, and rental services; and engages in media, publishing, and other business throughout the U.S., including in Michigan.

### B.     Corrupt FCA Officials

34.     **Alphons Iacobelli:** Defendant Iacobelli is a resident of Michigan and was employed as the Vice President of Employee Relations at FCA and as the

**EXHIBIT 10**

Co-Chairman of the NTC and its Joint Activities Board from 2008 to 2015. In this role, Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW. Through his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and FCA to direct the financial affairs of and approve payments made by the NTC. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution. At all times relevant to this Complaint, Iacobelli was an agent of Chrysler and/or FCA.

35.    Upon information and belief, Iacobelli, among others, has been secretly compensated for his participation in the scheme and to ensure that his professed cooperation with the government's investigation does not implicate top FCA Group executives or reveal the full scope of the scheme to target GM. The compensation to Iacobelli included providing him with control over apparent foreign accounts, in his name (or that of a close family member) and in the name of a business entity that he controls (Business Advisory Group, an entity created by Iacobelli), in Italy, Liechtenstein, Switzerland and Singapore. Upon information and belief, control over these accounts and possibly further compensation from FCA Group continued after

**EXHIBIT 10**

Iacobelli left FCA and later joined GM, and such funds remain available to Iacobelli to this day and are being actively managed by his wife.

36.    **Jerome Durden:** Defendant Durden is an individual currently residing in Michigan and was employed as a financial analyst at Chrysler and FCA in its corporate accounting department since 1985. In 2008, he was assigned by Chrysler to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and FCA, had the authority to approve and did approve payments made by the NTC. In addition, Durden was selected by Holiefield to serve as Treasurer of the Board of Trustees of the Leave the Light on Foundation ("LTLOF") from 2009 through June 2015. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution. At all times relevant to this Complaint, Durden was an agent of Chrysler and/or FCA.

37.    Upon information and belief, Durden, among others, has been secretly compensated for his participation in the scheme and to ensure that his professed cooperation with the government's investigation does not implicate top FCA Group executives or reveal the full scope of the scheme to target GM.  Despite Durden's public claim to the Court that he received no compensation for his central role in the

**EXHIBIT 10**

scheme, such compensation includes providing him control over apparent foreign accounts in Liechtenstein and the Cayman Islands in his name and/or in the name of his personal business entity, JAD Enterprises, created to conceal his ownership over these accounts.

38.     **Michael Brown:** Defendant Brown is an individual currently residing in Michigan and was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national CBAs between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Complaint, Brown was an agent of Chrysler and/or FCA.

### C.     <u>Dennis Williams - Corrupted Former UAW Officer and President</u>

39.     **Dennis D. Williams:** Defendant Williams is an individual currently residing in California, and he served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010–14).   Prior to 2010, Williams served on the UAW International Executive Board as the Director of Region 4 (2001 to 2010) during

**EXHIBIT 10**

which time he had direct dealings with Marchionne in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction equipment, which is commonly controlled by Exor NV.

40.     Upon information and belief, Williams, among others, has been secretly compensated for his participation in the scheme and to ensure that he does not implicate top FCA Group executives or reveal the full scope of the scheme to target GM.  The compensation to Williams includes providing him with apparent foreign accounts that he controls in Switzerland and Liechtenstein in his name individually and/or in the name of a business entity that he apparently controls, the so-called Williams Charity Fund.

### D.     Joseph Ashton - Corrupt Former UAW Vice President and UAW Trust Designated Director on GM's Board

41.     **Joseph Ashton**:  Defendant Joseph Ashton is an individual currently residing in New Jersey.  Ashton served on the UAW's Executive Board from 2006 to 2014, most recently as Vice President of the UAW's GM Department from 2010 to 2014, and previously as the Regional Director for Region 9 from 2006 to 2009.  Following his time at the UAW, from 2014 to December 2017, Williams supported Ashton serving as the UAW Trust's designated director on the Board of Directors of GM until he abruptly resigned.   On December 4, 2019, Ashton pled guilty to conspiracy to commit honest services wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h).

**EXHIBIT 10**

42.     In his role as the Vice President of the UAW's GM Department, Ashton used his influence to further FCA's scheme designed to increase GM's labor costs above market and above FCA's costs and directly harm GM by not granting GM the specific structural labor concessions it should have otherwise received but for the bribes.

43.     In return, upon information and belief, Ashton, among others, has been secretly compensated for his participation in the scheme and to ensure that he does not implicate higher-level FCA Group executives or reveal the full scope of the scheme to target GM.  Despite owing GM fiduciary duties in his role as a director, Ashton did not disclose the scheme to GM.  Upon information and belief, in return for this cooperation, Ashton obtained control over at least one foreign account in the Cayman Islands in his individual name and/or in the name of a business entity that he apparently controls, the so-called Ashton Fund.

## E.     **Significant Non-Parties and Other Entities**

44.     **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)**: The UAW is the union that exclusively represents the labor forces for both GM and FCA.  From 2009-2018, the UAW represented approximately 50,000 GM employees and between 23,000 and 47,000 FCA employees. As such, the UAW has a significant degree of market power

**EXHIBIT 10**

to force labor terms on either competitor, including through the ability to call strikes, among other actions.

45.     The UAW also has an unusual and limited governance structure where only five officers of the UAW—the President, the Secretary-Treasurer, and three Vice Presidents of the International Executive Board—effectively control its central decision-making regarding the negotiation and administration of collective bargaining agreements.  These UAW officers possess particularly strong powers as well, including the power to negotiate CBAs, call special conventions, authorize strikes, and issue and revoke charters, among other powerful tools.  While these UAW officers operate in the context of an International Executive Board that includes eleven "Regional Directors," these officers effectively control the overall decision-making, policy, director and officer elections, and negotiation and administration of the CBAs.  There are minimal checks and balances on the President and the other four officers as they have no oversight board, committee or trustee that is capable of overseeing and ensuring the integrity of the UAW Executive Board and taking action to address malfeasance.  In turn, these officers, who have nearly complete control over UAW affairs, are elected only every four years and have implemented practices to exercise substantial control over elections to perpetuate their role on the International Executive Board.  If any of these officers or directors

**EXHIBIT 10**

act corruptly, they have the power and influence to inflict direct harm on any given competitor in the name, and on behalf of, the UAW.

46. **Sergio Marchionne ("Marchionne")**: Non-party Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–18, the Chairman (2011–14) and CEO (2009–14) of Chrysler, and the COO of FCA North America (2011–18). Marchionne also served as the CEO of CNH Industrial (2004-2018), which was commonly controlled by Exor NV, which directly and indirectly is the largest shareholder of FCA NV. At all times relevant to this Amended Complaint, and until his death, Marchionne was an agent of FCA Group. Marchionne, with the highest level of approval at FCA Group, centrally orchestrated and later attempted to conceal the fraudulent scheme as alleged herein.

47. **NTC**: Non-party the NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were inherited by FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA. The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's Chrysler Department served as Co-Chairmen of the NTC Joint Activities

**EXHIBIT 10**

Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

48. **General Holiefield:** Non-party Holiefield (deceased in 2015) served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA on behalf of tens of thousands of FCA employees represented by the UAW. From 2007 to 2014, Holiefield also served on the UAW Executive Board. During much of the Holiefield leadership years, executives of Chrysler/FCA violated the Labor Management Relations Act by bribing Holiefield and his staff. Millions of dollars from Chrysler/FCA were diverted through NTC and LTLOF to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

49. **Ron Gettelfinger:** Non-party Gettelfinger is an individual currently residing in Kentucky who served on the UAW's Executive Board from 1992 to 2010, most recently as the UAW President (2002 to 2010) and previously as a Vice President (1998 to 2002) and as Regional Director (1992 to 1998).

50. **Norwood H. Jewell:** Non-party Jewell is an individual currently residing in Michigan and served on the UAW's Executive Board from 2011 to 2017,

**EXHIBIT 10**

most recently as the UAW's Vice President of the FCA Department (2014–17) and previously as Regional Director (2010–14). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371.

51.     **Virdell King:** Non-party King is an individual residing in Michigan and was a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to prison and a $5,500 fine.

52.     **Nancy Johnson:** Non-party Johnson is an individual residing in Michigan and was the top administrative assistant to Jewell, then the UAW Vice President for the Chrysler department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On July 23, 2018, Johnson pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

53.     **Keith Mickens:** Non-party Mickens is an individual residing in Michigan and was a senior official in the UAW Chrysler Department from 2010 through 2015. In 2011, Mickens served on the UAW committee responsible for

**EXHIBIT 10**

negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

54. **Wilson's Diversifed Products:** Upon information and belief, non-party Wilson's Diversifed Products, LLC ("Wilson's Diversifed Products") is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Wilson's Diversifed Products is owned and controlled by Morgan.

55. **Monica Morgan Photography:** Upon information and belief, non-party Monica Morgan Photography, LLC is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Monica Morgan Photography is owned and controlled by Morgan.

56. **Leave the Light on Foundation ("LTLOF"):** During much of the relevant time period, non-party LTLOF was a Michigan tax-exempt organization with a principal place of business in Detroit, Michigan, controlled by Holiefield. Numerous co-conspirators served as officers and directors of LTLOF, including Keith Mickens (Vice President and director), Jerome Durden (Treasurer and director), and Virdell King (director).

**EXHIBIT 10**

Case 2:22-mc-50024-GCS-DRG   ECF No. 34-2   PageID.899   Filed 02/01/23   Page 40 of 304
Case 2:19-cv-10429-PDB-DRG   ECF No. 84-2   filed 08/03/20   PageID.3037   Page 39 of
129

57. **Linda Knoll**:  Non-party Knoll serves as the Chief Human Resources Officer for FCA NV a position she has held since at least 2011, and previously served concurrently in the same role at CNH Industrial N.V., another company controlled by Exor NV, where Marchionne was the Chairman of the Board until his death.  Ms. Knoll also sat on the Group Executive Counsel of FCA Group, which is the highest operational body within FCA.  In this role, Ms. Knoll is reportedly responsible for overseeing the entirety of FCA Group's human resources function, including "organizational development, talent management, compensation and benefits, employee relations, and compliance and staffing."[8]

58. **Peter Glenn Shagena**: Non-party Shagena currently serves as the Vice President of Employee Relations at FCA, a role he took over in 2015 replacing Defendant Iacobelli.  Shagena also served on the NTC Joint Activities Board from 2015 to the present. In this role, Shagena was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW and resolving disputes and grievances that arose under the CBAs between Chrysler/FCA and UAW.  Shagena was Director – Group Human Resources Manufacturing at Chrysler, LLC in 2007.  In 2009, he became the Director of Human Resources, Manufacturing/World Class Manufacturing.  In that role, he headed labor relations

---

[8] https://www.fcagroup.com/en-US/group/governance/management/Pages/linda_Knoll.aspx

**EXHIBIT 10**

efforts, including the rollout of world class manufacturing, at all of the Company's manufacturing operations and joined the NTC. In 2013, he became Director of Human Resources at FCA Mexico before returning in June 2015 to take on the Vice President, Head of Employee Relations role, for FCA Group in North America, effectively assuming the prior role of Iacobelli.

59. **Colin Lightbody**: Non-party Lightbody previously served in the labor department at FCA (and previously Chrysler) from 1998 until his retirement in 2018 and reported directly to Iacobelli for many of those years. From 2014 to 2018, Lightbody was the Director of Labor Economics for FCA, with a substantial role in directing negotiations with the UAW. Lightbody describes his role at that time as "[f]or many years, provid[ing] strategic guidance to and work[ing] directly with the late FCA Chief Executive Officer, Sergio Marchionne." Since retiring from FCA, Lightbody has started his own consulting company, while also publishing blog posts concerning various collective bargaining topics.

## FCA-UAW CONTROL ENTERPRISE
## (18 U.S.C. § 1962(b))

60. From July 2009 until at least 2017, FCA Group, through a pattern of racketeering activity, acquired and maintained an interest in and/or control of the UAW, and in particular its decisions and actions regarding CBAs and other labor arrangements, which FCA Group and the other Defendants operated as an 18 U.S.C. § 1962(b) RICO enterprise ("FCA-UAW Control Enterprise"). In particular, as early

27

**EXHIBIT 10**

as July 2009, FCA Group and the named Defendants, through operation of the NTC and other means, paid bribes and gave items of value as alleged herein directly to top UAW officers and officials in violation of the Taft-Hartley Act. Starting in approximately July 2009, Defendants gave these items of significant value to UAW officials with the purpose of acquiring and maintaining, directly and indirectly, an interest in and/or control of the FCA-UAW Control Enterprise, particularly with respect to the UAW's negotiation and decision-making in determining CBA terms, supplemental agreements, and the application of such terms.

61. The UAW is not a for-profit business; its primary purpose is to negotiate, execute, implement, and administer CBAs for North American autoworkers, among others. Through their racketeering acts, FCA Group and the other named Defendants gained control of and exercised control over these essential functions of the UAW. This control manifested itself in FCA Group and the other named Defendants causing the UAW (1) to refuse certain structural changes to GM that GM otherwise would have received, (2) agreeing to name FCA as the lead in 2015, (3) structuring an agreement in 2015 designed to specifically impose asymmetric costs on GM, and (4) specifically advocating for the merger with GM. Through its acts of racketeering, Defendants took over the essential and day-to-day functions of the UAW, exercising control within the meaning of 1962(b).

**EXHIBIT 10**

62.     Through this exercise of control of the FCA-UAW Control Enterprise, direct damage was inflicted on GM, including but not limited to actions taken during the collective bargaining processes as more specifically alleged herein.

## FCA-NTC ENTERPRISE
### (18 U.S.C. § 1962(c))

63.     Through a pattern of racketeering from July 2009 to 2017, as alleged herein, Defendants also operated the NTC as an 18 U.S.C. § 1962(c) RICO enterprise ("FCA-NTC Enterprise"). The named Defendants operated the FCA-NTC Enterprise for the common purpose of directing funds from the NTC (and ultimately from FCA) to certain UAW leaders.  In particular, FCA Group and some of its top executives have admitted that they willingly, purposefully, and unlawfully used the NTC as a vehicle to bribe union officials, funneling millions of dollars through the NTC for the benefit of certain union leaders in violation of the Taft-Hartley Act. According to government prosecutors, the NTC "sits at the epicenter of a massive conspiracy to corrupt the labor management process, as the conduit of choice for illegal payments" by FCA.[9]  As further alleged herein, the bribery scheme and efforts to suppress revelations from that scheme are much deeper than has been revealed to

---

[9]     Response to the UAW-Chrysler Skill Dev. & Training Program's Mot. for Recognition of Crime Victim Status and for Restitution at 1, *In re Pet. of UAW-Chrysler Skill Dev. & Training Program, In the Matter of United States v. Iacobelli*, No. 2:18-mc-51223-PDB (E.D. Mich. Oct. 1, 2018).

**EXHIBIT 10**

date. Upon information and belief, in order to further the operation of the NTC as an enterprise, millions of dollars in bribes have been given to individuals involved in the scheme through control of funded offshore accounts to further conceal the scope of the scheme and that the scheme specifically targeted GM.

64. FCA funded the NTC pursuant to a formula set forth in the CBAs negotiated between FCA and the UAW. For years, FCA Group and its leaders directed and allowed certain UAW officials to misappropriate money from the NTC (with money ultimately coming from FCA Group) in return for, among other things, "benefits, concessions, and advantages" related to the negotiation, implementation, and administration of multiple CBAs. Further, Williams and Ashton, among other UAW leaders, demanded and received money and other items of value from FCA Group in return for assisting FCA's scheme to harm and ultimately attempt to merge with GM.

65. Each Defendant played a distinct role within the operation of the FCA-NTC Enterprise. FCA Group and its employees coordinated to knowingly and affirmatively direct funds from the NTC to certain UAW leaders, who knew it was impermissible to receive funds from FCA. As described further below, the precise role of each Defendant varied, but included encouraging certain UAW leaders to use NTC funds impermissibly, taking steps to conceal the payments to UAW leaders, and directly approving or demanding the impermissible payments. In addition,

**EXHIBIT 10**

Defendants Iacobelli, Durden, and Brown, acting within the scope of their employment at FCA Group and at the direction of senior management, made and directed these illicit payments to UAW leaders through the NTC.

66.     Through these actions, each of these Defendants made decisions on behalf of the FCA-NTC Enterprise, by determining what payment should be permitted to which UAW official, and/or carried out the decisions of the FCA-NTC Enterprise by making, approving, demanding, or receiving such payments. These payments were part of a coordinated and systematic scheme stretching back nearly a decade. These Defendants thus operated the FCA-NTC Enterprise through numerous racketeering acts, as described herein.

## JURISDICTION AND VENUE

67.     Because GM brings claims under the RICO Act, this Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331.

68.     Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this district.

69.     In addition to the reasons identified below, the Court may exercise personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b), because the ends of justice require that this conspiracy be tried in a single court. This Court is the only possible location for such a single trial given that the overwhelming

31

**EXHIBIT 10**

majority of actions and effects occurred in this district, and there is no other district where all Defendants would be subject to personal jurisdiction without recourse to § 1965(b).

70. The Court has personal jurisdiction over FCA and FCA NV for several additional reasons. FCA and FCA NV design, engineer, manufacture, distribute, and sell vehicles in the U.S. and Michigan under brands such as Chrysler, Jeep, Dodge, and Ram. As described herein, FCA and FCA NV engaged in and authorized a decade-long racketeering scheme occurring principally in Michigan, directed to harm GM, which is headquartered in Michigan. FCA NV's actions directed towards Michigan included the bribing of Michigan residents and routing bribes through the NTC, which is headquartered in Michigan. Thus, the Court has personal jurisdiction over FCA and FCA NV (a) under MCL § 600.715, because they have transacted business within the state of Michigan, and did or caused to be done things in the state or from which consequences were felt in this state, which give rise to the cause of action in this case; and (b) under 18 U.S.C. § 1965(a), because they have transacted affairs in this district. In addition, the Court has personal jurisdiction over FCA under MCL § 600.711 because it carries on a continuous and systematic part of its general business within Michigan such that it is essentially "at home" in Michigan. Indeed, FCA is headquartered in Michigan.

**EXHIBIT 10**

71.     The Court has personal jurisdiction over Iacobelli, Durden, Brown, Williams, and Ashton for several additional reasons. First, the Court has jurisdiction over Iacobelli, Durden, Brown, Williams, and Ashton (a) under MCL § 600.705, because during the relevant time period, they transacted business within the state of Michigan, and did or caused to be done things in this state or from which consequences were felt in this state, which give rise to the causes of action in this case; (b) under 18 U.S.C. § 1965(a), because they have transacted affairs in this district; and (c) with respect to all but Williams and Ashton, under MCL § 600.701, because they are residents of Michigan.

## DETAILED ALLEGATIONS

## I.     OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER FOR NO CASH

### A.     <u>Financial Crisis Threatens U.S. Auto Industry</u>

72.     In or about 2008, in the midst of the worst financial crisis since the Great Depression, the automotive industry faced a major crisis. The industry had been weakened by, among other things, rising gas prices, which drove consumers away from trucks and SUVs, and competition from foreign automakers with lower labor costs using non-unionized labor. Sales dramatically declined. By 2008, the situation had turned critical as a once-in-a-generation credit crunch nearly took down the world economy and wreaked havoc on the auto industry.

**EXHIBIT 10**

73.     Suffering several consecutive quarters of losses, in late 2008, the U.S. auto manufacturers turned to the government for assistance. The U.S. Department of the Treasury injected funds in General Motors Corporation ("Old GM") and Chrysler through the Troubled Asset Relief Program ("TARP"), but it served only as a stopgap.

74.     Chrysler filed for Chapter 11 on April 30, 2009. Old GM followed approximately a month later.

75.     Because the UAW represented 99 percent of Old GM's unionized employees and the government's provision of any additional TARP funds was conditioned on a new CBA that, in part, needed to set forth labor costs competitive to Japanese transplants (*e.g.*, Toyota, Nissan, and Honda), UAW leadership could slow down and potentially block the entire transaction.

**B.      Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler**

76.     At the same time in Europe, Fiat faced plummeting sales and a deepening economic crisis. In September 2008, Marchionne told his executive council, "Fiat needs to radically change its alliance strategy. We've done everything we can on our own. If we're going to survive this one, we need a partner."[10]

---

[10]   JENNIFER CLARK, MONDO AGNELLI: FIAT, CHRYSLER, AND THE POWER OF A DYNASTY 244 (2012) ("MONDO AGNELLI").

**EXHIBIT 10**

77.     Fiat needed an opportunity to enter the U.S. marketplace and recognized one in the financial crisis of the U.S. auto industry. Marchionne realized that the Old GM and Chrysler bankruptcies "were changing the game. All of the issues that had plagued the industry—its overcapacity, its poor use of capital, its inefficiency, the crushingly high cost of investment for new models—were now going to become unsustainable."[11] A "deal with Chrysler [could] be seen as part of a series of 'strategic partnerships' [that Fiat had] sealed with other automakers in recent years."[12] Fiat's would-be "partner" was in the U.S., and the UAW was Fiat's bridge to establish a domestic footprint given the UAW's significance in the U.S. automotive market.

78.     Marchionne, on behalf of Fiat, sought that critical connection—what appeared to outsiders as an alliance with UAW leadership—to help further Fiat's bid to acquire Chrysler. Marchionne quickly made the head of the union's Chrysler Department, Holiefield, a strategic partner and soon thereafter "a true friend."[13] Former UAW leadership, and Holiefield in particular, became Marchionne's main

---

[11] *Id.*

[12] Jeff Israely, *Fiat to Take 35% Stake in Chrysler*, TIME (Jan. 20, 2009), http://content.time.com/time/business/article/0,8599,1872719,00.html.

[13] Sergio Marchionne, *Eulogy for General Holiefield* (Mar. 17, 2015), https://media.fcanorthamerica.com/pdf.do?id=16436. ("*Eulogy for General Holiefield*").

**EXHIBIT 10**

cohorts in Fiat's business plan even while he explored a collaboration with Chrysler. "If the union would come around to the view that the Fiat-Chrysler partnership was the only way to keep the company from going bust, maybe it would throw its weight behind Fiat when it came time for talks to start at the Treasury."[14]

79.     In early 2009, Marchionne and his team met with Holiefield and then-UAW President Ron Gettelfinger in advance of any formal talks with the government.[15] This meeting laid the groundwork for a UAW-Fiat alliance.

80.     While Marchionne was in active discussions with the UAW, on March 30, 2009, the government gave Fiat and Chrysler only 30 days to reach an agreement.[16]

81.     Fiat began demanding what it needed from a new Chrysler-UAW CBA. Marchionne wanted the UAW to commit to support World Class Manufacturing ("WCM"). WCM is a manufacturing system that, according to Marchionne, "aims to ensure that the FCA Group's facilities are flexible and competitive with the best

---

[14] MONDO AGNELLI at 247.

[15] *Id.*

[16] The White House, *Remarks by the President on the American Automotive Industry* (Mar. 30, 2009), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-american-automotive-industry-33009.

**EXHIBIT 10**

in the world."[17] "It broke down the union's rigid job classification system with its strict hierarchy and boundaries about who could do what."[18] In Marchionne's view, it "got rid of an excessive cost structure, and it created efficiency."[19] As led by Fiat, Chrysler and Gettelfinger and Holiefield (on behalf of the UAW) agreed to Marchionne's demand to implement WCM.

82. Marchionne also wanted to use more temporary employees in place of hourly workers. While Holiefield publicly claimed that he "would have to take [his] family and leave town if [the UAW] agreed to that," he quickly came around to Marchionne's ideas.[20] UAW leadership agreed to lift any cap or restraint on Tier Two workers until 2015. Tier Two workers are less senior employees who have a lower wage structure than Tier One workers, have a different health plan, and are provided with a 401(k) plan instead of a defined benefit pension. They are therefore a less expensive labor source.

83. "Marchionne's goal overall was to have as few constraints as possible in his ability to operate Chrysler when it came out of bankruptcy. He wanted to save

---

[17] FCA, *Global Quality Through World Class Manufacturing*, https://www.fcagroup.com/enUS/media_center/insights/Pages/wcm_global_quality.aspx.

[18] MONDO AGNELLI at 259.

[19] *Id*.

[20] *Id*. at 258, 260.

**EXHIBIT 10**

Chrysler, take it public, pay everyone back, and move on."[21] On behalf of FCA Group, Marchionne eventually implemented a bribery scheme to achieve this goal and help revive Chrysler and then move on to harm and eventually seek to takeover GM.

84.    Holiefield thus formed a long-term "partnership with Marchionne to help revive the company."[22] As Marchionne relayed, Holiefield was a "true partner and a key force behind the transformation of [Chrysler]."[23]

85.    Starting as of July 2009, merely one month after Chrysler emerged from bankruptcy, Iacobelli and other FCA officials began to transfer hundreds of thousands of dollars of Chrysler funds to Holiefield. These payments were "viewed . . . as an investment in 'relationship building' with UAW Vice President Holiefield." [24] For example, Holiefield's charity, LTLOF, received hundreds of thousands of dollars in furtherance of FCA's anticipated "high value/high leverage

---

[21]  *Id*. at 260.

[22]  Joseph Szczesny, *Late UAW Vice President Leaves Tarnished Legacy*, WARDSAUTO                (Aug.                4,                2017), https://www.wardsauto.com/industry/late-uaw-vice-president-leaves-tarnished-legacy.

[23]  *Eulogy for General Holiefield*.

[24]  7/26/17 Iacobelli Indictment, at 13.

**EXHIBIT 10**

programs" with the UAW.[25] These bribes, well known within FCA Group and among certain former UAW leaders, helped fuel the start of a wide-ranging and long-lasting conspiracy, described in detail herein.



Marchionne and Holiefield in November 2009[26]

86.   In addition to authorizing the bribes through the NTC, Marchionne personally rewarded Holiefield for his assistance. For example, in February 2010, Marchionne, acting as an agent of FCA Group, gave Holiefield a custom-made Terra

---

[25]   *Id.* at 10.

[26]   *See* Bill Pugliano, *Sergio Marchionne Discusses the Future of the Chrysler Brand* (Nov. 4, 2009), https://www.gettyimages.com/detail/news-photo/sergio-marchionne-chrysler-group-llc-chief-executive-news-photo/92709619?adppopup=true.

**EXHIBIT 10**

Cielo Mare watch worth several thousand dollars in direct violation of the Taft-Hartley Act. Showing his knowledge of wrongdoing, Marchionne sought to conceal the bribe by "declar[ing] the goods at less than fifty bucks."[27] It was reported that Marchionne then lied about the gift when questioned about it by federal investigators several years later.[28]

87.    Upon information and belief, FCA paid for the Holiefield/Morgan wedding in Venice, Italy, and Marchionne approved of FCA Group's funding of the wedding.



---

[27]  7/13/18 Iacobelli Plea Agreement, at 8.

[28]  Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

**EXHIBIT 10**

Morgan and Holiefield Photo Posted on Morgan's Facebook Page[29]

88.     In addition to purchasing Holiefield's cooperation, on information and belief, FCA Group and Marchionne also made substantial payments to Defendant Ashton through at least one foreign financial account in the Cayman Islands. From 2010 to 2014, Ashton served as the UAW Vice President for the GM Department. In this role, just as Holiefield was the primary negotiator between the FCA and UAW, so too was Ashton the primary point of negotiation between the UAW and GM. In putting his scheme into motion, Marchionne thus had effective control over the UAW's negotiations with FCA and GM. This allowed Marchionne and FCA Group to ensure that Ashton imposed higher costs on GM, rather than the same benefits it provided to FCA and that it otherwise would have given GM under pattern bargaining but for the racketeering scheme.

**C.     FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW**

89.     In June 2009, Chrysler emerged from bankruptcy with Fiat owning 20 percent of its equity. This was a coup for Fiat as it had only contributed intellectual property and know-how, and no actual money. Fiat also obtained operating control over Chrysler, and Marchionne became its CEO.

---

[29] *See* Monica Morgan Photography, https://www.facebook.com/ MonicaMorganPhotography.

**EXHIBIT 10**

90.     Through the Chrysler bankruptcy, the UAW, through the UAW Trust, emerged as the majority owner of Chrysler, owning 55 percent of the equity. Additionally, the UAW Trust received a note payable for $4.6 billion at 9 percent interest and the right to appoint a director to Chrysler's Board. Fiat was given the right to purchase 40 percent of the UAW Trust's equity interest in Chrysler.

91.     From bankruptcy, the UAW Trust also became the largest shareholder of New GM, obtaining 17.5 percent of the equity, and receiving a $2.5 billion note, 260 million shares of preferred stock, warrants to purchase 45.5 million shares of New GM stock, and the right to appoint a director to GM's Board.

## II.     FCA FUNNELS MILLIONS TO THE UAW AND CERTAIN UAW LEADERS.

92.     In July 2009, FCA began a long-running intentional scheme of improper payments to certain UAW officials, funneled through the NTC, made by FCA senior executives and agents (including with the knowledge and approval of Marchionne on behalf of FCA NV) to influence the collective bargaining process. As a starter, FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW."[30]

---

[30] 5/25/18 Brown Plea Agreement, at 3.

42

**EXHIBIT 10**

93.     Iacobelli and Durden professed that the NTC made these payments, as authorized by the FCA Group, to keep UAW officials "fat, dumb, and happy" and to "buy labor peace."[31]   As Iacobelli further professed, "FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW."[32] And as Brown, FCA's Director of Employee Relations and NTC Co-Director claimed, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials."[33] FCA Group then used that greased relationship to control the UAW and have it impose higher costs on GM.

94.     To minimize detection of the payments, FCA had the NTC provide the bribes to various UAW officials through a variety of deceptive means and methods. The bribes violated the Taft-Hartley Act, 29 U.S.C. § 186, and were concealed through acts of mail and wire fraud, all constituting predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1).

---

[31]  7/26/17 Iacobelli Indictment, at 16; 10/31/18 Durden Gov't Sentencing Mem., at 2.

[32]  8/20/18 Iacobelli Gov't Sentencing Mem., at 8.

[33]  Id.; 5/25/18 Brown Plea Agreement, at 4.

**EXHIBIT 10**

95.     Similarly, UAW Vice President Holiefield used his personal charity, LTLOF, as one means to conceal his receipt of FCA bribes. Between July 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included FCA executive Jerome Durden and UAW officials Keith Mickens and Virdell King) transferred "more than $386,400 in funds" from the NTC to LTLOF.[34] Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS.  In turn, Holiefield, along with his girlfriend and later wife, Monica Morgan, used the purported charitable donations for personal expenditures.

96.     As the bribery scheme grew in complexity and depth, Holiefield and Morgan, with FCA Group's knowledge, used false front businesses, including Monica Morgan Photography, Wilson's Diversifed Products, and even a false hospice organization, in an attempt to launder funds from the NTC and LTLOF. Between July 2009 and 2011, LTLOF paid over $70,000 to Monica Morgan Photography, purportedly for photography lessons for underprivileged children. Yet, Morgan only taught a handful of classes, cancelled most of them, and then spent the money on fancy clothes, nightclubs, and restaurants. On another occasion in 2013, the NTC paid Monica Morgan Photography $13,500, purportedly for services

---

[34]  8/8/17 Durden Plea Agreement, at 6.

**EXHIBIT 10**

rendered, but, in fact, so that Morgan and Holiefield could pay off the last installment on their new in-ground pool. Between January 2011 and July 2012, the NTC transferred more than $425,000 to Wilson's Diversifed Products, which Morgan and Holiefield promptly used for personal expenses, including closing costs on the purchase of a house. In 2012, Morgan then created yet another shell company to receive over $200,000 in NTC funds, along with a fake hospice to allow LTLOF to "donate" over $350,000 directly to Holiefield's and Morgan's pockets.

97.     During the course of the conspiracy, the NTC at times would directly pay the personal expenses of certain UAW officials. For example, through wire transfer, the NTC paid off Holiefield's mortgage on his personal residence in the amount of $262,219.71.

98.     To further evade detection and broaden the conspiracy, in and around 2012, FCA executives began to encourage the use of credit cards, with statements sent through the U.S. mails and payments made in part using interstate wires, issued to UAW officials by the NTC so they could charge personal expenses ultimately paid for by FCA. "Iacobelli directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions."[35] Certain UAW officials used these credit cards, including Johnson, King, Mickens,

---

[35]  8/18/17 King Information, at 11.

**EXHIBIT 10**

and Jewell, charging, for example, $1,259.17 for luxury luggage; $2,182 for a Italian-made Beretta shotgun; $2,130 for Disney World theme park tickets; over $1,000 for a pair of Christian Louboutin designer shoes; and thousands of dollars in electronics and many more such personal items.

99.     UAW former-President Williams was deeply involved in the misuse of the NTC as a RICO enterprise, directing it from the UAW side. As revealed in the government's indictment of UAW official Vance Pearson, Williams rented a villa in Palm Springs, California, ostensibly for the UAW's Region 5 Conference, from on or about December 25, 2014 to January 31, 2015. During that time, upon information and belief, Williams participated in or was aware of FCA Group funds being used (via NTC credit cards) for lavish dinners and golf outings for UAW officials in Palm Springs, including: $7,569.55 on January 9, 2015 at LG's Prime Steakhouse, $1,267.79 at Indian Canyons Golf Resort, $4,587.04 on January 18, 2015 at LG's Prime Steakhouse, $3,372.74 on January 23, 2015 at Spencer's Restaurant, $6,200.05 on January 24, 2015 at Palm Springs Steak & Chop Restaurant, and $4,147.74 on January 28, 2015 at Melvyn's Restaurant.[36] Likewise, as alleged by the government, Williams rented a villa in Cathedral City, California, ostensibly for the 2016 UAW Region 5 Conference, from on or about

---

[36] *See* 4/2/19 Jewell Plea Agreement, at 9–10.

**EXHIBIT 10**

December 17, 2015 to March 31, 2016. During that time, upon information and belief, Williams participated in or was aware of FCA Group funds being used for personal purchases in Palm Springs including: $6,081.04 on February 3, 2016 at Melvyn's Restaurant, and $3,583.47 on February 12, 2016 at Palm Springs Steak & Chop Restaurant.[37]

100.   FCA Group bought control of UAW leaders to ensure that their bribery scheme achieved its goal of targeting and harming GM.  For example, upon information and belief, FCA NV perpetuated the operation and control of the RICO Enterprises by not only bribing General Holiefield as alleged herein and as admitted in criminal pleas, but also bribing Dennis Williams (UAW officer 2010-2018), Joseph Ashton (UAW officer 2010-2014), and Ron Gettelfinger (UAW Officer 1992-2010), by granting those individuals control over foreign financial accounts with substantial funds.  Gettelfinger served as the UAW President after Fiat's purchase of Chrysler in 2009, and helped ensure that co-conspirators Holiefield and Williams held and maintained positions of leadership within the UAW in 2010 in order to preserve and progress the conspiracy to harm GM.  For Gettelfinger, upon information and belief, such accounts apparently exist in Panama and Switzerland in his name and the name of a family member; for Williams, such accounts

---

[37]  *Id.* at 12.

**EXHIBIT 10**

apparently exist in Switzerland and Liechtenstein in his name and a business entity he controls; for Ashton, such an account apparently is located in the Cayman Islands either in his name or that of a business entity he controls. Upon information and belief, FCA NV enabled, funded and provided control to these individuals of these above identified accounts.

101. Of course, this audacious scheme to harm GM would run the risk of FCA Group employees blowing the whistle on such a scheme. To minimize that risk, upon information and belief, FCA and FCA NV provided an extraordinary amount of illicit compensation to its own current and former executives to carry out the scheme to harm GM and ensure the successful operation and control of the RICO Enterprises. As with former UAW leaders, this illicit compensation was provided to these current and former FCA and FCA NV executives in the form of control over foreign financial accounts that have been funded by FCA NV with millions of dollars. Upon information and belief, FCA Group executives who accepted compensation for purposes of executing, protecting and minimizing disclosure over the scope and depth of the scheme including targeting GM as described herein include:

> (a)　Alphons Iacobelli - As the former Vice President of Employee Relations at FCA (2008-June 2015) and NTC Director (2008-2015), Iacobelli executed on the scheme as directed by

**EXHIBIT 10**

Marchionne and his superiors. FCA NV compensated Iacobelli extremely well for his role in the scheme, including providing him with control over millions of dollars held in financial accounts apparently in Switzerland, Italy, Liechtenstein, and Singapore both directly, through family, and a corporate entity he controls.

(b)   Jerome Durden - As the controller of the NTC Enterprise and a Secretary of the NTC Joint Activities Board (2008-2015), who facilitated many of the direct payments to the UAW, FCA NV provided Durden with control over funds in financial accounts held in Liechtenstein and the Cayman Islands. These accounts are held in his name or the business entity that he controls. When sentenced for his presumed involvement in the scheme, Durden represented to the Court that he did not benefit from the scheme in any financial respect. That representation, made in connection with seeking a lighter prison sentence, is contrary to the compensation provided in the referenced foreign accounts.

(c)   Colin Lightbody - Lightbody was the Director of Labor Economics at FCA (2014-2018) until he retired at age 56. In that role and his predecessor roles at FCA, he reported directly to

49

**EXHIBIT 10**

Iacobelli and helped him carry out the scheme. FCA NV provided Lightbody with control over a Luxembourg financial account to pay for his role in executing and covering up the scheme. To help mislead after the scheme began to come to light, on December 12, 2019, Lightbody injected himself into the lawsuit and published a misleading blog post that purported to analyze the reason that FCA had an $8-an-hour advantage over GM in labor costs.[38] In that blog, drafted and made available on the internet to help fulfill his end of the bargain for the funds provided to him in the Luxembourg account, he intentionally omitted his knowledge of the bribery scheme and the secret agreement that FCA would not be held to the reinstatement of the 2015 cap as alleged herein.

(d)  Linda Knoll - Knoll is the long-term Chief Human Resource officer for FCA NV and reported directly to Marchionne. In that position and given her role on the Group Executive Council of FCA Group, Knoll not only had direct knowledge of the scheme

---

[38] *See* Colin Lightbody, "Why does FCA have an $8 per hour competitive labor cost advantage over GM?" (Dec. 12, 2019) https://hrandlaborguru.com/blogs/news/why-does-fca-have-an-8-per-hour-competitive-labor-cost-advantage-over-gm.

**EXHIBIT 10**

Case 2:22-mc-50024-GCS-DRG  ECF No. 34-2, PageID.824 Filed 02/01/23  Page 65 of 304
Case 2:19-cv-13429-PDB-DRG  ECF No. 34-2  filed 08/08/20  PageID.3062  Page 35 of
129

alleged herein, but also was used to minimize and prevent any employees from becoming "whistleblowers." For example, when an FCA executive came forward and publicly disclosed the FCA national fraudulent sales scheme and assisted the SEC with its investigation into that scheme as alleged herein, Knoll led the retaliation against that employee including withholding compensation from him. For her role in executing and covering up the scheme, FCA NV provided her with control over financial accounts in at least Luxembourg and Switzerland.

(e)  Peter Glenn Shagena - Shagena served as an NTC Director and Director of Labor Relations for World Class Manufacturing through much of the conspiracy period, reporting directly to Iacobelli. In that role, he was responsible for heading up labor relations efforts, including the rollout of World Class Manufacturing, at all of FCA's manufacturing operations. He also played a key role on FCA's negotiations teams. When Iacobelli retired in June 2015, Shagena replaced him as the Head of Employee Relations for North America. Upon information and belief, FCA NV compensated Shagena for his role in the conspiracy including facilitating bribery of the UAW leaders and

**EXHIBIT 10**

ensuring that he did not reveal the conspiracy. This compensation included funding one or more financial accounts for Shagena in one or more Swiss financial institutions.

## III. FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW LEADERS TO DAMAGE GM AND ACHIEVE LABOR PEACE FOR FCA FOR YEARS.

102.   Starting in July 2009 and continuing through at least 2015, in return for FCA Group's bribes, certain corrupt members of UAW's senior leadership in place at the time, including Ashton, Williams and Holiefield began providing Chrysler with labor programs that provided it with cost advantages over GM. GM would have received these structural labor benefits as well but for the bribes—as the goal of the conspiracy was to ensure that GM had a higher cost structure than Chrysler and later FCA. This CBA favoritism purchased through the bribes ultimately inflicted, as FCA Group intended, massive direct damage on GM in the form of higher labor costs.  As a result of these bribes, GM faced substantially above-market labor costs. UAW workers were not hurt, as UAW-represented GM workers were paid above-market.   These higher labor costs resulting from the scheme are straightforward to calculate and trace as GM's (and FCA's) regular business practices require the accurate costing of such programs.

103.  For example, at the time of the 2011 CBA, Chrysler and the UAW (through Iacobelli and Holiefield) documented their joint commitment to WCM,

**EXHIBIT 10**

which was a "full fledged partnership." They agreed that it was "of critical importance that WCM be jointly implemented systematically and fully in order to operate successfully and thereby position [Chrysler] and the [UAW] firmly among the winners of the global automotive manufacturing community."[39] As directed by the FCA Group to the UAW, including Williams and Ashton, the UAW denied GM the same labor flexibility and use with respect to its manufacturing operations. The UAW's agreement to implement these more efficient labor programs at FCA did not harm any individual FCA-UAW employees—as the programs did not impact the individual wages of any given worker or curtail in any material way the benefits received.

104. As described below, in 2014, in a Memorandum of Understanding ("MOU") negotiated outside of the collective bargaining process, the UAW again committed to support FCA's WCM program.

105. In October 2015, in a letter attached to the CBA, FCA and the UAW (through Jewell, another recipient of FCA bribes) once again agreed that "the need for unit flexibility to address fluctuating workloads is essential," and committed to "continue to support the full implementation of [WCM], New Hire Entry Level Wages and Benefits, and significant efficiency improvements." To that end, they

---

[39] Letter from A. Iacobelli, Chrysler Group LLC, to General Holiefield, International Union, UAW, World Class Employee Participation (Oct. 12, 2011).

**EXHIBIT 10**

committed to "the flexible utilization of [the] salary workforce," including: (a) that there may exist "[i]nefficient work rules and work practices . . . within the salary bargaining units," (b) "[t]he flexible use of the salary bargaining unit workforce can perform within classifications and departments, across classifications and departments, within units, across units, and within locals," and (c) "[t]he parties agree to discuss any opportunities to assign work across locals provided there is mutual agreement between the parties and a positive business case for keeping the work in-house."[40]

106. As FCA Group had directed through its bribery to certain corrupt UAW officials, the UAW through Williams and Ashton, among others, denied these benefits to GM, at the direction of FCA Group. GM made repeated efforts to collaborate with UAW leaders on improvements to its Global Manufacturing System ("GMS"), an efficiency improvement program that would have been on par with WCM. For example, during a meeting on August 13, 2014, officials in the UAW's GM Department acknowledged that WCM was a superior program, in part, because Chrysler management (specifically Marchionne) and the UAW worked closely to ensure it was a joint effort. UAW leadership failed to disclose that union support for FCA's WCM was, in part, purchased through bribes. Moreover, UAW leadership

---

[40] Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Salary Bargaining Unit Flexibility (Oct. 22, 2015).

**EXHIBIT 10**

and GM discussed that "[t]here needs to be an effort for the UAW and GM leadership to go through each element of GMS and together gain buy-in from the manufacturing managers and UAW members," and that "GMS cannot have the same success of WCM without the involvement of UAW members." But for FCA Group's bribery, the UAW would have granted this request to GM. Implementation of the GMS would not have harmed any UAW members; it would have allowed GM and the UAW to work collaboratively to increase the efficiency of GM's production process, ultimately benefiting GM and the UAW members (both through an increase in profit sharing payments and in the overall health of GM).

107. Another advantage FCA Group purchased through bribery related to "Tier Two" employees. As of the 2007 CBA, Chrysler, GM, and Ford employed both "Tier One" and "Tier Two" employees. As described above, Tier Two workers are less expensive employees who have a lower wage structure than those in Tier One.

108. FCA and GM were initially subject to a 25 percent cap on Tier Two workers under the 2007 CBA. This cap was lifted under pre-bankruptcy addendums in 2009, but in their 2009 addendums both FCA and GM agreed to reinstate the cap six years later in the 2015 CBA. GM's 2011 CBA reiterated this commitment, stating that "the parties will mutually agree to a hiring limit based on the entry level percentage as of September 14, 2015" to "be no more than 25% and no less than

**EXHIBIT 10**

20% of the total UAW-GM hourly population." In recognition and anticipation of this 2015 Tier Two cap, GM thus kept its proportion of Tier Two workers below the anticipated 25 percent cap. By 2015, Tier Two workers comprised around 20 percent of the UAW membership at GM.

109.   Through the conspiracy, upon information and belief, certain corrupt UAW leaders assured FCA that they would not insist on reinstating the Tier Two cap in 2015. Upon information and belief, FCA had reached a "side letter" agreement that the cap would not be reinstated, yet misled GM and the public by claiming in an October 2011 released summary of the 2011 CBA terms that "the cap will be reinstated at the end of" the 2011 CBA. From this private understanding purchased through the conspiracy that FCA would not be subject to a Tier Two cap, FCA hired Tier Two workers with abandon, possessing the incredibly valuable foreknowledge that it would not be penalized by any reinstatement of the cap. By 2015, Tier Two workers made up around 42 percent of the UAW membership at FCA—double the proportion of Tier Two workers at GM. This difference purchased through the bribery scheme provided FCA with a dramatic advantage with respect to average labor costs. Meanwhile, without this inside knowledge, GM managed to the cap and absorbed corresponding cost increases anticipating the 2015 cap reinstatement as required by the contract. In 2015, as FCA had been privately assured, the UAW did not insist on reinstating the Tier Two cap for FCA and, as negotiated through pattern

**EXHIBIT 10**

bargaining, the cap was not reinstated for GM either. In the end, and unbeknownst to GM in advance, ultimately there was no difference between how GM and FCA were treated in the 2015 negotiations with respect to Tier Two workers (as a result of the pattern bargaining). However, GM was harmed as a result of FCA's bribery because the UAW refused to inform GM in the time period before the expiration of the 2011 CBA that this cap would not be reinstated. But for the bribes, the UAW would have informed GM in 2011 that it did not intend to reinstate the Tier Two cap as it privately assured FCA so that GM could have addressed hiring accordingly and thus benefited its average labor cost.

110. FCA Group ensured that other additional advantages were denied to GM. For example, upon information and belief, in 2014, FCA and the UAW agreed to a formulary that would make better use of prescriptions that are widely available, significantly reducing FCA's health care costs. The formulary would have saved GM up to $20 million per year. Negotiators for GM repeatedly requested FCA's more cost-effective formulary during collective bargaining, but the UAW refused to agree, indicating the term would rankle UAW leadership. This request by GM would have been granted, but for FCA's bribery; the formulary did not harm any individual FCA employee as the concession merely limited the range of prescription drugs available for any particular condition, without preventing the treatment that an

**EXHIBIT 10**

individual UAW member received; to GM's knowledge, all FCA employees received, in substance, the necessary prescription drug treatment that was prescribed.

111.  Taken together, FCA Group's corruption, through operation of the FCA-UAW Control and NTC Enterprises, helped buy an average hourly wage advantage to take FCA from worst to first among the Detroit-based automakers. In 2006, Chrysler had the highest average hourly labor cost. Chrysler's employees were paid $75.86 in wages and benefits on average, and Old GM's employees were paid $70.51. Chrysler, Old GM, and Ford's labor costs exceeded non-unionized foreign automaker costs by approximately 50 to 80 percent prior to bankruptcy.

112.  Through its corruption, bribes, and operation of the RICO Enterprises, FCA was able to gain an average hourly wage advantage over GM. By 2015, FCA slashed its average hourly labor costs to $47—in the range of non-unionized foreign automakers operating in the U.S.—and $8 less on average per hour than GM ($55). FCA's average hourly wage advantage continues to this day: its labor costs are on average $8 per hour less than GM. This hourly wage disparity is not due to paying FCA employees less in wages in benefits—but rather it was due to denying GM structural labor programs that would have lowered its average hourly wage rate and that GM would have received but for the bribes.

**EXHIBIT 10**



## IV. FCA GROUP CONSPIRED WITH UAW LEADERS TO ATTEMPT A TAKEOVER OF GM BY MERGER

113. Sergio Marchionne held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008: "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[41]

114. As CEO of Fiat since 2004, Marchionne had long sought a merger with GM. After failing to effect a merger in 2005, Marchionne saw another opportunity

---

[41] Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, Reuters (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idUSTRE4B738Z20081208.

**EXHIBIT 10**

after Fiat acquired Chrysler in 2009. "[A]fter fixing Chrysler, let's . . . take General Motors and merge them together. Once and for all, let's straighten out the car industry, creating an American giant that also allows a long-term future for Fiat."[42]

115.   As alleged, a central purpose of the bribery scheme overseen by Marchionne was to harm GM by saddling it with higher labor costs thus inducing it to merge with FCA to achieve synergies and a higher return on capital. With the scheme well underway and having a desired effect, in October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA Group proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a combination.  But Marchionne remained resolute in his quest to force an FCA Group-GM combination.

A.   **Marchionne Prepares on Behalf of FCA to Force a Takeover of GM by Merger**

116.   By 2013, Chrysler had only two shareholders: (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

---

[42]  TOMMASO EBHARDT, SERGIO MARCHIONNE 63–64 (2019) (translated from Italian).

**EXHIBIT 10**

117.   In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent.  Fiat and the UAW Trust apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[43]

118.   In December 2013, Fiat apparently "scripted" Holiefield at an UAW Executive Board meeting to support Fiat's goal of buying all of the UAW Trust's stake. Iacobelli emailed that Holiefield would "create a dialogue pursuant to our outline" at the meeting which, upon information and belief, involved having the UAW support a complete sale of its Chrysler interest to Fiat.[44] This scripting demonstrates the degree of Fiat's control over the UAW and its top officials.

119.   On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a

---

[43]   Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17,                                                             2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale

[44]   7/13/18 Iacobelli Plea Agreement, at 9–10.

**EXHIBIT 10**

special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

120. Although not a party to the foregoing transaction, the UAW itself entered an "enforceable" MOU with FCA promising to "actively assist in the achievement of FCA's long-term business plan." Upon information and belief, while the agreement does not appear to have been published, it contains no termination date. In short, this agreement was an attempt by FCA and its co-conspirators to paper over—and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

> FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[45]

---

[45] FCA, 2014 ANNUAL REPORT, AT 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_repo rts/files/FCA_2014_Annual_Report.pdf.

**EXHIBIT 10**

Case 2:22-mc-50024-GCS-DRG ECF No. 34-2 PageID.326 Filed 02/01/23 Page 77 of 304
Case 2:19-cv-19429-PDB-DRG ECF No. 34-2 Filed 08/08/20 PageID.3077 Page 63 of
129

121.    Undoubtedly, this MOU conferred a competitive advantage upon FCA outside of the standard collective bargaining process. As stated by FCA in its Annual Report, the UAW's commitments under the MOU were of a "unique nature." Through its bribery, control of the UAW, and operation of the NTC, FCA ensured that UAW leadership conferred these unique advantages only on FCA and, as alleged herein, denied the same to GM to make sure that GM had higher costs.

122.    Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne at the helm of the combined entity.[46]

123.    After taking full control of Chrysler, and having secured control of the FCA-UAW Control Enterprise through bribery of its top officials, Marchionne set his sights on forcing a merger with another one of the "Big Three" North American automakers. Given the ownership structure of Ford, with the substantial share of voting power held by the Ford family, Ford would never be a target for Marchionne's merger ambitions.  GM was the only U.S. automaker target, and thus Marchionne had long focused his sights on GM.

---

[46] GM does not allege there was a violation of any securities law or requirement in connection with the sale and purchase of the Chrysler securities. As GM understands the facts, the ultimate selling price and terms that Fiat paid for the Chrysler shares were set following a court opinion concerning the terms of the purchase and certain third parties not impacted by the bribery scrutinized and approved the securities aspect of the transaction.

**EXHIBIT 10**

EXHIBIT 10

**B.    President Williams and Defendant Ashton Are Key Players in the Takeover Conspiracy**

124.    In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne turned to weaponizing his bribery scheme of the UAW to pressure GM to agree to merge with FCA.

125.    By this time, the primary UAW leaders FCA Group had been bribing had either already left the UAW (Gettelfinger) or were on their way out (Holiefield announced in November 2013 he would retire the following year). Yet, knowing that ongoing control of the UAW was crucial to the scheme, FCA Group had been bribing UAW Vice President Ashton and UAW Secretary-Treasurer and President Dennis Williams (among others). In 2014, Marchionne thus turned for support to the new UAW President, longtime friend and merger "wingman," Dennis Williams. Williams cooperated with the goals and plans of FCA and FCA NV and took affirmative steps to advance those goals as his cooperation had been purchased many times over. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at a Fiat-affiliated truck and tractor company. Williams has affirmed that he tries "not to second-guess Sergio," and that the pair have a "very good relationship," which was secured through the bribery of Williams.[47]

---

[47] Michael Martinez, *UAW President: Union Monitoring FCA-GM Merger Reports*, THE DETROIT NEWS (June 18, 2015),

64

126.   In addition to Williams, FCA Group and Marchionne also turned to UAW Vice President Joe Ashton. As the Vice President for the GM Department of the UAW, Ashton had the ability to directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA and, thus, that GM incurred higher costs. By 2014, Williams, having proven his loyalty in support of the scheme, and FCA Group found an even more valuable use for Ashton—they chose him to be the UAW Trust's designee on GM's Board.  At that point, Ashton was well-situated to convey to FCA Group confidential GM information relating to GM's CBA negotiations and strategy including with respect to FCA Group's merger overtures.

127.   FCA's control over Williams, the President of the UAW at the time, gave FCA substantial control over the UAW. As alleged herein, the President of the UAW has substantial power over the UAW, particularly when it comes to structuring and ordering of the CBA negotiations.

128.   Williams was a willing co-conspirator in Marchionne's bribery and takeover scheme, especially given the UAW's finances. In 2013, the UAW's

_____

https://www.detroitnews.com/story/business/autos/2015/06/18/uaw-monitoring-fca-gm-talks/28925955/.

**EXHIBIT 10**

financial circumstances were so dire that it sold $47 million in assets and "raid[ed] its strike fund to pay operating expenses."[48]

129. When Williams took office, he promptly encouraged further corruption. With the full support of FCA Group, Williams directed his lieutenants and other corrupt officials to use NTC funds and credit cards for travel, dining, and other illegal purposes to improve the UAW's budget (which the officials then used, in part, for their own purposes). FCA Group even had the NTC pay the salaries and benefits for high-level UAW employees to work at the NTC when they performed little or no work for the NTC and worked almost exclusively for the UAW. As Nancy Johnson admitted, "[t]his directive was issued in order to reduce costs to the UAW budget from such expenditures because the UAW's budget was under pressure."[49] Williams was not a bystander in this scheme; instead, Williams directed other UAW officials to continue the corruption.[50] Notably, the bribes from FCA to certain UAW officials continued after Williams assumed the UAW Presidency.

---

[48] Tom Krisher, Associated Press, *Detroit Automakers Worry About UAW Money Struggles,* YAHOO FINANCE (Feb. 22, 2014), https://finance.yahoo.com/news/detroit-automakers-worry-uaw-money-144156 521.html; Associated Press, *UAW Votes to Raise Dues for First Time in 47 Years,* CNBC (June 3, 2014), https://www.cnbc.com/2014/06/03/united-auto-workers-votes-to-raise-dues-for-first-time-in-47-years.html.

[49] 7/23/18 Johnson Plea Agreement, at 9.

[50] 6/3/20 Jones Plea Agreement, at 11 (referring to Williams as "UAW Official B").

**EXHIBIT 10**

130. By the time of the 2015 CBA negotiations, Williams had long been conspiring with Marchionne, and FCA and FCA NV effectively controlled the decision-making of Williams and other top UAW officers as alleged herein.

### C. FCA Undertakes "Operation Cylinder"

131. By 2014, FCA Group had been rejected repeatedly by GM regarding a merger between the two companies. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, FCA Group believed it was in a much stronger position to force a GM merger.

132. With Marchionne as the lead, FCA Group schemed that it could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world.[51] In part, for this very reason, Marchionne, on FCA Group's behalf, had authorized the bribery of UAW leaders, whose support was essential to the success of Operation Cylinder given that, among other reasons, the UAW could effectively block a merger under certain terms in the CBA. That the UAW wielded this veto potential over any merger was well known to Marchionne and Williams.

---

[51] Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

**EXHIBIT 10**

133.   FCA Group initiated its takeover plans in March 2015, when Marchionne, on behalf of parent company FCA NV, wrote to GM's Board and management, formally proposing the merger between GM and FCA NV.

134.   GM vetted the proposal with management, its advisors, and its Board, ultimately rejecting the offer on April 14, 2015. Ashton sat on GM's board when GM undertook this analysis.

135.   Undeterred, two weeks later, Marchionne went public with an unusual published PowerPoint that he entitled "*Confessions of a Capital Junkie*: An insider perspective on the cure for the industry's value-destroying addiction to capital." In it, Marchionne promoted the benefits of consolidation as "too large to ignore." The deck claimed nearly $5 billion in annual savings with such a GM/FCA merger based on reduction in investments and R&D, "with no impact on number employed."[52]

136.   In the spring of 2015, as the collective bargaining process ramped up, Marchionne pursued a full-court press media strategy to achieve Operation Cylinder. He geared his strategy to apply maximum pressure at key intervals in labor negotiations, which were well underway.

---

[52] FCA, *Confessions of a Capital Junkie: An Insider Perspective on the Cure for the Industry's Value-Destroying Addiction to Capital* (Apr. 29, 2015), available at https://www.autonews.com/assets/PDF/CA99316430.PDF.

**EXHIBIT 10**

137. Unbeknownst to GM, the U.S. Attorney had commenced an investigation by at least 2015 into FCA-UAW-NTC corruption. Marchionne strategically decided to oust Iacobelli as an employee, but not from the conspiracy. In June 2015, Iacobelli abruptly resigned from FCA. He then aggressively sought employment with GM so that he could continue to funnel information to his former FCA co-conspirators.

138. Marchionne then assumed a role not typically undertaken by a CEO: leading labor negotiations with the UAW and his purchased co-conspirators Williams and Jewell.

139. On June 18, 2015, at the request of UAW President Williams, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, who relayed and championed Marchionne's merger proposition despite the fact that GM had already formally rejected it by letter to FCA NV's Chairman and CEO who had made the offer. Working at Marchionne's behest as a result of the bribery scheme, Williams used his position to advocate for the merger and to encourage GM to consider the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

140. The next day, the GM Board was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a

**EXHIBIT 10**

merger and apparently had tapped Williams as FCA Group's messenger and advocate. And that the day before, Williams relayed that Marchionne had told him the GM Board had not seriously considered the FCA Group merger proposal—an untrue statement.

141.    In addition to the bought and paid-for UAW officials, Marchionne enlisted hedge funds and activist investors to support pursuing Operation Cylinder. The *Wall Street Journal* reported that Marchionne viewed activist partners "as a means to force consolidation on the fragmented auto industry."[53] FCA had reportedly lined up initial commitments to finance a $60 billion cash offer for GM. Days before the ceremony that formally opened labor negotiations, Marchionne told the *Financial Post* that the company's modeling suggested an FCA NV-GM merger was "the most logical combination in the entire industry."[54]

142.    On July 13, 2015, bargaining officially commenced with the tradition of "handshakes" between UAW leadership and the three Detroit automakers.

---

[53]    Eric Sylvers & John D. Stoll, *Chrysler Boss Recruits Activists to Prod GM Into a Merger*, WALL STREET JOURNAL (June 18, 2015), https://www.wsj.com/articles/chrysler-boss-recruits-activists-to-prod-gm-into-a-merger-1433806966.

[54]    Kristine Owram, *Fiat Chrysler, GM Merger Is Most Logical Combination in the Entire Auto Industry: Sergio Marchionne*, FINANCIAL POST (July 10, 2015), https://business.financialpost.com/news/fiat-chrysler-gm-merger-is-most-logical-combination-in-the-entire-auto-industry-sergio-marchionne.

**EXHIBIT 10**

Case 2:22-mc-50024-GCS-DRG   ECF No. 34-2 PageID.844 Filed 02/01/23 Page 85 of 304
Case 2:19-cv-13429-PDB-DRG   ECF No. 34-2   filed 08/03/20   PageID.3082   Page 75 of
129

143. Hugging Williams at the FCA-UAW "handshake" ceremony,
Marchionne signaled that consolidation using the UAW as the hammer was his goal
in the negotiations, exclaiming that, "[w]hatever happens in terms of consolidation,
it would never be done without the consent and support of the UAW. It's that
simple."[55] Williams, Jewell, and other UAW officials celebrated that night with an
$8,000+ meal at the London Chop House—paid for by FCA through the NTC.[56]



Marchionne Hugging Williams at "Handshake" Ceremony[57]

---

[55] Daniel Howes, *Marchionne's Merger Quest Not Over*, THE DETROIT NEWS
(July 27, 2015),
https://www.detroitnews.com/story/business/columnists/daniel-howes/2015/07/
27/howes-marchionnes-merger-mania-lives-despite-gm/30766303/.

[56] 12/12/18 Johnson Gov't Sentencing Mem., at 4–5.

[57] *See* Alexa St. John, *Marchionne Didn't Disclose Expensive Watch Given to UAW
Leader, Report Says,* AUTOMOTIVE NEWS (Aug. 16, 2018),
https://www.autonews.com/article/20180816/OEM/180819869/marchionne-did
n-t-disclose-expensive-watch-given-to-uaw-leader-report-says.

**EXHIBIT 10**

144.  As noted, Marchionne had purchased the support of the UAW to support a merger with GM because of the UAW's ability to object to such a merger. FCA and GM had signed documents stating that they would "not . . . partially or wholly sell, spin-off, split-off, consolidate or otherwise dispose of in any form, any . . . asset or business unit of any type, constituting a bargain unit under the Agreement."[58]

145.  Between July and mid-September 2015, GM bargained with the UAW through its subcommittees. The GM Board gave its negotiators authority to negotiate within a particular range.

146.  During these negotiations, Defendant Williams gave his list of "President's Demands" to GM. Based on GM's calculations, the Williams's "President's Demand" reflected a CBA with a total cost increase of just under a billion dollars over the 2011 CBA.

147.  Over the next couple of weeks, GM and the UAW continued to negotiate with various proposals and counter-proposals. GM made offers of increasing total cost, while the UAW was progressing down from its opening demand.

---

[58]  Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 22, 2015); *see also* Letter from Catherine L. Clegg, General Motors LLC, to Cynthia Estrada, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 25, 2015).

**EXHIBIT 10**

148.   Prior to September 13, 2015 and before selecting the target, the UAW had made various concessions, as had GM. The total incremental costs for the new potential deal were over 20 percent less than the UAW's initial demand of nearly $1 billion. The UAW's principal negotiators, represented to GM that they could "sell it"—that is, the deal that was on the table—to the UAW's members.

149.   During bargaining, Marchionne continued to agitate in the press for a merger between GM and FCA NV. Marchionne signaled that he would do what it would take to force a GM merger, telling *Automotive News* in an interview published on August 30, 2015: "***It would be unconscionable not to force a partner.***" When asked if that meant FCA NV would make a hostile bid, Marchionne explained, "Not hostile, [but] [t]here are varying degrees of hugs. I can hug you nicely, I can hug you tightly, I can hug you like a bear, I can really hug you. ***Everything starts with physical contact. Then it can degrade, but it starts with physical contact***."[59]

150.   A key to Marchionne's Operation Cylinder scheme was a practice known as pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts. The UAW describes

---

[59] Larry P. Vellequette, *Marchionne Puts the Squeeze on GM; GM's Response: 'Why Bail Out FCA?'*, AUTOMOTIVE NEWS (Aug. 30, 2015), https://www.autonews.com/article/20150830/INDUSTRY_ON_TRIAL/308319981/marchionne-puts-the-squeeze-on-gm-gm-s-response-why-bail-out-fca (emphasis added).

**EXHIBIT 10**

pattern bargaining as "a core part of [its] bargaining strategy"[60] and a "powerful strategic tool."[61] Pattern bargaining is a potent force multiplier: through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams weaponized pattern bargaining, not to protect the interests of the UAW's members, but to advance FCA Group's interests by promoting Marchionne's merger. FCA Group sought to leverage pattern bargaining to impose asymmetrical costs on GM, with the goal of causing harm to GM by it incurring massive labor costs and making it more likely to favorably consider a merger with FCA given the synergies touted by Marchionne.

151. Approximately every four years, each Detroit-based automaker negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same time, resulting in simultaneous negotiations. The UAW begins negotiations with each automaker through subcommittees in July.

152. Months later, and shortly before contract expiration, the UAW selects one of the automakers as a "lead" or "target" company, with which the UAW

---

[60] UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[61] Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

**EXHIBIT 10**

negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike (as it proved to the cost of billions of dollars in 2019).

153.   Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[62]

154.   Because pattern bargaining is such a powerful tool, it must be premised on good faith, arm's-length negotiations. Otherwise, as here, corrupt actors can use pattern bargaining to directly harm a competitor.

155.   While the government had imposed a "no-strike" rule at the automakers beginning in 2009, by the time of the 2015 negotiations, the provision was no longer in effect, making the 2015 target position particularly significant.

156.   The UAW typically selects the largest and best performing automaker as the target. This practice allows the union to maximize gains by locking in terms, such as wages and signing bonuses, which can then be imposed on the other

---

[62] *UAW President Dennis Williams Roundtable* (June 18, 2015), available at https://www.youtube.com/watch?v=bfS3EzxDXqI.

**EXHIBIT 10**

automakers through pattern bargaining. It follows that the least profitable automaker is generally the least likely target, as low profit margins make it more difficult for the union to secure favorable precedential terms.

157.   In the 2011 negotiations, GM was the lead and negotiated the first tentative agreement with the UAW.  But, as reflected herein, by that time, the UAW had been thoroughly corrupted and taken over by FCA.  Under ordinary circumstances with all parties negotiating in good faith, the UAW would have used its market power to force key elements of the GM deal on FCA, but under these circumstances, the implementation of the terms of the FCA 2011 CBA was, like the FCA 2015 CBA, a product of collusion between FCA and the UAW. As noted, skirting any pattern due to the bribes, FCA reached a secret deal to ensure that in 2015 the Tier Two cap would not be re-instated.

158.   Moving to the 2015 negotiations, based on past practices and having conducted a detailed analysis of the negotiation dynamics, GM reasonably believed that it would be the target in 2015. Industry analysts also did not believe that FCA was a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest percentage of lower-paid entry-level workers seeking

**EXHIBIT 10**

higher wages," which would "make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[63]

159.   On September 13, 2015, just two days before the CBAs were scheduled to expire, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between FCA Group and UAW leaders.

160.   Informed industry analysts were not expecting UAW's selection of FCA as the lead. According to the *Detroit Free Press*, the decision "surprised analysts and industry watchers across the nation." CBS Detroit reported that "just about every analyst said that Fiat Chrysler was the least likely to be the lead company." [64]

161.   Defendant Williams had near complete control over the selection of the lead. Williams at Marchionne's bidding chose FCA as the lead, despite being near a tentative agreement with GM through his "President's Demand." After selecting

---

[63]   Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, Detroit Free Press (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

[64]   *Id.*; *UAW Chooses Fiat Chrysler As Target in Contract Talks*, CBS Detroit (Sept. 13, 2015), https://detroit.cbslocal.com/2015/09/13/uaw-chooses-fiat-chrysler-as-target-in-contract-talks/.

**EXHIBIT 10**

FCA as the lead, Williams refused to explain why he had chosen FCA as the lead and instead told a GM executive that he would explain why he selected FCA when he retired. Williams never provided such an explanation. As has been revealed through the subsequent investigations, Williams chose FCA as the lead in order to use the FCA pattern agreement to harm GM and force a merger with GM. Williams made this selection at the direction of Marchionne to further the scheme alleged herein.

162.   On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[65]

163.   Marchionne explained that the "economics of the deal are almost irrelevant" because the costs "pale in comparison given the magnitude of the potential synergies and benefits" of a combination, and cemented a "philosophical approach that [FCA] wants to use going forward." Upon information and belief,

---

[65] Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS (Sept. 16, 2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

**EXHIBIT 10**

Marchionne was referring to using the collective bargaining process to pressure a merger between FCA and GM.[66]



Marchionne Hugging Williams After Announcement of Tentative Deal[67]

164.   The UAW bargaining team, with Jewell's authorization, celebrated the deal with a $6,912.81 dinner at the London Chop House in Detroit—paid for by the NTC with funds knowingly supplied by FCA—the very entity with which Jewell,

---

[66] *2015 UAW FCA Agreement Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=YX8wWGi28rs.

[67] *See* Editorial, *UAW, Chrysler Deal Addresses Key Issues,* THE DETROIT NEWS (Sept. 19, 2015), https://www.detroitnews.com/story/opinion/editorials/2015/09/19/editorial-wages-union-deal/72481834/.

**EXHIBIT 10**

Case 2:22-mc-50084-GCS-DRG   ECF No. 34-2, PageID.853   Filed 02/01/23   Page 94 of 304
Case 2:19-cv-10429-PDB-DRG   ECF No. 34-2   filed 08/08/20   PageID.3091   Page 84 of
129

Williams, and the UAW bargaining team had been negotiating.[68] The spigot of FCA
payoffs to certain UAW leaders continued to flow.

165.   On September 30, 2015, the UAW's FCA workforce rejected the
tentative agreement negotiated by the FCA and UAW leaders.[69] Various press
reports attributed the rejection to distrust of the union's leadership by its members.

166.   On October 8, 2015, FCA and the UAW announced a new tentative
agreement. Just as with the first tentative agreement, the FCA-UAW CBA deal terms
were structured to force enormous costs on GM. Although the initial tentative
agreement was rejected by the FCA-UAW membership, the new tentative agreement
that was ultimately approved was similar to the initial tentative agreement in terms
of structure and total cost.[70] As with the decision to choose FCA as the lead, and the

---

[68]   12/12/18 Johnson Gov't Sentencing Mem., at 5.

[69]   During bargaining, the UAW negotiates "tentative" agreements with each
automaker. These tentative agreements are then proposed to UAW members, who
vote to approve ("ratify") or reject the deal. Agreements are not legally effective
until ratification by UAW membership. If a majority of UAW members vote to
reject a tentative agreement, another agreement must then be negotiated and
proposed to UAW membership for ratification. In voting to reject a tentative
agreement, members do not provide a reason for the rejection.

[70]   As demonstrated by their actions with respect to the second tentative agreement,
the UAW leadership recognized that the failure of the first tentative agreement
was caused by the UAW's failure in messaging and process more than issues with
the substance of the agreement. *See* Tracy Samilton, "UAW hopes second time's
the       charm       for       new       contract       with       FCA"       (October 9, 2015)
https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contr
act-fca.

**EXHIBIT 10**

first tentative agreement, this second tentative agreement was structured effectively as a bribe by FCA to the UAW in return for the UAW's support for FCA's hoped-for merger with GM. GM's analysis of the final FCA-UAW CBA showed that, as a pattern for a GM agreement, it would be vastly more expensive than the agreement GM had negotiated prior to FCA's selection as lead. In contrast to the UAW's "President's Demand" presented by Defendant Williams to GM during the original negotiations (under $1 billion), the pattern from the FCA-UAW agreement was forecast to cost GM more than double the entire "President's Demand," with an estimated cost of nearly $2 billion. The difference between these amounts, which is easily calculated, is a direct harm Defendants' scheme imposed on GM through the 2015 CBA.

167. Not only did the 2015 FCA-UAW CBA force enormous costs on GM, but the deal was structured to particularly harm and weaken GM to further Marchionne's goal of forcing a merger with GM. Specifically, the 2015 FCA-UAW CBA contained large, unanticipated wage increases for Tier One employees. Such an increase had a disproportionate effect on GM as opposed to FCA given GM's larger proportion of Tier One employees (as a result of FCA and the UAW conspiring to remove the cap on Tier Two employees for FCA). In addition, despite the large wage increase for Tier One employees, after negotiating the pattern deal with FCA, the UAW demanded a substantially larger "ratification bonus" to

**EXHIBIT 10**

consummate a tentative agreement with GM. These onerous demands and conditions were specifically tailored to, and in fact did, directly harm GM through increased labor costs. UAW-represented workers greatly benefited from this rich contract.

168. On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval. Williams bragged that the deal was one of the "richest ever negotiated," saying "the recent bargaining process that took place on behalf of our members at FCA is a testament to the UAW's democratic values and commitment to our members."[71] No one outside of FCA Group and certain UAW leaders knew that the deal was a product of a long-running, insidious fraud.

169. At the time Williams approved of the FCA terms under which FCA was paying the UAW double their demand, UAW leaders, including Williams, and FCA Group leaders knew the federal government was actively investigating past FCA-UAW CBAs and labor agreements, and potentially other embezzlement of union funds. GM had no such knowledge. Through this "rich" FCA-UAW labor contract, Williams and corrupt UAW leaders were able to claim to the public, UAW members, and government investigators that UAW leadership had obtained

---

[71] Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-14455 26840.

**EXHIBIT 10**

significant FCA concessions that could then be used in pattern negotiation. Marchionne, in turn, structured and agreed to these CBA terms as a bribe to the UAW and to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers, and further his takeover scheme. This rich FCA deal also was a reward to UAW leadership for allowing FCA Group to control the UAW leaders for the past many years and had the benefit of providing a windfall for UAW workers.

170.   GM, selected as the next target, reached a tentative deal with the UAW on October 25, 2015, based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern and to mitigate the damage FCA had caused, the threatened risk of a strike proved too great. As Defendants had no doubt calculated in their corrupt dealings, the economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern.

171.   The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015 and was effective as of November 23, 2015.

172.   Ultimately, although GM was able to mitigate the immediate cost impact of the FCA pattern by about $400 million through negotiation and modification of non-core, non-pattern items, it could not and did not change the core, pattern-based economics of the final CBA between GM and the UAW.  The final

**EXHIBIT 10**

cost was approximately $1.9 billion in incremental labor charges over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

173.   Although GM was able to successfully resist the FCA-UAW leadership takeover scheme, substantial damage from the racketeering scheme had been inflicted: direct injuries to GM in the form of higher labor costs that continue to compound to this day.

174.   Failing to consummate Operation Cylinder was a regret Marchionne took to the grave. An excerpt from a biography of Marchionne states that an FCA NV-GM merger was "one uncompleted project that Marchionne probably regretted to the end of his life."[72]

## V.   CO-CONSPIRATORS ASHTON AND IACOBELLI SERVED AS INFORMANTS TO FCA CAUSING HARM TO GM.

175.   In order to further direct the harm specifically at GM and seek to leverage the 2015 CBA into a forced merger, Defendants, led by Marchionne and Williams, placed two informants at GM with access to confidential information.

---

[72]   Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG    BUSINESSWEEK    (Apr.    23,    2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

**EXHIBIT 10**

176.   First, although many of the UAW leaders who received bribes from FCA were members of the FCA Department of the UAW, upon information and belief, Defendant Ashton, the former Vice President of the GM Department of the UAW, also received such payments.  As noted, upon information and belief, FCA Group provided Ashton with control over a foreign account at least in the Cayman Islands in return for his perpetrating and not revealing the scheme against GM.

177.   As described above, a key part of the scheme was granting certain cost savings programs as described herein to FCA, while denying those same programs to GM.  To carry out this scheme, Ashton's involvement, as the Vice President of the GM Department, was essential to ensure that GM did not receive the FCA structural labor programs and related advantages as described herein to impose higher costs on GM.  FCA Group bribed Ashton to carry out his role in the scheme as noted herein.

178.   In June 2014, Ashton resigned as UAW Vice President for GM when Williams chose Ashton to become the UAW Trust's nominee to the GM Board. GM carefully vetted Ashton's credentials and fitness for Board service, and took appropriate steps to prevent any conflicts of loyalty. For example, GM determined that Ashton would be ineligible to join the Board unless he retired from the UAW, which Ashton did. When he joined the Board, Ashton received an orientation on his

**EXHIBIT 10**

Case 2:22-mc-50034-GCS-DRG ECF No. 11-2 PageID.350 Filed 02/01/22 Page 100 of 304
Case 2:19-cv-10429-PDB-DRG ECF No. 84-2 filed 08/03/20 PageID.3097 Page 99 of
129

rights and obligations as a director and signed an agreement to comply with his fiduciary duties to GM.

179. Ashton, while serving on GM's Board as a fiduciary, not only failed to disclose the ongoing scheme between FCA Group and the UAW, and the direct harm this scheme was designed to and was continuing to cause GM, but, upon information and belief, Ashton also proceeded to pass confidential GM information to the corrupt UAW and FCA Group executives. This confidential information included GM's strategies and internal positions in connection with the 2015 CBA negotiations.

180. The specific types of information to which Ashton was privy by virtue of his service on the board are extensive. In 2015 alone, a key period both for CBA negotiations and GM's response to FCA Group's merger request, Ashton received information showing detailed information on GM's actual performance and goals for 2015; early information discussing what GM viewed as the greatest risks in the coming CBA negotiations (specifically identifying the two-tiered wage structure); much more detailed discussions of risks and opportunities from the coming CBA negotiations, including specifically discussions around the tier-two wage structure; specific discussions of FCA's merger proposal, including GM's detailed strategies for defending against what it viewed as an unattractive proposal. Upon information and belief, Ashton passed this information to the UAW and FCA, allowing both

**EXHIBIT 10**

entities to tailor their approaches (both in labor negotiations and in merger efforts) to inflict maximum pressure on GM.

181.    In 2017, after the federal investigation came to light, GM sought to question Ashton about his knowledge of any wrongdoing. Ashton refused to speak with GM, which is contrary to the Company's policy, and instead resigned from the board.

182.    In addition to Ashton, Defendants, again led by Marchionne and Williams, took steps to install another conspirator inside GM. In June 2015, Alphons Iacobelli abruptly resigned from FCA, despite having been at the center of the scheme for years. Shortly after leaving FCA, Iacobelli began reaching out to GM labor employees, seeking information about GM's 2015 bargaining. Iacobelli then spent months requesting that GM hire him in a labor position. At that time, due to the affirmative actions of Defendants to conceal their fraud, GM had no way of knowing of Iacobelli's continued involvement in the long-running scheme to harm GM. GM hired Iacobelli to work in its labor relations department in January 2016.

183.    As an employee of GM's labor relations department, Iacobelli attended labor strategy meetings with GM senior leadership, which provided Iacobelli access to confidential information concerning GM's labor approaches and strategies. Upon information and belief, after joining GM, Iacobelli continued to receive or have control over illicit payments from FCA Group. In return, Iacobelli used his position

**EXHIBIT 10**

at GM to further the scheme to harm GM by passing to FCA Group the confidential labor strategy information he was provided with at GM.

184.   The placement of Ashton and Iacobelli inside GM was part of the scheme to directly target GM, causing GM to suffer direct harm from this ongoing scheme orchestrated at the highest levels of FCA Group.   FCA Group succeeded through the Racketeering Enterprises in driving up GM's labor costs for years.



## VI.   FCA NV'S HISTORIC CULTURE OF CORRUPTION AND BRIBERY AS A BUSINESS TOOL.

185.   Far from an aberration or the acts of rogue agents as FCA Group has proclaimed, the scheme described herein is completely in line with the overriding

88

**EXHIBIT 10**

corporate philosophy of FCA NV. This philosophy has been revealed through a variety of scandals in organizations controlled or connected to FCA NV.

186. For instance, Fiat and its leadership were caught in a vast political corruption scandal known as Kickback City during the 1990s. This scandal arose from the discovery that Fiat was paying billions of lire in bribes to government officials in return for public-work contracts and other political favors. Rather than owning up to its role in the scandal, from the outset Fiat attempted to use its own economic clout to shield the company from blame or responsibility. Just as FCA NV asserts here, during the Kickback City scandal, Fiat claimed that its upper management had no direct knowledge of the corrupt practices. Despite these claims, substantial evidence of direct involvement by top managers of Fiat was uncovered and eventually resulted in the arrest of a Fiat Board Member, finance director, chief operating officer, and other high-ranking executives of the company. Just as here, in Kickback City, Fiat followed the same pattern and used illicit financial accounts in banks in some of the same countries believed to be utilized in the scheme here, including Switzerland, the Bahamas, and possibly other countries.[73]

---

[73] Alan Cowell, "Kickback Scandal Convulses Italy" (May 10, 1992) https://www.nytimes.com/1992/05/10/world/kickback-scandal-convulses-italy.html (describing bribes being funneled through banks in Switzerland).

**EXHIBIT 10**

187.    Consistent with this culture of corruption, Marchionne was encouraged and rewarded to commit fraudulent practices to further the business interests of FCA NV and related companies.    FCA NV provided Marchionne with outsize compensation packages ($72 million in total pay in 2014 for example) despite documented scandals involving Marchionne.    For instance, at FCA, the company underwent scandals related to the payment of illegal kickbacks to the Iraqi government (leading to more than $15 million in total fines to the U.S. Government and the entry of a deferred prosecution agreement), charges of tax evasion (leading to a fine of 20-30 million Euros), and the hiding of safety data (leading to a $70 million fine in 2015).

188.    As another example, while not part of the scheme aimed at GM or the pattern of racketeering associated with the enterprises alleged herein, starting in February 2011, FCA began to systematically overstate its month-end sales figures, ultimately using the fraud to claim a record-breaking 71-month streak in year-over-year improvements.

189.    Reid Bigland, FCA's Senior Vice President of Sales and the executive in charge of the scheme, alleged that Marchionne was intimately involved with the reporting methodology: "[Bigland] reported directly to the Global Fiat Chrysler CEO, Sergio Marchionne. . . . [FCA's] most senior executive and leadership levels, including Marchionne . . . were well aware of the methodology[.]" Indeed, he alleges

**EXHIBIT 10**

that he "administered the protocol in accordance with best practices he received from . . . the Global CEO[.]"[74]

190.   In July 2016, FCA was forced to admit its inflated sales scheme, restate its sales, and acknowledge that the SEC and Department of Justice had launched investigations into its reporting. On September 27, 2019, the SEC charged FCA with misleading investors about the number of new vehicles sold each month to customers in the U.S.  FCA agreed to pay $40 million to settle the charges.[75]

191.   "The SEC's order finds that FCA US inflated new vehicle sales results by paying dealers to report fake vehicle sales and maintaining a database of actual but unreported sales, which employees often referred to as a 'cookie jar.'  In months when the growth streak would have ended or when FCA US fell short of other targets, FCA US dipped into the 'cookie jar' and reported old sales as if they had just occurred."[76]

192.   During many of these ongoing frauds, FCA Group faced tightening corporate governance requirements in Italy. In 2013, Italy put into place additional

---

[74]  First Am. Compl. at 3, 12, *Bigland v. FCA N. Am. Holdings, LLC, et al,* No. 2:19-cv-11659-GAD-SDD (E.D. Mich. June 12, 2019).

[75]  U.S. Sec. and Exchange Comm. Press Release, *Automaker to Pay $40 Million for Misleading Investors* (Sept. 27, 2019), https://www.sec.gov/news/press-release/2019-196.

[76]  *Id.*

**EXHIBIT 10**

requirements for adequate internal control and risk management systems, which were aimed at encouraging the discovery and uncovering of fraud, bribery, and other malfeasance. Rather than comply with these new requirements and risk the undoing of its corrupt business practices, in 2014, FCA NV moved its country of incorporation to the Netherlands. The move to the Netherlands accomplished two goals: (1) consolidating the power of FCA NV's controlling shareholders over the organization and (2) providing greater leeway for FCA's irregular governance practices.

193.   The Netherlands is well known for its lax taxation and corporate governance policies.  Although Dutch law provides requirements for companies that incorporate there, companies may disregard such requirements as long as they explain why they chose to ignore a specific rule of conduct—colloquially referred to as the "comply or explain" approach.  For instance, the Dutch Code contains "best practice" requirements for the number of independent directors that sit on a board. Rather than comply with this requirement, FCA NV notes in its SEC filings that it does not comply with this practice because "two of [its] nine non-executive directors are not independent[.]" The Dutch Code also requires that FCA NV's board committees be made up only of non-executive directors and, at most, one non-independent director. Contrary to this requirement, FCA NV states in its SEC

**EXHIBIT 10**

filings that its Governance and Sustainability Committee includes an executive director, and allows for the possibility of having two non-independent directors.[77]

194.  FCA likewise maintains lax and insulated corporate governance, with a board that does not include a single independent director.  Each member of the board of FCA is an employee of the company, with most having multiple roles throughout FCA Group.

## VII. U.S. ATTORNEY IN DETROIT'S CRIMINAL INVESTIGATION STARTS TO REVEAL THE CORRUPTION

195.  In July 2017, the government began unsealing indictments showing a years-long pattern of corruption and racketeering activity between FCA Group and certain UAW leaders. As GM later learned, the government's investigation had been underway for years before the indictments were released. Defendants were therefore aware of the investigation and yet continued to carry on and conceal their criminal conduct.

196.  The government has publicly charged and implicated over a dozen FCA and UAW officials, including the key officials responsible for managing FCA-UAW labor relations, administering the NTC, and 2015 collective bargaining negotiations. The charges illustrate the pervasive and deeply rooted "culture of corruption," as the

---

[77] *E.g.*, Fiat Chrysler Automobiles N.V., 2015 Annual Report, at https://www.sec.gov/Archives/edgar/data/1605484/000160548416000134/fca2015123120f.htm.

**EXHIBIT 10**

government used that description, that prevailed among FCA Group and certain UAW leaders during their criminal scheme.

197. One by one, each of the FCA and UAW co-conspirators entered guilty pleas admitting to a brazen scheme to enrich themselves and corrupt the collective bargaining process through the FCA Control and FCA-NTC Enterprises. Every official charged to date in the corruption scheme has pled guilty.

198. In those pleas, the co-conspirators admit to a dizzying number of racketeering acts, including millions in illegal "payments [that] were made in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW. That is exactly why they were made."[78] These acts, which have only been admitted, in part, due to the larger bribery scheme involving foreign bank accounts, were designed to and did pervert the collective bargaining process to the direct injury of GM.

## VIII. FCA GROUP AND ITS CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS EARLIER INJURY.

199. GM reasonably, but incorrectly, believed that FCA Group acted in good faith and negotiated agreements with UAW leadership at arm's length, including in

---

[78] 8/13/18 Iacobelli Sentencing Mem., at 13 (emphasis added).

**EXHIBIT 10**

Case 2:22-mc-50034-GCS-DRG ECF No. 1-2, PageID.868 Filed 02/01/23 Page 109 of 304
Case 2:19-cv-10429-PDB-DRG ECF No. 34-2 filed 08/03/20 PageID.3106 Page 95 of
129

2011 and 2015, consistent with FCA and UAW leadership's obligations under the Taft-Hartley Act and the UAW Constitution. For example, Williams described the 2015 CBA as a "balanced" agreement that was "a testament to the UAW's democratic values and commitment to our members."[79] Similarly, UAW leaders held up the 2011 CBA as proof that "cooperation and collective bargaining work."[80] In fact, the UAW recognized the importance of good faith pattern bargaining—including on October 25, 2015, the day the UAW and GM reached a tentative agreement—as it "levels the playing field so that companies compete based on the quality of their product or services and not how much they pay . . . their workers." In this way, the UAW assured, "one company cannot gain a competitive advantage over other companies with wages."[81]

200.   GM had no way to know that FCA Group had conspired through bribes to key UAW officials to ensure FCA received illicit competitive advantages compared to the inflated labor costs that caused GM harm, including, as described

---

[79] Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

[80] Joseph Szczesny, *Chrysler Agreement with UAW to Add 2,100 New Jobs*, DAILY TRIBUNE (Oct. 12, 2011), https://www.dailytribune.com/sports/chrysler-agreement-with-uaw-to-add-new-jobs/article_bc6b64af-c7b8-5518-874d-7d0a6caea35c.html.

[81] UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

**EXHIBIT 10**

herein, a private agreement dated as early as 2010 to avoid reinstating the 2015 cap on FCA Tier Two workers, a secret agreement to allow FCA to avoid the contractual limits on the number of temporary workers, and repeated commitments from UAW leadership to support FCA's "World Class Manufacturing" programs while rejecting GM's corollary programs.

201.    Defendants' bribery scheme was inherently self-concealing, as secrecy was essential to perpetuate the scheme. Had Defendants' violations of the Taft-Hartley Act been exposed, Defendants would have been investigated and prosecuted criminally, bringing the scheme to an end. In addition, Defendants conspired to conceal their bribery scheme from GM (and the world), by adopting extraordinary measures to obscure the unlawful transactions, the pattern of racketeering, and the resulting injury to GM. As described herein and as admitted in the criminal plea agreements, Defendants and their co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length of the scheme, Defendants' efforts successfully concealed the scheme and precluded suspicion of Defendants' conduct. For example:

(a)    FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited

**EXHIBIT 10**

payments and things of value paid to officers and employees of the UAW";[82]

(b) The co-conspirators used false-front companies and charitable organizations run by members of the UAW to secretly funnel money to other members of the conspiracy for personal use. For example, between July 2009 and 2015, "Durden conspired and agreed with Alphons Iacobelli, General Holiefield, Monica Morgan, . . . and other individuals and entities, to defraud the United States by using two tax-exempt organizations [the NTC and the LTLOF] to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others";[83]

(c) Iacobelli, Durden, Morgan, and their co-conspirators used the LTLOF to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[84]

(d) Iacobelli (on March 19, 2015), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on

---

[82] 5/25/18 Brown Plea Agreement, at 3.

[83] 8/8/17 Durden Plea Agreement, at 3.

[84] 7/26/17 Iacobelli Indictment, at 9.

**EXHIBIT 10**

November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e)     Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, the LTLOF, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives";[85]

(f)     In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty bucks."[86] Marchionne then falsely denied the gift when questioned about it by federal investigators;

---

[85]   6/13/17 Durden Information, at 6.

[86]   7/13/18 Iacobelli Plea Agreement, at 8.

**EXHIBIT 10**

(g)    "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[87]

(h)    On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials."[88]

(i)    From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell and other officials.[89] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General

---

[87] 7/26/17 Iacobelli Indictment, at 20.

[88] 5/25/18 Brown Plea Agreement, at 5.

[89] 4/2/19 Jewell Plea Agreement, at 3–4.

99

**EXHIBIT 10**

Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[90]

(j)   The Defendants and other FCA and UAW executives hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, the Cayman Islands, and others. These funds were put in these overseas accounts expressly to promote and protect the operation and control of the RICO Enterprises covertly.

202. It was not until July 2017, when the government announced indictments of Iacobelli, Morgan, and Durden, with charges following against King, Johnson, Mickens, Brown, and Jewell, that information was revealed that FCA had made illegal payments to certain UAW officials. GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to indicate whether it might have been injured by Defendants' activity or whether it might potentially have a cause of action. At the same time, Defendants and their co-conspirators continued to take active steps to conceal their illegal scheme and its effect on GM.

---

[90]  *Id.* at 13.

**EXHIBIT 10**

203.   In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other rogue and bad actors. As has now been revealed, these statements were false, and were designed to evade suspicion and prevent inquiry into Defendants' illegal conduct:

(a)   On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period*."[91] In fact, Williams himself was directly involved in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

(b)   On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that

---

[91]   Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

**EXHIBIT 10**

held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[92] In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c)    Following a day later in what appear to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that **this conduct had nothing whatsoever to do with the collective bargaining process, but rather involved two bad actors** . . . ."[93]

---

[92]  FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

[93]  Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

**EXHIBIT 10**

Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA." In reality, Marchionne and Williams themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d)     On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, *it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements*, including the 2011 collective bargaining agreement between the UAW and Chrysler."[94]

(e)     On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating: "*[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your*

---

[94]  *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

**EXHIBIT 10**

*collective bargaining agreement and no union funds were stolen or lost.*"[95]

(f) On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[96]

(g) On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process.*"[97]

204. Due to the co-conspirators' concealment of and misrepresentations regarding their criminal bribery activity and its effect on the collective bargaining

---

[95] *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[96] *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[97] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

**EXHIBIT 10**

Case 2:22-mc-50024-GCS-DRG ECF No. 34-2 PageID.878 Filed 02/01/22 Page 119 of 304
Case 2:19-cv-13429-POB-DRG ECF No. 84-2 filed 08/08/20 PageID.3116 Page 109 of
129

process, it was not until Iacobelli pled guilty on January 22, 2018, and his plea
agreement was released thereafter, that GM uncovered some meaningful details
regarding Defendants' scheme and its potential impact on GM. Iacobelli's guilty
plea revealed for the first time that FCA's illegal payments to UAW officials were
made "in an effort to obtain benefits, concessions, and advantages for FCA in the
negotiation, implementation, and administration of the collective bargaining
agreements between FCA and the UAW."[98] Thereafter, it took substantial research
and analysis to begin to discern the manner and extent to which GM was injured by
Defendants' illegal conduct.

205. GM did not and could not have reasonably discovered this information
earlier despite due diligence. Defendants' public statements, filings, and
agreements—which GM reviewed—gave no indication of their illegal activity,
much less its impact on the collective bargaining process and GM. To the contrary,
as described above, Defendants concealed their scheme from detection through
various artifices and outright lies to GM and the public intended to deceive GM and
deter inquiry.

---

[98] 7/13/18 Iacobelli Plea Agreement, at 7. (Iacobelli pled guilty on
January 22, 2018, and his plea agreement was filed the next day. Due to a
scrivener's error, a corrected version was filed on July 13, 2018.)

**EXHIBIT 10**

## CAUSES OF ACTION

### **First Cause of Action**

Violations of the RICO Act—18 U.S.C. § 1962(b)

Against FCA NV, FCA, Iacobelli, Brown, Durden, (collectively, "Control Defendants")

206.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

207.   This claim arises under 18 U.S.C. § 1962(b), which makes it "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

208.   At all relevant times, each Control Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3).

209.   The FCA-UAW Control Enterprise, which constitutes the UAW as a legal entity, is an enterprise within the meaning of 18 U.S.C. 1961(4).

210.   In violation of § 1962(b), Control Defendants acquired control over the FCA-UAW Control Enterprise through a pattern of racketeering activity.

211.   Control Defendants gained control over the FCA-Control Enterprise through at least the acts of racketeering activity identified below. The multiple acts of racketeering activity that Control Defendants committed and/or conspired to, or

**EXHIBIT 10**

aided and abetted in the commission of, were related to each other, were long-running, and therefore constitute a "pattern of racketeering activity."

212.   By gaining control over the FCA-UAW Control Enterprise through this pattern of racketeering activity, Control Defendants directly damaged GM by having the UAW negotiate and structure CBAs and take positions and enter into contracts and understandings that directly harmed GM as alleged herein, and by directing the implementation of various aspects of the CBAs as described above.

213.   The direct harm to GM was further caused by Defendants' efforts to place two conspirators within GM—Defendants Ashton and Iacobelli—on the Board and in the Labor Relations Department of GM.  Through Ashton and Iacobelli, Defendants were able to receive confidential information about GM's labor strategies and its response to FCA Group's merger overtures. This information allowed Defendants to further execute their scheme to inflict direct and substantial harm upon GM.

214.   Defendants are accordingly liable to GM for three times its actual damages as proved at trial plus interest, punitive damages, and attorney's fees.

<u>**Second Cause of Action**</u>

Violations of the RICO Act—18 U.S.C. § 1962(c)

Against All Defendants

215.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

**EXHIBIT 10**

216.   This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

217.   At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

218.   The FCA-NTC Enterprise was operated as an enterprise by Defendants since at least July 2009 for the common purpose of directing funds away from the NTC (and ultimately from FCA Group) and others for the benefit of certain UAW officials in return for benefits, concessions, and advantages to FCA through driving higher labor costs for GM as alleged herein. This purpose was achieved through a variety of related fraudulent schemes.

219.   Defendants conducted and participated in the affairs of the FCA-NTC Enterprise through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), consisting of numerous and repeated uses of the interstate mails, wire communications, and Taft-Hartley violations associated with the NTC, to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c), through violations of 28 U.S.C. § 186, and through violations of 18 U.S.C. § 1956.

**EXHIBIT 10**

220.   The NTC was used as a tool to carry out the elements of the illegal schemes and pattern of racketeering of Defendants. The FCA-NTC Enterprise had an ascertainable structure and purposes beyond the scope and commission of the predicate acts and conspiracy to commit such acts. The FCA-NTC Enterprise is separate and distinct from Defendants. The FCA-NTC Enterprise engaged in, and its activities affected, interstate and foreign commerce by, among other things, representing and training workers for national automakers and training workers to participate in an industry that engages in substantial interstate and international trade through its supply chains and systems of distribution.

221.   Defendants, through their agents and co-conspirators conducting the affairs of the FCA-NTC Enterprise, had the common purpose to secure funds and directly harm GM to force a merger between GM and FCA as more specifically alleged herein. Defendants, through their agents and co-conspirators, did so by, among other things: illegally manipulating the collective bargaining process, diverting funds from the NTC for the benefit of certain UAW officials, paying bribes by paying double the price of the 2015 CBA, and diverting additional FCA Group funds to involved individuals through the use of foreign bank accounts. Defendants carried out these schemes using the interstate mails and wires in violation of 18 U.S.C. §§ 1341 and 1343 and 29 U.S.C. § 186.

**EXHIBIT 10**

222.    Each Defendant participated in the operation and managed the affairs of the FCA-NTC Enterprise as described herein by making decisions on behalf of the enterprise and/or carrying out the decisions of the enterprises, including by directing, authorizing, demanding, receiving or concealing improper payments and/or by impacting the collective bargaining process. Each Defendant committed at least two acts of racketeering activity as identified below. The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and were long-running, and therefore constitute a "pattern of racketeering activity."

223.    As described herein and detailed in the co-conspirators' criminal charges, guilty pleas, and sentencing memoranda, Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

224.    FCA:

(a)     Beginning in July 2009, FCA began a long-running scheme of improper payments to UAW officials, funneled through the NTC, made by FCA senior executives and agents, including with the knowledge and approval of Marchionne. All such payments were made willfully and with the intent to benefit the UAW and its officials to influence the collective bargaining process and

**EXHIBIT 10**

directly harm GM, as alleged herein. FCA and its agents used and directed the use of the mails and wires to further this fraudulent scheme in violation of 18 U.S.C. §§ 1341 and 1343. Examples of such improper payments and uses of the mails and wires made by agents acting in the interest of FCA are set forth below.

(b)     In July 2009, Durden, Iacobelli, and others caused the transfer of $15,000 in funds from NTC to the LTLOF, an entity controlled by Holiefield, in violation of 29 U.S.C. § 186.

(c)     In 2010, Marchionne provided a watch worth several thousand dollars to Holiefield with a hand-written note that stated, "Dear General, I declared the goods at less than fifty bucks. That should remove any potential conflict," in violation of 29 U.S.C. § 186.

(d)     On at least one occasion between October 2010 and September 2011, Durden, Iacobelli, and others caused the transfer of more than $421,960 in funds from NTC to Morgan for the purchase of personal items, in violation of 29 U.S.C. § 186.

(e)     In May 2011, Iacobelli sent an email to Durden cautioning Durden not to put the details of certain expenditures made for the benefit of Holiefield in writing. This email was in furtherance of

**EXHIBIT 10**

Defendants' fraudulent schemes and was sent via the interstate wires in violation of 18 U.S.C. § 1343.

(f)     On multiple occasions between May 2011 and October 2013, Iacobelli, Durden, and others authorized the payment of over $350,000 in personal expenses for Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(g)     On at least one occasion in June 2014, Durden, Iacobelli, and others caused the transfer of more than $262,000 in funds from NTC to pay off the mortgage of Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(h)     In 2014, 2015, and 2016, FCA and its agents knowingly approved the use of tens of thousands of dollars of NTC funds to pay for expenditures in Palm Springs for the benefit of the UAW and its officials, in violation of 29 U.S.C. § 186.

(i)     With FCA's knowledge and encouragement, Jewell repeatedly used a credit card and funds provided to him as Co-Chairman of the NTC to make extravagant purchases for the benefit of himself and other high-ranking UAW officials, in violation of 29 U.S.C. § 186. Such purchases included $8,926.93 for a two-month stay at a villa in Palm Springs, California in January and

**EXHIBIT 10**

February 2016; $6,681.12 for golf, golf club rentals, golf balls, meals, beer, and liquor at the Indian Canyons Golf Resort in Palm Springs; $1,259.17 for luxury luggage; $2,182 for an Italian-made Beretta shotgun; and $468.86 for cigars at Wild Bill's Tobacco store. These purchases also included $2,130 of Disney World theme park tickets for his friend and his friend's family; multiple tickets to Universal Studios theme park for his friends at a cost of $217.26 each; and numerous extravagant dinners for himself and other UAW officials (such as a $7,500 meal at LG's Prime Steakhouse in Palm Springs, California; a $6,200 meal and $6,900 meal at Palm Springs Steak and Chop Restaurant, and a $7,694 meal at London Chop House in Detroit).

(j) FCA knowingly approved the use of FCA funds for the personal benefit of Mickens, including allowing Mickens to spend thousands of dollars at Best Buy stores purchasing items for his personal use, in violation of 29 U.S.C. § 186.

225. FCA NV:

(a) Beginning in July 2009, acting through its agent Marchionne, FCA NV engaged in a pattern of making and approving

**EXHIBIT 10**

payments and the provision of things of value to UAW leaders, as described above. Marchionne himself gave improper things of value to UAW leaders, such as in February 2010, when Marchionne provided a custom-made watch worth several thousand dollars to Holiefield. In addition, Marchionne, as the CEO of FCA NV, and to achieve the ultimate goal of a combination between GM and FCA NV, instructed high-ranking FCA executives, including Iacobelli, to make more than $1.5 million in prohibited payments and things of value directly and indirectly to top UAW officials. Marchionne made these payments, and approved other such payments, within the scope of his employment with and for the benefit of FCA NV. Each of these payments made and approved by Marchionne were in violation of 29 U.S.C. § 186.

(b)    Further, Marchionne aided and abetted numerous violations of 29 U.S.C. § 186 by directing Iacobelli and other FCA executives to make payments totaling over $1.5 million to UAW officials in violation of § 186. Marchionne did so within the scope of his employment with and for the benefit of FCA NV. Marchionne affirmatively assisted in these violations through this direction

**EXHIBIT 10**

and through his oversight and approval of these payments, all in violation of § 186 and with the specific intent that payments be made in violation of § 186.

(c)     FCA NV, through its agents, granted control over numerous foreign bank accounts to individual UAW and FCA co-conspirators.   Through this scheme, FCA NV, using numerous foreign financial institutions and accounts, directed funds from outside the United States to and for the benefit of United States citizens, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM. These payments through the foreign bank accounts were made in violation of 18 U.S.C. § 1956.

226.  Alphons Iacobelli:

(a)     In July 2009, Iacobelli and others acting in the interest of FCA and using funds provided to NTC by FCA caused the transfer of $15,000 in funds from NTC to LTLOF, an entity controlled by Holiefield, for the benefit of Holiefield in violation of 29 U.S.C. § 186.

**EXHIBIT 10**

Case 2:22-mc-50034-GCS-DRG   ECF No. 34-2 PageID.889 Filed 02/01/22 Page 130 of 304
Case 2:19-cv-19429-POS-DRG   ECF No. 84-2 PageID.889   filed 08/03/20   PageID.3127 Page 120 of
129

(b)    In May 2011, Iacobelli authorized the expenditure of more than $2,100 of NTC funds for Morgan, for the benefit of Holiefield, and knowing that FCA would ultimately pay for these tickets, in violation of 29 U.S.C. § 186.

(c)    In 2011 and 2012, Iacobelli authorized and directed the expenditure of more than $435,000 to Wilson's Diversified Products, which was owned and/or controlled by Holiefield and Morgan, to pay for personal purchases by UAW officials, including Holiefield. Iacobelli authorized and directed this payment for the benefit of Holiefield, and knowing that FCA would ultimately pay for this expenditure, in violation of 29 U.S.C. § 186.

(d)    Between 2012 and June 2015, Iacobelli authorized the expenditure of more than $450,000 of NTC funds to pay for personal purchases by UAW officials, including Holiefield. Iacobelli authorized and directed these payments for the benefit of the UAW and its officials, and knowing that these expenditures were ultimately paid by FCA, in violation of 29 U.S.C. § 186.

**EXHIBIT 10**

(e)    On at least one occasion in June 2014, and with the intent to benefit the UAW and its officials in order to influence the UAW in its relations with FCA, Durden, Iacobelli and others acting in the interest of FCA and using funds provided to NTC by FCA, caused the transfer of more than $262,000 in funds from NTC to pay off the mortgage of Holiefield and Morgan, in violation of 29 U.S.C. § 186.

(f)    Upon information and belief, Iacobelli received substantial amounts from FCA and FCA NV in the form of control over accounts held at financial institutions in Switzerland, Italy, Singapore, and Liechtenstein, in his own name, the name of a family member, and the name of a business entity he controls. These amounts were directed from outside the United States to and for the benefit of Iacobelli, a United States citizen, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM. Iacobelli received such funds in violation of 18 U.S.C. § 1956.

**EXHIBIT 10**

227.  Jerome Durden:

(a)  In July 2009, Durden and others acting in the interest of FCA and using funds provided to NTC by FCA caused the transfer of $15,000 in funds from NTC to LTLOF, an entity controlled by Holiefield, for the benefit of Holiefield in violation of 29 U.S.C. § 186.

(b)  On at least one occasion between October 2010 and September 2011, and with the intent of benefitting the UAW in order to influence the UAW in its relations with FCA, Durden, Iacobelli, and others acting in the interest of FCA and using funds provided to NTC by FCA, caused the transfer of more than $421,960 in funds from NTC to Morgan, in violation of 29 U.S.C. § 186.

(c)  Durden signed and caused to be filed numerous false IRS Form 990s for the NTC. These filings, which failed to identify hundreds of thousands of dollars in funds being transferred to UAW officials and entities associated with them—including $195,015 in 2010, $543,960 in 2011, $335,852 in 2012, $145,054 in 2013, and $262,000 in 2014—were necessary to perpetrate the scheme and avoid its detection by GM. These

**EXHIBIT 10**

Form 990s were filed using either the interstate wires or mails,
in violation of 18 U.S.C. § 1341 and/or § 1343 on at least
February 25, 2011;       November 1, 2011;       May 15, 2012;
May 14, 2013; May 13, 2014; and May 11, 2015.

(d)    Upon information and belief, Durden received substantial
amounts from FCA and FCA NV in the form of control over
accounts held at financial institutions in the Cayman Islands and
Liechtenstein, in his own name and the name of a business entity
he controls.   These amounts were directed from outside the
United States to and for the benefit of Durden, a United States
citizen, with the intent to promote and further FCA NV's and
FCA's unlawful scheme of using the NTC to direct prohibited
payments to UAW officials in an effort to harm GM.   Durden
received such funds in violation of 18 U.S.C. § 1956.

228.   Michael Brown:

(a)    Brown authorized numerous payments, totaling hundreds of
thousands of dollars to the UAW, in the guise of reimbursements
for 100 percent of the salaries and benefits the UAW paid to
individuals placed on "special assignment" status and members
of the UAW International Staff, knowing that many of those

**EXHIBIT 10**

individuals did no work for the NTC. Each of these payments was approved as a gift to high-level UAW officials, each in violation of 29 U.S.C. § 186.

229.  Dennis Williams

(a)  Upon information belief, Williams received substantial amounts from FCA and FCA NV in the form of control over accounts held at financial institutions in Switzerland and Liechtenstein, in his own name and the name of a charitable entity he controls.  These amounts were directed from outside the United States to and for the benefit of Williams, a United States citizen, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM.  Williams received such funds in violation of 29 U.S.C. § 186 and 18 U.S.C. § 1956.

(b)  During various union functions, Williams partook in extravagant meals, golf-related expenses, and other luxuries, knowing that these items were being funded by FCA in violation of 29 U.S.C. § 186.

**EXHIBIT 10**

230. Joseph Ashton:

    (a)    Upon information and belief, Ashton solicited and received numerous payments, totaling hundreds of thousands of dollars, from FCA NV and FCA. These funds are or were held in an offshore account at least in Cayman Islands. Each of these payments to Ashton by FCA were in violation of 29 U.S.C. § 186.

    (b)    In addition, the funds in these accounts were directed from outside the United States to and for the benefit of Ashton, a United States citizen, with the intent to promote and further FCA NV's and FCA's unlawful scheme of using the NTC to direct prohibited payments to UAW officials in an effort to harm GM. Ashton received such funds in violation of 18 U.S.C. § 1956.

231. GM's injuries were directly and proximately caused by Defendants' racketeering activities. For example, as alleged herein, FCA Group's illicit payments to certain UAW officials, entailing a pattern of racketeering including Taft-Hartley violations, inflicted billions of dollars of damages on GM, including: (a) injuries resulting from unique competitive advantages provided FCA but denied to GM to drive up GM's costs from July 2009 through 2015, including in connection with WCM, the proportion of Tier Two workers, and limits on temporary workers; and

**EXHIBIT 10**

(b) over \$1 billion in connection with the ratified 2015 GM-UAW CBA and all of its resulting direct harms.

232.  The direct harm to GM was further caused by Defendants' efforts to place two informants within GM—Defendants Ashton and Iacobelli—on the Board and in the Labor Relations Department of GM.  Through Ashton and Iacobelli, Defendants were able to receive confidential information about GM's labor strategies and its response to FCA Group's merger overtures. This information allowed Defendants to further execute their scheme to inflict direct and substantial harm upon GM.

233.  Defendants are accordingly liable to GM for three times its actual damages as proved at trial plus interest, punitive damages, and attorney's fees.

## Third Cause of Action

### Violations of the RICO Act—18 U.S.C. § 1962(d)

### Against All Defendants

234.  Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

235.  This claim arises under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

236.  Defendants further conspired and agreed to violate 18 U.S.C. § 1962(c) and § 1962(b) in violation of 18 U.S.C. § 1962(d) by knowingly agreeing to adopt

**EXHIBIT 10**

the goal of further facilitating the operation of the aforementioned FCA-NTC Enterprise, and by taking and maintaining control of the FCA-UAW Control Enterprise through a pattern of racketeering and by agreeing to the commission of multiple predicate acts and overt acts.

237. All Defendants have participated as co-conspirators in these offenses and have performed acts in furtherance of the conspiracy.

238. Defendants agreed, whether expressly or tacitly, that some person would commit at least two predicate acts in the course of participating in the affairs or operations of these enterprises.

239. Each Defendant and other co-conspirator was aware of the essential scope and nature of the scheme to corruptly operate the FCA-NTC Enterprise and take and maintain control of the FCA-UAW Control Enterprise.

240. There was no plausible lawful rationale for the manner in which Defendants and their co-conspirators participated in the affairs of the NTC and the UAW.

241. GM's injuries were directly and proximately caused by the unlawful agreement among these co-conspirators.

242. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorney's fees.

**EXHIBIT 10**

243.   Defendants are accordingly liable to Plaintiffs for three times their actual damages as proved at trial, punitive damages, plus interest and attorney's fees.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.   Damages, under RICO, in an amount to be determined at trial, including but not limited to the billions of dollars in damages GM suffered as a result of Defendants' bribery scheme, pattern of racketeering, and other unlawful acts;

B.   An award of punitive and/or exemplary damages as Defendants have acted with malice and willful disregard for GM's rights;

C.   An award of costs and fees incurred in pursuing this litigation, including attorney's costs, fees, and the fees and costs of experts;

D.   Equitable relief, including restitution; and

E.   Any other relief the Court deems just, fair, necessary, or equitable.

**EXHIBIT 10**

Dated: August 3, 2020                    Respectfully submitted,

                                         **HONIGMAN LLP**

                                         By: *_/s/ Jeffrey K. Lamb_____*
                                         Jeffrey K. Lamb (P76738)
                                         J. Michael Huget (P39150)
                                         Shirin S. Goyal (P82528)
                                         2290 First National Building
                                         660 Woodward Avenue
                                         Detroit, MI 48226
                                         Telephone:  (313) 465-7000
                                         jlamb@honigman.com
                                         mhuget@honigman.com
                                         sgoyal@honigman.com

                                         **KIRKLAND & ELLIS LLP**

                                         By: *_/s/ Hariklia Karis_____*
                                         Hariklia Karis, P.C.
                                         Jeffrey Willian, P.C.
                                         Casey R. Fronk
                                         Casey McGushin
                                         300 North LaSalle
                                         Chicago, IL 60654
                                         Telephone:  (312) 862-2000
                                         hariklia.karis@kirkland.com
                                         jeffrey.willian@kirkland.com
                                         casey.fronk@kirkland.com
                                         casey.mcgushin@kirkland.com

                                         Austin Norris
                                         Maisie Allison
                                         333 South Hope Street
                                         Los Angeles, CA 90071
                                         Telephone:  (213) 680-8400
                                         austin.norris@kirkland.com
                                         maisie.allison@kirkland.com

                                         *Attorneys for Plaintiffs General Motors LLC
                                         and General Motors Company*

                                         125

**EXHIBIT 10**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| GENERAL MOTORS LLC, GENERAL MOTORS COMPANY,<br><br>                Plaintiffs,<br><br>   against<br><br>JOSEPH ASHTON,<br><br>                Defendant. | Case No. 1:20-cv-12659-RBK-SAK<br><br>**DISCOVERY CONFIDENTIALITY ORDER** |

It appearing that discovery in the above-captioned action is likely to involve the disclosure of confidential information, it is ORDERED as follows:

1.      Any party to this litigation and any third-party shall have the right to designate as "Confidential" and subject to this Order any information, document, or thing, or portion of any document or thing: (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales or other confidential business information, or (b) that contains private or confidential personal information, or (c) that contains information received in confidence from third parties, or (d) which the producing party otherwise believes in good faith to be entitled to protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure and Local Civil Rule 5.3. Any party to this litigation or any third party covered by this Order, who produces or discloses any Confidential material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL - SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Confidential").

2.      Any party to this litigation and any third-party shall have the right to designate as "Highly Confidential" and subject to this Order any information, document, or thing, or portion of any document or thing that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the designating party. Any party to this litigation or any third party who is covered by this Order, who produces or discloses any Attorneys' Eyes Only material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "HIGHLY CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Highly Confidential").

1

**EXHIBIT 11**

3.      All Confidential material shall be used by the receiving party solely for purposes of the prosecution or defense of this action and the Related Actions,[1] shall not be used by the receiving party for any business, commercial, competitive, personal or other purpose, and shall not be disclosed by the receiving party to anyone other than those set forth in Paragraph 4, unless and until the restrictions herein are removed either by written agreement of counsel for the parties, or by Order of the Court.  It is, however, understood that counsel for a party may give advice and opinions to his or her client solely relating to the above-captioned action based on his or her evaluation of Confidential material, provided that such advice and opinions shall not reveal the content of such Confidential material except by prior written agreement of counsel for the parties, or by Order of the Court.

4.      Confidential material and the contents of Confidential material may be disclosed only to the following individuals under the following conditions:

a.      Outside counsel (herein defined as any attorney at the parties' outside law firms) and relevant in-house counsel for the parties;

b.      Outside experts or consultants retained by outside counsel for purposes of this action or the Related Actions, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A;

c.      Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

d.      The Court and court personnel;

e.      Any deponent may be shown or examined on any information, document or thing designated Confidential if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein or is employed by the party who produced the information, document or thing, or if the producing party consents to such disclosure;

f.      Vendors retained by or for the parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials; and

---

[1]   "Related Actions" refers to *General Motors LLC, et al. v. FCA US LLC, et al.*, 2:19-cv-13429-PDB-DRG (E.D. Mich.), *General Motors LLC, et al. v. Alphons Iacobelli, et al.*, 20-011998-CB (Circuit Court of the County of Wayne), and *General Motors LLC and General Motors Company v. Dennis Williams*, Case No. CVR12103181 (Superior Court of California, County of Riverside).

2

**EXHIBIT 11**

g.    The parties.  In the case of parties that are corporations or other business entities, "party" shall mean executives who are required to participate in decisions with reference to this lawsuit.

5.    Confidential material shall be used only by individuals permitted access to it under Paragraph 4.  Confidential material, copies thereof, and the information contained therein, shall not be disclosed in any manner to any other individual, until and unless (a) outside counsel for the party asserting confidentiality waives the claim of confidentiality, or (b) the Court orders such disclosure.

6.    With respect to any depositions that involve a disclosure of Confidential material of a party to this action, such party shall have until thirty (30) days after receipt of the deposition transcript within which to inform all other parties that portions of the transcript are to be designated Confidential, which period may be extended by agreement of the parties.  No such deposition transcript shall be disclosed to any individual other than the individuals described in Paragraphs 4(a), (b), (c), (d) and (f) above and the deponent during these thirty (30) days, and no individual attending such a deposition shall disclose the contents of the deposition to any individual other than those described in Paragraphs 4(a), (b), (c), (d) and (f) above during said thirty (30) days.  Upon being informed that certain portions of a deposition are to be designated as Confidential, all parties shall immediately cause each copy of the transcript in its custody or control to be appropriately marked and limit disclosure of that transcript in accordance with Paragraphs 3 and 4.

7.    Material produced and marked as Highly Confidential may be disclosed only to the persons or entities listed in Paragraphs 4(a)-4(f) above and to such other persons as counsel for the producing party agrees in advance or as Ordered by the Court.

8.    If counsel for a party receiving documents or information designated as Highly Confidential hereunder objects to such designation of any or all of such items, the following procedure shall apply:

a.    Counsel for the objecting party shall serve on the designating party or third party a written objection to such designation, which shall describe with particularity the documents or information in question and shall state the grounds for objection.  Counsel for the designating party or third party shall respond in writing to such objection within 14 days, and shall state with particularity the grounds for asserting that the document or information is Highly Confidential.  If no timely written response is made to the objection, the challenged designation will be deemed to be void and the document will be deemed Confidential.  If the designating party or nonparty makes a timely response to such objection asserting the propriety of the designation, counsel shall then confer in good faith in an effort to resolve the dispute.

b.    If a dispute as to a Highly Confidential designation of a document or item of information cannot be resolved by agreement, the proponent of the designation being challenged shall present the dispute to the Court initially by telephone or

**EXHIBIT 11**

letter, in accordance with Local Civil Rule 37.1(a)(1), before filing a formal motion for an order regarding the challenged designation. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

9.     Any document designated "Confidential" or "Highly Confidential" by a party or non-party and which document is filed with the Court shall be filed under seal, in accordance with Local Civil Rule 5.3.

10.    If the need arises during trial or at any Hearing before the Court for any party to disclose Confidential or Highly Confidential information, it may do so only after giving notice to the producing party and as directed by the Court.

11.    To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Confidential material that should have been designated as such, regardless of whether the information, document or thing was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information, document or thing disclosed or as to any other material or information concerning the same or related subject matter. Such inadvertent or unintentional disclosure may be rectified by notifying in writing counsel for all parties to whom the material was disclosed that the material should have been designated Confidential within a reasonable time after disclosure. Such notice shall constitute a designation of the information, document or thing as Confidential under this Discovery Confidentiality Order.

12.    When the inadvertent or mistaken disclosure of any information, document or thing protected by privilege or work-product immunity is discovered by the producing party and brought to the attention of the receiving party, the receiving party's treatment of such material shall be in accordance with Federal Rule of Civil Procedure 26(b)(5)(B). Such inadvertent or mistaken disclosure of such information, document or thing shall not by itself constitute a waiver by the producing party of any claims of privilege or work-product immunity. However, nothing herein restricts the right of the receiving party to challenge the producing party's claim of privilege if appropriate within a reasonable time after receiving notice of the inadvertent or mistaken disclosure.

13.    No information that is in the public domain or which is already known by the receiving party through proper means or which is or becomes available to a party from a source other than the party asserting confidentiality, rightfully in possession of such information on a non-confidential basis, shall be deemed or considered to be Confidential material under this Discovery Confidentiality Order.

14.    This Discovery Confidentiality Order shall not deprive any party of its right to object to discovery by any other party or on any otherwise permitted ground. This Discovery Confidentiality Order is being entered without prejudice to the right of any party to move the Court for modification or for relief from any of its terms.

**EXHIBIT 11**

15.     This Discovery Confidentiality Order shall survive the termination of this action and shall remain in full force and effect unless modified by an Order of this Court or by the written stipulation of the parties filed with the Court.

16.     If a party receiving Confidential information is served with a subpoena or an order issued in other litigation that would compel disclosure of any material or document designated Confidential or Highly Confidential by another party, the party receiving the subpoena or order must so notify the party that designated the Confidential or Highly Confidential information, in writing, immediately and in no event more than five (5) business days after receiving the subpoena or order.  Such notification must include a copy of the subpoena or court order.  The party receiving the subpoena or order must also inform, in writing, the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order.  The purpose of this procedure is to alert the designating party to the existence of this Order and to afford the designating party in this case the opportunity to seek to protect its Confidential or Highly Confidential information from disclosure.  The obligations set forth in this paragraph shall remain in effect for so long as a party has in its possession, custody, or control Confidential or Highly Confidential information produced by another party in this case.

17.     Upon final conclusion of this litigation and the Related Actions, each party or other individual subject to the terms hereof shall be under an obligation to assemble and to return to the originating source all originals and unmarked copies of documents and things containing Confidential or Highly Confidential material and to destroy, should such source so request, all copies of Confidential or Highly Confidential material that contain and/or constitute attorney work product as well as excerpts, summaries and digests revealing Confidential or Highly Confidential material; provided, however, that counsel may retain complete copies of all transcripts and pleadings including any exhibits attached thereto for archival purposes, subject to the provisions of this Discovery Confidentiality Order.  To the extent a party requests the return of Confidential or Highly Confidential material from the Court after the final conclusion of the litigation, including the exhaustion of all appeals therefrom and all related proceedings, the party shall file a motion seeking such relief.

IT IS SO ORDERED.

Dated:  11/30/21                          _Sharon A. King_

                                         Sharon A. King, U.S.M.J.

**EXHIBIT 11**

**EXHIBIT A**

| | |
|---|---|
| GENERAL MOTORS LLC, GENERAL MOTORS COMPANY, | Case No. 1:20-cv-12659-RBK-SAK |
| Plaintiffs, | |
| against | **AGREEMENT TO BE BOUND BY DISCOVERY CONFIDENTIALITY ORDER** |
| JOSEPH ASHTON, | |
| Defendant. | |

I, being duly sworn, state that:

1. My address is _____.

2. My present employer is _____ and the address of my present employment is _____.

3. My present occupation or job description is _____.

4. I have carefully read and understood the provisions of the Discovery Confidentiality Order in this case signed by the Court, and I will comply with all provisions of the Discovery Confidentiality Order.

5. I will hold in confidence and not disclose to anyone not qualified under the Discovery Confidentiality Order any Confidential Material or any words, summaries, abstracts, or indices of Confidential Information disclosed to me.

6. I will limit use of Confidential Material disclosed to me solely for purposes of this action.

7. No later than the final conclusion of the case, I will return all Confidential Material and summaries, abstracts, and indices thereof which come into my possession, and documents or things which I have prepared relating thereto, to counsel for the party for whom I was employed or retained.

   I declare under penalty of perjury that the foregoing is true and correct.


Dated: _____        _____

                                           [NAME]

6

**EXHIBIT 11**

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

       Plaintiffs,

v.

ALPHONS IACOBELLI, FCA US LLC, FIAT
CHRYSLER AUTOMOBILES, N.V., JEROME
DURDEN,

       Defendants.

Civil Action No. 20-011998-CB

Hon. David J. Allen

**SECOND AMENDED
COMPLAINT**

---

Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Adam M. Wenner (P75309)
Shirin S. Goyal (P82528)
Keith D. Underkoffler (P84854)
HONIGMAN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
awenner@honigman.com
sgoyal@honigman.com
kunderkoffler@honigman.com

Hariklia Karis, P.C. *(pro hac vice)*
Jeffrey Willian, P.C. *(pro hac vice)*
Stacey G. Pagonis *(pro hac vice)*
Casey McGushin *(pro hac vice)*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
stacey.pagonis@kirkland.com
casey.mcgushin@kirkland.com

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

Austin Norris *(pro hac vice)*
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (213) 680-8400
austin.norris@kirkland.com

Maisie Allison *(pro hac vice)*
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs*

---

A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the Second Amended Complaint has been previously filed in the United States District Court for the Eastern District of Michigan where it was given case number 2:19-cv-13429 and was assigned to Judge Paul D. Borman. The action is no longer pending.

A civil action between certain of these parties or other parties arising out of the transaction or occurrence alleged in the Second Amended Complaint has been previously filed in Wayne County Circuit Court where it was given case number 20-012007-CB and assigned to Judge Lita M. Popke. That action was removed to the United States District Court for the Eastern District of Michigan where it was given case number 2:20-cv-12556 and assigned to Judge Terrence G. Berg. That action is no longer pending.

*/s/Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)

This case involves a business or commercial dispute as defined in MCL § 600.8031 and meets the criteria to be assigned to the business court.

*/s/Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

THE PARTIES.......................................................................................................6

    A.    Plaintiffs ..................................................................................6

    B.    Defendants ...............................................................................6

    C.    Significant Non-Parties and Other Entities.................................9

JURISDICTION AND VENUE .............................................................................16

PROCEDURAL HISTORY....................................................................................17

DETAILED ALLEGATIONS ...............................................................................18

I.    OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER.............................................................................................18

    A.    Financial Crisis Threatens U.S. Auto Industry .........................18

    B.    Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler ...........19

    C.    FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW ..................................................................22

II.    DEFENDANTS FUNNEL MILLIONS TO THE UAW AND CERTAIN FORMER UAW LEADERS.......................................................................24

    B.    Evidence of the Existence and Control Over Foreign Accounts. ..........................32

III.    FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW LEADERS TO DAMAGE GM.........................................................................................33

IV.    DEFENDANTS CONSPIRED WITH UAW LEADERS TO ATTEMPT A TAKEOVER OF GM BY MERGER. ...............................................................40

    A.    Marchionne Conspires on Behalf of FCA and FCA NV to Force a Takeover of GM by Merger .................................................41

    B.    Williams and Ashton Are Key Players in the Takeover Conspiracy....................44

    C.    FCA NV Initiates "Operation Cylinder".................................46

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

V.    ASHTON AND IACOBELLI PASSED INFORMATION TO FCA AND FCA NV, CAUSING HARM TO GM. ......................................................................58

VI.   DEFENDANTS AND THEIR CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS INJURY EARLIER. ........................................................64

CAUSES OF ACTION ..........................................................................................73

REQUESTS FOR RELIEF .....................................................................................92

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

**SECOND AMENDED COMPLAINT**

General Motors LLC and General Motors Company (individually or collectively, "GM")

for their Second Amended Complaint, allege as follows:

**INTRODUCTION**

1.       This case is about (what was) an Italian company, Fiat Chrysler Automobiles N.V.

(now known as Stellantis, N.V. and referred to herein as "FCA NV")[1], which obtained operational

control over an iconic U.S. auto company, Chrysler Group LLC. Shortly after the acquisition, FCA

NV and its wholly-owned subsidiary FCA US LLC ("FCA") embarked on a systemic and near

decade-long conspiracy to bribe certain senior union officials to corrupt the collective bargaining

process and inflict harm upon GM in order to weaken GM and have it acquiesce to FCA NV's

desire that the two companies combine.  This is not a garden-variety corporate corruption scheme;

Defendant Alphons Iacobelli described his involvement as being part of the biggest corporate

corruption case in U.S. business history.[2]

2.       As initially revealed starting with the first indictment in July 2017, the United States

Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation

into corruption by and between FCA, FCA NV, and certain former union leaders. This

investigation has resulted in criminal charges against fifteen individuals with three FCA officials

and eleven former UAW officials (and one UAW official's spouse) pleading guilty to a years-long

bribery scheme.  In addition, FCA itself pled guilty to conspiring to provide items of value to UAW

leaders, including that FCA "knowingly and voluntarily joined the conspiracy" to provide such

---

[1]    After this case was originally filed, Fiat Chrysler Automobiles, N.V. changed its name to
Stellantis N.V.  For ease of reference, this Second Amended Complaint continues to refer to
Stellantis N.V. as "FCA N.V."

[2]    DeLorenzo Decl. at ¶ 6.

1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

items."[3]  FCA has further admitted that it is responsible for the actions of its employees and agents as described in the plea agreement.[4]  These include Defendant Iacobelli, FCA's former Vice President of Labor Relations, currently serving a 66-month prison sentence for his central role in the conspiracy, as well as Defendant Jerome Durden, FCA's former employee who approved and concealed illegal payments and was sentenced to 15 months in prison. As has been repeatedly admitted, starting no later than July 2009, FCA paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and the UAW itself and, in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." During the course of this bribery scheme, two collective bargaining agreements ("CBAs") were negotiated with FCA—in 2011 and 2015—both subject to corruption in their negotiation and implementation, with one of the specific purposes being to harm GM as described herein.

3.     Beyond these acts admitted in criminal pleadings, through its continued investigation GM has uncovered additional evidence demonstrating that the scheme was even broader than previously believed.  This investigation confirms that GM was the intended target of the scheme perpetrated by Defendants.  For example, and as previously submitted as evidence to this Court, after being indicted and within days of the reported death (July 25, 2018) of Sergio Marchionne (Iacobelli's trusted co-conspirator and protector at FCA), Iacobelli initiated contact and had in-person meetings with Peter DeLorenzo, a reporter covering the auto industry.[5]  Iacobelli solicited DeLorenzo to help him write a "tell-all" book regarding FCA's effective scheme to bribe

---

3     FCA Plea Agmt. at 2.

4     *Id*. at 3.

5     A declaration signed by DeLorenzo (the "DeLorenzo Decl.") is attached as Exhibit 1.

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

the UAW.  During these conversations, Iacobelli confirmed that the scheme was not driven by a few "bad apples" within FCA; instead, it was directly orchestrated by Marchionne, FCA's then-CEO, and GM was the express target of Marchionne's scheme.[6]  In fact, in late July 2018 emails exchanged between Iacobelli and DeLorenzo, they discussed that the book should be titled "Scam: How Fiat Chrysler and the UAW Conspired Together to Commit One of the Biggest Cases of Corporate Fraud in U.S. History," and it should include the "specific highlights, moments, schemes, emails, bad actors within FCA (Sergio, et al) and so on."  Iacobelli told DeLorenzo that the scope of the FCA scheme was far broader than what had been publicly revealed at the time and even showed contemporaneous FCA documents to DeLorenzo confirming Marchionne's involvement in the bribery scheme.[7]  After Iacobelli profusely thanked DeLorenzo for agreeing to write the book and for his "courage" in "being a voice of truth," Iacobelli ceased communication with DeLorenzo without explanation.  Upon information and belief, Iacobelli used the threat of the DeLorenzo publication as reflected in their emails to obtain protection and financial payments from FCA and FCA N.V., including through the use of the foreign bank accounts in Iacobelli's name.

4.     Through this lawsuit, GM seeks recourse against FCA, FCA NV, Iacobelli, and Durden for this long-running bribery scheme and its numerous related frauds and torts, all of which were intended to and did cause billions of dollars of harm to GM.

5.     As a direct result of the scheme, FCA received certain structural programs and benefits that were denied to GM. For example, FCA was provided with genuine support for its

---

[6]    DeLorenzo Decl. at ¶ 19.

[7]    DeLorenzo has not been contacted by federal investigators about his communications with Iacobelli.  DeLorenzo Decl. at ¶ 22.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

efficiency program, while GM was denied the same for its program—Global Manufacturing System ("GMS"). In addition, FCA was provided with valuable foreknowledge about coming changes to contractual limits on less expensive Tier Two workers, while GM was denied the same knowledge. Finally, FCA received support for its "longer term business plan" and another secret, "side letter" agreement with the UAW, both of which were denied to GM.

6.      Next, with cooperation of UAW leadership purchased through bribes, FCA NV's former CEO, Sergio Marchionne worked with then-UAW President Dennis Williams to use the negotiations and bargaining of the 2015 collective bargaining agreement ("CBA") to pressure GM to accede to FCA NV's merger desires. Specifically, after GM rejected Marchionne's formal merger demand in the spring of 2015, Marchionne, through bribery, obtained the "lead" negotiating position for FCA, and with the co-conspirators identified herein, crafted a CBA that, once imposed on GM through pattern bargaining, would cause GM massive harm with the goal to pressure GM into a merger. While GM ultimately resisted this takeover scheme, in the process Marchionne and FCA negotiated a 2015 CBA that cost GM one billion dollars more than the UAW had even sought from GM before FCA was designated the lead.

7.      A collection of foreign accounts held by and/or affiliated with those involved in the conspiracy recently came to light, further demonstrating the scope and value of FCA and FCA NV's scheme and consistent with Iacobelli's statement to DeLorenzo that the scheme was much broader than previously known.[8] Upon information and belief, and as the only plausible inference based on the facts revealed thus far and the statements of Iacobelli, FCA NV and/or FCA provided millions of dollars to co-conspirators via numerous undisclosed offshore bank accounts and

---

[8]     DeLorenzo Decl. at ¶ 4 ("[Iacobelli] declared that the scheme and those involved was much broader than was known publicly[.]").

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

utilized such accounts to purchase the support and silence of numerous high-level UAW officers and FCA executives. These recipients of FCA-funded offshore accounts include former UAW Presidents, including Dennis Williams, former UAW Vice President Joseph Ashton, and Iacobelli and Durden, who centrally orchestrated the scheme on Defendants' behalf. FCA and FCA NV then furthered their scheme from inside GM. First, FCA, FCA NV, and Williams chose Ashton to be the UAW Trust's[9] designee on GM's Board. Second, Defendants placed Iacobelli in a high-level position within GM's Labor Relations department. Ashton and Iacobelli secured and maintained these positions through years of affirmative misrepresentations and fraudulent omissions to GM, which had no knowledge of Defendants' scheme or Ashton's and Iacobelli's central roles in the scheme.

8.      Once inside, and unbeknownst to GM, Ashton and Iacobelli utilized their access to GM's highly confidential and competitively sensitive negotiating and labor relations information and funneled this information to FCA, FCA NV, and their co-conspirators. For example, Ashton provided information to FCA, FCA NV, and their co-conspirators from the UAW about GM's negotiation strategies during the 2015 CBA negotiations and information about GM's response to FCA NV's merger overtures, while Iacobelli provided information about GM's labor strategy obtained in meetings with other members of GM senior leadership. Despite owing GM fiduciary duties, neither Ashton nor Iacobelli disclosed this criminal scheme or their roles in it to anyone at GM.

---

[9]   The UAW Trust was established as a result of the 2007 CBAs between the UAW, FCA, GM, and Ford, which assigned retiree health care liabilities to an independent Voluntary Employee Beneficiary Association. Pursuant to restructuring following the 2008 financial crisis, the UAW Trust obtained the right to appoint a director to New GM's Board.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

## THE PARTIES

### A.    Plaintiffs

9.    **General Motors LLC**: Plaintiff General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC. The sole member of General Motors Holdings LLC is Plaintiff General Motors Company, which is a Delaware corporation with its principle place of business in Detroit, Michigan. General Motors LLC is thus a citizen of Delaware and Michigan. General Motors LLC is the largest automaker in the U.S. and an iconic American company that manufactures and sells automobiles in the U.S. under brands including Chevrolet, Cadillac, Buick, and GMC.

10.    **General Motors Company**: Plaintiff General Motors Company (herein referred to as "GM Company" or "New GM") is a Delaware corporation with its principal place of business in Detroit, Michigan, and is the ultimate parent of General Motors LLC.

### B.    Defendants

11.    **FCA US LLC (formerly known as Chrysler Group LLC):** Defendant FCA US LLC ("FCA") was an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA was a wholly owned subsidiary of FCA NV, a publicly traded foreign entity listed on the New York Stock Exchange ("NYSE"). FCA manufactured and sold automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram. FCA was an employer in the automotive industry. FCA and FCA NV competed with GM in the automotive industry.  On March 1, 2021, FCA pled guilty to conspiring to violate 29 U.S.C. § 186(a)(2), (b)(1), and (d)(1) by providing funds and other things of value to UAW leaders.  FCA further admitted that it was responsible for the acts of its officers, directors,

6

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

employees, and agents described in the Information, which largely recounts the prior acts to which the former FCA employees had pled guilty.  Pursuant to the plea agreement, FCA agreed to pay a fine of $30 million and to a term of three years' probation.  On August 17, 2021, a federal court accepted the plea agreement and sentenced FCA with a $30 million-fine and to three years of probation and oversight by an independent corporate compliance monitor.

12.     **Stellantis N.V. (formerly known as Fiat Chrysler Automobiles N.V. and Fiat):** Defendant Stellantis N.V. ("FCA NV"), the successor of the Italian automotive company formerly known as Fiat S.p.A. ("Fiat"), is the ultimate parent company and owner of FCA US LLC. FCA NV is organized under the laws of the Netherlands, as a Naamloze Venootschap, and its principal executive offices are in Amsterdam, Netherlands. The Netherlands is a country known for not imposing rigorous corporate governance standards on those companies that select it as their domicile.  Since October 2014, FCA NV's common stock has traded on the NYSE under the ticker symbol FCAU, and it regularly files with the SEC annual reports on Forms 20-F and furnishes Forms 6-K pursuant to Section 13(a) of the Exchange Act. FCA NV is an automotive group that, both directly and through its subsidiaries, designs, engineers, manufactures, distributes, and sells vehicles and components; provides retail and dealer financing, leasing, and rental services; and engages in media, publishing, and other business throughout the U.S., including in Michigan.

13.     **Alphons Iacobelli:** Defendant Iacobelli is a Michigan resident and citizen, domiciled in Michigan, who was employed as the Vice President of Employee Relations at FCA and as the Co-Chairman of the UAW-Chrysler National Training Center ("NTC") and its Joint Activities Board from 2008 to 2015. In this role, Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW. Through his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

FCA to direct the financial affairs of and approve payments made by the NTC. Immediately after leaving FCA in June 2015, Iacobelli actively sought employment at GM in its Labor Relations department. In January 2016, Iacobelli was hired by GM as Executive Director, North America Labor Relations, after a background check, without GM having any knowledge of Iacobelli's misdeeds or the ongoing investigation into them. Iacobelli worked at GM from January 2016 until the indictment against him was made public in July 2017. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution. Iacobelli remains domiciled in Michigan, with his primary residence in Rochester Hills, Michigan, and is a citizen of Michigan. At all times relevant to this Second Amended Complaint, Iacobelli was an agent of Chrysler and/or FCA.

14.     **Jerome Durden:** Defendant Durden is a Michigan resident and citizen, domiciled in Michigan, who was employed as a financial analyst at Chrysler and FCA in its corporate accounting department since 1985. In 2008, he was assigned by Chrysler (and continued under FCA) to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and FCA, had the authority to approve and did approve payments made by the NTC, including payments in furtherance of the conspiracy alleged herein. In addition, Durden was selected by Holiefield to serve as Treasurer of the Board of Trustees of Holiefield's Leave the Light on Foundation ("LTLOF") from 2009 through June 2015. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution. Durden

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

remains domiciled in Michigan, with his primary residence in Rochester, Michigan, and is a citizen of Michigan. At all times relevant to this Second Amended Complaint, Durden was an agent of Chrysler and/or FCA.

### C.   Significant Non-Parties and Other Entities

15.    **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)**: The UAW is the union that exclusively represents the labor forces for both GM and FCA. From 2009-2019 the UAW represented approximately 50,000 GM employees and between 23,000 and 47,000 FCA employees. As such, the UAW has a significant degree of market power to force labor terms on either competitor, including through the ability to call strikes, among other actions. The UAW is headquartered in Detroit, Michigan.

16.    The UAW also has an unusual and limited governance structure where only five officers of the UAW—the President, the Secretary-Treasurer, and three Vice Presidents of the International Executive Board—effectively control its central decision-making regarding the negotiation and administration of collective bargaining agreements. These UAW officers possess particularly strong powers as well, including the power to negotiate CBAs, call special conventions, authorize strikes, and issue and revoke charters, among other powerful tools. While these UAW officers operate in the context of an International Executive Board that includes eleven "Regional Directors," these officers have effectively controlled the overall decision-making, policy, director and officer elections, and negotiation and administration of the CBAs. There are minimal checks and balances on the President and the other four officers as throughout the relevant period they had no oversight board, committee or trustee that oversaw and ensured the integrity of the UAW Executive Board or that could take action to address malfeasance. In addition, these officers, who have nearly complete control over UAW affairs, are elected only every four years

Document received by the MI Wayne 3rd Circuit Court.

9

**EXHIBIT 12**

and implemented practices to exercise substantial control over elections to perpetuate their role on the International Executive Board. If any of these officers or directors acted corruptly, they had the power and influence to inflict direct harm on any given competitor in the name, and on behalf of, the UAW.

17.     **Sergio Marchionne ("Marchionne"):** Acting principally from and within Michigan, non-party Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–18, the Chairman (2011–14) and CEO (2009–14) of Chrysler, and the COO of FCA North America (2011–18). Marchionne also served as the CEO of CNH Industrial (2004-2018), which was commonly controlled by Exor NV, which directly and indirectly is the largest shareholder of FCA NV. At all times relevant to this Second Amended Complaint, and until his death, Marchionne was an agent of FCA and FCA NV. Marchionne, with the highest level of approval at FCA NV and FCA, centrally orchestrated and later attempted to conceal the fraudulent scheme as alleged herein.

18.     **UAW-Chrysler National Training Center ("NTC"):** Non-party NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were inherited by FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA. The governing body of the NTC is known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's Chrysler Department serve as Co-Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board is made up of senior officials from FCA and the UAW.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

19.  **Michael Brown:** Brown is a Michigan resident who was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national CBAs between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Second Amended Complaint, Brown was an agent of Chrysler and/or FCA.

20.  **Dennis D. Williams:** Williams served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010 to 2014). Prior to 2010, Williams served on the UAW International Executive Board as the Director of Region 4 (2001 to 2010) during which time he had direct dealings with Sergio Marchionne in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction equipment, which is commonly controlled by Exor NV. On August 27, 2020, the United States Attorney for the Eastern District of Michigan charged Williams with conspiracy to embezzle union funds in violation of 18 U.S.C. § 371 and 29 U.S.C. § 501(c). Williams pled guilty on September 30, 2020 and was sentenced to twenty-one months imprisonment on May 11, 2021 and assessed $132,000 in restitution.

21.  **Joseph Ashton**: Ashton served on the UAW's executive Board from 2006 to 2014, most recently as Vice President of the UAW's GM Department from 2010 to 2014, and previously as the Regional Director for Region 9 from 2006 to 2009. Following his time at the UAW, from 2014 to December 2017, Ashton served as the UAW Trust's designee on New GM's Board of Directors. In December 2017, Ashton abruptly resigned that position. On December 4, 2019,

Document received by the MI Wayne 3rd Circuit Court.

11

**EXHIBIT 12**

Ashton pled guilty to conspiracy to commit honest services wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h). On November 17, 2020, Ashton was sentenced to thirty months imprisonment and is currently incarcerated at FCI Fairton in New Jersey.  On September 14, 2020, GM sued Ashton in the United States District Court for the District of New Jersey for his breaches of fiduciary duty and related frauds while serving as a director on New GM's Board.

22.  **General Holiefield:** Holiefield (deceased in 2015) served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA on behalf of tens of thousands of FCA employees represented by the UAW. From 2007 to 2014, Holiefield also served on the UAW Executive Board. During much of the Holiefield leadership years, executives of Chrysler/FCA violated the Labor Management Relations Act by bribing Holiefield and his staff. Millions of dollars from Chrysler/FCA were diverted through NTC and LTLOF to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

23.  **Norwood H. Jewell:** Jewell is a Michigan resident who served on the UAW's Executive Board from 2011 to 2017, most recently as the UAW's Vice President of the FCA Department (2014–17) and previously as Regional Director (2010–14). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371. Jewell admitted to using funds from the NTC for personal benefit, as part of a "culture of corruption" between UAW leaders and executives at FCA,

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

and to receiving "things of value from persons acting in the interest of FCA."[10] Jewell was sentenced to fifteen months in prison.

24.    **Virdell King:** King was a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371. King admitted to participating in a scheme through which she, and other UAW leaders, took and received "money and things of value from persons acting in the interest of FCA."[11] King was thereafter sentenced to prison and a $5,500 fine.

25.    **Nancy Johnson:** Johnson was the top administrative assistant to Jewell, then the UAW Vice President for the Chrysler department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On July 23, 2018, Johnson pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371. Johnson admitted to participating in a scheme through which she, and other UAW leaders, took and received "money and things of value from persons acting in the interest of FCA."[12] Johnson was then sentenced to one year and one day in prison and a $10,000 fine.

26.    **Keith Mickens:** Mickens was a senior official in the UAW Chrysler Department from 2010 through 2015. In 2011, Mickens served on the UAW committee responsible for negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy

---

[10]    Jewell Plea Agreement at 2-3.

[11]    V. King Plea Agreement at 3.

[12]    Johnson Plea Agreement at 2-3.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

to violate the Labor Management Relations Act, 18 U.S.C. § 371. Mickens admitted to participating in a scheme through which he, and other UAW leaders, took and received "payments, money, and things of value from persons acting in the interest of FCA."[13] Mickens was thereafter sentenced to one year and one day in prison and a $10,000 fine.

27. **Wilson's Diversified Products:** Upon information and belief, Wilson's Diversified Products, LLC ("Wilson's Diversified Products") is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Wilson's Diversified Products is owned and controlled by Morgan.

28. **Monica Morgan Photography:** Upon information and belief, non-party Monica Morgan Photography, LLC is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Monica Morgan Photography is owned and controlled by Morgan.

29. **Leave the Light on Foundation ("LTLOF"):** During much of the relevant time period, non-party LTLOF was a Michigan tax-exempt organization with a principal place of business in Detroit, Michigan, controlled by Holiefield. Numerous co-conspirators served as officers and directors of LTLOF, including Keith Mickens (Vice President and director), Jerome Durden (Treasurer and director), and Virdell King (director).

30. **Linda Knoll**: Knoll served as the Chief Human Resources Officer for FCA NV, a position she has held from 2011 until 2021, and previously served concurrently in the same role at CNH Industrial NV, another company controlled by Exor NV, where Marchionne was the Chairman of the Board until his death. Ms. Knoll also sat on the Group Executive Counsel of FCA,

---

[13]   Mickens Plea Agreement at 3.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

which is the highest operational body within FCA. In this role, Ms. Knoll is reportedly responsible for overseeing the entirety of FCA and FCA NV's human resources function, including "organizational development, talent management, compensation and benefits, employee relations, and compliance and staffing."[14]

31.     **Peter Glenn Shagena**: Shagena took over as the Vice President of Employee Relations at FCA in 2015, when Iacobelli left. Shagena also served on the NTC Joint Activities Board beginning in 2015. In this role, Shagena was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW and resolving disputes and grievances that arose under the CBAs between Chrysler/FCA and UAW. Shagena became Director – Group Human Resources Manufacturing at Chrysler, LLC in 2007. In 2009, he became the Director of Human Resources, Manufacturing/World Class Manufacturing. In that role, he joined the NTC board and led Chrysler's labor relations efforts, including the rollout of World Class Manufacturing ("WCM") at all of the Company's manufacturing operations. In 2013, he became Director of Human Resources at FCA Mexico before returning in June 2015 to become the Vice President, Head of Employee Relations for FCA Group in North America (effectively assuming Iacobelli's prior role).

32.     **Colin Lightbody**: Lightbody previously served in the labor department at FCA (and previously Chrysler) from 1998 until his retirement in 2018 and reported directly to Iacobelli for many of those years. From 2014 to 2018, Lightbody was the Director of Labor Economics for FCA, with a substantial role in directing negotiations with the UAW. Lightbody described his role at that time as "[f]or many years, provid[ing] strategic guidance to and work[ing] directly with the

---

[14]   https://www.fcagroup.com/en-US/group/governance/management/Pages/ linda_Knoll.aspx

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

late FCA Chief Executive Officer, Sergio Marchionne." Since retiring from FCA, Lightbody has started his own consulting company, while also publishing blog posts concerning various collective bargaining topics.

## JURISDICTION AND VENUE

33.     This court has subject matter jurisdiction over this dispute under MCL § 600.605.

34.     Venue is proper in this Court under MCL § 600.1629(1)(a) because the original injury to GM occurred in this county and Defendants have conducted and conduct significant business in this county, including through substantial manufacturing operations in the county. Venue is also proper in this Court under MCL § 600.1629(1)(b) because the original injury to GM including the harm and damages it suffered occurred in this county and GM resides and has a place of business in this county.

35.     The Court has personal jurisdiction over FCA and FCA NV for several reasons. The Court has personal jurisdiction over FCA under MCL § 600.711 because it carries on a continuous and systematic part of its general business within Michigan such that it is essentially "at home" in Michigan. Indeed, FCA is headquartered in Michigan. In addition, FCA and FCA NV design, engineer, manufacture, distribute, and sell vehicles in the U.S. and Michigan under brands such as Chrysler, Jeep, Dodge, and Ram. As described herein, FCA and FCA NV have engaged in and authorized a decade-long conspiracy occurring principally in Michigan, directed to harm GM, which is headquartered in Wayne County, Michigan. FCA NV's actions directed towards Michigan, including towards Detroit, Michigan, included the bribing of Michigan residents and routing bribes through the NTC, which is headquartered in Michigan. Thus, the Court has personal jurisdiction over FCA and FCA NV under MCL § 600.715, because they have transacted business within the state of Michigan; own, use, and possess property within the state

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

of Michigan (including FCA's headquarters); and did or caused to be done things in the state or from which consequences were felt in this state, which give rise to the causes of action in this case.

36.     The Court has personal jurisdiction over Iacobelli and Durden for several reasons. The Court has jurisdiction over Iacobelli and Durden under MCL § 600.701 because they are domiciled in Michigan. The Court further possesses personal jurisdiction over Iacobelli and Durden under MCL § 600.705, because during the relevant time period, they transacted business within the state of Michigan, and did or caused to be done things in this state or from which consequences were felt in this state, which give rise to the causes of action in this case.

## PROCEDURAL HISTORY

37.     Based on many of the same underlying factual allegations contained in this Complaint, GM brought suit against Defendants in November 2019 in the United States District Court for the Eastern District of Michigan. In that suit, GM alleged federal law claims based on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as state law claims for unfair competition and conspiracy. The state law claims for unfair competition and conspiracy were brought in federal court based on supplemental jurisdiction.

38.     On June 15, 2020, after briefing on the defendants' motion to dismiss was complete but prior to any hearing or substantive rulings, the District Court entered an order declining to exercise supplemental jurisdiction over the state law claims. The order stated that trying the state and federal law claims together "would create insurmountable, confusing, and prejudicial spillover-evidence issues, and also create jury confusion that instructions could not cure."[15] The District Court thus exercised discretion to decline supplemental jurisdiction pursuant to 28 U.S.C.

---

[15]   6/15/20 Order at 2.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

§ 1367(c)(4). GM thus brings this suit to assert its state law causes of actions based on Defendants' wrongdoing.

39.     After declining to exercise jurisdiction on the state law claims, the District Court granted defendants' motion to dismiss GM's federal law RICO claims. The District Court determined that, under the specific proximate cause standard for federal RICO claims, GM's complaint did not sufficiently allege proximate causation between the admitted wrongdoing of FCA and FCA NV's agents on the one hand, and the harm to GM on the other. The District Court's ruling on this RICO-specific causation issue, which GM is appealing, does not have any bearing on the state law claims brought in this suit. GM's appeal to the United States Court of Appeals for the Sixth Circuit is pending.

## DETAILED ALLEGATIONS

### I.     OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER.

#### A.     <u>Financial Crisis Threatens U.S. Auto Industry</u>

40.     In or about 2008, in the midst of the worst financial crisis since the Great Depression, the automotive industry faced a major crisis. The industry had been weakened by, among other things, rising gas prices, which drove consumers away from trucks and SUVs, and competition from foreign automakers with lower labor costs using non-unionized labor. Sales dramatically declined. By 2008, the situation had turned critical, as a once-in-a-generation credit crunch nearly took down the world economy and wreaked havoc on the auto industry.

41.     Suffering several consecutive quarters of losses, in late 2008, the U.S. auto manufacturers turned to the government for assistance. The U.S. Department of the Treasury injected funds in General Motors Corporation ("Old GM") and Chrysler through the Troubled Asset Relief Program ("TARP"), but it served only as a stopgap.

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

42.     Chrysler filed for Chapter 11 on April 30, 2009. Old GM followed approximately a month later.

43.     Because the UAW represented 99 percent of Old GM's unionized employees and the government's provision of any additional TARP funds was conditioned on a new collective bargaining agreement that, in part, needed to set forth labor costs competitive to Japanese transplants (*e.g.*, Toyota, Nissan, and Honda), UAW leadership could slow down and potentially block the entire transaction.

**B.     Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler**

44.     At the same time in Europe, Fiat faced declining sales and a deepening economic crisis. In September 2008, Marchionne told his executive council, "Fiat needs to radically change its alliance strategy. We've done everything we can on our own. If we're going to survive this one, we need a partner."[16]

45.     Fiat needed an opportunity to enter the U.S. marketplace and recognized one in the financial crisis of the U.S. auto industry. Marchionne realized that the Old GM and Chrysler bankruptcies "were changing the game. All of the issues that had plagued the industry—its overcapacity, its poor use of capital, its inefficiency, the crushingly high cost of investment for new models—were now going to become unsustainable."[17] A "deal with Chrysler [could] be seen as part of a series of 'strategic partnerships' [that Fiat had] sealed with other automakers in recent

---

16   JENNIFER CLARK, MONDO AGNELLI: FIAT, CHRYSLER, AND THE POWER OF A DYNASTY 244 (2012) ("MONDO AGNELLI").

17   *Id.*

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

years."[18] Fiat's would-be "partner" was in the U.S., and the UAW was Fiat's bridge to establish a domestic footprint given the UAW's significance in the U.S. automotive market.

46.     Marchionne, on behalf of Fiat, sought that critical connection—what appeared to outsiders as an alliance with UAW leadership—to help further Fiat's bid to acquire Chrysler. Marchionne quickly made the head of the union's Chrysler Department, Holiefield, a strategic partner and soon thereafter "a true friend."[19] Former UAW leadership, and Holiefield in particular, became Marchionne's main cohorts in Fiat's business plan even while he explored a collaboration with Chrysler. "If the union would come around to the view that the Fiat-Chrysler partnership was the only way to keep the company from going bust, maybe it would throw its weight behind Fiat when it came time for talks to start at the Treasury."[20]

47.     In early 2009, Marchionne and his team met with Holiefield and another UAW official in advance of any formal talks with the government.[21] This meeting laid the groundwork for a UAW-Fiat alliance ultimately secured through a sophisticated bribery scheme.

48.     While Marchionne was in active discussions with the UAW, on March 30, 2009, the government gave Fiat and Chrysler only 30 days to reach an agreement.[22]

---

[18]   Jeff Israely, *Fiat to Take 35% Stake in Chrysler*, TIME (Jan. 20, 2009), http://content.time.com/time/business/article/0,8599,1872719,00.html.

[19]   Sergio Marchionne, *Eulogy for General Holiefield* (Mar. 17, 2015), https://media.fcanorthamerica.com/pdf.do?id=16436. ("*Eulogy for General Holiefield*").

[20]   MONDO AGNELLI at 247.

[21]   *Id.*

[22]   The White House, *Remarks by the President on the American Automotive Industry* (Mar. 30, 2009), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-american-automotive-industry-33009.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

49.     Fiat began demanding what it needed from a new Chrysler-UAW CBA. Marchionne wanted the UAW to commit to support a manufacturing system called WCM. According to Marchionne, WCM "aims to ensure that the FCA Group's facilities are flexible and competitive with the best in the world."[23] "It broke down the union's rigid job classification system with its strict hierarchy and boundaries about who could do what."[24] In Marchionne's view, it "got rid of an excessive cost structure, and it created efficiency."[25] As instructed by Fiat, Chrysler, and UAW officials, including Holiefield (on behalf of the UAW) agreed to Marchionne's demand to implement WCM.

50.     Marchionne also wanted to use more temporary employees in place of hourly workers. While Holiefield publicly claimed that he "would have to take [his] family and leave town if [the UAW] agreed to that," he quickly came around to Marchionne's ideas.[26] UAW leadership agreed to lift any cap or restraint on Tier Two workers until 2015. Tier Two workers are less senior employees who have a lower wage structure than Tier One workers, have a different health plan, and are provided with a 401(k) plan instead of a defined benefit pension. They are therefore a less expensive labor source than Tier One workers.

---

[23]  FCA, *Global Quality Through World Class Manufacturing*, https://www.fcagroup.com/enUS/media_center/insights/Pages/wcm_global_quality.aspx.

[24]  MONDO AGNELLI at 259.

[25]  *Id*.

[26]  *Id*. at 258, 260.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

51.     "Marchionne's goal overall was to have as few constraints as possible in his ability to operate Chrysler when it came out of bankruptcy. He wanted to save Chrysler, take it public, pay everyone back, and move on."[27]

52.     Holiefield thus formed a long-term "partnership with Marchionne to help revive the company."[28] As Marchionne relayed, Holiefield was a "true partner and a key force behind the transformation of [Chrysler]."[29]

**C.      FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW**

53.     In June 2009, Chrysler had emerged from bankruptcy with Fiat owning 20 percent of its equity. This was a coup for Fiat, as it had only contributed intellectual property and know-how, and no actual money. Fiat also obtained operating control over Chrysler, and Marchionne became its CEO.

54.     Through the Chrysler bankruptcy, the UAW, through the UAW Trust, emerged as the majority owner of Chrysler, owning 55 percent of the equity. Additionally, the UAW Trust received a note payable for $4.6 billion at 9 percent interest and the right to appoint a director to Chrysler's Board. Fiat was given the right to purchase 40 percent of the UAW Trust's equity interest in Chrysler.

55.     From bankruptcy, the UAW Trust also became the largest shareholder of New GM, obtaining 17.5 percent of the equity, and receiving a $2.5 billion note, 260 million shares of

---

[27]   *Id*. at 260.

[28]   Joseph Szczesny, *Late UAW Vice President Leaves Tarnished Legacy*, WARDSAUTO (Aug. 4, 2017), https://www.wardsauto.com/industry/late-uaw-vice-president-leaves-tarnished-legacy.

[29]   *Eulogy for General Holiefield*.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

preferred stock, warrants to purchase 45.5 million shares of New GM stock, and the right to appoint a director to New GM's Board.

56.     As Iacobelli and Durden have admitted, starting no later than July 2009, merely one month after Chrysler emerged from bankruptcy, Iacobelli, Durden, and other FCA and FCA NV officials began to transfer hundreds of thousands of dollars of Chrysler funds to Holiefield (and likely others). Iacobelli and Durden were central to this scheme and have pled guilty to their involvement. As stated in Iacobelli's indictment, these illegal payments were "viewed . . . as an investment in 'relationship building' with UAW Vice President Holiefield."[30]

57.     For example, Holiefield's charity, LTLOF, received hundreds of thousands of dollars in furtherance of FCA's anticipated "high value/high leverage programs" with the UAW.[31] These bribes, well known among FCA and FCA NV management and certain former UAW leaders but kept secret from GM and the public, helped fuel the start of a wide-ranging and long-lasting conspiracy that included funds from NTC and also the establishment of foreign bank accounts, described in detail herein.

58.     In addition to authorizing the bribes through the NTC, Marchionne personally rewarded Holiefield for his assistance. For example, in February 2010, Marchionne, acting as an agent of FCA NV and FCA, gave Holiefield a custom-made Terra Cielo Mare watch worth several thousand dollars. Marchionne sought to conceal the bribe by "declar[ing] the goods at less than

---

[30]   7/26/17 Iacobelli Indictment, at 13.

[31]   *Id*. at 10.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

fifty bucks."[32] It was reported that Marchionne then lied about the gift when questioned about it by federal investigators several years later.[33]

## II. DEFENDANTS FUNNEL MILLIONS TO THE UAW AND CERTAIN FORMER UAW LEADERS.

59.  In July 2009, FCA senior executives and agents, including Iacobelli and Durden (with the knowledge and approval of Marchionne on behalf of FCA NV), began a long-running intentional scheme of improper payments to certain UAW officials, funneled through the NTC and through foreign financial institutions, to influence the collective bargaining process. Speaking with DeLorenzo, Iacobelli described the NTC as a slush fund for payments to the UAW and the scope of the payments to the UAW as "simply incomprehensible."[34]  The payments included monthly stipends to UAW leaders and members of approximately $250,000, along with substantial expenditures beyond these monthly amounts.[35]

60.  Even focusing solely on the payments that have been expressly admitted in criminal pleadings, the amounts paid are substantial. To begin, FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW."[36]  As Durden has admitted, as controller of the NTC, he facilitated illegal payments to UAW leaders as directed by Iacobelli and helped

---

[32]  7/13/18 Iacobelli Plea Agreement, at 8.

[33]  Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

[34]  DeLorenzo Decl. at ¶

[35]  *Id*.

[36]  5/25/18 Brown Plea Agreement, at 3.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

conceal those payments as well. Specifically, Durden has admitted that, starting in 2009, he knowingly "conspired and agreed" with Iacobelli, Holiefield, and others, "to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others."[37] "During the course of the scheme, Jerome Durden and his co-conspirators diverted more than $4.5 million from [the NTC] to purchase a luxury Ferrari automobile, to pay off the mortgage on a personal residence, to install a swimming pool, spa, and outdoor kitchen at a personal residence, to purchase two $37,500 limited-edition fountain pens, to make home improvements, and to pay for personal credit card transactions, among other personal expenses."[38] Moreover, Durden has admitted that he concealed the illegal payments through various means including tax fraud.

61.     Iacobelli and Durden pled that the NTC made these payments, as authorized by FCA and FCA NV, to keep UAW officials "fat, dumb, and happy" and to "buy labor peace."[39] As Iacobelli further admitted, "FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW."[40] And as Brown, FCA's Director of Employee Relations and NTC Co-Director admitted, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials."[41] Then, according to plan, FCA and FCA NV used that greased relationship to control the UAW and have it impose higher costs on GM.

---

[37]   Durden Plea Agreement at 3.

[38]   Durden Plea Agreement at 3.

[39]   7/26/17 Iacobelli Indictment, at 16; 10/31/18 Durden Gov't Sentencing Mem., at 2.

[40]   8/20/18 Iacobelli Gov't Sentencing Mem., at 8.

[41]   *Id.*; 5/25/18 Brown Plea Agreement, at 4.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

62.     Iacobelli was equally clear with DeLorenzo that the central purpose of the scheme was to get leverage over the UAW, so that in negotiations FCA could gain a competitive advantage over GM through labor costs, and ultimately force a merger with GM.[42]

63.     UAW Vice President Holiefield used his personal charity, LTLOF, as one means to conceal his receipt of FCA bribes. Between July 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included FCA executive Jerome Durden and UAW officials Keith Mickens and Virdell King) transferred "more than $386,400 in funds" from the NTC to LTLOF.[43] Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS. In turn, as known by Iacobelli and Durden, Holiefield, along with his girlfriend and later wife, Monica Morgan, used the purported charitable donations for personal expenditures.  Iacobelli has further admitted that this wrongdoing was not limited to Holiefield's charity, telling DeLorenzo that UAW executive charities were generally used to funnel money to the UAW leaders.[44]

64.     As the bribery scheme grew in complexity and depth, Holiefield and Morgan, with Defendants' knowledge and assistance, used false front businesses, including Monica Morgan Photography, Wilson's Diversified Products, and even a false hospice organization, in an attempt to launder funds from the NTC and LTLOF. Between July 2009 and 2011, LTLOF paid over $70,000 to Monica Morgan Photography, purportedly for photography lessons for underprivileged children. Yet, Morgan only taught a handful of classes, cancelled most of them, and then spent the money on fancy clothes, nightclubs, and restaurants. On another occasion in 2013, the NTC paid

---

[42]   DeLorenzo Decl. at ¶ 13.

[43]   8/8/17 Durden Plea Agreement, at 6.

[44]   DeLorenzo Decl., at ¶ 18.

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

Monica Morgan Photography $13,500, purportedly for services rendered but in fact so that Morgan and Holiefield could pay off the last installment on their new in-ground pool. Between January 2011 and July 2012, the NTC transferred more than $425,000 to Wilson's Diversified Products, which Morgan and Holiefield promptly used for personal expenses, including closing costs on the purchase of a house. In 2012, Morgan then created yet another shell company to receive over $200,000 in NTC funds, along with a fake hospice to allow LTLOF to "donate" over $350,000 directly to Holiefield's and Morgan's pockets.

65.     During the course of the conspiracy, the NTC (at the direction and on behalf of Defendants, including Durden and Iacobelli) at times would directly pay the personal expenses of certain UAW officials. For example, through wire transfer, the NTC paid off Holiefield's mortgage on his personal residence in the amount of $262,219.71.

66.     To further evade detection and broaden the conspiracy, in and around 2012, FCA executives including Iacobelli began to encourage the use of credit cards, with statements sent through the U.S. mails and payments made in part using interstate wires, issued to UAW officials by the NTC so they could charge personal expenses ultimately paid for by FCA. "Iacobelli directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions."[45] Certain UAW officials used these credit cards, including Johnson, King, Mickens, and Jewell, charging, for example, $1,259.17 for luxury luggage; $2,182 for a Italian-made Beretta shotgun; $2,130 for Disney World theme park tickets; over $1,000 for a pair of Christian Louboutin designer shoes; and thousands of dollars in electronics and many more such personal items.[46]

---

[45]   8/18/17 King Information, at 11.

[46]   *See, e.g.*, Jewell Plea Agreement at 8-12 (describing specific purchases).

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

67.     FCA and FCA NV bought control of UAW leaders to ensure that their bribery scheme achieved its goal of targeting and harming GM. For example, upon information and belief, FCA NV perpetuated its ongoing scheme by not only bribing General Holiefield as alleged herein and as admitted in criminal pleas, but also bribing Dennis Williams (UAW officer 2010-2018), Joseph Ashton (UAW officer 2010-2014), and other UAW officers, by granting those individuals control over foreign financial accounts with substantial funds and other items of value.  Iacobelli confirmed that Williams, Ashton, and several other then-UAW leaders were part of the FCA scheme designed to harm GM.[47] Upon information and belief, for Williams such accounts exist in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank) in his name and the name of a business entity he controls.  As described in the DeLorenzo Declaration, Marchionne also gave Williams a valuable watch (as he did with Holiefield), along with a similar note jokingly downplaying its value.[48]  For Ashton such accounts exist or existed in Japan (Shinsei Bank) and Cayman Islands (Cayman National Bank) in his name and the name of a business entity he controls. Upon information and belief, FCA and FCA NV enabled, funded, and directed control of the above-identified accounts.

68.     FCA and FCA NV's funding of offshore accounts was not a new practice. In the past FCA NV (through predecessor Fiat S.p.A.) has admitted to using offshore accounts to bribe Italian politicians, and that these entities have the commercial power and influence to cause such banks and other facilitators to open and maintain these foreign accounts for third parties as identified herein. Plaintiffs' allegations are based, in part, on the statements of Iacobelli concerning the scope of the scheme, and the proven and admitted pattern of bribing officials in the past.

---

[47]  DeLorenzo Decl. at ¶ 20.

[48]  DeLorenzo Decl. at ¶ 3.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

Further, there is no other credible explanation for such foreign accounts in such countries and financial institutions held by this disparate yet closely connected group of individuals who are US residents employed in the US other than that they were facilitated and funded by FCA and FCA NV. The notion that a closely tied group of FCA and UAW executives would possess undisclosed foreign bank accounts unrelated to their admitted participation in a multi-year bribery scheme is simply not plausible. As alleged above, FCA NV (through predecessor Fiat S.p.A.) admittedly used foreign accounts in connection with a prior bribery scheme.

69.     Of course, this scheme to harm GM would run the risk of FCA and FCA NV employees blowing the whistle on such a scheme. To minimize that risk, upon information and belief, FCA and FCA NV provided illicit compensation to its own current and former executives to carry out the scheme to harm GM. As with former UAW leaders, this illicit compensation was provided, in part, in the form of control over foreign financial accounts that have been funded by FCA and/or FCA NV with millions of dollars. Upon information and belief, FCA and FCA NV executives who accepted compensation for purposes of executing, protecting and minimizing disclosure over the scope and depth of the scheme including targeting GM as described herein include, but are not limited to:

(a)     Alphons Iacobelli - As the former Vice President of Employee Relations at FCA (2008-June 2015) and NTC Director (2008-2015), Iacobelli executed on the scheme as directed by Marchionne and his superiors. Iacobelli admitted in his sentencing memorandum that the corruption at issue was perpetrated by "FCA executives." FCA NV compensated Iacobelli extremely well for his role in the scheme, including providing him with control over millions of dollars held in financial accounts in Switzerland

Document received by the MI Wayne 3rd Circuit Court.

29

**EXHIBIT 12**

(UBS and Credit Suisse), Italy (Deutsche Bank), Liechtenstein (VP Bank Vaduz), and Singapore (DBS Bank) both directly, through family, and through a corporate entity he controls.

(b)     Jerome Durden - As the controller of the NTC and a Secretary of the NTC Joint Activities Board (2008-2015), who facilitated many of the direct payments to the UAW, FCA NV provided Durden with control over funds in financial accounts held in Liechtenstein (LGT Bank Vaduz) and the Cayman Islands (Cayman National Bank). These accounts are held in his name or the business entity that he controls. When sentenced for his involvement in the scheme, Durden represented to the Court that he did not benefit from the scheme in any financial respect. That representation, made in connection with seeking a lighter prison sentence, is contrary to the compensation provided in the referenced foreign accounts.

(c)     Colin Lightbody - Lightbody was the Director of Labor Economics at FCA (2014-2018) until he retired at age 56. In that role and his predecessor roles at FCA, he reported directly to Iacobelli and helped him carry out the scheme. FCA NV provided Lightbody with control over a Luxembourg financial account (Fortuna Bank) to pay for his role in executing and covering up the scheme. To help mislead after the scheme began to come to light, on December 12, 2019, Lightbody injected himself into the issue by publishing a misleading blog post that purported to analyze the reason that

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

FCA had an $8-an-hour advantage over GM in labor costs.[49] In that blog, drafted and made available on the internet to help fulfill his end of the bargain for the funds provided to him in the Luxembourg account, he intentionally omitted his knowledge of the bribery scheme and the secret agreement that FCA would not be held to the reinstatement of the 2015 cap as alleged herein.

(d)     Linda Knoll - Knoll was the long-term Chief Human Resources officer for FCA NV and reported directly to Marchionne. In that position and given her role on the Group Executive Council of FCA, Knoll not only had direct knowledge of the scheme alleged herein, but also was used to minimize and prevent employees from becoming "whistleblowers." For example, when an FCA executive came forward and publicly disclosed the FCA national fraudulent sales scheme and assisted the SEC with its investigation into that scheme as alleged herein, Knoll led the retaliation against that employee including withholding compensation from him. For her role in executing and covering up the scheme, FCA NV provided her with control over financial accounts in at least Luxembourg (Lombard Odier Europe) and Switzerland (Banquet Pictet & Cie SA).

(e)     Peter Glenn Shagena - Shagena served as an NTC Director and Director of Labor Relations for World Class Manufacturing through much of the

---

[49]     *See* Colin Lightbody, "Why does FCA have an $8 per hour competitive labor cost advantage over GM?" (Dec. 12, 2019) https://hrandlaborguru.com/blogs/news/why-does-fca-have-an-8-per-hour-competitive-labor-cost-advantage-over-gm.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

conspiracy period, reporting directly to Iacobelli. In that role, he was responsible for leading labor relations efforts, including the rollout of World Class Manufacturing at all of FCA's manufacturing operations. He also played a key role on FCA's negotiations teams. When Iacobelli retired in June 2015, Shagena replaced him as the Head of Employee Relations for North America. Upon information and belief, FCA NV compensated Shagena for his role in the conspiracy including facilitating bribery of the UAW leaders and ensuring that he did not reveal the conspiracy. This compensation included funding one or more financial accounts for Shagena in one or more Swiss financial institutions (UBS Geneva and Itau Private Bank).

**B.    Evidence of the Existence and Control Over Foreign Accounts.**

70.    Through substantial investigative effort, GM has developed evidence of the existence and control over foreign accounts by Defendants and other individuals involved with the FCA bribery scheme detailed herein.  As part of this effort, GM retained the services of GreyList Trace Ltd ("Greylist"), a UK-based investigative service.  GreyList uses proprietary technology to determine whether a specific email address has an existing relationship with a financial institution.

71.    International financial institutions universally use email addresses to register bank accounts, and when an email address is associated with an account, the financial institution will "whitelist," or approve, that address in the banks' spam filter.  Emails from addresses that are whitelisted or recognized and approved in a bank's email system are authorized and quickly allowed to pass through the banks' spam filter, while email addresses that are wholly unknown (or "greylisted") by a bank's email system will require further investigation and thus be delayed. GreyList's method sends out a digital code reflecting a given email address to investigate the spam

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

filters of various financial institutions, and its algorithm can measure the difference in the amount of time that the financial institution's spam filter takes to review an email to determine whether the email address is whitelisted/approved and thus has a preexisting relationship with that financial institution.

72.     As soon as this timing difference is detected, the string of code reflecting the email address destroys itself.  Neither the code nor anything else ever enters the bank's servers.  For those reasons, GreyList's methodology cannot do any more than indicate that a relationship exists between the financial institution and the email address.  Based on its substantial sampling and testing, GreyList's algorithm generates hits with an accuracy of 98%.

73.     In 2021, GreyList's algorithm discovered banking connections between Jerome Durden and Joseph Ashton at Cayman National Bank, and between Alphons Iacobelli and several foreign financial institutions including the DBS Bank Ltd. in Singapore, VP Bank AG in Liechtenstein, and the Deutsche Bank in Bologna, Italy.

74.     GreyList's analysis and results provide clear evidence that Iacobelli, Durden, and Ashton possess ownership or other interests in accounts maintained at foreign financial institutions at which they would have no reason to maintain accounts other than their connection to the schemes at issue in this litigation.

## III.    FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW LEADERS TO DAMAGE GM.

75.     Starting in July 2009 and continuing through at least 2015, in return for FCA and FCA NV's bribes facilitated by Iacobelli and Durden, certain corrupt members of UAW's senior leadership in place at the time, including Ashton, Williams, and Holiefield, began providing Chrysler with labor programs that provided it with cost advantages over GM, while denying GM the ability to implement similar programs. Based on the UAW's stated preference of engaging in

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

pattern bargaining, GM had a reasonable expectation that it would not be denied structural labor benefits as a result of bribes paid by FCA to withhold such benefits from GM—the goal of the conspiracy was to ensure that GM had a higher cost structure than Chrysler and later FCA. This CBA favoritism purchased through the bribes, as FCA and FCA NV intended, inflicted massive direct damage upon and weakened GM in the form of higher labor costs by denying GM the concessions made to FCA, which GM had a reasonable expectation of receiving. As a result of these bribes, GM faced substantially above-market on average labor costs.

76.     As a senior labor executive at FCA and top negotiator with the UAW, Iacobelli was also directly and centrally involved in reaching these arrangements with the UAW. He also ensured, through his continued directing of payments to UAW leaders, that GM was denied such benefits.

77.     For example, at the time of the 2011 CBA, Chrysler and the UAW (through Iacobelli and Holiefield) documented their joint commitment to WCM, which was a "full-fledged partnership." They agreed that it was "of critical importance that WCM be jointly implemented systematically and fully in order to operate successfully and thereby position [Chrysler] and the [UAW] firmly among the winners of the global automotive manufacturing community."[50] As directed by FCA and FCA NV to the UAW, including Williams and Ashton, the UAW denied GM the same labor flexibility and efficiency enhancement with respect to its manufacturing operations. The UAW's agreement to implement these more efficient labor programs at FCA did not harm any individual FCA-UAW employees—as the programs did not impact the individual wages of any given worker or curtail the benefits received.

---

[50]   Letter from A. Iacobelli, Chrysler Group LLC, to General Holiefield, International Union, UAW, World Class Employee Participation (Oct. 12, 2011).

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

78.     As described below, in 2014, in a secret Memorandum of Understanding ("MOU") negotiated outside of the collective bargaining process, the UAW again committed to support FCA's WCM program. Given Iacobelli's role at FCA during this time, he would have been directly involved in the negotiation and implementation of this agreement between the UAW and FCA.

79.     In October 2015, in a letter attached to the FCA-UAW CBA, FCA and the UAW (through Jewell, another recipient of FCA bribes) once again agreed that "the need for unit flexibility to address fluctuating workloads is essential," and committed to "continue to support the full implementation of [WCM], New Hire Entry Level Wages and Benefits, and significant efficiency improvements." To that end, they committed to "the flexible utilization of [the] salary workforce," including: (a) that there may exist "[i]nefficient work rules and work practices . . . within the salary bargaining units," (b) "[t]he flexible use of the salary bargaining unit workforce can perform within classifications and departments, across classifications and departments, within units, across units, and within locals," and (c) "[t]he parties agree to discuss any opportunities to assign work across locals provided there is mutual agreement between the parties and a positive business case for keeping the work in-house."[51]

80.     As FCA and FCA NV had directed through its bribery executed by Iacobelli and Durden to certain corrupt UAW officials, the UAW, through Williams and Ashton, among others, denied these benefits to GM, at the direction of FCA and FCA NV. GM made repeated efforts to collaborate with UAW leaders to agree upon and implement the parameters of GMS, an efficiency improvement program that would have been on par with WCM. For example, during a meeting on August 13, 2014, officials in the UAW's GM Department acknowledged that WCM was a superior

---

[51]    Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Salary Bargaining Unit Flexibility (Oct. 22, 2015).

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

program, in part, because Chrysler management (specifically Marchionne) and the UAW worked closely to ensure it was a joint effort. UAW leadership failed to disclose that union support for FCA's WCM was, in part, purchased through bribes. Moreover, UAW leadership and GM discussed that "[t]here needs to be an effort for the UAW and GM leadership to go through each element of GMS and together gain buy-in from the manufacturing managers and UAW members," and that "GMS cannot have the same success of WCM without the involvement of UAW members." But for FCA and FCA NV's bribery facilitated and carried out by Iacobelli, Durden, and others, the UAW would have worked to implement GMS in earnest with GM. Implementation of the advantages provided to FCA would have allowed GM and the UAW to work collaboratively to increase the efficiency of GM's production process, ultimately benefiting GM and the UAW members (both through an increase in profit sharing payments and in the overall health of GM).

81.    Another advantage FCA and FCA NV purchased through bribery related to "Tier Two" employees. As of the 2007 CBA, Chrysler, GM, and Ford employed both "Tier One" and "Tier Two" employees. As described above, Tier Two workers are less expensive employees who have a lower wage structure than those in Tier One.

82.    FCA and GM were initially subject to a 25 percent cap on Tier Two workers under the 2007 CBA. This cap was lifted under pre-bankruptcy addendums in 2009, but in their 2009 addendums both FCA and GM agreed to reinstate the cap six years later in the 2015 CBA. GM's 2011 CBA reiterated this commitment, stating that "the parties will mutually agree to a hiring limit based on the entry level percentage as of September 14, 2015" to "be no more than 25% and no less than 20% of the total UAW-GM hourly population." In recognition and anticipation of this 2015 Tier Two cap, GM thus kept its proportion of Tier Two workers below the anticipated 25

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

percent cap. By 2015, Tier Two workers comprised around 20 percent of the UAW membership at GM.

83.     Through the conspiracy, certain corrupt UAW leaders assured FCA that they would not insist on reinstating the Tier Two cap in 2015. Specifically, FCA had reached a "side letter" agreement not publicly available that the cap would not be reinstated, yet misled GM and the public by claiming in an October 2011 released summary of the 2011 UAW-FCA CBA terms that "the cap will be reinstated at the end of" the 2011 CBA. Based on this private understanding purchased through the conspiracy that FCA would not be subject to a Tier Two cap, FCA hired many more Tier Two workers, possessing the valuable foreknowledge that it would not be penalized by any reinstatement of the cap. By 2015, Tier Two workers made up around 42 percent of the UAW membership at FCA—double the proportion of Tier Two workers at GM. This difference purchased through the bribery scheme provided FCA with a dramatic advantage with respect to average labor costs. Meanwhile, without this inside knowledge, GM managed to the cap and incurred corresponding cost increases anticipating the 2015 cap reinstatement as required by the contract. In 2015, as FCA had been privately assured, the UAW did not insist on reinstating the Tier Two cap for FCA and, as negotiated through pattern bargaining, the cap was not reinstated for GM either. In the end, and unbeknownst to GM in advance, ultimately there was no difference between how GM and FCA were treated in the 2015 negotiations with respect to Tier Two workers (as a result of the pattern bargaining). However, GM was harmed as a result of FCA's bribery because the UAW failed to inform GM in the time period before the expiration of the 2011 CBA that this cap would not be reinstated. Instead, they provided that information only to FCA. But for the bribes, the UAW would have informed GM in 2011 that it did not intend to reinstate the Tier

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

Two cap as it privately assured FCA so that GM could have addressed hiring accordingly and lowered its average labor cost.

84. FCA and FCA NV, working through Iacobelli and Durden and utilizing the bribery scheme, ensured that other additional advantages were denied to GM. For example, upon information and belief, in 2014, FCA and the UAW agreed to a formulary that would make better use of prescriptions that are widely available, significantly reducing FCA's health care costs. The formulary would have saved GM up to $20 million per year. Negotiators for GM repeatedly requested FCA's more cost-effective formulary during collective bargaining, but the UAW refused to agree, indicating the term would rankle UAW leadership. This request by GM would have been granted, but for FCA's bribery. The formulary did not harm any individual FCA employee as the concession merely limited the range of prescription drugs available for any particular condition, without preventing the treatment that an individual UAW member received; to GM's knowledge, all FCA employees received, in substance, the necessary prescription drug treatment that was prescribed.

85. Taken together, FCA and FCA NV's bribery scheme bought an average hourly wage advantage that took FCA from worst to first among the Detroit-based automakers. In 2006, Chrysler had the highest average hourly labor cost. Chrysler paid $75.86 on average in wages and benefits to its work force, and Old GM paid $70.51. Chrysler, Old GM, and Ford's labor costs exceeded non-unionized foreign automaker costs by approximately 50 to 80 percent prior to bankruptcy.

86. Nancy Johnson, a former UAW official who negotiated directly with FCA representatives, recently testified in separate proceedings that the bribes paid by FCA to UAW members and leaders were intended to, and in fact did, influence the UAW's bargaining position.

Document received by the MI Wayne 3rd Circuit Court.

38

**EXHIBIT 12**

Johnson testified in a sworn affidavit that certain actions taken by former representatives of the UAW "was influenced by FCA bribes."[52] Johnson specifically noted the fact that the FCA bribery negatively affected the implementation and enforcement of the bargained-for grievance process, as well as FCA's allowed number of temporary workers and workers hired at Tier II wages. Johnson's sworn testimony corroborates GM's allegations, made in multiple prior pleadings, that FCA bribed the UAW to target GM for higher costs in the administration and the negotiation of the CBAs.

87.    Through its corruption, and bribes, FCA was able to gain an average hourly wage advantage over GM. By 2015, FCA slashed its average hourly labor costs to $47—in the range of non-unionized foreign automakers operating in the U.S.—and $8 less on average per hour than GM ($55). FCA's average hourly wage advantage continues to this day: its labor costs are on average $8 per hour less than GM. This hourly wage disparity is not due to paying FCA employees less in wages and benefits—but rather it was due to denying GM structural labor programs that would have lowered its average hourly wage rate and that GM would have received but for the bribes.

---

[52]  N. Johnson Aff. at ¶ 3-4.  Ms. Johnson's affidavit was filed on April 25, 2021 as Exhibit G to Dkt. No. 7 in Case No. 2:21-mc-50554-PDB-APP, *United States v. FCA US LLC* (E.D. Mich.).

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.



## IV. DEFENDANTS CONSPIRED WITH UAW LEADERS TO ATTEMPT A TAKEOVER OF GM BY MERGER.

88.     Sergio Marchionne held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008: "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[53]

89.     As CEO of Fiat since 2004, Marchionne had long sought a merger with GM. After failing to effect a merger in 2005, Marchionne saw another opportunity after Fiat acquired Chrysler in 2009. "[A]fter fixing Chrysler, let's . . . take General Motors and merge them together. Once and for all, let's straighten out the car industry, creating an American giant that also allows a long-term future for Fiat."[54]

---

[53]   Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, REUTERS (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idU STRE4B738Z20081208.

[54]   TOMMASO EBHARDT, SERGIO MARCHIONNE 63–64 (2019) (translated from Italian).

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

90.     A central purpose of the bribery scheme overseen by Marchionne was to harm GM by saddling it with higher labor costs thus inducing it to merge with FCA to achieve synergies and a higher return on capital. With the scheme well underway and having a desired negative effect on GM, in October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA NV proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a combination. But Marchionne remained resolute in his quest to force an FCA NV-GM combination

91.     Iacobelli confirmed that the primary purpose of the bribery scheme was to get former UAW leadership in FCA's pockets and then use that leverage to harm GM through dramatically higher labor costs and effectuate a merger.  As Iacobelli confessed to DeLorenzo, Marchionne wished to be the "little fish that swallowed the whale" in achieving an FCA-takeover of GM.[55]  In short, these statements made by Iacobelli to Peter DeLorenzo dispel any notion that FCA's scheme was simply intended to reduce FCA's labor costs to make it generally more competitive—the central intention of the scheme was to specifically harm GM in an effort to force GM to merge with FCA.

A.      **Marchionne Conspires on Behalf of FCA and FCA NV to Force a Takeover of GM by Merger**

92.     By 2013, Chrysler had only two shareholders: (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

93.     In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent. Fiat and the UAW Trust

---

[55]   DeLorenzo Decl. at ¶ 19.

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[56]

94.     In December 2013, Fiat, through Iacobelli, apparently "scripted" Holiefield for an UAW Executive Board meeting to support Fiat's goal of buying all the UAW Trust's stake. Iacobelli emailed that Holiefield would "create a dialogue pursuant to our outline" at the meeting, which, upon information and belief, involved having the UAW support a complete sale of its Chrysler interest to Fiat.[57] This scripting demonstrates the degree of Fiat's control over the UAW and its top officials.

95.     On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

96.     Although not a party to the foregoing transaction, at the same time the UAW itself entered an "enforceable" Memorandum of Understanding ("MOU") with FCA promising to "actively assist in the achievement of FCA's long-term business plan." While the agreement does not appear to have been published, the public description of it reflects no termination date. In short, this agreement was an attempt by FCA, Iacobelli, and their co-conspirators to paper over—and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

---

[56]  Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17, 2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale

[57]  7/13/18 Iacobelli Plea Agreement, at 9–10.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[58]

97.     This MOU conferred a competitive advantage upon FCA outside of the standard collective bargaining process. As stated by FCA in its Annual Report, the UAW's commitments under the MOU were of a "unique nature," though FCA of course hid that it was the result of the bribes. Through its bribery executed by Iacobelli and Durden, control of the UAW, and operation of the NTC, FCA ensured that UAW leadership conferred these unique advantages only on FCA and, as alleged herein, denied the same to GM to make sure that GM had higher costs.

98.     Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne as CEO of the combined entity.[59]

99.     After taking full control of Chrysler, Marchionne set his sights on forcing a merger with another one of the "Big Three" North American automakers. Given the ownership structure of Ford, with the substantial share of voting power held by the Ford family, Ford would never be

---

[58]   FCA,          2014          ANNUAL          REPORT,          AT          178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_reports/files/FCA_2014_Annual_Report.pdf.

[59]   GM does not allege there was a violation of any securities law or requirement in connection with the sale and purchase of the Chrysler securities. As GM understands the facts, the ultimate selling price and terms that Fiat paid for the Chrysler shares were set following a court opinion concerning the terms of the purchase and certain third parties not impacted by the bribery scrutinized and approved the securities aspect of the transaction.

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

a viable target for Marchionne's merger ambitions. GM was the only U.S. automaker target, and thus Marchionne had long focused his sights on GM.

### B.   Williams and Ashton Are Key Players in the Takeover Conspiracy

100.    In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne turned to using his bribery scheme of the UAW to pressure GM to agree to merge with FCA.

101.    By this time, the primary UAW leaders Defendants had been bribing had either already left the UAW or were on their way out (Holiefield announced in November 2013 he would retire the following year). Yet, knowing that ongoing control of the UAW was crucial to the scheme, in 2014, Marchionne turned for support to the new UAW President, longtime friend and merger "wingman," Dennis Williams. Williams cooperated with the goals and plans of FCA and FCA NV and took affirmative steps to advance those goals as his cooperation was being purchased. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at a Fiat-affiliated truck and tractor company. Williams has affirmed that he tries "not to second-guess Sergio," and that the pair have a "very good relationship," which was secured through the bribery of Williams.[60]

102.    In addition to Williams, FCA, FCA NV, and Marchionne also turned to UAW Vice President Joe Ashton. As the Vice President for the UAW's GM Department, Ashton had the ability to directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA and, thus, that GM incurred higher costs. Iacobelli identified both Williams and Ashton as UAW

---

[60]  Michael Martinez, *UAW President: Union Monitoring FCA-GM Merger Reports*, THE DETROIT NEWS (June 18, 2015), https://www.detroitnews.com/story/business/autos/2015/06/18/uaw-monitoring-fca-gm-talks/28925955/.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

officers that actively participated in the FCA-led scheme.[61] By 2014, Williams, having proven his loyalty in support of the scheme, and FCA and FCA NV found an even more valuable use for Ashton—they chose him to be the UAW Trust's designee on New GM's Board. At that point, Ashton was well-situated to convey to FCA and FCA NV confidential GM information relating to GM's CBA negotiations and strategy including with respect to FCA NV's merger overtures.

103.     Williams was a willing co-conspirator in Marchionne's bribery and takeover scheme; some of that willingness was likely attributable to the UAW's finances. In 2013, the UAW's financial circumstances were so dire that it sold $47 million in assets and "raid[ed] its strike fund to pay operating expenses."[62]

104.     When Williams took office, he encouraged further corruption. With the full support of FCA and FCA NV, Williams directed his lieutenants and other officials to use NTC funds and credit cards for travel, dining, and other illegal purposes to improve the UAW's budget (which the officials then used, in part, for their own purposes).[63] FCA and FCA NV not only willingly abided by this Williams directive but also had the NTC pay the salaries and benefits for high-level UAW employees to work at the NTC when they performed little or no work for the NTC and worked almost exclusively for the UAW. As Nancy Johnson admitted, "[t]his directive was issued in order to reduce costs to the UAW budget from such expenditures because the UAW's budget was under

---

[61]     DeLorenzo Decl. at ¶ 20.

[62]     Tom Krisher, Associated Press, *Detroit Automakers Worry About UAW Money Struggles*, YAHOO FINANCE (Feb. 22, 2014), https://finance.yahoo.com/news/detroit-automakers-worry-uaw-money-144156521.html; Associated Press, *UAW Votes to Raise Dues for First Time in 47 Years*, CNBC (June 3, 2014), https://www.cnbc.com/2014/06/03/united-auto-workers-votes-to-raise-dues-for-first-time-in-47-years.html.

[63]     *See* Williams Information, at 6-7.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

pressure."[64] In short, Williams was not a bystander in this scheme; instead, Williams directed other UAW officials to continue the corruption,[65] and consistent with that instruction, the bribes from FCA to certain UAW officials continued after Williams assumed the UAW Presidency.

105.    By the time of the 2015 CBA negotiations, Williams had long been conspiring with Marchionne, and FCA and FCA NV effectively controlled the decision-making of Williams and other top UAW officers as alleged herein.

**C.    FCA NV Initiates "Operation Cylinder"**

106.    By 2014, FCA NV had been rejected repeatedly by GM regarding a merger between the two companies. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, FCA NV believed it was in a stronger position to force a GM merger.

107.    With Marchionne and Iacobelli as the leads, FCA and FCA NV believed that they could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world.[66] In part, for this very reason, Marchionne, on behalf of FCA and FCA NV, had authorized Iacobelli's, Durden's and others' bribery of UAW leaders. Their support was essential to the success of Operation Cylinder given that, among other reasons, the UAW could effectively block

---

[64]  7/23/18 Johnson Plea Agreement, at 9.

[65]  6/3/20 Jones Plea Agreement, at 11 (referring to Williams as "UAW Official B").

[66]  Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK            (Apr.            23,            2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

a merger under certain terms in the CBA. Marchionne, Iacobelli and Williams were well aware that the UAW wielded this veto power.

108.    FCA and FCA NV initiated its takeover plans in March 2015, when Marchionne, on behalf of parent company FCA NV, wrote to New GM's Board and management, formally proposing the merger between GM and FCA NV.

109.    GM vetted the proposal with management, its advisors, and its Board, ultimately rejecting the offer on April 14, 2015. Ashton sat on New GM's Board and thus was privy to the confidential Board discussions when GM undertook this analysis.

110.    Undeterred, two weeks later, Marchionne went public with a PowerPoint that he entitled "*Confessions of a Capital Junkie*: An insider perspective on the cure for the industry's value-destroying addiction to capital." In it, Marchionne promoted the benefits of consolidation as "too large to ignore." The deck claimed nearly $5 billion in annual savings with such a GM/FCA merger based on reduction in investments and R&D, "with no impact on number employed."[67]

111.    In the spring of 2015, as the collective bargaining process ramped up, Marchionne pursued a full-court press media strategy to achieve Operation Cylinder. He geared his strategy to apply maximum pressure at key intervals in labor negotiations, which were formally beginning that summer.

112.    Unbeknownst to GM, the U.S. Attorney had commenced an investigation by at least 2015 into corruption involving FCA, the UAW, and, in particular, the NTC. That investigation also focused on Iacobelli's actions to facilitate that conspiracy. Marchionne and his superiors at

---

[67]    FCA, *Confessions of a Capital Junkie: An Insider Perspective on the Cure for the Industry's Value-Destroying Addiction to Capital* (Apr. 29, 2015), available at https://www.autonews.com/assets/PDF/CA99316430.PDF.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

FCA NV strategically decided to oust Iacobelli as an employee, but not from the conspiracy, despite the fact that Iacobelli was its lead UAW negotiator for formal negotiations that would kick off in July 2015. In June 2015, Iacobelli abruptly resigned from FCA. Immediately thereafter, he aggressively sought employment with GM so that FCA and FCA NV could place him in a position to funnel information to his co-conspirators. As noted, FCA and FCA NV had already bought Iacobelli's, Durden's, and others' continuing role in the conspiracy through provision of the funded foreign accounts.

113.    Marchionne then assumed a role not typically undertaken by a CEO: leading labor negotiations with the UAW and his co-conspirators Williams and Jewell.

114.    On June 18, 2015, at the request of UAW President Williams, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, who relayed and championed Marchionne's merger proposition despite the fact that GM had already formally rejected it by letter to FCA NV's Chairman and CEO who had made the offer. Working at Marchionne's behest, Williams used his position as UAW President to advocate for the merger and to encourage GM to consider the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

115.    The next day, the New GM Board was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a merger and apparently had tapped Williams as FCA NV's messenger and advocate. And they were further informed that Williams relayed that Marchionne had told him the New GM Board had not seriously considered the FCA NV merger proposal—an untrue statement.

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

116. On July 13, 2015, bargaining officially commenced with the tradition of "handshakes" between UAW leadership and the three Detroit automakers.

117. Hugging Williams at the FCA-UAW "handshake" ceremony, Marchionne signaled that consolidation was his goal in the negotiations, exclaiming that, "[w]hatever happens in terms of consolidation, it would never be done without the consent and support of the UAW. It's that simple."[68] Williams, Jewell, and other UAW officials celebrated that night with an $8,000 plus meal at the London Chop House—illegally paid for by FCA through the NTC.[69]



Marchionne Hugging Williams at "Handshake" Ceremony[70]

---

[68] Daniel Howes, *Marchionne's Merger Quest Not Over*, THE DETROIT NEWS (July 27, 2015), https://www.detroitnews.com/story/business/columnists/daniel-howes/2015/07/27/howes-marchionnes-merger-mania-lives-despite-gm/30766303/.

[69] 12/12/18 Johnson Gov't Sentencing Mem., at 4–5.

[70] *See* Alexa St. John, *Marchionne Didn't Disclose Expensive Watch Given to UAW Leader, Report Says,* AUTOMOTIVE NEWS (Aug. 16, 2018), https://www.autonews.com/article/20180816/OEM/180819869/marchionne-didn-t-disclose-expensive-watch-given-to-uaw-leader-report-says.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

118.     As noted, Marchionne (with the active participation of Iacobelli and Durden) had purchased the support of the UAW to support a merger with GM because of the UAW's ability to object to such a merger. FCA and GM had signed documents with the UAW stating that they would "not . . . partially or wholly sell, spin-off, split-off, consolidate or otherwise dispose of in any form, any . . . asset or business unit of any type, constituting a bargain unit under the Agreement."[71] FCA secured the UAW leadership's support for a merger—worth billions to FCA—through the payment of bribes.

119.     Between July and mid-September 2015, GM bargained with the UAW through its subcommittees. The New GM Board gave its negotiators authority to negotiate within a particular range.

120.     During these negotiations, Williams gave his "Presidential Demands" to GM. Based on GM's calculations, Williams's "Presidential Demands" reflected a CBA with a total cost increase of nearly a billion dollars over the 2011 CBA.

121.     Over the next couple of weeks, GM and the UAW continued to negotiate with various proposals and counter-proposals. GM made offers of increasing total cost, while the UAW was progressing down from its opening demand.

122.     Prior to September 13, 2015 and before selecting the target, the UAW had made various concessions, as had GM. The UAW had agreed to reduce their demands from the initial Presidential Demands by more than 20 percent, from the initial $1 billion demand. The UAW's

---

[71]   Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 22, 2015); *see also* Letter from Catherine L. Clegg, General Motors LLC, to Cynthia Estrada, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 25, 2015).

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

principal negotiators represented to GM that they could "sell it" to the UAW's members—that is, the deal that was on the table.

123.   During bargaining, Marchionne continued to agitate in the press for a merger between GM and FCA NV. Marchionne signaled that he would do what it would take to force a GM merger, telling *Automotive News* in an interview published on August 30, 2015: "***It would be unconscionable not to force a partner.***" When asked if that meant FCA NV would make a hostile bid, Marchionne explained, "Not hostile, [but] [t]here are varying degrees of hugs. I can hug you nicely, I can hug you tightly, I can hug you like a bear, I can really hug you. ***Everything starts with physical contact. Then it can degrade, but it starts with physical contact***."[72]

124.   A key to Marchionne's Operation Cylinder scheme was the longstanding practice of the UAW in the automotive industry of pattern bargaining, a strategy in which unionized workers across an industry attempt to force uniform terms in their contracts. The UAW describes pattern bargaining as "a core part of [its] bargaining strategy"[73] and a "powerful strategic tool."[74] Pattern bargaining is a potent force multiplier: through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams weaponized pattern bargaining to advance FCA and FCA NV's interests by promoting Marchionne's merger. FCA and FCA NV sought to leverage pattern bargaining to impose asymmetrical costs on GM, with the goal of causing harm to GM by

---

[72]   Larry P. Vellequette, *Marchionne Puts the Squeeze on GM; GM's Response: 'Why Bail Out FCA?'*, AUTOMOTIVE NEWS (Aug. 30, 2015), https://www.autonews.com/article/20150830/INDUSTRY_ON_TRIAL/308319981/marchionne-puts-the-squeeze-on-gm-gm-s-response-why-bail-out-fca (emphasis added).

[73]   UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[74]   Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

it incurring massive labor costs and making it more likely to favorably consider a merger with FCA given the synergies touted by Marchionne. In doing so, FCA NV and FCA accomplished their goal of causing massive harm to GM through the imposition of higher labor costs that FCA would not incur, making it more likely for GM to merge with FCA.

125.     Approximately every four years, each Detroit-based automaker negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same time on the same day, resulting in simultaneous negotiations. The UAW begins negotiations with each automaker through subcommittees in July.

126.     Months later, and shortly before contract expiration, the UAW selects one of the automakers as a "lead" or "target" company, with which the UAW negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike (as it proved to the cost of billions of dollars in 2019).

127.     Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[75]

128.     Because pattern bargaining is such a powerful tool, each of the participants expects and relies on good faith, arm's-length negotiations with the UAW and by their competitors. Otherwise, as here, corrupt actors can use pattern bargaining to directly harm a competitor.

---

[75] *UAW   President   Dennis   Williams   Roundtable*   (June 18, 2015),   available   at https://www.youtube.com/watch?v=bfS3EzxDXqI.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

129. While the government had imposed a "no-strike" rule at FCA and GM beginning in 2009, by the time of the 2015 negotiations, the provision was no longer in effect, making the 2015 target position particularly significant.

130. The UAW typically selects the largest and best performing automaker as the target. This practice allows the union to maximize gains by locking in terms, such as wages and signing bonuses, which can then be imposed on the other automakers through pattern bargaining. It follows that the least profitable automaker is generally the least likely target, as low profit margins make it more difficult for the union to secure favorable precedential terms.

131. In the 2011 negotiations, GM was the lead and negotiated the first tentative agreement with the UAW. But, as reflected herein, and as admitted in criminal pleas by FCA executives and UAW officials, by that time, the UAW had been thoroughly corrupted and taken over by FCA. Under ordinary circumstances with all parties negotiating in good faith, the UAW would have used its market power to force key elements of the GM deal on FCA, but under these circumstances, the implementation of the terms of the FCA 2011 CBA was, like the FCA 2015 CBA, a product of collusion between FCA and the UAW. Iacobelli was one of the primary negotiators with the UAW in that corrupt 2011 process. As noted, skirting any pattern due to the bribes, FCA reached a secret deal to ensure that in 2015 the Tier Two cap would not be re-instated.

132. When it came time for the 2015 negotiations, based on objective factors, GM reasonably believed that it would be the target again. That expectation was based on past practices and a detailed analysis of the negotiation dynamics. Industry analysts also did not consider FCA to be a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest percentage of lower-paid entry-level workers seeking higher wages," which would

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

"make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[76]

133.    On September 13, 2015, just two days before the CBAs were scheduled to expire, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between Defendants and certain UAW leaders.

134.    Informed industry analysts were not expecting UAW's selection of FCA as the lead. According to the *Detroit Free Press*, the decision "surprised analysts and industry watchers across the nation." CBS Detroit reported that "just about every analyst said that Fiat Chrysler was the least likely to be the lead company."[77]

135.    Williams had near complete control over the selection of the lead. Although the UAW nominally had a group of individuals responsible for making the selection, Williams dictated to those individuals that FCA would be chosen as the lead. Marchionne directed Williams to choose FCA as the lead, despite the fact that the UAW was near a tentative agreement with GM. As subsequently revealed, Marchionne told Williams to choose FCA as the lead in order to use the FCA pattern agreement to harm GM and force a merger between FCA and GM.

---

[76]   Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

[77]   *Id.*; *UAW Chooses Fiat Chrysler As Target in Contract Talks*, CBS DETROIT (Sept. 13, 2015), https://detroit.cbslocal.com/2015/09/13/uaw-chooses-fiat-chrysler-as-target-in-contract-talks/.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

136.    On September 15, 2015, two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[78]

137.    The economics of the deal made perfect sense to Marchionne. In his words, the "economics of the deal are almost irrelevant" because the costs of the 2015 CBA "pale in comparison given the magnitude of the potential synergies and benefits" of a combination and, to FCA's CEO, cemented a "philosophical approach that [FCA] wants to use going forward." Marchionne was referring to the combination of a merged FCA and GM.[79]



---

[78]   Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS        (Sept.        16,        2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

[79]   *2015 UAW FCA Agreement Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=YX8wWGi28rs.

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

Marchionne Hugging Williams After Announcement of Tentative Deal[80]

138.   On September 30, 2015, the UAW's FCA workforce rejected the tentative agreement negotiated by the FCA and UAW leaders.[81] Various press reports attributed the rejection to distrust of the union's leadership by its members that resulted in part from the public "hug" between Marchionne and Williams.

139.   On October 8, 2015, FCA and the UAW announced a new tentative agreement, which was ultimately approved. Just as with the first tentative agreement, the FCA-UAW CBA deal terms were structured to force enormous costs on GM. The new tentative agreement was similar to the initial tentative agreement in terms of structure and total cost.[82] As with the decision to choose FCA as the lead, and the first tentative agreement, this second tentative agreement was structured effectively as a bribe by FCA to the UAW in return for the UAW's support for FCA's hoped-for merger with GM.

140.   Not only did the 2015 FCA-UAW CBA force enormous costs on GM, but the deal was structured to particularly harm and weaken GM to further Marchionne's goal of forcing a

---

[80]   *See* Editorial, *UAW, Chrysler Deal Addresses Key Issues,* THE DETROIT NEWS (Sept. 19, 2015), https://www.detroitnews.com/story/opinion/editorials/2015/09/19/editorial-wages-union-deal/72481834/.

[81]   During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

[82]   As demonstrated by their actions with respect to the second tentative agreement, the UAW leadership recognized that the failure of the first tentative agreement was caused by the UAW's failure in messaging and process more than issues with the substance of the agreement. *See* Tracy Samilton, "UAW hopes second time's the charm for new contract with FCA" (October 9, 2015) https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contract-fca.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

merger with GM. Specifically, the 2015 FCA-UAW CBA contained large, unanticipated wage increases for Tier One employees. Such an increase had a disproportionate effect on GM as opposed to FCA given GM's larger proportion of Tier One employees (as a result of FCA and the UAW conspiring to remove the cap on Tier Two employees for FCA and giving FCA that assurance years in advance). In addition, despite the large wage increase for Tier One employees, after negotiating the pattern deal with FCA, the UAW demanded a substantially larger "ratification bonus" to consummate a tentative agreement with GM. These onerous demands and conditions were specifically tailored to, and in fact did, directly harm GM through increased labor costs. UAW-represented employees greatly benefited from this rich contract.

141.    On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval. Williams bragged that the deal was one of the "richest ever," saying "the recent bargaining process that took place on behalf of our members at FCA is a testament to the UAW's democratic values and commitment to our members."[83] No one outside of Defendants and certain UAW leaders knew that the deal was a product of a long-running, insidious fraud.

142.    At the time Williams approved of the FCA terms under which FCA was paying the UAW double their demand, UAW leaders, including Williams, and FCA and FCA NV leaders knew the federal government was actively investigating past FCA-UAW CBAs and labor agreements, and potentially other embezzlement of union funds. GM had no such knowledge. Through this "rich" FCA-UAW labor contract, Williams and corrupt UAW leaders were able to claim to the public, UAW members, and government investigators that UAW leadership had

---

[83]   Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

obtained significant FCA concessions that could then be used in pattern negotiation. Marchionne, in turn, structured and agreed to these CBA terms as a bribe to the UAW and to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers, and further his takeover scheme. This rich FCA deal also was a reward to UAW leadership for allowing FCA and FCA NV to control the UAW leaders for the past many years and had the benefit of providing a windfall for UAW members.

143.    GM, selected as the next target, reached a tentative deal with the UAW on October 25, 2015, based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern and to mitigate the damage FCA had caused, the threatened risk of a strike proved too great. As Defendants had no doubt calculated in their corrupt dealings, the economic force of pattern bargaining and threat of strike forced GM to largely concede to FCA's agreement as a pattern.

144.    The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015 and was effective as of November 23, 2015.

145.    Ultimately, despite its negotiations, GM could not and did not change the core, pattern-based economics of the final CBA between GM and the UAW. The final CBA between GM and the UAW caused GM to incur approximately $1.9 billion in incremental labor costs over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

## V.    ASHTON AND IACOBELLI PASSED INFORMATION TO FCA AND FCA NV, CAUSING HARM TO GM.

146.    In order to further defraud GM, Defendants, led by Marchionne, placed two informants at GM with access to confidential information.

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

147.     First, although many of the UAW leaders who received bribes from FCA were members of the FCA Department of the UAW, Ashton, the former Vice President of the GM Department of the UAW, also received such payments. As noted, upon information and belief and as the only reasonable inference under all circumstances, FCA and FCA NV provided Ashton with control over foreign accounts in Japan and the Cayman Islands in return for his perpetrating and not revealing the scheme against GM.

148.     As described above, a key part of the scheme was granting certain cost savings programs as described herein to FCA, while expressly denying those same programs to GM, despite GM's reasonable expectancy of receiving those programs. To carry out this scheme, Ashton's involvement, as the Vice President of the GM Department, was essential to ensure that GM did not receive the FCA structural labor programs and related advantages as described herein to impose higher costs on GM. FCA and FCA NV bribed Ashton to carry out his role in the scheme as noted herein.

149.     In June 2014, Ashton resigned as UAW Vice President for the GM Department when Williams chose him to become the UAW Trust's nominee to the New GM Board.

150.     Ashton, while serving on New GM's Board as a fiduciary, not only failed to disclose the ongoing scheme between FCA and FCA NV and the UAW, but, upon information and belief, Ashton also proceeded to pass confidential GM information to the corrupt UAW leaders and FCA and FCA NV executives. This confidential information included GM's strategies and internal positions in connection with the 2015 CBA negotiations.

151.     The specific types of information to which Ashton was privy by virtue of his service on New GM's board are extensive. In 2015 alone, a key period both for CBA negotiations and GM's response to FCA NV's merger request, Ashton received information showing detailed

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

information regarding GM's actual performance and goals for 2015; early information discussing what GM viewed as the greatest risks in the coming CBA negotiations (specifically identifying the two-tiered wage structure); much more detailed discussions of risks and opportunities from the coming CBA negotiations, including specifically discussions around the Tier Two wage structure; specific discussions of FCA's merger proposal, including GM's detailed strategies for defending against what it viewed as an unattractive proposal. Upon information and belief, based in part on the foreign accounts provided to Ashton, Ashton passed this information to the UAW and FCA, allowing both entities to tailor their approaches (both in labor negotiations and in merger efforts) to inflict maximum pressure on GM.

152.    In addition to Ashton, Defendants, again led by Marchionne, took steps to install another conspirator inside GM. In June 2015, Alphons Iacobelli abruptly resigned from FCA, despite having been at the center of the scheme for years. Although Iacobelli was no longer formally working for FCA during the 2015 negotiations, Iacobelli continued his work as part of the FCA-UAW bribery scheme. Immediately after leaving FCA, Iacobelli began reaching out to GM labor relations employees, seeking a position at the company and information about GM's 2015 bargaining with the UAW. Iacobelli then spent months courting GM personnel to hire him as the Executive Director, North American Labor Relations, a senior and critical labor position. Over multiple conversations with GM employees, Iacobelli claimed that he left FCA because he and Marchionne had different visions for the company and it was time for Iacobelli to "move on." GM relied on these representations in hiring Iacobelli. Upon reliable information and significant belief, Iacobelli in fact left FCA for a very different reason: to infiltrate GM so he could provide FCA and other conspirators with confidential GM information. GM hired Iacobelli to work in its labor relations department in January 2016.

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

153.    At that time, due to the affirmative actions of Defendants to conceal their fraud, GM did not and had no way of knowing of Iacobelli's continued involvement in the long-running scheme to harm GM. Iacobelli never disclosed the scheme or his role in it to anyone at GM. To the contrary, Iacobelli misrepresented to GM his reasons for leaving FCA in order to secure and maintain employment and further the scheme.

154.    In his employment agreement, Iacobelli acknowledged that in the course of his employment, he may become "privy to trade secrets or other confidential/proprietary information concerning GM, its parent, General Motors Company, or any of their subsidiaries and/or affiliates . . . the disclosure of which will cause irreparable harm." Iacobelli agreed not to disclose this information "to any person or entity."

155.    Further, Iacobelli agreed to adhere to GM guidelines with respect to employee conduct, including those contained in GM's "Winning With Integrity — Our Values and Guidelines for Employee Conduct" ("Code of Conduct"). Among other requirements of honest and ethical behavior, the Code of Conduct, which Iacobelli received in-person training on, forbid Iacobelli from taking or receiving bribes: "Anti-bribery laws prohibit anyone, including government officials and private individuals, from offering, accepting, receiving, or giving bribes. In some countries, facilitation payments are a common business practice, but under our Code, these are prohibited too. Violating these laws or our Code can have serious consequences for you and our company, including damage to our reputation, fines, and jail time. Follow the law, our Code, and our policies and avoid activities that even suggest something improper." Moreover, Iacobelli committed to "never accept or provide anything of value (a 'gift') that may create a conflict of interest or suggest something improper" and to "[n]ever solicit gifts or favors and refuse any gift that doesn't comply with the law, our Code, or our policies."

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

156.    As a high-ranking employee of GM, Iacobelli owed fiduciary duties to GM. Iacobelli served as Executive Director of Labor Relations for GM from January 2016 until he left his employment following the announcement of his indictment. In this capacity, Iacobelli was a senior executive overseeing all operational labor relations activities including labor strategy.

157.    As a high-level executive employee in GM's Labor Relations department with substantial oversight and involvement in CBA negotiations, Iacobelli attended labor strategy meetings with GM senior leadership, which provided Iacobelli access to confidential information concerning GM's labor approaches and strategies in the U.S. and other regions. Iacobelli often provided input to GM concerning strategy decisions involving the UAW and FCA without ever disclosing his multi-year and continuing involvement in a conspiracy with UAW officers and FCA. Indeed, in early 2016, he volunteered to assist with any renewed efforts of Marchionne to merge with GM, telling GM's management that Marchionne was "desperate and vulnerable" and that Marchionne "can't bake a cake in half the time by doubling the heat of the oven." As alleged, Iacobelli's ongoing loyalties and role in the FCA and FCA NV conspiracy had been bought and paid for through the foreign accounts. Upon information and belief, FCA and FCA NV continued to fund these accounts even after Iacobelli left FCA; Iacobelli thus used his position at GM to further the scheme to harm GM by passing to the UAW, FCA, and FCA NV the confidential labor strategy information he obtained at GM.

158.    During the last several months of his employment with GM (including when Iacobelli would have been aware that the indictment against him was going to be unsealed), Iacobelli printed an unusually high number of highly-confidential GM documents on the printer located in his private GM office.  From November 2016 through his departure from GM shortly after his July 27, 2017 indictment was publicized, Iacobelli printed an unusually and unreasonably

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

large number of documents—far beyond any reasonable limit to perform his job function in good faith.  The majority of these documents contained highly confidential and commercially sensitive information including forward-looking strategy documents, U.S. and Canada labor negotiations documents, and sensitive presentations prepared for GM's most senior management.  Several of these documents were printed to non-GM printers, and Iacobelli also used certain non-GM external drives such as "thumb drives" in connection with copying GM's highly-confidential documents.

159.    Upon Iacobelli's termination from GM, the items in his office were reviewed, and the overwhelming majority of documents printed by Iacobelli were not accounted for in his office, *i.e.*, these documents were not found in hard copy format in his office at the time of his termination and could have easily been, and upon information and belief were, distributed to a third party, including FCA and FCA N.V.   In July 2017, when Iacobelli surely knew he was under imminent indictment (his indictment became public on July 26, 2017), Iacobelli continued to print highly-confidential GM strategy documents for his use in providing value to FCA including printing such documents on a non-GM printer.  When Iacobelli printed these documents in or about July 2017, he knew he would have no business use for these documents other than providing value to third parties including FCA.

160.    Iacobelli also committed other crimes related to the conspiracy while employed at GM. For example, on March 28, 2016, Iacobelli filed a fraudulent tax return that omitted $404,504 in illicit income Iacobelli had diverted from the NTC.

161.    The placement of Ashton and Iacobelli inside GM was part of the scheme to directly target GM, causing GM to suffer direct harm from this ongoing scheme orchestrated at the highest levels of FCA and FCA NV. FCA and FC NV succeeded in driving up GM's labor costs for years.

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

## VI.  DEFENDANTS AND THEIR CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS INJURY EARLIER.

162.  Based on statements made by UAW leaders and FCA executives and employees, GM reasonably, but incorrectly, believed that FCA and FCA NV acted in good faith and negotiated agreements with UAW leadership at arm's length, including in 2011 and 2015. For example, Williams described the 2015 CBA as a "balanced" agreement that was "a testament to the UAW's democratic values and commitment to our members."[84] Similarly, UAW leaders held up the 2011 FCA CBA as proof that "cooperation and collective bargaining work."[85] In fact, the UAW recognized the importance of good faith pattern bargaining—including on October 25, 2015, the day the UAW and GM reached a tentative agreement—as it "levels the playing field so that companies compete based on the quality of their product or services and not how much they pay . . . their workers." In this way, the UAW assured, "one company cannot gain a competitive advantage over other companies with wages."[86]

163.  GM had no way to know that Defendants had conspired through bribes to key UAW officials to ensure FCA received illicit competitive advantages compared to the inflated labor costs that caused GM harm, including, as described herein, a private agreement dated as early as 2010 to avoid reinstating the 2015 cap on FCA Tier Two workers, a secret agreement to allow FCA to

---

[84]  Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

[85]  Joseph Szczesny, *Chrysler Agreement with UAW to Add 2,100 New Jobs*, DAILY TRIBUNE (Oct. 12, 2011), https://www.dailytribune.com/sports/chrysler-agreement-with-uaw-to-add-new-jobs/article_bc6b64af-c7b8-5518-874d-7d0a6caea35c.html.

[86]  UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

avoid the contractual limits on the number of temporary workers, and repeated commitments from UAW leadership to support FCA's "World Class Manufacturing" programs while rejecting GM's corollary programs.

164.   Defendants' scheme was inherently self-concealing, as secrecy was essential to perpetuate the scheme. Had Defendants' wrongdoing been exposed, Defendants would have been investigated and prosecuted criminally, bringing the scheme to an end. In addition, Defendants conspired to conceal their bribery scheme from GM (and the world), by adopting extraordinary measures to obscure the unlawful transactions. As described herein and as admitted in the criminal plea agreements, Defendants and their co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length of the scheme, Defendants' efforts successfully concealed the scheme and precluded suspicion of Defendants' conduct. For example:

(a)   FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW";[87]

(b)   The co-conspirators used false-front companies and charitable organizations run by members of the UAW to secretly funnel money to other members of the conspiracy for personal use. For example, between July 2009 and 2015, "Durden conspired and agreed with Alphons Iacobelli, General Holiefield, Monica Morgan, . . . and other individuals and entities,

---

[87]   5/25/18 Brown Plea Agreement, at 3.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

to defraud the United States by using two tax-exempt organizations [the NTC and the LTLOF] to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others";[88]

(c)     Iacobelli, Durden, Morgan, and their co-conspirators used the LTLOF to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[89]

(d)     Iacobelli (on March 19, 2015, and March 28, 2016), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e)     Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, the LTLOF, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives";[90]

(f)     In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty

---

[88]   8/8/17 Durden Plea Agreement, at 3.

[89]   7/26/17 Iacobelli Indictment, at 9.

[90]   6/13/17 Durden Information, at 6.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

bucks." [91] Marchionne then reportedly falsely denied the gift when questioned about it by federal investigators;

(g)    "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[92]

(h)    On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials."[93]

(i)    From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell and other officials. [94] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[95]

---

[91]  7/13/18 Iacobelli Plea Agreement, at 8.

[92]  7/26/17 Iacobelli Indictment, at 20.

[93]  5/25/18 Brown Plea Agreement, at 5.

[94]  4/2/19 Jewell Plea Agreement, at 3–4.

[95]  *Id.* at 13.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

(j)     Corrupted FCA executives, including Iacobelli and Durden, and UAW leaders who acted as co-conspirators in this conspiracy hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, the Cayman Islands, and others. These funds were put in these overseas accounts expressly to promote and protect the schemes described in this Complaint.

165.    It was not until July 2017, when the government announced indictments of Iacobelli, Morgan, and Durden, with charges following against King, Johnson, Mickens, Brown, and Jewell, that information was revealed that FCA had made some illegal payments to certain UAW officials although the scope and object of the scheme were not revealed until later. GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to indicate whether it might have been injured by Defendants' activity or whether it might potentially have a cause of action. At the same time, Defendants and their co-conspirators continued to take active steps to conceal their illegal scheme and its effect on GM.

166.    In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other rogue and bad actors. As has now been revealed including by the subsequent guilty pleas of both Williams and FCA, these statements were false, and were designed to evade suspicion and prevent inquiry into Defendants' illegal conduct:

(a)    On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities

Document received by the MI Wayne 3rd Circuit Court.

68

**EXHIBIT 12**

detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period*."[96] In fact, Williams himself was directly involved in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

(b)     On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[97] In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c)     Following a day later in what appear to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that ***this conduct had nothing whatsoever to do with the***

---

[96]   Dennis   Williams,   *Letter   Regarding   DOJ   Investigation*   (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

[97]   FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

*collective bargaining process, but rather involved two bad actors . . . ."*[98] Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA." In reality, Marchionne and Williams themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d)   On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, *it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements*, including the 2011 collective bargaining agreement between the UAW and Chrysler."[99]

(e)   On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating: "*[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your*

---

[98]   Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

[99]   *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

*collective bargaining agreement and no union funds were stolen or lost.*"[100]

(f)  On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[101]

(g)  On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process.*"[102]

167.  Due to the co-conspirators' concealment of and misrepresentations regarding their criminal bribery activity and its effect on the collective bargaining process, it was not until Iacobelli pled guilty on January 22, 2018, and his plea agreement was made public thereafter, that GM began to uncover some meaningful details regarding Defendants' scheme and its potential impact on GM. For example, Iacobelli's guilty plea revealed for the first time that FCA's illegal payments to UAW officials were made "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective

---

[100]  *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[101]  *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[102]  *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

bargaining agreements between FCA and the UAW."[103] Thereafter, it took substantial research and analysis to begin to discern the manner and extent to which GM was defrauded by FCA and FCA NV's illegal conduct.

168.    After thorough investigation, including witness interviews, review of publicly available information regarding criminal developments, close monitoring of the criminal proceedings against Defendants and their co-conspirators, review and analysis of internal GM documents and communications, the engagement of consulting experts, and an in-depth analysis of collective bargaining negotiations and related agreements among GM, FCA, and the UAW, GM brought suit in November 2019 against Defendants in the United States District Court for the Eastern District of Michigan.

169.    At that time, GM had no indication of Iacobelli and Ashton's continuing roles in the scheme while they were employed at GM. GM had no reasonable way of discovering that information prior to 2020 at the earliest. The criminal filings against FCA executives (including Iacobelli) were silent on Iacobelli's and Ashton's passing of confidential GM information to FCA or its co-conspirators while they were employees of GM. It was not until GM, through further due diligence, learned in 2020 upon information and belief that Iacobelli and Ashton held offshore accounts funded by FCA and FCA NV and thus Iacobelli's and Ashton's role in the scheme continued when they were employed by GM.

170.    GM did not and could not have reasonably discovered this information earlier despite due diligence. Public statements, filings, and agreements by Defendants and their co-

---

[103]  7/13/18 Iacobelli Plea Agreement, at 7. (Iacobelli pled guilty on January 22, 2018, and his plea agreement was filed the next day. Due to a scrivener's error, a corrected version was filed on July 13, 2018.)

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

conspirators—which GM reviewed—gave no indication of their illegal activity, much less its impact on the collective bargaining process and GM. To the contrary, as described above, Defendants concealed their scheme from detection through various artifices and outright lies to GM and the public intended to deceive GM and deter inquiry.

## CAUSES OF ACTION

### First Cause of Action

### Fraud

### (Defendants FCA and FCA NV)

171.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

172.    As alleged in detail above, Defendants—along with numerous co-conspirators affiliated with FCA, FCA NV, and the UAW—orchestrated a decade-long conspiracy to corrupt the collective bargaining process and labor relations and harm GM. As admitted by Iacobelli to DeLorenzo, the purpose of this scheme was to directly harm GM, in order to force GM into a merger with FCA. In addition to being liable for the actions of their employees, FCA and FCA NV are liable for the actions, omissions, and misrepresentations of their co-conspirators as a result of their ongoing conspiracy, described in detail above, to damage GM. These co-conspirators for whose actions FCA is liable includes, but is not limited to Williams, Ashton, Iacobelli, Durden, and Jewell. FCA, FCA NV, and its co-conspirators knowingly or recklessly made numerous material misrepresentations to GM. For example:

(a)    On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor department employees that his reason for departing FCA was a disagreement with Marchionne. This was a knowingly false representation. In fact, Iacobelli left FCA in an effort to

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

continue the ongoing scheme of forcing a merger from within GM, and Iacobelli made these representations to GM at the behest of and for the benefit of FCA and FCA NV leadership.

(b)     On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct, which, among other things, prohibited receiving any bribes or improper payments. This was a knowingly false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that he had accepted and would continue to accept bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM and was seeking employment at GM to further that scheme.

(c)     In 2014, when he joined New GM's Board of Directors, and each year following his appointment until 2017, through written questionnaires completed by Ashton, Ashton repeatedly made numerous misrepresentations to GM. For example, in conspiracy with FCA and FCA NV, Ashton repeatedly disclaimed in writing that he had any "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or been offered anything of value by a "third party" "in consideration" for his service as a GM director. Ashton further falsely affirmed that he "adhered" to GM' Code of Conduct, which prohibits "bribery", among other pertinent illegal activity. In addition, Ashton represented that he had "no special arrangement or understanding between [him] and any other person pursuant to which" he was

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

nominated to the Board, and that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." These representations were knowingly false. In fact, at the times Ashton made these written representations, he was engaged in an ongoing scheme with FCA and FCA NV to harm GM, including by passing confidential GM information to the UAW, FCA, and FCA NV as part of the scheme, and in return received substantial compensation from FCA and FCA NV.

(d)    On or about July 14, 2015, in a public statement made during the kickoff of 2015 CBA negotiations, FCA CEO Marchionne stated: "I'm confident we have the right leadership and right teams in place to negotiate a long-term, responsible agreement." This was a knowingly false representation. In fact, as Marchionne knew, both FCA and UAW leadership were engaged in a years-long scheme to corrupt the collective bargaining process to benefit FCA and harm GM. Rather than having the "right teams in place to negotiate a long-term, responsible agreement," leadership on both sides was corrupted and UAW leadership had been bribed to secure an agreement that was designed specifically to harm GM.

(e)    On or about September 15, 2015, in public statements relating to FCA's tentative CBA with the UAW, Marchionne stated: "I've dealt with three different UAW presidents over the past six years and I believe you are seeing a new maturity in the union's relationships with the car

41992169.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

companies. . . . I can only commend Dennis [Williams], Norwood [Jewell], and his team for having put together an incredibly professional engagement with FCA that has allowed us to bring this to a conclusion." This was a knowingly false representation. In fact, rather than reflecting "maturity" by the UAW and "an incredibly professional engagement," collective bargaining negotiations were infected with fraud and the product of a years-long scheme to corrupt the bargaining process to benefit FCA and harm GM.

(f)     On or around September 13, 2015, UAW President Williams falsely told GM's CEO that he decided to choose FCA as the lead target in collective bargaining negotiations because of FCA's advantage over GM and Ford in terms of FCA's larger proportion of lower-paid Tier Two workers. Williams falsely represented that the UAW needed to reduce the Tier Two discrepancy and thereby reduce FCA's competitive advantage. This was a knowingly false representation. In fact, Defendants had purchased the lead target position through a years-long bribery scheme between Defendants and UAW leaders. Williams chose FCA pursuant to this bribery scheme and to increase FCA's competitive advantage, not because of any Tier Two discrepancy.

(g)     On or around September 14, 2015, UAW President Williams falsely told GM's CEO that he would "come out in [GM's] defense if Sergio [Marchionne] tries to spin this that UAW selected Chrysler because of merger." This was a knowingly false representation. In fact, Defendants

Document received by the MI Wayne 3rd Circuit Court.

76

**EXHIBIT 12**

had purchased the lead target position through a years-long bribery scheme between Defendants and UAW leaders. Williams chose FCA pursuant to this bribery scheme and to, among other things, pressure GM to merge with FCA.

(h)    On or about September 15, 2015, in a public statement regarding FCA's tentative CBA, UAW President Williams stated: "I also want to thank UAW Vice President Jimmy Settles, Cindy Estrada, and Norwood Jewell for working together to determine and select FCA as their targeted company. We did that, that was a collective decision, not just mine alone. . . . I believe the [agreement] is balanced." This was a knowingly false representation. In fact, UAW leadership had not "work[ed] together" to select FCA as the lead target, but followed Williams' selection, his sole decision, of FCA pursuant to a years-long bribery scheme between Defendants and UAW leaders. Further, the 2015 FCA CBA was not "balanced" but rather was a product of fraud designed to benefit FCA and harm GM.

(i)    On or about September 15, 2015, in a public statement regarding collective bargaining between FCA and the UAW, Norwood Jewell stated: "I don't think there's ever been more integrity in a system than there was in this negotiation. I really mean that. We were able to have open, honest dialogue and really go after some issues that were tough." This was a knowingly false representation. In fact, negotiations between FCA and the UAW did not reflect "integrity." Rather, they were infected

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

by fraud and part of a years-long scheme to corrupt the collective bargaining process to benefit FCA and harm GM.

(j)    On or around October 22, 2015, in a public statement regarding the 2015 FCA CBA, UAW President Williams stated: "The recent bargaining process that took place on behalf of our members at FCA is a testament to the UAW's democratic values and commitment to our members." This was a knowingly false representation. In fact, the bargaining process was infected by fraud and bribery and was the culmination of a years-long scheme to corrupt the bargaining process to benefit FCA and harm GM.

173.    As a director and senior executive employee of GM given substantial trust and authority over CBA negotiations in Canada, respectively, Ashton and Iacobelli owed GM duties of good faith, loyalty and disclosure. By the time each joined GM, they had actively participated for years in Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM all while enriching themselves as co-conspirators. As described above, they specifically joined GM to further Defendants' scheme from inside GM's boardroom and negotiating table. Despite owing GM a duty to disclose, neither Ashton nor Iacobelli disclosed Defendants' ongoing scheme to GM, their respective roles in the scheme, or the harm resulting to GM from Defendants' ongoing scheme. Rather, Ashton and Iacobelli made fraudulent misrepresentations to occupy positions of trust, funnel GM's confidential information to Defendants, and thereby further Defendants' scheme and harm GM.  As demonstrated by GM's analysis of Iacobelli's GM-issued laptop, he had in fact been printing an inexplicably large number of sensitive GM documents, which were not recovered when Iacobelli left GM's employment.  On information and belief, these documents were provided to FCA and FCA N.V.

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

174.    These fraudulent misrepresentations were intended to and did induce reliance by GM. For example, had GM known of Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM, GM would not have entered into the 2015 CBA, which was based on the fraudulently tainted FCA-UAW pattern. GM also would not have hired Ashton or Iacobelli, precluding them from harming GM by funneling GM's confidential information to Defendants.

175.    The only purpose for the public statements made by UAW leaders around the 2015 CBA negotiations was to assure GM, and the public, that their decisions related to the selection of FCA as the lead and the substance of the 2015 tentative agreement was not tainted by any wrongdoing. Similarly, the statements by Williams to GM regarding his reasoning for selecting FCA as the lead were designed to, and did, induce reliance by GM that the selection was done for no reason other than the benefit of the UAW. As FCA and the UAW intended, GM relied on these statements.

176.    Defendants' fraudulent misrepresentations were intended to and did cause harm to GM. As a result of Defendants' fraudulent misrepresentations, GM paid billions of dollars in labor costs it otherwise would not have incurred, including more than $1 billion above what it would have paid in connection with the 2015 CBA.

## Second Cause of Action

### Fraud by Omission

### (Defendants FCA and FCA NV)

177.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

178.    As alleged in detail above, Defendants—along with numerous co-conspirators affiliated with FCA, FCA NV, and the UAW—orchestrated a decade-long conspiracy to corrupt

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

the collective bargaining process and labor relations and harm GM. As admitted by Iacobelli to DeLorenzo, the purpose of this scheme was to directly harm GM, in order to force GM into a merger with FCA. In addition to being liable for the actions of their employees, FCA and FCA NV are liable for the actions, omissions, and misrepresentations of their co-conspirators as a result of their ongoing conspiracy, described in detail above, to damage GM. These co-conspirators for whose actions FCA is liable includes, but is not limited to Williams, Ashton, Iacobelli, and Jewell. FCA, FCA NV, and their agents/co-conspirators knowingly or recklessly failed to disclose numerous material facts of which Defendants were aware, the non-disclosure of which created a false impression for GM. For example:

(a) On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor Department employees that his reason for departing FCA was a disagreement with Marchionne. Iacobelli failed to disclose the material fact that Iacobelli left FCA in an effort to continue the ongoing scheme of forcing a merger from within GM. The Defendants were aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to hire Iacobelli, and/or maintain his employment.

(b) On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct which, among other things, prohibited receiving any bribes or improper payments. Iacobelli failed to disclose the material fact that he had accepted and would continue to accept bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM. Defendants were aware of this undisclosed material fact, and sought

Document received by the MI Wayne 3rd Circuit Court.

80

41992169.1

**EXHIBIT 12**

to induce GM's reliance on that fact in causing GM to hire Iacobelli and/or maintain his employment.

(c)     In early 2016, Iacobelli volunteered to assist with any renewed efforts of Marchionne to merge with GM, telling GM's management that Marchionne was "desperate and vulnerable" and that Marchionne "can't bake a cake in half the time by doubling the heat of the oven." Iacobelli failed to disclose the material fact that he had participated in a scheme to harm GM and force a merger between FCA and GM. Defendants were aware of this undisclosed, material fact, and sought to induce GM's reliance on this fact in causing GM to hire Iacobelli and/or maintain his employment.

(d)     In 2014, when he joined New GM's Board of Directors, and each year following his appointment until 2017, through written questionnaires completed by Ashton, Ashton repeatedly made numerous misrepresentations to GM. For example, Ashton repeatedly represented in writing that he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or been offered anything of value by a "third party" "in consideration" for his service as a GM director. Ashton further falsely affirmed that he "adhered" to GM' Code of Conduct, which prohibits "bribery", among other pertinent illegal activity. Ashton failed to disclose the material fact that Ashton had accepted and would continue to accept bribes and improper payments

Document received by the MI Wayne 3rd Circuit Court.

81

**EXHIBIT 12**

from FCA and FCA NV in furtherance of their scheme to harm GM. The Defendants and Ashton were aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to allow Ashton to serve on New GM's Board.

179.    As a director and senior executive employee of GM given substantial trust and authority, Ashton and Iacobelli, respectively, owed GM duties of good faith, loyalty and disclosure. By the time each joined GM, they had actively participated for years in Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM all while enriching themselves as co-conspirators. As described above, they specifically joined GM to further Defendants' scheme from inside GM's boardroom and negotiating table. Despite owing GM a duty to disclose, neither Ashton nor Iacobelli disclosed Defendants' ongoing scheme to GM, their respective roles in the scheme, or the harm resulting to GM from Defendants' ongoing scheme. Rather, Ashton and Iacobelli fraudulently suppressed the truth to occupy positions of trust, funnel GM's confidential information to Defendants, and thereby further Defendants' scheme and harm GM.

180.    These fraudulent omissions were intended to and did induce reliance by GM. For example, had GM known of Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM, GM would not have entered into the 2015 CBA, which was based on the fraudulently tainted FCA-UAW pattern. GM also would not have hired Ashton or Iacobelli, precluding them from harming GM by funneling GM's confidential information to Defendants.

181.    Defendants' fraudulent omissions were intended to and did cause harm to GM. As a result of Defendants' fraudulent misrepresentations, GM paid billions of dollars in labor costs it

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

otherwise would not have incurred, including more than $1 billion above what it would have paid in connection with the 2015 CBA.

### Third Cause of Action

### Fraud

### (Defendant Iacobelli)

182.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

183.    As described above, Iacobelli knowingly or recklessly made numerous material misrepresentations to GM. For example:

(a)    On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor Relations department employees that his reason for departing FCA was a disagreement with Marchionne. These were knowingly false representations. In fact, Iacobelli left FCA due to the ongoing government investigation in an effort to continue the ongoing scheme from within GM, and Iacobelli made these representations to GM at the behest of and for the benefit of FCA and FCA NV leadership.

(b)    On February 7, 2016, Iacobelli represented that he would "not discuss or disclose to any person or entity any trade secret or confidential/proprietary information" belonging to GM. This was a knowingly false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that he was joining GM to access and funnel GM's confidential information to FCA, FCA NV, and their co-conspirators. As demonstrated by GM's analysis of Iacobelli's GM-issued laptop, he had in fact been printing an inexplicably large number of sensitive GM documents, which were not

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

recovered when Iacobelli left GM's employment. On information and belief, these documents were provided to FCA and FCA N.V.

(c)     On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct, which, among other things, prohibited receiving any bribes or improper payments. This was a knowingly false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that he had accepted and would continue to accept and control bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM and was seeking employment at GM to further that scheme.

184.    These fraudulent misrepresentations were intended to and did induce reliance by GM. For example, had GM known of the criminal scheme to corrupt the bargaining process and Iacobelli's role in the scheme, GM would not have hired Iacobelli into GM's Labor Relations department or maintained his employment until his indictment was unsealed in July 2017.

185.    Iacobelli's fraudulent misrepresentations were intended to and did cause harm to GM. As a result of Iacobelli's fraudulent misrepresentations and omissions, GM hired Iacobelli into GM's Labor Relations department and paid him a salary. Once employed, Iacobelli betrayed GM's trust by funneling GM's confidential information to FCA, FCA NV, and their co-conspirators.

### Fourth Cause of Action

### Fraud by Omission

### (Defendant Iacobelli)

186.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

187.    Iacobelli owed GM a duty of disclosure. First, as a high-level senior executive of GM given substantial trust and authority over CBA negotiations in Canada and labor relations matters in North America, Iacobelli owed GM duties of good faith, loyalty, and disclosure. Second, Iacobelli actively participated and provided input in meetings and discussions concerning strategy decisions involving the UAW and FCA. Having participated and provided input in these discussions, Iacobelli had a duty to make complete disclosures of facts where his partial disclosures would and did convey false impressions and mislead GM.

188.    By the time Iacobelli joined GM, he had actively participated for years in a criminal scheme to corrupt the bargaining process to benefit FCA and harm GM all while enriching himself as a co-conspirator. Iacobelli has pled guilty to his participation in this scheme. Despite knowing of and participating in this scheme, Iacobelli never disclosed the scheme to anyone at GM. Indeed, as described above, Iacobelli specifically joined GM to further this scheme from GM.

189.    Moreover, Iacobelli actively participated and provided input in meetings and discussions concerning strategy decisions involving the UAW and FCA. Nonetheless, while providing input on matters relating to bargaining, Iacobelli never disclosed the past and ongoing scheme to GM, his role in the past and ongoing scheme, or the harm resulting to GM from the past and ongoing scheme. Rather, Iacobelli fraudulently suppressed the truth to occupy a position of trust, funnel GM's confidential information to FCA, FCA NV, and their co-conspirators and thereby further the scheme to harm GM.

190.    In addition, as described above, Iacobelli knowingly or recklessly failed to disclose numerous additional material facts of which he was aware, the non-disclosure of which created a false impression for GM. For example:

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

(a)     On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor Relations department employees that his reason for departing FCA was a disagreement with Marchionne. Iacobelli failed to disclose the material fact that Iacobelli left FCA in the middle of a criminal investigation in an effort to continue the ongoing scheme. Iacobelli was aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to hire Iacobelli.

(b)     In early 2016, Iacobelli volunteered to assist with any renewed efforts of Marchionne to merge with GM, telling GM's management that Marchionne was "desperate and vulnerable" and that Marchionne "can't bake a cake in half the time by doubling the heat of the oven." Iacobelli failed to disclose the material fact that he had participated in a scheme to harm GM and force a merger between FCA and GM. Iacobelli was aware of this undisclosed, material fact, and sought to induce GM's reliance on this fact in causing GM to hire Iacobelli and/or maintain his employment.

(c)     On February 7, 2016, Iacobelli represented that he would "not discuss or disclose to any person or entity any trade secret or confidential/proprietary information" belonging to GM. Iacobelli failed to disclose the material fact that Iacobelli was joining GM to access and funnel GM's confidential information to the UAW, FCA, and FCA NV. Iacobelli was aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to hire Iacobelli and/or maintain his employment.

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

(d)     On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct which, among other things, prohibited receiving any bribes or improper payments. Iacobelli failed to disclose the material fact that he had accepted and would continue to accept bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM. Iacobelli was aware of this undisclosed material fact, and sought to induce GM's reliance on that fact, in causing GM to hire Iacobelli and/or maintain his employment.

191.    These fraudulent omissions were intended to and did induce reliance by GM. For example, had GM known of the criminal scheme to corrupt the bargaining process and Iacobelli's role in the scheme, GM would not have hired Iacobelli or maintained his employment until his indictment was unsealed in July 2017.

192.    Iacobelli's fraudulent omissions were intended to and did cause harm to GM. As a result of Iacobelli's fraudulent omissions, GM hired Iacobelli into GM's Labor Relations department and paid him a salary. Once employed, Iacobelli betrayed GM's trust by funneling GM's confidential information to FCA, FCA NV, and their co-conspirators.

**Fifth Cause of Action**

**Breach of Fiduciary Duty**

**(Defendant Iacobelli)**

193.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

194.    From January 2016 to 2017, Iacobelli was the Executive Director of GM's Labor Relations department. In his role in the Labor Relations department, Iacobelli was a senior executive responsible for directing labor strategy. Iacobelli was given substantial trust and

Document received by the MI Wayne 3rd Circuit Court.

87

**EXHIBIT 12**

authority by GM including responsibility in 2016 over CBA negotiations in Canada and labor relations matters in North America. Iacobelli was also privy to a significant amount of GM confidential, propriety, and competitive information, particularly but not exclusively in the area of labor relations and negotiations. In his high-level role, Iacobelli owed GM fiduciary duties including duties of trust, confidence, and loyalty.

195.    Iacobelli breached those duties by, among other things, failing to disclose to GM before and after he was hired by GM his knowledge and involvement in the past and ongoing bribery scheme between FCA, himself and certain UAW leaders to harm GM and force a merger between GM and FCA; failing to disclose Iacobelli's significant role in effectuating this scheme while at the same time representing to GM that he was acting in GM's interest and participating in discussions and meetings involving GM's strategies for labor relations in the U.S. and GM's dealings with competitors including FCA; making the affirmative misrepresentations identified herein; and, unbeknownst to GM, disclosing GM confidential information to the UAW and/or FCA in return for bribes while serving as an employee of GM. All of these breaches were done without disclosure to GM and without obtaining GM's consent.

196.    As a direct result of these breaches of Iacobelli's fiduciary duty, GM was damaged.

197.    Iacobelli is accordingly liable to GM for this harm.

**Sixth Cause of Action**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Defendants FCA and FCA NV)**

198.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

199.    As part of their role in the scheme described above, FCA and FCA NV had actual knowledge that Ashton and Iacobelli owed fiduciary duties to GM as a result of their service on

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

New GM's Board of Directors and as a senior executive with GM, respectively, who participated in critical GM strategic meetings and received confidential information about GM's labor and strategy and resulting decisions.

200.    To further their scheme, FCA and FCA NV encouraged and substantially assisted Ashton and Iacobelli in breaching their fiduciary duties to GM by, among other things, making prohibited payments to Iacobelli and Ashton in return for Iacobelli and Ashton taking and providing information in violation of their fiduciary duties to GM. These payments included the establishing of multiple undisclosed offshore accounts and the funding of such accounts with multiple millions of dollars.

201.    As a result of FCA and FCA NV's encouragement of and substantial assistance to Iacobelli and Ashton's breaches, GM was directly harmed.

### Seventh Cause of Action

### Unfair Competition

### (Defendants FCA and FCA NV)

202.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

203.    GM, throughout the relevant time period, competed with FCA and FCA NV in the automobile industry.

204.    As alleged herein, FCA and FCA NV engaged in conduct that is unfair, unethical, fraudulent, or deceptive.

205.    For example, as alleged herein, Defendants' fraudulent and long-running scheme to influence relations with the UAW violated the integrity of the collective bargaining process, resulting in unfair advantages conferred on FCA and FCA NV and direct harm to GM. FCA and FCA NV also used the relationship established through the fraudulent scheme to obtain the lead

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

target position in 2015 collective bargaining negotiations and to negotiate an agreement designed to harm GM. As a result, as more specifically alleged herein, GM sustained tremendous economic loss.

206.    Through the public statements of FCA and FCA NV's agents and co-conspirators, the public, and GM, were misled about the nature of the negotiations between FCA and the UAW, and how those negotiations impacted GM through the application of pattern bargaining. Specifically, UAW leaders, acting at the direction of FCA and FCA NV, repeatedly assured the public that their decisions in determining the lead for 2015 CBA negotiations and in negotiating the 2015 tentative agreements with FCA and GM were based solely on the best interests of the UAW membership.  In fact, as recounted above, these decisions were influenced and ultimately dictated by the bribes paid by FCA and FCA NV to UAW leaders.

207.    Defendants' scheme to place Ashton and Iacobelli inside GM and obtain GM's highly confidential and competitively sensitive negotiating and labor relations information in exchange for millions of dollars in offshore accounts is also unfair, unethical, fraudulent, and deceptive. Through misrepresentations and omissions FCA, FCA NV, Ashton, and Iacobelli made publicly as well as directly to GM, the public, and GM, were misled about Ashton's and Iacobelli's roles at GM. While Ashton and GM purported to act in GM's best interests consistent with their fiduciary duties, in fact they joined GM under false pretenses to access and funnel GM's confidential information to FCA, FCA NV, and other co-conspirators in return for bribes.

208.    As a result of Defendants' unfair, unethical, fraudulent, or deceptive activities, both GM and the public were deceived and harmed. GM also is entitled to exemplary damages for such conduct.

Document received by the MI Wayne 3rd Circuit Court.

41992169.1

**EXHIBIT 12**

### Eighth Cause of Action

### Civil Conspiracy

### (All Defendants)

209.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

210.    As described above, FCA, FCA NV, Iacobelli, and Durden have conspired with numerous other individuals to defraud GM, to unfairly compete with GM, and to breach fiduciary duties owed to GM. Indeed, Iacobelli and Durden have admitted that they knowingly conspired with other individuals and entities, including certain UAW officials, to make and conceal illegal bribes in furtherance of FCA and FCA NV's scheme.

211.    As described above, Defendants conspired with numerous other individuals and entities, including the UAW and UAW leaders, and Ashton to defraud GM through numerous misrepresentations and omissions regarding, among other things, the integrity of the collective bargaining process and Ashton's and Iacobelli's role in the conspiracy. Defendants further conspired with the UAW, UAW leaders and Ashton to unfairly compete with GM by bribing UAW officials in order to corrupt the collective bargaining process and obtain unfair advantages, by accepting bribes in offshore accounts in furtherance of the conspiracy, and also by placing Ashton and Iacobelli inside GM to funnel GM's confidential information to FCA, FCA NV, and other conspirators. And Defendants conspired with the UAW, UAW leaders, and Ashton, to cause Iacobelli and Ashton to breach their fiduciary duties to GM by funneling GM's confidential information to FCA, FCA NV, and other conspirators.

212.    As described above, these torts were committed through concerted action by two or more persons to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means.

41992169.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

213.     As a result of this conspiracy, GM has been directly harmed.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.     Damages in an amount to be determined at trial, including but not limited to the billions of dollars in damages GM suffered as a result of Defendants' bribery scheme, breaches of fiduciary duty, fraud, unfair competition, and other unlawful acts;

B.     An award of punitive and/or exemplary damages as Defendants have acted with malice and willful disregard for GM's rights;

C.     An award of costs and fees incurred in pursuing this litigation, including attorney's costs, fees, and the fees and costs of experts;

D.     Equitable relief, including restitution; and

E.     Any other relief the Court deems just, fair, necessary, or equitable.

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

Dated: December 13, 2021                Respectfully submitted,

                                        **HONIGMAN LLP**

                                        By: */s/ Jeffrey K. Lamb*
                                        Jeffrey K. Lamb (P76738)
                                        J. Michael Huget (P39150)
                                        Adam M. Wenner (P75309)
                                        Shirin S. Goyal (P82528)
                                        Keith D. Underkoffler (P84854)
                                        2290 First National Building
                                        660 Woodward Avenue
                                        Detroit, MI 48226
                                        Telephone: (313) 465-7000
                                        jlamb@honigman.com
                                        mhuget@honigman.com
                                        awenner@honigman.com
                                        sgoyal@honigman.com
                                        kunderkoffler@honigman.com

                                        **KIRKLAND & ELLIS LLP**
                                        Hariklia Karis, P.C. *(pro hac vice)*
                                        Jeffrey Willian, P.C. *(pro hac vice)*
                                        Stacey G. Pagonis *(pro hac vice)*
                                        Casey McGushin *(pro hac vice)*
                                        300 North LaSalle
                                        Chicago, IL 60654
                                        Telephone: (312) 862-2000
                                        hariklia.karis@kirkland.com
                                        jeffrey.willian@kirkland.com
                                        stacey.pagonis@kirkland.com
                                        casey.mcgushin@kirkland.com
                                        Austin Norris *(pro hac vice)*
                                        2049 Century Park East
                                        Los Angeles, CA 90067
                                        Telephone: (213) 680-8400
                                        austin.norris@kirkland.com

                                        Maisie Allison *(pro hac vice)*
                                        333 South Hope Street
                                        Los Angeles, CA 90071
                                        Telephone: (213) 680-8400
                                        maisie.allison@kirkland.com

                                        *Attorneys for Plaintiffs*

*Document received by the MI Wayne 3rd Circuit Court.*

93

**EXHIBIT 12**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on December 13, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the electronic filing system, which will send notification of such filing to all attorneys of record.

Respectfully submitted,

**HONIGMAN LLP**

By: */s/Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com

Document received by the MI Wayne 3rd Circuit Court.

94

41992169.1

**EXHIBIT 12**

# Exhibit 1

# Affidavit of Peter DeLorenzo

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

          Plaintiffs,

v.

ALPHONS IACOBELLI, FCA US LLC, FIAT
CHRYSLER AUTOMOBILES, N.V., JEROME
DURDEN,

          Defendants.

Civil Action No. 20-011998-CB

Hon. David J. Allen

---

## AFFIDAVIT OF PETER DELORENZO

STATE OF MICHIGAN    )
                 ) SS
COUNTY OF WAYNE    )

I, Peter DeLorenzo, being first duly sworn, state:

1.    I am over the age of 18 and make this affidavit based on my own personal knowledge, and if called and sworn as a witness, I could and would testify to the facts stated herein. I hereby attest that the following facts are true and accurate to the best of my recollection.

2.    Since 1999, I have authored a website blog that is titled the AutoExtremist, which primarily addresses issues in the auto industry.

3.    In July 2018, I was contacted via email by Alphons Iacobelli ("Iacobelli") shortly after the passing of Sergio Marchionne on or around July 25 2018. We eventually exchanged at least four emails, which are attached hereto and had two in-person meetings. Iacobelli and I had no prior relationship before he contacted me.

4.    At Iacobelli's request, I met him twice in July 2018 at a Starbucks in Rochester, Michigan, and each meeting lasted approximately 45 minutes to an hour. Iacobelli explained to

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

me that he wanted me to write a book about the FCA story of corruption and conspiracy with the UAW and the role of certain individuals in that conspiracy. He declared that the scheme and those involved was much broader than was known publicly and provided many of the supporting details as related herein.

5.     Iacobelli stated that he felt I was the one to tell his story. He explained in the past FCA and Sergio Marchionne ("Marchionne") had taken significant note of my public writings about FCA and, therefore, thought I was the correct person to write his book. Based on what he reported to me, I was interested in pursuing such a project with Iacobelli, and we even reached the point of discussing possible titles for the book.

6.     In summary, he told me that he was guilty of participating in what he described as the biggest corporate corruption case in US business history. He related that FCA's UAW "training funds" were nothing more than a slush fund for payouts to union leaders going all the way back to 1985. Iacobelli stated that he was originally hired by FCA to reduce the footprint of the program but then "Sergio & Co" added requests and demanded that money be moved around for various things until the scheme became out of control. He said that monthly payouts to the UAW were around "$250K" but sometimes much more and Marchionne was aware of every bit of it. Iacobelli made it clear that FCA used these payments for "leverage" during the CBA contract negotiations. Iacobelli further stated that the amounts of money expended beyond the monthly amounts are simply incomprehensible.

7.     Iacobelli said the NTC was a scam from the start. The reports of the money that was missing to date were incredibly low given how much was distributed to the UAW on a monthly basis.

38806364.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

8.      Iacobelli spoke at some length about a massive, lavish, estimated $2 million retirement party thrown in Las Vegas by FCA for a high-level UAW official who I understood to be UAW President, Dennis Williams, based on a description of the timing and purpose of the party. Iacobelli indicated that this Vegas based party had recently happened, that the event lasted several days and that FCA paid for everything associated with it.

9.      Iacobelli stated that UAW executives regularly traveled to Las Vegas, often monthly, at FCA's expense. He said that top UAW executives would also use a house paid for by FCA in Palm Springs whenever the need or desire arose.

10.     Iacobelli reported that Marchionne gave two expensive watches to UAW officers other than the one he reportedly gave to General Holiefield -- and that one such watch was given to Williams. Each watch gift from Marchionne purportedly contained a carefully written note to help suggest the watch had minimal value. I don't recall if Iacobelli indicated who received the other watch. I asked Iacobelli what Marchionne knew about the scheme in general, and he said Marchionne knew everything about the payments to the UAW, and that nothing happened without Marchionne's knowledge. Iacobelli made it clear that Marchionne was a micro-manager and knew all details.

11.     Iacobelli agreed that Marchionne would have been criminally indicted, but for his untimely death, given his central and controlling role in the scheme to pay the UAW.

12.     Iacobelli said that Marchionne orchestrated the funneling of money to the upper hierarchy of UAW, including cash, free trips, and gifts for their spouses.

13.     Iacobelli told me that Marchionne's end game was to have the UAW in his pocket so that he could then make a move on GM to force a merger. Iacobelli stated unequivocally that

Document received by the MI Wayne 3rd Circuit Court.

38806364.1

**EXHIBIT 12**

Marchionne's goal was to gain a competitive advantage over GM through labor costs in order to force a takeover.

14.     Iacobelli said that Ron Gettelfinger did not want any part of the money directly from the NTC, but Bob King took money, trips, and items of value along with Dennis Williams. This was part of Marchionne's operational strategy from the start, according to Iacobelli. He further stated that most of the executives of the UAW were on the take as he later related names of those individuals.

15.     Iacobelli said "they were all on the take and were all going down," and that Nancy Rae of FCA knew about the payments. Iacobelli also told me that anyone who worked closely with or for Iacobelli knew that he had virtually unlimited spending at his disposal as part of this scheme to bribe the UAW executives.

16.     Iacobelli allowed me to review documents that he brought to both of our meetings. The documents were in two manila folders, one of which was at least three inches thick with a rubber band around it and the other was approximately two inches thick with no rubber band. There were hundreds of pages of documents in these folders. Iacobelli claimed that these documents verified his statements about the scope and scale of the scheme to payoff UAW officials and Marchionne's orchestration of that scheme. I could see that these documents included lengthy memos (several pages long and single-spaced) and contained information about payments and responsibility for payments. Iacobelli's documents appeared to be contemporaneous business records of FCA and not after the fact notes created by Iacobelli. Among the documents that I was shown were memos involving Marchionne discussing essential elements of the golf tournaments and methods for orchestrating the passing of money to the UAW. The documents contained descriptions of actual payments to UAW officials and appeared to establish that Marchionne knew

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

about them.  There were many emails that Iacobelli showed me that reflected the scope of the payments to the UAW officials and how they were going to be distributed, and he expressed satisfaction that what he was relating to me regarding the scope and nature of the scheme and Marchionne's clear involvement was well-documented. Iacobelli claimed Marchionne asked him to leave FCA after he expressed misgivings about the growing nature of the scheme to Marchionne and his chief Lieutenant, who I believe Iacobelli said was Alfred Altavilla.

17.      Iacobelli said that the sales scheme, which was the subject of FCA's government settlement, was Marchionne's idea all the way, and that he was a micro-manager and knew everything.

18.      Iacobelli said that the UAW executive charities were used to funnel money, but did not provide details.

19.      Iacobelli said that Marchionne felt that anything that could be saved through the labor negotiations relative to GM would allow FCA to have a competitive advantage over GM. Ford never was mentioned.  Iacobelli made clear that Sergio was targeting GM because of his desire to be the "little fish that swallowed the whale," which was his stated goal when he first took over Chrysler in 2009.

20.      Iacobelli confirmed the following UAW executives were in on the FCA graft: James Settles, Gary Casteel, Bob King, Dennis Williams, General Holiefield, Joe Ashton, and Norwood Jewell. Iacobelli never mentioned Cindy Estrada to me.

21.      After our second meeting and follow-on email discussion about the book title and a book outline that Iacobelli stated he was working on, Iacobelli did not contact me further.  I do not know why he ceased communication with me.

38806364.1

**EXHIBIT 12**

Document received by the MI Wayne 3rd Circuit Court.

22.     On November 23, 2019, I publicly wrote about my meeting with Iacobelli. I made clear in the column that Iacobelli had spelled out to me the broad scope and details of FCA's scheme to corrupt the UAW and extract better labor terms. For example, I wrote: "Over those two meetings, Iacobelli presented a devastating account of just how deep the payoffs to UAW officials actually were. The FCA-UAW training centers were a complete joke, with UAW members reporting to the centers to do nothing, if they bothered to show up at all. And the tales of payments for plane trips, vacations, binges in Las Vegas and myriad other gifts, cash and prizes were eye-opening, including a $2 million retirement party for an outgoing UAW executive that was staged in Las Vegas. Iacobelli said approximately $250,000 a month was spent keeping the UAW officials in line, in some months less, but in some months much more than that. And it was all designed to extract favorable considerations from the UAW, which translated into reduced labor costs to FCA. And Iacobelli named names… And make no mistake, Marchionne was up to his eyeballs in every bit of it, according to Iacobelli. In fact, given what he said – including Marchionne gifting expensive watches to key UAW officials with a carefully-worded note attached so they couldn't be construed to having any value - I surmised that Marchionne would have been indicted if he hadn't passed away, and Iacobelli didn't disagree with my assessment." No one from the federal government or FCA ever contacted me to discuss my meetings with Iacobelli, what documents he had in his possession or what facts he related to me.

23.     Unrelated to my meetings with Iacobelli, beginning in May 2019 I have been a party to a consulting agreement with General Motors LLC pursuant to which I have provided strategic consulting services in the areas of design and marketing, with a particular focus on Cadillac and GM's electric car programs. At no time at or around the time that I entered into the consulting agreement with GM did I disclose or discuss with GM that I had met or communicated

Document received by the MI Wayne 3rd Circuit Court.

6

**EXHIBIT 12**

with Mr. Iacobelli as described herein nor did I disclose to anyone at GM the information shared with me by Mr. Iacobelli.  Nothing that I have recounted here in my affidavit has been influenced by the referenced 2019 consulting agreement with GM.

FURTHER AFFIANT SAYETH NOT.

_____
Peter DeLorenzo

Subscribed and sworn to before me this 16th day of April, 2021

_____
Notary Public, Oakland Cou., MI
My Commission Expires: 9-30-2024

LANITA Y. CATO
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Sep 30, 2024
ACTING IN COUNTY OF

7

38806364.1

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

**From:** "Peter DeLorenzo" <renzo@peterdelorenzo.com>
**To:** "Al Iacobelli" <al.iacobelli@wowway.com>
**Sent:** Sunday, July 29, 2018 4:58:30 AM
**Subject:** Initial Thoughts..

Hi Al,

I have a few initial thoughts.

First of all I am making initial contacts with a couple of publishers, one of which published the Number 1 best selling business book of 2017.

Secondly; I have a *preliminary* working title in mind for discussion as well:

SCREWED. The Inside story of one of the biggest corporate corruption cases in U.S. History.

I am finding out what the publisher needs in order for us to pitch the book, but I assume I will write an intro and we will provide an outline, and maybe a snippet of the first chapter.

I feel the book should open on the day you were approached by the authorities; including everything you were feeling that day.

Then the book would go back to the beginning and the story would unfold as it happened, with specific highlights, moments, scenes, emails, bad actors within FCA (Sergio et al) and so on.

Peter

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**



**This email exchange was with Al about the direction of the book, and a title...**

-------- Forwarded Message --------
**Subject:**Re: Initial Thoughts..
  **Date:**Mon, 30 Jul 2018 12:43:33 -0400 (EDT)
  **From:**Alphons Iacobelli <al.iacobelli@wowway.com>
    **To:**Peter DeLorenzo <renzo@peterdelorenzo.com>

My apologies for the delay in getting back to you.

I agree with your initial thoughts and at first blush, I like the title also.

In terms of flow, I am completely open but I would assume an editor will likely want a word in that. I am currently working on the outline that is more chronologically driven (for now) but will inevitably change to accommodate a reader's interest. I love the idea of opening the book with the day the Feds came to the house then going back. I like the idea of you writing the intro also. I want to arm you with the various sub plots which I think the outline will cover thoroughly. Then let your creative genius take over. I'll keep you posted on my progress.

I can't thank you enough for your assistance and at the very least being a voice of truth. I truly respect your courage to write the unmitigated truth. There aren't a lot of us left out there. I feel that outside the "Detroit Bubble" people have a much different view of our industry and you capture it.

I'll stay close as I grind through the outline. I would like to share a high level version as soon as I can so I will stay close. Thank you talk soon.Al

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

**Response:**

---------- Forwarded message ---------
From: **Peter DeLorenzo** <renzo@peterdelorenzo.com>
Date: Mon, Jul 30, 2018 at 1:31 PM
Subject: Re: Initial Thoughts..
To: Alphons Iacobelli <al.iacobelli@wowway.com>

Thank you, Al.

I will keep thinking about the title. It could be even more specific to the subject matter but maybe not quite as punchy, as in:

SCAM: How Fiat Chrysler and the UAW conspired together to commit one of the biggest cases of corporate fraud in U.S. history.

I will probably come up with a few more as we go...

Peter

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

**More:**

---------- Forwarded message ---------
From: **Peter DeLorenzo** <renzo@peterdelorenzo.com>
Date: Mon, Jul 30, 2018 at 6:25 PM
Subject: More thoughts.
To: Alphons Iacobelli <al.iacobelli@wowway.com>

Al,

Upon further review; I like this title because it combines the impact of SCREWED while naming the players, which is important:

SCREWED. How Fiat Chrysler and the UAW conspired to commit one of the biggest cases of corporate fraud in U.S. history.

Peter

Document received by the MI Wayne 3rd Circuit Court.

**EXHIBIT 12**

1   Austin Norris (SBN 284603)
    KIRKLAND & ELLIS LLP
2   2049 Century Park East
    Los Angeles, CA 90067
3   Telephone: (310) 552-4200
    Facsimile: (310) 552-5900
4   austin.norris@kirkland.com

5   [Additional Counsel on Signature Page]

6   *Attorneys for Plaintiffs General Motors LLC*
7   *and General Motors Company*

**FILED**
Superior Court of California
County of Riverside

**12/30/2021**
**C. Ortiz**

Electronically Filed

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **COUNTY OF RIVERSIDE**

10  GENERAL MOTORS LLC and          )   Case No. CVRI2103181
    GENERAL MOTORS COMPANY,         )
11                                  )   **FIRST AMENDED COMPLAINT**
                                    )   **FOR:**
            Plaintiffs,             )   **(1) INTENTIONAL**
12                                  )   **MISREPRESENTATION**
        v.                          )   **(2) CONCEALMENT**
13                                  )   **(3) UNFAIR COMPETITION**
    DENNIS WILLIAMS,                )   **(4) AIDING AND ABETTING**
14                                  )   **BREACH OF FIDUCIARY DUTY**
            Defendant.              )
15                                  )
                                    )   **JURY TRIAL DEMAND**
16                                  )
                                    )
17                                  )

18

19

20

21

22

23

24

25

26

27

28

---

FIRST AMENDED COMPLAINT                    **EXHIBIT 13**

1  General Motors LLC and General Motors Company (individually or collectively, "GM") for their

2  Complaint against Dennis Williams state and allege as follows:

### INTRODUCTION

3  1.  From 2014 to 2018, Dennis Williams, a resident of Corona, California, was the President

4  of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of

5  America ("UAW"), one of the largest unions in the United States and the union that exclusively represents

6  American autoworkers, negotiating directly with GM and its competitors.

7  2.  From 2010 to 2014, Williams was the UAW's Secretary-Treasurer and a member of the

8  powerful International Executive Board, which tightly controls the union's decision-making and indirect

9  elections. Williams's "rise to power came through inside political dealing."[1] Indeed, as a demonstration

10  of Williams's political power within the UAW, "for every [UAW] election that Williams 'won' . . . he ran

11  unopposed."[2]

12  3.  During that time, unbeknownst to GM, FCA US LLC[3] and its parent company Stellantis

13  NV[4] (together, "FCA") were engaged in a secret, sprawling bribery scheme to corrupt collective

14  bargaining with the UAW, the union that both FCA and GM share, and target GM for harm. Williams,

15  "himself . . . an institution within the ranks" of UAW leadership, was a linchpin of the scheme.[5]

16  4.  Since 2018, FCA, Williams, and 14 other individuals, including three FCA executives and

17  ten former officers of the UAW, have pleaded guilty as part of a criminal investigation by the U.S.

18  Attorney for the Eastern District of Michigan. On May 11, 2021, Williams was sentenced to 21 months in

---

[1]  Williams Gov't Sentencing Memorandum at 3. The Williams criminal pleadings cited herein are filed in the U.S. District Court for the Eastern District of Michigan, *United States v. Williams*, Case No. 2:20-cr-20382-PDB-RSW-1.

[2]  *Id.* at 3.

[3]  FCA US LLC was formerly known as Chrysler Group LLC, the successor of Chrysler LLC. FCA US LLC is a wholly owned subsidiary of Stellantis NV. On March 1, 2021, FCA pleaded guilty to conspiracy to violate the Labor Management Relations Act, and agreed to pay a fine of $30 million. In addition, FCA agreed to three years of probation, which includes oversight by an independent compliance monitor. FCA is scheduled to be sentenced on July 22, 2021.

[4]  Stellantis NV was created through the merger of Groupe PSA and FCA NV, the successor of the Italian automotive company formerly known as Fiat S.p.A. ("Fiat").

[5]  Williams Gov't Sentencing Memorandum at 2.

FIRST AMENDED COMPLAINT                    **EXHIBIT 13**

federal prison.[6] The organization he led is now operating under at least six years of independent oversight.[7] As has been repeatedly admitted in federal plea agreements, starting in 2009, FCA paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and to the UAW itself and—in return—received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[8]

5. As revealed by the federal criminal investigation, FCA's bribes ranged from large cash payments funneled through UAW officers' false-front charities and businesses to lavish steakhouse dinners and golf outings in Palm Springs, California, where then-UAW officers, spurred on by Williams, lived the "absolute high life" secretly paid for by the UAW and FCA for months every year between 2013 and 2018.[9]

6. By bribing Williams and other then-UAW officers, FCA did not just "grease the skids" for itself, lowering its own labor costs. Instead, FCA also ensured the UAW would deny to GM the benefits, concessions, and advantages that FCA had obtained through bribes, so that GM would pay billions of dollars more in labor-related costs.[10] In 2015, Williams, purporting to deal with GM even-handedly, secretly colluded with FCA's then-CEO Sergio Marchionne to corrupt collective bargaining negotiations, ultimately imposing more than $1 billion in additional costs upon GM. FCA forced these costs on GM as part of a multifaceted strategy—in which Williams was a central figure because of the UAW's influence—

---

[6] Press Release, Dep't of Justice, Former International UAW President Dennis Williams Sentenced to Prison for Embezzling Union Funds, https://www.justice.gov/usao-edmi/pr/former-international-uaw-president-dennis-williams-sentenced-prison-embezzling-union (May 11, 2021).

[7] On January 29, 2021, acknowledging "criminal convictions, allegations, sworn testimony, and judicial findings of past problems with fraud, corruption, and criminal conduct by certain officials within the UAW and certain of its related entities," the UAW entered into a consent decree with the U.S. Attorney for the Eastern District of Michigan whereby it agreed to six years of oversight by a federal monitor. *See United States v. Int'l Union, United Auto., Aerospace, and Agricultural Implement Workers of Am.*, No. 2:20-cv-13293-DML-RSW (Dkt. No. 10) (E.D. Mich. Jan. 29, 2021).

[8] *See, e.g.*, Iacobelli Plea Agreement at 7. The Iacobelli criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden*, Case No. 2:17-cr-20406-PDB-RSW.

[9] Jewell Gov't Sentencing Memorandum at 15. The Jewell criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Jewell*, Case No. 2:19-cr-20146-PDB-RSW.

[10] Brown Plea Agreement at 4. The Brown criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden*, Case No. 2:17-cr-20406-PDB-RSW.

---

**EXHIBIT 13**

1   to attempt to force a merger with GM. Former FCA Vice President of Employee Relations Alphons

2   Iacobelli later admitted to auto-industry journalist Peter DeLorenzo, as attested to in a sworn affidavit

3   attached to this Complaint as Exhibit A, that Marchionne orchestrated the bribery of UAW officers with

4   the central goal of harming GM, rendering it less competitive than FCA from a labor cost standpoint, with

5   the ultimate goal of forcing a merger between FCA and GM.[11]

6        7.    GM's own investigation has exposed an even broader dimension to the scheme to harm

7   GM: as alleged, a hidden network of foreign bank accounts stashing tens of millions of dollars in bribes

8   from FCA for former UAW officers and FCA executives in countries such as Switzerland, Luxembourg,

9   Liechtenstein, Italy, Singapore, and the Cayman Islands. On information and belief, Williams himself has

10  received funds through multiple banks in Liechtenstein and Switzerland. Joseph Ashton, a former UAW

11  officer and former GM Board member, and Iacobelli, a longtime FCA executive who abruptly departed

12  the company to seek a job at GM—both of whom in their GM roles had access to GM's confidential

13  information and owed fiduciary duties to GM—also received funds in foreign bank accounts.[12] On

14  information and belief, in return for payments in foreign bank accounts, Williams conspired with Ashton

15  and Iacobelli to relay GM's confidential information to the UAW and FCA regarding GM's strategies for

16  labor negotiations and FCA's merger effort, so they could maximize the harm to GM.

17       8.    As described further below, when he was at the helm of the UAW, Williams was at the

18  center of a vast criminal scheme by GM's competitor to harm GM through higher labor costs and to

19  promote an ill-fated merger between FCA and GM. GM has reason to believe and alleges that Williams

20  took millions of dollars to assist FCA in its business goal to harm GM. Through this action, GM seeks to

21  discover the full extent of the harm caused to GM as a result of the scheme and to recover for it.

22                                  **THE PARTIES**

23  **A.**   **Plaintiffs**

24       9.    **General Motors LLC**: Plaintiff General Motors LLC is a Delaware limited liability

25  company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. The

26  _____

27  [11]  Ex. A, Peter DeLorenzo Affidavit at 2.

28  [12]  Ashton and Iacobelli are among the individuals who have been convicted as part of the federal investigation.

1  sole member of General Motors LLC is General Motors Holdings LLC. The sole member of General

2  Motors Holdings LLC is Plaintiff General Motors Company, which is a Delaware corporation with its

3  principal place of business in Detroit, Michigan. General Motors LLC is the largest automaker in the U.S.

4  and an iconic American company that manufactures and sells automobiles in the U.S. under brands

5  including Chevrolet, Cadillac, Buick, and GMC.

6        10.  **General Motors Company**: Plaintiff General Motors Company is a Delaware corporation

7  with its principal place of business in Detroit, Michigan, and is the ultimate parent of General Motors

8  LLC.

9  **B.**  **Defendant**

10        11.  Dennis Williams is an individual who was the UAW President from June 2014 to June

11  2018 and Secretary-Treasurer from 2010 to 2014. From 2001 to 2010, Williams served on the UAW

12  Executive Board as the director of Region 4, during which time he dealt directly with Sergio Marchionne

13  in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction

14  equipment commonly controlled by Exor NV, the largest shareholder of Stellantis NV. On August 27,

15  2020, the United States Attorney for the Eastern District of Michigan charged Williams with conspiracy

16  to embezzle union funds in connection with the use of UAW dues money to pay for golf, cigars, and

17  extended stays at villas in Palm Springs in violation of 18 U.S.C. § 371 and 29 U.S.C. § 501(c). Williams

18  pleaded guilty on September 30, 2020. On May 11, 2021, Williams was sentenced to 21 months in prison

19  and ordered to pay a $10,000 fine, having paid $147,976 in restitution. Williams is a California resident

20  and citizen, domiciled in Corona, California.

21  <u>**JURISDICTION AND VENUE**</u>

22        12.  This Court has subject matter jurisdiction over this dispute under Cal. Const. art. VI, § 10.

23  This is an unlimited civil case as Plaintiffs' damages exceed $25,000.

24        13.  This Court has personal jurisdiction over Williams because he is domiciled in California,

25  and this dispute arises out of his activities in the state.

26        14.  Venue is proper in Riverside County and in this judicial district pursuant to California Code

27  of Civil Procedure § 395 because Williams resides in Corona, Riverside County. In addition, much of the

28  misconduct underlying this dispute, including FCA's payments of bribes to Williams, occurred in

Riverside County, including during retreats to Palm Springs, California, when Williams and his then-fellow UAW officers lived the "absolute high life" funded with union and FCA dollars. During the scheme, Williams resided for months in Palm Springs each year. On information and belief, relevant evidence also is maintained in Riverside County. For example, in August 2019, federal agents raided Williams's Corona home in search of evidence related to the years-long bribery scheme.[13]

## FACTUAL ALLEGATIONS

### I. FCA FUNNELS MILLIONS IN BRIBES TO WILLIAMS AND UAW OFFICERS.

15. Starting no later than 2009, unbeknownst to GM, FCA executives began a long-running scheme of secret payoffs to Dennis Williams and other then-UAW officers, funneled through FCA's UAW training center, the NTC,[14] and through a network of foreign bank accounts, to skew labor relations in FCA's favor and against GM. This scheme conferred unfair labor benefits on FCA that the UAW denied to GM. Through bribery, FCA obtained labor advantages over GM and imposed on GM higher labor costs.

16. During the course of the scheme, FCA executives "diverted [for the benefit of UAW officers and themselves] more than $4.5 million from [the NTC] to purchase a luxury Ferrari automobile, to pay off the mortgage on a personal residence, to install a swimming pool, spa, and outdoor kitchen at a personal residence, to purchase two $37,500 limited-edition fountain pens, to make home improvements, and to pay for personal credit card transactions, among other personal expenses."[15] Sergio Marchionne himself gave Williams an expensive watch with a "carefully written note to help suggest the watch had minimal value."[16]

---

[13] Robert Snell, *Feds Aimed Guns, Handcuffed Ex-UAW Boss Dennis Williams During Raids,* DETROIT NEWS (Sept. 17, 2019), https://www.detroitnews.com/story/business/autos/2019/09/17/retired-uaw-head-dennis-williams-held-gunpoint-during-federal-raids/2309500001/.

[14] The NTC or UAW-Chrysler Skill Development & Training Program is a Michigan tax-exempt corporation. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA.

[15] Durden Plea Agreement at 3–4. The Durden criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden,* Case No. 2:17-cr-20406-PDB-RSW.

[16] Ex. A, DeLorenzo Affidavit at 3. As admitted by Iacobelli, in February 2010, Marchionne similarly gave UAW Vice President General Holiefield a custom-made Terra Cielo Mare watch with a note "declar[ing] the goods at less than fifty bucks." Iacobelli Plea Agreement at 8.

17.     FCA made the payments to keep Williams and other UAW officers "fat, dumb, and happy" and to "buy[] labor peace."[17] As one FCA executive admitted, "FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW."[18] Indeed, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials."[19] "Money that was supposed to be going towards the training of UAW rank and file members was instead used to bribe UAW officials . . . with the expectation that Fiat Chrysler would benefit at the bargaining table."[20] As planned, FCA bribed Williams and the UAW to lower FCA's labor costs and impose higher costs on GM.

18.     Iacobelli later admitted that "Marchionne's end game was to have the UAW in his pocket so that he could then make a move on GM to force a merger. Iacobelli stated unequivocally that Marchionne's goal was to gain a competitive advantage over GM through labor costs in order to force a takeover."[21]

19.     In and around 2012, FCA executives began to encourage the use of credit cards issued to UAW officers by the NTC so they could charge personal expenses to FCA. "Iacobelli directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions."[22]

20.     As Secretary-Treasurer and President of the UAW, Williams did not merely accept bribes from FCA, he directed the UAW to embrace the corruption. "Sometime in 2014 or 2015, [Williams] directed senior UAW officials to use money supplied by automobile manufacturing companies through

---

[17]  Iacobelli Gov't Sentencing Memorandum at 1–2.

[18]  *Id.* at 8.

[19]  *Id.*

[20]  Morgan Gov't Sentencing Memorandum at 12. The Morgan criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden,* Case No. 2:17-cr-20406-PDB-RSW.

[21]  Ex. A, DeLorenzo Affidavit at 3–4.

[22]  King Information at 11. The King criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden,* Case No. 2:17-cr-20406-PDB-RSW.

FIRST AMENDED COMPLAINT                    **EXHIBIT 13**

1   joint UAW training centers to pay for travel, including travel solely for purported union business, as well
2   as lavish meals and other entertainment costs of senior UAW officials and their friends, family and allies.
3   This directive was issued in order to reduce costs to the UAW budget from such expenditures because the
4   UAW's budget was under pressure."[23] Specifically, Williams "pushed his leadership team to use training
5   center funds, instead of using UAW funds, to pay for its employees." "He operated in a similar way with
6   training center credit cards—ordering people who had such a card to come have lunch with him . . . and
7   to 'bring [your] card.'"[24]

8       **A.**    **Under Williams, Palm Springs Spending Is "Out of Control."**

9       21.    Williams was particularly "fond of union travel to Palm Springs."[25] In July 2014, newly
10  installed as UAW President, Williams stated that "he would stay in Palm Springs for one month his first
11  year in office, two months the second, three months the third, and four months for the fourth."[26] In his
12  first year as UAW President, "Williams stayed in Palm Springs for 37 days. Then he stayed 105 days in
13  2016, 121 days in 2017, and 71 days in 2018. Williams also invited guests, who stayed in their own
14  villas."[27] Palm Springs villas were rented for Williams on at least the following dates:

15      •   December 27, 2013 to January 27, 2014

16      •   December 25, 2014 to January 31, 2015

17      •   December 17, 2015 to March 31, 2016

18      •   December 1, 2016 to April 1, 2017[28]

19

20

21

22
    ──────────────
23  [23]  Johnson Plea Agreement at 9. The Johnson criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden*, Case No. 2:17-cr-20406-PDB-RSW.

24  [24]  Williams Gov't Sentencing Memorandum at 9–10.

25  [25]  *Id.* at 6.

26  [26]  *Id.* at 4.

27  [27]  *Id.*

28  [28]  Pearson Compl. at 14–15. The Pearson criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Robinson*, Case No. 2:19-cr-20726-PDW-RSW.

FIRST AMENDED COMPLAINT    **EXHIBIT 13**

22.      Williams treated his stays in Palm Springs "like an all-expenses-paid vacation."[29] Indeed, "the level of spending [in Palm Springs] increased dramatically during Williams's tenure as UAW President—it became 'out of control.'"[30] In short, a substantial part of the graft that Williams accepted and reveled in occurred for months on end, year after year—in Palm Springs—paid in substantial part by FCA.

23.      Lavish expenses were both embezzled from union dues and—pursuant to Williams's directive—paid for by FCA. Then-UAW officers "use[d] a house paid for by FCA in Palm Springs whenever the need or desire arose."[31] As they have admitted, FCA also paid for "golf, expensive meals, hotel suites, limousine services, condominium expenses, and other things" in Palm Springs.[32] For example, during Williams's stays there, FCA paid for at least the following:

- January 2015 – $1,267.79 at Indian Canyons Golf Resort
- January 2015 – $1,652 at Cardiff Limousine
- January and February 2015 – $6,900 at the Renaissance Resort & Spa
- January 9, 2015 – $7,569.55 at LG's Prime Steakhouse
- January 18, 2015 – $4,587.04 at LG's Prime Steakhouse
- January 23, 2015 – $3,372.74 at Spencer's Palm Springs
- January 24, 2015 – $6,200.05 at Palm Springs Steak & Chop Restaurant
- January 28, 2015 – $4,147.74 at Melvyn's Restaurant
- January and February 2016 – $6,681.12 at Indian Canyons Golf Resort
- February 3, 2016 – $6,081.04 at Melvyn's Restaurant
- February 12, 2016 – $3,583.47 at Palm Springs Steak & Chop Restaurant[33]

---

[29]  Williams Gov't Sentencing Memorandum at 3.

[30]  *Id.* at 4.

[31]  Ex. A, DeLorenzo Affidavit at 3.

[32]  Johnson Plea Agreement at 10.

[33]  Jewell Plea Agreement at 12–15; Johnson Indictment at 11.

FIRST AMENDED COMPLAINT                    EXHIBIT 13

24.     Indeed, FCA admitted that in January and February 2015 alone, Iacobelli "approved the use of NTC credit cards to pay for over $30,000 in meals for UAW officials at various restaurants in Palm Springs and southern California."[34]

**B.     FCA Compensates Williams With Funds in Foreign Bank Accounts.**

25.     On information and belief, FCA accomplished its bribery scheme in part with bribes paid to Williams and other former UAW officers though a network of hidden foreign bank accounts. As Iacobelli admitted to DeLorenzo, Williams was "in on the FCA graft," and the FCA scheme "was much broader than was known publicly . . . ."[35]

26.     Upon information and belief, for Williams such accounts exist in Switzerland (LGT Bank and Bank Sparhafen) and Liechtenstein (Mason Private Bank) in his name and/or the name of a business entity he controls, the Williams Charity Fund. Through these longstanding foreign bank accounts, Williams was on the payroll of first CNH and then FCA for years even prior to becoming President of the UAW in 2014. There is no legitimate reason for the former Secretary-Treasurer and President of the UAW to have such substantial foreign accounts at these banks in these particular countries known for banking secrecy. For example, Bank Sparhafen is a small regional Swiss bank (158th largest in Switzerland), with only one office (Zurich), but despite its small size has a developed history of helping clients at the expense of the banking laws.[36] Moreover, on information and belief, there is a substantial risk of foreign account transfers, dissipation, and spoliation—some of which has likely already taken place—absent prompt discovery and transparency regarding these foreign accounts.

**II.     THROUGH BRIBERY, FCA'S LABOR COSTS PLUNGE AND GM'S CLIMB.**

27.     In return for bribes, the Williams-led UAW provided FCA with labor programs that gave it cost advantages over GM, while denying GM the ability to implement similar programs, ensuring that it would have a higher cost structure than FCA. "Marchionne felt that anything that could be saved through

---

[34] FCA Plea Agreement (Statement of Facts) at 9. The FCA criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. FCA US LLC*, Case No. 2:21-cr-20031-PDB-APP-1.

[35] Ex. A, DeLorenzo Affidavit at 2, 5.

[36] *See, e.g.*, Press Release, Dep't of Justice, Two More Banks Reach Resolutions Under Justice Department's Swiss Bank Program, https://www.justice.gov/opa/pr/two-more-banks-reach-resolutions-under-justice-departments-swiss-bank-program-1 (June 19, 2015).

**EXHIBIT 13**

the labor negotiations relative to GM would allow FCA to have a competitive advantage over GM."[37] This labor favoritism purchased through bribes, as FCA intended, inflicted massive damage upon and weakened GM in the form of higher labor costs by denying GM the concessions made to FCA. As a result of the bribes, GM faced substantially above-market average labor costs.

28.     For example, a key advantage purchased by FCA through bribery related to "tier-two" employees. As of the 2007 collective bargaining agreement (or "CBA"), Chrysler, GM, and Ford employed both "tier-one" and "tier-two" employees. Tier-two workers are less expensive, entry-level employees who have a lower wage structure.

29.     FCA and GM were initially subject to a 25 percent cap on tier-two workers under the 2007 CBA. This cap was lifted under pre-bankruptcy addendums in 2009, but in their 2009 addendums both FCA and GM agreed to reinstate the cap six years later in the 2015 CBA. GM's 2011 CBA reiterated this commitment, stating that "the parties will mutually agree to a hiring limit based on the entry level percentage as of September 14, 2015" to "be no more than 25% and no less than 20% of the total UAW GM hourly population." In recognition and anticipation of this 2015 tier-two cap, GM kept its proportion of tier-two workers below the anticipated 25 percent cap. By 2015, tier-two workers comprised around 20 percent of the UAW membership at GM.

30.     In exchange for bribes, Williams and other then-UAW officers assured FCA that they would not insist on reinstating the tier-two cap in 2015. Specifically, FCA had reached a secret "side letter" agreement with the UAW that the cap would not be reinstated, yet misled GM and the public by claiming in an October 2011 released summary of the 2011 UAW-FCA CBA terms that "the cap will be reinstated at the end of" the 2011 CBA. Based on this private understanding purchased through bribery that FCA would not be subject to a tier-two cap, FCA hired many more tier-two workers, possessing the valuable foreknowledge that it would not be penalized by any reinstatement of the cap. By 2015, tier-two workers made up around 42 percent of the UAW membership at FCA—double the proportion of tier-two workers at GM. This difference provided FCA with a dramatic advantage with respect to average labor costs. Meanwhile, without this inside knowledge, GM managed to the cap and incurred corresponding

---

[37]   Ex. A, DeLorenzo Affidavit at 5.

1   cost increases anticipating the 2015 cap reinstatement required by the contract. In 2015, as FCA had been

2   privately assured, Williams and the UAW did not insist on reinstating the tier-two cap for FCA and, as

3   negotiated through pattern bargaining, the cap was not reinstated for GM either. In the end, and

4   unbeknownst to GM in advance, ultimately there was no difference between how GM and FCA were

5   treated in the 2015 negotiations with respect to tier-two workers (as a result of pattern bargaining).

6   However, GM was harmed as a result of FCA's bribery because the UAW failed to inform GM in the time

7   period before the expiration of the 2011 CBA that this cap would not be reinstated. Instead, that

8   information was provided only to FCA.

9          31.     FCA ensured that other advantages were denied to GM. For example, upon information

10  and belief, in 2014, FCA and the UAW agreed to a formulary that would make better use of prescriptions

11  that are widely available, significantly reducing FCA's health care costs. The formulary would have saved

12  GM up to $20 million per year. Negotiators for GM repeatedly requested FCA's more cost effective

13  formulary during collective bargaining, but, despite past practice of pattern bargaining, the UAW refused

14  to agree, indicating the term would rankle UAW leadership, though the formulary merely limited the range

15  of prescription drugs available for any particular condition, without preventing the treatment that any

16  individual UAW member received.

17         32.     Taken together, FCA's bribery scheme bought an average hourly wage advantage that took

18  FCA from worst to first among the Detroit automakers. In 2006, Chrysler had the highest average hourly

19  labor cost. Chrysler paid $75.86 on average in wages and benefits to its work force, and GM's predecessor

20  paid $70.51. Chrysler, GM's predecessor, and Ford's labor costs exceeded non-unionized foreign

21  automaker costs by approximately 50 to 80 percent prior to bankruptcy.

22         33.     Through its corruption, FCA was able to gain an average hourly wage advantage over GM.

23  By 2015, FCA slashed its average hourly labor costs to $47—in the range of non-unionized foreign

24  automakers operating in the U.S.—and $8 less on average per hour than GM ($55). FCA's corruptly

25  procured average hourly wage advantage continues to this day: its labor costs are on average $8 per hour

26  less than GM.

27

28

III.  **WILLIAMS CONSPIRES WITH FCA TO ATTEMPT A FORCED MERGER.**

34.  In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne began to use FCA's bribery scheme to pressure GM to merge with FCA.

35.  Knowing that ongoing control of the UAW was essential to the scheme, in 2014, Marchionne turned for support to the new UAW President, longtime friend and merger "wingman," Williams.[38] Marchionne and Williams had known each other since the early 2000s, when Williams negotiated contracts at CNH, the Fiat-affiliated truck and tractor company. Marchionne had been angling for a merger with GM ever since. After failing to effect a merger in 2005, he was emboldened by Fiat's acquisition of Chrysler. As described in the DeLorenzo Affidavit, Marchionne "target[ed] GM because of his desire to be the 'little fish that swallowed the whale,' which was his stated goal when he first took over Chrysler in 2009."[39]

36.  For his part, Williams has admitted that he tries "not to second-guess Sergio."[40] According to Williams, "what we find with [Marchionne] is that he understands manufacturing, he understands the auto industry, he's not a person you take lightly, and he and I have a very good relationship," which it turns out was secured through bribery.[41]

37.  In addition to Williams, FCA also turned to UAW Vice President Ashton. As head of the UAW's GM Department, Ashton had the ability to directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA and, thus, that GM incurred higher costs. By 2014, FCA and the UAW found an even more valuable use for Ashton—designating him to be the UAW Trust's designee on GM's

---

[38]  John D. Stoll, *Union May Help Fiat Chrysler Find a Merger Partner,* WALL STREET JOURNAL (Sept. 16, 2015), https://www.wsj.com/articles/union-may-help-fiat-chrysler-find-a-merger-partner-1442437843 (describing Williams as a "key ally [to Marchionne] in the search for a merger partner. The pair regularly text each other and discuss an array of broad concepts, say associates.").

[39]  Exhibit A, DeLorenzo Affidavit at 5.

[40]  Michael Martinez, *UAW President: Union Monitoring FCA-GM Merger Reports,* DETROIT NEWS (June 18, 2015), https://www.detroitnews.com/story/business/autos/2015/06/18/uaw-monitoring-fca-gm-talks/28925955/.

[41]  UAW President Dennis Williams Press Roundtable (June 18, 2015).

1  Board.[42] On the Board of GM, Ashton was well-positioned to convey to Williams and FCA confidential

2  GM information relating to GM's collective bargaining negotiations and strategy, including with respect

3  to FCA's merger effort.

4      38.     The central purpose of the bribes FCA paid to Williams and other UAW officers was to

5  harm GM in an effort to induce it to merge with FCA to achieve synergies and a higher return on capital.

6  With the scheme well underway, by 2013, Chrysler had only two shareholders: (1) Fiat, which owned a

7  controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

8      39.     In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's

9  stake in Chrysler, offering $139.7 million for 3.3 percent. Fiat and the UAW Trust apparently disagreed

10 over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that

11 "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake

12 in Chrysler."[43]

13     40.     On November 7, 2013, Williams was announced by the insider UAW Administrative

14 Caucus as the presumptive next UAW President.[44] Shortly thereafter, on January 1, 2014, with Williams's

15 full support as the UAW's President-elect, Fiat announced an agreement to acquire the UAW Trust's

16 entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that

17 amount, $1.9 billion, was financed through a special distribution by Chrysler with Chrysler agreeing to

18 pay the UAW Trust another $700 million over four years.

19     41.     Although not a party to the foregoing transaction, the UAW itself entered into an

20 "enforceable" Memorandum of Understanding with FCA promising to "actively assist in the achievement

21 of FCA US's long-term business plan." In short, this agreement was an attempt by FCA and its co-

22

23 ───────────────

24 [42] The UAW Trust was established as a result of the 2007 CBAs between the UAW, FCA, GM, and Ford, which assigned
   retiree health care liabilities to an independent Voluntary Employee Beneficiary Association. Pursuant to restructuring
   following the 2008 financial crisis, the UAW Trust obtained the right to appoint a director to GM's Board.

25
26 [43] Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale*, SEEKING ALPHA (Oct. 17, 2013),
   https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale.

27 [44] Bernie Woodall, *UAW Leaders Give Nod to Williams as Next President*, REUTERS (Nov. 7, 2013),
   https://www.reuters.com/article/us-autos-uaw-president/uaw-leaders-give-nod-to-williams-as-next-president-
28 idUSBRE9A61E720131107 (noting that since 1946, "the UAW candidate endorsed by the administrative caucus has
   always gone on to win election as president").

**EXHIBIT 13**

conspirators to paper over—and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

> FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing** ("WCM") programs, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[45]

42. Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne at the helm of the combined entity.

43. By 2014, GM had rejected multiple overtures from FCA regarding a merger. But in early 2015, having successfully consolidated control over Chrysler, Marchionne believed FCA was in a stronger position to force a merger with GM.

44. With Marchionne as the lead, FCA schemed that it could effectively take over GM through a merger (code-named "Operation Cylinder"), install Marchionne as the CEO of the combined companies, and oversee the largest auto company in the world.[46] The support of Williams was essential to the success of Operation Cylinder because, among other reasons, the UAW could effectively block a merger under certain collective bargaining terms. Marchionne and Williams were well aware that the UAW wielded this veto power over any potential merger.

45. FCA initiated its takeover plans in March 2015, when Marchionne wrote to GM's Board and management, formally proposing the merger between GM and FCA. GM vetted the proposal with management, its advisors, and its Board, and ultimately rejected the offer on April 14, 2015.

46. On June 18, 2015, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM's lead labor negotiator Cathy Clegg attended a meeting with Williams and UAW Vice President Cindy Estrada, Ashton's successor, who relayed and championed Marchionne's merger

---

[45] FCA, 2014 ANNUAL REPORT, at 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_reports/files/FCA_2014_Annual_Report.pdf (emphasis added).

[46] Tommaso Ebhardt, *The Crisis Fiat Faced as It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

1    proposition. Working at Marchionne's behest as a result of the bribery scheme, Williams used his position
2    to press for GM to consider the proposed merger. GM made clear to Williams that it was not interested in
3    merging with FCA.

4        47.    The next day, the GM Board, including Ashton, was informed of the Williams meeting.
5    They were informed that Marchionne had been in direct talks with Williams about a merger and apparently
6    had tapped Williams as FCA's mouthpiece. They were also told that the day before, Williams relayed that
7    Marchionne had told him the GM Board had not seriously considered the FCA merger proposal—an
8    untrue statement.

9        48.    A key to Marchionne's Operation Cylinder scheme was the longstanding practice in the
10   automotive industry known as pattern bargaining, a strategy in which unionized workers across an industry
11   attempt to bargain uniform terms in their contracts. The UAW describes pattern bargaining as "a core part
12   of [its] bargaining strategy"[47] and a "powerful strategic tool."[48] Pattern bargaining is a potent force
13   multiplier: through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-
14   competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams
15   weaponized pattern bargaining, not to protect the interests of the UAW's members, but to advance FCA's
16   interests by promoting Marchionne's merger to the detriment of GM. FCA sought to leverage pattern
17   bargaining to impose asymmetrical costs on GM, with the goal of harming GM by imposing massive labor
18   costs on GM and making it more likely to favorably consider a merger with FCA given the synergies
19   touted by Marchionne. For example, Marchionne had stated publicly that in his view the benefits of
20   consolidation were "too large to ignore," claiming that a merger would produce nearly $5 billion in annual
21   savings based on a reduction in investments and R&D "with no impact on number employed."[49]

22       49.    Approximately every four years, each Detroit-based automaker negotiates a CBA with the
23   UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same

---

[47] UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[48] Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

[49] FCA, *Confessions of a Capital Junkie: An Insider Perspective on the Cure for the Industry's Value-Destroying Addiction to Capital* (Apr. 29, 2015), available at https://www.autonews.com/assets/pdf/ca99316430.pdf.

1   time, resulting in simultaneous negotiation. The UAW begins negotiations with each automaker through

2   subcommittees in July.

3        50.   Months later, and shortly before contract expiration, the UAW selects one of the

4   automakers as a "lead" or "target" company, with which the UAW negotiates a CBA. Then, the UAW

5   exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The

6   UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike.

7        51.   Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern

8   bargaining. The companies ought to compete on a product quality, engineering, and process and not on

9   the backs of workers. That philosophy has been embedded for us since Walter Reuther and it is embedded

10  with Dennis Williams."[50]

11       52.   In 2015 bargaining, based on past practices and having conducted a detailed analysis of the

12  negotiation dynamics, GM reasonably believed that it would be the lead. Industry analysts also did not

13  believe that FCA was a viable lead. FCA was "the smallest of the three companies, with the lowest profit

14  margins and the highest percentage of lower-paid entry-level workers seeking higher wages," which

15  would "make it more difficult for the UAW to win big pay raises for its workers and big signing

16  bonuses."[51]

17       53.   Between July and mid-September 2015, prior to the announcement of the lead company,

18  GM bargained with the UAW through its subcommittees. The GM Board gave its negotiators authority to

19  negotiate within a particular range.

20       54.   During these negotiations, Williams gave his list of "Presidential Demands" to GM. Based

21  on GM's calculations, the UAW's opening demand reflected a CBA with a total cost increase of just under

22  a billion dollars over the 2011 CBA.

23       55.   Prior to September 13, 2015 and before selecting the target for pattern bargaining, both the

24  UAW and GM had made various concessions in their negotiations. Those concessions decreased the total

25

26  _____

    [50] UAW President Dennis Williams Roundtable (June 18, 2015).

27  [51] Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13,

28       2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-
         talks/72091592/.

FIRST AMENDED COMPLAINT                    EXHIBIT 13

1  incremental costs for the new potential deal by more than 20 percent compared to the UAW's initial

2  demand of nearly $1 billion. The UAW's principal negotiators represented to GM that they could "sell

3  it"—that is, the deal that was on the table—to the UAW's members.

4        56.      Unbeknownst to GM, rather than dealing with the automakers at arm's length, Williams

5  and UAW officers' "arms were reaching towards the deep pockets of Fiat Chrysler."[52] Moreover, while

6  serving on GM's Board, Ashton was playing a key role in advancing FCA's scheme to harm GM through

7  the 2015 negotiations. Through his membership on the GM Board and his close relationship with

8  Williams, Ashton was able to provide the UAW and FCA with unparalleled access to information on both

9  sides of the ongoing UAW-GM CBA negotiations.

10        57.      On September 13, 2015, the UAW unexpectedly announced that it had chosen FCA as the

11  lead, a position secured through the years-long bribery scheme between FCA, Williams, and then-UAW

12  officers.

13        58.      Williams had virtually total control over the selection of the lead. Williams chose FCA as

14  the lead, at Marchionne's bidding, in order to use the FCA pattern agreement to harm GM and seek to

15  force a merger between FCA and GM.

16        59.      On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW

17  announced that an agreement had been reached that, in Marchionne's words, was a "transformational

18  deal."[53]

19        60.      Marchionne explained that the "economics of the deal are almost irrelevant" because the

20  costs "pale in comparison given the magnitude of the potential synergies and benefits" of a combination,

21  and cemented a "philosophical approach that [FCA] wants to use going forward."[54] The facts indicate that

22  Marchionne was referring to using the collective bargaining process to pressure a merger between FCA

23  and GM.

24  _____

25  [52]  Jewell Gov't Sentencing Memorandum at 15.

26  [53]  Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS (Sept. 16, 2015),
27      https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

28  [54]  FCA US LLC and UAW Reach a Tentative Contract Agreement Announcement (Sept. 15, 2015), available at
    https://www.youtube.com/watch?v=Ep_4PHdN0Xs&list=ULUmkhHvDUvH0.

1    61.    Williams and the UAW bargaining team celebrated the agreement with a $6,912.81 dinner

2    at the London Chop House in Detroit, paid for by FCA.[55]

3    62.    On September 30, 2015 and despite the richness of the tentative agreement, the UAW's

4    FCA workforce rejected the tentative agreement negotiated by the FCA and UAW officers.[56] Various

5    press reports attributed the rejection to distrust of the union's leadership by its members.

6    63.    On October 8, 2015, FCA and the UAW announced a new tentative agreement, which was

7    similar to the initial tentative agreement in terms of structure and total cost to FCA.[57] The deal was

8    specifically tailored to, and in fact ultimately did, disproportionately harm GM.

9    64.    On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval.

10    65.    On October 25, 2015, GM, selected as the next target, reached a tentative deal with the

11    UAW based on the fraudulently tainted FCA pattern. Although GM tried to resist the use of the FCA

12    agreement as a pattern, the threatened risk of a strike proved too great. As had been intended by the various

13    conspirators, the coercive economic force of pattern bargaining forced GM to largely concede FCA's

14    agreement as a pattern. Additionally, after the pattern agreement was negotiated, Williams personally

15    demanded a substantially larger "ratifications bonus" from GM to consummate the agreement. The 2015

16    GM CBA was ratified by UAW membership on November 20, 2015 and was effective as of November

17    23, 2015.

18    66.    Ultimately, the final CBA between GM and the UAW caused GM to incur approximately

19    $1.9 billion in incremental labor costs over four years—exceeding by more than $1 billion the deal GM

20    believed it had reached with the UAW before Williams's selection of FCA as lead.

---

[55]   Jewell Gov't Sentencing Memorandum at 10.

[56]   During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

[57]   As demonstrated by their actions with respect to the second tentative agreement, UAW officers recognized that the failure of the first tentative agreement was caused by the UAW's failure in messaging and process more than issues with the substance of the agreement. *See* Tracy Samilton, *UAW hopes second time's the charm for new contract with FCA,* MICHIGAN RADIO (Oct. 19, 2015), https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contract-fca.

FIRST AMENDED COMPLAINT                    **EXHIBIT 13**

## IV.   ASHTON AND IACOBELLI PASS CONFIDENTIAL INFORMATION TO WILLIAMS AND FCA, CAUSING HARM TO GM.

67.   In order to aid in the fraud to benefit FCA and harm GM, Williams and FCA placed two informants at GM with access to confidential information.

68.   First, although many of the UAW officers who received bribes from FCA were part of the FCA Department of the UAW, Ashton, the former Vice President of the GM Department, also received such payments. Upon information and belief and as the only reasonable inference under all circumstances, FCA provided Ashton with control over foreign accounts in Japan (Shinsei Bank) and the Cayman Islands (Cayman National Bank) in return for his furthering and not revealing the scheme against GM.

69.   As described above, a key part of the scheme was granting certain cost-savings programs to FCA, while expressly denying those same programs to GM, despite GM's reasonable expectancy of receiving those programs. To carry out this scheme, Ashton's involvement, as head of the GM Department, was essential to ensure that GM did not receive the FCA structural labor programs and related advantages as described herein to impose higher costs on GM. FCA bribed Ashton to carry out his role in the scheme.

70.   In June 2014, Ashton resigned from the UAW when Williams and the UAW chose him to become the UAW Trust's nominee to the GM Board.

71.   Ashton, while serving on GM's Board as a fiduciary, not only failed to disclose the ongoing scheme between FCA and the UAW as was his duty, but, upon information and belief, also proceeded to share confidential GM information with Williams and FCA. This confidential information included GM's strategies and internal positions in connection with the 2015 CBA negotiations.

72.   The specific types of information to which Ashton was privy because of his service on GM's board are extensive. In 2015 alone, a key period both for CBA negotiations and GM's response to FCA's merger effort, Ashton received information showing detailed information regarding GM's actual performance and goals for 2015; early information discussing what GM viewed as the greatest risks in the coming CBA negotiations (specifically identifying the two-tiered wage structure); much more detailed discussions of risks and opportunities from the coming CBA negotiations, including specifically discussions around the two-tier wage structure; and specific discussions of FCA's merger proposal,

**EXHIBIT 13**

1   including GM's detailed strategies for defending against what it viewed as an unattractive proposal. Upon

2   information and belief, based in part on the funds in foreign accounts provided to Ashton, Ashton passed

3   this information to Williams and FCA, allowing them to tailor their approaches (both in labor negotiations

4   and in their merger effort) to inflict maximum pressure on GM.

5       73.    In addition to Ashton, Williams and FCA took steps to install another conspirator inside

6   GM. In June 2015, Iacobelli abruptly resigned from FCA, despite having been at the center of the scheme

7   for years. Although Iacobelli was no longer formally working for FCA during the 2015 negotiations,

8   Iacobelli continued his work as part of FCA's bribery scheme. Immediately after leaving FCA, Iacobelli

9   began reaching out to GM labor relations employees, seeking a position at the company and information

10  about GM's 2015 bargaining with the UAW. Iacobelli then spent months courting GM personnel to hire

11  him as the Executive Director, North American Labor Relations, a senior and critical labor position. Over

12  multiple conversations with GM employees, Iacobelli claimed that he left FCA because he and

13  Marchionne had different visions for the company and it was time for Iacobelli to "move on." GM relied

14  on these representations in hiring Iacobelli. Upon reliable information and significant belief, Iacobelli in

15  fact left FCA for a very different reason: to infiltrate GM so he could provide FCA and other conspirators

16  with confidential GM information. GM hired Iacobelli to work in its labor relations department in January

17  2016.

18      74.    At that time, due to the affirmative steps taken by Williams and FCA to conceal their fraud,

19  GM did not and had no way of knowing of Iacobelli's continued involvement in the long-running scheme

20  to harm GM. Iacobelli never disclosed the scheme or his role in it to anyone at GM. To the contrary,

21  Iacobelli misrepresented to GM his reasons for leaving FCA in order to secure and maintain employment

22  and further the scheme.

23      75.    As a high-ranking employee of GM, Iacobelli owed fiduciary duties to GM. Iacobelli

24  served as Executive Director of Labor Relations for GM from January 2016 until he left his employment

25  following the announcement of his indictment. In this capacity, Iacobelli was a senior executive

26  overseeing all operational labor relations activities including labor strategy.

27      76.    As a high-level executive employee in GM's Labor Relations department with substantial

28  oversight and involvement in CBA negotiations, Iacobelli attended labor strategy meetings with GM

FIRST AMENDED COMPLAINT

**EXHIBIT 13**

senior leadership, which provided Iacobelli access to confidential information concerning GM's labor approaches and strategies in the U.S. and other regions. Iacobelli often provided input to GM concerning strategy decisions involving the UAW and FCA without ever disclosing his multi-year and continuing involvement in a conspiracy with UAW officers and FCA. Indeed, in early 2016, he volunteered to assist with any renewed efforts of Marchionne to merge with GM, telling GM's management that Marchionne was "desperate and vulnerable" and that Marchionne "can't bake a cake in half the time by doubling the heat of the oven." As alleged, Iacobelli's ongoing loyalties and role in the FCA scheme had been bought and paid for partially through the foreign accounts. Upon information and belief, FCA continued to fund these accounts even after Iacobelli left FCA; Iacobelli thus used his position at GM to further the scheme to harm GM by passing to the UAW and FCA the confidential labor strategy information he obtained at GM.

77.     Iacobelli also committed other crimes related to the scheme while employed at GM. For example, on March 28, 2016, Iacobelli filed a fraudulent tax return that omitted $404,504 in illicit income Iacobelli had diverted from the NTC.

78.     The placement of Ashton and Iacobelli inside GM was part of the scheme to target GM for harm, with Williams and FCA succeeding in driving up GM's labor costs for years.

V.     **WILLIAMS AND HIS CO-CONSPIRATORS CONCEAL THE SCHEME AND RESULTING HARM, PREVENTING GM FROM DISCOVERING IT.**

79.     Based on statements made by then-UAW officers and FCA executives and employees, GM reasonably, but incorrectly, believed that FCA acted in good faith and negotiated agreements with the UAW at arm's length, including in 2011 and 2015. For example, Williams represented that the 2015 CBA was a "balanced" agreement that was "a testament to the UAW's democratic values and commitment to our members."[58] Similarly, UAW officers held up the 2011 FCA CBA as proof that "cooperation and collective bargaining work."[59] In fact, the UAW recognized the importance of good faith pattern

---

[58]   Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

[59]   Joseph Szczesny, *Chrysler Agreement with UAW to Add 2,100 New Jobs*, DAILY TRIBUNE (Oct. 12, 2011), https://www.dailytribune.com/sports/chrysler-agreement-with-uaw-to-add-new-jobs/article_bc6b64af-c7b8-5518-874d-7d0a6caea35c.html.

bargaining—including ironically on October 25, 2015, the day the UAW and GM reached a tentative agreement—as it "levels the playing field so companies compete based on the quality of their products or services and not how much they pay . . . their workers." In this way, the UAW falsely assured, "one company cannot gain a competitive advantage over other companies with wages."[60]

80.　　GM had no way to know that FCA had bribed Williams and key UAW officers to ensure FCA received competitive advantages compared to the inflated labor costs that caused GM direct and substantial harm, including, as described herein, a private agreement dated as early as 2010 to avoid reinstating the 2015 cap on FCA tier-two workers, and a commitment from the UAW to support FCA's World Class Manufacturing program while rejecting GM's corollary programs.

81.　　The scheme was inherently self-concealing, as secrecy was essential to perpetuate the scheme. Had the wrongdoing been exposed, FCA and the UAW would have been investigated and prosecuted criminally, bringing the scheme to an end. In addition, Williams, FCA, and others conspired to conceal their bribery scheme from GM (and the world), by adopting extraordinary measures to obscure illegal transactions. As described herein and as admitted in federal plea agreements, they took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length of the scheme, these efforts successfully concealed the scheme and precluded suspicion of their conduct. For example:

> (a) Corrupted FCA executives and then-UAW officers, including Williams, Ashton, Iacobelli, and Durden, hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, and the Cayman Islands. These funds were placed in these offshore accounts expressly to promote and protect the schemes described in this Complaint.

---

[60]　UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

(b) Williams advocated for the use of innovative billing arrangements with various resorts in Palm Springs to conceal the UAW's "'extracurricular activity'" there.[61]

(c) FCA executives "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW."[62]

(d) The co-conspirators used false-front companies and charitable organizations run by members of the UAW to secretly funnel money to other members of the conspiracy for personal use. For example, between July 2009 and 2015, "Durden conspired and agreed with Alphons Iacobelli, [former UAW Vice President] General Holiefield, Monica Morgan, . . . and other individuals and entities, to defraud the United States by using two tax-exempt organizations [the NTC and the Leave the Light on Foundation ("LTLOF")] to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others."[63]

(e) Iacobelli (on March 19, 2015 and March 28, 2016), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments.

(f) Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, the NTC, the LTLOF, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives."[64]

---

[61] Williams Gov't Sentencing Memorandum at 6.

[62] Brown Plea Agreement at 3.

[63] Durden Plea Agreement at 3.

[64] Durden Information at 6.

(g) In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty bucks."[65] Marchionne then falsely denied the gift when questioned by federal investigators.[66] As described in the DeLorenzo Affidavit, Marchionne gave a similar watch (accompanied by a similar note) to Williams.[67]

(h) "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing."[68]

(i) On December 16, 2015, an FCA executive "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials."[69]

(j) From 2014 to 2016, former UAW Vice President Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell and other officials. Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[70]

---

[65] Iacobelli Plea Agreement at 8.

[66] Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say,* DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-corruption/985477002/.

[67] Ex. A, DeLorenzo Affidavit at 3.

[68] Iacobelli Indictment at 20.

[69] Brown Plea Agreement at 5.

[70] Jewell Plea Agreement at 3–4, 13.

FIRST AMENDED COMPLAINT

**EXHIBIT 13**

(k) To this day, key actors in the longstanding FCA conspiracy, including Williams, Ashton, and Jewell, refuse to cooperate fully with the government's investigation. Even as he pleaded guilty, Williams did not accept responsibility for his conduct, pointing the finger at his successor, Gary Jones, whom he claimed had "assured him that everything was 'above board.'"[71]

82.    It was not until July 2017, when the government announced indictments of Iacobelli, Morgan, and Durden, with charges following against former UAW officers, Jewell and Nancy Johnson and FCA executive Michael Brown, among others, that it was revealed that FCA had made prohibited payments to certain UAW officers, though the scope and object of the scheme were not revealed until later. GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to indicate whether it might have been injured by FCA's scheme or whether it might potentially have a cause of action. At the same time, Williams, FCA, and their co-conspirators continued to take active steps to conceal their illegal scheme and its effect on GM.

83.    In 2017 and 2018, in a series of letters and public statements, Williams and FCA falsely warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other rogue and bad actors. As has now been revealed, these statements were flatly untrue, and were designed to evade suspicion and prevent inquiry into criminal conduct:

(a) On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period.*"[72] In fact, Williams himself was a linchpin of the scheme, which was designed to and did corrupt the collective bargaining process.

---

[71]   Williams Sentencing Memorandum at 13.

[72]   Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/ (emphasis added).

FIRST AMENDED COMPLAINT          **EXHIBIT 13**

(b) On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that held roles at the [NTC], an independent legal entity. These egregious acts were neither known to nor sanctioned by FCA US."[73] In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process, and has pleaded guilty to the scheme.[74]

(c) Following a day later in what appear to be coordinated statements, Marchionne published a letter that piggy backed on Williams's false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that *this conduct had nothing whatsoever to do with the collective bargaining process, but rather involved two bad actors* . . . ." Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA."[75] In reality, Marchionne and Williams themselves participated in and spearheaded the scheme to corrupt the collective bargaining process.

(d) On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements, including the 2011 collective bargaining agreement between the UAW and Chrysler."[76]

---

[73] FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

[74] Iacobelli Gov't Sentencing Memorandum at 8.

[75] Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

[76] *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://web.archive.org/web/20171011053453/https://uaw.org/letter-to-uaw-members/ (emphasis added).

(e) On January 26, 2018, days after Iacobelli pleaded guilty, Williams published a letter to UAW members stating: "[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your collective bargaining agreement and no union funds were stolen or lost."[77] Williams himself has now pleaded guilty to embezzling union funds.

(f) On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[78]

(g) On August 27, 2018, FCA released a statement that it "firmly restates that it was a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process*."[79]

84.     Due to Williams and others' concealment of and misrepresentations regarding FCA's bribery scheme and its effect on the collective bargaining process, it was not until after July 23, 2018, when Johnson pleaded guilty and indirectly implicated Williams in the scheme to embezzle funds from UAW training centers, that GM became aware that Williams had a role in it. (Williams was not criminally charged until August 27, 2020.) Thereafter, GM undertook a thorough investigation to begin to discern the manner and extent to which GM was defrauded by Williams's conduct.

85.     Moreover, it was not until 2020, through further due diligence, that GM discovered that FCA's bribery scheme extended to a network of foreign bank accounts (and therefore that Ashton and

---

[77] *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://web.archive.org/web/20180201023757/https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[78] UAW President Dennis Williams Roundtable (May 24, 2018).

[79] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

1  Iacobelli had a continuing role in FCA's scheme when they were employed by GM). However, as alleged,

2  bribes to Williams flowed through the NTC and therefore on FCA's behalf in the form of expensive gifts,

3  meals, and lodging, as well as through the foreign accounts.

4       86.    GM did not and could not have reasonably discovered this information earlier despite due

5  diligence. Public statements, filings, and agreements by Williams and his co-conspirators—which GM

6  reviewed—gave no indication of the true scope of their bribery scheme, much less its impact on the

7  collective bargaining process and GM. To the contrary, as described above, Williams and his co-

8  conspirators concealed their scheme from detection through various misrepresentations to GM and the

9  public intended to deceive GM and deter inquiry.

10  **CAUSES OF ACTION**

11  **FIRST CAUSE OF ACTION**

12  **Intentional Misrepresentation**

13       87.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

14       88.    As alleged in detail above, Williams was part of a long-running scheme in which he

15  knowingly conspired to corrupt the collective bargaining process and defraud and harm GM. In addition

16  to being liable for his own conduct, Williams is liable for the acts, omissions, and misrepresentations of

17  his co-conspirators. These co-conspirators for whose acts Williams is liable include, but are not limited to

18  FCA, Ashton, Iacobelli, and Jewell. Williams and his co-conspirators knowingly or recklessly made

19  numerous misrepresentations to GM pursuant to the conspiracy. As alleged above, these torts were

20  committed pursuant to an agreement by two or more persons to do wrongful acts, including bribery and

21  fraud.

22       89.    For example, on or around September 13, 2015, Williams falsely told GM's CEO that he

23  decided to choose FCA as the lead target in collective bargaining negotiations because of FCA's advantage

24  over GM and Ford in terms of FCA's larger proportion of lower-paid tier-two workers. Williams falsely

25  represented that the UAW needed to reduce the tier-two discrepancy and thereby reduce FCA's

26  competitive advantage. This was a knowingly false representation. In fact, FCA had purchased the lead

27  target position through a years-long bribery scheme between FCA, Williams, and other co-conspirators.

28

1  Williams selected FCA pursuant to this bribery scheme and to increase FCA's advantage over GM, not
2  because of any tier-two discrepancy.

3      90.     This fraudulent misrepresentation, made to GM's CEO during the 2015 collective
4  bargaining process, was intended to and did induce reasonable reliance by GM. This fraudulent
5  misrepresentation induced GM to enter into the 2015 CBA, which was based on the fraudulently tainted
6  FCA pattern agreement. But for this fraudulent misrepresentation, GM would have acted differently.

7      91.     This fraudulent misrepresentation was intended to and did cause harm to GM. As a result
8  of this misrepresentation, GM paid more than $1 billion above what it would have paid in connection with
9  the 2015 CBA.

10     92.     As a director and senior executive employee of GM given substantial trust and authority
11 over labor negotiations, Ashton and Iacobelli owed GM duties of good faith, loyalty, and disclosure. By
12 the time each joined GM, they had actively participated for years in FCA's scheme to corrupt the
13 bargaining process to advantage FCA and harm GM all while enriching themselves as co-conspirators. As
14 described above, in conspiracy with FCA and Williams, Ashton and Iacobelli specifically joined GM to
15 further FCA and Williams's scheme from inside GM's boardroom and negotiating table. Despite owing
16 GM a duty to disclose, neither Ashton nor Iacobelli disclosed FCA's ongoing scheme to GM, their
17 respective roles in the scheme, or the harm resulting to GM from the ongoing scheme. Rather, Ashton and
18 Iacobelli made intentional misrepresentations to occupy positions of trust, funnel GM's confidential
19 information to Williams and FCA, and thereby further the scheme and harm GM.

20     93.     In 2014, when he joined GM's Board of Directors, and each year following his appointment
21 until 2017, through written questionnaires completed by Ashton, Ashton repeatedly made numerous
22 misrepresentations to GM. For example, in conspiracy with Williams and FCA, Ashton repeatedly
23 disclaimed in writing that he had any "business or financial interests or relationships" with a company
24 selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or
25 been offered anything of value by a "third party" "in consideration" for his service as a GM director.
26 Ashton further falsely affirmed that he "adhered" to GM's Code of Conduct, which prohibits "bribery,"
27 among other pertinent illegal activity. In addition, Ashton represented that he had "no special arrangement
28 or understanding between [him] and any other person pursuant to which" he was nominated to the Board,

1  and that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a

2  director of GM." These representations were knowingly false. In fact, at the times Ashton made these

3  written representations, he was engaged in an ongoing scheme with Williams and FCA to harm GM,

4  including by passing confidential GM information to Williams and FCA as part of the scheme, and in

5  return received substantial compensation from FCA.

6        94.    These fraudulent misrepresentations were intended to and did induce reasonable reliance

7  by GM. These fraudulent misrepresentations induced GM to hire, pay, and continue to employ Ashton as

8  a GM director. But for these fraudulent misrepresentations, GM would have acted differently.

9        95.    These fraudulent misrepresentations were intended to and did cause harm to GM. As a

10  result of these misrepresentations, GM hired, paid, and continued to employ Ashton as a GM director. In

11  addition to paying Ashton hundreds of thousands of dollars in compensation, Ashton funneled GM's

12  confidential information to Williams and FCA, permitting them to craft their negotiations to harm GM

13  through increased labor costs.

14        96.    On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain

15  GM Labor department employees that his reason for departing FCA was a disagreement with Marchionne.

16  This was a knowingly false representation. In fact, Iacobelli left FCA in an effort to continue the ongoing

17  scheme of forcing a merger from within GM, and Iacobelli made these representations to GM at the behest

18  of and for the benefit of FCA.

19        97.    This fraudulent misrepresentation was intended to and did induce reasonable reliance by

20  GM. This fraudulent misrepresentation induced GM to hire, employ, and compensate Iacobelli. But for

21  this fraudulent misrepresentation, GM would have acted differently.

22        98.    This fraudulent misrepresentation was intended to and did cause harm to GM. As a result

23  of this misrepresentation, GM hired and compensated Iacobelli. In addition to paying Iacobelli hundreds

24  of thousands of dollars in compensation, Iacobelli funneled GM's confidential information to Williams

25  and FCA, permitting them to craft their negotiations to harm GM through increased labor costs.

26        99.    On February 7, 2016, Iacobelli represented that he would "not discuss or disclose to any

27  person or entity any trade secret or confidential/proprietary information" belonging to GM. This was a

28

FIRST AMENDED COMPLAINT       **EXHIBIT 13**

1   knowingly false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that

2   he was joining GM to access and funnel GM's confidential information to FCA and its co-conspirators.

3        100.    This fraudulent misrepresentation was intended to and did induce reasonable reliance by

4   GM. This fraudulent misrepresentation induced GM to hire, employ, and compensate Iacobelli. But for

5   this fraudulent misrepresentation, GM would have acted differently.

6        101.    This fraudulent misrepresentation was intended to and did cause harm to GM. As a result

7   of this misrepresentation, GM hired and compensated Iacobelli. In addition to paying Iacobelli hundreds

8   of thousands of dollars in compensation, Iacobelli funneled GM's confidential information to Williams

9   and FCA, permitting them to craft their negotiations to harm GM through increased labor costs.

10       102.    On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct

11  which, among other things, prohibited receiving any bribes or improper payments. This was a knowingly

12  false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that he had

13  accepted and would continue to accept bribes and improper payments from FCA in furtherance of their

14  scheme to harm GM and was seeking employment at GM to further that scheme.

15       103.    This fraudulent misrepresentation was intended to and did induce reasonable reliance by

16  GM. This fraudulent misrepresentation induced GM to hire, employ, and compensate Iacobelli. But for

17  this fraudulent misrepresentation, GM would have acted differently.

18       104.    This fraudulent misrepresentation was intended to and did cause harm to GM. As a result

19  of this misrepresentation, GM hired and compensated Iacobelli. In addition to paying Iacobelli hundreds

20  of thousands of dollars in compensation, Iacobelli funneled GM's confidential information to Williams

21  and FCA, permitting them to craft their negotiations to harm GM through increased labor costs.

22  **SECOND CAUSE OF ACTION**

23  **Concealment**

24       105.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

25       106.    By making statements purporting to deal with GM evenhandedly during collective

26  bargaining negotiations and later denying that FCA's bribery had any impact on collective bargaining,

27  Williams concealed the material facts that he and other then-UAW officers were taking bribes from FCA,

28  including during negotiations, that he selected FCA as lead as a result, and that he had been conspiring

1   with FCA and Ashton, among others, to obtain GM's confidential information and impose higher labor

2   costs on GM. In dozens of meetings with members of GM's labor relations team in connection with 2015

3   CBA negotiations, Williams never once revealed that he was part of an ongoing bribery scheme with

4   GM's competitor and one of the other two companies engaged in negotiations with the UAW. During

5   CBA negotiations, Williams personally engaged in in-depth discussions and made specific demands and

6   proposals to GM, and stated that he "appreciated [GM's] work" and believed that the "parties [could]

7   work" with a negotiated GM proposal, before selecting FCA as lead, without disclosing that he had been

8   bribed by FCA all along. Williams also personally demanded a hefty ratification bonus from GM without

9   disclosing that this was part of FCA's scheme to impose an inflated CBA on GM. Further, Williams met

10  with GM executives and made statements to them in support of a merger with GM without disclosing that

11  he had been bribed by FCA to be Marchionne's "wingman" in that effort.

12      107.   Williams had a duty to disclose these facts because of his relationship and transactions with

13  GM. Further, he made representations to GM but failed to disclose facts that materially qualified his

14  representations, or which rendered his disclosures likely to mislead, and his statements actively concealed

15  discovery from GM.

16      108.   Williams intended to and did in fact defraud GM by intentionally concealing these facts.

17  Had he disclosed them, GM would have acted differently.

18      109.   At the time, GM was unaware of these facts, and because of Williams's concealment, paid

19  billions of dollars in labor costs it otherwise would not have incurred, including more than $1 billion above

20  what it would have paid in connection with the 2015 CBA.

21      110.   As alleged in detail above, Williams is also liable for the acts, omissions, and

22  misrepresentations of his co-conspirators. Williams and his co-conspirators knowingly or recklessly

23  concealed information from GM with an intent to deceive. As alleged above, these torts were committed

24  pursuant to an agreement by two or more persons to do wrongful acts, including bribery and fraud.

25      111.   For example, as alleged above, Ashton and Iacobelli owed GM duties of disclosure. By the

26  time each joined GM, they had actively participated for years in FCA's scheme to corrupt the bargaining

27  process to advantage FCA and harm GM all while enriching themselves as co-conspirators. As described

28  above, in conspiracy with FCA and Williams, Ashton and Iacobelli specifically joined GM to further FCA

**EXHIBIT 13**

and Williams's scheme from inside GM's boardroom and negotiating table. Despite owing GM a duty to disclose, neither Ashton nor Iacobelli disclosed FCA's ongoing scheme to GM, their respective roles in the scheme, or the harm resulting to GM from the ongoing scheme. Rather, Ashton and Iacobelli concealed this information to occupy positions of trust, funnel GM's confidential information to Williams and FCA, and thereby further the scheme and harm GM.

112.   Ashton and Iacobelli intended to and did in fact defraud GM by intentionally concealing these facts. Had they disclosed them, GM would have acted differently.

113.   At the time, GM was unaware of these facts, and because of the concealment by Ashton and Iacobelli, GM paid hundreds of thousands of dollars in compensation it otherwise would not have paid, GM had its confidential information stolen and funneled to Williams and FCA, and GM incurred excess labor costs it otherwise would not have incurred.

## THIRD CAUSE OF ACTION

### Unfair Competition
### Violation of Cal. Bus. & Prof. Code 17200

114.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

115.   Williams's acceptance of bribes from FCA in and around Palm Springs and encouragement of other UAW officers to take bribes as part of a scheme to buy advantages for FCA and impose higher costs on GM in an attempt to merge with GM are unlawful, unfair, and/or fraudulent business acts or practices and thus constitute unfair competition under California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200.

116.   Williams's business acts or practices are unlawful under the UCL because they violated laws including 18 U.S.C. § 371 and 29 U.S.C. § 186.

117.   Williams's business acts or practices are unfair under the UCL because they significantly threaten or harm competition without any valid business justification.

118.   Williams's business acts or practices are fraudulent under the UCL because the public is likely to be deceived by Williams's repeated misrepresentations regarding the purported integrity of the collective bargaining process and false denials that the bribery had any effect on labor relations.

119.    As a result of Williams's unlawful, unfair, and/or fraudulent business acts or practices, Williams received substantial payments from FCA funneled through the NTC and foreign bank accounts to which he is not entitled, and GM has been directly harmed.

### FOURTH CAUSE OF ACTION

#### Aiding and Abetting Breach of Fiduciary Duty

120.    Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

121.    As part of his role in the scheme described above, Williams had actual knowledge that Ashton and Iacobelli owed fiduciary duties to GM as a result of Ashton's service on GM's Board of Directors and Iacobelli's high-level position within GM and that they divulged confidential information about GM's strategy and decision-making.

122.    To further FCA's scheme, Williams encouraged and substantially assisted Ashton and Iacobelli in breaching their fiduciary duties to GM by, among other things, funneling the confidential information they obtained through their roles at GM to the UAW and FCA.

123.    As a result of Williams's encouragement of and substantial assistance to Iacobelli and Ashton's breaches, GM was directly harmed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.    A judgment in favor of Plaintiffs on all claims;

2.    Compensatory and general damages in an amount to be determined at trial, including but not limited to the damages GM suffered as a result of Williams's fraud, concealment, substantial assistance to and encouragement of Ashton and Iacobelli's breaches of fiduciary duty to GM, and other wrongful acts committed pursuant to his conspiracy with FCA and others;

3.    An award of punitive and/or exemplary damages as Williams acted with malice and willful disregard for GM's rights;

4.    An award of costs and fees incurred in pursuing this litigation, including attorney's costs, fees, and the fees and costs of experts;

5.    Equitable relief, including injunctive relief and restitution under the UCL; and

6.    Any other relief the Court deems just, fair, necessary, or equitable.

| | |
|---|---|
| 1 | DATED: December 30, 2021 |

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

_[signature]_

Austin Norris (SBN 284603)
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
austin.norris@kirkland.com

Maisie Allison (SBN 324727)
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500
maisie.allison@kirkland.com

[Admitted _Pro Hac Vice_]
Hariklia Karis, P.C.
Jeffrey Willian, P.C.
Stacey G. Pagonis
Casey McGushin
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
stacey.pagonis@kirkland.com
casey.mcgushin@kirkland.com

_Attorneys for Plaintiffs General Motors LLC and General Motors Company_

35

**EXHIBIT 13**

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| A | April 16, 2021 Affidavit of Peter DeLorenzo | 37-48 |

# EXHIBIT A

**EXHIBIT 13**

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

                 Plaintiffs,

v.

ALPHONS IACOBELLI, FCA US LLC, FIAT
CHRYSLER AUTOMOBILES, N.V., JEROME
DURDEN,

                 Defendants.

Civil Action No. 20-011998-CB

Hon. David J. Allen

_____

**AFFIDAVIT OF PETER DELORENZO**

STATE OF MICHIGAN      )
                             ) SS
COUNTY OF WAYNE       )

I, Peter DeLorenzo, being first duly sworn, state:

1.     I am over the age of 18 and make this affidavit based on my own personal knowledge, and if called and sworn as a witness, I could and would testify to the facts stated herein. I hereby attest that the following facts are true and accurate to the best of my recollection.

2.     Since 1999, I have authored a website blog that is titled the AutoExtremist, which primarily addresses issues in the auto industry.

3.     In July 2018, I was contacted via email by Alphons Iacobelli ("Iacobelli") shortly after the passing of Sergio Marchionne on or around July 25 2018. We eventually exchanged at least four emails, which are attached hereto and had two in-person meetings. Iacobelli and I had no prior relationship before he contacted me.

4.     At Iacobelli's request, I met him twice in July 2018 at a Starbucks in Rochester, Michigan, and each meeting lasted approximately 45 minutes to an hour. Iacobelli explained to

**EXHIBIT 13**

me that he wanted me to write a book about the FCA story of corruption and conspiracy with the UAW and the role of certain individuals in that conspiracy. He declared that the scheme and those involved was much broader than was known publicly and provided many of the supporting details as related herein.

5.    Iacobelli stated that he felt I was the one to tell his story. He explained in the past FCA and Sergio Marchionne ("Marchionne") had taken significant note of my public writings about FCA and, therefore, thought I was the correct person to write his book. Based on what he reported to me, I was interested in pursuing such a project with Iacobelli, and we even reached the point of discussing possible titles for the book.

6.    In summary, he told me that he was guilty of participating in what he described as the biggest corporate corruption case in US business history. He related that FCA's UAW "training funds" were nothing more than a slush fund for payouts to union leaders going all the way back to 1985. Iacobelli stated that he was originally hired by FCA to reduce the footprint of the program but then "Sergio & Co" added requests and demanded that money be moved around for various things until the scheme became out of control. He said that monthly payouts to the UAW were around "$250K" but sometimes much more and Marchionne was aware of every bit of it. Iacobelli made it clear that FCA used these payments for "leverage" during the CBA contract negotiations. Iacobelli further stated that the amounts of money expended beyond the monthly amounts are simply incomprehensible.

7.    Iacobelli said the NTC was a scam from the start. The reports of the money that was missing to date were incredibly low given how much was distributed to the UAW on a monthly basis.

38806364.1

**EXHIBIT 13**

8.      Iacobelli spoke at some length about a massive, lavish, estimated $2 million retirement party thrown in Las Vegas by FCA for a high-level UAW official who I understood to be UAW President, Dennis Williams, based on a description of the timing and purpose of the party. Iacobelli indicated that this Vegas based party had recently happened, that the event lasted several days and that FCA paid for everything associated with it.

9.      Iacobelli stated that UAW executives regularly traveled to Las Vegas, often monthly, at FCA's expense. He said that top UAW executives would also use a house paid for by FCA in Palm Springs whenever the need or desire arose.

10.     Iacobelli reported that Marchionne gave two expensive watches to UAW officers other than the one he reportedly gave to General Holiefield -- and that one such watch was given to Williams.  Each watch gift from Marchionne purportedly contained a carefully written note to help suggest the watch had minimal value.  I don't recall if Iacobelli indicated who received the other watch.  I asked Iacobelli what Marchionne knew about the scheme in general, and he said Marchionne knew everything about the payments to the UAW, and that nothing happened without Marchionne's knowledge.  Iacobelli made it clear that Marchionne was a micro-manager and knew all details.

11.     Iacobelli agreed that Marchionne would have been criminally indicted, but for his untimely death, given his central and controlling role in the scheme to pay the UAW.

12.     Iacobelli said that Marchionne orchestrated the funneling of money to the upper hierarchy of UAW, including cash, free trips, and gifts for their spouses.

13.     Iacobelli told me that Marchionne's end game was to have the UAW in his pocket so that he could then make a move on GM to force a merger.  Iacobelli stated unequivocally that

3

Marchionne's goal was to gain a competitive advantage over GM through labor costs in order to force a takeover.

14.     Iacobelli said that Ron Gettelfinger did not want any part of the money directly from the NTC, but Bob King took money, trips, and items of value along with Dennis Williams. This was part of Marchionne's operational strategy from the start, according to Iacobelli.  He further stated that most of the executives of the UAW were on the take as he later related names of those individuals.

15.     Iacobelli said "they were all on the take and were all going down," and that Nancy Rae of FCA knew about the payments.  Iacobelli also told me that anyone who worked closely with or for Iacobelli knew that he had virtually unlimited spending at his disposal as part of this scheme to bribe the UAW executives.

16.     Iacobelli allowed me to review documents that he brought to both of our meetings. The documents were in two manila folders, one of which was at least three inches thick with a rubber band around it and the other was approximately two inches thick with no rubber band. There were hundreds of pages of documents in these folders.  Iacobelli claimed that these documents verified his statements about the scope and scale of the scheme to payoff UAW officials and Marchionne's orchestration of that scheme. I could see that these documents included lengthy memos (several pages long and single-spaced) and contained information about payments and responsibility for payments.  Iacobelli's documents appeared to be contemporaneous business records of FCA and not after the fact notes created by Iacobelli.  Among the documents that I was shown were memos involving Marchionne discussing essential elements of the golf tournaments and methods for orchestrating the passing of money to the UAW.  The documents contained descriptions of actual payments to UAW officials and appeared to establish that Marchionne knew

38806364.1

**EXHIBIT 13**

about them.  There were many emails that Iacobelli showed me that reflected the scope of the payments to the UAW officials and how they were going to be distributed, and he expressed satisfaction that what he was relating to me regarding the scope and nature of the scheme and Marchionne's clear involvement was well-documented. Iacobelli claimed Marchionne asked him to leave FCA after he expressed misgivings about the growing nature of the scheme to Marchionne and his chief Lieutenant, who I believe Iacobelli said was Alfred Altavilla.

17.     Iacobelli said that the sales scheme, which was the subject of FCA's government settlement, was Marchionne's idea all the way, and that he was a micro-manager and knew everything.

18.     Iacobelli said that the UAW executive charities were used to funnel money, but did not provide details.

19.     Iacobelli said that Marchionne felt that anything that could be saved through the labor negotiations relative to GM would allow FCA to have a competitive advantage over GM. Ford never was mentioned.  Iacobelli made clear that Sergio was targeting GM because of his desire to be the "little fish that swallowed the whale," which was his stated goal when he first took over Chrysler in 2009.

20.     Iacobelli confirmed the following UAW executives were in on the FCA graft: James Settles, Gary Casteel, Bob King, Dennis Williams, General Holiefield, Joe Ashton, and Norwood Jewell. Iacobelli never mentioned Cindy Estrada to me.

21.     After our second meeting and follow-on email discussion about the book title and a book outline that Iacobelli stated he was working on, Iacobelli did not contact me further.  I do not know why he ceased communication with me.

38806364.1

**EXHIBIT 13**

22.     On November 23, 2019, I publicly wrote about my meeting with Iacobelli. I made clear in the column that Iacobelli had spelled out to me the broad scope and details of FCA's scheme to corrupt the UAW and extract better labor terms. For example, I wrote: "Over those two meetings, Iacobelli presented a devastating account of just how deep the payoffs to UAW officials actually were. The FCA-UAW training centers were a complete joke, with UAW members reporting to the centers to do nothing, if they bothered to show up at all. And the tales of payments for plane trips, vacations, binges in Las Vegas and myriad other gifts, cash and prizes were eye-opening, including a $2 million retirement party for an outgoing UAW executive that was staged in Las Vegas. Iacobelli said approximately $250,000 a month was spent keeping the UAW officials in line, in some months less, but in some months much more than that. And it was all designed to extract favorable considerations from the UAW, which translated into reduced labor costs to FCA. And Iacobelli named names... And make no mistake, Marchionne was up to his eyeballs in every bit of it, according to Iacobelli. In fact, given what he said – including Marchionne gifting expensive watches to key UAW officials with a carefully-worded note attached so they couldn't be construed to having any value - I surmised that Marchionne would have been indicted if he hadn't passed away, and Iacobelli didn't disagree with my assessment." No one from the federal government or FCA ever contacted me to discuss my meetings with Iacobelli, what documents he had in his possession or what facts he related to me.

23.     Unrelated to my meetings with Iacobelli, beginning in May 2019 I have been a party to a consulting agreement with General Motors LLC pursuant to which I have provided strategic consulting services in the areas of design and marketing, with a particular focus on Cadillac and GM's electric car programs. At no time at or around the time that I entered into the consulting agreement with GM did I disclose or discuss with GM that I had met or communicated

with Mr. Iacobelli as described herein nor did I disclose to anyone at GM the information shared

with me by Mr. Iacobelli.  Nothing that I have recounted here in my affidavit has been influenced

by the referenced 2019 consulting agreement with GM.

FURTHER AFFIANT SAYETH NOT.

Peter DeLorenzo

Subscribed and sworn to before
me this _____ day of April, 2021

Notary Public, _____, MI
My Commission Expires: _____

LANITA Y. CATO
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Sep 30, 2024
ACTING IN COUNTY OF

7

38806364.1

Exhibit A
Page 44

**EXHIBIT 13**

**From:** "Peter DeLorenzo" <renzo@peterdelorenzo.com>
**To:** "Al Iacobelli" <al.iacobelli@wowway.com>
**Sent:** Sunday, July 29, 2018 4:58:30 AM
**Subject:** Initial Thoughts..

Hi Al,

I have a few initial thoughts.

First of all I am making initial contacts with a couple of publishers, one of which published the Number 1 best selling business book of 2017.

Secondly; I have a *preliminary* working title in mind for discussion as well:

SCREWED. The inside story of one of the biggest corporate corruption cases in U.S. History.

I am finding out what the publisher needs in order for us to pitch the book, but I assume I will write an intro and we will provide an outline, and maybe a snippet of the first chapter.

I feel the book should open on the day you were approached by the authorities; including everything you were feeling that day.

Then the book would go back to the beginning and the story would unfold as it happened, with specific highlights, moments, scenes, emails, bad actors within FCA (Sergio et al) and so on.

Peter

**EXHIBIT 13**

**This email exchange was with Al about the direction of the book, and a title...**

-------- Forwarded Message --------
**Subject:** Re: Initial Thoughts..
   **Date:** Mon, 30 Jul 2018 12:43:33 -0400 (EDT)
   **From:** Alphons Iacobelli <al.iacobelli@wowway.com>
     **To:** Peter DeLorenzo <renzo@peterdelorenzo.com>

My apologies for the delay in getting back to you.

I agree with your initial thoughts and at first blush, I like the title also.

In terms of flow, I am completely open but I would assume an editor will likely want a word in that. I am currently working on the outline that is more chronologically driven (for now) but will inevitably change to accommodate a reader's interest. I love the idea of opening the book with the day the Feds came to the house then going back. I like the idea of you writing the intro also. I want to arm you with the various sub plots which I think the outline will cover thoroughly. Then let your creative genius take over. I'll keep you posted on my progress.

I can't thank you enough for your assistance and at the very least being a voice of truth. I truly respect your courage to write the unmitigated truth. There aren't a lot of us left out there. I feel that outside the "Detroit Bubble" people have a much different view of our industry and you capture it.

I'll stay close as I grind through the outline. I would like to share a high level version as soon as I can so I will stay close. Thank you talk soon. Al

**EXHIBIT 13**

**Response:**

---------- Forwarded message ----------
From: **Peter DeLorenzo** <renzo@peterdelorenzo.com>
Date: Mon, Jul 30, 2018 at 1:31 PM
Subject: Re: Initial Thoughts..
To: Alphons Iacobelli <al.iacobelli@wowway.com>

Thank you, Al.

I will keep thinking about the title. It could be even more specific to the subject matter but maybe not quite as punchy, as in:

SCAM: How Fiat Chrysler and the UAW conspired together to commit one of the biggest cases of corporate fraud in U.S. history.

I will probably come up with a few more as we go...

Peter

**EXHIBIT 13**

**More:**

---------- Forwarded message ----------
From: **Peter DeLorenzo** <renzo@peterdelorenzo.com>
Date: Mon, Jul 30, 2018 at 6:25 PM
Subject: More thoughts.
To: Alphons Iacobelli <al.iacobelli@wowway.com>

Al,

Upon further review; I like this title because it combines the impact of SCREWED while naming the players, which is important:

SCREWED. How Fiat Chrysler and the UAW conspired to commit one of the biggest cases of corporate fraud in U.S. history.

Peter

**EXHIBIT 13**