UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GENERAL MOTORS LLC, and, GENERAL MOTORS COMPANY, | Case No. 22-50034 |
| Plaintiffs, | George Caram Steeh U.S. District Judge |
| v. | |
| JOSEPH ASHTON, | David R. Grand U.S. Magistrate Judge |
| Defendant. | Arising from *General Motors LLC et al. v. Ashton*, No. 20-cv-12659 (D.N.J.) |
| _____/ | |

**ORDER GRANTING IN PART AND DENYING IN PART
MOTION TO QUASH SUBPOENA *DUCES TECUM* FILED
BY NON-PARTY SUSAN IACOBELLI (ECF No. 1)**

**Background**

This miscellaneous action was commenced on January 12, 2022, by Susan Iacobelli ("Ms. Iacobelli"), who resides in this district. In short, General Motors LLC and General Motors Company (collectively, "GM") served Ms. Iacobelli with a subpoena *duces tecum* (the "Subpoena") in connection with the case of *General Motors LLC, et al. v. Ashton*, No. 20-12659, which is pending the District of New Jersey (the "New Jersey Action"). Neither Ms. Iacobelli nor her husband, Alphons Iacobelli ("Mr. Iacobelli"), is a party to the New Jersey Action. However, Mr. Iacobelli is a defendant in different litigation brought by General Motors which is pending in the Wayne County Circuit Court (the "Wayne County Action"), and the parties agree that the facts of the New Jersey and Wayne County Actions largely overlap.

In the New Jersey Action, GM alleges that Ashton engaged in two wrongful schemes, which the judge assigned to that action summarized as follows:

- "Ashton committed fraud and a breach of his fiduciary duties to GM by participating in a 'criminal kickback scheme' that siphoned money from the [UAW-GM Center for Human Resources] CHR. The Complaint alleges that Ashton and several co-conspirators 'deceptively solicited, influenced, and obtained contracts for CHR vendors to provide clothing and other items to UAW members.' [] In return, they 'demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value.'"

- "The second theory of liability asserts that Ashton acted improperly in his role on GM's board during GM's 2015 collective bargaining negotiations. As part of this theory, the Complaint alleges that Ashton disclosed confidential information discussed in GM board meetings to Fiat Chrysler ('FCA') and Fiat Chrysler Automobiles N.V. ('FCA NV.') The Complaint alleges that FCA and FCA NV gave millions of dollars to UAW officials to obtain advantages for FCA and secure disadvantages for GM in negotiating and implementing collective bargaining agreements."

While Mr. Iacobelli is not a named defendant in the New Jersey Action, he is referenced throughout the operative complaint in that case, and there appears to be no dispute that he is one of the alleged "co-conspirators" referenced therein. Indeed, GM has characterized its complaint in the New Jersey Action as alleging "that FCA (acting through agents *such as Mr. Iacobelli*) directed improper payments to Mr. Ashton and others in a direct effort to harm GM, and that FCA employees (*such as Mr. Iacobelli*) also maintained such accounts." (ECF No. 1, PageID.209) (emphasis added). Moreover, GM admits that the allegations against Mr. Iacobelli in the Wayne County Action "overlap" the claims against Ashton in the New Jersey Action. (*Id.*). The following allegations from the operative complaint against Mr. Iacobelli in the Wayne County Action confirms the "overlap":

2

1. This case is about (what was) an Italian company, Fiat Chrysler Automobiles N.V. (now known as Stellantis, N.V. and referred to herein as "FCA NV"), which obtained operational control over an iconic U.S. auto company, Chrysler Group LLC. Shortly after the acquisition, FCA NV and its wholly-owned subsidiary FCA US LLC ("FCA") embarked on a systemic and near decade-long conspiracy to bribe certain senior union officials to corrupt the collective bargaining process and inflict harm upon GM in order to weaken GM and have it acquiesce to FCA NV's desire that the two companies combine. This is not a garden-variety corporate corruption scheme; Defendant Alphons Iacobelli described his involvement as being part of the biggest corporate corruption case in U.S. business history.

\* \* \*

4. Through this lawsuit, GM seeks recourse against FCA, FCA NV, Iacobelli, and Durden for this long-running bribery scheme and its numerous related frauds and torts, all of which were intended to and did cause billions of dollars of harm to GM.

