# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

**NO. 17-CR-20406**

**vs.**

**HON. PAUL D. BORMAN**

**D-2 ALPHONS IACOBELLI,**

**Defendant.**

________________________________/

## SENTENCING MEMORANDUM OF THE UNITED STATES

## I. Introduction

Fiat Chrysler Automobiles US LLC ("FCA"), through its Vice President for Employee Relations, defendant Alphons Iacobelli, sought to corrupt and warp the labor-management relationship with senior officials of the International Union, United Automobile, Aerospace, and Agriculture Implement Workers of America ("UAW"). FCA sought to obtain benefits, concessions, and advantages in the negotiation and administration of collective bargaining agreements with the UAW in an effort to buy labor peace. High-level officials of the UAW sought to enrich themselves and live lavish lifestyles rather than zealously work on behalf of the best interests of tens of thousands of rank and file members of their union. Additionally, these labor officials sought to advance the interests of the UAW by willingly,

purposefully, and unlawfully taking millions of dollars from FCA in order to reduce the expenses of the union and improve its budgetary position.

For years, defendant Iacobelli stood at the center of this dishonorable and nefarious relationship between FCA and the UAW. At FCA, Iacobelli was the most senior executive tasked with managing the company's relationship with the UAW. For certain aspects of FCA's negotiations and relationship with the UAW, Iacobelli reported directly to FCA's Chief Executive Officer. Iacobelli was highly compensated by FCA, earning millions of dollars in salary and bonuses. During the course of the conspiracy, Iacobelli executed a policy of buying labor peace with the UAW by enriching those officials in order to make them "fat, dumb, and happy." Iacobelli intentionally flouted the law and corrupted union leadership for the benefit of his employer, FCA. In the process, however, Iacobelli also enriched himself, while fraudulently avoiding hundreds of thousands of dollars in taxes.

The Court's sentence should reflect the seriousness of Iacobelli's crimes and the need to deter corporate executives, corporations, union officials, and labor unions from similar conduct. At the same time, the sentence also should account for Iacobelli's acceptance of responsibility and his sincere efforts at revealing vast labor-management corruption and assisting in efforts to end it.

## II. Analysis of Sentencing Factors

### A. Sentencing Guideline Issues

Based on Iacobelli's sentencing memorandum, the parties are now in agreement with the Probation Officer's calculation of the sentencing guideline range of 97 to 121 months. This range is capped at 96 months based on the statutory maximum sentences for the offenses of conviction.

### B. Seriousness of the Offenses

#### 1. The Corruption of the Labor-Management Relationship

The Labor Management Relations Act of 1947, better known as the Taft-Hartley Act, sought to deter and punish the real danger that corporations and their executives would seek to corrupt union officials by bribing those officials to ignore the best interests of the rank and file union members. The law made it a criminal offense for an employer and its executives to give money or things of value to union officials. Given the grave and substantial danger of the corruption of the labor-management relationship, the Taft-Hartley Act criminalized such payments to union officials without any need to demonstrate that the corrupting payments actually bought particular advantages for the employer. Instead, Congress drew a bright-line rule, criminalizing all payments by employers to union officials, subject to certain

Case 2:21-cr-20406-GCS-RSW ECF No. 31-4, PageID.1520 Filed 07/11/22 Page 4 of 14

exceptions that do not apply here. In this way, the law protects every union member who must rely upon his or her union's leadership.

In this case, Iacobelli, on behalf of FCA, gave millions of dollars to UAW officials and the union itself in order to corruptly purchase labor peace. Fully aware of the dictates and criminal penalties of the Taft-Hartley Act, Iacobelli and his co-conspirators worked through the joint UAW-FCA National Training Center ("NTC") as a mechanism to flout the law and pass millions to UAW officials and the union itself. The NTC, whose board was chaired by Iacobelli and the UAW Vice President in command of the Chrysler Department, was an instrumentality and part of the criminal conspiracy, used as a method to conceal illegal Taft-Hartley payments under the benevolent guise of training workers and ensuring their health and safety.

Iacobelli was the Vice President for Employee Relations for FCA. In that position, Iacobelli was the lead FCA executive for labor relations and had top responsibility for managing the company's relationship with the UAW. Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under these agreements. The NTC provided an opportunity for FCA and its executives to seek

a corporate advantage by funneling money to UAW officials and the UAW in direct violation of the Taft-Hartley Act.

This corrupt conspiracy took a number of forms. First, senior UAW officials were greased and influenced by FCA with first class travel, designer clothing, furniture, lavish meals and parties, jewelry, and custom-made Italian watches. Iacobelli directed that senior UAW officials like UAW Vice President General Holiefield, Keith Mickens, Virdell King, Nancy Johnson, and others receive NTC credit cards, and that these UAW officials could use those cards to make personal purchases. High-level UAW officials engaged in obscenely expensive meals, parties, and the unlimited consumption of alcohol at the expense of FCA. UAW officials used FCA money through their NTC credit cards to buy designer shoes for over $1,000 per pair, seemingly unlimited rounds of golf, cigars, vanity-labeled bottles of wine, an Italian shotgun, designer clothing, and expensive luggage. In this way, UAW officials became indebted to FCA and Iacobelli at the expense of violating their duty to loyally represent tens of thousands of rank and file UAW members.

