# EXHIBIT 7

Case 2:22-mc-50034-GCS-DRG ECF No. 3-18, PageID.1596 Filed 07/19/22 Page 1 of 42



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

General Motors LLC,

Plaintiff,

-v- Case No. 22-50034

Joseph Ashton,

Defendant,

-v-

Alphons Iacobelli,

Respondent.
_______________________________________/

MOTION HEARING
April 28, 2022
BEFORE THE HONORABLE DAVID R. GRAND
United States Magistrate Judge

HEARING CONDUCTED VIA VIDEO CONFERENCE
ALL PARTIES APPEARING REMOTELY

APPEARANCES:

FOR THE PLAINTIFF: JEFFREY L. WILLIAN
CASEY McGUSHIN
Kirkland & Ellis (Chicago)
200 East Randolph Drive, Suite 6000
Chicago, Illinois 60601
and
ADAM MICHAEL WENNER
Honigman LLP
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226

FOR THE RESPONDENT: MICHAEL A. NEDELMAN
Nedelman Legal Group PLLC
28580 Orchard Lake Road, Suite 140
Farmington Hills, Michigan 48334

To Obtain a Certified Transcript Contact:
Rene L. Twedt, CSR-2907, RDR, CRR, CRC
www.transcriptorders.com

TABLE OF CONTENTS

| MATTER | PAGE |
| --- | --- |
| MOTION TO COMPEL | |
| Argument by Mr. Willian | 4 |
| Argument by Mr. Nedelman | 11 |
| Further Argument by Mr. Willian | 20 |
| Further Argument by Mr. Nedelman | 22 |
| Further Argument by Mr. Nedelman | 25 |
| Further Argument by Mr. Willian | 26 |
| Partial Ruling by the Court | 27 |
| Further Argument by Mr. Willian | 32 |
| Further Argument by Mr. Nedelman | 33 |
| Further Ruling by the Court | 36 |
| CERTIFICATE OF COURT REPORTER | 41 |

Remote Hearing
April 28, 2022
1:04 p.m.

* * *

THE CLERK: Court calls Case Number 22-50034, General Motors LLC versus Ashton.

THE COURT: All right. Thank you.

If I could have appearances, please, starting with General Motors?

MR. WILLIAN: Your Honor, this is Jeff Willian on behalf of General Motors, from the law firm of Kirkland & Ellis.

THE COURT: All right. Thank you.

MR. WENNER: Good afternoon, your Honor. Adam Wenner from Honigman also for General Motors.

MR. McGUSHIN: And good afternoon, your Honor. Casey McGushin, also from Kirkland, on behalf of General Motors.

THE COURT: Thank you.

MR. NEDELMAN: Good afternoon, your Honor. Michael Nedelman on behalf of Alphons Iacobelli.

THE COURT: All right. Thank you.

We are here for General Motors' motion to compel compliance with the third-party subpoena issued to Mr. Iacobelli.

I've ready everything, and I'm happy to hear any

additional argument either side wishes to make, starting with the moving party.

MR. WILLIAN: Yes, your Honor. Thank you. This is Jeff Willian on behalf of General Motors.

I'll put aside relevance for a moment, but we have grave concerns about the good-faith nature of compliance with our subpoena. I'm going to touch on sort of the high points to make that argument.

First of all, Mr. Iacobelli is a central figure in a long-running conspiracy that's been proven, and that is, FCA paid items of value to the UAW to get benefits in the CBA negotiating process for years.

Your Honor, I'm going to stop for a second. Do you hear me clearly? Because I hear some feedback.

THE COURT: I hear you fine. That's probably me typing.

MR. WILLIAN: Oh, I'm sorry. Okay. Fair enough.

THE COURT: I hear you fine.

One question I have is, what is the size of the alleged fraud and fraudulent payments from FCA to the individuals at GM?

MR. WILLIAN: We don't know. We're attempting to fully discover it. We know it involves millions for sure, through the -- what the government has identified. So the items of value involve millions of -- millions of dollars of

value, but we also believe that there's uncovered payments that -- as part of the lawsuits that we have, that we have initiated as well.

THE COURT: All right.

MR. WILLIAN: So we have grave concerns about the good-faith nature of the compliance of the subpoena.

Obviously, Mr. Iacobelli is a critical witness. It's critical we get full discovery from him. Yet, as it turns out, Mr. Nedelman, his counsel, Mr. Iacobelli's counsel has disclosed to us that he had no role in the search for electronic documents from Mr. Iacobelli's electronic devices, which is very unusual and strange in any case, but certainly in a case of this nature and this importance.

And so that obviously raised a number of concerns about who is doing the searching and sort of the good-faith nature of the response.

And secondly, we asked Mr. Nedelman, all right, that's fine. Who did the searches? Tell us the details of the search. What did they search and the like.

And Mr. Nedelman has refused to disclose to us any details of the search. Who did the search? Was it Mr. Iacobelli himself? Which we would suggest to this Court would be relatively improper. Was it somebody else? What items did they search? Where did they search and the like. And we had nothing but, really, a stiff arm from counsel

on that.

THE COURT: Have you -- have you offered to take a deposition of the person who -- you know, noticed up a deposition of the person who conducted the search?

MR. WILLIAN: We certainly would be willing to do that, your Honor, except we don't even know who that is. No name has been given to us. We have asked for that name or names and Mr. Nedelman has refused to provide those names.

