# EXHIBIT 11

20-011998-CB FILED IN MY OFFICE Cathy M. Garrett WAYNE COUNTY CLERK 12/13/2021 4:31 PM Lori Fletcher

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

Plaintiffs,

v.

ALPHONS IACOBELLI, FCA US LLC, FIAT CHRYSLER AUTOMOBILES, N.V., JEROME DURDEN,

Defendants.

Civil Action No. 20-011998-CB

Hon. David J. Allen

**SECOND AMENDED COMPLAINT**

---

Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Adam M. Wenner (P75309)
Shirin S. Goyal (P82528)
Keith D. Underkoffler (P84854)
HONIGMAN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
awenner@honigman.com
sgoyal@honigman.com
kunderkoffler@honigman.com

Hariklia Karis, P.C. *(pro hac vice)*
Jeffrey Willian, P.C. *(pro hac vice)*
Stacey G. Pagonis *(pro hac vice)*
Casey McGushin *(pro hac vice)*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
stacey.pagonis@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris *(pro hac vice)*
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (213) 680-8400
austin.norris@kirkland.com

Maisie Allison *(pro hac vice)*
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs*

---

A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the Second Amended Complaint has been previously filed in the United States District Court for the Eastern District of Michigan where it was given case number 2:19-cv-13429 and was assigned to Judge Paul D. Borman. The action is no longer pending.

A civil action between certain of these parties or other parties arising out of the transaction or occurrence alleged in the Second Amended Complaint has been previously filed in Wayne County Circuit Court where it was given case number 20-012007-CB and assigned to Judge Lita M. Popke. That action was removed to the United States District Court for the Eastern District of Michigan where it was given case number 2:20-cv-12556 and assigned to Judge Terrence G. Berg. That action is no longer pending.

*/s/Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)

This case involves a business or commercial dispute as defined in MCL § 600.8031 and meets the criteria to be assigned to the business court.

*/s/Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)

**TABLE OF CONTENTS**

**Page**


INTRODUCTION ..... 1

THE PARTIES ..... 6

- A. Plaintiffs ..... 6
- B. Defendants ..... 6
- C. Significant Non-Parties and Other Entities ..... 9

JURISDICTION AND VENUE ..... 16

PROCEDURAL HISTORY ..... 17

DETAILED ALLEGATIONS ..... 18

I. OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER ..... 18

- A. Financial Crisis Threatens U.S. Auto Industry ..... 18
- B. Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler ..... 19
- C. FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW ..... 22

II. DEFENDANTS FUNNEL MILLIONS TO THE UAW AND CERTAIN FORMER UAW LEADERS ..... 24

- B. Evidence of the Existence and Control Over Foreign Accounts. ..... 32

III. FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW LEADERS TO DAMAGE GM ..... 33

IV. DEFENDANTS CONSPIRED WITH UAW LEADERS TO ATTEMPT A TAKEOVER OF GM BY MERGER. ..... 40

- A. Marchionne Conspires on Behalf of FCA and FCA NV to Force a Takeover of GM by Merger ..... 41
- B. Williams and Ashton Are Key Players in the Takeover Conspiracy ..... 44
- C. FCA NV Initiates "Operation Cylinder" ..... 46




41992169.1

V. ASHTON AND IACOBELLI PASSED INFORMATION TO FCA AND FCA NV, CAUSING HARM TO GM. ....58

VI. DEFENDANTS AND THEIR CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS INJURY EARLIER. ....64

CAUSES OF ACTION ....73

REQUESTS FOR RELIEF ....92

# SECOND AMENDED COMPLAINT

General Motors LLC and General Motors Company (individually or collectively, "GM") for their Second Amended Complaint, allege as follows:

## INTRODUCTION

1. This case is about (what was) an Italian company, Fiat Chrysler Automobiles N.V. (now known as Stellantis, N.V. and referred to herein as "FCA NV")[1], which obtained operational control over an iconic U.S. auto company, Chrysler Group LLC. Shortly after the acquisition, FCA NV and its wholly-owned subsidiary FCA US LLC ("FCA") embarked on a systemic and near decade-long conspiracy to bribe certain senior union officials to corrupt the collective bargaining process and inflict harm upon GM in order to weaken GM and have it acquiesce to FCA NV's desire that the two companies combine. This is not a garden-variety corporate corruption scheme; Defendant Alphons Iacobelli described his involvement as being part of the biggest corporate corruption case in U.S. business history.[2]

2. As initially revealed starting with the first indictment in July 2017, the United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA, FCA NV, and certain former union leaders. This investigation has resulted in criminal charges against fifteen individuals with three FCA officials and eleven former UAW officials (and one UAW official's spouse) pleading guilty to a years-long bribery scheme. In addition, FCA itself pled guilty to conspiring to provide items of value to UAW leaders, including that FCA "knowingly and voluntarily joined the conspiracy" to provide such

---

[1] After this case was originally filed, Fiat Chrysler Automobiles, N.V. changed its name to Stellantis N.V. For ease of reference, this Second Amended Complaint continues to refer to Stellantis N.V. as "FCA N.V."

[2] DeLorenzo Decl. at ¶ 6.

items."[3] FCA has further admitted that it is responsible for the actions of its employees and agents as described in the plea agreement.[4] These include Defendant Iacobelli, FCA's former Vice President of Labor Relations, currently serving a 66-month prison sentence for his central role in the conspiracy, as well as Defendant Jerome Durden, FCA's former employee who approved and concealed illegal payments and was sentenced to 15 months in prison. As has been repeatedly admitted, starting no later than July 2009, FCA paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and the UAW itself and, in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." During the course of this bribery scheme, two collective bargaining agreements ("CBAs") were negotiated with FCA—in 2011 and 2015—both subject to corruption in their negotiation and implementation, with one of the specific purposes being to harm GM as described herein.

3. Beyond these acts admitted in criminal pleadings, through its continued investigation GM has uncovered additional evidence demonstrating that the scheme was even broader than previously believed. This investigation confirms that GM was the intended target of the scheme perpetrated by Defendants. For example, and as previously submitted as evidence to this Court, after being indicted and within days of the reported death (July 25, 2018) of Sergio Marchionne (Iacobelli's trusted co-conspirator and protector at FCA), Iacobelli initiated contact and had in-person meetings with Peter DeLorenzo, a reporter covering the auto industry.[5] Iacobelli solicited DeLorenzo to help him write a "tell-all" book regarding FCA's effective scheme to bribe

---

[3] FCA Plea Agmt. at 2.

[4] *Id*. at 3.

[5] A declaration signed by DeLorenzo (the "DeLorenzo Decl.") is attached as Exhibit 1.

the UAW. During these conversations, Iacobelli confirmed that the scheme was not driven by a few "bad apples" within FCA; instead, it was directly orchestrated by Marchionne, FCA's then-CEO, and GM was the express target of Marchionne's scheme.[6] In fact, in late July 2018 emails exchanged between Iacobelli and DeLorenzo, they discussed that the book should be titled "Scam: How Fiat Chrysler and the UAW Conspired Together to Commit One of the Biggest Cases of Corporate Fraud in U.S. History," and it should include the "specific highlights, moments, schemes, emails, bad actors within FCA (Sergio, et al) and so on." Iacobelli told DeLorenzo that the scope of the FCA scheme was far broader than what had been publicly revealed at the time and even showed contemporaneous FCA documents to DeLorenzo confirming Marchionne's involvement in the bribery scheme.[7] After Iacobelli profusely thanked DeLorenzo for agreeing to write the book and for his "courage" in "being a voice of truth," Iacobelli ceased communication with DeLorenzo without explanation. Upon information and belief, Iacobelli used the threat of the DeLorenzo publication as reflected in their emails to obtain protection and financial payments from FCA and FCA N.V., including through the use of the foreign bank accounts in Iacobelli's name.

4. Through this lawsuit, GM seeks recourse against FCA, FCA NV, Iacobelli, and Durden for this long-running bribery scheme and its numerous related frauds and torts, all of which were intended to and did cause billions of dollars of harm to GM.

5. As a direct result of the scheme, FCA received certain structural programs and benefits that were denied to GM. For example, FCA was provided with genuine support for its

---

[6] DeLorenzo Decl. at ¶ 19.

[7] DeLorenzo has not been contacted by federal investigators about his communications with Iacobelli. DeLorenzo Decl. at ¶ 22.

efficiency program, while GM was denied the same for its program—Global Manufacturing System ("GMS"). In addition, FCA was provided with valuable foreknowledge about coming changes to contractual limits on less expensive Tier Two workers, while GM was denied the same knowledge. Finally, FCA received support for its "longer term business plan" and another secret, "side letter" agreement with the UAW, both of which were denied to GM.

6. Next, with cooperation of UAW leadership purchased through bribes, FCA NV's former CEO, Sergio Marchionne worked with then-UAW President Dennis Williams to use the negotiations and bargaining of the 2015 collective bargaining agreement ("CBA") to pressure GM to accede to FCA NV's merger desires. Specifically, after GM rejected Marchionne's formal merger demand in the spring of 2015, Marchionne, through bribery, obtained the "lead" negotiating position for FCA, and with the co-conspirators identified herein, crafted a CBA that, once imposed on GM through pattern bargaining, would cause GM massive harm with the goal to pressure GM into a merger. While GM ultimately resisted this takeover scheme, in the process Marchionne and FCA negotiated a 2015 CBA that cost GM one billion dollars more than the UAW had even sought from GM before FCA was designated the lead.

7. A collection of foreign accounts held by and/or affiliated with those involved in the conspiracy recently came to light, further demonstrating the scope and value of FCA and FCA NV's scheme and consistent with Iacobelli's statement to DeLorenzo that the scheme was much broader than previously known.[8] Upon information and belief, and as the only plausible inference based on the facts revealed thus far and the statements of Iacobelli, FCA NV and/or FCA provided millions of dollars to co-conspirators via numerous undisclosed offshore bank accounts and

[8] DeLorenzo Decl. at ¶ 4 ("[Iacobelli] declared that the scheme and those involved was much broader than was known publicly[.]").

utilized such accounts to purchase the support and silence of numerous high-level UAW officers and FCA executives. These recipients of FCA-funded offshore accounts include former UAW Presidents, including Dennis Williams, former UAW Vice President Joseph Ashton, and Iacobelli and Durden, who centrally orchestrated the scheme on Defendants' behalf. FCA and FCA NV then furthered their scheme from inside GM. First, FCA, FCA NV, and Williams chose Ashton to be the UAW Trust's[9] designee on GM's Board. Second, Defendants placed Iacobelli in a high-level position within GM's Labor Relations department. Ashton and Iacobelli secured and maintained these positions through years of affirmative misrepresentations and fraudulent omissions to GM, which had no knowledge of Defendants' scheme or Ashton's and Iacobelli's central roles in the scheme.

8. Once inside, and unbeknownst to GM, Ashton and Iacobelli utilized their access to GM's highly confidential and competitively sensitive negotiating and labor relations information and funneled this information to FCA, FCA NV, and their co-conspirators. For example, Ashton provided information to FCA, FCA NV, and their co-conspirators from the UAW about GM's negotiation strategies during the 2015 CBA negotiations and information about GM's response to FCA NV's merger overtures, while Iacobelli provided information about GM's labor strategy obtained in meetings with other members of GM senior leadership. Despite owing GM fiduciary duties, neither Ashton nor Iacobelli disclosed this criminal scheme or their roles in it to anyone at GM.

[9] The UAW Trust was established as a result of the 2007 CBAs between the UAW, FCA, GM, and Ford, which assigned retiree health care liabilities to an independent Voluntary Employee Beneficiary Association. Pursuant to restructuring following the 2008 financial crisis, the UAW Trust obtained the right to appoint a director to New GM's Board.

## THE PARTIES

**A. Plaintiffs**

9. **General Motors LLC**: Plaintiff General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC. The sole member of General Motors Holdings LLC is Plaintiff General Motors Company, which is a Delaware corporation with its principle place of business in Detroit, Michigan. General Motors LLC is thus a citizen of Delaware and Michigan. General Motors LLC is the largest automaker in the U.S. and an iconic American company that manufactures and sells automobiles in the U.S. under brands including Chevrolet, Cadillac, Buick, and GMC.

10. **General Motors Company**: Plaintiff General Motors Company (herein referred to as "GM Company" or "New GM") is a Delaware corporation with its principal place of business in Detroit, Michigan, and is the ultimate parent of General Motors LLC.

**B. Defendants**

11. **FCA US LLC (formerly known as Chrysler Group LLC):** Defendant FCA US LLC ("FCA") was an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA was a wholly owned subsidiary of FCA NV, a publicly traded foreign entity listed on the New York Stock Exchange ("NYSE"). FCA manufactured and sold automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram. FCA was an employer in the automotive industry. FCA and FCA NV competed with GM in the automotive industry. On March 1, 2021, FCA pled guilty to conspiring to violate 29 U.S.C. § 186(a)(2), (b)(1), and (d)(1) by providing funds and other things of value to UAW leaders. FCA further admitted that it was responsible for the acts of its officers, directors,

employees, and agents described in the Information, which largely recounts the prior acts to which the former FCA employees had pled guilty. Pursuant to the plea agreement, FCA agreed to pay a fine of $30 million and to a term of three years' probation. On August 17, 2021, a federal court accepted the plea agreement and sentenced FCA with a $30 million-fine and to three years of probation and oversight by an independent corporate compliance monitor.

12. **Stellantis N.V. (formerly known as Fiat Chrysler Automobiles N.V. and Fiat):** Defendant Stellantis N.V. ("FCA NV"), the successor of the Italian automotive company formerly known as Fiat S.p.A. ("Fiat"), is the ultimate parent company and owner of FCA US LLC. FCA NV is organized under the laws of the Netherlands, as a Naamloze Venootschap, and its principal executive offices are in Amsterdam, Netherlands. The Netherlands is a country known for not imposing rigorous corporate governance standards on those companies that select it as their domicile. Since October 2014, FCA NV's common stock has traded on the NYSE under the ticker symbol FCAU, and it regularly files with the SEC annual reports on Forms 20-F and furnishes Forms 6-K pursuant to Section 13(a) of the Exchange Act. FCA NV is an automotive group that, both directly and through its subsidiaries, designs, engineers, manufactures, distributes, and sells vehicles and components; provides retail and dealer financing, leasing, and rental services; and engages in media, publishing, and other business throughout the U.S., including in Michigan.

13. **Alphons Iacobelli:** Defendant Iacobelli is a Michigan resident and citizen, domiciled in Michigan, who was employed as the Vice President of Employee Relations at FCA and as the Co-Chairman of the UAW-Chrysler National Training Center ("NTC") and its Joint Activities Board from 2008 to 2015. In this role, Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW. Through his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and

FCA to direct the financial affairs of and approve payments made by the NTC. Immediately after leaving FCA in June 2015, Iacobelli actively sought employment at GM in its Labor Relations department. In January 2016, Iacobelli was hired by GM as Executive Director, North America Labor Relations, after a background check, without GM having any knowledge of Iacobelli's misdeeds or the ongoing investigation into them. Iacobelli worked at GM from January 2016 until the indictment against him was made public in July 2017. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution. Iacobelli remains domiciled in Michigan, with his primary residence in Rochester Hills, Michigan, and is a citizen of Michigan. At all times relevant to this Second Amended Complaint, Iacobelli was an agent of Chrysler and/or FCA.

14. **Jerome Durden:** Defendant Durden is a Michigan resident and citizen, domiciled in Michigan, who was employed as a financial analyst at Chrysler and FCA in its corporate accounting department since 1985. In 2008, he was assigned by Chrysler (and continued under FCA) to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and FCA, had the authority to approve and did approve payments made by the NTC, including payments in furtherance of the conspiracy alleged herein. In addition, Durden was selected by Holiefield to serve as Treasurer of the Board of Trustees of Holiefield's Leave the Light on Foundation ("LTLOF") from 2009 through June 2015. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution. Durden

remains domiciled in Michigan, with his primary residence in Rochester, Michigan, and is a citizen of Michigan. At all times relevant to this Second Amended Complaint, Durden was an agent of Chrysler and/or FCA.

## C. Significant Non-Parties and Other Entities

15. **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)**: The UAW is the union that exclusively represents the labor forces for both GM and FCA. From 2009-2019 the UAW represented approximately 50,000 GM employees and between 23,000 and 47,000 FCA employees. As such, the UAW has a significant degree of market power to force labor terms on either competitor, including through the ability to call strikes, among other actions. The UAW is headquartered in Detroit, Michigan.

16. The UAW also has an unusual and limited governance structure where only five officers of the UAW—the President, the Secretary-Treasurer, and three Vice Presidents of the International Executive Board—effectively control its central decision-making regarding the negotiation and administration of collective bargaining agreements. These UAW officers possess particularly strong powers as well, including the power to negotiate CBAs, call special conventions, authorize strikes, and issue and revoke charters, among other powerful tools. While these UAW officers operate in the context of an International Executive Board that includes eleven "Regional Directors," these officers have effectively controlled the overall decision-making, policy, director and officer elections, and negotiation and administration of the CBAs. There are minimal checks and balances on the President and the other four officers as throughout the relevant period they had no oversight board, committee or trustee that oversaw and ensured the integrity of the UAW Executive Board or that could take action to address malfeasance. In addition, these officers, who have nearly complete control over UAW affairs, are elected only every four years

and implemented practices to exercise substantial control over elections to perpetuate their role on the International Executive Board. If any of these officers or directors acted corruptly, they had the power and influence to inflict direct harm on any given competitor in the name, and on behalf of, the UAW.