\* \* \*

7. . . . Upon information and belief, and as the only plausible inference based on the facts revealed thus far and the statements of Iacobelli, FCA NV and/or FCA provided millions of dollars to co-conspirators via numerous undisclosed offshore bank accounts and utilized such accounts to purchase the support and silence of numerous high-level UAW officers and FCA executives. These recipients of FCA-funded offshore accounts include former UAW Presidents, including Dennis Williams, ***former UAW Vice President Joseph Ashton, and Iacobelli*** and Durden, ***who centrally orchestrated the scheme on Defendants' behalf***. FCA and FCA NV then furthered their scheme from inside GM. First, FCA, FCA NV, and Williams chose Ashton to be the UAW Trust's designee on GM's Board. Second, Defendants placed Iacobelli in a high-level position within GM's Labor Relations department. ***Ashton and Iacobelli secured and maintained these positions through years of affirmative misrepresentations and fraudulent omissions to GM***, which had no knowledge of Defendants' scheme or ***Ashton's and Iacobelli's central roles in the scheme***.

8. Once inside, and unbeknownst to GM, ***Ashton and Iacobelli utilized their access*** to GM's highly confidential and competitively sensitive negotiating and labor relations information and funneled this information to FCA, FCA NV, and their co-conspirators. For example, Ashton provided information to FCA, FCA NV, and their co-conspirators from the UAW about GM's

3

> negotiation strategies during the 2015 CBA negotiations and information about GM's response to FCA NV's merger overtures, while Iacobelli provided information about GM's labor strategy obtained in meetings with other members of GM senior leadership. ***Despite owing GM fiduciary duties, neither Ashton nor Iacobelli disclosed this criminal scheme or their roles in it to anyone at GM.***

(ECF No. 11, PageID.409-13).

In connection with the New Jersey Action, GM has served Ms. Iacobelli with a subpoena duces tecum (the "Subpoena"). In seeking to depose Ms. Iacobelli, GM notes that "no party has asserted any claim against Mrs. Iacobelli in any case" (ECF No. 10, PageID.255), and that its goal is to obtain information about the "overall scheme" Mr. Iacobelli is alleged to be involved with and his particular role in the scheme: "***The subpoenas to Ms. Iacobelli*** and [Mr. Iacobelli's third-party company] BAG seek relevant information and documents they may possess *about the overall scheme* and these ***dealings by Mr. Iacobelli***, including information concerning foreign accounts held in the name of Ms. Iacobelli or BAG ***for the benefit of Mr. Iacobelli***." (ECF No. 1, PageID.209) (emphasis added).

Ms. Iacobelli has commenced this miscellaneous action by filing the instant motion to quash the Subpoena "because [she] is the spouse of Alphons Iacobelli, and Alphons Iacobelli has not consented to that deposition." (ECF No. 1, PageID.16). Ms. Iacobelli relies on MCL 600.2162(1), which provides, in relevant part:

> In a civil action . . . a husband shall not be examined as a witness for or against his wife without her consent or a wife for or against her husband without his consent, except as provided in subsection (3)[1] . . .

---

[1] The parties have not argued that any of the exceptions are applicable here.

4

MCL 600.2162(1).

Ms. Iacobelli summed up her argument in her reply brief: "[GM has] consistently alleged in the [New Jersey and Wayne County] Actions that as an alleged coconspirator, Mr. Iacobelli is liable for the alleged acts and conduct of Mr. Ashton [] and the other alleged co-conspirators. The deposition of Mrs. Iacobelli cannot be viewed in isolation but must instead be viewed in the context of this and the [New Jersey and Wayne County] Actions which, although separately brought, are unquestionably interrelated by reason of the overlapping allegations of conspiratorial conduct in furtherance of a single scheme – and the testimony sought is thus either 'for or against' Mr. Iacobelli." (ECF No. 11, PageID.262). In its response brief, GM argued principally that MCL 600.2162(1) does not apply because "the spousal testimony privilege only applies where a spouse is a party to the underlying lawsuit." (ECF No. 10, PageID.252-56). GM devoted about a page to its argument that it "has reason to believe that Mrs. Iacobelli has personal knowledge relevant to the claims at issue in the Ashton Action. As recounted in Mrs. Iacobelli's Motion through the lengthy citation of [the New Jersey Action's presiding judge's] Order denying Mr. Ashton's motion to dismiss, one aspect of GM's claims against Mr. Ashton arise from the payment of funds to numerous individuals through foreign financial accounts. GM has reason to believe that such accounts exist at one or more foreign financial institutions in Mrs. Iacobelli's name ***and that she has played a role*** in other accounts in her husband's name and the name of Business Advisory Group (Mr. Iacobelli's personal business)."[2] (*Id.*,

---

[2] This assertion raises questions about GM's contentions that Ms. Iacobelli is not a party to any of the actions regarding the alleged scheme, and that through the subpoenas GM seeks information

PageID.256) (emphasis added).