Second, Iacobelli oversaw a series of payments to Holiefield and his wife, Monica Morgan, amounting to hundreds of thousands of dollars. FCA money was used to fund Holiefield's "charity," the Leave the Light On Foundation, which was

in fact a thinly-disguised mechanism to enrich Holiefield and Morgan. Iacobelli directed that over $260,000 in money provided by FCA be used to pay off the mortgage on the Holiefield home. Iacobelli directed that the NTC use money provided by FCA to purchase hundreds of thousands of dollars in "trinkets and trash" and purported photography lessons from companies established by Morgan and Holiefield as a way to funnel more money to the UAW Vice President.

Third, FCA and Iacobelli directed a stream of income of millions of dollars to the UAW as an entity. Ostensibly, FCA reimbursed the UAW for the salaries and benefits of UAW officials who were assigned to and worked at the NTC. This payment of the salaries of UAW officials with money provided by FCA was known as "chargebacks." Some UAW officials actually did work at the NTC, and FCA money was given to the UAW to pay the salaries, benefits, and UAW bonuses of these officials. However, a large number of UAW officials, purportedly assigned to the NTC, actually spent their time doing UAW work representing the union's interests and not performing work at the NTC. Iacobelli and FCA viewed the chargebacks to FCA of these UAW salaries as a political gift to the UAW. High-level UAW officials intentionally assigned UAW officials to the NTC with no intention that they would perform any real work at the NTC. It was merely a corrupt mechanism whereby FCA money could be used by the UAW to keep the UAW's

costs down. In total, from June 2009 through July 2017, the amount of the illegal chargebacks paid by FCA to the UAW was over $9 million. This illegal revenue was unrelated to the UAW's tax-exempt purpose. It should be noted that Iacobelli left FCA in June 2015, but these chargeback payments and other payments described below continued after his departure.

Additional income the UAW received from FCA was in the form of a fraudulent and bogus 7% administrative fee that the UAW added on to the chargeback invoices for the salaries of UAW officials. When FCA paid the salaries of UAW officials assigned to the NTC, the UAW charged FCA a 7% fee, ostensibly to pay the administrative costs of overseeing the payment of salaries and benefits of UAW officials at the NTC. In fact, however, the administrative cost to the UAW of maintaining its employees at the NTC was negligible and certainly did not amount to the 7% charged. Instead, the UAW and its high-level officials viewed the 7% administrative fee as a profit center to make money for the union. From June 2009 through July 2017, the UAW received over $2.9 million in administrative fees paid by FCA. The $2.9 million in administrative fees taken by the UAW was based on all of the chargebacks paid by FCA, not just the improper $9 million in chargebacks for UAW officials nominally assigned to the NTC. This fraudulent administrative fee revenue was also unrelated to the tax-exempt purpose of the UAW. Even though

the UAW is a tax-exempt organization, the union is required under law to pay taxes on sources of income unrelated to its tax-exempt purpose. FCA viewed the 7% as simply another cost of doing business with the UAW in terms of keeping labor peace.

Through this criminal conspiracy to violate the Taft-Hartley Act, FCA, through Iacobelli and its executives, was implementing a corporate policy to buy good relationships with UAW officials. As one FCA executive put it, FCA was making an "investment," by "spending thousands here," in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW. FCA executives sought to keep UAW officials "fat, dumb and happy" with their few thousand dollars and credit cards, whereas FCA was seeking advantages and concessions in the negotiation and administration of the collective bargaining agreements. Another FCA executive admitted that it was the intent of FCA executives to "grease the skids" in their relationship with UAW officials. This was how Iacobelli viewed his actions on behalf of his employer, FCA—using FCA's money in an attempt to buy "company-friendly" policies among the UAW's leadership. The seriousness of the corruption of the labor-management relationship cannot be overstated. Because of FCA's conduct, through Iacobelli and others, tens

of thousands of hourly UAW workers were deprived of the representation that they deserved and paid for in union dues.

### 2. <u>Iacobelli's Tax Fraud</u>

While Iacobelli was executing a corporate culture by engineering and overseeing the illegal payments to union officials and the UAW, Iacobelli also directed income and benefits to himself using the NTC as a mechanism. This additional income that Iacobelli received took many forms, including a Ferrari, jewel-encrusted pens, hundreds of thousands of dollars in improvements and additions to the pool at his residence, personal spending on his credit cards, and more. Rather than paying taxes on this additional income, Iacobelli fraudulently concealed his income and paid nothing to the IRS.