THE COURT: All right.

MR. WILLIAN: And look, we have -- we have strong reason to believe that there are critical documents that have not been produced by Mr. Iacobelli that either are in his possession or were in his possession at one point in time.

For example, we have given to the Court, as I think -- as Exhibit 1 to our original motion, the DeLorenzo affidavit. It's a very detailed affidavit from a journalist back from 2018 that collaborated with Mr. Iacobelli on a potential book that would expose in detail this massive fraud involving FCA and the UAW.

And in that affidavit, he details documents that Mr. Iacobelli personally showed him. He described them in detail. For example, he described memos of Mr. Marchionne, who was the CEO of FCA at the time, where he was discussing methods of orchestrating the passing of money to the UAW. That's paragraph 16 of the affidavit.

And he describes how Iacobelli showed him documents that were lengthy memos, several pages long, which contained information about payments and responsibility for payments to the UAW.

THE COURT: Those were the single-spaced memos; correct?

MR. WILLIAN: Yes. Yes, your Honor. And in addition, we also --

(Connectivity disruption.)

MR. WILLIAN: I'm sorry. Go ahead, your Honor.

THE COURT: Did you not receive any of those? So no documents that you received would fit that description of being a lengthy, single-spaced memo?

MR. WILLIAN: That's correct, your Honor. However, we did ask Mr. Nedelman if we could take Mr. Iacobelli's production and show it to Mr. DeLorenzo as to whether he -- so that he could eyeball it himself and confirm whether or not that was -- any of those documents were the documents that had been shown to him. And Mr. Nedelman has completely declined to allow us to show those documents to Mr. DeLorenzo. So we haven't even been able to make that point of confirmation with Mr. DeLorenzo.

We also know on this point that Mr. Iacobelli uses multiple and has used multiple, multiple email addresses for communication for some strange reason, yet not one document

has been produced from his personal email files whatsoever. We don't even know if they have been searched, to be honest with your Honor.

Next, we have been met with a host of objections by counsel, and the one that he seems to have landed on is burden. And frankly, we spent -- Mr. McGushin spent multiple hours with Mr. Nedelman on meet-and-confers trying to flesh out various objections, including this burden objection, which seems to be the objection they are hiding behind now, yet no details were ever provided to us despite multiple requests of the details of that burden, as you know, which is required if you're going to stand behind a burden objection.

We did see, in the response brief, that at least as to one area, Mr. Nedelman's communications with NTC counsel, there was an argument of burden because he had over 1,000 emails with NTC counsel. But beyond that, we don't know what documents are being withheld on burden grounds.

Next, we have heard multiple assertions of privilege, but really, there has been no sort of fine pen put on the nature of these privileges and we know that some of them are just flatly absurd.

For example, there has been an assertion of a common interest privilege between Mr. Iacobelli and FCA during the -- sort of the criminal interactions in the criminal proceedings, yet we know FCA was applying for victim status and claimed that

it had been a victim of Mr. Iacobelli's fraud. So the notion that there could be a common interest, you know, makes no sense to us.

We have a suggestion on how to deal with privileges here at the end.

So look, you know, obviously these all raise grave concerns that there seems to be a concerted effort just not to comply in good faith with this subpoena.

On the relevance point, your Honor, we would point the Court to paragraphs 55 through 57 of the Ashton first amended complaint, and in particular, also, paragraph 107. Those paragraphs clearly mention Mr. Iacobelli's name repeatedly, mention that he was part of a scheme involving Mr. Ashton and FCA, where FCA would pay Mr. Ashton and pay Mr. Iacobelli to get GM confidential information.

That's all, you know, laid out in those paragraphs. So the notion that a number of these documents aren't relevant just makes no sense to us, because Mr. Iacobelli was front and center with the scheme involving Mr. Ashton as alleged.

And just finally to conclude, your Honor, the gamesmanship has really continued even after we filed these papers. I went to Mr. Nedelman's office, finally, to look at the originals of Mr. Iacobelli's notes, and when we get there, Mr. Lamb and I got there, we were given copies. And we were told, "Oh, there are no originals of his notes for you to

look at. And those missing pages, we don't have those. The government still has those. The government still has the originals." And so we made this trip to Mr. Nedelman's office and -- to look at originals, but there weren't any originals.

And now, in addition to that, we know that in the Michigan State Court action Mr. Iacobelli is taking the position that he doesn't have to answer any discovery because of a spousal privilege that would prevent him from testifying against his wife.

So he is refusing all discovery in that case, which is a side issue, but it just shows you, really, the concerted effort here to not comply in good faith with this very important subpoena to us.

So in conclusion, your Honor, we would ask you to issue a very robust order compelling compliance with the entirety of this subpoena.

And at this point, since Mr. Nedelman has declined to be involved in the searching for documents, which is critical, we don't think that we can fairly allow Mr. Iacobelli to do this on his own. We think it's appropriate for you to order that all of his electronic devices, including any emails he has on the cloud, that those go to a third party who can do the searching -- and we will pay for it -- but who can do the searching with an agreed-upon protocol and search terms to -- in order to comply with the subpoena.

Because at this point, the gamesmanship really needs to end. We really need this discovery. Right now the Ashton matter is set to -- discovery is closing at the beginning of June. And we have asked for a short extension, but the bottom line is, we need this discovery critically soon.