17. **Sergio Marchionne ("Marchionne"):** Acting principally from and within Michigan, non-party Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–18, the Chairman (2011–14) and CEO (2009–14) of Chrysler, and the COO of FCA North America (2011–18). Marchionne also served as the CEO of CNH Industrial (2004-2018), which was commonly controlled by Exor NV, which directly and indirectly is the largest shareholder of FCA NV. At all times relevant to this Second Amended Complaint, and until his death, Marchionne was an agent of FCA and FCA NV. Marchionne, with the highest level of approval at FCA NV and FCA, centrally orchestrated and later attempted to conceal the fraudulent scheme as alleged herein.

18. **UAW-Chrysler National Training Center ("NTC"):** Non-party NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were inherited by FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA. The governing body of the NTC is known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's Chrysler Department serve as Co-Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board is made up of senior officials from FCA and the UAW.

19. **Michael Brown:** Brown is a Michigan resident who was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national CBAs between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Second Amended Complaint, Brown was an agent of Chrysler and/or FCA.

20. **Dennis D. Williams:** Williams served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010 to 2014). Prior to 2010, Williams served on the UAW International Executive Board as the Director of Region 4 (2001 to 2010) during which time he had direct dealings with Sergio Marchionne in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction equipment, which is commonly controlled by Exor NV. On August 27, 2020, the United States Attorney for the Eastern District of Michigan charged Williams with conspiracy to embezzle union funds in violation of 18 U.S.C. § 371 and 29 U.S.C. § 501(c). Williams pled guilty on September 30, 2020 and was sentenced to twenty-one months imprisonment on May 11, 2021 and assessed $132,000 in restitution.

21. **Joseph Ashton**: Ashton served on the UAW's executive Board from 2006 to 2014, most recently as Vice President of the UAW's GM Department from 2010 to 2014, and previously as the Regional Director for Region 9 from 2006 to 2009. Following his time at the UAW, from 2014 to December 2017, Ashton served as the UAW Trust's designee on New GM's Board of Directors. In December 2017, Ashton abruptly resigned that position. On December 4, 2019,

Ashton pled guilty to conspiracy to commit honest services wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h). On November 17, 2020, Ashton was sentenced to thirty months imprisonment and is currently incarcerated at FCI Fairton in New Jersey. On September 14, 2020, GM sued Ashton in the United States District Court for the District of New Jersey for his breaches of fiduciary duty and related frauds while serving as a director on New GM's Board.

22. **General Holiefield:** Holiefield (deceased in 2015) served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA on behalf of tens of thousands of FCA employees represented by the UAW. From 2007 to 2014, Holiefield also served on the UAW Executive Board. During much of the Holiefield leadership years, executives of Chrysler/FCA violated the Labor Management Relations Act by bribing Holiefield and his staff. Millions of dollars from Chrysler/FCA were diverted through NTC and LTLOF to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

23. **Norwood H. Jewell:** Jewell is a Michigan resident who served on the UAW's Executive Board from 2011 to 2017, most recently as the UAW's Vice President of the FCA Department (2014–17) and previously as Regional Director (2010–14). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371. Jewell admitted to using funds from the NTC for personal benefit, as part of a "culture of corruption" between UAW leaders and executives at FCA,

and to receiving "things of value from persons acting in the interest of FCA."[10] Jewell was sentenced to fifteen months in prison.

24. **Virdell King:** King was a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371. King admitted to participating in a scheme through which she, and other UAW leaders, took and received "money and things of value from persons acting in the interest of FCA."[11] King was thereafter sentenced to prison and a $5,500 fine.

25. **Nancy Johnson:** Johnson was the top administrative assistant to Jewell, then the UAW Vice President for the Chrysler department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On July 23, 2018, Johnson pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371. Johnson admitted to participating in a scheme through which she, and other UAW leaders, took and received "money and things of value from persons acting in the interest of FCA."[12] Johnson was then sentenced to one year and one day in prison and a $10,000 fine.

26. **Keith Mickens:** Mickens was a senior official in the UAW Chrysler Department from 2010 through 2015. In 2011, Mickens served on the UAW committee responsible for negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy

---

[10] Jewell Plea Agreement at 2-3.

[11] V. King Plea Agreement at 3.

[12] Johnson Plea Agreement at 2-3.

to violate the Labor Management Relations Act, 18 U.S.C. § 371. Mickens admitted to participating in a scheme through which he, and other UAW leaders, took and received "payments, money, and things of value from persons acting in the interest of FCA."[13] Mickens was thereafter sentenced to one year and one day in prison and a $10,000 fine.

27. **Wilson's Diversified Products:** Upon information and belief, Wilson's Diversified Products, LLC ("Wilson's Diversified Products") is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Wilson's Diversified Products is owned and controlled by Morgan.

28. **Monica Morgan Photography:** Upon information and belief, non-party Monica Morgan Photography, LLC is a Michigan limited liability company with a principal place of business in Detroit, Michigan. Upon information and belief, Monica Morgan Photography is owned and controlled by Morgan.

29. **Leave the Light on Foundation ("LTLOF"):** During much of the relevant time period, non-party LTLOF was a Michigan tax-exempt organization with a principal place of business in Detroit, Michigan, controlled by Holiefield. Numerous co-conspirators served as officers and directors of LTLOF, including Keith Mickens (Vice President and director), Jerome Durden (Treasurer and director), and Virdell King (director).

30. **Linda Knoll**: Knoll served as the Chief Human Resources Officer for FCA NV, a position she has held from 2011 until 2021, and previously served concurrently in the same role at CNH Industrial NV, another company controlled by Exor NV, where Marchionne was the Chairman of the Board until his death. Ms. Knoll also sat on the Group Executive Counsel of FCA,

---

[13] Mickens Plea Agreement at 3.

which is the highest operational body within FCA. In this role, Ms. Knoll is reportedly responsible for overseeing the entirety of FCA and FCA NV's human resources function, including "organizational development, talent management, compensation and benefits, employee relations, and compliance and staffing."[14]

31. **Peter Glenn Shagena**: Shagena took over as the Vice President of Employee Relations at FCA in 2015, when Iacobelli left. Shagena also served on the NTC Joint Activities Board beginning in 2015. In this role, Shagena was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW and resolving disputes and grievances that arose under the CBAs between Chrysler/FCA and UAW. Shagena became Director – Group Human Resources Manufacturing at Chrysler, LLC in 2007. In 2009, he became the Director of Human Resources, Manufacturing/World Class Manufacturing. In that role, he joined the NTC board and led Chrysler's labor relations efforts, including the rollout of World Class Manufacturing ("WCM") at all of the Company's manufacturing operations. In 2013, he became Director of Human Resources at FCA Mexico before returning in June 2015 to become the Vice President, Head of Employee Relations for FCA Group in North America (effectively assuming Iacobelli's prior role).

32. **Colin Lightbody**: Lightbody previously served in the labor department at FCA (and previously Chrysler) from 1998 until his retirement in 2018 and reported directly to Iacobelli for many of those years. From 2014 to 2018, Lightbody was the Director of Labor Economics for FCA, with a substantial role in directing negotiations with the UAW. Lightbody described his role at that time as "[f]or many years, provid[ing] strategic guidance to and work[ing] directly with the

[14] https://www.fcagroup.com/en-US/group/governance/management/Pages/ linda_Knoll.aspx

late FCA Chief Executive Officer, Sergio Marchionne." Since retiring from FCA, Lightbody has started his own consulting company, while also publishing blog posts concerning various collective bargaining topics.

**JURISDICTION AND VENUE**

33. This court has subject matter jurisdiction over this dispute under MCL § 600.605.

34. Venue is proper in this Court under MCL § 600.1629(1)(a) because the original injury to GM occurred in this county and Defendants have conducted and conduct significant business in this county, including through substantial manufacturing operations in the county. Venue is also proper in this Court under MCL § 600.1629(1)(b) because the original injury to GM including the harm and damages it suffered occurred in this county and GM resides and has a place of business in this county.

35. The Court has personal jurisdiction over FCA and FCA NV for several reasons. The Court has personal jurisdiction over FCA under MCL § 600.711 because it carries on a continuous and systematic part of its general business within Michigan such that it is essentially "at home" in Michigan. Indeed, FCA is headquartered in Michigan. In addition, FCA and FCA NV design, engineer, manufacture, distribute, and sell vehicles in the U.S. and Michigan under brands such as Chrysler, Jeep, Dodge, and Ram. As described herein, FCA and FCA NV have engaged in and authorized a decade-long conspiracy occurring principally in Michigan, directed to harm GM, which is headquartered in Wayne County, Michigan. FCA NV's actions directed towards Michigan, including towards Detroit, Michigan, included the bribing of Michigan residents and routing bribes through the NTC, which is headquartered in Michigan. Thus, the Court has personal jurisdiction over FCA and FCA NV under MCL § 600.715, because they have transacted business within the state of Michigan; own, use, and possess property within the state

of Michigan (including FCA's headquarters); and did or caused to be done things in the state or from which consequences were felt in this state, which give rise to the causes of action in this case.

36. The Court has personal jurisdiction over Iacobelli and Durden for several reasons. The Court has jurisdiction over Iacobelli and Durden under MCL § 600.701 because they are domiciled in Michigan. The Court further possesses personal jurisdiction over Iacobelli and Durden under MCL § 600.705, because during the relevant time period, they transacted business within the state of Michigan, and did or caused to be done things in this state or from which consequences were felt in this state, which give rise to the causes of action in this case.

## PROCEDURAL HISTORY

37. Based on many of the same underlying factual allegations contained in this Complaint, GM brought suit against Defendants in November 2019 in the United States District Court for the Eastern District of Michigan. In that suit, GM alleged federal law claims based on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as state law claims for unfair competition and conspiracy. The state law claims for unfair competition and conspiracy were brought in federal court based on supplemental jurisdiction.

38. On June 15, 2020, after briefing on the defendants' motion to dismiss was complete but prior to any hearing or substantive rulings, the District Court entered an order declining to exercise supplemental jurisdiction over the state law claims. The order stated that trying the state and federal law claims together "would create insurmountable, confusing, and prejudicial spillover-evidence issues, and also create jury confusion that instructions could not cure."[15] The District Court thus exercised discretion to decline supplemental jurisdiction pursuant to 28 U.S.C.

[15] 6/15/20 Order at 2.

§ 1367(c)(4). GM thus brings this suit to assert its state law causes of actions based on Defendants' wrongdoing.

39. After declining to exercise jurisdiction on the state law claims, the District Court granted defendants' motion to dismiss GM's federal law RICO claims. The District Court determined that, under the specific proximate cause standard for federal RICO claims, GM's complaint did not sufficiently allege proximate causation between the admitted wrongdoing of FCA and FCA NV's agents on the one hand, and the harm to GM on the other. The District Court's ruling on this RICO-specific causation issue, which GM is appealing, does not have any bearing on the state law claims brought in this suit. GM's appeal to the United States Court of Appeals for the Sixth Circuit is pending.

## DETAILED ALLEGATIONS

## I. OPERATION CHRYSLER: FIAT ACQUIRES OPERATING CONTROL OF CHRYSLER.

### A. Financial Crisis Threatens U.S. Auto Industry

40. In or about 2008, in the midst of the worst financial crisis since the Great Depression, the automotive industry faced a major crisis. The industry had been weakened by, among other things, rising gas prices, which drove consumers away from trucks and SUVs, and competition from foreign automakers with lower labor costs using non-unionized labor. Sales dramatically declined. By 2008, the situation had turned critical, as a once-in-a-generation credit crunch nearly took down the world economy and wreaked havoc on the auto industry.

41. Suffering several consecutive quarters of losses, in late 2008, the U.S. auto manufacturers turned to the government for assistance. The U.S. Department of the Treasury injected funds in General Motors Corporation ("Old GM") and Chrysler through the Troubled Asset Relief Program ("TARP"), but it served only as a stopgap.

42. Chrysler filed for Chapter 11 on April 30, 2009. Old GM followed approximately a month later.

43. Because the UAW represented 99 percent of Old GM's unionized employees and the government's provision of any additional TARP funds was conditioned on a new collective bargaining agreement that, in part, needed to set forth labor costs competitive to Japanese transplants (*e.g.*, Toyota, Nissan, and Honda), UAW leadership could slow down and potentially block the entire transaction.

**B. Fiat and Marchionne Seek Entry into the U.S. Market Through Chrysler**

44. At the same time in Europe, Fiat faced declining sales and a deepening economic crisis. In September 2008, Marchionne told his executive council, "Fiat needs to radically change its alliance strategy. We've done everything we can on our own. If we're going to survive this one, we need a partner."[16]

45. Fiat needed an opportunity to enter the U.S. marketplace and recognized one in the financial crisis of the U.S. auto industry. Marchionne realized that the Old GM and Chrysler bankruptcies "were changing the game. All of the issues that had plagued the industry—its overcapacity, its poor use of capital, its inefficiency, the crushingly high cost of investment for new models—were now going to become unsustainable."[17] A "deal with Chrysler [could] be seen as part of a series of 'strategic partnerships' [that Fiat had] sealed with other automakers in recent

[16] JENNIFER CLARK, MONDO AGNELLI: FIAT, CHRYSLER, AND THE POWER OF A DYNASTY 244 (2012) ("MONDO AGNELLI").

[17] *Id.*

years."[18] Fiat's would-be "partner" was in the U.S., and the UAW was Fiat's bridge to establish a domestic footprint given the UAW's significance in the U.S. automotive market.

46. Marchionne, on behalf of Fiat, sought that critical connection—what appeared to outsiders as an alliance with UAW leadership—to help further Fiat's bid to acquire Chrysler. Marchionne quickly made the head of the union's Chrysler Department, Holiefield, a strategic partner and soon thereafter "a true friend."[19] Former UAW leadership, and Holiefield in particular, became Marchionne's main cohorts in Fiat's business plan even while he explored a collaboration with Chrysler. "If the union would come around to the view that the Fiat-Chrysler partnership was the only way to keep the company from going bust, maybe it would throw its weight behind Fiat when it came time for talks to start at the Treasury."[20]

47. In early 2009, Marchionne and his team met with Holiefield and another UAW official in advance of any formal talks with the government.[21] This meeting laid the groundwork for a UAW-Fiat alliance ultimately secured through a sophisticated bribery scheme.

48. While Marchionne was in active discussions with the UAW, on March 30, 2009, the government gave Fiat and Chrysler only 30 days to reach an agreement.[22]

---

18 Jeff Israely, *Fiat to Take 35% Stake in Chrysler*, TIME (Jan. 20, 2009), http://content.time.com/time/business/article/0,8599,1872719,00.html.

19 Sergio Marchionne, *Eulogy for General Holiefield* (Mar. 17, 2015), https://media.fcanorthamerica.com/pdf.do?id=16436. ("*Eulogy for General Holiefield*").

20 MONDO AGNELLI at 247.

21 *Id*.

22 The White House, *Remarks by the President on the American Automotive Industry* (Mar. 30, 2009), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-american-automotive-industry-33009.

49. Fiat began demanding what it needed from a new Chrysler-UAW CBA. Marchionne wanted the UAW to commit to support a manufacturing system called WCM. According to Marchionne, WCM "aims to ensure that the FCA Group's facilities are flexible and competitive with the best in the world."[23] "It broke down the union's rigid job classification system with its strict hierarchy and boundaries about who could do what."[24] In Marchionne's view, it "got rid of an excessive cost structure, and it created efficiency."[25] As instructed by Fiat, Chrysler, and UAW officials, including Holiefield (on behalf of the UAW) agreed to Marchionne's demand to implement WCM.

50. Marchionne also wanted to use more temporary employees in place of hourly workers. While Holiefield publicly claimed that he "would have to take [his] family and leave town if [the UAW] agreed to that," he quickly came around to Marchionne's ideas.[26] UAW leadership agreed to lift any cap or restraint on Tier Two workers until 2015. Tier Two workers are less senior employees who have a lower wage structure than Tier One workers, have a different health plan, and are provided with a 401(k) plan instead of a defined benefit pension. They are therefore a less expensive labor source than Tier One workers.

---

[23] FCA, *Global Quality Through World Class Manufacturing*, https://www.fcagroup.com/enUS/media_center/insights/Pages/wcm_global_quality.aspx.

[24] MONDO AGNELLI at 259.

[25] *Id.*

[26] *Id.* at 258, 260.

51. "Marchionne's goal overall was to have as few constraints as possible in his ability to operate Chrysler when it came out of bankruptcy. He wanted to save Chrysler, take it public, pay everyone back, and move on."[27]

52. Holiefield thus formed a long-term "partnership with Marchionne to help revive the company."[28] As Marchionne relayed, Holiefield was a "true partner and a key force behind the transformation of [Chrysler]."[29]

### C. <u>FCA Obtains the Right to Purchase a Majority of Chrysler's Shares from the UAW</u>

53. In June 2009, Chrysler had emerged from bankruptcy with Fiat owning 20 percent of its equity. This was a coup for Fiat, as it had only contributed intellectual property and know-how, and no actual money. Fiat also obtained operating control over Chrysler, and Marchionne became its CEO.

54. Through the Chrysler bankruptcy, the UAW, through the UAW Trust, emerged as the majority owner of Chrysler, owning 55 percent of the equity. Additionally, the UAW Trust received a note payable for $4.6 billion at 9 percent interest and the right to appoint a director to Chrysler's Board. Fiat was given the right to purchase 40 percent of the UAW Trust's equity interest in Chrysler.