The Court held oral argument on March 8, 2022, during which it explained, in detail, why GM's argument about the applicability of Michigan's spousal testimony privilege lacked merit. (ECF No. 15). The Court incorporates that ruling herein by reference. Despite the significant "overlap" discussed above, the Court was unwilling to prospectively rule that any and all conceivable questions GM may wish to ask of Ms. Ashton would be covered by the privilege. (*Id.*). Accordingly, it encouraged the parties to "think about the purpose of this privilege," which the Michigan Court of Appeals described as "preservation of marital harmony," (*Id.*, PageID.586-87) (quoting *People v. Armentero*, 148 Mich. App. 120, 128-29 (1986), bearing in mind that "ask[ing] a spouse to testify in a way that is directly adversarial to her spouse's, whether it's financial interests or potential criminal responsibility, [] could very easily invade that privilege and that marital harmony." (*Id.*, PageID.587). Thus, the Court suggested that the deposition proceed with the understanding that "questions that [] GM reasonably expects to elicit testimony for or against Mr. Iacobelli in any other kind of proceeding would be off base . . ." (*Id.*, PageID.588).

While the Court was hopeful its guidance would enable the parties to proceed with Ms. Iacobelli's deposition, it recognized that a deposition where the privilege was asserted in response to every question, followed by a new motion, would be highly inefficient. Thus, the Court permitted the parties to file supplemental briefs to the extent they were

---

"about the overall scheme and these dealings by Mr. Iacobelli, including information concerning foreign accounts held in the name of Ms. Iacobelli or BAG for the benefit of Mr. Iacobelli." Regardless, the Court makes its decision based on the facts and law, not characterizations.

able to identify specific questions GM was proposing to ask. The parties then filed multiple supplemental briefs, which essentially boil down a dispute about whether GM may question Ms. Iacobelli about any of the following proposed "topics":

> 1. Ms. Iacobelli's work history, including any relationship she has or has had with UAW.
>
> 2. Whether Ms. Iacobelli personally knows or has had conversations with any of the key individuals in the underlying scheme (Ashton, Marchionne, Williams, etc.).
>
> 3. Foreign countries Ms. Iacobelli has traveled to since 2012.
>
> 4. Direct or indirect communications Ms. Iacobelli has had related to foreign countries or accounts.
>
> 5. Purchases on Ms. Iacobelli's credit cards reflected in the documents that have been produced.
>
> 6. Ms. Iacobelli's knowledge on foreign accounts including related transactions over which she has or had an interest, authority or control.
>
> 7. Topics related to document discovery—i.e., whether Ms. Iacobelli kept notes, what email account(s) she uses, what messaging applications or other methods of electronic communication (including devices) she has used since 2012.
>
> 8. Ms. Iacobelli's involvement in discarding or deleting documents or data that has been discarded or deleted which she has been involved with directly or indirectly regarding FCA, GM or the UAW.
>
> 9. Foreign property in which Ms. Iacobelli has an interest.

The Court will rule on each of the disputed topics below.

## **Applicable Standards**

The privilege which prevents one spouse from being compelled to provide testimony "for or against" the other spouse exists to preserve "marital harmony." On the

other hand, because "the public . . . has a right to every man's evidence," Michigan law has made clear that the spousal privilege should be narrowly construed, and exceptions to the privilege should be broadly construed. *People v. Fisher*, 442 Mich. 560, 574-75 (1993); *People v. Eberhardt*, 205 Mich. App. 587, 589–90 (1994). A number of other more general rules of discovery are also applicable. First, "[a] subpoena to a third party under Rule 45 is subject to the same discovery limitations as those set out in Rule 26." *United States v. Blue Cross Blue Shield of Michigan*, No. 10-14155, 2012 WL 4513600, at *5 (E.D. Mich. Oct. 1, 2012). Second, Rule 26(b)(1) provides for liberal discovery, allowing parties to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Finally, in a conspiracy case, allowable discovery includes that which will reveal "the connections between and among the named parties and various non-parties who were also alleged to be part of the underlying conspiracy," "the scope of the fraud," and "additional potential parties and witnesses." *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, No. 12-CV-11500, 2013 WL 10572229, at *3 (E.D. Mich. Aug. 13, 2013).