Iacobelli himself identified the seriousness of his tax offense, and courts have consistently recognized that "'[t]ax offenses, in and of themselves, are serious offenses,'" and that "'a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one.'" *United States v. Ture*, 450 F.3d 352, 357-58 (8th Cir. 2006) (quoting U.S.S.G. § 2T1.1, cmt. background). The "criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system" and that "[c]riminal tax prosecutions serve to punish the

violator and promote respect for the tax laws." *United States v. Carlson*, 498 F.3d 761, 764 (8th Cir. 2007).

Not only did Iacobelli deny rank and file UAW workers of honest and effective representation, he also denied the tax-paying citizens of his fair share of taxes. Through his criminal tax fraud, Iacobelli "in effect stole from his fellow taxpayers." *United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007), *cert. granted, judgment vacated on other grounds*, 552 U.S. 1089 (2008). "While tax fraud is not violent in nature, at its heart, it is theft, specifically theft of money to which the public is entitled." *United States v. Taylor*, 499 F.3d 94, 102 (1st Cir. 2007), *cert. granted, judgment vacated on other grounds*, 552 U.S. 1092 (2008).

### C. <u>Respect for the Law and Just Punishment</u>

The Court's sentence for Iacobelli's crimes needs to promote respect for the law and impose just punishment for his misconduct. Iacobelli was employed at a very high and sensitive level of a public company, and he intentionally acted to violate federal law in the interests of his company. Over 45,000 hourly employees for FCA were represented by the UAW during the period of the conspiracy. These men and women believed that their union leaders were looking out for their best interests and negotiating in good faith, not double dealing them for personal gain. Through this criminal conspiracy, however, FCA and its executives, like Iacobelli,

and the UAW and its officials, were operating under a corrupted labor-management process. During his involvement in the scheme, Iacobelli was the quarterback of this criminal conspiracy. It is difficult to calculate the harm that resulted to the grievance process, the bargaining process, and labor relations generally. Despite this difficulty, there is no doubt about the need to impose punishment for the wrongdoing and to vindicate the rule of law in the face of such long-standing and extensive criminal conduct.

However, part of just punishment is a recognition of sincere acceptance of responsibility and remorse. Through their dealings with Iacobelli, government agents and prosecutors have identified such qualities in Iacobelli's genuine acknowledgement of the gravity of his wrongdoing. Iacobelli pleaded guilty to both his participation in the Taft-Hartley conspiracy and to his tax violation. The Court's sentence should factor Iacobelli's contrition and acceptance of responsibility in determining an appropriate sentence.

**D. <u>Deterrence</u>**

Given the importance of the integrity of good faith and honest-dealing in labor-management negotiations, general deterrence is a critical component of the Court's sentence in this case. Corporate executives and high-level union officials need to know that labor corruption will be punished severely. Business executives

like Iacobelli who are responsible for negotiating with labor leaders need to know that their dealings with union officials must be conducted at the highest level of honesty, integrity, and transparency. White collar criminals are "prime candidates for general deterrence," because they act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013). Corporate executives spend their days and nights determining risk and calculating the costs of their business plans. This Court can inject those plans with the knowledge that illegal payments to union officials will receive significant punishment.

In the same way, deterrence needs to be served in terms of Iacobelli's violations of the tax laws through his avoidance of over $800,000 in taxes on the significant stream of income he directed to himself.

## III. Conclusion

Acting in the interests of his corporate employer, Iacobelli was a leader and organizer of serious criminal activity. He also avoided paying over $800,000 in taxes on income and benefits he received. Iacobelli's criminal conduct, and the criminal conduct of his co-conspirators, have undermined the trust and confidence that hundreds of thousands of rank and file union members have in the integrity of their union's leadership and the integrity of the collective bargaining process. This

harm is not limited to the tens of thousands of FCA hourly employees. Iacobelli participated in the most serious of criminal conduct that resulted in poisonous and lasting harm. Because the criminal conduct at issue in this case is subject to repetition in this and other industries, there is a great need to strengthen general deterrence so as to dissuade other executives, companies, and unions from engaging in similar crimes. Finally, Iacobelli has engaged in extensive and serious efforts, described elsewhere, to take responsibility for his conduct and to cooperate with the government's ongoing investigation of long-standing criminal conduct. The Court should recognize these efforts and sentence Iacobelli to a term of 76 months of imprisonment so as to achieve the goals of Section 3553(a).

MATTHEW SCHNEIDER
United States Attorney

s/David A. Gardey
DAVID A. GARDEY
ERIN S. SHAW
CHARLES J. KALIL II
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9591

Dated: August 20, 2018

# CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Counsel of Record for Alphons Iacobelli

s/David A. Gardey
DAVID A. GARDEY
ERIN S. SHAW
CHARLES KALIL II
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9591

Dated: August 20, 2018