Thank you.

THE COURT: All right. And what specific -- so when you review the subpoena, there are many specific requests. Is it your position that your motion applies to every single request?

MR. WILLIAN: Yes. At this point, your Honor, we would ask the Court to -- given the fact that we don't know who did the search, we don't believe it was a thorough search, that we haven't been given any information as to who did the search, that the appropriate remedy here would be to simply issue -- obviously the Court has the power to hold somebody in contempt if they don't respond to a subpoena, but we're not asking for that. We're just asking for a very direct and broad order that the discovery -- the subpoena be complied with completely and that we also take this extra step with respect to Mr. Iacobelli's emails and electronic devices.

THE COURT: All right. Thank you.

Mr. Nedelman, you can go ahead.

MR. NEDELMAN: Thank you, your Honor.

Your Honor, I understand that General Motors is

disappointed in the production. But that disappointment does not equate to a failure to comply with the subpoena.

I'm actually somewhat surprised that General Motors would take the position that the recipient of the subpoena collecting the documents responsive to the subpoena is somehow improper, because there is no requirement other than that the recipient of the subpoena collect and produce those non-privileged documents which are, in fact, responsive.

THE COURT: So are you saying that it was Mr. Iacobelli who was solely responsible for collecting and producing the documents that have been produced?

MR. NEDELMAN: In part, your Honor. Some of the documents that were provided were provided -- collected by Mr. Iacobelli and given to me. Some of the documents that were provided, even though I don't think that they were remotely within the appropriate scope of discovery related to the NTC litigation which I collected, because I had the discovery that had been produced in those -- in that matter, I had the pleadings, so I produced it.

So it's somewhat of a combination of information that was originally collected by Mr. Iacobelli and given to me and some information that I had directly as a result of my participation in the various actions that are pending.

But there is -- there has not been a lack of good faith in the production. Admittedly, there is a dispute over

the scope and there is a dispute over the propriety of the examination.

And even with respect to the documents that Mr. Willian and Mr. Lamb viewed, the fact that they were copies should not have been a surprise because I advised them that in many cases we did not have originals; that the only remaining documents in Mr. Iacobelli's possession were copies.

And as I advised Mr. Lamb and Mr. Willian, a great deal of perhaps what they are looking for and were hoping to find had been seized by the United States in the execution of a search warrant for Mr. Iacobelli's home and had not been returned to him.

So I understand their disappointment. Mr. Iacobelli, because he was the subject of a -- his house was the subject of a search warrant, doesn't have a lot.

I can't -- I can't explain Mr. DeLorenzo's recollection of what he claims he saw, but as I have explained to General Motors, we have produced all of what Mr. Iacobelli had in his possession at the time of his meeting with Mr. DeLorenzo but for whatever privileged documents may have been in that collection.

But as I further explained, the documents that Mr. DeLorenzo -- excuse me -- that Mr. Iacobelli had in his possession at the time of the meeting were not, because there was no reason to, segregated. And so there may have been, in

what was ultimately produced to General Motors, additional documents that had been collected from the time of Mr. DeLorenzo's meeting.

THE COURT: Did I hear you say that privileged documents -- claimed privileged documents that had been in that folder were removed and not produced?

MR. NEDELMAN: Privileged documents that were in the entirety of Mr. Iacobelli's possession were not produced.

THE COURT: But were any of those --

MR. NEDELMAN: Whether or not they were --

(Overlapping speakers.)

MR. NEDELMAN: I'm sorry.

Whether or not they were in Mr. Iacobelli's possession at the time of his meeting with Mr. DeLorenzo is unclear, but they weren't shown to Mr. DeLorenzo.

THE COURT: That's not my question. My question is, where Mr. DeLorenzo's affidavit speaks to two folders, and he described them with what I would call significant particularity, especially due to the passage of time, even referencing that one of the folders had a rubber band around it, he said one was three inches thick, the other was two inches thick, and he said that he saw -- he recalled seeing, I think it said, multiple single-spaced, lengthy memos that spoke to certain topics. And GM's position is, we've reviewed the documents that were produced and no such memos are included in

the production.

And so my question is, is the reason they weren't included in the production because they were withheld on the grounds of privilege or is the reason they were not produced something else? Either they weren't there or they were there and they have been lost or some other reason.

But let's start with the question: Were those memos withheld on the basis of privilege?

MR. NEDELMAN: No, your Honor, they were not.

THE COURT: Okay. So --

MR. NEDELMAN: If they were ever even there.

THE COURT: Right.

MR. NEDELMAN: I mean...

THE COURT: Okay. And what is the problem with letting Mr. DeLorenzo review the documents that were produced, you know, provided he signs an appropriate protective order, which I assume is already in place in this case? But why not just let them have that level of review by the person who claims to have already seen the documents?

MR. NEDELMAN: The -- here's the issue that we're facing, your Honor. And it kind of highlights the problem.

General Motors is conducting discovery in the Ashton case that it intends to use in the Michigan case without either Mr. Iacobelli or FCA or Mr. Durden having the opportunity to appropriately protect their interests in connection with that

discovery and the ultimate use of the documents.

There is an ongoing dispute as to the ability of General Motors to use those documents in the -- what I'll call the Michigan State Court case. And at least temporarily, there is no ability of General Motors to use the Michigan production in any other proceeding.