55. From bankruptcy, the UAW Trust also became the largest shareholder of New GM, obtaining 17.5 percent of the equity, and receiving a $2.5 billion note, 260 million shares of

---

[27] *Id.* at 260.

[28] Joseph Szczesny, *Late UAW Vice President Leaves Tarnished Legacy*, WARDSAUTO (Aug. 4, 2017), https://www.wardsauto.com/industry/late-uaw-vice-president-leaves-tarnished-legacy.

[29] *Eulogy for General Holiefield*.

preferred stock, warrants to purchase 45.5 million shares of New GM stock, and the right to appoint a director to New GM's Board.

56. As Iacobelli and Durden have admitted, starting no later than July 2009, merely one month after Chrysler emerged from bankruptcy, Iacobelli, Durden, and other FCA and FCA NV officials began to transfer hundreds of thousands of dollars of Chrysler funds to Holiefield (and likely others). Iacobelli and Durden were central to this scheme and have pled guilty to their involvement. As stated in Iacobelli's indictment, these illegal payments were "viewed . . . as an investment in 'relationship building' with UAW Vice President Holiefield."[30]

57. For example, Holiefield's charity, LTLOF, received hundreds of thousands of dollars in furtherance of FCA's anticipated "high value/high leverage programs" with the UAW.[31] These bribes, well known among FCA and FCA NV management and certain former UAW leaders but kept secret from GM and the public, helped fuel the start of a wide-ranging and long-lasting conspiracy that included funds from NTC and also the establishment of foreign bank accounts, described in detail herein.

58. In addition to authorizing the bribes through the NTC, Marchionne personally rewarded Holiefield for his assistance. For example, in February 2010, Marchionne, acting as an agent of FCA NV and FCA, gave Holiefield a custom-made Terra Cielo Mare watch worth several thousand dollars. Marchionne sought to conceal the bribe by "declar[ing] the goods at less than

---

[30] 7/26/17 Iacobelli Indictment, at 13.

[31] *Id*. at 10.



41992169.1

fifty bucks."[32] It was reported that Marchionne then lied about the gift when questioned about it by federal investigators several years later.[33]

## II. DEFENDANTS FUNNEL MILLIONS TO THE UAW AND CERTAIN FORMER UAW LEADERS.

59. In July 2009, FCA senior executives and agents, including Iacobelli and Durden (with the knowledge and approval of Marchionne on behalf of FCA NV), began a long-running intentional scheme of improper payments to certain UAW officials, funneled through the NTC and through foreign financial institutions, to influence the collective bargaining process. Speaking with DeLorenzo, Iacobelli described the NTC as a slush fund for payments to the UAW and the scope of the payments to the UAW as "simply incomprehensible."[34] The payments included monthly stipends to UAW leaders and members of approximately $250,000, along with substantial expenditures beyond these monthly amounts.[35]

60. Even focusing solely on the payments that have been expressly admitted in criminal pleadings, the amounts paid are substantial. To begin, FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW."[36] As Durden has admitted, as controller of the NTC, he facilitated illegal payments to UAW leaders as directed by Iacobelli and helped

---

[32] 7/13/18 Iacobelli Plea Agreement, at 8.

[33] Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

[34] DeLorenzo Decl. at ¶

[35] *Id.*

[36] 5/25/18 Brown Plea Agreement, at 3.

conceal those payments as well. Specifically, Durden has admitted that, starting in 2009, he knowingly "conspired and agreed" with Iacobelli, Holiefield, and others, "to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others."[37] "During the course of the scheme, Jerome Durden and his co-conspirators diverted more than $4.5 million from [the NTC] to purchase a luxury Ferrari automobile, to pay off the mortgage on a personal residence, to install a swimming pool, spa, and outdoor kitchen at a personal residence, to purchase two $37,500 limited-edition fountain pens, to make home improvements, and to pay for personal credit card transactions, among other personal expenses."[38] Moreover, Durden has admitted that he concealed the illegal payments through various means including tax fraud.

61. Iacobelli and Durden pled that the NTC made these payments, as authorized by FCA and FCA NV, to keep UAW officials "fat, dumb, and happy" and to "buy labor peace."[39] As Iacobelli further admitted, "FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW."[40] And as Brown, FCA's Director of Employee Relations and NTC Co-Director admitted, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials."[41] Then, according to plan, FCA and FCA NV used that greased relationship to control the UAW and have it impose higher costs on GM.

---

[37] Durden Plea Agreement at 3.

[38] Durden Plea Agreement at 3.

[39] 7/26/17 Iacobelli Indictment, at 16; 10/31/18 Durden Gov't Sentencing Mem., at 2.

[40] 8/20/18 Iacobelli Gov't Sentencing Mem., at 8.

[41] *Id.*; 5/25/18 Brown Plea Agreement, at 4.

62. Iacobelli was equally clear with DeLorenzo that the central purpose of the scheme was to get leverage over the UAW, so that in negotiations FCA could gain a competitive advantage over GM through labor costs, and ultimately force a merger with GM.[42]

63. UAW Vice President Holiefield used his personal charity, LTLOF, as one means to conceal his receipt of FCA bribes. Between July 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included FCA executive Jerome Durden and UAW officials Keith Mickens and Virdell King) transferred "more than $386,400 in funds" from the NTC to LTLOF.[43] Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS. In turn, as known by Iacobelli and Durden, Holiefield, along with his girlfriend and later wife, Monica Morgan, used the purported charitable donations for personal expenditures. Iacobelli has further admitted that this wrongdoing was not limited to Holiefield's charity, telling DeLorenzo that UAW executive charities were generally used to funnel money to the UAW leaders.[44]

64. As the bribery scheme grew in complexity and depth, Holiefield and Morgan, with Defendants' knowledge and assistance, used false front businesses, including Monica Morgan Photography, Wilson's Diversified Products, and even a false hospice organization, in an attempt to launder funds from the NTC and LTLOF. Between July 2009 and 2011, LTLOF paid over $70,000 to Monica Morgan Photography, purportedly for photography lessons for underprivileged children. Yet, Morgan only taught a handful of classes, cancelled most of them, and then spent the money on fancy clothes, nightclubs, and restaurants. On another occasion in 2013, the NTC paid

---

[42] DeLorenzo Decl. at ¶ 13.

[43] 8/8/17 Durden Plea Agreement, at 6.

[44] DeLorenzo Decl., at ¶ 18.

Monica Morgan Photography $13,500, purportedly for services rendered but in fact so that Morgan and Holiefield could pay off the last installment on their new in-ground pool. Between January 2011 and July 2012, the NTC transferred more than $425,000 to Wilson's Diversified Products, which Morgan and Holiefield promptly used for personal expenses, including closing costs on the purchase of a house. In 2012, Morgan then created yet another shell company to receive over $200,000 in NTC funds, along with a fake hospice to allow LTLOF to "donate" over $350,000 directly to Holiefield's and Morgan's pockets.

65. During the course of the conspiracy, the NTC (at the direction and on behalf of Defendants, including Durden and Iacobelli) at times would directly pay the personal expenses of certain UAW officials. For example, through wire transfer, the NTC paid off Holiefield's mortgage on his personal residence in the amount of $262,219.71.

66. To further evade detection and broaden the conspiracy, in and around 2012, FCA executives including Iacobelli began to encourage the use of credit cards, with statements sent through the U.S. mails and payments made in part using interstate wires, issued to UAW officials by the NTC so they could charge personal expenses ultimately paid for by FCA. "Iacobelli directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions."[45] Certain UAW officials used these credit cards, including Johnson, King, Mickens, and Jewell, charging, for example, $1,259.17 for luxury luggage; $2,182 for a Italian-made Beretta shotgun; $2,130 for Disney World theme park tickets; over $1,000 for a pair of Christian Louboutin designer shoes; and thousands of dollars in electronics and many more such personal items.[46]

---

[45] 8/18/17 King Information, at 11.

[46] *See, e.g.*, Jewell Plea Agreement at 8-12 (describing specific purchases).

67. FCA and FCA NV bought control of UAW leaders to ensure that their bribery scheme achieved its goal of targeting and harming GM. For example, upon information and belief, FCA NV perpetuated its ongoing scheme by not only bribing General Holiefield as alleged herein and as admitted in criminal pleas, but also bribing Dennis Williams (UAW officer 2010-2018), Joseph Ashton (UAW officer 2010-2014), and other UAW officers, by granting those individuals control over foreign financial accounts with substantial funds and other items of value. Iacobelli confirmed that Williams, Ashton, and several other then-UAW leaders were part of the FCA scheme designed to harm GM.[47] Upon information and belief, for Williams such accounts exist in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank) in his name and the name of a business entity he controls. As described in the DeLorenzo Declaration, Marchionne also gave Williams a valuable watch (as he did with Holiefield), along with a similar note jokingly downplaying its value.[48] For Ashton such accounts exist or existed in Japan (Shinsei Bank) and Cayman Islands (Cayman National Bank) in his name and the name of a business entity he controls. Upon information and belief, FCA and FCA NV enabled, funded, and directed control of the above-identified accounts.

68. FCA and FCA NV's funding of offshore accounts was not a new practice. In the past FCA NV (through predecessor Fiat S.p.A.) has admitted to using offshore accounts to bribe Italian politicians, and that these entities have the commercial power and influence to cause such banks and other facilitators to open and maintain these foreign accounts for third parties as identified herein. Plaintiffs' allegations are based, in part, on the statements of Iacobelli concerning the scope of the scheme, and the proven and admitted pattern of bribing officials in the past.

[47] DeLorenzo Decl. at ¶ 20.

[48] DeLorenzo Decl. at ¶ 3.

Further, there is no other credible explanation for such foreign accounts in such countries and financial institutions held by this disparate yet closely connected group of individuals who are US residents employed in the US other than that they were facilitated and funded by FCA and FCA NV. The notion that a closely tied group of FCA and UAW executives would possess undisclosed foreign bank accounts unrelated to their admitted participation in a multi-year bribery scheme is simply not plausible. As alleged above, FCA NV (through predecessor Fiat S.p.A.) admittedly used foreign accounts in connection with a prior bribery scheme.

69. Of course, this scheme to harm GM would run the risk of FCA and FCA NV employees blowing the whistle on such a scheme. To minimize that risk, upon information and belief, FCA and FCA NV provided illicit compensation to its own current and former executives to carry out the scheme to harm GM. As with former UAW leaders, this illicit compensation was provided, in part, in the form of control over foreign financial accounts that have been funded by FCA and/or FCA NV with millions of dollars. Upon information and belief, FCA and FCA NV executives who accepted compensation for purposes of executing, protecting and minimizing disclosure over the scope and depth of the scheme including targeting GM as described herein include, but are not limited to:

(a) Alphons Iacobelli - As the former Vice President of Employee Relations at FCA (2008-June 2015) and NTC Director (2008-2015), Iacobelli executed on the scheme as directed by Marchionne and his superiors. Iacobelli admitted in his sentencing memorandum that the corruption at issue was perpetrated by "FCA executives." FCA NV compensated Iacobelli extremely well for his role in the scheme, including providing him with control over millions of dollars held in financial accounts in Switzerland

(UBS and Credit Suisse), Italy (Deutsche Bank), Liechtenstein (VP Bank Vaduz), and Singapore (DBS Bank) both directly, through family, and through a corporate entity he controls.

(b) Jerome Durden - As the controller of the NTC and a Secretary of the NTC Joint Activities Board (2008-2015), who facilitated many of the direct payments to the UAW, FCA NV provided Durden with control over funds in financial accounts held in Liechtenstein (LGT Bank Vaduz) and the Cayman Islands (Cayman National Bank). These accounts are held in his name or the business entity that he controls. When sentenced for his involvement in the scheme, Durden represented to the Court that he did not benefit from the scheme in any financial respect. That representation, made in connection with seeking a lighter prison sentence, is contrary to the compensation provided in the referenced foreign accounts.

(c) Colin Lightbody - Lightbody was the Director of Labor Economics at FCA (2014-2018) until he retired at age 56. In that role and his predecessor roles at FCA, he reported directly to Iacobelli and helped him carry out the scheme. FCA NV provided Lightbody with control over a Luxembourg financial account (Fortuna Bank) to pay for his role in executing and covering up the scheme. To help mislead after the scheme began to come to light, on December 12, 2019, Lightbody injected himself into the issue by publishing a misleading blog post that purported to analyze the reason that

FCA had an $8-an-hour advantage over GM in labor costs.[49] In that blog, drafted and made available on the internet to help fulfill his end of the bargain for the funds provided to him in the Luxembourg account, he intentionally omitted his knowledge of the bribery scheme and the secret agreement that FCA would not be held to the reinstatement of the 2015 cap as alleged herein.

(d) Linda Knoll - Knoll was the long-term Chief Human Resources officer for FCA NV and reported directly to Marchionne. In that position and given her role on the Group Executive Council of FCA, Knoll not only had direct knowledge of the scheme alleged herein, but also was used to minimize and prevent employees from becoming "whistleblowers." For example, when an FCA executive came forward and publicly disclosed the FCA national fraudulent sales scheme and assisted the SEC with its investigation into that scheme as alleged herein, Knoll led the retaliation against that employee including withholding compensation from him. For her role in executing and covering up the scheme, FCA NV provided her with control over financial accounts in at least Luxembourg (Lombard Odier Europe) and Switzerland (Banquet Pictet & Cie SA).

(e) Peter Glenn Shagena - Shagena served as an NTC Director and Director of Labor Relations for World Class Manufacturing through much of the

---

[49] *See* Colin Lightbody, "Why does FCA have an $8 per hour competitive labor cost advantage over GM?" (Dec. 12, 2019) https://hrandlaborguru.com/blogs/news/why-does-fca-have-an-8-per-hour-competitive-labor-cost-advantage-over-gm.

conspiracy period, reporting directly to Iacobelli. In that role, he was responsible for leading labor relations efforts, including the rollout of World Class Manufacturing at all of FCA's manufacturing operations. He also played a key role on FCA's negotiations teams. When Iacobelli retired in June 2015, Shagena replaced him as the Head of Employee Relations for North America. Upon information and belief, FCA NV compensated Shagena for his role in the conspiracy including facilitating bribery of the UAW leaders and ensuring that he did not reveal the conspiracy. This compensation included funding one or more financial accounts for Shagena in one or more Swiss financial institutions (UBS Geneva and Itau Private Bank).

**B. Evidence of the Existence and Control Over Foreign Accounts.**

70. Through substantial investigative effort, GM has developed evidence of the existence and control over foreign accounts by Defendants and other individuals involved with the FCA bribery scheme detailed herein. As part of this effort, GM retained the services of GreyList Trace Ltd ("Greylist"), a UK-based investigative service. GreyList uses proprietary technology to determine whether a specific email address has an existing relationship with a financial institution.

71. International financial institutions universally use email addresses to register bank accounts, and when an email address is associated with an account, the financial institution will "whitelist," or approve, that address in the banks' spam filter. Emails from addresses that are whitelisted or recognized and approved in a bank's email system are authorized and quickly allowed to pass through the banks' spam filter, while email addresses that are wholly unknown (or "greylisted") by a bank's email system will require further investigation and thus be delayed. GreyList's method sends out a digital code reflecting a given email address to investigate the spam

filters of various financial institutions, and its algorithm can measure the difference in the amount of time that the financial institution's spam filter takes to review an email to determine whether the email address is whitelisted/approved and thus has a preexisting relationship with that financial institution.

72. As soon as this timing difference is detected, the string of code reflecting the email address destroys itself. Neither the code nor anything else ever enters the bank's servers. For those reasons, GreyList's methodology cannot do any more than indicate that a relationship exists between the financial institution and the email address. Based on its substantial sampling and testing, GreyList's algorithm generates hits with an accuracy of 98%.

73. In 2021, GreyList's algorithm discovered banking connections between Jerome Durden and Joseph Ashton at Cayman National Bank, and between Alphons Iacobelli and several foreign financial institutions including the DBS Bank Ltd. in Singapore, VP Bank AG in Liechtenstein, and the Deutsche Bank in Bologna, Italy.

74. GreyList's analysis and results provide clear evidence that Iacobelli, Durden, and Ashton possess ownership or other interests in accounts maintained at foreign financial institutions at which they would have no reason to maintain accounts other than their connection to the schemes at issue in this litigation.

## III. FIAT AND ITS SUCCESSORS CORRUPTED FORMER UAW LEADERS TO DAMAGE GM.

75. Starting in July 2009 and continuing through at least 2015, in return for FCA and FCA NV's bribes facilitated by Iacobelli and Durden, certain corrupt members of UAW's senior leadership in place at the time, including Ashton, Williams, and Holiefield, began providing Chrysler with labor programs that provided it with cost advantages over GM, while denying GM the ability to implement similar programs. Based on the UAW's stated preference of engaging in

pattern bargaining, GM had a reasonable expectation that it would not be denied structural labor benefits as a result of bribes paid by FCA to withhold such benefits from GM—the goal of the conspiracy was to ensure that GM had a higher cost structure than Chrysler and later FCA. This CBA favoritism purchased through the bribes, as FCA and FCA NV intended, inflicted massive direct damage upon and weakened GM in the form of higher labor costs by denying GM the concessions made to FCA, which GM had a reasonable expectation of receiving. As a result of these bribes, GM faced substantially above-market on average labor costs.

76. As a senior labor executive at FCA and top negotiator with the UAW, Iacobelli was also directly and centrally involved in reaching these arrangements with the UAW. He also ensured, through his continued directing of payments to UAW leaders, that GM was denied such benefits.