**Discussion**

      Taking all of the foregoing principles into account, the Court finds that Ms.

Iacobelli's position rests on too broad an interpretation of Michigan's spousal privilege, and fails to appreciate the other competing considerations discussed above, including that the Court must narrowly construe the privilege. As GM aptly characterizes it, Ms. Iacobelli's interpretation of the privilege takes "the broadest possible view" of its contours (ECF No. 22, PageID.1152), arguing that because the claims against Ashton and Mr. Iacobelli "are unquestionably interrelated by reason of the overlapping allegations of conspiratorial conduct in furtherance of a single alleged scheme," any topic that could have any possible connection to the alleged scheme, even if that topic concerns *only Ms. Iacobelli*, or conduct that involves *only Ashton*, would necessarily elicit testimony that is "either 'for or against' Mr. Iacobelli." (ECF No. 24, PageID.1248-49).

### Topic 1 – Ms. Iacobelli's work history, including any relationship she has or has had with the UAW

Ms. Iacobelli objects to this topic, "to the extent that the proposed examination seeks information relating to any 'relationship with UAW, etc' that involves the alleged 'scheme.' Any such examination would necessarily be 'for or against' Mr. Iacobelli and not a permissible topic of examination for the reason that [GM has] alleged that the alleged foreign accounts were part of a 'scheme to bribe former UAW officials to benefit FCA and harm GM.'" (ECF No. 24, PageID.1249). The Court concurs with GM that asking Ms. Iacobelli about her "preexisting professional relationship with the UAW" does not impermissibly invade the spousal privilege, as no answer to such a question would implicate her husband in any wrongdoing. Of course, as GM recognizes (ECF No. 25, PageID.1274), should the questions turn to, for example, specific relationships intertwined

9

with the allegations underlying the alleged "scheme," it might be appropriate to assert the spousal privilege.

### Topic 2 – Whether Ms. Iacobelli personally knows or has had conversations with any of the "key individuals in the underlying scheme"

This topic seems not to be in dispute. Ms. Iacobelli "limited her objection to the extent that [GM] seeks to discover the occurrence of (if any) and/or conversations (if any) with any of those persons [GM] refer[s] to as the 'key players in the scheme.'" GM recognizes this, and agrees those questions differ from ones directed at Ms. Iacobelli's "knowledge, if any, of conversations between the 'key players in the scheme.'" (ECF No. 25, PageID.1275).

### Topics 3, 4, 6, 11, 12[3] – "Foreign countries Ms. Iacobelli has traveled to since 2012," "Direct or indirect communications Ms. Iacobelli has had related to foreign countries or accounts," "Ms. Iacobelli's knowledge on foreign accounts including related transactions over which she has or had an interest, authority or control," "Any documents or data that has been discarded or deleted she has been involved with directly or indirectly regarding FCA, GM or the UAW including foreign accounts," and "Foreign property in which she has an interest"

Ms. Iacobelli argues that because GM alleges that "each of Mr. Iacobelli, Mr. Ashton, Mr. Williams, FCA and others conspired, in return for payments by FCA to unidentified foreign bank accounts, to breach alleged duties to one or both of the Plaintiffs," any question to Ms. Iacobelli about foreign bank accounts or property necessarily would elicit information "for or against" her husband. (ECF No. 24, PageID.1254). Of course, in a way she is correct; the answer to any question is arguably

---

[3] In its supplemental brief, GM listed only nine topics, having "consolidated" certain topics identified in a prior list. In its response, Ms. Iacobelli addressed twelve "topics."

10

either "against" Mr. Iacobelli because it implicates him, or "for" Mr. Iacobelli, because it exculpates or at least does not implicate him, in the alleged scheme. But the requirement that the Court narrowly construe the privilege simply doesn't allow for this "broadest possible" interpretation. And Ms. Iacobelli's additional arguments related to these topics show why. Ms. Iacobelli points to her interpretation of certain of GM's allegations as pertaining to **her own alleged wrongdoing**. For instance, she argues that "GM alleges that 'FCA NV compensated [Mr.] Iacobelli extremely well for his role in the scheme, including providing him with control over millions of dollars held in financial accounts in Switzerland (UBS and Credit Suisse), Italy (Deutsche Bank), Liechtenstein (VP Bank Vaduz) and Singapore (DBS Band) both directly, **through family [Susanne Iacobelli]**, and through a corporate entity he controls [Business Advisory Group]'" and that "GM strongly implies in this Ashton Action that **Mrs. Iacobelli is a coconspirator** in the alleged scheme of which GM complains." (*Id.*, PageID.1255) (emphasis added).