On its face the protective order in the Ashton case permits discovery in the Ashton case to be used in the Michigan case. Whether or not that will be applied by Judge Allen, we will wait and see.

There are -- fundamentally, I don't have an objection to Mr. DeLorenzo reviewing the documents. The concern that I have is, Mr. DeLorenzo is an employee of General Motors at this point. He is not a third-party journalist. And his -- his review of those documents, again -- and I understand the appropriateness of an NDA, but he is not a witness in the Ashton case. And I'm not sure what benefit there is to Mr. DeLorenzo reviewing documents produced by Mr. Iacobelli in a matter in which the DeLorenzo affidavit was first submitted to Judge Allen. And what we have is discovery being conducted in a New Jersey Federal case for the purpose of using it in the Michigan State Court case.

THE COURT: Well, let's address that, because that is one of the underlying fundamental issues here, probably the principal one that the parties have focused on.

And I -- you know, I have read the amended complaint carefully in light of the parties' arguments and to me it seems pretty straightforward. It's -- the argument of GM's claim is that both Mr. Iacobelli and Mr. Ashton were, essentially, similarly situated.

They were -- had these former connections to FCA, who then went over to GM, and they were paid bribes by somebody at FCA to obtain information that was then turned over to FCA for FCA's beneficial use in negotiating a preferential union contract and to disadvantage GM so that GM would not be able to get similar, I guess, concessions, I'll say. And so the -- so that is the claim that's made pretty clear throughout the complaint.

In addition to the paragraph cited by counsel, you know, Mr. Ashton really focuses his brief, his argument, on the fact that, well, Count 3 is this fraud by omission, and how can Mr. Iacobelli have information that would speak to a fraud by omission of Mr. Ashton.

But when you actually read the fraud by omission allegations in that specific count, and not to mention that it incorporates the others up above, but the specific allegations in the fraud by omission claim include that, number one, paragraph 127, that by the time Ashton joined GM's board he had actively participated in FCA and FCA's -- I'll just refer to it as FCA's criminal scheme to corrupt the bargaining

process to benefit FCA and harm GM.

And later, in paragraph 128(b), Ashton failed to disclose -- so it's again fraud by omission -- the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process.

Paragraph 131: Ashton was nominated to GM's board and GM paid him compensation. Once on the board, Ashton betrayed GM's trust by funneling GM's confidential information to the UAW and/or FCA leaders.

Now, all of those aspects that I read, yes, there are omissions by Mr. Ashton in terms of what he didn't disclose, but it's also all related to the same underlying alleged scheme of bribing the GM officials, and not just bribing them, but bribing them for a specific purpose of corrupting the union negotiations and the bargaining process.

And so -- and then GM's position is, okay, if we can show how broad the scheme was, that that is -- that would speak to the proofs against Mr. Ashton.

And then they cite -- I don't know why they're all State Farm cases, but they cite three State Farm cases which do speak to that, which speak to, look, if you have a scheme, a conspiracy, and it's alleged against, you know, one particular -- or you're looking at a particular claim against a particular entity, the plaintiff is allowed to pursue other avenues of discovery to flesh out, well, how broad is it? And

in doing so, not only do you broaden, perhaps, the scope, but you buttress the allegations against the actual party.

And so that's what I see -- that's what I see them doing, which makes, at least in general -- now, you could argue about any particular request and say, okay, well, this particular request, even if we -- even if we say in general you agree with my assessment, this particular request doesn't speak to that, and that's a separate issue.

But this more fundamental issue of, hey, this is only a fraud by omission count against Mr. Ashton, and therefore, no discovery related to Mr. Iacobelli could be relevant, you know, I just kind of reject that also. And that gets us then to the individual requests.

And that's why I started by asking Mr. Willian about what requests are actually in dispute here, because the way the motion is briefed, there are really only three or four categories of documents that were -- requests that were in dispute. They were the bank records, correspondence between counsel, and I think maybe one or two others.

And I guess my -- you know, my general sense is, to the extent any of those categories of documents bear on the alleged scheme, that is, the alleged scheme by FCA to bribe GM employees in connection with the bargaining process, I think they are relevant and should be produced.

Now, I haven't gone through every single one of the

enumerated requests in the subpoena because that wasn't how it was presented, and so I'm a little reluctant, Mr. Willian, to just say, okay, well, you're going to have to produce everything, because that implies I concluded that they are all relevant, but I would certainly follow what I just said in that analysis.

So I don't know if that helps between -- you know, in terms of focusing the arguments, but in terms of the biggest piece of this, that's how I see it.

MR. WILLIAN: Thank you, your Honor, for those comments, and understood.

The reason why I did frame it as we're looking for a broader order is because, as we mentioned in our motion and has become more clear, counsel did not participate in the search for electronic documents whatsoever, nor did they have some sort of third-party responsible person doing that. Instead, for the first time at this hearing we hear that it was Mr. Iacobelli himself. And frankly, that's just not acceptable, your Honor, because we have evidence now that critical documents were not produced. I have already --

(Connectivity disruption.)

THE COURT: You froze.

MR. WILLIAN: -- circumstances. We do believe it is --

THE COURT: Mr. Willian, you froze. You said, "We

have evidence that certain documents were not produced," and then you froze.

MR. WILLIAN: Yeah. Apologies.

I have already detailed for you the evidence that certain critical documents have not been produced involving the DeLorenzo affidavit and that no emails of any sort were produced from Mr. Iacobelli's personal email accounts, the many of them.

And so, look, under these circumstances we're suggesting to the Court that those electronic documents that were not properly searched, those apply to all the categories of the subpoena, of course. And so we're asking -- that's why we're asking for the order to apply at least electronically to all the categories of the subpoena, and that we would get a third party involved to take control of Mr. Iacobelli's electronic devices and his email accounts, and then Mr. Nedelman and I would negotiate a search protocol that we would bring to the Court and that the searching would be taken -- undertaken in that way.

And as well, this forensic group who we would choose mutually could also look for evidence of spoliation. We know in the Aston matter the Court has expressed significant concern over spoliation. I have those same concerns here given what hasn't been produced and given the fact that Mr. Nedelman completely conceded the review to Mr. Iacobelli for some

reason, which is a little hard to understand under these circumstances. So that's why we would suggest the broad order I suggested, your Honor.

THE COURT: All right. Well, Mr. Nedelman, did you have anything else that you wanted to add in terms of the -- you know, my view of the relevance issue before we delve into this other issue?

MR. NEDELMAN: Your Honor, I do understand your view of the relevance.

THE COURT: Okay.

MR. NEDELMAN: And I would --

THE COURT: So --

MR. NEDELMAN: And I'll accept it for purposes of moving forward.

I guess the one thing that I would request is, since all of the allegations upon which General Motors has based its discovery requests as they relate to Mr. Iacobelli are all on information and belief, and in our view, have not been, as a result, well pled, and the allegations of alleged foreign accounts are purely speculative and have no substantive allegations to support them, that in the spirit of cooperation, if Mr. DeLorenzo is going to be able to review the documents from Mr. Iacobelli, that Mr. Iacobelli produced that are attributable to that meeting, that General Motors also -- I would ask, your Honor, to force General Motors to provide

Mr. Iacobelli access to the discovery that General Motors has produced that support the allegations of these accounts on which they want to base the discovery requests.

I mean, we're -- you know, for example, the requests that are at issue today include requests for Mr. Iacobelli's domestic bank accounts. There are no allegations in the -- in the amended complaint in the Ashton matter that even mention Mr. Iacobelli's domestic accounts.

So there are -- the range of what General Motors is seeking to do in terms of discovery in the Ashton case, as your Honor points out, bears on the allegations in the other matters.

But this becomes a one-way street for discovery, which I think is inappropriate, and it really kind of highlights the concern that we have on the manner in which discovery is being conducted in the Ashton case.

THE COURT: One question I had in terms of the bank account. You're looking for payments from FCA; correct?

MR. WILLIAN: They could be from FCA, but they could also more likely not be directly from FCA but some sort of intermediary or some foreign accounts. It could be a wire from, you know, some unknown institution. It could be a fiduciary. We -- so the notion that it would come directly from FCA would be a little hard to believe, your Honor. I don't think they were that simplistic. Pretty sure that any

such money would be coming from some third-party institution that we would have to examine.

THE COURT: And so then what do you do? So you get -- let's say I order him to produce the requested bank records. So then what? You -- it's typically a bank record, a wire. It doesn't have, often, a name. It will just have some account number, routing number, that kind of thing. And so then what? Every single transaction, you then need to go and do discovery on or every transaction over a certain amount? And so could I order production of something less than just, okay, turn over all of your bank records?

MR. WILLIAN: Understood, your Honor. So I've done a number of these cases before, and what you do is, when you look at the bank records month to month, and you look for something that's strange. And frankly, wire transfers into the account from overseas would be something we would -- yes, we would investigate, of course. And we would determine where it came from and then maybe would have to trace that out overseas. But you would look for an anomaly of that nature. That's correct.

And we're happy to do this counsel's eyes only and the like under a heavy protective order given that they are Mr. Iacobelli's personal accounts, but that -- I don't know how else to trace potential bribes to Mr. Iacobelli without looking at his domestic records. They clearly are highly relevant.

THE COURT: All right. Let me ask another question of Mr. Nedelman.

How is it that there were no emails produced? Is that because the objection was that you are not entitled to any of these documents, or you're just not going to produce them and wait for Judge Grand's ruling to see if we have to, or is it that a full search was done and they just don't exist, or something else?

MR. NEDELMAN: I think it's a combination, your Honor. Certainly with respect to the communications, if any, between Mr. Iacobelli's counsel and counsel for FCA, we objected to that inquiry in its entirety.

But some of it also is a function of the categories of documents that General Motors requested, because -- and I'm not -- and I can't represent, because I didn't do the search, and I can have Mr. Iacobelli go back and conduct it again, but the nature of the categories that General Motors requested dealt with communications while Mr. Iacobelli was employed either by FCA or perhaps at some point by General Motors, which would have been emails housed on either FCA's or General Motors' respective email servers and not from Mr. Iacobelli's personal emails.

So I'm not surprised that General Motors did not receive, in response to the -- to the request perhaps what they thought or what they wanted to receive or hoped existed

because of the nature of the requests themselves. But I can certainly have Mr. Iacobelli go back and determine whether or not there are any emails that he perhaps missed in his search.

THE COURT: Well, when you say go back and have Mr. Iacobelli determine, do you agree with me that the case law provides that counsel has some level of obligation of reasonably assuring a reasonably complete search as opposed to just simply turning over whatever the client provides with no further oversight into the process that was used to collect them?

MR. NEDELMAN: Well, without disclosing my conversations with Mr. Iacobelli, your Honor, I am -- I did take steps to ensure that what was responsive was searched for and produced. And that's, I think, as far as I can appropriately go.

THE COURT: All right.

MR. NEDELMAN: But we're not talking about a General Motors or FCA type of scenario where there are, you know, potentially millions of emails on a corporate server that need to be reviewed.

MR. WILLIAN: Duly noted, your Honor. And we -- perhaps Mr. Nedelman -- very specifically, all right, he was very clear he had no involvement in this searching process, very clear with us, without exception. And then we asked for the details of who did that searching and he was very clear

he wouldn't tell us any of those details whatsoever.

So the notion that Mr. Nedelman somehow took steps that he didn't disclose to ensure that the searching was thorough, it's just -- it's somewhat belied by the prior representations to us, your Honor.

THE COURT: Well, I don't know. It's different, I think, when I'm asking Mr. Nedelman questions than when you're asking him questions, and I could understand and I'm respectful of the attorney-client privilege. And I did not mean to and I don't think I did ask him to invade any kind of privilege.

But I wanted to -- I think it is appropriate to get his recognition that it takes more as counsel than just accepting whatever your client gives you, and you know you need to ask questions. So if you would -- if you would expect there to be certain -- a certain level of communication or certain communications and they don't show up from your client, it's not reasonable to just shrug your shoulders and say, "Well, he gave me what he gave me." You have to talk to your client and say, "You know, look, I was expecting X, Y, and Z and why wasn't it there?" And try to figure out where things went awry, if at all, or if there is some other explanation.

And so I take Mr. Nedelman at his word that he had conversations, and I think also Mr. Nedelman recognized that a search was done at a time when there was this unresolved dispute. And once there is guidance from the Court about

what -- what is relevant and not relevant and all of that, that could change the production.

And so at least at this point, I'm really not inclined to require that the search be done by some third party and that Mr. Iacobelli turn over all of his electronic devices. I mean, I think certainly that could be warranted depending on -- you know, depending on what else is produced or not produced. You know, I don't know. But at least at this point I think that that would be excessive and just unwarranted given the circumstances I have discussed about kind of what brought us to where we are today.

So what I think needs to happen is, as I said, I think the information is relevant to the reasons I have said. The parties obviously understand Rule 26(b) and the focus on proportionality, including the importance of the issues at stake. To me, these issues are very important.

You know, I -- you know, living in this area, I have at least a general sense of the significance of the case, and obviously having read it in the parties' briefs that illuminates the importance of the issues.

The amount in controversy I asked counsel about today, I really wasn't exactly sure, and he indicated it's in the millions. And so that would warrant or cut in favor of a finding of proportional -- proportionality of the request.

The parties' relative access to the information,

only Mr. Iacobelli would have this information.

The parties' resources, you know, if you -- as Mr. Nedelman said, you know, this is not -- this is not going to be searching on some server that needs to be recreated from a drive or things like that that could be extremely expensive. This is the kind of search that an individual working closely with his counsel should be able to accomplish without too much burden.

And so, you know, again, my ruling as to the points that need consideration are all in favor of relevance, proportionality, and therefore, the production.

And then that gets us down to the -- you know, what actually needs to happen. And now, with the benefit of this ruling, I think that it's appropriate for the Court to just order full compliance with the subpoena, but for Mr. Ashton [sic] to have the opportunity, in light of the Court's ruling, to be the one to ensure compliance.

And when I say full compliance, I'm obviously not including attorney-client privilege material. So if we -- to the extent that attorney-client privilege material exists, he is not required to produce that. But he would need to produce an appropriate privilege log specifying, as you all know, the contours of the documents that have been withheld on privileged grounds, the basis of the privilege, et cetera, sufficient for them to evaluate the privilege claim.

And in terms of the bank records, I do think that those are all relevant because they will speak to this overall alleged scheme. And it's -- I want to be clear, it's a very specific form of scheme, and I gave the allegations in the amended complaint that I think really make Mr. Ashton's and Mr. Iacobelli's alleged involvement, you know, extremely parallel. And as GM described, they're alleged to be essentially two silos in the -- you know, in the same scheme.

And so I do think that the only way to deal with that, really get to that, is through the source documents of Mr. Iacobelli.

And I also am respectful, though, of the intrusiveness of the request into his bank records and that, and so I think that a very strict attorney's eyes only plus experts kind of protective order is in place that limits the use of the documents and the recipients of the documents, et cetera. But you all can, I think, work that out.

The other -- just one other allegation I want to highlight is that in paragraph number -- counsel said 55 is where the allegations were made against Mr. Iacobelli, which, again, just are extremely in line with the ones made against Mr. Ashton.

And then in paragraph 109, FCA makes clear that its claim is that there were -- FCA had a, quote, corporate policy, that's in quotes, of bribing key officials, and that's plural,

in order to corrupt the corrupted bargaining process.

So again, the complaint is -- it is speaking about more than just Mr. Ashton, even though he is the only defendant in that particular case.

Let's see. And so, again, I think I have already addressed the bank records issue.

In terms of there not being emails, I mean, that is concerning to me. I guess I would expect there to be emails. But at this point, because we discussed that search was done prior to this ruling and prior -- and at a time when Mr. Iacobelli was asserting all sorts of objections, I'm just not prepared to say that those emails have been improperly withheld to such a degree that I need to order a forensic examination at this point.

I think -- as I said, I think the appropriate thing to do is to now, in light of the hearing, ensure that the searches are done, and Mr. Nedelman, that's your obligation as an attorney and counsel of record to ensure that a thorough search is done and reasonable search is done by -- I should say -- of your client's electronic equipment.

And if he is not capable, if you determine that his own skill set is not reasonably capable of ensuring completeness, then it's up to you to talk about that and say, "Hey, we need to get somebody who is more capable than you, Mr. Iacobelli." I just don't know at this point.

And so certainly if that becomes an issue where he -- there is still this issue of GM believing and being able to show that more is warranted, I would be happy to consider it at that time. I don't really see much of a burden here.

In terms of the privilege issue, as I said, anything that is purely privileged I am, of course, okay with Mr. Iacobelli not producing.

I do want to address this issue of the joint defense privilege and make sure that we get that kind of squared away, because at least that one was teed up to the extent where I think I could make a ruling on that today.

So why don't we speak to that particularly? And I think that should really close out this hearing.

Mr. Willian, if you want to address the joint defense argument?

MR. WILLIAN: Yes, your Honor. And I did touch on it briefly, but it's fairly simple.

So when Mr. Iacobelli was indicted in 2017 and throughout the criminal procedures and through even his prison -- while he served his time in prison, FCA has taken the position all along that it was a victim. In fact, it filed for victim status formally under government regulations and all along claimed that Mr. Iacobelli did them wrong, that he was a rogue agent, he was a bad apple, that he was actually outside the scope of his authority. And so the notion that under those

circumstances that they could have a common interest to protect their communications obviously makes no sense. There could be no common joint defense at that point in time.

Now, there may be, perhaps, once GM initiated the lawsuits back in 2019 against Mr. Iacobelli and FCA at the same time, I think that was in November of 2019 if I have my year right, perhaps they could develop some sort of argument at that point that there is a common defense, at least as to the lawsuit, but certainly before then, absolutely, it's impossible, really, to have a common joint defense at that point in time, given that FCA was claiming that they were the victim.

THE COURT: What if -- couldn't there -- couldn't there be two points of view, and FCA claiming that there is no common privilege, and Mr. Iacobelli claiming, yes, there is?

MR. WILLIAN: Well, certainly anyone can say anything, and there could be two points of view, but it's -- it's just hard to imagine that when one party says there is no common privilege but the other one says there is, I don't -- I'm not aware of any case law that says that, therefore, there can be when one is asserting there is and the other is asserting there isn't. I think it has to be a mutual agreement and understanding.

THE COURT: All right. Mr. Nedelman?

MR. NEDELMAN: Your Honor, I think Mr. Willian is

premising his argument on an erroneous belief. To my knowledge, FCA never applied for restitution claiming victim status in Mr. Iacobelli's criminal proceedings. There was a request by the NTC for victim status. But the NTC existed independently of FCA, and to my knowledge, FCA never took that position.

There certainly is -- as Mr. Iacobelli, as the former head of labor relations for FCA, there certainly was a common interest between him and them, setting aside whatever public relations approach FCA may have taken.

There certainly, from a -- from a legal standpoint and ultimately FCA acknowledged that there certainly was a common interest in both of them with respect to defeating the criminal allegations that were both pending and threatened in this proceeding.

So I don't accept Mr. Willian's position, nor do I think the Court should accept that there could not be a common interest simply because the NTC sought restitution and perhaps, you know, in the spirit of Casa Blanca, that FCA was expressing public shock that action had been taken by one of its employees.

So I think that it goes to -- I think an inquiry into communications between counsel for FCA and Mr. Iacobelli goes well beyond any appropriate inquiry in this case, and I frankly -- I don't know the extent to which -- what -- how easy

or difficult it would be to parse emails between counsel who deal with each other regularly to determine what may or may not have related, first separating those, and then determining whether or not they were appropriately produced. I think we start with whether or not that's even an appropriate inquiry in light of the fact that there was a common interest and in our --

(Connectivity disruption.)

THE COURT: Mr. Nedelman, you completely cut out for just about 20 seconds. And so you were saying, I think, we start with the issue of whether there even --

MR. NEDELMAN: I think, your Honor, we start with whether or not there is an appropriate privilege and before we undertake the burden of assembling all of the communications that may have happened between counsel for Mr. Iacobelli and Mr. -- and FCA.

THE COURT: And how could I make that determination with -- at least without seeing some of these documents in an in-camera review with an understanding of the parties' specific -- well, your client's specific argument as to the privilege?

MR. NEDELMAN: I don't -- I don't -- you know, obviously, your Honor, if you want to see specific documents then I will confer with Mr. Iacobelli's criminal counsel and provide some to your Honor.

I think it may also -- and this is where the absence of FCA in this proceeding becomes somewhat difficult. To the extent that criminal counsel and Mr. Iacobelli believed that they were cooperating with FCA because there was an underlying common interest, beyond their statements, perhaps your Honor needs to see some of the communications. But I don't know if the communications themselves will establish the common interest or just evidence that they were operating under that understanding.

But I'm happy to talk to Mr. Dumouchel and provide your Honor with representative samples rather than a wholesale search of -- with your Honor's permission, a wholesale search of all of the communications to start.

THE COURT: All right. Well, I do think that it's really impossible for me to make an accurate assessment of the extent of any common interest privilege. And I think there certainly could come a time where the interests are diverging such that communications after that point were not subject to a common interest privilege, but there, I think, could be a period of time where FCA and its former employee had a common interest and I just -- without seeing the specific documents, I don't know how I make that assessment.

MR. WILLIAN: And your Honor, I think --

(Overlapping speakers.)

THE COURT: I think you suggested that in your reply

brief; correct?

MR. WILLIAN: Sorry, your Honor. I do have a suggestion.

I may have missed your question because you froze or I froze.

But I do have a suggestion, in that, since the common interest privilege is Mr. Nedelman's and his client's burden, let's go ahead and brief this while -- I mean, obviously there's going to be some time needed to comply with the subpoena, and maybe we should talk about putting a deadline on that. But I can envision a briefing schedule where, in the next, you know, two weeks Mr. Nedelman submits a brief in support of the common interest privilege and the time period to which it applies and the basis for it, and then we have a chance to obviously respond to that, and then we could have argument on that.

I don't think it's been teed up in sufficient detail. Mr. Nedelman is correct, I think it probably was FCA's controlled entity, the NTC, that filed for victim status. But nonetheless, FCA was very vocal in stating that it was a victim of Mr. Iacobelli's actions. But I think briefing might be appropriate.

THE COURT: All right. I agree. And I just am very hesitant to make any sort of ruling one way or another on this issue at this point based on the current record.

So what I'm going to do is make a docket entry that indicates I have granted the motion to the extent discussed herein, just because I just don't want it still sitting out there for two more weeks and then, you know, technically I don't know if there will be an objection or not to any of that, but technically, I want to get that time running and see if there is. Although I'd, you know, be comfortable, obviously, with the analysis.

And so I will indicate in the docket that it's been granted to the extent discussed herein and held in abeyance as to common interest privilege issues.

And Mr. Nedelman, is two weeks enough time for you to submit a supplemental brief on that?

MR. NEDELMAN: Yes, your Honor.

THE COURT: Okay. And then Mr. Willian, how long after that would you need to file your response?

MR. WILLIAN: Ten days would be fine, your Honor.

THE COURT: Okay.

MR. NEDELMAN: Your Honor, if I could ask for some direction in connection with the brief.

Obviously, there is a significant burden in compiling all of the documents that would otherwise be responsive. Is your Honor looking for a representative sample of the communications so you can make an informed -- a better informed decision?

THE COURT: Yes. I think that would be helpful.

MR. NEDELMAN: Okay.

THE COURT: You know, and you can submit those in camera and maybe give a log to opposing counsel of what you have provided to the Court, and that way we can all talk about the issues as much as possible. It's always kind of difficult when it's in camera to talk about it with counsel because you don't want to reveal anything, but I am sure we can handle it in a way that will allow me to make a fully informed decision. Okay?

MR. NEDELMAN: Fair enough, your Honor. Thank you.

MR. WILLIAN: Thank you, your Honor.

THE COURT: Okay. And in terms of compliance with the subpoena, I know you're on a little bit of a tight time frame, although I guess -- is there a motion to get more time in the New Jersey case pending right now or not?

MR. WILLIAN: Yes. We filed a joint letter with Ashton's counsel to get an additional 60 days.

THE COURT: Okay. So Mr. Nedelman, if I give 30 days to comply with the subpoena, is that enough time?

MR. NEDELMAN: I would ask for a little bit more, your Honor, only because of my travel schedule, and I'm going to have to be probably with Mr. Iacobelli to ensure that it's done. So if we could -- if I could ask for a little bit more, that would be appreciated.

MR. WILLIAN: Your Honor, we have been in talks with Mr. Nedelman for months now and 30 days -- I was going to ask for 21 days. 30 seems fairly generous. If he comes back to us and says, "I need another five days," of course, we would not -- we would say yes to that, but it would be nice to shoot for 30 days.

THE COURT: All right. I think -- I think at this point of how long that things -- everything's been out there, 30 days should be sufficient. If -- you know, I'm pretty reasonable. If good-faith efforts are being made to meet that deadline and, you know, as Mr. Willian said, it comes up and you need a little more time, obviously, that's -- that would be okay as well, but I'll put 30 days in the order.

The other thing I would say is, you don't have to wait until the very end to start producing things. So that is one way to show good faith is, you know, you knock off the -- you know, one category and produce that and say, we're still working on the others, but here's the first category, as opposed to holding off.

So that -- and that would go a long way to, as I said, showing that things are moving forward as they should.

All right. Anyone have any questions about any of this before we go?

MR. NEDELMAN: No. I think we're -- I think I'm satisfied, your Honor. Thank you.

MR. WILLIAN: Thank you, your Honor. Much appreciated.

THE COURT: Okay. Thank you all.

Thanks, Rene, for court reporting. Good seeing you.

All right. Take care everybody. Bye.

(Proceedings adjourned at 2:03 p.m.)

* * *

CERTIFICATE OF COURT REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

***s/ Rene L. Twedt*** **April 29, 2022**
RENE L. TWEDT, CSR-2907, RDR, CRR, CRC Date
Federal Official Court Reporter