77. For example, at the time of the 2011 CBA, Chrysler and the UAW (through Iacobelli and Holiefield) documented their joint commitment to WCM, which was a "full-fledged partnership." They agreed that it was "of critical importance that WCM be jointly implemented systematically and fully in order to operate successfully and thereby position [Chrysler] and the [UAW] firmly among the winners of the global automotive manufacturing community."[50] As directed by FCA and FCA NV to the UAW, including Williams and Ashton, the UAW denied GM the same labor flexibility and efficiency enhancement with respect to its manufacturing operations. The UAW's agreement to implement these more efficient labor programs at FCA did not harm any individual FCA-UAW employees—as the programs did not impact the individual wages of any given worker or curtail the benefits received.

---

[50] Letter from A. Iacobelli, Chrysler Group LLC, to General Holiefield, International Union, UAW, World Class Employee Participation (Oct. 12, 2011).

78. As described below, in 2014, in a secret Memorandum of Understanding ("MOU") negotiated outside of the collective bargaining process, the UAW again committed to support FCA's WCM program. Given Iacobelli's role at FCA during this time, he would have been directly involved in the negotiation and implementation of this agreement between the UAW and FCA.

79. In October 2015, in a letter attached to the FCA-UAW CBA, FCA and the UAW (through Jewell, another recipient of FCA bribes) once again agreed that "the need for unit flexibility to address fluctuating workloads is essential," and committed to "continue to support the full implementation of [WCM], New Hire Entry Level Wages and Benefits, and significant efficiency improvements." To that end, they committed to "the flexible utilization of [the] salary workforce," including: (a) that there may exist "[i]nefficient work rules and work practices . . . within the salary bargaining units," (b) "[t]he flexible use of the salary bargaining unit workforce can perform within classifications and departments, across classifications and departments, within units, across units, and within locals," and (c) "[t]he parties agree to discuss any opportunities to assign work across locals provided there is mutual agreement between the parties and a positive business case for keeping the work in-house."[51]

80. As FCA and FCA NV had directed through its bribery executed by Iacobelli and Durden to certain corrupt UAW officials, the UAW, through Williams and Ashton, among others, denied these benefits to GM, at the direction of FCA and FCA NV. GM made repeated efforts to collaborate with UAW leaders to agree upon and implement the parameters of GMS, an efficiency improvement program that would have been on par with WCM. For example, during a meeting on August 13, 2014, officials in the UAW's GM Department acknowledged that WCM was a superior

[51] Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Salary Bargaining Unit Flexibility (Oct. 22, 2015).

program, in part, because Chrysler management (specifically Marchionne) and the UAW worked closely to ensure it was a joint effort. UAW leadership failed to disclose that union support for FCA's WCM was, in part, purchased through bribes. Moreover, UAW leadership and GM discussed that "[t]here needs to be an effort for the UAW and GM leadership to go through each element of GMS and together gain buy-in from the manufacturing managers and UAW members," and that "GMS cannot have the same success of WCM without the involvement of UAW members." But for FCA and FCA NV's bribery facilitated and carried out by Iacobelli, Durden, and others, the UAW would have worked to implement GMS in earnest with GM. Implementation of the advantages provided to FCA would have allowed GM and the UAW to work collaboratively to increase the efficiency of GM's production process, ultimately benefiting GM and the UAW members (both through an increase in profit sharing payments and in the overall health of GM).

81. Another advantage FCA and FCA NV purchased through bribery related to "Tier Two" employees. As of the 2007 CBA, Chrysler, GM, and Ford employed both "Tier One" and "Tier Two" employees. As described above, Tier Two workers are less expensive employees who have a lower wage structure than those in Tier One.

82. FCA and GM were initially subject to a 25 percent cap on Tier Two workers under the 2007 CBA. This cap was lifted under pre-bankruptcy addendums in 2009, but in their 2009 addendums both FCA and GM agreed to reinstate the cap six years later in the 2015 CBA. GM's 2011 CBA reiterated this commitment, stating that "the parties will mutually agree to a hiring limit based on the entry level percentage as of September 14, 2015" to "be no more than 25% and no less than 20% of the total UAW-GM hourly population." In recognition and anticipation of this 2015 Tier Two cap, GM thus kept its proportion of Tier Two workers below the anticipated 25

percent cap. By 2015, Tier Two workers comprised around 20 percent of the UAW membership at GM.

83. Through the conspiracy, certain corrupt UAW leaders assured FCA that they would not insist on reinstating the Tier Two cap in 2015. Specifically, FCA had reached a "side letter" agreement not publicly available that the cap would not be reinstated, yet misled GM and the public by claiming in an October 2011 released summary of the 2011 UAW-FCA CBA terms that "the cap will be reinstated at the end of" the 2011 CBA. Based on this private understanding purchased through the conspiracy that FCA would not be subject to a Tier Two cap, FCA hired many more Tier Two workers, possessing the valuable foreknowledge that it would not be penalized by any reinstatement of the cap. By 2015, Tier Two workers made up around 42 percent of the UAW membership at FCA—double the proportion of Tier Two workers at GM. This difference purchased through the bribery scheme provided FCA with a dramatic advantage with respect to average labor costs. Meanwhile, without this inside knowledge, GM managed to the cap and incurred corresponding cost increases anticipating the 2015 cap reinstatement as required by the contract. In 2015, as FCA had been privately assured, the UAW did not insist on reinstating the Tier Two cap for FCA and, as negotiated through pattern bargaining, the cap was not reinstated for GM either. In the end, and unbeknownst to GM in advance, ultimately there was no difference between how GM and FCA were treated in the 2015 negotiations with respect to Tier Two workers (as a result of the pattern bargaining). However, GM was harmed as a result of FCA's bribery because the UAW failed to inform GM in the time period before the expiration of the 2011 CBA that this cap would not be reinstated. Instead, they provided that information only to FCA. But for the bribes, the UAW would have informed GM in 2011 that it did not intend to reinstate the Tier

Two cap as it privately assured FCA so that GM could have addressed hiring accordingly and lowered its average labor cost.

84. FCA and FCA NV, working through Iacobelli and Durden and utilizing the bribery scheme, ensured that other additional advantages were denied to GM. For example, upon information and belief, in 2014, FCA and the UAW agreed to a formulary that would make better use of prescriptions that are widely available, significantly reducing FCA's health care costs. The formulary would have saved GM up to $20 million per year. Negotiators for GM repeatedly requested FCA's more cost-effective formulary during collective bargaining, but the UAW refused to agree, indicating the term would rankle UAW leadership. This request by GM would have been granted, but for FCA's bribery. The formulary did not harm any individual FCA employee as the concession merely limited the range of prescription drugs available for any particular condition, without preventing the treatment that an individual UAW member received; to GM's knowledge, all FCA employees received, in substance, the necessary prescription drug treatment that was prescribed.

85. Taken together, FCA and FCA NV's bribery scheme bought an average hourly wage advantage that took FCA from worst to first among the Detroit-based automakers. In 2006, Chrysler had the highest average hourly labor cost. Chrysler paid $75.86 on average in wages and benefits to its work force, and Old GM paid $70.51. Chrysler, Old GM, and Ford's labor costs exceeded non-unionized foreign automaker costs by approximately 50 to 80 percent prior to bankruptcy.

86. Nancy Johnson, a former UAW official who negotiated directly with FCA representatives, recently testified in separate proceedings that the bribes paid by FCA to UAW members and leaders were intended to, and in fact did, influence the UAW's bargaining position.



41992169.1

Johnson testified in a sworn affidavit that certain actions taken by former representatives of the UAW "was influenced by FCA bribes."[52] Johnson specifically noted the fact that the FCA bribery negatively affected the implementation and enforcement of the bargained-for grievance process, as well as FCA's allowed number of temporary workers and workers hired at Tier II wages. Johnson's sworn testimony corroborates GM's allegations, made in multiple prior pleadings, that FCA bribed the UAW to target GM for higher costs in the administration and the negotiation of the CBAs.

87. Through its corruption, and bribes, FCA was able to gain an average hourly wage advantage over GM. By 2015, FCA slashed its average hourly labor costs to $47—in the range of non-unionized foreign automakers operating in the U.S.—and $8 less on average per hour than GM ($55). FCA's average hourly wage advantage continues to this day: its labor costs are on average $8 per hour less than GM. This hourly wage disparity is not due to paying FCA employees less in wages and benefits—but rather it was due to denying GM structural labor programs that would have lowered its average hourly wage rate and that GM would have received but for the bribes.

---

[52] N. Johnson Aff. at ¶ 3-4. Ms. Johnson's affidavit was filed on April 25, 2021 as Exhibit G to Dkt. No. 7 in Case No. 2:21-mc-50554-PDB-APP, *United States v. FCA US LLC* (E.D. Mich.).




## IV. DEFENDANTS CONSPIRED WITH UAW LEADERS TO ATTEMPT A TAKEOVER OF GM BY MERGER.

88. Sergio Marchionne held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008: "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[53]

89. As CEO of Fiat since 2004, Marchionne had long sought a merger with GM. After failing to effect a merger in 2005, Marchionne saw another opportunity after Fiat acquired Chrysler in 2009. "[A]fter fixing Chrysler, let's . . . take General Motors and merge them together. Once and for all, let's straighten out the car industry, creating an American giant that also allows a long-term future for Fiat."[54]

---

[53] Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, REUTERS (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idUSTRE4B738Z20081208.

[54] TOMMASO EBHARDT, SERGIO MARCHIONNE 63–64 (2019) (translated from Italian).

90. A central purpose of the bribery scheme overseen by Marchionne was to harm GM by saddling it with higher labor costs thus inducing it to merge with FCA to achieve synergies and a higher return on capital. With the scheme well underway and having a desired negative effect on GM, in October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA NV proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a combination. But Marchionne remained resolute in his quest to force an FCA NV-GM combination

91. Iacobelli confirmed that the primary purpose of the bribery scheme was to get former UAW leadership in FCA's pockets and then use that leverage to harm GM through dramatically higher labor costs and effectuate a merger. As Iacobelli confessed to DeLorenzo, Marchionne wished to be the "little fish that swallowed the whale" in achieving an FCA-takeover of GM.[55] In short, these statements made by Iacobelli to Peter DeLorenzo dispel any notion that FCA's scheme was simply intended to reduce FCA's labor costs to make it generally more competitive—the central intention of the scheme was to specifically harm GM in an effort to force GM to merge with FCA.

### A. Marchionne Conspires on Behalf of FCA and FCA NV to Force a Takeover of GM by Merger

92. By 2013, Chrysler had only two shareholders: (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

93. In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent. Fiat and the UAW Trust

[55] DeLorenzo Decl. at ¶ 19.



41992169.1

apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[56]

94. In December 2013, Fiat, through Iacobelli, apparently "scripted" Holiefield for an UAW Executive Board meeting to support Fiat's goal of buying all the UAW Trust's stake. Iacobelli emailed that Holiefield would "create a dialogue pursuant to our outline" at the meeting, which, upon information and belief, involved having the UAW support a complete sale of its Chrysler interest to Fiat.[57] This scripting demonstrates the degree of Fiat's control over the UAW and its top officials.

95. On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

96. Although not a party to the foregoing transaction, at the same time the UAW itself entered an "enforceable" Memorandum of Understanding ("MOU") with FCA promising to "actively assist in the achievement of FCA's long-term business plan." While the agreement does not appear to have been published, the public description of it reflects no termination date. In short, this agreement was an attempt by FCA, Iacobelli, and their co-conspirators to paper over—and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

---

[56] Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17, 2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale

[57] 7/13/18 Iacobelli Plea Agreement, at 9–10.

> FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[58]

97. This MOU conferred a competitive advantage upon FCA outside of the standard collective bargaining process. As stated by FCA in its Annual Report, the UAW's commitments under the MOU were of a "unique nature," though FCA of course hid that it was the result of the bribes. Through its bribery executed by Iacobelli and Durden, control of the UAW, and operation of the NTC, FCA ensured that UAW leadership conferred these unique advantages only on FCA and, as alleged herein, denied the same to GM to make sure that GM had higher costs.

98. Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne as CEO of the combined entity.[59]

99. After taking full control of Chrysler, Marchionne set his sights on forcing a merger with another one of the "Big Three" North American automakers. Given the ownership structure of Ford, with the substantial share of voting power held by the Ford family, Ford would never be

---

[58] FCA, 2014 ANNUAL REPORT, AT 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_reports/files/FCA_2014_Annual_Report.pdf.

[59] GM does not allege there was a violation of any securities law or requirement in connection with the sale and purchase of the Chrysler securities. As GM understands the facts, the ultimate selling price and terms that Fiat paid for the Chrysler shares were set following a court opinion concerning the terms of the purchase and certain third parties not impacted by the bribery scrutinized and approved the securities aspect of the transaction.

a viable target for Marchionne's merger ambitions. GM was the only U.S. automaker target, and thus Marchionne had long focused his sights on GM.

**B. Williams and Ashton Are Key Players in the Takeover Conspiracy**

100. In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne turned to using his bribery scheme of the UAW to pressure GM to agree to merge with FCA.

101. By this time, the primary UAW leaders Defendants had been bribing had either already left the UAW or were on their way out (Holiefield announced in November 2013 he would retire the following year). Yet, knowing that ongoing control of the UAW was crucial to the scheme, in 2014, Marchionne turned for support to the new UAW President, longtime friend and merger "wingman," Dennis Williams. Williams cooperated with the goals and plans of FCA and FCA NV and took affirmative steps to advance those goals as his cooperation was being purchased. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at a Fiat-affiliated truck and tractor company. Williams has affirmed that he tries "not to second-guess Sergio," and that the pair have a "very good relationship," which was secured through the bribery of Williams.[60]

102. In addition to Williams, FCA, FCA NV, and Marchionne also turned to UAW Vice President Joe Ashton. As the Vice President for the UAW's GM Department, Ashton had the ability to directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA and, thus, that GM incurred higher costs. Iacobelli identified both Williams and Ashton as UAW

---

[60] Michael Martinez, *UAW President: Union Monitoring FCA-GM Merger Reports*, THE DETROIT NEWS (June 18, 2015), https://www.detroitnews.com/story/business/autos/2015/06/18/uaw-monitoring-fca-gm-talks/28925955/.

officers that actively participated in the FCA-led scheme.[61] By 2014, Williams, having proven his loyalty in support of the scheme, and FCA and FCA NV found an even more valuable use for Ashton—they chose him to be the UAW Trust's designee on New GM's Board. At that point, Ashton was well-situated to convey to FCA and FCA NV confidential GM information relating to GM's CBA negotiations and strategy including with respect to FCA NV's merger overtures.

103. Williams was a willing co-conspirator in Marchionne's bribery and takeover scheme; some of that willingness was likely attributable to the UAW's finances. In 2013, the UAW's financial circumstances were so dire that it sold $47 million in assets and "raid[ed] its strike fund to pay operating expenses."[62]

104. When Williams took office, he encouraged further corruption. With the full support of FCA and FCA NV, Williams directed his lieutenants and other officials to use NTC funds and credit cards for travel, dining, and other illegal purposes to improve the UAW's budget (which the officials then used, in part, for their own purposes).[63] FCA and FCA NV not only willingly abided by this Williams directive but also had the NTC pay the salaries and benefits for high-level UAW employees to work at the NTC when they performed little or no work for the NTC and worked almost exclusively for the UAW. As Nancy Johnson admitted, "[t]his directive was issued in order to reduce costs to the UAW budget from such expenditures because the UAW's budget was under

---

[61] DeLorenzo Decl. at ¶ 20.

[62] Tom Krisher, Associated Press, *Detroit Automakers Worry About UAW Money Struggles,* YAHOO FINANCE (Feb. 22, 2014), https://finance.yahoo.com/news/detroit-automakers-worry-uaw-money-144156521.html; Associated Press, *UAW Votes to Raise Dues for First Time in 47 Years,* CNBC (June 3, 2014), https://www.cnbc.com/2014/06/03/united-auto-workers-votes-to-raise-dues-for-first-time-in-47-years.html.

[63] *See* Williams Information, at 6-7.

pressure."[64] In short, Williams was not a bystander in this scheme; instead, Williams directed other UAW officials to continue the corruption,[65] and consistent with that instruction, the bribes from FCA to certain UAW officials continued after Williams assumed the UAW Presidency.

105. By the time of the 2015 CBA negotiations, Williams had long been conspiring with Marchionne, and FCA and FCA NV effectively controlled the decision-making of Williams and other top UAW officers as alleged herein.

### C. FCA NV Initiates "Operation Cylinder"

106. By 2014, FCA NV had been rejected repeatedly by GM regarding a merger between the two companies. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, FCA NV believed it was in a stronger position to force a GM merger.

107. With Marchionne and Iacobelli as the leads, FCA and FCA NV believed that they could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world.[66] In part, for this very reason, Marchionne, on behalf of FCA and FCA NV, had authorized Iacobelli's, Durden's and others' bribery of UAW leaders. Their support was essential to the success of Operation Cylinder given that, among other reasons, the UAW could effectively block

---

64 7/23/18 Johnson Plea Agreement, at 9.

65 6/3/20 Jones Plea Agreement, at 11 (referring to Williams as "UAW Official B").

66 Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

a merger under certain terms in the CBA. Marchionne, Iacobelli and Williams were well aware that the UAW wielded this veto power.

108. FCA and FCA NV initiated its takeover plans in March 2015, when Marchionne, on behalf of parent company FCA NV, wrote to New GM's Board and management, formally proposing the merger between GM and FCA NV.

109. GM vetted the proposal with management, its advisors, and its Board, ultimately rejecting the offer on April 14, 2015. Ashton sat on New GM's Board and thus was privy to the confidential Board discussions when GM undertook this analysis.

110. Undeterred, two weeks later, Marchionne went public with a PowerPoint that he entitled "*Confessions of a Capital Junkie*: An insider perspective on the cure for the industry's value-destroying addiction to capital." In it, Marchionne promoted the benefits of consolidation as "too large to ignore." The deck claimed nearly $5 billion in annual savings with such a GM/FCA merger based on reduction in investments and R&D, "with no impact on number employed."[67]

111. In the spring of 2015, as the collective bargaining process ramped up, Marchionne pursued a full-court press media strategy to achieve Operation Cylinder. He geared his strategy to apply maximum pressure at key intervals in labor negotiations, which were formally beginning that summer.

112. Unbeknownst to GM, the U.S. Attorney had commenced an investigation by at least 2015 into corruption involving FCA, the UAW, and, in particular, the NTC. That investigation also focused on Iacobelli's actions to facilitate that conspiracy. Marchionne and his superiors at

---

[67] FCA, *Confessions of a Capital Junkie: An Insider Perspective on the Cure for the Industry's Value-Destroying Addiction to Capital* (Apr. 29, 2015), available at https://www.autonews.com/assets/PDF/CA99316430.PDF.

FCA NV strategically decided to oust Iacobelli as an employee, but not from the conspiracy, despite the fact that Iacobelli was its lead UAW negotiator for formal negotiations that would kick off in July 2015. In June 2015, Iacobelli abruptly resigned from FCA. Immediately thereafter, he aggressively sought employment with GM so that FCA and FCA NV could place him in a position to funnel information to his co-conspirators. As noted, FCA and FCA NV had already bought Iacobelli's, Durden's, and others' continuing role in the conspiracy through provision of the funded foreign accounts.

113. Marchionne then assumed a role not typically undertaken by a CEO: leading labor negotiations with the UAW and his co-conspirators Williams and Jewell.

114. On June 18, 2015, at the request of UAW President Williams, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, who relayed and championed Marchionne's merger proposition despite the fact that GM had already formally rejected it by letter to FCA NV's Chairman and CEO who had made the offer. Working at Marchionne's behest, Williams used his position as UAW President to advocate for the merger and to encourage GM to consider the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

115. The next day, the New GM Board was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a merger and apparently had tapped Williams as FCA NV's messenger and advocate. And they were further informed that Williams relayed that Marchionne had told him the New GM Board had not seriously considered the FCA NV merger proposal—an untrue statement.

116. On July 13, 2015, bargaining officially commenced with the tradition of "handshakes" between UAW leadership and the three Detroit automakers.

117. Hugging Williams at the FCA-UAW "handshake" ceremony, Marchionne signaled that consolidation was his goal in the negotiations, exclaiming that, "[w]hatever happens in terms of consolidation, it would never be done without the consent and support of the UAW. It's that simple."[68] Williams, Jewell, and other UAW officials celebrated that night with an $8,000 plus meal at the London Chop House—illegally paid for by FCA through the NTC.[69]



Marchionne Hugging Williams at "Handshake" Ceremony[70]

---

[68] Daniel Howes, *Marchionne's Merger Quest Not Over*, THE DETROIT NEWS (July 27, 2015), https://www.detroitnews.com/story/business/columnists/daniel-howes/2015/07/27/howes-marchionnes-merger-mania-lives-despite-gm/30766303/.

[69] 12/12/18 Johnson Gov't Sentencing Mem., at 4–5.

[70] *See* Alexa St. John, *Marchionne Didn't Disclose Expensive Watch Given to UAW Leader, Report Says,* AUTOMOTIVE NEWS (Aug. 16, 2018), https://www.autonews.com/article/20180816/OEM/180819869/marchionne-didn-t-disclose-expensive-watch-given-to-uaw-leader-report-says.

118. As noted, Marchionne (with the active participation of Iacobelli and Durden) had purchased the support of the UAW to support a merger with GM because of the UAW's ability to object to such a merger. FCA and GM had signed documents with the UAW stating that they would "not . . . partially or wholly sell, spin-off, split-off, consolidate or otherwise dispose of in any form, any . . . asset or business unit of any type, constituting a bargain unit under the Agreement."[71] FCA secured the UAW leadership's support for a merger—worth billions to FCA—through the payment of bribes.

119. Between July and mid-September 2015, GM bargained with the UAW through its subcommittees. The New GM Board gave its negotiators authority to negotiate within a particular range.

120. During these negotiations, Williams gave his "Presidential Demands" to GM. Based on GM's calculations, Williams's "Presidential Demands" reflected a CBA with a total cost increase of nearly a billion dollars over the 2011 CBA.

121. Over the next couple of weeks, GM and the UAW continued to negotiate with various proposals and counter-proposals. GM made offers of increasing total cost, while the UAW was progressing down from its opening demand.

122. Prior to September 13, 2015 and before selecting the target, the UAW had made various concessions, as had GM. The UAW had agreed to reduce their demands from the initial Presidential Demands by more than 20 percent, from the initial $1 billion demand. The UAW's

---

[71] Letter from Glenn Shagena, FCA US LLC, to Norwood H. Jewell, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 22, 2015); *see also* Letter from Catherine L. Clegg, General Motors LLC, to Cynthia Estrada, International Union, UAW, Plant Closing and Sale Moratorium (Oct. 25, 2015).

principal negotiators represented to GM that they could "sell it" to the UAW's members—that is, the deal that was on the table.

123. During bargaining, Marchionne continued to agitate in the press for a merger between GM and FCA NV. Marchionne signaled that he would do what it would take to force a GM merger, telling *Automotive News* in an interview published on August 30, 2015: "***It would be unconscionable not to force a partner.***" When asked if that meant FCA NV would make a hostile bid, Marchionne explained, "Not hostile, [but] [t]here are varying degrees of hugs. I can hug you nicely, I can hug you tightly, I can hug you like a bear, I can really hug you. ***Everything starts with physical contact. Then it can degrade, but it starts with physical contact***."[72]

124. A key to Marchionne's Operation Cylinder scheme was the longstanding practice of the UAW in the automotive industry of pattern bargaining, a strategy in which unionized workers across an industry attempt to force uniform terms in their contracts. The UAW describes pattern bargaining as "a core part of [its] bargaining strategy"[73] and a "powerful strategic tool."[74] Pattern bargaining is a potent force multiplier: through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams weaponized pattern bargaining to advance FCA and FCA NV's interests by promoting Marchionne's merger. FCA and FCA NV sought to leverage pattern bargaining to impose asymmetrical costs on GM, with the goal of causing harm to GM by

---

[72] Larry P. Vellequette, *Marchionne Puts the Squeeze on GM; GM's Response: 'Why Bail Out FCA?'*, AUTOMOTIVE NEWS (Aug. 30, 2015), https://www.autonews.com/article/20150830/INDUSTRY_ON_TRIAL/308319981/marchionne-puts-the-squeeze-on-gm-gm-s-response-why-bail-out-fca (emphasis added).

[73] UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[74] Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

it incurring massive labor costs and making it more likely to favorably consider a merger with FCA given the synergies touted by Marchionne. In doing so, FCA NV and FCA accomplished their goal of causing massive harm to GM through the imposition of higher labor costs that FCA would not incur, making it more likely for GM to merge with FCA.

125. Approximately every four years, each Detroit-based automaker negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same time on the same day, resulting in simultaneous negotiations. The UAW begins negotiations with each automaker through subcommittees in July.

126. Months later, and shortly before contract expiration, the UAW selects one of the automakers as a "lead" or "target" company, with which the UAW negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike (as it proved to the cost of billions of dollars in 2019).

127. Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[75]

128. Because pattern bargaining is such a powerful tool, each of the participants expects and relies on good faith, arm's-length negotiations with the UAW and by their competitors. Otherwise, as here, corrupt actors can use pattern bargaining to directly harm a competitor.

[75] *UAW President Dennis Williams Roundtable* (June 18, 2015), available at https://www.youtube.com/watch?v=bfS3EzxDXqI.

129. While the government had imposed a "no-strike" rule at FCA and GM beginning in 2009, by the time of the 2015 negotiations, the provision was no longer in effect, making the 2015 target position particularly significant.

130. The UAW typically selects the largest and best performing automaker as the target. This practice allows the union to maximize gains by locking in terms, such as wages and signing bonuses, which can then be imposed on the other automakers through pattern bargaining. It follows that the least profitable automaker is generally the least likely target, as low profit margins make it more difficult for the union to secure favorable precedential terms.

131. In the 2011 negotiations, GM was the lead and negotiated the first tentative agreement with the UAW. But, as reflected herein, and as admitted in criminal pleas by FCA executives and UAW officials, by that time, the UAW had been thoroughly corrupted and taken over by FCA. Under ordinary circumstances with all parties negotiating in good faith, the UAW would have used its market power to force key elements of the GM deal on FCA, but under these circumstances, the implementation of the terms of the FCA 2011 CBA was, like the FCA 2015 CBA, a product of collusion between FCA and the UAW. Iacobelli was one of the primary negotiators with the UAW in that corrupt 2011 process. As noted, skirting any pattern due to the bribes, FCA reached a secret deal to ensure that in 2015 the Tier Two cap would not be re-instated.

132. When it came time for the 2015 negotiations, based on objective factors, GM reasonably believed that it would be the target again. That expectation was based on past practices and a detailed analysis of the negotiation dynamics. Industry analysts also did not consider FCA to be a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest percentage of lower-paid entry-level workers seeking higher wages," which would

"make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[76]

133. On September 13, 2015, just two days before the CBAs were scheduled to expire, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between Defendants and certain UAW leaders.

134. Informed industry analysts were not expecting UAW's selection of FCA as the lead. According to the *Detroit Free Press*, the decision "surprised analysts and industry watchers across the nation." CBS Detroit reported that "just about every analyst said that Fiat Chrysler was the least likely to be the lead company."[77]

135. Williams had near complete control over the selection of the lead. Although the UAW nominally had a group of individuals responsible for making the selection, Williams dictated to those individuals that FCA would be chosen as the lead. Marchionne directed Williams to choose FCA as the lead, despite the fact that the UAW was near a tentative agreement with GM. As subsequently revealed, Marchionne told Williams to choose FCA as the lead in order to use the FCA pattern agreement to harm GM and force a merger between FCA and GM.

---

[76] Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

[77] *Id.*; *UAW Chooses Fiat Chrysler As Target in Contract Talks*, CBS DETROIT (Sept. 13, 2015), https://detroit.cbslocal.com/2015/09/13/uaw-chooses-fiat-chrysler-as-target-in-contract-talks/.

136. On September 15, 2015, two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[78]

137. The economics of the deal made perfect sense to Marchionne. In his words, the "economics of the deal are almost irrelevant" because the costs of the 2015 CBA "pale in comparison given the magnitude of the potential synergies and benefits" of a combination and, to FCA's CEO, cemented a "philosophical approach that [FCA] wants to use going forward." Marchionne was referring to the combination of a merged FCA and GM.[79]



[78] Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits,'* DETROIT FREE PRESS (Sept. 16, 2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

[79] *2015 UAW FCA Agreement Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=YX8wWGi28rs.



41992169.1

Marchionne Hugging Williams After Announcement of Tentative Deal[80]

138. On September 30, 2015, the UAW's FCA workforce rejected the tentative agreement negotiated by the FCA and UAW leaders.[81] Various press reports attributed the rejection to distrust of the union's leadership by its members that resulted in part from the public "hug" between Marchionne and Williams.

139. On October 8, 2015, FCA and the UAW announced a new tentative agreement, which was ultimately approved. Just as with the first tentative agreement, the FCA-UAW CBA deal terms were structured to force enormous costs on GM. The new tentative agreement was similar to the initial tentative agreement in terms of structure and total cost.[82] As with the decision to choose FCA as the lead, and the first tentative agreement, this second tentative agreement was structured effectively as a bribe by FCA to the UAW in return for the UAW's support for FCA's hoped-for merger with GM.

140. Not only did the 2015 FCA-UAW CBA force enormous costs on GM, but the deal was structured to particularly harm and weaken GM to further Marchionne's goal of forcing a

---

[80] *See* Editorial, *UAW, Chrysler Deal Addresses Key Issues,* THE DETROIT NEWS (Sept. 19, 2015), https://www.detroitnews.com/story/opinion/editorials/2015/09/19/editorial-wages-union-deal/72481834/.

[81] During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

[82] As demonstrated by their actions with respect to the second tentative agreement, the UAW leadership recognized that the failure of the first tentative agreement was caused by the UAW's failure in messaging and process more than issues with the substance of the agreement. *See* Tracy Samilton, "UAW hopes second time's the charm for new contract with FCA" (October 9, 2015) https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contract-fca.

merger with GM. Specifically, the 2015 FCA-UAW CBA contained large, unanticipated wage increases for Tier One employees. Such an increase had a disproportionate effect on GM as opposed to FCA given GM's larger proportion of Tier One employees (as a result of FCA and the UAW conspiring to remove the cap on Tier Two employees for FCA and giving FCA that assurance years in advance). In addition, despite the large wage increase for Tier One employees, after negotiating the pattern deal with FCA, the UAW demanded a substantially larger "ratification bonus" to consummate a tentative agreement with GM. These onerous demands and conditions were specifically tailored to, and in fact did, directly harm GM through increased labor costs. UAW-represented employees greatly benefited from this rich contract.

141. On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval. Williams bragged that the deal was one of the "richest ever," saying "the recent bargaining process that took place on behalf of our members at FCA is a testament to the UAW's democratic values and commitment to our members."[83] No one outside of Defendants and certain UAW leaders knew that the deal was a product of a long-running, insidious fraud.

142. At the time Williams approved of the FCA terms under which FCA was paying the UAW double their demand, UAW leaders, including Williams, and FCA and FCA NV leaders knew the federal government was actively investigating past FCA-UAW CBAs and labor agreements, and potentially other embezzlement of union funds. GM had no such knowledge. Through this "rich" FCA-UAW labor contract, Williams and corrupt UAW leaders were able to claim to the public, UAW members, and government investigators that UAW leadership had

[83] Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

obtained significant FCA concessions that could then be used in pattern negotiation. Marchionne, in turn, structured and agreed to these CBA terms as a bribe to the UAW and to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers, and further his takeover scheme. This rich FCA deal also was a reward to UAW leadership for allowing FCA and FCA NV to control the UAW leaders for the past many years and had the benefit of providing a windfall for UAW members.

143. GM, selected as the next target, reached a tentative deal with the UAW on October 25, 2015, based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern and to mitigate the damage FCA had caused, the threatened risk of a strike proved too great. As Defendants had no doubt calculated in their corrupt dealings, the economic force of pattern bargaining and threat of strike forced GM to largely concede to FCA's agreement as a pattern.

144. The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015 and was effective as of November 23, 2015.

145. Ultimately, despite its negotiations, GM could not and did not change the core, pattern-based economics of the final CBA between GM and the UAW. The final CBA between GM and the UAW caused GM to incur approximately $1.9 billion in incremental labor costs over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

## V. ASHTON AND IACOBELLI PASSED INFORMATION TO FCA AND FCA NV, CAUSING HARM TO GM.

146. In order to further defraud GM, Defendants, led by Marchionne, placed two informants at GM with access to confidential information.

147. First, although many of the UAW leaders who received bribes from FCA were members of the FCA Department of the UAW, Ashton, the former Vice President of the GM Department of the UAW, also received such payments. As noted, upon information and belief and as the only reasonable inference under all circumstances, FCA and FCA NV provided Ashton with control over foreign accounts in Japan and the Cayman Islands in return for his perpetrating and not revealing the scheme against GM.

148. As described above, a key part of the scheme was granting certain cost savings programs as described herein to FCA, while expressly denying those same programs to GM, despite GM's reasonable expectancy of receiving those programs. To carry out this scheme, Ashton's involvement, as the Vice President of the GM Department, was essential to ensure that GM did not receive the FCA structural labor programs and related advantages as described herein to impose higher costs on GM. FCA and FCA NV bribed Ashton to carry out his role in the scheme as noted herein.

149. In June 2014, Ashton resigned as UAW Vice President for the GM Department when Williams chose him to become the UAW Trust's nominee to the New GM Board.

150. Ashton, while serving on New GM's Board as a fiduciary, not only failed to disclose the ongoing scheme between FCA and FCA NV and the UAW, but, upon information and belief, Ashton also proceeded to pass confidential GM information to the corrupt UAW leaders and FCA and FCA NV executives. This confidential information included GM's strategies and internal positions in connection with the 2015 CBA negotiations.

151. The specific types of information to which Ashton was privy by virtue of his service on New GM's board are extensive. In 2015 alone, a key period both for CBA negotiations and GM's response to FCA NV's merger request, Ashton received information showing detailed



41992169.1

information regarding GM's actual performance and goals for 2015; early information discussing what GM viewed as the greatest risks in the coming CBA negotiations (specifically identifying the two-tiered wage structure); much more detailed discussions of risks and opportunities from the coming CBA negotiations, including specifically discussions around the Tier Two wage structure; specific discussions of FCA's merger proposal, including GM's detailed strategies for defending against what it viewed as an unattractive proposal. Upon information and belief, based in part on the foreign accounts provided to Ashton, Ashton passed this information to the UAW and FCA, allowing both entities to tailor their approaches (both in labor negotiations and in merger efforts) to inflict maximum pressure on GM.

152. In addition to Ashton, Defendants, again led by Marchionne, took steps to install another conspirator inside GM. In June 2015, Alphons Iacobelli abruptly resigned from FCA, despite having been at the center of the scheme for years. Although Iacobelli was no longer formally working for FCA during the 2015 negotiations, Iacobelli continued his work as part of the FCA-UAW bribery scheme. Immediately after leaving FCA, Iacobelli began reaching out to GM labor relations employees, seeking a position at the company and information about GM's 2015 bargaining with the UAW. Iacobelli then spent months courting GM personnel to hire him as the Executive Director, North American Labor Relations, a senior and critical labor position. Over multiple conversations with GM employees, Iacobelli claimed that he left FCA because he and Marchionne had different visions for the company and it was time for Iacobelli to "move on." GM relied on these representations in hiring Iacobelli. Upon reliable information and significant belief, Iacobelli in fact left FCA for a very different reason: to infiltrate GM so he could provide FCA and other conspirators with confidential GM information. GM hired Iacobelli to work in its labor relations department in January 2016.

153. At that time, due to the affirmative actions of Defendants to conceal their fraud, GM did not and had no way of knowing of Iacobelli's continued involvement in the long-running scheme to harm GM. Iacobelli never disclosed the scheme or his role in it to anyone at GM. To the contrary, Iacobelli misrepresented to GM his reasons for leaving FCA in order to secure and maintain employment and further the scheme.

154. In his employment agreement, Iacobelli acknowledged that in the course of his employment, he may become "privy to trade secrets or other confidential/proprietary information concerning GM, its parent, General Motors Company, or any of their subsidiaries and/or affiliates . . . the disclosure of which will cause irreparable harm." Iacobelli agreed not to disclose this information "to any person or entity."

155. Further, Iacobelli agreed to adhere to GM guidelines with respect to employee conduct, including those contained in GM's "Winning With Integrity — Our Values and Guidelines for Employee Conduct" ("Code of Conduct"). Among other requirements of honest and ethical behavior, the Code of Conduct, which Iacobelli received in-person training on, forbid Iacobelli from taking or receiving bribes: "Anti-bribery laws prohibit anyone, including government officials and private individuals, from offering, accepting, receiving, or giving bribes. In some countries, facilitation payments are a common business practice, but under our Code, these are prohibited too. Violating these laws or our Code can have serious consequences for you and our company, including damage to our reputation, fines, and jail time. Follow the law, our Code, and our policies and avoid activities that even suggest something improper." Moreover, Iacobelli committed to "never accept or provide anything of value (a 'gift') that may create a conflict of interest or suggest something improper" and to "[n]ever solicit gifts or favors and refuse any gift that doesn't comply with the law, our Code, or our policies."

156. As a high-ranking employee of GM, Iacobelli owed fiduciary duties to GM. Iacobelli served as Executive Director of Labor Relations for GM from January 2016 until he left his employment following the announcement of his indictment. In this capacity, Iacobelli was a senior executive overseeing all operational labor relations activities including labor strategy.

157. As a high-level executive employee in GM's Labor Relations department with substantial oversight and involvement in CBA negotiations, Iacobelli attended labor strategy meetings with GM senior leadership, which provided Iacobelli access to confidential information concerning GM's labor approaches and strategies in the U.S. and other regions. Iacobelli often provided input to GM concerning strategy decisions involving the UAW and FCA without ever disclosing his multi-year and continuing involvement in a conspiracy with UAW officers and FCA. Indeed, in early 2016, he volunteered to assist with any renewed efforts of Marchionne to merge with GM, telling GM's management that Marchionne was "desperate and vulnerable" and that Marchionne "can't bake a cake in half the time by doubling the heat of the oven." As alleged, Iacobelli's ongoing loyalties and role in the FCA and FCA NV conspiracy had been bought and paid for through the foreign accounts. Upon information and belief, FCA and FCA NV continued to fund these accounts even after Iacobelli left FCA; Iacobelli thus used his position at GM to further the scheme to harm GM by passing to the UAW, FCA, and FCA NV the confidential labor strategy information he obtained at GM.

158. During the last several months of his employment with GM (including when Iacobelli would have been aware that the indictment against him was going to be unsealed), Iacobelli printed an unusually high number of highly-confidential GM documents on the printer located in his private GM office. From November 2016 through his departure from GM shortly after his July 27, 2017 indictment was publicized, Iacobelli printed an unusually and unreasonably

large number of documents—far beyond any reasonable limit to perform his job function in good faith. The majority of these documents contained highly confidential and commercially sensitive information including forward-looking strategy documents, U.S. and Canada labor negotiations documents, and sensitive presentations prepared for GM's most senior management. Several of these documents were printed to non-GM printers, and Iacobelli also used certain non-GM external drives such as "thumb drives" in connection with copying GM's highly-confidential documents.

159. Upon Iacobelli's termination from GM, the items in his office were reviewed, and the overwhelming majority of documents printed by Iacobelli were not accounted for in his office, *i.e.*, these documents were not found in hard copy format in his office at the time of his termination and could have easily been, and upon information and belief were, distributed to a third party, including FCA and FCA N.V. In July 2017, when Iacobelli surely knew he was under imminent indictment (his indictment became public on July 26, 2017), Iacobelli continued to print highly-confidential GM strategy documents for his use in providing value to FCA including printing such documents on a non-GM printer. When Iacobelli printed these documents in or about July 2017, he knew he would have no business use for these documents other than providing value to third parties including FCA.

160. Iacobelli also committed other crimes related to the conspiracy while employed at GM. For example, on March 28, 2016, Iacobelli filed a fraudulent tax return that omitted $404,504 in illicit income Iacobelli had diverted from the NTC.

161. The placement of Ashton and Iacobelli inside GM was part of the scheme to directly target GM, causing GM to suffer direct harm from this ongoing scheme orchestrated at the highest levels of FCA and FCA NV. FCA and FC NV succeeded in driving up GM's labor costs for years.

## VI. DEFENDANTS AND THEIR CO-CONSPIRATORS CONCEALED THE CONSPIRACY AND RESULTING DAMAGE, PREVENTING GM FROM DISCOVERING ITS INJURY EARLIER.

162. Based on statements made by UAW leaders and FCA executives and employees, GM reasonably, but incorrectly, believed that FCA and FCA NV acted in good faith and negotiated agreements with UAW leadership at arm's length, including in 2011 and 2015. For example, Williams described the 2015 CBA as a "balanced" agreement that was "a testament to the UAW's democratic values and commitment to our members."[84] Similarly, UAW leaders held up the 2011 FCA CBA as proof that "cooperation and collective bargaining work."[85] In fact, the UAW recognized the importance of good faith pattern bargaining—including on October 25, 2015, the day the UAW and GM reached a tentative agreement—as it "levels the playing field so that companies compete based on the quality of their product or services and not how much they pay . . . their workers." In this way, the UAW assured, "one company cannot gain a competitive advantage over other companies with wages."[86]

163. GM had no way to know that Defendants had conspired through bribes to key UAW officials to ensure FCA received illicit competitive advantages compared to the inflated labor costs that caused GM harm, including, as described herein, a private agreement dated as early as 2010 to avoid reinstating the 2015 cap on FCA Tier Two workers, a secret agreement to allow FCA to

---

[84] Christina Rogers, *UAW Ratifies a Richer Deal With Fiat Chrysler*, WALL STREET JOURNAL (Oct. 22, 2015), https://www.wsj.com/articles/uaw-workers-ratify-deal-with-fiat-chrysler-1445526840.

[85] Joseph Szczesny, *Chrysler Agreement with UAW to Add 2,100 New Jobs*, DAILY TRIBUNE (Oct. 12, 2011), https://www.dailytribune.com/sports/chrysler-agreement-with-uaw-to-add-new-jobs/article_bc6b64af-c7b8-5518-874d-7d0a6caea35c.html.

[86] UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

avoid the contractual limits on the number of temporary workers, and repeated commitments from UAW leadership to support FCA's "World Class Manufacturing" programs while rejecting GM's corollary programs.

164. Defendants' scheme was inherently self-concealing, as secrecy was essential to perpetuate the scheme. Had Defendants' wrongdoing been exposed, Defendants would have been investigated and prosecuted criminally, bringing the scheme to an end. In addition, Defendants conspired to conceal their bribery scheme from GM (and the world), by adopting extraordinary measures to obscure the unlawful transactions. As described herein and as admitted in the criminal plea agreements, Defendants and their co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length of the scheme, Defendants' efforts successfully concealed the scheme and precluded suspicion of Defendants' conduct. For example:

(a) FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited payments and things of value paid to officers and employees of the UAW";[87]

(b) The co-conspirators used false-front companies and charitable organizations run by members of the UAW to secretly funnel money to other members of the conspiracy for personal use. For example, between July 2009 and 2015, "Durden conspired and agreed with Alphons Iacobelli, General Holiefield, Monica Morgan, . . . and other individuals and entities,

---

[87] 5/25/18 Brown Plea Agreement, at 3.

Case 2:22-mc-50034-GCS-DRG ECF No. 17-2, PageID.1631 Filed 08/12/22 Page 71 of 111

to defraud the United States by using two tax-exempt organizations [the NTC and the LTLOF] to improperly divert millions of dollars in unreported income to his co-conspirators, himself and others";[88]

(c) Iacobelli, Durden, Morgan, and their co-conspirators used the LTLOF to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[89]

(d) Iacobelli (on March 19, 2015, and March 28, 2016), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e) Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, the LTLOF, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives";[90]

(f) In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty

---

88 8/8/17 Durden Plea Agreement, at 3.

89 7/26/17 Iacobelli Indictment, at 9.

90 6/13/17 Durden Information, at 6.



41992169.1

bucks."[91] Marchionne then reportedly falsely denied the gift when questioned about it by federal investigators;

(g) "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[92]

(h) On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials."[93]

(i) From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell and other officials.[94] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[95]

---

[91] 7/13/18 Iacobelli Plea Agreement, at 8.

[92] 7/26/17 Iacobelli Indictment, at 20.

[93] 5/25/18 Brown Plea Agreement, at 5.

[94] 4/2/19 Jewell Plea Agreement, at 3–4.

[95] *Id.* at 13.

(j) Corrupted FCA executives, including Iacobelli and Durden, and UAW leaders who acted as co-conspirators in this conspiracy hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, the Cayman Islands, and others. These funds were put in these overseas accounts expressly to promote and protect the schemes described in this Complaint.

165. It was not until July 2017, when the government announced indictments of Iacobelli, Morgan, and Durden, with charges following against King, Johnson, Mickens, Brown, and Jewell, that information was revealed that FCA had made some illegal payments to certain UAW officials although the scope and object of the scheme were not revealed until later. GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to indicate whether it might have been injured by Defendants' activity or whether it might potentially have a cause of action. At the same time, Defendants and their co-conspirators continued to take active steps to conceal their illegal scheme and its effect on GM.

166. In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other rogue and bad actors. As has now been revealed including by the subsequent guilty pleas of both Williams and FCA, these statements were false, and were designed to evade suspicion and prevent inquiry into Defendants' illegal conduct:

(a) On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities

detailed by this indictment until they were brought to our attention by the government. . . . ***[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period***."[96] In fact, Williams himself was directly involved in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

(b) On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[97] In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing key officials in order to corrupt the collective bargaining process. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c) Following a day later in what appear to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that ***this conduct had nothing whatsoever to do with the***

---

[96] Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

[97] FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

***collective bargaining process, but rather involved two bad actors*** . . . ."[98] Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA." In reality, Marchionne and Williams themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d) On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what anyone says, ***it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements***, including the 2011 collective bargaining agreement between the UAW and Chrysler."[99]

(e) On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating: "***[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your***

98 Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

99 *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

***collective bargaining agreement and no union funds were stolen or lost.***"[100]

(f) On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[101]

(g) On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . ***the conduct of these individuals . . . had no impact on the collective bargaining process.***"[102]

167. Due to the co-conspirators' concealment of and misrepresentations regarding their criminal bribery activity and its effect on the collective bargaining process, it was not until Iacobelli pled guilty on January 22, 2018, and his plea agreement was made public thereafter, that GM began to uncover some meaningful details regarding Defendants' scheme and its potential impact on GM. For example, Iacobelli's guilty plea revealed for the first time that FCA's illegal payments to UAW officials were made "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective

---

[100] *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

[101] *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[102] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

bargaining agreements between FCA and the UAW."[103] Thereafter, it took substantial research and analysis to begin to discern the manner and extent to which GM was defrauded by FCA and FCA NV's illegal conduct.

168. After thorough investigation, including witness interviews, review of publicly available information regarding criminal developments, close monitoring of the criminal proceedings against Defendants and their co-conspirators, review and analysis of internal GM documents and communications, the engagement of consulting experts, and an in-depth analysis of collective bargaining negotiations and related agreements among GM, FCA, and the UAW, GM brought suit in November 2019 against Defendants in the United States District Court for the Eastern District of Michigan.

169. At that time, GM had no indication of Iacobelli and Ashton's continuing roles in the scheme while they were employed at GM. GM had no reasonable way of discovering that information prior to 2020 at the earliest. The criminal filings against FCA executives (including Iacobelli) were silent on Iacobelli's and Ashton's passing of confidential GM information to FCA or its co-conspirators while they were employees of GM. It was not until GM, through further due diligence, learned in 2020 upon information and belief that Iacobelli and Ashton held offshore accounts funded by FCA and FCA NV and thus Iacobelli's and Ashton's role in the scheme continued when they were employed by GM.

170. GM did not and could not have reasonably discovered this information earlier despite due diligence. Public statements, filings, and agreements by Defendants and their co-

[103] 7/13/18 Iacobelli Plea Agreement, at 7. (Iacobelli pled guilty on January 22, 2018, and his plea agreement was filed the next day. Due to a scrivener's error, a corrected version was filed on July 13, 2018.)

conspirators—which GM reviewed—gave no indication of their illegal activity, much less its impact on the collective bargaining process and GM. To the contrary, as described above, Defendants concealed their scheme from detection through various artifices and outright lies to GM and the public intended to deceive GM and deter inquiry.

## CAUSES OF ACTION

### <u>First Cause of Action</u>

### Fraud

### (Defendants FCA and FCA NV)

171. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

172. As alleged in detail above, Defendants—along with numerous co-conspirators affiliated with FCA, FCA NV, and the UAW—orchestrated a decade-long conspiracy to corrupt the collective bargaining process and labor relations and harm GM. As admitted by Iacobelli to DeLorenzo, the purpose of this scheme was to directly harm GM, in order to force GM into a merger with FCA. In addition to being liable for the actions of their employees, FCA and FCA NV are liable for the actions, omissions, and misrepresentations of their co-conspirators as a result of their ongoing conspiracy, described in detail above, to damage GM. These co-conspirators for whose actions FCA is liable includes, but is not limited to Williams, Ashton, Iacobelli, Durden, and Jewell. FCA, FCA NV, and its co-conspirators knowingly or recklessly made numerous material misrepresentations to GM. For example:

(a) On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor department employees that his reason for departing FCA was a disagreement with Marchionne. This was a knowingly false representation. In fact, Iacobelli left FCA in an effort to

continue the ongoing scheme of forcing a merger from within GM, and Iacobelli made these representations to GM at the behest of and for the benefit of FCA and FCA NV leadership.

(b) On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct, which, among other things, prohibited receiving any bribes or improper payments. This was a knowingly false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that he had accepted and would continue to accept bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM and was seeking employment at GM to further that scheme.

(c) In 2014, when he joined New GM's Board of Directors, and each year following his appointment until 2017, through written questionnaires completed by Ashton, Ashton repeatedly made numerous misrepresentations to GM. For example, in conspiracy with FCA and FCA NV, Ashton repeatedly disclaimed in writing that he had any "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or been offered anything of value by a "third party" "in consideration" for his service as a GM director. Ashton further falsely affirmed that he "adhered" to GM' Code of Conduct, which prohibits "bribery", among other pertinent illegal activity. In addition, Ashton represented that he had "no special arrangement or understanding between [him] and any other person pursuant to which" he was

nominated to the Board, and that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." These representations were knowingly false. In fact, at the times Ashton made these written representations, he was engaged in an ongoing scheme with FCA and FCA NV to harm GM, including by passing confidential GM information to the UAW, FCA, and FCA NV as part of the scheme, and in return received substantial compensation from FCA and FCA NV.

(d) On or about July 14, 2015, in a public statement made during the kickoff of 2015 CBA negotiations, FCA CEO Marchionne stated: "I'm confident we have the right leadership and right teams in place to negotiate a long-term, responsible agreement." This was a knowingly false representation. In fact, as Marchionne knew, both FCA and UAW leadership were engaged in a years-long scheme to corrupt the collective bargaining process to benefit FCA and harm GM. Rather than having the "right teams in place to negotiate a long-term, responsible agreement," leadership on both sides was corrupted and UAW leadership had been bribed to secure an agreement that was designed specifically to harm GM.

(e) On or about September 15, 2015, in public statements relating to FCA's tentative CBA with the UAW, Marchionne stated: "I've dealt with three different UAW presidents over the past six years and I believe you are seeing a new maturity in the union's relationships with the car

companies. . . . I can only commend Dennis [Williams], Norwood [Jewell], and his team for having put together an incredibly professional engagement with FCA that has allowed us to bring this to a conclusion." This was a knowingly false representation. In fact, rather than reflecting "maturity" by the UAW and "an incredibly professional engagement," collective bargaining negotiations were infected with fraud and the product of a years-long scheme to corrupt the bargaining process to benefit FCA and harm GM.

(f) On or around September 13, 2015, UAW President Williams falsely told GM's CEO that he decided to choose FCA as the lead target in collective bargaining negotiations because of FCA's advantage over GM and Ford in terms of FCA's larger proportion of lower-paid Tier Two workers. Williams falsely represented that the UAW needed to reduce the Tier Two discrepancy and thereby reduce FCA's competitive advantage. This was a knowingly false representation. In fact, Defendants had purchased the lead target position through a years-long bribery scheme between Defendants and UAW leaders. Williams chose FCA pursuant to this bribery scheme and to increase FCA's competitive advantage, not because of any Tier Two discrepancy.

(g) On or around September 14, 2015, UAW President Williams falsely told GM's CEO that he would "come out in [GM's] defense if Sergio [Marchionne] tries to spin this that UAW selected Chrysler because of merger." This was a knowingly false representation. In fact, Defendants



41992169.1

had purchased the lead target position through a years-long bribery scheme between Defendants and UAW leaders. Williams chose FCA pursuant to this bribery scheme and to, among other things, pressure GM to merge with FCA.

(h) On or about September 15, 2015, in a public statement regarding FCA's tentative CBA, UAW President Williams stated: "I also want to thank UAW Vice President Jimmy Settles, Cindy Estrada, and Norwood Jewell for working together to determine and select FCA as their targeted company. We did that, that was a collective decision, not just mine alone. . . . I believe the [agreement] is balanced." This was a knowingly false representation. In fact, UAW leadership had not "work[ed] together" to select FCA as the lead target, but followed Williams' selection, his sole decision, of FCA pursuant to a years-long bribery scheme between Defendants and UAW leaders. Further, the 2015 FCA CBA was not "balanced" but rather was a product of fraud designed to benefit FCA and harm GM.

(i) On or about September 15, 2015, in a public statement regarding collective bargaining between FCA and the UAW, Norwood Jewell stated: "I don't think there's ever been more integrity in a system than there was in this negotiation. I really mean that. We were able to have open, honest dialogue and really go after some issues that were tough." This was a knowingly false representation. In fact, negotiations between FCA and the UAW did not reflect "integrity." Rather, they were infected

by fraud and part of a years-long scheme to corrupt the collective bargaining process to benefit FCA and harm GM.

(j) On or around October 22, 2015, in a public statement regarding the 2015 FCA CBA, UAW President Williams stated: "The recent bargaining process that took place on behalf of our members at FCA is a testament to the UAW's democratic values and commitment to our members." This was a knowingly false representation. In fact, the bargaining process was infected by fraud and bribery and was the culmination of a years-long scheme to corrupt the bargaining process to benefit FCA and harm GM.

173. As a director and senior executive employee of GM given substantial trust and authority over CBA negotiations in Canada, respectively, Ashton and Iacobelli owed GM duties of good faith, loyalty and disclosure. By the time each joined GM, they had actively participated for years in Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM all while enriching themselves as co-conspirators. As described above, they specifically joined GM to further Defendants' scheme from inside GM's boardroom and negotiating table. Despite owing GM a duty to disclose, neither Ashton nor Iacobelli disclosed Defendants' ongoing scheme to GM, their respective roles in the scheme, or the harm resulting to GM from Defendants' ongoing scheme. Rather, Ashton and Iacobelli made fraudulent misrepresentations to occupy positions of trust, funnel GM's confidential information to Defendants, and thereby further Defendants' scheme and harm GM. As demonstrated by GM's analysis of Iacobelli's GM-issued laptop, he had in fact been printing an inexplicably large number of sensitive GM documents, which were not recovered when Iacobelli left GM's employment. On information and belief, these documents were provided to FCA and FCA N.V.

174. These fraudulent misrepresentations were intended to and did induce reliance by GM. For example, had GM known of Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM, GM would not have entered into the 2015 CBA, which was based on the fraudulently tainted FCA-UAW pattern. GM also would not have hired Ashton or Iacobelli, precluding them from harming GM by funneling GM's confidential information to Defendants.

175. The only purpose for the public statements made by UAW leaders around the 2015 CBA negotiations was to assure GM, and the public, that their decisions related to the selection of FCA as the lead and the substance of the 2015 tentative agreement was not tainted by any wrongdoing. Similarly, the statements by Williams to GM regarding his reasoning for selecting FCA as the lead were designed to, and did, induce reliance by GM that the selection was done for no reason other than the benefit of the UAW. As FCA and the UAW intended, GM relied on these statements.

176. Defendants' fraudulent misrepresentations were intended to and did cause harm to GM. As a result of Defendants' fraudulent misrepresentations, GM paid billions of dollars in labor costs it otherwise would not have incurred, including more than $1 billion above what it would have paid in connection with the 2015 CBA.

## Second Cause of Action

### Fraud by Omission

### (Defendants FCA and FCA NV)

177. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

178. As alleged in detail above, Defendants—along with numerous co-conspirators affiliated with FCA, FCA NV, and the UAW—orchestrated a decade-long conspiracy to corrupt

the collective bargaining process and labor relations and harm GM. As admitted by Iacobelli to DeLorenzo, the purpose of this scheme was to directly harm GM, in order to force GM into a merger with FCA. In addition to being liable for the actions of their employees, FCA and FCA NV are liable for the actions, omissions, and misrepresentations of their co-conspirators as a result of their ongoing conspiracy, described in detail above, to damage GM. These co-conspirators for whose actions FCA is liable includes, but is not limited to Williams, Ashton, Iacobelli, and Jewell. FCA, FCA NV, and their agents/co-conspirators knowingly or recklessly failed to disclose numerous material facts of which Defendants were aware, the non-disclosure of which created a false impression for GM. For example:

(a) On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor Department employees that his reason for departing FCA was a disagreement with Marchionne. Iacobelli failed to disclose the material fact that Iacobelli left FCA in an effort to continue the ongoing scheme of forcing a merger from within GM. The Defendants were aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to hire Iacobelli, and/or maintain his employment.

(b) On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct which, among other things, prohibited receiving any bribes or improper payments. Iacobelli failed to disclose the material fact that he had accepted and would continue to accept bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM. Defendants were aware of this undisclosed material fact, and sought

to induce GM's reliance on that fact in causing GM to hire Iacobelli and/or maintain his employment.

(c) In early 2016, Iacobelli volunteered to assist with any renewed efforts of Marchionne to merge with GM, telling GM's management that Marchionne was "desperate and vulnerable" and that Marchionne "can't bake a cake in half the time by doubling the heat of the oven." Iacobelli failed to disclose the material fact that he had participated in a scheme to harm GM and force a merger between FCA and GM. Defendants were aware of this undisclosed, material fact, and sought to induce GM's reliance on this fact in causing GM to hire Iacobelli and/or maintain his employment.

(d) In 2014, when he joined New GM's Board of Directors, and each year following his appointment until 2017, through written questionnaires completed by Ashton, Ashton repeatedly made numerous misrepresentations to GM. For example, Ashton repeatedly represented in writing that he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or been offered anything of value by a "third party" "in consideration" for his service as a GM director. Ashton further falsely affirmed that he "adhered" to GM' Code of Conduct, which prohibits "bribery", among other pertinent illegal activity. Ashton failed to disclose the material fact that Ashton had accepted and would continue to accept bribes and improper payments

from FCA and FCA NV in furtherance of their scheme to harm GM. The Defendants and Ashton were aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to allow Ashton to serve on New GM's Board.

179. As a director and senior executive employee of GM given substantial trust and authority, Ashton and Iacobelli, respectively, owed GM duties of good faith, loyalty and disclosure. By the time each joined GM, they had actively participated for years in Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM all while enriching themselves as co-conspirators. As described above, they specifically joined GM to further Defendants' scheme from inside GM's boardroom and negotiating table. Despite owing GM a duty to disclose, neither Ashton nor Iacobelli disclosed Defendants' ongoing scheme to GM, their respective roles in the scheme, or the harm resulting to GM from Defendants' ongoing scheme. Rather, Ashton and Iacobelli fraudulently suppressed the truth to occupy positions of trust, funnel GM's confidential information to Defendants, and thereby further Defendants' scheme and harm GM.

180. These fraudulent omissions were intended to and did induce reliance by GM. For example, had GM known of Defendants' criminal scheme to corrupt the bargaining process to benefit FCA and harm GM, GM would not have entered into the 2015 CBA, which was based on the fraudulently tainted FCA-UAW pattern. GM also would not have hired Ashton or Iacobelli, precluding them from harming GM by funneling GM's confidential information to Defendants.

181. Defendants' fraudulent omissions were intended to and did cause harm to GM. As a result of Defendants' fraudulent misrepresentations, GM paid billions of dollars in labor costs it

otherwise would not have incurred, including more than $1 billion above what it would have paid in connection with the 2015 CBA.

**<u>Third Cause of Action</u>**

**Fraud**

**(Defendant Iacobelli)**

182. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

183. As described above, Iacobelli knowingly or recklessly made numerous material misrepresentations to GM. For example:

(a) On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor Relations department employees that his reason for departing FCA was a disagreement with Marchionne. These were knowingly false representations. In fact, Iacobelli left FCA due to the ongoing government investigation in an effort to continue the ongoing scheme from within GM, and Iacobelli made these representations to GM at the behest of and for the benefit of FCA and FCA NV leadership.

(b) On February 7, 2016, Iacobelli represented that he would "not discuss or disclose to any person or entity any trade secret or confidential/proprietary information" belonging to GM. This was a knowingly false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that he was joining GM to access and funnel GM's confidential information to FCA, FCA NV, and their co-conspirators. As demonstrated by GM's analysis of Iacobelli's GM-issued laptop, he had in fact been printing an inexplicably large number of sensitive GM documents, which were not

recovered when Iacobelli left GM's employment. On information and belief, these documents were provided to FCA and FCA N.V.

(c) On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct, which, among other things, prohibited receiving any bribes or improper payments. This was a knowingly false representation. In fact, at the time Iacobelli made this representation, Iacobelli knew that he had accepted and would continue to accept and control bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM and was seeking employment at GM to further that scheme.

184. These fraudulent misrepresentations were intended to and did induce reliance by GM. For example, had GM known of the criminal scheme to corrupt the bargaining process and Iacobelli's role in the scheme, GM would not have hired Iacobelli into GM's Labor Relations department or maintained his employment until his indictment was unsealed in July 2017.

185. Iacobelli's fraudulent misrepresentations were intended to and did cause harm to GM. As a result of Iacobelli's fraudulent misrepresentations and omissions, GM hired Iacobelli into GM's Labor Relations department and paid him a salary. Once employed, Iacobelli betrayed GM's trust by funneling GM's confidential information to FCA, FCA NV, and their co-conspirators.

**<u>Fourth Cause of Action</u>**

**Fraud by Omission**

**(Defendant Iacobelli)**

186. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

187. Iacobelli owed GM a duty of disclosure. First, as a high-level senior executive of GM given substantial trust and authority over CBA negotiations in Canada and labor relations matters in North America, Iacobelli owed GM duties of good faith, loyalty, and disclosure. Second, Iacobelli actively participated and provided input in meetings and discussions concerning strategy decisions involving the UAW and FCA. Having participated and provided input in these discussions, Iacobelli had a duty to make complete disclosures of facts where his partial disclosures would and did convey false impressions and mislead GM.

188. By the time Iacobelli joined GM, he had actively participated for years in a criminal scheme to corrupt the bargaining process to benefit FCA and harm GM all while enriching himself as a co-conspirator. Iacobelli has pled guilty to his participation in this scheme. Despite knowing of and participating in this scheme, Iacobelli never disclosed the scheme to anyone at GM. Indeed, as described above, Iacobelli specifically joined GM to further this scheme from GM.

189. Moreover, Iacobelli actively participated and provided input in meetings and discussions concerning strategy decisions involving the UAW and FCA. Nonetheless, while providing input on matters relating to bargaining, Iacobelli never disclosed the past and ongoing scheme to GM, his role in the past and ongoing scheme, or the harm resulting to GM from the past and ongoing scheme. Rather, Iacobelli fraudulently suppressed the truth to occupy a position of trust, funnel GM's confidential information to FCA, FCA NV, and their co-conspirators and thereby further the scheme to harm GM.

190. In addition, as described above, Iacobelli knowingly or recklessly failed to disclose numerous additional material facts of which he was aware, the non-disclosure of which created a false impression for GM. For example:

(a) On or about June 30, 2015, and then again in late July 2015, Iacobelli represented to certain GM Labor Relations department employees that his reason for departing FCA was a disagreement with Marchionne. Iacobelli failed to disclose the material fact that Iacobelli left FCA in the middle of a criminal investigation in an effort to continue the ongoing scheme. Iacobelli was aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to hire Iacobelli.

(b) In early 2016, Iacobelli volunteered to assist with any renewed efforts of Marchionne to merge with GM, telling GM's management that Marchionne was "desperate and vulnerable" and that Marchionne "can't bake a cake in half the time by doubling the heat of the oven." Iacobelli failed to disclose the material fact that he had participated in a scheme to harm GM and force a merger between FCA and GM. Iacobelli was aware of this undisclosed, material fact, and sought to induce GM's reliance on this fact in causing GM to hire Iacobelli and/or maintain his employment.

(c) On February 7, 2016, Iacobelli represented that he would "not discuss or disclose to any person or entity any trade secret or confidential/proprietary information" belonging to GM. Iacobelli failed to disclose the material fact that Iacobelli was joining GM to access and funnel GM's confidential information to the UAW, FCA, and FCA NV. Iacobelli was aware of this undisclosed material fact, and sought to induce GM's reliance on that fact in causing GM to hire Iacobelli and/or maintain his employment.

(d) On February 7, 2016, Iacobelli represented that he would adhere to GM's Code of Conduct which, among other things, prohibited receiving any bribes or improper payments. Iacobelli failed to disclose the material fact that he had accepted and would continue to accept bribes and improper payments from FCA and FCA NV in furtherance of their scheme to harm GM. Iacobelli was aware of this undisclosed material fact, and sought to induce GM's reliance on that fact, in causing GM to hire Iacobelli and/or maintain his employment.

191. These fraudulent omissions were intended to and did induce reliance by GM. For example, had GM known of the criminal scheme to corrupt the bargaining process and Iacobelli's role in the scheme, GM would not have hired Iacobelli or maintained his employment until his indictment was unsealed in July 2017.

192. Iacobelli's fraudulent omissions were intended to and did cause harm to GM. As a result of Iacobelli's fraudulent omissions, GM hired Iacobelli into GM's Labor Relations department and paid him a salary. Once employed, Iacobelli betrayed GM's trust by funneling GM's confidential information to FCA, FCA NV, and their co-conspirators.

## Fifth Cause of Action

## Breach of Fiduciary Duty

## (Defendant Iacobelli)

193. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

194. From January 2016 to 2017, Iacobelli was the Executive Director of GM's Labor Relations department. In his role in the Labor Relations department, Iacobelli was a senior executive responsible for directing labor strategy. Iacobelli was given substantial trust and

authority by GM including responsibility in 2016 over CBA negotiations in Canada and labor relations matters in North America. Iacobelli was also privy to a significant amount of GM confidential, propriety, and competitive information, particularly but not exclusively in the area of labor relations and negotiations. In his high-level role, Iacobelli owed GM fiduciary duties including duties of trust, confidence, and loyalty.

195. Iacobelli breached those duties by, among other things, failing to disclose to GM before and after he was hired by GM his knowledge and involvement in the past and ongoing bribery scheme between FCA, himself and certain UAW leaders to harm GM and force a merger between GM and FCA; failing to disclose Iacobelli's significant role in effectuating this scheme while at the same time representing to GM that he was acting in GM's interest and participating in discussions and meetings involving GM's strategies for labor relations in the U.S. and GM's dealings with competitors including FCA; making the affirmative misrepresentations identified herein; and, unbeknownst to GM, disclosing GM confidential information to the UAW and/or FCA in return for bribes while serving as an employee of GM. All of these breaches were done without disclosure to GM and without obtaining GM's consent.

196. As a direct result of these breaches of Iacobelli's fiduciary duty, GM was damaged.

197. Iacobelli is accordingly liable to GM for this harm.

## <u>Sixth Cause of Action</u>

### Aiding and Abetting Breach of Fiduciary Duty

### (Defendants FCA and FCA NV)

198. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

199. As part of their role in the scheme described above, FCA and FCA NV had actual knowledge that Ashton and Iacobelli owed fiduciary duties to GM as a result of their service on

New GM's Board of Directors and as a senior executive with GM, respectively, who participated in critical GM strategic meetings and received confidential information about GM's labor and strategy and resulting decisions.

200. To further their scheme, FCA and FCA NV encouraged and substantially assisted Ashton and Iacobelli in breaching their fiduciary duties to GM by, among other things, making prohibited payments to Iacobelli and Ashton in return for Iacobelli and Ashton taking and providing information in violation of their fiduciary duties to GM. These payments included the establishing of multiple undisclosed offshore accounts and the funding of such accounts with multiple millions of dollars.

201. As a result of FCA and FCA NV's encouragement of and substantial assistance to Iacobelli and Ashton's breaches, GM was directly harmed.

## **Seventh Cause of Action**

### **Unfair Competition**

### **(Defendants FCA and FCA NV)**

202. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

203. GM, throughout the relevant time period, competed with FCA and FCA NV in the automobile industry.

204. As alleged herein, FCA and FCA NV engaged in conduct that is unfair, unethical, fraudulent, or deceptive.

205. For example, as alleged herein, Defendants' fraudulent and long-running scheme to influence relations with the UAW violated the integrity of the collective bargaining process, resulting in unfair advantages conferred on FCA and FCA NV and direct harm to GM. FCA and FCA NV also used the relationship established through the fraudulent scheme to obtain the lead

target position in 2015 collective bargaining negotiations and to negotiate an agreement designed to harm GM. As a result, as more specifically alleged herein, GM sustained tremendous economic loss.

206. Through the public statements of FCA and FCA NV's agents and co-conspirators, the public, and GM, were misled about the nature of the negotiations between FCA and the UAW, and how those negotiations impacted GM through the application of pattern bargaining. Specifically, UAW leaders, acting at the direction of FCA and FCA NV, repeatedly assured the public that their decisions in determining the lead for 2015 CBA negotiations and in negotiating the 2015 tentative agreements with FCA and GM were based solely on the best interests of the UAW membership. In fact, as recounted above, these decisions were influenced and ultimately dictated by the bribes paid by FCA and FCA NV to UAW leaders.

207. Defendants' scheme to place Ashton and Iacobelli inside GM and obtain GM's highly confidential and competitively sensitive negotiating and labor relations information in exchange for millions of dollars in offshore accounts is also unfair, unethical, fraudulent, and deceptive. Through misrepresentations and omissions FCA, FCA NV, Ashton, and Iacobelli made publicly as well as directly to GM, the public, and GM, were misled about Ashton's and Iacobelli's roles at GM. While Ashton and GM purported to act in GM's best interests consistent with their fiduciary duties, in fact they joined GM under false pretenses to access and funnel GM's confidential information to FCA, FCA NV, and other co-conspirators in return for bribes.

208. As a result of Defendants' unfair, unethical, fraudulent, or deceptive activities, both GM and the public were deceived and harmed. GM also is entitled to exemplary damages for such conduct.

## Eighth Cause of Action

**Civil Conspiracy**

**(All Defendants)**

209. Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

210. As described above, FCA, FCA NV, Iacobelli, and Durden have conspired with numerous other individuals to defraud GM, to unfairly compete with GM, and to breach fiduciary duties owed to GM. Indeed, Iacobelli and Durden have admitted that they knowingly conspired with other individuals and entities, including certain UAW officials, to make and conceal illegal bribes in furtherance of FCA and FCA NV's scheme.

211. As described above, Defendants conspired with numerous other individuals and entities, including the UAW and UAW leaders, and Ashton to defraud GM through numerous misrepresentations and omissions regarding, among other things, the integrity of the collective bargaining process and Ashton's and Iacobelli's role in the conspiracy. Defendants further conspired with the UAW, UAW leaders and Ashton to unfairly compete with GM by bribing UAW officials in order to corrupt the collective bargaining process and obtain unfair advantages, by accepting bribes in offshore accounts in furtherance of the conspiracy, and also by placing Ashton and Iacobelli inside GM to funnel GM's confidential information to FCA, FCA NV, and other conspirators. And Defendants conspired with the UAW, UAW leaders, and Ashton, to cause Iacobelli and Ashton to breach their fiduciary duties to GM by funneling GM's confidential information to FCA, FCA NV, and other conspirators.

212. As described above, these torts were committed through concerted action by two or more persons to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means.

213. As a result of this conspiracy, GM has been directly harmed.

**REQUESTS FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A. Damages in an amount to be determined at trial, including but not limited to the billions of dollars in damages GM suffered as a result of Defendants' bribery scheme, breaches of fiduciary duty, fraud, unfair competition, and other unlawful acts;

B. An award of punitive and/or exemplary damages as Defendants have acted with malice and willful disregard for GM's rights;

C. An award of costs and fees incurred in pursuing this litigation, including attorney's costs, fees, and the fees and costs of experts;

D. Equitable relief, including restitution; and

E. Any other relief the Court deems just, fair, necessary, or equitable.

Case 2:22-mc-50034-GCS-DRG ECF No. 3-13, PageID.2795 Filed 07/18/22 Page 98 of 111

Dated: December 13, 2021

Respectfully submitted,

**HONIGMAN LLP**

By: */s/ Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Adam M. Wenner (P75309)
Shirin S. Goyal (P82528)
Keith D. Underkoffler (P84854)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
awenner@honigman.com
sgoyal@honigman.com
kunderkoffler@honigman.com

**KIRKLAND & ELLIS LLP**
Hariklia Karis, P.C. *(pro hac vice)*
Jeffrey Willian, P.C. *(pro hac vice)*
Stacey G. Pagonis *(pro hac vice)*
Casey McGushin *(pro hac vice)*
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
stacey.pagonis@kirkland.com
casey.mcgushin@kirkland.com
Austin Norris *(pro hac vice)*
2049 Century Park East
Los Angeles, CA 90067
Telephone: (213) 680-8400
austin.norris@kirkland.com

Maisie Allison *(pro hac vice)*
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

This is to certify that on December 13, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the electronic filing system, which will send notification of such filing to all attorneys of record.

Respectfully submitted,

**HONIGMAN LLP**

By: *_/s/Jeffrey K. Lamb_*
Jeffrey K. Lamb (P76738)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7000
jlamb@honigman.com

# Exhibit 1

# Affidavit of Peter DeLorenzo

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

Plaintiffs,

v.

ALPHONS IACOBELLI, FCA US LLC, FIAT CHRYSLER AUTOMOBILES, N.V., JEROME DURDEN,

Defendants.

Civil Action No. 20-011998-CB

Hon. David J. Allen

---

**AFFIDAVIT OF PETER DELORENZO**

STATE OF MICHIGAN )
) SS
COUNTY OF WAYNE )

I, Peter DeLorenzo, being first duly sworn, state:

1. I am over the age of 18 and make this affidavit based on my own personal knowledge, and if called and sworn as a witness, I could and would testify to the facts stated herein. I hereby attest that the following facts are true and accurate to the best of my recollection.

2. Since 1999, I have authored a website blog that is titled the AutoExtremist, which primarily addresses issues in the auto industry.

3. In July 2018, I was contacted via email by Alphons Iacobelli ("Iacobelli") shortly after the passing of Sergio Marchionne on or around July 25 2018. We eventually exchanged at least four emails, which are attached hereto and had two in-person meetings. Iacobelli and I had no prior relationship before he contacted me.

4. At Iacobelli's request, I met him twice in July 2018 at a Starbucks in Rochester, Michigan, and each meeting lasted approximately 45 minutes to an hour. Iacobelli explained to

me that he wanted me to write a book about the FCA story of corruption and conspiracy with the UAW and the role of certain individuals in that conspiracy. He declared that the scheme and those involved was much broader than was known publicly and provided many of the supporting details as related herein.

5. Iacobelli stated that he felt I was the one to tell his story. He explained in the past FCA and Sergio Marchionne ("Marchionne") had taken significant note of my public writings about FCA and, therefore, thought I was the correct person to write his book. Based on what he reported to me, I was interested in pursuing such a project with Iacobelli, and we even reached the point of discussing possible titles for the book.

6. In summary, he told me that he was guilty of participating in what he described as the biggest corporate corruption case in US business history. He related that FCA's UAW "training funds" were nothing more than a slush fund for payouts to union leaders going all the way back to 1985. Iacobelli stated that he was originally hired by FCA to reduce the footprint of the program but then "Sergio & Co" added requests and demanded that money be moved around for various things until the scheme became out of control. He said that monthly payouts to the UAW were around "$250K" but sometimes much more and Marchionne was aware of every bit of it. Iacobelli made it clear that FCA used these payments for "leverage" during the CBA contract negotiations. Iacobelli further stated that the amounts of money expended beyond the monthly amounts are simply incomprehensible.

7. Iacobelli said the NTC was a scam from the start. The reports of the money that was missing to date were incredibly low given how much was distributed to the UAW on a monthly basis.

8. Iacobelli spoke at some length about a massive, lavish, estimated $2 million retirement party thrown in Las Vegas by FCA for a high-level UAW official who I understood to be UAW President, Dennis Williams, based on a description of the timing and purpose of the party. Iacobelli indicated that this Vegas based party had recently happened, that the event lasted several days and that FCA paid for everything associated with it.

9. Iacobelli stated that UAW executives regularly traveled to Las Vegas, often monthly, at FCA's expense. He said that top UAW executives would also use a house paid for by FCA in Palm Springs whenever the need or desire arose.

10. Iacobelli reported that Marchionne gave two expensive watches to UAW officers other than the one he reportedly gave to General Holiefield -- and that one such watch was given to Williams. Each watch gift from Marchionne purportedly contained a carefully written note to help suggest the watch had minimal value. I don't recall if Iacobelli indicated who received the other watch. I asked Iacobelli what Marchionne knew about the scheme in general, and he said Marchionne knew everything about the payments to the UAW, and that nothing happened without Marchionne's knowledge. Iacobelli made it clear that Marchionne was a micro-manager and knew all details.

11. Iacobelli agreed that Marchionne would have been criminally indicted, but for his untimely death, given his central and controlling role in the scheme to pay the UAW.

12. Iacobelli said that Marchionne orchestrated the funneling of money to the upper hierarchy of UAW, including cash, free trips, and gifts for their spouses.

13. Iacobelli told me that Marchionne's end game was to have the UAW in his pocket so that he could then make a move on GM to force a merger. Iacobelli stated unequivocally that

Marchionne's goal was to gain a competitive advantage over GM through labor costs in order to force a takeover.

14. Iacobelli said that Ron Gettelfinger did not want any part of the money directly from the NTC, but Bob King took money, trips, and items of value along with Dennis Williams. This was part of Marchionne's operational strategy from the start, according to Iacobelli. He further stated that most of the executives of the UAW were on the take as he later related names of those individuals.

15. Iacobelli said "they were all on the take and were all going down," and that Nancy Rae of FCA knew about the payments. Iacobelli also told me that anyone who worked closely with or for Iacobelli knew that he had virtually unlimited spending at his disposal as part of this scheme to bribe the UAW executives.

16. Iacobelli allowed me to review documents that he brought to both of our meetings. The documents were in two manila folders, one of which was at least three inches thick with a rubber band around it and the other was approximately two inches thick with no rubber band. There were hundreds of pages of documents in these folders. Iacobelli claimed that these documents verified his statements about the scope and scale of the scheme to payoff UAW officials and Marchionne's orchestration of that scheme. I could see that these documents included lengthy memos (several pages long and single-spaced) and contained information about payments and responsibility for payments. Iacobelli's documents appeared to be contemporaneous business records of FCA and not after the fact notes created by Iacobelli. Among the documents that I was shown were memos involving Marchionne discussing essential elements of the golf tournaments and methods for orchestrating the passing of money to the UAW. The documents contained descriptions of actual payments to UAW officials and appeared to establish that Marchionne knew

about them. There were many emails that Iacobelli showed me that reflected the scope of the payments to the UAW officials and how they were going to be distributed, and he expressed satisfaction that what he was relating to me regarding the scope and nature of the scheme and Marchionne's clear involvement was well-documented. Iacobelli claimed Marchionne asked him to leave FCA after he expressed misgivings about the growing nature of the scheme to Marchionne and his chief Lieutenant, who I believe Iacobelli said was Alfred Altavilla.

17. Iacobelli said that the sales scheme, which was the subject of FCA's government settlement, was Marchionne's idea all the way, and that he was a micro-manager and knew everything.

18. Iacobelli said that the UAW executive charities were used to funnel money, but did not provide details.

19. Iacobelli said that Marchionne felt that anything that could be saved through the labor negotiations relative to GM would allow FCA to have a competitive advantage over GM. Ford never was mentioned. Iacobelli made clear that Sergio was targeting GM because of his desire to be the "little fish that swallowed the whale," which was his stated goal when he first took over Chrysler in 2009.

20. Iacobelli confirmed the following UAW executives were in on the FCA graft: James Settles, Gary Casteel, Bob King, Dennis Williams, General Holiefield, Joe Ashton, and Norwood Jewell. Iacobelli never mentioned Cindy Estrada to me.

21. After our second meeting and follow-on email discussion about the book title and a book outline that Iacobelli stated he was working on, Iacobelli did not contact me further. I do not know why he ceased communication with me.

22. On November 23, 2019, I publicly wrote about my meeting with Iacobelli. I made clear in the column that Iacobelli had spelled out to me the broad scope and details of FCA's scheme to corrupt the UAW and extract better labor terms. For example, I wrote: "Over those two meetings, Iacobelli presented a devastating account of just how deep the payoffs to UAW officials actually were. The FCA-UAW training centers were a complete joke, with UAW members reporting to the centers to do nothing, if they bothered to show up at all. And the tales of payments for plane trips, vacations, binges in Las Vegas and myriad other gifts, cash and prizes were eye-opening, including a $2 million retirement party for an outgoing UAW executive that was staged in Las Vegas. Iacobelli said approximately $250,000 a month was spent keeping the UAW officials in line, in some months less, but in some months much more than that. And it was all designed to extract favorable considerations from the UAW, which translated into reduced labor costs to FCA. And Iacobelli named names… And make no mistake, Marchionne was up to his eyeballs in every bit of it, according to Iacobelli. In fact, given what he said – including Marchionne gifting expensive watches to key UAW officials with a carefully-worded note attached so they couldn't be construed to having any value - I surmised that Marchionne would have been indicted if he hadn't passed away, and Iacobelli didn't disagree with my assessment." No one from the federal government or FCA ever contacted me to discuss my meetings with Iacobelli, what documents he had in his possession or what facts he related to me.

23. Unrelated to my meetings with Iacobelli, beginning in May 2019 I have been a party to a consulting agreement with General Motors LLC pursuant to which I have provided strategic consulting services in the areas of design and marketing, with a particular focus on Cadillac and GM's electric car programs. At no time at or around the time that I entered into the consulting agreement with GM did I disclose or discuss with GM that I had met or communicated

with Mr. Iacobelli as described herein nor did I disclose to anyone at GM the information shared with me by Mr. Iacobelli. Nothing that I have recounted here in my affidavit has been influenced by the referenced 2019 consulting agreement with GM.

FURTHER AFFIANT SAYETH NOT.

Peter DeLorenzo

Subscribed and sworn to before
me this 16th day of April, 2021

Notary Public, Oakland Cnty, MI
My Commission Expires: 9-30-2024

LANITA Y. CATO
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Sep 30, 2024
ACTING IN COUNTY OF

**From:** "Peter DeLorenzo" <renzo@peterdelorenzo.com>
**To:** "Al Iacobelli" <al.iacobelli@wowway.com>
**Sent:** Sunday, July 29, 2018 4:58:30 AM
**Subject:** Initial Thoughts..

Hi Al,

I have a few initial thoughts.

First of all I am making initial contacts with a couple of publishers, one of which published the Number 1 best selling business book of 2017.

Secondly; I have a *preliminary* working title in mind for discussion as well:

SCREWED. The Inside story of one of the biggest corporate corruption cases in U.S. History.

I am finding out what the publisher needs in order for us to pitch the book, but I assume I will write an intro and we will provide an outline, and maybe a snippet of the first chapter.

I feel the book should open on the day you were approached by the authorities; including everything you were feeling that day.

Then the book would go back to the beginning and the story would unfold as it happened, with specific highlights, moments, scenes, emails, bad actors within FCA (Sergio et al) and so on.

Peter

**This email exchange was with Al about the direction of the book, and a title...**

-------- Forwarded Message --------
**Subject:**Re: Initial Thoughts..
**Date:**Mon, 30 Jul 2018 12:43:33 -0400 (EDT)
**From:**Alphons Iacobelli <al.iacobelli@wowway.com>
**To:**Peter DeLorenzo <renzo@peterdelorenzo.com>

My apologies for the delay in getting back to you.

I agree with your initial thoughts and at first blush, I like the title also.

In terms of flow, I am completely open but I would assume an editor will likely want a word in that. I am currently working on the outline that is more chronologically driven (for now) but will inevitably change to accommodate a reader's interest. I love the idea of opening the book with the day the Feds came to the house then going back. I like the idea of you writing the intro also. I want to arm you with the various sub plots which I think the outline will cover thoroughly. Then let your creative genius take over. I'll keep you posted on my progress.

I can't thank you enough for your assistance and at the very least being a voice of truth. I truly respect your courage to write the unmitigated truth. There aren't a lot of us left out there. I feel that outside the "Detroit Bubble" people have a much different view of our industry and you capture it.

I'll stay close as I grind through the outline. I would like to share a high level version as soon as I can so I will stay close. Thank you talk soon.Al

**Response:**

---------- Forwarded message ---------
From: **Peter DeLorenzo** <renzo@peterdelorenzo.com>
Date: Mon, Jul 30, 2018 at 1:31 PM
Subject: Re: Initial Thoughts..
To: Alphons Iacobelli <al.iacobelli@wowway.com>

Thank you, Al.

I will keep thinking about the title. It could be even more specific to the subject matter but maybe not quite as punchy, as in:

SCAM: How Fiat Chrysler and the UAW conspired together to commit one of the biggest cases of corporate fraud in U.S. history.

I will probably come up with a few more as we go...

Peter

**More:**

---------- Forwarded message ---------
From: **Peter DeLorenzo** <renzo@peterdelorenzo.com>
Date: Mon, Jul 30, 2018 at 6:25 PM
Subject: More thoughts.
To: Alphons Iacobelli <al.iacobelli@wowway.com>

Al,

Upon further review; I like this title because it combines the impact of SCREWED while naming the players, which is important:

SCREWED. How Fiat Chrysler and the UAW conspired to commit one of the biggest cases of corporate fraud in U.S. history.

Peter