At least insofar as the accounts and assets in question are Ms. Iacobelli's alone, and don't involve conduct by Mr. Iacobelli, rather than a concern about being compelled to testify "for or against her husband," Ms. Iacobelli's concern is really about being compelled to testify ***against herself***.[4] There's a privilege that may apply to such testimony, but it's not the spousal privilege contained within MCL 600.2162(1). Thus, narrowly construing the privilege – and as GM recognizes – while "Ms. Iacobelli may assert a spousal privilege argument to the extent that property or accounts are jointly held between her and her

---

[4] And, the questions are really about determining the alleged scheme's scope, rather than any other particular person's alleged involvement in it. *Physiomatrix*, 2013 WL 10572229, at *3.

11

husband," "to the extent the property is solely under her control, testimony concerning the existence of such accounts would not upset marital harmony or be 'for or against' her husband.  Likewise, Ms. Iacobelli may be able to maintain an objection on spousal privilege to the extent testifying concerning her travel would also speak to the travel of Mr. Iacobelli; but testimony concerning travel Ms. Iacobelli took unrelated to the travel of her husband [does not] not implicate the spousal privilege."  (ECF No. 25, PageID.1276).

In sum, to the extent GM's questions to Ms. Iacobelli pertain only to her own foreign accounts and assets, and involve only her own dealings therewith, Michigan's spousal privilege does not apply.

### Topic 5 – Purchases on Ms. Iacobelli's credit cards reflected in the documents that have been produced

Topic 5 concerns purchases made on Ms. Iacobelli's AMEX card.  In asserting the spousal privilege, Ms. Iacobelli argues, "since [GM] allege[s] them to be part of the alleged 'scheme'" her testimony about the charges would be "for or against" her husband.  (ECF No. 24, PageID.1258).  Again, GM seems to agree that "there could conceivably be specific purchases that could not be inquired into because disclosing the purchases would disclose something about Mr. Iacobelli's involvement in the scheme."  (ECF No. 25, PageID.1276-77).  However, to the extent charges reflect "Ms. Iacobelli's own purchases on her credit cards," GM's position is that the spousal privilege does not apply.  As explained above, *see supra* at 11-12, narrowly construing the spousal privilege, the Court agrees with GM, and finds that Ms. Iacobelli cannot properly invoke that privilege with respect to questions put to her about her own use, of her own credit card.

### Topic 10 – Any role Ms. Iacobelli took in communicating with Peter DeLorenzo

In the Wayne County Action, GM alleges that shortly after Sergio Marchionne died in July 2018, Mr. Iacobelli met with Peter DeLorenzo, who writes about the auto industry, to solicit DeLorenzo to "help him write a 'tell-all' book regarding FCA's effective scheme to bribe the UAW." (ECF No. 11, PageID.410-11). GM alleges that Mr. Iacobelli "told DeLorenzo that the scope of the FCA scheme was far broader than what had been publicly revealed at the time and even showed contemporaneous FCA documents to DeLorenzo confirming Marchionne's involvement in the bribery scheme." (*Id.*, PageID.411).

To the extent Ms. Iacobelli had any "role" in communications with DeLorenzo concerning the discussions, meetings, etc., between DeLorenzo and Mr. Iacobelli, the spousal privilege would apply. While the present allegations make it difficult to envision questions to Ms. Iacobelli that would *not* be covered by the privilege, to the extent she and DeLorenzo communicated regarding matters not involving Mr. Iacobelli or the information he discussed with DeLorenzo, the privilege would not apply.

### Conclusion

Ms. Iacobelli's motion to quash GM's subpoena *duces tecum* **(ECF No. 1)** is **GRANTED IN PART AND DENIED IN PART** as discussed above.

**SO ORDERED.**

Dated: June 1, 2022  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties' attention is drawn to Fed. R. Civ. P. 72(a), which provides a period of fourteen (14) days from the date of receipt of a copy of this order within which to file objections for consideration by the district judge under 28 U.S. C. §636(b)(1).

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 1, 2022.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager