## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **GENERAL MOTORS LLC et al.,** | **Case No. 2:22-mc-50034-GSC-DRG**<br>**Hon. George Steeh**<br>**Magistrate Judge David R. Grand** |
| **Plaintiffs,** | |
| **v.** | **Related Case No. 20-12659 (RBK-SAK)**<br>**Pending in the United States District Court**<br>**for the District of New Jersey Camden**<br>**Vicinage** |
| **JOSEPH ASHTON,** | **Related Case** *General Motors LLC v FCA,*<br>*LLC,* **bearing case no. 19-cv-13429**<br>**(Dismissed)** |
| **Defendant.** | **United States District Court for the Eastern**<br>**District of Michigan**<br>**Southern Division** |
| _____/ | |

## RESPONSE AND BRIEF OF SUSANNE IACOBELLI IN OPPOSITION TO GMS' MOTION TO ENFORCE RULE 45 SUBPOENA TO SUSANNE IACOBELLI

Susanne Iacobelli, through her attorneys, submits the following Response and Brief in Opposition to Plaintiff General Motors LLC and General Motors Company's (collectively "GM") Motion to Enforce the Rule 45 Subpoena to Susanne Iacobelli*:*

## **CONCISE STATEMENT OF ISSUE PRESENTED**

Is GM entitled to any further relief to "enforce" the Rule 45 Subpoena duces tecum directed to Susanne Iacobelli?

Mrs. Iacobelli says "NO"

## **CONTROLLING AUTHORITY**

1. Fed. R. Civ. P. 45

2. MCL 600.2162(4)

## INTRODUCTION

Plaintiffs General Motors LLC and General Motors Company (collectively "GM") need to accept Susanne Iacobelli's truthful and complete responses as both the goal of their requests and satisfying Mrs. Iacobelli's obligations. GMs' instant Motion to "enforce" this Court's November 10, 2021 Subpoena *duces tecum* to Susanne Iacobelli must be denied. Mrs. Iacobelli fully complied with her obligations in response to the November 10, 2021 Subpoena *duces tecum*. The Motion reflects nothing more than GMs' disbelief that Mrs. Iacobelli – like GM themselves – does not have any documents supportive of GMs' speculation masquerading as an Amended Complaint.[1] Indeed, GMs' use of the discovery process in this case approaches, if it has not already crossed, the bounds of reasonable and appropriate discovery to a third party in this case.[2]

Mrs. Iacobelli has previously provided detailed written responses to the Subpoena *duces tecum*, plainly and unequivocally advised GM, in response to each

---

[1] The Sixth Circuit Court of Appeals recently issued its Opinion affirming Judge Borman's dismissal of GMs' RICO action, further evidencing the absence of any legally cognizable claim in favor of GM against Mr. Iacobelli, among others. A copy of the Opinion is attached as **Exhibit 1**.

[2] Because GM has initiated three separate cases in three jurisdictions with different defendants – despite the interrelatedness of those claims – there is unfortunately no single jurist with authority to control the overlapping manner and scope of discovery. As a result, GM has conducted discovery in each case without an obligation (and with an unwillingness) to share that discovery with the balance of the defendants in the other cases. Mr. Ashton certainly doesn't have any incentive to attempt to restrain GMs' conduct – and therefore GM has been able to use this Ashton case as a vehicle to conduct unrestrained discovery, including in this Ashton case seeking the bank records of Susanne Iacobelli's mother, as well as the adult children of Mr. and Mrs. Iacobelli – all without prior notice to or any meaningful opportunity for Mr. Iacobelli, Mrs. Iacobelli, their adult children, or Mrs. Iacobelli's mother to object to the intrusive inquires.

paragraph of the Subpoena *duces tecum*, (a) whether she had any responsive documents and if so, whether or not any of those (or all of those) responsive documents were privileged; or (b) if, as was the case in numerous instances, that she did not have any responsive documents. Mrs. Iacobelli equally plainly and unequivocally identified the privileged documents as being limited to her personal notes of conversations with her husband Alphons Iacobelli (which documents are protected from involuntary disclosure by the marital communications privilege) and of her communications with counsel (which documents are protected from involuntary disclosure by the attorney-client privilege). See December 24, 2021 letter attached as **Exhibit 2**.

GM seems to have forgotten the limited obligation of a recipient in response to a Subpoena *duces tecum*. The recipient (in this case Mrs. Iacobelli) is obligated to make a reasonable search for responsive documents in locations, if any, where those documents are likely to be found and produce non-privileged documents responsive to the request within the recipient's possession, custody and/or control; and with respect to material protected from involuntary disclosure pursuant to an appliable privilege, "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing the information itself privileged or protected, will enable the parties to assess the claim." Rule 45(e)(2)(A)(ii). The recipient is not, GMs' protests to the contrary notwithstanding, obligated to explain why documents that <u>never</u> existed don't <u>currently</u> exist.

GMs' Motion is replete with unsupportable demands. Perhaps most particularly

egregious is GMs' incredulity in asserting that Mrs. Iacobelli "must produce a copy of the passport that existed after the expired passport" (Mrs. Iacobelli provided to GM a copy of the last passport issued to her), which demand <u>assumes</u> the existence of a further passport. <u>On July 18, 2022, prior to the filing by GM of this Motion, the undersigned at an in-person meeting with GM counsel expressly advised counsel for GM that a subsequent passport had not been issued</u>. Mrs. Iacobelli does not, in response to the *duces tecum* portion of the Subpoena, owe GM a further explanation why this "important document" (GMs' characterization at Motion p. 17) – a document that exists only in the imagination of GM - "does not exist."

In a further, equally meritless effort to justify its unsupportable Motion, and obviously abandoning any pretense that GM views Mrs. Iacobelli only as a "percipient witness" (as alleged by GM at ECF no. 10, at page ID 252) and not a "target," GM now claims that "GM has also uncovered evidence that FCA paid certain family members of its co-conspirators, including S. Iacobelli, and thus has reason to believe that S. Iacobelli was directly involved in the illicit foreign account payments." GM not only utterly failed and/or refused, however, to provide any support for that assertion (leaving Mrs. Iacobelli in a position akin to the "double secret probation" status of the mythical Delta Tau Chi fraternity in the movie "Animal House"), but fails to acknowledge that:

(a) GM has in the Wayne County Action[3] admitted that **it does not possess any**

---

[3] *General Motors LLC v FCA US, LLC et al*, bearing case no. 2019-011998-CB in the Wayne County (MI) Circuit Court (the "Wayne County Action").

**information** and cannot identify, with respect to <u>any</u> alleged foreign account, (a) the date the account was opened, (b) the person who opened the account, (c) the date the account was closed, if closed, (d) the account number, (e) each account holder, (f) the beneficiary(ies) of the account, (g) the signatory(ies) on or having access to the account, (h) each person with "control" over the account, as that term is used at Second Amended Complaint ¶67, (i) the deposits into the account, the identity of the depositor and source of funds deposited, (j) each withdrawal from the account, the identity of the person making the withdrawal and the person for whose benefit the withdrawal was made; and/or (k) the most recent balance in the account, and the source of that information. See **Exhibit 3**, Plaintiffs' Responses and Objections to Defendant Alphons Iacobelli's First Set of Interrogatories, at Interrogatory no. 10. Instead, GM alleges that its "allegations related to these accounts were made on the basis of an investigation that is protected by the work product and other privileges," and has raised other privileges as a bar to disclosing the requested information. *Id.* See also Responses to Interrogatory nos. 11; and

(b) GM has in the Wayne County Action further admitted that with regard to the alleged "foreign accounts," GM **does not have any documents** that evidence with respect to <u>any</u> alleged foreign account, (a) the date the account was opened, (b) the date the account was closed, if closed, (c) the account number, (e) the beneficiary(ies) of the account, (f) the signatory(ies) on or having

4

access to the account, (g) each person with "control" over the account, as that term is used at Second Amended Complaint ¶67, (h) the deposits into the account, the identity of the depositor and source of funds deposited, (i) each withdrawal from the account; and/or (k) the balance in the account *at any time*. See **Exhibit 4**, Plaintiffs' Responses and Objections to Defendant Alphons Iacobelli's First Set of Requests for Production, at Response no. 1. GM further admits that it has no documents to reflect, evidence or describe the manner in which the accounts were opened, or that were furnished in connection with the opening of those accounts. *Id*. at Response no. 2. GM additionally admits that it has no documents to support its allegations that Mr. Iacobelli had control over any of the alleged accounts at the several financial institutions referenced by GM (*Id*. at Response nos. 3 through 6). While GM claims (in its response to Request for Production no. 1(d)) the existence of documents that reflect, evidence and/or identify the account holder(s).

There is no truth or factual basis upon which GM could in good faith assert, let alone "strong evidence" (as suggested by GM at Motion pp. 8-9), that Mrs. Iacobelli "willfully withheld" any non-privileged documents responsive to the Subpoena *duces tecum*, and GM utterly fails to identify any alleged deficiency. The singular document to which GM points – a Declaration provided by Mrs. Iacobelli to the United States Attorneys' Office for the Eastern District of Michigan – was simply not responsive to any of the paragraphs in the very detailed Subpoena *duces tecum* at issue, and

production of that Declaration was not required. While GM's subpoena *duces tecum* to Butzel Long in the Wayne County Action yielded production of that document, that result is not surprising since the subpoena *duces tecum* to Butzel Long was not identical to the subpoena *duces tecum* to Mr. Iacobelli in this case, and some minor differences in the production of responsive documents should have been expected.

Finally, Mrs. Iacobelli will not again respond to GMs' discussion – since the discussion is not only immaterial to the relief sought but also devoid of legal argument or citation to <u>any</u> authority – of their underlying stories and claims, the continuing applicability of the spousal privilege, and the potential invocation by Mrs. Iacobelli and/or Mr. Iacobelli of their Fifth Amendment rights against self-incrimination. Before this Court is a simple request to "compel the full production of documents requested by the Subpoena," which request must be denied since all non-privileged, responsive documents have been produced. If the Court believes that a response to GMs' characterization of its Amended Complaint, the effect of the applicable privileges, or any other issue is appropriate, Mrs. Iacobelli requests leave to supplement this Response prior to the Court ruling on the instant Motion.

As earlier pointed out in Alphons Iacobelli's response (ECF Doc. 33) to GMs' Expedited Motion (ECF Doc. 31) directed to Mr. Iacobelli, the only conclusion reasonably drawn from this Motion (like the Expedited Motion brought with regard to Mr. Iacobelli) is that GM are dissatisfied with the results of their discovery efforts, which to date have apparently failed to yield any admissible evidence to support GM's

wholly fictitious claims against Mr. Iacobelli and others. The abject failure of discovery to date to adduce the "evidence" that GM hope against hope will magically rise like a phoenix from the impending ashes of its action to lend support to their claims does not, however, provide support for the instant Motion or the relief sought.

Mrs. Iacobelli – who perhaps GM must be reminded is not a party to this action - has, unfortunately, become a victim of GM's refusal to acknowledge that, their "belief" notwithstanding, there is no support for their claims. GM do not identify any non-privileged documents, including any ESI, actually in the possession, custody and/or control of Mrs. Iacobelli that Mrs. Iacobelli has not already produced, but instead speculates that "there must be more."[4]

## **ARGUMENT**

The rules governing issuance of the underlying Subpoena *duces tecum*, and the obligations of the recipient, are fairly well-established. Fed. R. Civ. P. 45 permits issuance of subpoenas *duces tecum* to third parties  The permissible scope of discovery may cover only the items that, in the judgment of the district court, are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P.

---

[4] Although Mrs. Iacobelli fully believes that an adequate search has been made for all responsive documents, including a search for responsive ESI, Mr. Iacobelli is through counsel nevertheless in the process of engaging a third-party ESI vendor to confirm the results of those earlier efforts. Thus, any concerns that GM may have regarding the sufficiency of the search to date for responsive ESI will be obviated by the further ESI inquiry to be made with the assistance of the third-party vendor, and production of any non-privileged, responsive ESI if it is determined to exist.

26(b)(1). Factors that pertain to proportionality are

> the importance of the issues at stake in the action, the amount in
> controversy, the parties' relative access to relevant information, the
> parties' resources, the importance of the discovery in resolving the
> issues, and whether the burden or expense of the proposed discovery
> outweighs its likely benefit.

*Id.*

A subpoena to a third party under Rule 45 is subject to the same discovery limitations as those set out in Rule 26. *United States v. Blue Cross Blue Shield of Michigan*, No. 10-14155, 2012 U.S. Dist. LEXIS 141355, 2012 WL 4513600, at *5 (E.D. Mich. Oct. 1, 2012). Pursuant to Federal Rule of Civil Procedure 26(b)(1),

> Parties may obtain discovery regarding any nonprivileged matter
> that is relevant to any party's claim or defense and proportional to the
> needs of the case, considering the importance of the issues at stake in
> the action, the amount in controversy, the parties' relative access to
> relevant information, the parties' resources, the importance of the
> discovery in resolving the issues, and whether the burden or expense of
> the proposed discovery outweighs its likely benefit. Information within
> this scope of discovery need not be admissible in evidence to be
> discoverable.

In addition, "[a]lthough Rule 26(b) applies equally to discovery of nonparties, the fact of nonparty status may be considered by the court in weighing the burdens imposed in the circumstances**.**" *Katz v. Batavia Marine & Sporting Supplies, Inc.,* 984 F.2d 422, 424 (Fed. Cir. 1993).

While a plaintiff should not be denied reasonable access to information necessary to establish its <u>claim</u>, the permissible scope of discovery does not extend to discovery that seeks to prove irrelevant allegations against non-parties that are not

material to the plaintiff's claims. As Judge Goldsmith of this Court recently confirmed, a "plaintiff is not permitted 'to 'go fishing' and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *Raboczkay v City of Taylor*, 2020 U.S. Dist. LEXIS 200242 (October 28, 2020), *citing Surles ex rel. Johnson v. Greyhound Lines, Inc*., 474 F. 3d 288, 305 (6th Cir. 2007)(denying motion to compel old personnel file since the information sought was too far removed from the allegations in the complaint). "In doing so, the district court must balance the right to discovery with the need to prevent 'fishing expeditions.'" *Lindke v Freed*, 2020 US. Dist. LEXIS 203940 at *4 (E.D. Mich. November 2, 2020)(granting motion to quash as to requests that sought information having nothing to do with the defendant).

A person receiving a Rule 45 subpoena *duces tecum* must make a reasonable search for responsive documents in locations, if any, where those documents are likely to be found and produce non-privileged documents responsive to the request within the recipient's possession, custody and/or control; to the extent that the documents responsive to a subpoena *duces tecum* are protected from involuntary disclosure pursuant to an applicable privilege, the recipient of a subpoena *duces tecum* is required to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing the information itself privileged or protected, will enable the parties to assess the claim." Rule 45(e)(2)(A)(ii).

Mrs. Iacobelli timely and fully responded to the Subpoena *duces tecum*. Mrs. Iacobelli was not required to provide to GM a "privilege log" of the documents

withheld on the basis of a privilege. Rather, Mrs. Iacobelli was as noted above required only to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing the information itself privileged or protected, will enable the parties to assess the claim." Rule 45(e)(2)(A)(ii). Mrs. Iacobelli fulfilled this obligation, identifying the documents withheld as being "limited to any personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure and will not be produced." Certainly, a privilege log is not necessary for GM to conclude, or for the Court to find, that the documents withheld are privileged and not subject to involuntary production. Indeed, GM does not argue that the documents withheld on the basis of the asserted privileges are not properly withheld, but for inexplicable reason assert that a privilege log is still required. That makes no sense.

Against that background, Mr. Iacobelli responds as follows to the specific categories of requests addressed by GM:

## I. **The Objections Raised**

In light of this Court's prior rulings, Mrs. Iacobelli is not further challenging the scope of the discovery requests set forth in the Subpoena *duces tecum*, and considers her earlier objections to both the scope of the discovery sought and any attendant burden to have been overruled (in this regard, any objection to production based upon

Mrs. Iacobelli's belief that GMs' Subpoena was not issued with any "good faith" belief that Mrs. Iacobelli would have responsive documents would appear to have been subsumed in the Court's ruling). Therefore, no non-privileged, responsive documents have been withheld on the basis of these objections and it is unclear why, in light of this Court's clear direction, GM reverts to a further, extended discussion of the permitted scope of discovery as if the issue remains unresolved.

By like token, this Court has ruled upon the applicability of the spousal privilege and it is unclear why GM continues to address that issue as if it too was unresolved. This Court has already determined that the spousal [testimonial] privilege set forth at MCL 600.2162(1) is applicable in this case. See March 9, 2022 Minute Order (Text Only). The spousal confidential communication privilege set forth at MCL 600.2162(4) bars any examination of a married person as to any communication made between spouses during the marriage – and therefore protects from involuntary disclosure Mrs. Iacobelli's notes of her privileged spousal conversations with her husband, Alphons Iacobelli. Certainly, GMs' overbroad request to "strike all objections" cannot reasonably be construed to include those based upon the spousal privileges. Mrs. Iacobelli has not asserted the applicability of the spousal communication privilege as a bar to the production of any otherwise responsive documents other than her notes of conversations with her husband and has not withheld the production of documents other than those notes.

It is similarly unclear why GM believes that the objections to production based

upon the attorney-client privilege "should not be credited," since the objections were timely raised, the nature of the documents withheld described and the basis for the privilege identified (i.e., Mrs. Iacobelli's notes of her discussions with counsel) – which description GM has not contended is inadequate, and with respect to which category of documents GM do not respond or even attempt to articulate a reason why the attorney-client privilege would not protect those notes from involuntary disclosure.

## II. <u>There Has Been an Adequate, Good Faith Search for Responsive Documents</u>

Mrs. Iacobelli has never disputed and does not presently dispute her obligation to conduct a reasonable search for responsive documents in locations, if any, where those documents are likely to be found and produce non-privileged documents responsive to the request within the recipient's possession, custody and/or control. She has fulfilled that obligation. Mrs. Iacobelli is not required to conduct a "fishing expedition" to further confirm that she does not have any non-privileged responsive documents within her possession, custody and/or control, simply to satisfy GMs' imagination.

In this regard, Mrs. Iacobelli unequivocally advised GM, in her written response to the Subpoena *duces tecum* and after careful consideration of the requests, that she did not have any non-privileged responsive documents to ¶¶1,3-20 and 22 of the Subpoena *duces tecum*. Mrs. Iacobelli need not aimlessly search for documents that she knows she does not have, on topics with respect to which she has no knowledge.

## A. **Bank Account Information**

### 1. **The Alleged "Foreign Accounts" (Request nos. 1-11)**

GM asserts that despite Mrs. Iacobelli's express denial of any knowledge of the alleged "foreign accounts," she must still fulfill an alleged but legally non-existent "responsibility to obtain documents relating to such foreign accounts, if they exist" and "be compelled to provide GM written consents to seek such information relating to these accounts from foreign institutions." There is absolutely no lawful basis upon which this Court could properly conclude that Mrs. Iacobelli must take any further steps to satisfy her obligations in response to the Subpoena *duces tecum*, especially since, as noted above:

(a) GM is in possession of a Declaration pursuant to which Mrs. Iacobelli attests she has no knowledge of the alleged foreign accounts;

(b) GM has in the Wayne County Action admitted that **it does not possess any information** and cannot identify, with respect to <u>any</u> alleged foreign account, (a) the date the account was opened, (b) the person who opened the account, (c) the date the account was closed, if closed, (d) the account number, (e) each account holder, (f) the beneficiary(ies) of the account, (g) the signatory(ies) on or having access to the account, (h) each person with "control" over the account, as that term is used at Second Amended Complaint ¶67, (i) the deposits into the account, the identity of the depositor and source of funds deposited, (j) each withdrawal from the account, the identity of the person

making the withdrawal and the person for whose benefit the withdrawal was made; and/or (k) the most recent balance in the account, and the source of that information. See **Exhibit 3**, Plaintiffs' Responses and Objections to Defendant Alphons Iacobelli's First Set of Interrogatories, at Interrogatory no. 10. Instead, GM alleges that its "allegations related to these accounts were made on the basis of an investigation that is protected by the work product and other privileges," and has raised other privileges as a bar to disclosing the requested information. *Id*. See also Responses to Interrogatory nos. 11; and

(c) GM has in the Wayne County Action further admitted that with regard to the alleged "foreign accounts," GM **does not have any documents** that evidence with respect to <u>any</u> alleged foreign account, (a) the date the account was opened, (b) the date the account was closed, if closed, (c) the account number, (e) the beneficiary(ies) of the account, (f) the signatory(ies) on or having access to the account, (g) each person with "control" over the account, as that term is used at Second Amended Complaint ¶67, (h) the deposits into the account, the identity of the depositor and source of funds deposited, (i) each withdrawal from the account; and/or (k) the balance in the account *at any time*. See **Exhibit 4**, Plaintiffs' Responses and Objections to Defendant Alphons Iacobelli's First Set of Requests for Production, at Response no. 1. GM further admits that it <u>has no documents</u> to reflect, evidence or describe the manner in which the accounts were opened, or that were furnished in

connection with the opening of those accounts. *Id*. at Response no. 2. GM additionally admits that it has no documents to support its allegations that Mr. Iacobelli had control over any of the alleged accounts at the several financial institutions referenced by GM (*Id*. at Response nos. 3 through 6). While GM claims (in its response to Request for Production no. 1(d)) the existence of documents that reflect, evidence and/or identify the account holder(s).

How, exactly, does GM expect Mrs. Iacobelli to seek information relating to alleged foreign accounts of which she has no knowledge? How, exactly, does GM expect Mrs. Iacobelli to seek information relating to the alleged foreign accounts that <u>GM itself has admitted GM has no actual knowledge</u>? If, as GM claims, GM lacks any identifiable information relating to these alleged foreign accounts, exactly what would be the nature and scope of the requested "written consent?" This is not a case in which there is evidence[5] that the alleged foreign accounts exist, or that Mrs. Iacobelli has

---

[5] GMs' bald allegation, based upon speculation and supposition, that its investigator found undefined "banking connections between Mr. Iacobelli and his family and several foreign financial institutions" is at best a gross exaggeration of the allegations themselves, which are in any event without any evidentiary support. Plaintiffs' description of the methodology allegedly used and "results" obtained by GreyList Trace Ltd, the so-called "investigative service" that Plaintiffs apparently engaged, reveals only that Plaintiffs' investigation proved the existence of <u>absolutely nothing</u>. Noting that the alleged result of its "investigation" at best determined only whether or not a particular bank's email spam filter allowed emails from a particular email address, Plaintiffs jump to the unsupportable conclusion – without any knowledge of the specific criteria used by any particular financial institution to filter emails - that if an email address is not immediately "blocked" or "blacklisted," then the person allegedly associated with that email account must have "a relationship" with that financial institution. Plaintiffs then leap from that vague, unsupportable conclusion

knowledge – let alone access, custody and/or control – of the alleged (and to date unidentified by GM) accounts. GMs' request that Mrs. Iacobelli execute that which would essentially be a broad power of attorney in favor of GM to continue its fishing expedition is simply not warranted, appropriate or reasonable.

The single case cited by GM to support its request for the involuntary provision of "consent" by Mrs. Iacobelli does not support that request and could not have arisen under more dissimilar circumstances than those presented in this case. The Order in *Commodities Futures Trading Comm'n v. Schroeder*, 2006 U.S. Dist. LEXIS 82246; 2006 WL 3114275 (W.D. Mich. October 6, 2006) was a Consent Order <u>agreed to by the defendant</u> as part of the resolution of a case and approved by the Court, not a finding by the Court that involuntarily compelling the provision of a "consent to release of financial records" was independently appropriate. The defendant who agreed to be ordered to provide the release was a party to the case, not a non-party deponent such as Mrs. Iacobelli. The Court's approval of the parties' <u>agreement</u> to intrusive control over the defendant's financial affairs, in the context of resolving violations by the defendant of the Commodity Exchange Act and the regulations promulgated thereunder, was understandable. Since consent orders are construed as contracts,

---

to the next, asserting that such alleged "relationship" provides "clear evidence" of a "banking connection." And all of this is based upon a "spoofed" "test" email (apparently "spoofing" of Mr. Iacobelli's and likely Mrs. Iacobelli's email address(es)) and by Plaintiffs' own admission, use of a "string of code reflecting the email address" that allegedly "destroy[s] itself." (Wayne Count Action Second Amended Complaint ¶72).

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236-37, 95 S. Ct. 926, 43 L. Ed. 2d 148 (1975), that Order does not support imposing upon Mrs. Iacobelli, who is not a party to these proceedings and opposes any such relief, a similar obligation.

In asking for relief well beyond that should even be considered by this Court, GM ignores that if, as it alleges, it has "evidence" of "banking connections" between Mrs. Iacobelli and foreign banks that GM alleges exist, GM can use that "evidence" to issue to the affected institutions appropriate subpoenas *duces tecum* or other discovery requests for the information GM seeks.

## 2. <u>Domestic Bank Account Information</u>

The domestic bank account information sought from both Mrs. and Mr. Iacobelli in this case is identical. GM has been provided with, in response to the subpoena *duces tecum* to Mr. Iacobelli, all of the bank statements and records responsive to the subpoena *duces tecum* and in their collective possession. In light of the results of the meet and confer between the parties, Mrs. Iacobelli did not believe it was necessary and has not requested from her banks copies of any statements that may exist in the possession of the banks, to the extent that such statements are available, since GM previously indicated that they were "prepared to subpoena these directly from the banks as needed." Mr. Iacobelli offered GM additional support if it needed additional information to issue the subpoenas *duces tecum* and has not stood in the way of the issuance of such subpoenas *duces tecum* to the banks. Upon information and belief, GM have issued a subpoena *duces tecum* to American Express (but have not had the

courtesy of affording Mrs. Iacobelli a copy or notice of the issuance of that subpoena *duces tecum)* and have also issued subpoenas *duces tecum* to the banks at issue. See **Exhibit 5** (to JPMorgan Chase, including a subpoena *duces tecum* not only for Mrs. Iacobelli's bank records, but for those of her adult children and elderly mother for whom she is the primary caregiver); see also **Exhibit 6** (to Comerica) **and Exhibit 7** (to Bank of America).

If this Court believes that Mrs. Iacobelli should be compelled to request bank records (notwithstanding GM's commitment to seek and actually having sought them independently), Mrs. Iacobelli will do so, but in such event GM should be compelled to bear the cost (if any) associated with obtaining those documents.

### B. Government Investigation Records (Request nos. 12-14)

There is a reason why GM does not, in the Motion, repeat the requests set forth in the Subpoena *duces tecum* that they claim were not satisfied by Mrs. Iacobelli – because the limited scope of GMs' requests do not support the argument made or the relief sought. Subpoena *duces tecum* request nos. 12-14 seek the following:

12. Documents and Communications in Your possession that relate to the investigation conducted by the U.S. Attorney's Office for the Eastern District of Michigan into the UAW, FCA, and Joseph Ashton.

13. Documents and Communications You provided to the U.S. Attorney's Office for the Eastern District of Michigan in connection with that office's investigation into the UAW, FCA, and Joseph Ashton.

14. Documents and Communications in Your possession that relate to any investigation conducted by any government authority or agency into the UAW, FCA, and Joseph Ashton.

Mrs. Iacobelli's Declaration was not produced in response to request nos. 12-14 for a simple reason: it was not responsive to any of those requests, and unsurprisingly, GM does not argue that it was. That the Declaration was responsive to the subpoena *duces tecum* served upon Butzel Long, and was produced pursuant to that subpoena *duces tecum*, is not evidence that it was responsive to the Subpoena *duces tecum* to Mrs. Iacobelli (it was not), or that Mrs. Iacobelli improperly withheld any documents (she did not). Mrs. Iacobelli was not obligated to produce the documents that GM wished it had sought, as opposed to the documents they actually sought.

### C. The "DeLorenzo Documents" (Request nos. 15, 17-19)

Subpoena duces tecum request nos. 15 and 17-19 seek the following:

15. Communications in Your possession between Alphons Iacobelli and Peter DeLorenzo.

***

17. Your Communications with Peter DeLorenzo.
18. Documents and Communications that Alphons Iacobelli showed to Peter DeLorenzo and/or that Alphons Iacobelli brought to Alphons Iacobelli's meetings with Peter DeLorenzo in 2018.
19. All book outlines in Your possession that Alphons Iacobelli created, as referenced in Paragraph 21 of the Peter DeLorenzo Declaration filed in General Motors et al. v. Alphons Iacobelli et al., No. 20-011998-CB (Wayne County Circuit Court).

Mrs. Iacobelli has advised GM, in writing and in response to the Subpoena *duces tecum*, that there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to these requests; and the privileged documents are limited to her notes protected from involuntary disclosure pursuant to the spousal

communication privilege and/or the attorney-client privilege. The law required nothing more, and it is unclear what more GM expects Mrs. Iacobelli to do.

D. **Mrs. Iacobelli's Passport (Document no. 25)**.

Subpoena *duces tecum* request no. 25 sought the production of Mrs. Iacobelli's passport. While she initially resisted production of the passport, given a reasonable fear of misuse by GM in light of their (or their investigator's) apparent "spoofing" of Mrs. Iacobelli's email accounts, Mrs. Iacobelli finally relented and provided a copy of her passport. GMs' response? That wasn't enough. GM demanded a copy of a subsequent and/or renewal passport that GM presumed and asserted, without any factual basis whatsoever, existed. As the drumbeat continued, there were repeated representations that Mrs. Iacobelli had fully complied with request no. 25, and an express in-person representation on July 18, 2022 to GMs' counsel that there was no subsequent and/or replacement passport. Still, GM cannot accept the truth.

Mrs. Iacobelli is not obligated, in response to the duces tecum portion of the subject Subpoena *duces tecum*, to explain or "state why that important document does not exist." She need not provide an explanation if there is one, or if there isn't an explanation, make one up hoping to satisfy GM.

## **CONCLUSION**

For the reasons set forth above, Susanne Iacobelli prays that this Court enter its Order:

A.  Denying GMs' Motion to Enforce the Rule 45 Subpoena *duces tecum* to Susanne Iacobelli;

B.  Awarding in favor of Susanne Iacobelli and against Plaintiffs and their counsel those costs, including actual attorneys' fees, incurred in defending this Motion; and

C.  Awarding in favor of Susanne Iacobelli and against Plaintiffs such other relief as may be just and equitable under the circumstances.

Respectfully submitted,
NEDELMAN LEGAL GROUP PLLC
/s/ Michael A. Nedelman
Michael A. Nedelman (P35433)
Attorneys for Alphons Iacobelli
28580 Orchard Lake Road, Suite 140
Farmington Hills, Michigan 48334
(248) 855-8888

Dated: August 18, 2022           mnedelman@nglegal.com

## INDEX OF EXHIBITS:

1. August 11, 2022 Opinion of the Sixth Circuit in General Motors LLC v FCA US LLC, case no. 20-1791
2. 2021.12.24 letter to Marina re Susanne Iacobelli response to Response to subpoena duces tecum
3. Plaintiffs' Responses and Objections to Defendant Alphons Iacobelli's First Set of Interrogatories
4. Plaintiffs' Responses and Objections to Defendant Alphons Iacobelli's First Set of Requests for Production
5. JPMorgan Chase Bank Notifications of Subpoenas duces tecum
6. Subpoena *duces tecum* to Comerica
7. Subpoena *duces tecum* to Bank of America

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **GENERAL MOTORS LLC et al.,** | **Case No. 2:22-mc-50034-GSC-DRG**<br>**Hon. George Steeh**<br>**Magistrate Judge David R. Grand** |
| **Plaintiffs,** | |
| **v.** | **Related Case No. 20-12659 (RBK-SAK)**<br>**Pending in the United States District Court**<br>**for the District of New Jersey Camden**<br>**Vicinage** |
| **JOSEPH ASHTON,** | **Related Case *General Motors LLC v FCA,***<br>***LLC*, bearing case no. 19-cv-13429**<br>**(Dismissed)** |
| **Defendant.** | **United States District Court for the Eastern**<br>**District of Michigan** |
| _____/ | **Southern Division** |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via the e-filing portal to all counsel of record.

I declare that the above statement is true to the best of my knowledge, information and belief on this 18th day of August, 2022.

/s/ Michelle K Watler
Michelle K. Watler

23

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0185p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

GENERAL MOTORS, LLC; GENERAL MOTORS COMPANY,

           *Plaintiffs-Appellants*,

    *v.*

FCA US, LLC; FIAT CHRYSLER AUTOMOBILES N.V.; ALPHONS IACOBELLI; JEROME DURDEN; MICHAEL BROWN,

           *Defendants-Appellees*.

> No. 20-1791

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:19-cv-13429—Paul D. Borman, District Judge.

Argued: March 4, 2021

Decided and Filed: August 11, 2022

Before: STRANCH, LARSEN, and NALBANDIAN, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Paul D. Clement, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellants. Steven L. Holley, SULLIVAN & CROMWELL LLP, New York, New York, for FCA Appellees. **ON BRIEF:** Paul D. Clement, Erin E. Murphy, Matthew D. Rowen, Julie M.K. Siegal, KIRKLAND & ELLIS LLP, Washington, D.C., Hariklia Karis, Jeffrey Willian, KIRKLAND & ELLIS LLP, Chicago, Illinois, for Appellants. Steven L. Holley, Matthew J. Porpora, Jacob E. Cohen, Samantha F. Hynes, SULLIVAN & CROMWELL LLP, New York, New York, Thomas W. Cranmer, MILLER, CANFIELD, PADDOCK & STONE, PLC, Troy, Michigan, for FCA Appellees. Michael A. Nedelman, NEDELMAN LEGAL GROUP, PLLC, Farmington Hills, Michigan, for Appellee Iacobelli. Judith S. Gracey, THE GRACEY LAW FIRM, PLLC, Keego Harbor, Michigan, for Appellee Durden.

**EXHIBIT 1**

---

### OPINION

---

LARSEN, Circuit Judge.  For almost a decade, executives at FCA US, LLC and its parent company, Fiat Chrysler Automobiles N.V.,[1] engaged in a pattern of racketeering, involving bribery and corrupt labor relations with the United Auto Workers (UAW).  General Motors (GM) believes that it was the intended victim of the scheme and says it has suffered billions of dollars in damages because of it.  GM accordingly sued FCA, Fiat, and various executives under the Racketeer Influenced and Corrupt Organizations Act (RICO).  The district court granted defendants' motions to dismiss, concluding that GM had failed to establish that the alleged RICO violations proximately caused its injuries.  For the reasons stated, we AFFIRM.

### I.

Because the case is at the motion to dismiss stage, the factual allegations in the complaint are what matter, and we accept them as true.  *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382–83 (6th Cir. 2016).

In 2008, the country was facing a financial crisis.  As losses mounted, some U.S. auto companies looked to the federal government for help.  The government gave financial relief to General Motors Corporation (Old GM) and Chrysler through the Troubled Asset Relief Program.  That did not work, and Chrysler and Old GM filed for Chapter 11 bankruptcy in 2009.  In Europe, Fiat faced similar troubles.  Fiat CEO Sergio Marchionne determined that Fiat had to secure a partnership with one of the U.S. auto companies to survive.  Marchionne determined that "the UAW was Fiat's bridge to establish a domestic footprint given the UAW's significance in the U.S. automotive market."  Complaint, R. 1, PageID 25.

Marchionne began to cultivate a relationship with the UAW, "quickly ma[king] the head of the union's Chrysler Department, [General] Holiefield, a strategic partner and soon thereafter 'a true friend.'"  *Id.*  Marchionne sought to convince the UAW that a Fiat-Chrysler partnership

---

[1]Fiat Chrysler changed its name to Stellantis N.V. on January 17, 2021, after merging with Peugeot S.A. Because the briefing and the lower court use Fiat and FCA, we do the same.

**EXHIBIT 1**

would be good for the union, hoping that when it came time for Fiat to negotiate over a purchase of Chrysler, the UAW would "throw its weight behind Fiat." *Id.* at 25–26.

Fiat began to negotiate a partial purchase of Chrysler. As part of the purchase, Marchionne demanded that the UAW support World Class Manufacturing (WCM), a system that would make the Fiat/Chrysler facilities flexible, jettisoning "the union's rigid job classification system with its strict hierarchy and boundaries about who could do what." *Id.* at 26–27. Chrysler and the UAW agreed to Marchionne's request to implement WCM. Similarly, the UAW agreed to hire more temporary employees in place of hourly workers. And UAW leadership agreed that, until 2015, it would "lift any cap or restraint on Tier Two workers"—"a less expensive labor source," comprising less-senior employees with a lower wage structure and fewer benefits. *Id.* at 27. "Marchionne's goal overall was to have as few constraints as possible in his ability to operate Chrysler when it came out of bankruptcy." *Id.* GM alleges that "Marchionne implemented a bribery scheme to achieve this goal and help revive Chrysler and, relatedly, harm GM." *Id.*

Chrysler emerged from bankruptcy in June 2009 with Fiat owning 20 percent of its equity, and the UAW owning 55 percent. Fiat had the right to purchase 40 percent of the UAW's equity interest in Chrysler.[2] GM also emerged from bankruptcy, with the UAW owning 17.5 percent equity in the new company, making it the largest shareholder.

GM says the scheme began the following month, in July 2009, with a series of bribes. Defendant Alphons Iacobelli, the former Vice President of Employee Relations at FCA, "and other FCA officials began to transfer hundreds of thousands of dollars of Chrysler funds to Holiefield." *Id.* at 28. FCA paid for Holiefield's wedding to Monica Morgan in Venice and showered Holiefield with gifts, including a "custom-made Terra Cielo Mare watch worth several thousand dollars." *Id.* at 29.

---

[2]By 2013, Fiat had acquired a 58.5 percent stake in Chrysler, with the UAW owning the rest. In 2014, Fiat acquired the UAW's remaining stake in Chrysler. That is when the business entity officially became "FCA." GM's complaint, however, uses "FCA" instead of Fiat when discussing all events after Fiat first acquired an interest in Chrysler in 2009. We do the same for ease. And we use "FCA" to refer to all defendants, including the individual defendants, when discussing the arguments presented to this court, and differentiate only when necessary.

**EXHIBIT 1**

From there, "FCA began a long-running intentional scheme of improper payments to certain UAW officials, funneled primarily through the [UAW-FCA National Training Center (NTC)], made by FCA senior executives and agents (including with the knowledge and approval of Marchionne) to influence the collective bargaining process." *Id.* at 31. FCA used NTC's credit card and bank accounts to conceal payments and gifts to UAW officers and employees worth over $1.5 million. The goal was "to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW." *Id.* at 32. Defendant Michael Brown, FCA's Director of Employee Relations and NTC Co-Director, pleaded guilty to criminal charges for his role in the fraud. He explained that "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials." *Id.*

FCA funneled money to Holiefield and his wife, Morgan, through charitable organizations and false front businesses, including Morgan's photography business. Defendant Jerome Durden, an FCA executive who served on the board of one of Holiefield's charities, assisted in these payments. The amounts were staggering. For example, FCA funneled $425,000 to one business; Holiefield and Morgan used the money for personal expenses, including closing costs on a house. The couple spent other payments made to these businesses— in amounts of $386,400; $350,000; and $200,000 and so-on—to finish an in-ground pool, buy clothes, and visit nightclubs and restaurants. On another occasion, the NTC directly paid off the mortgage on Holiefield's personal residence, sending a wire transfer for over $250,000.

FCA also encouraged UAW officials to use credit cards issued by the NTC. UAW officials happily complied, "charging, for example, $1,259.17 for luxury luggage; $2,182 for a[n] Italian-made Beretta shotgun; $2,130 for Disney World theme park tickets; over $1,000 for a pair of Christian Louboutin designer shoes; and thousands of dollars in electronics and many more such personal items." *Id.* at 35. Other UAW officials, including former President Dennis Williams, used FCA funds for lavish dinners and golf outings.

What did Chrysler get from the bribery scheme? GM says that because of FCA's bribes, "certain corrupt members of UAW's leadership began providing Chrysler with labor peace and competitive advantages to propel Chrysler's performance without regard to the interests of UAW membership." *Id.* at 36. The bribes "were made for this very purpose: to obtain 'benefits,

**EXHIBIT 1**

concessions, and advantages' not only in labor negotiations but also the implementation and administration of at least the post-2009 CBAs, in 2011 and 2015." *Id.* at 36–37. Also, "through its bribery, FCA ensured that while these special advantages were conferred on FCA, the same or similar advantages were not provided to . . . GM despite it seeking similar programs and concessions." *Id.* at 37. This, says GM, inflicted "massive direct damage on GM in the form of higher costs." *Id.*

FCA's bribes secured the UAW's agreement to FCA's preferred WCM system. GM had a similar, but inferior, program of its own (the Global Manufacturing System [GMS]). But despite having "worked closely" with FCA to ensure the success of its system and to bring the program on par with WCM, UAW leaders rebuffed GM's "repeated efforts to collaborate . . . on improvements to" GMS. *Id.* at 38–39. Without "buy-in" from the Union, GMS could not be as successful as FCA's WCM. *Id.* at 39. So, GM says that because of the bribes, the UAW never "fully embraced" GM's efforts to implement GMS. *Id.*

FCA's bribes also secured it an advantage with respect to the hiring of lower cost workers. A prior agreement had limited both FCA and GM in terms of the number of lower-wage, Tier Two employees they could hire. But in 2009, the UAW and the auto companies agreed to lift the cap, with an understanding that the cap would be reinstated in 2015. Because of the bribes, the UAW privately told FCA that it would not actually reinstate the cap for either auto company in 2015. Without this knowledge, GM stayed below the cap on Tier Two workers between 2009 and 2015, while "FCA hired Tier Two workers with abandon, possessing the incredibly valuable foreknowledge that it would not be penalized." *Id.* at 40. "This difference purchased through the bribery scheme provided FCA with a dramatic advantage with respect to average labor costs." *Id.* Similarly, because the UAW did not hold FCA to the contractual limits on temporary workers (who are entitled to substantially less compensation than unionized employees), FCA was able to lower its average hourly labor costs. GM received no such concession on temporary workers. In addition, bribed UAW officials oversaw the UAW's grievance process. "Instead of zealously pursuing union grievances and health and safety issues," corrupt UAW grievance officials, "effectively" gave FCA "control" of "potentially costly and disruptive labor grievances." *Id.* at 41. "GM was denied any such corresponding

**EXHIBIT 1**

benefit." *Id.* Moreover, in 2014, through "'side letter' agreements" "outside of the traditional bargaining process," FCA obtained a favorable prescription drug agreement with the UAW, which significantly reduced FCA's healthcare costs. A similar prescription agreement would have saved GM up to $20 million per year, but the UAW refused to agree to terms with GM.

Add this all up and the bribes bought FCA "a wage advantage to take FCA from worst to first among the Detroit-based automakers" in terms of its labor costs. *Id.* at 42. "By 2015, FCA [had] slashed its labor costs to $47 [per hour]—in the range of non-unionized foreign automakers operating in the U.S.—and $8 less on average per hour than GM ($55)." *Id.* According to GM, "FCA directed key UAW officials to deny similar labor advantages to GM, inflicting significant additional costs on GM." *Id.* at 43. The bribery continued when Dennis Williams took over as president of the UAW in 2014. "Williams specifically directed his lieutenants and other corrupt officials to accelerate their fraud, and use NTC funds and credit cards for travel, dining, and other illegal purposes to improve the UAW's budget." *Id.* at 48. Williams would be a willing participant in the rest of the scheme.

Marchionne also had long sought a merger with a U.S. auto company. "With Marchionne as the lead, FCA schemed that it could effectively take over GM through a merger (code-named 'Operation Cylinder'), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world." *Id.* at 49. It was in part for this reason that Marchionne "had authorized the bribery of UAW leaders." *Id.* Their "support was essential to the success of Operation Cylinder" because "the UAW could effectively block a merger under certain terms in the CBA." *Id.* at 49–50. Marchionne approached GM about a merger in 2015, but GM rejected the offer, even after bribed UAW executives pressed GM to move forward.

Bargaining over the 2015 collective bargaining agreements began in July 2015. By early September, the UAW and GM had inched closer to a framework for a new agreement. Though the UAW had initially demanded "nearly $1 billion" in total cost increases over the 2011 CBA, the "new potential deal" reduced those costs by more than 20 percent. *Id.* at 54. But that agreement never materialized.

**EXHIBIT 1**

The auto companies and the UAW use "pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts." *Id.* at 55. "[T]he UAW selects one of the automakers as a 'lead' or 'target' company, with which the UAW negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a 'pattern' for negotiations." *Id.* at 56. The UAW usually chooses the largest and best performing automaker as the target because it allows the UAW to maximize its gains by locking in favorable wage increases and signing bonuses. GM thought it would be chosen as the target. Industry analysts agreed; they also believed FCA was not a viable target because it was the smallest and least profitable of the companies.

Nevertheless, in September 2015, the UAW unexpectedly chose FCA as the target, a position, according to GM, "secured through the years-long bribery scheme between FCA Group and UAW leaders." *Id.* at 58. Two days after selecting FCA as the target, "FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a 'transformational deal.'" *Id.* at 59. The UAW bargaining team celebrated the deal with a $7,000 dinner in Detroit—paid for with NTC funds.

The UAW's FCA workforce rejected the agreement, however, sending the parties back to the bargaining table. In early October, FCA and the UAW reached a new agreement. According to GM, the terms of this deal "were structured to force enormous costs on GM." *Id.* at 61. "[A]s a pattern for a GM agreement, it would be vastly more expensive than the agreement GM had negotiated prior to FCA's selection as lead." *Id.* In fact, it was twice as costly as the UAW's initial demands of GM, which GM had successfully negotiated down. FCA-UAW members ratified the revised deal.

By this time, FCA and UAW leaders knew that the government had become suspicious. GM says that "[t]hrough this 'rich' FCA-UAW labor contract, Williams and corrupt UAW leaders were able to claim to the public, UAW members, and government investigators that UAW leadership had obtained significant FCA concessions that could then be used in pattern negotiation." *Id.* at 62. "Marchionne, in turn, structured and agreed to these CBA terms to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers, and further his takeover scheme." *Id.*

**EXHIBIT 1**

The UAW selected GM as the next target for negotiations, using "the fraudulently tainted FCA-UAW pattern." *Id.* "[T]he economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern"; in November 2015, UAW workers ratified the new agreement with GM. *Id.* at 63. "[A]lthough GM was able to reduce the immediate cost impact of the FCA pattern by about $400 million, the final CBA between GM and the UAW cost approximately $1.9 billion in incremental labor charges over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead." *Id.* And "[a]lthough GM was able to successfully resist the FCA-UAW leadership takeover scheme, substantial damage from the racketeering scheme had been inflicted: direct injuries to GM that continue to reverberate and compound to this day, including higher costs and lost investment initiatives." *Id.*

By 2017, the jig was up. The Department of Justice criminally charged numerous FCA executives and UAW officials for their roles in the conspiracy. "One by one, each of the FCA and UAW co-conspirators entered guilty pleas admitting to a brazen scheme to enrich themselves and corrupt the collective bargaining process through the FCA Control and FCA-NTC Enterprises." *Id.* at 66. That includes Iacobelli, Durden, and Brown, the three individual defendants in this case. FCA also pleaded guilty for its role in the corruption scandal and agreed to pay a $30 million fine. *See* David Shepardson, *Fiat Chrysler to plead guilty, pay $30 million to resolve U.S. criminal labor probe*, Reuters (Jan. 27, 2021, 10:45 AM), https://www.reuters.com/article/us-usa-autos-labor/fiat-chrysler-to-plead-guilty-pay-30-million-to-resolve-u-s-criminal-labor-probe-idUSKBN29W1ZA. For its part, the UAW agreed to a consent decree that would put the union under federal monitoring for six years; a judge approved the consent decree. *See* Breana Noble & Robert Snell, *Judge approves UAW consent decree; union has 30 days to propose monitors*, The Detroit News (Jan. 29, 2021, 7:35 PM), https://www.detroitnews.com/story/business/autos/2021/01/29/federal-judge-approved-united-auto-workers-consent-decree/4317725001/.

On November 20, 2019, GM sued FCA, Fiat, Iacobelli, Durden, and Brown, asserting three RICO claims against all defendants, one claim each under 18 U.S.C. § 1962(b), (c), and (d); a claim for unfair competition under Michigan law against FCA and Fiat; and a claim for

**EXHIBIT 1**

civil conspiracy against all defendants.  The district court declined to exercise supplemental jurisdiction over GM's state law claims.[3]

All defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  The district court granted the motions.  Assuming that FCA had committed the alleged RICO violations, the district court held that FCA's alleged RICO violations were either indirect or too remote to have proximately caused GM's alleged injuries.  All of GM's RICO claims therefore failed.  The district court dismissed GM's complaint with prejudice.

GM filed a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e), arguing that newly discovered evidence showed that the scheme directly and intentionally targeted it.  GM asked the court to vacate its order or, in the alternative, allow it to file an amended complaint.  The court denied the motion, concluding that GM's new evidence was too speculative to warrant reopening the case and that there were no other clear legal errors. GM timely appealed.

## II.

We must first assess whether this case is properly before us.  FCA argues that the National Labor Relations Board (NLRB) has exclusive jurisdiction over GM's claims because they are based on conduct that arguably constitutes an unfair labor practice.  FCA invokes the doctrine of *Garmon* preemption, which gets its name from the Supreme Court's decision in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).[4]  Because FCA's *Garmon* argument potentially implicates the court's subject matter jurisdiction, we address it before proceeding to the merits.  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608 (6th Cir. 2004);

---

[3]A Michigan state court dismissed all of GM's claims against FCA.  *See* David Shepardson, *Michigan judge tosses GM lawsuit against Fiat Chrysler*, Reuters (Oct. 18, 2021, 5:55 AM), https://www.reuters.com/business/autos-transportation/michigan-judge-tosses-gm-lawsuit-against-fiat-chrysler-2021-10-17/.

[4]As this court explained in *Trollinger v. Tyson Foods, Inc.*, the use of the word "preemption" to describe the doctrine is a bit of a misnomer.  370 F.3d 602, 608 (6th Cir. 2004).  "*Garmon* is more than a traditional preemption doctrine . . . because when properly invoked it tells us not just what law applies (federal law, not state law) but who applies it (the National Labor Relations Board, not the state courts or federal district courts)." *Id.*

**EXHIBIT 1**

*Int'l Longshoremen's Ass'n. v. Davis*, 476 U.S. 380, 393 (1986); *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 299 (6th Cir. 2011); *but see Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004) (holding that, when "[a]pplied to claims in federal court, and arising under federal law," *Garmon* does not affect a court's subject-matter jurisdiction but is instead an abstention doctrine, "allocating to an administrative agency the first crack at certain matters").

"Sections 7 and 8 of the National Labor Relations Act protect certain labor practices (such as organizing or joining a labor union, bargaining collectively, and engaging in concerted activity, or refraining from engaging in any of these activities) and prohibit certain others (such as interfering with a protected activity or coercing employees to join a union)." *Trollinger*, 370 F.3d at 608. Because Congress vested the NLRB "with primary jurisdiction to determine what is or is not an unfair labor practice" under the NLRA, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982), federal courts generally may not resolve claims based on "activity which 'is arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the [NLRB],'" *id.* (quoting *Garmon*, 359 U.S. at 245).

But there are exceptions to the NLRB's primary jurisdiction. For example, "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies" as "long as the statute does not conflict with §§ 7 or 8 of the NLRA and . . . litigants do not circumvent the primary jurisdiction of the NLRB simply by casting statutory claims [under §§ 7 or 8 of the NLRA] as violations of [an independent federal law]." *Trollinger*, 370 F.3d at 609–10 (citations omitted). And Congress may also "expressly carve[] out an exception to the [NLRB's] jurisdiction." *Brennan v. Chestnut*, 973 F.2d 644, 646 (8th Cir. 1992) (citing *Vaca v. Sipes*, 386 U.S. 171, 179–80 (1967) (citing cases)). Here, Congress has done just that.

GM's RICO claims are predicated on violations of a labor law—namely, 29 U.S.C. § 186 (also known as Section 302 of the Labor Management Relations Act (LMRA)), which prohibits certain financial transactions between employers, employees and unions.[5] It is one of two labor

---

[5]Section 186 of the LMRA is a criminal statute. *Ohlendorf v. United Food & Comm. Workers Int'l Union, Local 876*, 883 F.3d 636, 640 (6th Cir. 2018). It does not create a private right of action, and the Attorney General has the authority to enforce it. *See id.* at 640–43; *In re WKYC-TV, Inc.*, 359 N.L.R.B. 286, 289 n.13 (2012).

**EXHIBIT 1**

laws listed as RICO predicates in 18 U.S.C. § 1961(1).[6]  So the question is whether, by naming a labor law as a RICO predicate, Congress "expressly carved out an exception to" the NLRB's jurisdiction.  We answer:  yes.

No circuit court has authoritatively addressed whether the NLRB retains primary jurisdiction over RICO claims predicated on violations of § 186.  Two have suggested in dictum, however, that it does not.  *See Brennan*, 973 F.2d at 646 ("[A] claimed violation of 29 U.S.C. § 186 would not be preempted because RICO includes violations of § 186 within the definition of 'racketeering activity'"); *Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 977 (1st Cir. 1995) ("The specific exceptions carved out in §§ 186 and 501(c) support the conclusion that Congress intended that violations of labor laws other than § 186 [or § 501(c)] alleged as predicate acts are preempted." (alteration in original) (citation omitted)); *see also Teamsters Local 372 v. Detroit Newspapers*, 956 F. Supp. 753, 759 (E.D. Mich. 1997) (stating that *Garmon* preemption does not apply when "Congress has expressly carved out an exception to the NLRB's jurisdiction," such as when it added § 186 as a RICO predicate).  We agree.

Like our sister circuits, we are persuaded by a well-reasoned district court opinion that confronted this very issue—*Butchers' Union, Local No. 498 v. SDC Investment, Inc.*, 631 F. Supp. 1001 (E.D. Cal. 1986).  *See Brennan*, 973 F.2d at 646 (calling *Butchers' Union* the "leading case" on whether federal courts may resolve RICO claims predicated on violations of § 186).  Like the court in *Butchers' Union*, we find it "hard to imagine that Congress would have made § 186 a RICO predicate act without the intention of making violations of § 186, which necessarily arise in the labor context, the basis of a RICO action brought in the district court." 631 F. Supp. at 1007.  Undoubtedly, a RICO claim predicated on § 186 violations will require the resolution of labor law questions, "but that is simply a consequence of Congress making § 186 violations predicate acts for RICO purposes."  *Id.* at 1008.  When it comes to the jurisdiction of the NLRB, "Congress gets to make the rules—and change them."  *Id.* at 1006. Although Congress designated the NLRB as the exclusive forum for consideration of most labor

---

The NLRB, however, has jurisdiction over unfair labor charges premised on a violation of § 186.  *See WKYC-TV, Inc.*, 359 NLRB at 289 n.13; *see also Ohlendorf*, 883 F.3d at 643; *Swanigan v. FCA US LLC*, 938 F.3d 779, 785–86 (6th Cir. 2019).

[6]The other is 29 U.S.C. § 501(c), which pertains to the embezzlement of union funds.

**EXHIBIT 1**

law questions, it "can and does create exceptions to that exclusivity." *Id.* at 1006–07. This is one of them.

FCA focuses on this court's decision in *Trollinger*, which explained that "when a RICO action depends upon a federal-law predicate offense and a violation of that predicate law may be found only if the defendant's conduct violates the NLRA, the federal district courts lack jurisdiction under *Garmon* because the NLRA issues in the case would be anything but collateral." 370 F.3d at 610–11. Because the labor law issues in this case are hardly "collateral," FCA argues that *Garmon* preemption applies. But *Trollinger* did not address the question here— whether, by expressly designating § 186 as a RICO predicate, Congress "has expressly carved out an exception to the" NLRB's jurisdiction. *Brennan*, 973 F.2d at 646. We hold that it has. Accordingly, GM's claims were properly before the district court.

### III.

We turn to the merits. We review de novo the district court's order dismissing for failure to state a claim under Rule 12(b)(6). *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002). "We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 382–83 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

RICO provides a civil cause of action for treble damages to anyone injured "by reason of" certain racketeering activity. 18 U.S.C. §§ 1964(c), 1962. To state such a claim, the plaintiff must allege that the defendant's violation was both a factual and proximate cause of his injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266–68 (1992). Factual cause is established "whenever a particular outcome would not have happened 'but-for' the purported cause." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020); *see also UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). And in the RICO context, proximate cause asks whether "the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *accord Holmes*, 503 U.S. at 268–69. The directness requirement rests on three premises: the difficulty of "ascertain[ing] the amount of a plaintiff's

**EXHIBIT 1**

damages attributable to the violation, as distinct from other, independent, factors"; the risk of duplicative recoveries; and the availability of a more suitable plaintiff. *Anza*, 547 U.S. at 458–60 (quoting *Holmes*, 503 U.S. at 269); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008).

GM's allegations can be grouped into three distinct categories of injuries. First, GM alleges that from 2009–2015, FCA bribed the UAW to secure "unique competitive advantages." R.1, PageID 90. Second, GM alleges that, during the same period, FCA directed the UAW to withhold those same benefits from GM. Finally, GM alleges that, through its bribes, FCA weaponized the 2015 pattern-bargaining process to harm GM. We begin with the competitive-advantage injuries.

## A.

The Supreme Court's opinion in *Anza* illustrates how to apply the directness requirement to competitive-advantage injuries. In *Anza*, the Court considered a RICO claim brought by Ideal Steel Supply against its competitor, National Steel Supply. 547 U.S. at 453–55. Ideal alleged that National had cheated the State of New York by failing to charge sales taxes on some of its transactions; that enabled National to unfairly lower its prices, which in turn cost Ideal sales. *Id.* Those allegations, the Court held, were insufficient to establish proximate cause under RICO. *Id.* at 461. "The cause of Ideal's asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. Ideal's theory of causation, the Court explained, raised two of the concerns underlying the directness requirement. First, delineating the extent to which the fraud, rather than other factors, caused Ideal's lost sales would be particularly complex; and second, there was a more directly injured plaintiff, the State. *Id.* at 458–60.

Most of GM's injuries are, like Ideal's, assertions of an unfair competitive advantage. According to GM, FCA's bribes allowed it to commandeer the union grievance process, and to secure the more efficient WCM system, a higher proportion of low-cost workers, and a cheaper prescription-benefits program. In short, GM alleges that FCA's corruption "helped buy a wage advantage to take FCA from worst to first among the Detroit-based automakers" in terms of its

**EXHIBIT 1**

labor costs.  R. 1, PageID 42.  GM does not say how FCA spent its wage savings: Did it slash its prices, pay off debt, or invest in research and development?  Nor does GM say what specific harm resulted: Did it lose sales?  Was it forced to cut profit margins?  But the necessary inference is that FCA's unfair labor advantage hurt GM in the marketplace.  That theory should sound familiar.  It is precisely the one rejected in *Anza*.  *See Anza*, 547 U.S. at 458–61.  As in *Anza*, GM's theory raises complex apportionment problems: What share of GM's (unspecified) marketplace injuries are attributable to FCA's unfair labor advantage, rather than to "other, independent[] factors"?  *Id.* at 458 (quoting *Holmes*, 503 U.S. at 269).  Thus, it is impossible to "trace a straight line" from FCA's conduct in violation of RICO to these injuries, precluding a finding of proximate cause.  *See Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013).  And, of course, there is a more "immediate" victim: FCA workers.  *Anza*, 547 U.S. at 460.  What didn't work in *Anza* can't work here.

Nor does it work under *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) (plurality opinion).  There, the City of New York taxed cigarette possession.  *Id.* at 4.  Hemi, an out-of-state supplier, sold cigarettes online to residents of the City.  *Id.*  Hemi was not required to collect the City tax, but the federal Jenkins Act required Hemi to submit its customer information to the State of New York.  *Id.* at 5.  Hemi didn't comply.  *Id.* at 6.  The City then sued Hemi under RICO, arguing that "[w]ithout the reports from Hemi, the State could not pass on the information to the City."  *Id.* at 9.  Lacking customer information, the City could not collect the tax from its residents.  *Id.*  The plurality found proximate cause lacking because the City's harm did not flow directly from the RICO predicate act (the failure to file Jenkins Act reports) but rather from "the customers' failure to pay their taxes."  *Id.* at 11.  And there was a more immediate victim (the State).  *Id.* at 12.  GM's competitive-advantage theory of proximate cause fails under *Hemi Group* for the same reasons that it fails under *Anza.*

GM argues that this case is different because FCA intended to harm GM.  Whatever purchase that formulation of proximate cause had at common law, *see* Restatement (Second) of Torts § 435A; *Hemi Grp.*, 559 U.S. at 23–25 (Breyer, J., dissenting), the Supreme Court has squarely rejected it in this context.  "A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a

**EXHIBIT 1**

competitor's expense." *Anza*, 547 U.S. at 460; *Hemi Grp.*, 559 U.S. at 13. That is true notwithstanding the Court's statement in *Bridge v. Phoenix Bond & Indemnity Co.* that "one who intentionally causes injury to another is subject to liability to the other for that injury." 553 U.S. at 657 (alteration omitted) (quoting Restatement (Second) of Torts § 870). While a later portion of *Bridge* addressed RICO's directness requirement, *see id.* at 657–58; *Hemi Grp.*, 559 U.S. at 14, the Court discussed intent only in explaining that common law liability for fraud extended beyond the party who relied on the defendant's misrepresentation. *See Bridge*, 553 U.S. at 656–57. We are highly skeptical that the unanimous Court in *Bridge* was silently overruling a key holding of *Anza* in its discussion of traditional fraud principles. And if there were any room to question our skepticism, the plurality opinion in *Hemi Group* erased it. *See* 559 U.S. at 12–13 (noting that, although the dissent in *Anza* thought proximate cause should turn on intent, "the dissent there did not carry the day"); *see also Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018) (after *Anza* and *Hemi Group*, "foreseeability and intention have little to no import for RICO's proximate cause test"); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (focus of RICO inquiry is "directness," not "on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was 'the *intended* consequence[] of [the defendant's] behavior'" (first alteration in original) (quoting *Hemi Grp.*, 559 U.S. at 12)).[7]

Still, GM is right in at least one respect: Using an intermediary in a RICO scheme does not alone preclude liability. *Bridge* held that the directness requirement was satisfied where a bidder in a county auction sued a rival bidder, even though the rival's scheme depended on first duping the county. 553 U.S. at 657–58. The same was true when a mortgage company enlisted the help of a crooked home appraiser to perpetuate lending fraud, *Wallace*, 714 F.3d at 416, and when a political donor bribed a state's governor to sign favorable legislation into law, *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 725 (7th Cir. 2014). These schemes, like many at

---

[7]Nothing in *Wallace v. Midwest Financial and Mortgage Services. Inc.*, 714 F.3d at 416, suggests that an injury that is foreseeable could satisfy RICO proximate cause even if the injury were indirect. Instead, *Wallace* is best read consistently with *Trollinger*, which recognized that even if an injury is direct, "the causal link between the injury and the conduct may still be too weak to constitute proximate cause—because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes." *Trollinger*, 370 F.3d at 614. In other words, foreseeability may be necessary, but it is not sufficient.

**EXHIBIT 1**

the heart of RICO conspiracies, use a middleman to accomplish their goals. *See* 18 U.S.C. § 1961(1) (bribery, extortion, money laundering, murder-for-hire). That fact alone does not foreclose relief. What makes this case different, however, is the presence of an intermediate *victim*. Despite falling prey to the defendant's trickery, the county in *Bridge* was not injured in any tangible, compensable way. 553 U.S. at 658 (recognizing that any reputational injury to the county was too "speculative and remote"). The FCA workers, by contrast, are "more immediate victim[s]" who are "better situated to sue." *Id.* We join our sister circuits in recognizing this critical distinction. *Compare Empress Casino*, 763 F.3d at 734 (finding proximate cause where "[t]here was no more directly injured party standing between the [plaintiffs] and the alleged wrongdoer") *with Empire Merchs.*, 902 F.3d at 144 (finding lack of proximate cause where "New York State was a more direct victim of the smuggling operation"). GM's theory, therefore, is insufficient to establish RICO proximate cause.

## B.

Perhaps sensing that its 2009–2015 injuries were doomed under *Anza* and *Hemi Group*, GM alleges that FCA bribed union executives not only to give FCA certain concessions but also to "deny similar labor advantages to GM." R. 1, PageID 43. That theory suffers from a different flaw—a lack of but-for causation.

FCA allegedly bribed the union to deny labor advantages to GM, but GM never asserts that it would have received those advantages absent FCA's bribes or that it was in any way entitled to the benefits FCA received. *Contra Bostock*, 140 S. Ct. at 1739 ("[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause."). Nor does GM allege that pattern bargaining was at play with respect to these pre-2015 benefits. So even accepting as true GM's allegation that FCA officials directed UAW leaders to deny comparable benefits to GM, that fact doesn't change the causation analysis. GM has not alleged that it would have received such benefits absent the corruption. So FCA's bribes were not a but-for cause of the harm.

This may seem harsh to GM. While GM cleanly fought its way out of a once-in-a-generation economic downturn, FCA bribed its way out. But GM's inability to recover for the

**EXHIBIT 1**

alleged denial of benefits follows from a straightforward application of elementary causation principles. And its inability to recover for FCA's illicit competitive advantage follows from binding Supreme Court precedent. *See Anza*, 547 U.S. at 460; *cf. id.* at 474–75 (Thomas, J., concurring in part and dissenting in part) (criticizing the majority's "restrictive proximate-cause test" for foreclosing relief on competitive injuries that are "the principal concern of RICO").

## C.

That leaves GM's allegations of injury stemming from the 2015 CBA negotiations. Recall that, according to GM, FCA bought its way into the coveted "target" position for pattern bargaining and negotiated two deals with the Union. The FCA workers rejected the first and ratified the second. Then, using the second FCA deal as a template, GM and its workers reached an agreement with GM that cost the company far more than its prior negotiations would have predicted.

There are two ways to look at these facts. On one view, FCA, recognizing its relatively weak financial position, wanted to be the target so that it could lock in a deal that kept its labor costs low. That would sensibly explain why FCA workers rejected the first deal; it was not labor-friendly enough. But if that is GM's theory, it fails to satisfy proximate cause for the same reasons as the other competitive-advantage injuries. *Anza* forecloses relief.

On the other hand, GM's complaint seems to put forward a different theory regarding the 2015 CBA. According to GM, Marchionne spent more than a decade fixated on the idea of merging with GM. In pursuit of that goal, FCA made several overtures to GM, used bought-and-paid-for Union executives to influence GM's Board, and amped up the pressure through the press and private-capital campaigns. And the 2015 CBA negotiations were to be Marchionne's coup de grâce: FCA would purchase the first seat at the bargaining table so that it could give away the farm, saddling GM with crippling labor costs and leaving it ripe for a takeover. Sure, the deal would hurt FCA in the short-term, but Marchionne would get his prize.

Color us skeptical. But for the purposes of a motion to dismiss, we are satisfied that GM's factual allegations, taken as true, are plausible. *Iqbal*, 556 U.S. at 678. For one thing, Marchionne's overwhelming desire for an FCA–GM merger takes an otherwise irrational course

**EXHIBIT 1**

of action "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For another, these CBAs are undoubtedly quite complex, making it plausible that FCA could have structured the deal to hurt GM far worse than it hurt itself. Indeed, that seems like a reasonable inference from GM's allegation that FCA "structured and agreed to [concessions] to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers." R. 1, PageID 62. The upshot is that while the competitive-advantage interpretation of these facts seems more likely, we are not convinced that it is such "an obvious alternative explanation," that GM's alternate theory cannot clear the plausibility bar. *Twombly*, 550 U.S. at 567.

But GM isn't out of the woods yet. Even accepting GM's theory as true, the chain of causation between FCA's bribes and GM's injury is still too attenuated. *See Hemi Grp.*, 559 U.S. at 9. Consider what had to occur before the consequences of FCA's bribe could have reached GM: FCA had to buy the first seat at the bargaining table (that's the RICO predicate); but FCA workers rejected the first negotiated contract, so the UAW and FCA had to renegotiate a more worker-friendly contract; then FCA workers had to ratify the renegotiated deal; the UAW and GM then bargained on the basis of the renegotiated deal (GM admits it was able to partially lessen the burden of the FCA contract); GM had to agree to a sufficiently attractive contract for its workers, knowing that it was in a better financial position than FCA and could presumably offer *more* than FCA did; and GM workers had to ratify the new contract. The chain leading from FCA's bribe to GM's increased labor costs had to pass through the independent actions of at least two independent parties—the FCA and GM workforces. So GM's alleged harm rests on "separate actions carried out by separate parties." *Id.* at 11 (emphasis omitted). And that gives rise to difficulties in assessing and apportioning fault, concerns central to the Court's decisions in *Anza* and *Holmes*. Would GM's independent workforce have ratified the pre-negotiated deal if GM had been first to the table? How much did the FCA workers' rejection of the initial deal contribute to GM's alleged damages? Difficult questions like these distinguish GM's theory from the "straightforward" one in *Bridge*, where there were no "independent factors that account[ed] for [the plaintiff's] injury." 553 U.S. at 658. At bottom, the directness requirement "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation" and has "particular resonance when applied to claims brought by economic

**EXHIBIT 1**

competitors." *Anza*, 547 U.S. at 460. GM has failed to show that the predicate acts directly caused its 2015 pattern-bargaining injuries. The district court did not err by dismissing GM's complaint on causation grounds.

IV.

Finally, GM argues that the district court erred by denying its motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). We review an order denying such a motion for an abuse of discretion. *Clark v. United States*, 764 F.3d 653, 661 (6th Cir. 2014). "Under Rule 59, a court may alter the judgment based on: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Id.* (quotation marks omitted) (quoting *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010)).

GM argues that the district court erred by not allowing GM to amend its complaint based on newly discovered offshore bank accounts in the names of various individuals involved in the scheme. "To constitute 'newly discovered evidence,' the evidence must have been previously unavailable." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).

GM says that the district court erred because leave to amend should be freely given and that, generally, a plaintiff must be given one chance to amend the complaint when a court dismisses based on purported pleading defects. But those conventions apply to pre-judgment motions under Federal Rule of Civil Procedure 15. GM's motion came after entry of the judgment, and that makes a difference. *Leisure Caviar*, 616 F.3d at 615–16. "If a permissive amendment policy applied after adverse judgments, plaintiffs could use the court as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Id.* at 616 (citation omitted). So, "[w]hen a party seeks to amend a complaint after an adverse judgment, it . . . must shoulder a heavier burden." *Id.* "Instead of meeting only the modest requirements of Rule 15, the claimant must meet the requirements for reopening a case established by Rules 59 or 60." *Id.*

GM argued before the district court that it was unable to obtain the evidence it now offers due to the district court's order denying limited discovery. We think that a fair point, and FCA

**EXHIBIT 1**

does not challenge it.  But, regardless, GM has not met its burden of showing that the district court abused its discretion in denying the motion.   The purported new evidence does not move the needle.  It confirms what we already knew—FCA was bribing UAW officials.  The new information?  UAW officials might have been hiding large sums in foreign bank accounts.  So maybe the amounts of the bribes were more than originally thought.  But that does not change the nature of the scheme, only its size.

One name bears mention.  GM uncovered an offshore bank account in former UAW Vice President Joseph Ashton's name, and from there infers that FCA bribed Ashton to harm GM.  Ashton was selected by former UAW President Dennis Williams and appointed by the UAW to serve on GM's Board from 2014 to 2017.  GM characterizes the existence of the Ashton account as "reveal[ing] that from 2010 to 2014, FCA and FCA NV *likely* made substantial payments to Ashton."  Motion to Amend or Alter Judgment, R. 84, PageID 3000 (emphasis added).  GM alleges two separate theories of how Ashton harmed GM.  First, GM says that Ashton, as lead negotiator with GM from 2010 to 2014, was crucial in withholding the competitive-advantage benefits from GM per FCA's instructions.  Second, GM says that FCA bribed Ashton to infiltrate GM as a member of its Board and funnel GM's secrets to FCA.

It is worth noting that GM does not say how Ashton's account was funded, that there is any connection between the various offshore accounts it has uncovered, or that it has evidence that FCA bribed Ashton.  Meanwhile, the Department of Justice has convicted Ashton for fraud unrelated to FCA.  *See Former UAW Vice President Sentenced to 30 Months for Taking $250,000 in Bribes and Kickbacks*, U.S. Dep't of Justice (Nov. 17, 2020), https://www.justice.gov/usao-edmi/pr/former-uaw-vice-president-sentenced-30-months-taking-250000-bribes-and-kickbacks.

Regardless, as for the allegations that Ashton harmed GM by withholding benefits from 2010 to 2014, at FCA's instruction, that theory is not new, only the name of the actor is.  As for GM's allegations that Ashton harmed GM once he joined GM's Board, GM alleges only that FCA bribed Ashton from 2010 to 2014 when he was with the UAW.  *See* Motion to Amend or Alter Judgment, R. 84, PageID 3000.  GM does not say that it has evidence that FCA continued to bribe Ashton once he renounced his UAW affiliation and joined GM's Board.  Any suggestion

**EXHIBIT 1**

then that Ashton *infiltrated* GM and funneled its secrets to FCA is mere conjecture and not supported by GM's newly discovered evidence.

One last thing warrants attention. Above, we concluded that GM could not satisfy RICO proximate cause for its competitive-advantage injuries because it failed to allege that it had any right to, or legitimate expectation of, those benefits. GM's proposed amended complaint, when discussing Ashton's role in the scheme and throughout, now contains conclusory allegations that the UAW would have bestowed on a corruption-free GM the same competitive-advantage benefits that it alleges FCA obtained only through bribery, although it fails to explain why the UAW would have done so. So does this save GM? No, given the posture. These allegations seem to be a direct response to the district court's conclusion (like ours) that the complaint failed to allege that GM had any entitlement to the competitive-advantage benefits that the UAW withheld. As the district court explained, "[t]he allegations show that the 'unique competitive advantages' at issue would not have been available to a company unwilling to bribe UAW officials." R. 82, PageID 2969–71. Rule 59(e) does not allow a plaintiff to use the district court opinion "as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Leisure Caviar*, 616 F.3d at 616 (citation omitted). That is exactly what GM tries do here. Accordingly, the district court did not abuse its discretion by denying GM's Rule 59(e) motion.

* * *

We AFFIRM.

**EXHIBIT 1**

# NEDELMAN LEGAL GROUP, PLLC
### ATTORNEYS AT LAW
#### PROFESSIONAL LIMITED LIABILITY COMPANY

28580 ORCHARD LAKE ROAD, SUITE 140
FARMINGTON HILLS, MICHIGAN 48334

32 SE 2ND AVE., STE 636
DELRAY BEACH, FL 33444
_____

TELEPHONE (248) 855-8888
MICHAEL A. NEDELMAN                    TELEPHONE: (561) 278-8855
ALSO ADMITTED IN FL & AZ                                           E-MAIL   mnedelman@nglegal.com

December 24, 2021

James Marina, Esq.
Kirkland & Ellis
601 Lexington Avenue                    Via email to: james.marina@kirkland.com
New York, New York 10022


Casey McGushin, Esq.
Kirkland & Ellis
300 North LaSalle
Chicago, IL 60654                    Via email to: casey.mcgushin@kirkland.com


Re: Susanne Iacobelli/ *General Motors v Ashton*
    *Case 20-12659 (USDC NJ)*
    Our File No. 1751.009

Gentlemen:

I write in my capacity as counsel for non-party Susanne Iacobelli, (a) with reference to the Subpoena *duces tecum* dated November 10, 2021 and served upon Mrs. Iacobelli on November 14, 2021, in that action entitled *General Motors LLC v Ashton*, bearing case no. 20-12659 in the United States District Court for the District of New Jersey (the "Ashton New Jersey Action"), and (b) as a follow-up to my letter (and the included objections) dated November 26, 2021 and our subsequent discussions. On behalf of Susanne Iacobelli and in light of the Order in *General Motors LLC v Iacobelli, et al*, bearing case no. 20-011998-CB in the Wayne County (Michigan) Circuit Court (the "Michigan State Court Action") permitting General Motors LLC to amend its Complaint, we amend our objections to the scope of the subpoena *duces tecum* and your demand for her testimony - despite our continued belief that (c) the request for documents seeks documents that are not relevant to any of the claims made in the Ashton New Jersey Action; (d) that the requests are not proportional to the needs of the case; (e) that the requested discovery is an improper attempt to conduct discovery in each of the Michigan State Court Action and that (dismissed) action entitled *General Motors LLC v FCA, LLC*, bearing case no. 19-cv-13429 in the United States District Court for the Eastern District of Michigan (the "Michigan Federal Court Action") (the Michigan Federal Court Action and the Michigan State Court Action are sometimes collectively referred to as the "Michigan Actions"); and (f) the request imposes upon Ms. Iacobelli

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **2** of **11**

an undue burden. Those objections notwithstanding, we respond as follows in an effort to narrow the scope of any remaining dispute, and reduce the attendant costs and expenses.

Although we believe that the information sought from Susanne Iacobelli is beyond the permissible scope of discovery in the Ashton New Jersey Action and reflects the bad faith efforts of Plaintiffs to use the Ashton New Jersey Action as a vehicle to conduct an intrusive, broad-ranging investigation into unrelated claims, Susanne Iacobelli is providing a more fulsome response (rather than simply objecting) solely to narrow any potential dispute and avoid costly and unnecessary Motion practice, including the cost and expense associated with her bringing a Motion to Quash and, if we were to only narrowly assert all available objections (including to the relevance of the requests themselves), the cost and expense associated with defending any Motion to Compel being brought by "GM."

Federal Rule of Civil Procedure 45(d), Protecting a Person Subject to a Subpoena; Enforcement, states in relevant part as follows:

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

Pursuant to Fed. R. Civ. P. 45(d)(2)(B), Susanne Iacobelli makes the following objections to the *duces tecum* portion of the subpoena (Susanne Iacobelli may provide greater detail in support of her objections either in her own Motion to Quash, or in response to any Motion to Compel you may file):

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **3** of **11**

**<u>Definitions</u>**:

Objections are made to the definition of "NTC" to the extent that it is defined as "including any and all of its current or former directors, officers, board, employees, agents, advisors, or other persons acting on its behalf," for the reason that the other persons and/or entities sought to be included are not identified, rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "UAW" to the extent that it is defined as "including any and all of its current or former affiliates, subsidiaries, directors, officers, board, employees, agents, members, and other persons acting on its behalf," for the reason that the other persons and/or entities sought to be included are not identified, rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "And" and "or" requiring the terms to be construed "to bring within the scope of the request responses that might otherwise be outside of the scope" – rendering the request impermissibly broad and incomprehensibly vague.

Objections are made to the definition of "You," for the reason that "GM's" broad definition of "You," would purport to include not just Mrs. Iacobelli but also her counsel within its definition, and arguably seek to include within the scope of this third-party subpoena *duces tecum* the work product and conduct of her counsel (whether or not her counsel was acting on her behalf); the definition is vague as a result, and renders each request unduly burdensome. Susanne Iacobelli objects to the definition of "You" extending to include her counsel.

     Therefore, in response to the specific numbered requests:

1.    Document request no. 1 seeks "documents and communications relating to any effort by You, FCA, or Joseph Ashton, or any person acting on their behalf, to impose higher costs or other financial harm on GM by directly or indirectly providing bribes or unlawful payments of money or things of value to the UAW, its current or former officers oremployees, and/or current or former managers, directors, or employees of FCA." There is no good faith basis for either "GM" believing that Susanne Iacobelli could possibly have any non-privileged responsive documents, and the request reflects nothing more than an attempt to impose upon Susanne Iacobelli undue burden. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request. The privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced, or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **4** of **11**

and will not be produced.

2.      Document request no. 2 seeks "documents and communications relating to You, FCA, the NTC, or any person acting on their behalf providing any 'money or other thing of value' (within the meaning of that phrase as set forth in Section 302 of the Labor Management Relations Act) to the UAW, its current or former officers, employees,or their relatives, or any charitable organization or other entity associated with the UAW or its current or former officers, employees, or their relatives, either directly or indirectly."

As Plaintiffs are well-aware, and in fact plead at Amended Complaint ¶12, Alphons Iacobelli pled guilty to conspiracy to violate the Labor Management Relations Act, based upon providing on behalf of FCA money or other things of value to UAW officials; FCA has also pled guilty to related charges. Any information that Susanne Iacobelli may have – and the emphasis is on the "may" – would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege and will not be produced.

As you are also aware, Mrs. Iacobelli was named as a party defendant in that action entitled *The UAW-Chrysler Skill Development and Training Program v Iacobelli, et al*, bearing case no. 18-166226-CZ in the Oakland County (MI) Circuit Court. Given the unduly broad nature of your request and although Susanne Iacobelli never provided any money or any other thing of value to any of the referenced persons or entities, it is possible that papers filed and discovery exchanged in that matter may be responsive to this request if construed to include allegations of such conduct. Ms. Iacobelli objects to the request; determining if any of the pleadings or other papers filed in that matter (all of which are publicly available) are responsive to your request would be unduly burdensome upon Mrs. Iacobelli and cause her to incur undue expense and will only be undertaken if ordered by the Court and Plaintiffs agree to compensate Mrs. Iacobelli for the time and expense (including that of the undersigned counsel) in conducting the necessary review.
        .

3.      Document request no. 3 seeks documents "reflecting, referencing, or describing Sergio Marchionne's knowledge that any money or other thing of value (including but not limited to cash, debts paid, home improvements, gifts, automobiles, entertainment, travel, meals, retirement and other parties, personal items, and promises of future items of value) were provided by You, FCA, the NTC, or any person acting on their behalf to the UAW, its current or former officers, employees, or their relatives, either directly or indirectly (including but not limited to Joseph Ashton, Ron Gettelfinger, Dennis Williams, Gary Jones, Norwood Jewell, and General Holiefield)." There is no good faith basis upon which Plaintiffs could reasonably believe that Susanne Iacobelli would have any responsive documents reflecting Sergio Marchionne's knowledge, if any, on any subject. While we object

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **5** of **11**

to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request except to the extent, if any, that Mr. Marchione's alleged knowledge, if any, was referenced in the pleadings and/or papers filed, and discovery exchanged, in the NTC Action. For the reasons set forth above, determining if any of the pleadings or other papers filed in that matter (all of which are publicly available) are responsive to your request would be unduly burdensome upon Mrs. Iacobelli and cause her to incur undue expense and will only be undertaken if ordered by the Court and Plaintiffs agree to compensate Mrs. Iacobelli for the time and expense (including that of the undersigned counsel) in conducting the necessary review. The privileged documents are limited to any personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure and will not be produced.

4.  Plaintiffs' Amended Complaint in the Ashton New Jersey Action makes limited references to alleged "foreign accounts," at ¶¶57, 58, 60 and 107(a). Plaintiffs' First Amended Complaint at ¶57 references "certain foreign financial accounts in the Cayman Islands (Cayman National Bank) and Japan (Shisei Bank) held in the name of Ashton and/or Ashton's charity;" and at ¶58 references the alleged grant to Ashton, General Holifield and Dennis Williams control or a beneficial interest over account in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank).

   At subpoena *duces tecum* Request no. 4, however, Plaintiffs seek documents and communications relating to "any of the foreign bank accounts identified in the Complaint…", but then proceed to assume that the accounts identified in the Amended Complaint include (but they do not) "those held by or for … Alphons Iacobelli in Switzerland (UBS and Credit Suisse), Italy (Deutsche Bank), Liechtenstein (VP Bank Vaduz), and Singapore (DBS Bank); Jerome Durden in Liechtenstein (LGT Bank Vaduz) and the Cayman Islands (Cayman National Bank); Colin Lightbody in Luxembourg (Fortuna Bank); Linda Knoll in Luxembourg (Lombard Odier Europe)and Switzerland (Banquet Pictet & Cie SA); and Peter Glenn Shagena in Switzerland(UBS Geneva and Itau Private Bank), including any payments or transfers of funds into or that ended up in such accounts, whether directly or indirectly." Reference to those additional alleged accounts was made in both the (dismissed) Michigan Federal Court Action and the Michigan State Court Action, but is not made in the Amended Complaint in the Ashton New Jersey Action, clearly evidencing the improper efforts of Plaintiffs to use the Ashton New Jersey Action to conduct discovery relevant, if at all, only to the Michigan Actions. As a result, the request seeks information that is not relevant or proportional to the needs of this case, and beyond the permissible scope of discovery in this case. While we object to the request as being well outside the permissible scope of discovery, in the interests of

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **6** of **11**

narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; the privileged documents are limited to any personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure and will not be produced.

5.   Document request nos. 5-9 seek documents and communications relating to banking relationships (if any exist) with "any foreign bank accounts with which You are or have ever been affiliated in any way, directly or indirectly" (Request no. 5), "deposits or transfers into a United States financial institute where the source of funds directly or indirectly came from a foreign bank" (Request no. 6), "accounts maintained directly or indirectly at financial institutions inside or outside of the United States" (Request no. 7), "communications with any bank, financial institution or financial advisor located outside the United States" (Request no. 8) and the location and contents of any safe deposit box at any financial institution (Request no. 9).

Assuming, arguendo, that such foreign accounts exist, the request is made in the absence of any relationship, let alone relevance, between the claims in the Ashton New Jersey Action and the documents sought. Moreover, the request is not reasonably limited in time (extending back to January 1, 2009, per instruction no. 7), and Request no. 6 is not, for example, limited to deposits or transfers into accounts of any named individuals, rendering the request overly broad, not relevant to the claims made and not remotely proportional to the needs of the Ashton New Jersey Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

With respect to Request nos. 7 and 9 and to the extent the requests are construed to be limited to accounts in the name of Susanne Iacobelli (including accounts in US financial institutions), Plaintiffs' attempt to secure the personal financial information of Susanne Iacobelli seeks information that is not relevant to the claims made in the Ashton New Jersey Action or proportionate to the needs of the case, and therefore not within the permitted scope of discovery. In short, it is an unwarranted intrusion into the personal affairs of Susanne Iacobelli and any responsive documents will not be produced.

6.   Document request no. 10 seeks documents relating to alleged payments by FCA or the NTC into foreign bank accounts (how any such payments, other than perhaps to Mr. Ashton, could possibly be relevant to the claims is the Ashton New Jersey Action is a complete mystery). We object to the request for the reason that it seeks information that is not relevant to the claims made in the Ashton New Jersey Action or proportionate to the needs of the case, and therefore not within the permitted scope

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **7** of **11**

of discovery; and for the additional reason that given breadth of that request and without any guidelines as to how Mrs. Iacobelli could reasonably determine if any document "related to alleged payments," particularly in light of Susanne Iacobelli's status as a defendant in the NTC Action (and to the extent that any of the pleadings and papers filed, and discovery exchanged, might be responsive to the request), responding to the request as written would be unduly burdensome and costly. In the interests of narrowing the scope of any possible dispute, to the extent that the request is limited to payments to Mr. Ashton and the accounts identified in the Amended Complaint, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request and the privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced; and may include notes of her communications with her husband, which are also protected from involuntary disclosure and will not be produced.

7.  Document request no. 11 seeks documents and communications relating to FCA or the NTC allegedly paying or directing the payment of funds or proceeds into foreign bank accounts for the benefit of the UAW, its current or former officers,employees, or their relatives (including Joseph Ashton, Alphons Iacobelli, and Dennis Williams), or any charitable organization or other entity (including the Ashton Fund and Williams Charity Fund) associated with the UAW or any of its current or former officers, employees, or their relatives, including but not limited to Documents relating to opening, closing, or depositing funds into such foreign bank accounts. While we object to the request for the reason that it is well outside the permissible scope of discovery given the limited nature of Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty, and therefore the request is not proportional to the needs of this case, in the interests of narrowing the scope of any possible dispute we can advise that there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request. The privileged documents are limited to any personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced or any notes of her communications with her husband, which are protected by the spousal communication privilege from involuntary disclosure and will not be produced.

8.  Document request no. 12 seeks documents and communications relating to the investigation conducted by the U.S. Attorney's Office for the Eastern District of Michigan into the UAW, FCA, and Joseph Ashton. Again, while perhaps GM may be able to make an argument (we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **8** of **11**

to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty; and imposes an undue burden on Susanne Iacobelli, especially given the potential breadth of the request resulting from "GM/s" use of the vague phrase "relating to." Those objections notwithstanding, in the interests of narrowing the scope of any possible dispute, we can advise there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; and the privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure; and may include notes of her communications with her husband, which are also protected from involuntary disclosure and will not be produced.

9.   Document request no. 13 seeks documents and communications provided to the U.S. Attorney's Office for the Eastern District of Michigan in connection with that office's investigation into the UAW, FCA, and Joseph Ashton. For the reasons stated in connection with our objections to Document request no. 12, above, while perhaps GM may be able to make an argument (again, we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; and the privileged documents are limited to her personal notes taken in connection with the provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced.

10.   Document request no. 14 seeks documents and communications relating to any investigation conducted by any government authority or agency into the UAW, FCA, and Joseph Ashton. Again, while perhaps GM may be able to make an argument (we will wait and see) that any responsive documents sought are relevant to the extent the request is narrowed to the investigation of Joseph Ashton (which the request is not, given the definition of the word "and"), the request is in any event not proportional to the needs of this case – which claims are limited to Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty. In addition, any documents that Susanne Iacobelli may have would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege and will not be produced.

11.   Document request no. 15 seeks communications in Susanne Iacobelli's possession

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **9** of **11**

between Alphons Iacobelli and Peter DeLorenzo. Any documents that Susanne Iacobelli <u>may</u> have would only have been a result of privileged communications with her husband or with counsel, and are protected from involuntary disclosure by reason of the spousal communication privilege and/or the attorney client privilege. With that limitation, and while we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, we can advise that there are no non-privileged documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request; and the privileged documents are limited to her personal notes taken in connection with my provision of legal advice to her, all of which are protected by the attorney-client privilege from involuntary disclosure and will not be produced.

12.   Document request no. 16 seeks documents relating to Susanne Iacobelli's communications (if any) with Joseph or Denise Ashton. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

13.   Document request no. 17 seeks documents relating to communications between Susanne Iacobelli and Peter DeLorenzo. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

14.   Document request no. 18 seeks documents and communications that Alphons Iacobelli allegedly showed to Peter DeLorenzo and/or that Alphons Iacobelli allegedly brought to Alphons Iacobelli's meetings with Peter DeLorenzo in 2018 - again issues that have been raised in connection with Plaintiffs' attempts to amend the claims in the (dismissed) Michigan Federal Court Action and in The Second Amended Complaint the Michigan State Court Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

15.   Document request no. 19 seeks "[a]ll book outlines in Susanne Iacobelli's possession that Alphons Iacobelli created, as referenced in Paragraph 21 of the Peter DeLorenzo Declaration filed in *General Motors et al. v. Alphons Iacobelli et al.*, No. 20-011998-CB (Wayne County Circuit Court) – which clearly evidences that the request relates solely to the Michigan State Court Action. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **10** of **11**

16.    Document request no. 20 seeks documents and communications "with any FCA representative including outside counsel to FCA during the time period after Alphons Iacobelli ceased employment at FCA," despite the wholesale absence of any relationship, let alone relevancy, of such potential communications by non-party Susanne Iacobelli to the Plaintiffs' state law claims against Mr. Ashton for fraud and breach of fiduciary duty. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request

17.    Document request no. 21 seeks documents and communications "directly, through counsel, or through any third party with Jerome Durden or his agents or representatives." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

18.    Document request no. 22 seeks documents "sufficient to show" (whatever that means) all electronic devices that Alphons Iacobelli used to communicate with any third parties since he ceased working at FCA." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

19.    Document request no. 23 seeks documents and communications "sufficient to show" (again, whatever that means) "the business purpose and activities of Business Advisory Group (and any affiliates), notwithstanding the fact that Business Advisory Group is not a party to this action, or even identified as a person having discoverable information. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

20.    Document request no. 24 seeks documents and communications "sufficient to identify" (again, whatever that means) "other affiliates of Business Advisory Group over which You or Business Advisory Group had an overlapping ownership or interest," notwithstanding the fact that Business Advisory Group is not a party to this action, or even identified as a person having discoverable information. While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

21.    Document request no. 25 seeks a copy of Susanne Iacobelli's passport – a document

**EXHIBIT 2**

James Marina, Esq.
Casey McGushin, Esq.
December 24, 2021
Page **11** of **11**

that has no conceivable relevance to Plaintiffs' claims against Mr. Ashton for fraud and breach of fiduciary duty. In addition, given your clients' admitted "spoofing" of Mr. Iacobelli's email address, and the likelihood that it also "spoofed" Susanne Iacobelli's email address, it is clear that your clients cannot be trusted to maintain the confidentiality of personally identifiable information. The requested copy will not be produced.

22. Document request no. 26 seeks "[a]ll USB drives that Alphons Iacobelli used during his employment with GM." While we object to the request as being well outside the permissible scope of discovery, in the interests of narrowing the scope of any possible dispute, there are no documents in the possession, custody and/or control of Susanne Iacobelli responsive to this request.

Please note that the fact any specific request is not expressly objected to should not be construed as meaning that responsive items are in the possession, control or custody of my client.

This letter and the objections set forth herein are made without prejudice to, and expressly reserving, all additional objections and defenses that may exist in favor of Susanne Iacobelli to the subpoena *duces tecum*; and is not intended and shall not be construed and/or asserted to be a waiver of any such objections and/or defenses, or a waiver of any and all privileges that may exist in favor of Susanne Iacobelli or others including, but not limited to, the spousal communication privilege, the spousal privilege, the marital privilege and Susanne Iacobelli's privilege under the Fifth and Fourteenth Amendments to the United States Constitution, all of which being expressly preserved.

In addition, this letter and the amended objections set forth herein, are made without prejudice to Susanne Iacobelli seeking such other relief, including but not limited to payment by each of "GM" of the costs to be incurred in any further response to the subpoena *duces tecum* and/or appearing for any testimony, if ordered by the Court following a determination of the obligation to testify in light of the spousal privileged, as may be appropriate under the circumstances.

If you would like to further discuss this matter, please do not hesitate to contact me.

Very truly yours,

NEDELMAN LEGAL GROUP PLLC

Michael A. Nedelman

L/16220_2

**EXHIBIT 2**

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

      Plaintiffs,

v.

ALPHONS IACOBELLI, FCA US LLC, FIAT
CHRYSLER AUTOMOBILES, N.V., JEROME
DURDEN,

      Defendants.

Civil Action No. 20-011998-CB

Hon. David J. Allen

**PLAINTIFFS' RESPONSES AND
OBJECTIONS TO DEFENDANT
ALPHONS IACOBELLI'S FIRST
SET OF INTERROGATORIES**

---

Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Adam M. Wenner (P75309)
Shirin S. Goyal (P82528)
HONIGMAN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Tel: (313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
awenner@honigman.com
sgoyal@honigman.com

Hariklia Karis, P.C.
Jeffrey L. Willian, P.C.
Stacey G. Pagonis
Casey McGushin
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
casey.mcgushin@kirkland.com
stacey.pagonis@kirkland.com

Austin Norris
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (213) 680-8400
austin.norris@kirkland.com

Maisie Allison
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs*

**EXHIBIT 3**

## <u>PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT ALPHONS IACOBELLI'S FIRST SET OF INTERROGATORIES</u>

Pursuant to Michigan Court Rule 2.309, Plaintiffs General Motors LLC and General Motors Company ("GM"), by and through their undersigned counsel, hereby respond and object as follows to Defendant Alphons Iacobelli's ("Iacobelli" or "Defendant") First Set of Interrogatories to GM, dated April 6, 2022 (the "Interrogatories").

### GENERAL OBJECTIONS TO INTERROGATORIES

GM makes the following objections to the Interrogatories, which form a part of GM's response to each and every request and topic and are set forth herein to avoid repetition and duplication. Although some or all of these General Objections and Objections to Definitions and Instructions (collectively, the "General Objections") may be specifically invoked in a response to a specific interrogatory, failure to mention a General Objection specifically is not a waiver of any General Objection.

In asserting the following objections to the Interrogatories, GM does not waive and hereby expressly reserves the right to assert any and all objections to the admissibility into evidence at trial, summary disposition, and at any other point in the process, of any information produced in response to the Interrogatories or referred to in these responses. GM reserves the right to supplement its answers to these Interrogatories in the normal course of discovery and in line with any case management and scheduling orders entered by the Court. GM does not submit, adopt, or acquiesce in any factual or legal contention, assertion, assumption, characterization, or implication contained in the Interrogatories.

1.     GM objects to the Interrogatories and to the Instructions and Definitions to the extent they seek to impose on GM any obligation greater than or different from that required by

**EXHIBIT 3**

the Michigan Court Rules and/or any applicable case law or Court orders relevant to the proper scope, timing, and extent of discovery in this action.

2.      GM objects to the Interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery.   No such information is intended to be produced, and the inadvertent disclosure of any privileged information by GM shall not be deemed a waiver of any applicable privilege, doctrine, immunity, exemption, or limitation on discovery with respect to such information, or to the subject matter of the information, or GM's right to object to the use of such information during any later proceeding. In particular, GM has not waived, and will not waive, its privileges over any investigation conducted by GM's counsel or investigators retained by GM's counsel and working at counsel's direction.  *See United States v. Nobles*, 422 U.S. 225, 238 (1975) ("[T]he [work product] doctrine protect[s] material prepared by agents for the attorney as well as those prepared by the attorney himself.");  *see also J.A. Utley Co. v. Borchard*, 372 Mich. 367, 373 (1964);  *Aboeid v. Saudi Arabian Airlines, Inc.*, 2012 WL 3637430, at *3 (E.D.N.Y. Aug. 22, 2012); Michigan Court Rule 2.302 (materials "prepared in anticipation of litigation or for trial by or for another party or another party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent)," are protected work product).

3.      Nothing contained in GM's responses to the Interrogatories shall be construed as an admission by GM relative to the existence or non-existence of any information or documents.

4.      GM objects to the Interrogatories to the extent that they call for information not in the possession, custody, or control of GM or for information equally available to Defendant.

**EXHIBIT 3**

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      GM objects to the definition of "describe in detail" as overly broad, unduly burdensome, and vague, to the extent it seeks disclosure of "all relevant facts necessary for a complete understanding of the act, process, event or thing in question."  The term "complete understanding" is not defined and is a highly subjective term.  Further, this litigation is in an early stage and meaningful discovery has not yet been produced by Defendants, the parties who possess the vast majority of the relevant information to this litigation.  GM reserves the right to amend, supplement, and/or otherwise revise its interrogatory responses as discovery proceeds.

2.      GM objects to the definition of "legal basis" as overly broad, unduly burdensome, and premature to the extent it seeks GM's legal theories and principles and "all laws, statutes, cases, and authorities" in support of those theories and principles.  This litigation is in the early stages of discovery and GM will set forth its legal theories when required under an applicable case management order and/or pursuant to any other order by the Court.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify by date, subject matter, number of pages, author, sender and recipient (if applicable), each written item of "confidential GM information" (as that phrase is used at Second Amended Complaint ¶ 152) that Alphons Iacobelli allegedly provided to FCA.

### RESPONSE TO INTERROGATORY NO. 1:

GM objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and premature to the extent it requires GM to describe in detail "each written item of 'confidential GM information'" that Defendant provided to FCA.  In particular, this interrogatory is premature and burdensome in that it purports to require GM to identify each item that Defendant Iacobelli

**EXHIBIT 3**

printed and copied and/or provided to FCA, at the outset of this litigation and before any meaningful discovery has occurred.  At this stage of the litigation, it is Defendant and his co-conspirators—not GM—who have primary access to and control over the confidential information that Defendant shared with FCA.  GM anticipates that evidence relevant to its allegations and responsive to this interrogatory will be produced by Defendants or third parties in discovery, and GM has sought and will seek such evidence through discovery in this litigation.

Subject to and without waiver of these and the General Objections, GM responds that, upon information and belief, Defendant Iacobelli shared confidential information with FCA including documents containing GM's labor and negotiations strategy and presentations prepared for senior management.  GM reserves the right to amend, supplement, and otherwise revise this response as discovery proceeds and Defendants produce information that bears on this request.  Indeed, it is Defendant Iacobelli who has full awareness of what documents and information regarding GM that he provided to FCA and FCA NV.

**INTERROGATORY NO. 2:**

Except to the extent identified in response to the preceding Interrogatory, describe in detail each item of "confidential GM information" (as that phrase is used at Second Amended Complaint ¶ 152) that Alphons Iacobelli allegedly provided to FCA.

**RESPONSE TO INTERROGATORY NO. 2:**

GM objects to this interrogatory as duplicative of Interrogatory No. 1 and hereby incorporates its Response to Interrogatory No. 1 by reference.

**INTERROGATORY NO. 3:**

With respect to each item of "confidential GM information" (as that phrase is used at Second Amended Complaint ¶ 152) that Alphons Iacobelli allegedly provided to FCA:

**EXHIBIT 3**

a.  state when Mr. Iacobelli was provided with and/or accessed such item

b.  state the date that Mr. Iacobelli allegedly provided such item to FCA

c.  identify each person with access to such alleged "confidential GM information"

d.  describe in detail how that alleged "confidential GM information" was maintained by GM to ensure its continued confidentiality

### RESPONSE TO INTERROGATORY NO. 3:

GM objects to this interrogatory as duplicative of Interrogatory No. 1 and hereby incorporates its Response to Interrogatory No. 1 by reference.

GM further objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and premature to the extent it requires GM to describe details of Defendant Iacobelli's own illicit actions in providing "confidential GM information" to FCA. At this stage of the litigation, it is Defendant and his co-conspirators—not GM—who have primary access to and control over the confidential information that Defendant shared with FCA and/or the UAW. GM anticipates that evidence relevant to its allegations and responsive to this interrogatory will be produced by Defendants or third parties in discovery, and GM has sought and will seek such evidence through discovery in this litigation.

Subject to and without waiver of these and the General Objections, GM responds that, upon information and belief, Defendant Iacobelli shared GM's confidential information with FCA throughout Iacobelli's tenure at GM, particularly during the last several months of his employment. GM took multiple steps to protect the confidentiality of this information, including requiring Defendant Iacobelli to sign an agreement not to disclose GM's "trade secrets or other confidential/proprietary information" "to any person or entity." GM also required Defendant Iacobelli to commit to GM's Code of Conduct for honest and ethical employee behavior. In addition, GM limited the availability of confidential information to certain employees and as an

5

**EXHIBIT 3**

Executive at GM, Iacobelli was entrusted to maintain the confidentiality of that information and clearly aware that providing information to FCA regarding GM's labor strategy was inappropriate, prohibited, and a breach of fiduciary duty.  GM reserves the right to amend, supplement, and otherwise revise this response as discovery proceeds and Defendants produce information that bears on this request.

**INTERROGATORY NO. 4:**

Identify by date, subject matter, number of pages, author, sender and recipient (if applicable), each written item of "confidential labor strategy information" (as that phrase is used at Second Amended Complaint ¶ 157) that Alphons Iacobelli allegedly provided to FCA.

**RESPONSE TO INTERROGATORY NO. 4:**

GM objects to this interrogatory as duplicative of Interrogatory Nos. 1-3 and hereby incorporates its responses to those interrogatories by reference.

**INTERROGATORY NO. 5:**

Except to the extent identified in response to the preceding Interrogatory, describe in detail each item of "confidential labor strategy information" (as that phrase is used at Second Amended Complaint ¶ 157) that Alphons Iacobelli allegedly provided to FCA.

**RESPONSE TO INTERROGATORY NO. 5:**

GM objects to this interrogatory as duplicative of Interrogatory Nos. 1-4 and hereby incorporates its responses to those interrogatories by reference.

**INTERROGATORY NO. 6:**

With respect to each item of "confidential labor strategy information" (as that phrase is used at Second Amended Complaint ¶ 157) that Alphons Iacobelli allegedly provided to FCA, state:

**EXHIBIT 3**

   a.  state when Mr. Iacobelli was provided with and/or accessed such item

   b.  state the date that Mr. Iacobelli allegedly provided such item to FCA

   c.  identify each person with access to such alleged "confidential GM information"

   d.  describe in detail how that alleged "confidential GM information" was maintained by GM to ensure its continued confidentiality

**RESPONSE TO INTERROGATORY NO. 6:**

GM objects to this interrogatory as duplicative of Interrogatory No. 3 and hereby incorporates its response to Interrogatory No. 3 by reference.

**INTERROGATORY NO. 7:**

Identify by date, subject matter, number of pages, author, sender and recipient (if applicable), each written item of "GM's confidential information" (as that phrase is used at Second Amended Complaint ¶ 185) that Alphons Iacobelli allegedly provided to FCA.

**RESPONSE TO INTERROGATORY NO. 7:**

GM objects to this interrogatory as duplicative of Interrogatory Nos. 1, 2, 4, and 5 and hereby incorporates its responses to those interrogatories by reference.

**INTERROGATORY NO. 8:**

Except to the extent identified in response to the preceding Interrogatory, describe in detail each item of "GM's confidential information" (as that phrase is used at Second Amended Complaint ¶ 185) that Alphons Iacobelli allegedly provided to FCA.

**RESPONSE TO INTERROGATORY NO. 8:**

GM objects to this interrogatory as duplicative of Interrogatory Nos. 1, 2, 4, 5, and 7 and hereby incorporates its responses to those interrogatories by reference.

**EXHIBIT 3**

**INTERROGATORY NO. 9:**

With respect to each item of "GM's confidential information" (as that phrase is used at

Second Amended Complaint ¶ 152) that Alphons Iacobelli allegedly provided to FCA, state:

    a. state when Mr. Iacobelli was provided with and/or accessed such item

    b. state the date that Mr. Iacobelli allegedly provided such item to FCA

    c. identify each person with access to such alleged "confidential GM information"

    d. describe in detail how that alleged "confidential GM information" was maintained by GM to ensure its continued confidentiality

**RESPONSE TO INTERROGATORY NO. 9:**

GM objects to this interrogatory as duplicative of Interrogatory Nos. 3 and 6 and hereby

incorporates its responses to those interrogatories by reference.

**INTERROGATORY NO. 10:**

With respect to each and every foreign account referenced at Second Amended Complaint

paragraphs 7, 57, 67, 68, 69, 70, 73, 74, 112, 157 and/or 164:

    a. State the date the account was opened

    b. Identify the person who opened the account

    c. State the date the account was closed, if it has been closed

    d. State the account number

    e. Identify each account holder(s)

    f. Identify each and every beneficiary(ies) of the account

    g. Identify the signatory(ies) on and/or having access to the account

    h. Identify each person with "control" over the account (as the term "control" is used at Second Amended Complaint ¶ 67 and if different, Second Amended Complaint ¶ 69)

**EXHIBIT 3**

    i.   Describe each deposit(s) into the account, the identity of the depositor and the source of the funds deposited

    j.   Describe each withdrawal(s) from the account, and the identity of the person(s) making the withdrawal and for whose benefit the withdrawal was made

    k.   The most recent balance in the account, and the source of such information

**<u>RESPONSE TO INTERROGATORY NO. 10</u>:**

GM objects to this interrogatory on the grounds that it is overly broad and unduly burdensome to the extent it requires GM to identify detailed information about "each and every foreign account" used by Defendants in their scheme.  GM also objects to this interrogatory because, like other interrogatories above, it actually consists of numerous interrogatories by virtue of its extensive list of subparts.  GM further objects that information responsive to this interrogatory is necessarily in Defendants' possession, custody, or control.  It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations related to these accounts were made on the basis of an investigation that is protected by the work product and other privileges.  GM expects Defendants and/or relevant third parties to produce the evidence relevant to these allegations, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery.

Subject to and without waiver of these objections and the General Objections, GM responds that, upon information and belief, foreign accounts used by Defendants in this scheme exist at the following financial institutions: LGT Bank (Switzerland), Mason Private Bank (Liechtenstein), Shinsei Bank (Japan), Cayman National Bank (Cayman Islands), UBS (Switzerland), Credit Suisse (Switzerland), Deutsche Bank (Italy), VP Bank Vaduz

**EXHIBIT 3**

(Liechtenstein), DBS Bank (Singapore), LGT Bank Vaduz (Liechtenstein), Fortuna Bank (Luxembourg), UBS Geneva (Switzerland), Itau Private Bank (Switzerland), and VP Bank AG (Liechtenstein).

Further responding, the account numbers, transaction history, and other account details are within the knowledge of Defendants and their co-conspirators as GM does not yet possess this information.  GM reserves the right to amend, supplement, and otherwise revise this response as discovery proceeds and Defendants produce information that bears on this request.

**INTERROGATORY NO. 11:**

Identify each person with personal knowledge of the existence, ownership and/or control over each and every foreign account referenced at Second Amended Complaint 7, 57, 67, 68, 69, 70, 73, 74, 112, 157 and/or 164.

**RESPONSE TO INTERROGATORY NO. 11:**

GM objects to this interrogatory on the grounds that information responsive to this interrogatory is necessarily in Defendants' possession, custody, and/or control.  It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations related to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product and other privileges.  GM expects that the evidence relevant to these allegations will be produced by Defendants or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.

Subject to and without waiver of the foregoing and General Objections, GM responds that, based on its preliminary investigation, the following individuals and entities are likely to have knowledge of the foreign accounts referenced in the Second Amended Complaint: FCA, FCA NV,

**EXHIBIT 3**

Dennis Williams, Joseph Ashton, Alphons Iacobelli, Jerome Durden, Colin Lightbody, Linda Knoll, and Peter Glenn Shagena. GM reserves the right to amend, supplement, and otherwise revise this response as discovery proceeds and Defendants produce information that bears on this request.

**INTERROGATORY NO. 12:**

Describe in detail the damages that General Motors LLC claims to have suffered by reason of the alleged wrongdoing of Iacobelli as set forth in the Second Amended Complaint including, but not limited to, (a) who made the calculation of such damages; (b) the discrete components of such damage calculation; (c) the methodology used in calculating the alleged damages.

**RESPONSE TO INTERROGATORY NO. 12:**

GM objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and premature to the extent that it calls for a calculation of General Motors LLC's damages when GM's investigation and discovery has not yet been completed. GM further objects to this interrogatory as premature to the extent that it asks or purports to require GM to provide information that is the subject of forthcoming expert disclosures. GM will provide such disclosures as required under the relevant scheduling or case management order and/or as ordered by the Court.

Subject to and without waiver of the foregoing and General Objections, GM responds that, based upon its reasonable investigation to date, GM is seeking damages in an amount to be determined at trial, including but not limited to the billions of dollars in damages GM suffered as a result of Defendant and his co-conspirators' bribery scheme, breaches of fiduciary duty, fraud, unfair competition, and other unlawful acts.

**EXHIBIT 3**

Further responding, GM's damages from increased labor costs were imposed on GM in two ways.  First, starting no later than 2009, in return for bribes to former union officials, FCA secured labor cost advantages for itself and secured disadvantages to GM, causing GM to incur higher labor costs.  For example, through bribery, FCA secured workforce flexibility by eliminating hiring limits on less expensive employees; secured the union's support for a workplace efficiency program, which was refused to GM; and, in 2014, obtained a prescription formulary (denied to GM) that would have saved GM up to $20 million per year.  Second, in 2015, FCA bribed former union officials to select FCA as the lead company in collective bargaining negotiations.  The lead company negotiates a pattern agreement that is then imposed on other automakers.  FCA used the lead negotiating position to impose on GM an agreement vastly more expensive than the agreement GM would otherwise have negotiated.  The amount of GM's damages resulting from the Defendants' conduct, and calculations thereof, will be included in GM's expert disclosures upon the completion of discovery and at the time set by the Court.

**INTERROGATORY NO. 13:**

Describe in detail the damages that General Motors Company claims to have suffered by reason of the alleged wrongdoing of Iacobelli as set forth in the Second Amended Complaint including, but not limited to, (a) who made the calculation of such damages; (b) the discrete components of such damage calculation; (c) the methodology used in calculating the alleged damages.

**RESPONSE TO INTERROGATORY NO. 13:**

GM objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and premature to the extent that it calls for a calculation of General Motor Company's damages when GM's investigation and discovery has not yet been completed.  GM further objects to this

**EXHIBIT 3**

interrogatory as premature to the extent that it asks or purports to require GM to provide information that is the subject of forthcoming expert disclosures.  GM will provide such disclosures as required under the relevant scheduling or case management order and/or as ordered by the Court.

Subject to and without waiver of the foregoing and General Objections, GM responds that, based upon its reasonable investigation to date, GM is seeking damages in an amount to be determined at trial, including but not limited to the billions of dollars in damages GM suffered as a result of Defendant and his co-conspirators' bribery scheme, breaches of fiduciary duty, fraud, unfair competition, and other unlawful acts.

Further responding, GM's damages from increased labor costs were imposed on GM in two ways.  First, starting no later than 2009, in return for bribes to former union officials, FCA secured labor cost advantages for itself and secured disadvantages to GM, causing GM to incur higher labor costs.  For example, through bribery, FCA secured workforce flexibility by eliminating hiring limits on less expensive employees; secured the union's support for a workplace efficiency program, which was refused to GM; and, in 2014, obtained a prescription formulary (denied to GM) that would have saved GM up to $20 million per year.  Second, in 2015, FCA bribed former union officials to select FCA as the lead company in collective bargaining negotiations.  The lead company negotiates a pattern agreement that is then imposed on other automakers.  FCA used the lead negotiating position to impose on GM an agreement vastly more expensive than the agreement GM would otherwise have negotiated.  The amount of GM's damages resulting from the Defendants' conduct, and calculations thereof, will be included in GM's expert disclosures upon the completion of discovery and at the time set by the Court.

**EXHIBIT 3**

Dated:  May 25, 2022                    Respectfully submitted,

                                        **HONIGMAN LLP**

                                        By: */s/Jeffrey K. Lamb*
                                        Jeffrey K. Lamb (P76738)
                                        J. Michael Huget (P39150)
                                        Adam M. Wenner (P75309)
                                        Shirin S. Goyal (P82528)
                                        2290 First National Building
                                        660 Woodward Avenue
                                        Detroit, MI 48226
                                        Telephone: (313) 465-7000
                                        jlamb@honigman.com
                                        mhuget@honigman.com
                                        awenner@honigman.com
                                        sgoyal@honigman.com

                                        **KIRKLAND & ELLIS LLP**
                                        Hariklia Karis, P.C.
                                        Jeffrey L. Willian, P.C.
                                        Stacey G. Pagonis
                                        Casey McGushin
                                        300 North LaSalle
                                        Chicago, IL 60654
                                        Telephone: (312) 862-2000
                                        hariklia.karis@kirkland.com
                                        jeffrey.willian@kirkland.com
                                        casey.mcgushin@kirkland.com
                                        stacey.pagonis@kirkland.com

                                        Austin Norris
                                        2049 Century Park East
                                        Los Angeles, CA 90067
                                        Telephone: (213) 680-8400
                                        austin.norris@kirkland.com

                                        Maisie Allison
                                        555 South Flower Street
                                        Los Angeles, CA 90071
                                        Telephone: (213) 680-8400
                                        maisie.allison@kirkland.com

                                        *Attorneys for Plaintiffs*

**EXHIBIT 3**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date, May 25, 2022, I caused a true and correct

copy of the foregoing to be served, by electronic mail, upon the following counsel for Defendant

Alphons Iacobelli, with electronic copies to counsel for all Defendants.


**Michael A. Nedelman**
NEDELMAN LEGAL GROUP PLLC
28580 Orchard Lake Road, Suite 140
Farmington Hills, MI 48334
Email: mnedelman@nglegal.com


                                        */s/ Jeffrey K. Lamb*_____
                                        Jeffrey K. Lamb

**EXHIBIT 3**

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

GENERAL MOTORS LLC,
GENERAL MOTORS COMPANY,

       Plaintiffs,

v.

ALPHONS IACOBELLI, et al.

       Defendants.

Civil Action No. 20-011998-CB

Hon. David J. Allen

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT ALPHONS IACOBELLI'S FIRST SET OF REQUESTS FOR PRODUCTION**

---

Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Adam M. Wenner (P75309)
Shirin S. Goyal (P82528)
Keith D. Underkoffler (P84854)
HONIGMAN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Tel: (313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
awenner@honigman.com
sgoyal@honigman.com
kunderkoffler@honigman.com

Hariklia Karis, P.C. (*pro hac vice*)
Jeffrey Willian, P.C. (*pro hac vice*)
Stacey G. Pagonis (*pro hac vice*)
Casey McGushin (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
stacey.pagonis@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris (*pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (213) 680-8400
austin.norris@kirkland.com

Maisie Allison (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs*

**EXHIBIT 4**

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF REQUESTS FOR PRODUCTION**

Plaintiffs General Motors LLC and General Motors Company (collectively, "GM" or "Plaintiffs") respond as follows to Defendant Alphons Iacobelli's ("Iacobelli") First Set of Requests for Production to Plaintiffs (the "Requests," and each a "Request").

## GENERAL OBJECTIONS

Plaintiffs make the following objections to the Requests (together with the objections to definitions and objections to instructions, the "General Objections"), which form a part of Plaintiffs' response to each and every Request and are set forth here to avoid repetition and duplication. Although some or all of these General Objections may be specifically invoked in a response to a specific Request, failure to mention a General Objection specifically should not be construed as a waiver of any General Objection.

1.      Plaintiffs object to the Requests on the grounds that they are overly broad, unduly burdensome, vague, and ambiguous to the extent that they seek "all/any documents" or "all/any communications" relating to specific topics. Consistent with Plaintiffs' obligations under the Michigan Court Rules ("MCR"), and subject to their stated objections, any statement herein that Plaintiffs will produce documents responsive to a specific Request means that Plaintiffs will conduct a reasonably diligent search for documents in their possession, custody, and control. Plaintiffs' production will be completed in accordance with the deadline as agreed-upon by the parties in the Joint Proposed Discovery Schedule submitted to Judge Popke on March 1, 2022.

2.      Plaintiffs object to the Requests to the extent that they seek the production of documents protected from disclosure by any applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege, the work product doctrine, the common interest privilege, and any other applicable privilege.  Any inadvertent disclosure of any privileged information to Defendant shall not be deemed or construed to constitute a waiver of any privilege,

1

**EXHIBIT 4**

any other doctrine against disclosure, or Plaintiffs' right to object to the use of any document inadvertently disclosed. Plaintiffs reserve the right to demand that Defendant return to them any document inadvertently produced.

3.      Plaintiffs object to the Requests to the extent that they purport to require Plaintiffs to produce documents not within their possession, custody, or control.  By making these objections and responses, Plaintiffs do not concede that they have in their possession, custody, or control any documents responsive to a particular Request.

4.      Plaintiffs object to the time period of the requests to the extent they seek documents from January 1, 2007, as unduly burdensome, overbroad, disproportionate to the needs of the case and irrelevant to any claims or defenses.

5.      Plaintiffs reserve all objections that may be available to them at any hearing or trial or on any motion as to the use or admissibility of any information provided. Plaintiffs' decision to provide information in response to the Requests does not constitute an admission by Plaintiffs that such information is relevant to this action or admissible in evidence, nor does it constitute an agreement that a request for similar information in this or any related proceedings will be treated in a similar matter.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      Plaintiffs object to the Instructions to the extent that they purport to impose any requirement or obligation not imposed by the Michigan Court Rules or an order of the Court.

2.      Plaintiffs object to Definition Nos. 2, 4, and 10 overly broad, vague, ambiguous, and premature as discovery is ongoing and has not yet been completed.

3.      Plaintiffs object to Definition No. 3 as overly broad, unduly burdensome, vague, and ambiguous. Plaintiffs will produce electronically stored information pursuant to an ESI protocol agreed-upon by the parties and/or ordered by the Court.

**EXHIBIT 4**

## SPECIFIC RESPONSES AND OBJECTIONS

### REQUEST FOR PRODUCTION NO. 1:

Produce all documents that, with respect to each and every foreign account referenced at Second Amended Complaint paragraphs 7,57,67,68,69,70,73,74,112,157 and/or 164, reflect, evidence and/or identify:

a. The date the account was opened
b. The date the account was closed, if it has been closed
c. The account number
d. The account holder(s)
e. The beneficiary(ies) of the account
f. The signatory(ies) on and/or having access to the account
g. The identity of each person with "control" over the account (as the term "control" is used at Second Amended Complaint ¶65 and if different, Second Amended Complaint ¶67)
h. Any deposit(s) into the account
i. Any withdrawal(s) from the account
j. The balance in the account at any time

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges.  GM expects that discoverable evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive, and to the extent the documents are publicly available and thus equally accessible to Defendant.

Subject to and without waiving the foregoing and the General Objections, with respect to subsection "d" of this Request, GM will produce the non-privileged GreyList reports reflecting factual findings related to the foreign accounts.  GM will not produce, however, documents concerning its

**EXHIBIT 4**

investigation into Defendants' foreign accounts that are protected by the attorney work product or other privileges.   Further responding, GM does not have non-privileged documents responsive to the remaining subsections of this Request in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 2:**

Produce all documents that, with respect to each and every foreign account referenced at Second Amended Complaint paragraphs 7,57,67,68,69,70,73,74,112,157 and/or 164, reflect, evidence or describes:

a. The manner in which the account was opened (in person, remotely, etc)
b. The documents that were furnished to the foreign financial institution in connection with opening of the account
c. How, if at all, Alphons Iacobelli, any member of his family and/or any entity under his control had any interest in, control of and/or otherwise dealt with such account.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges.  GM expects that discoverable evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive, and to the extent the documents are publicly available and thus equally accessible to Defendant.

Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant. GM will not produce, however, documents concerning its investigation into Defendant's foreign accounts that are protected by the attorney work product or other privileges.  Further responding, GM does not have non-privileged

**EXHIBIT 4**

documents responsive to subsections "a" and "b" of this Request in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 3:**

      Produce all documents that reflect the factual basis for, evidence and/or support the allegation at Second Amended Complaint ¶68(a) that Mr. Iacobelli had "control over millions of dollars held in financial accounts in Switzerland (UBS and Credit Suisse)."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

      GM objects to this Request on the grounds that the Second Amended Complaint filed in this matter does not contain a ¶ 68(a); the quoted language is found in ¶ 69(a). Nevertheless, GM responds as follows: GM further objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM— who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges.  GM expects that evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive, and to the extent the documents are publicly available and thus equally accessible to Defendant.

      Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant.  GM will not produce, however, documents concerning its investigation into Defendant's foreign accounts that are protected by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 4:**

      Produce all documents that reflect the factual basis for, evidence and/or support the allegation at Second Amended Complaint ¶69(a) that Mr. Iacobelli had "control over millions of dollars held in financial accounts in … Italy (Deutsche Bank)."

**EXHIBIT 4**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts. Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges. GM expects that evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant. GM will not produce, however, documents concerning its investigation into Defendant's foreign accounts that are protected by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 5:**

Produce all documents that reflect the factual basis for, evidence and/or support the allegation at Second Amended Complaint ¶69(a) that Mr. Iacobelli had "control over millions of dollars held in financial accounts in … Liechtenstein (VP Bank Vaduz)."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts. Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges. GM expects that evidence relevant to

**EXHIBIT 4**

these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant.  GM will not produce, however, documents concerning its investigation into Defendant's foreign accounts that are protected by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 6:**

Produce all documents that evidence, reflect and/or support the factual basis for, evidence and/or support the allegation at Second Amended Complaint ¶69(a) that Mr. Iacobelli had "control over millions of dollars held in financial accounts in … Singapore (DBS Bank)."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges.  GM expects that evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant.  GM will not produce,

**EXHIBIT 4**

however, documents concerning its investigation into Defendant's foreign accounts that are protected by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 7:**

Produce all documents that evidence, reflect and/or support the alleged establishment, creation and/or origination by and/or on behalf of any person, firm and/or entity other than Defendant Iacobelli, of any bank account in the name of and/or for the benefit of Defendant Iacobelli.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges.  GM expects that evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant.  GM will not produce, however, documents concerning its investigation into Defendant's foreign accounts that are protected by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 8:**

Produce all documents containing "confidential GM information" (as that phrase is used at Second Amended Complaint ¶152) that Alphons Iacobelli allegedly provided to FCA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

GM objects that documents responsive to this Request are necessarily in Defendants'

**EXHIBIT 4**

possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have direct access to and control over documents that relate to Defendant's participation in the secret bribery scheme underlying GM's Second Amended Complaint.  In short, it is Defendants Iacobelli, FCA, and FCA NV who are aware of what documents and information regarding GM Iacobelli provided to the co-conspirators. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM states that during the last several months of Iacobelli's employment with GM (including when Iacobelli would have been aware that the indictment against him was going to be unsealed), he printed an unusually high number of highly confidential GM documents on the printer located in his private GM office.  Moreover, from November 2016 through his departure from GM shortly after his July 26, 2017 indictment was publicized, Iacobelli printed an unusually and unreasonably large number of documents—far beyond any reasonable limit to perform his job function in good faith.  The majority of these documents contained highly confidential and commercially sensitive information including forward-looking strategy documents and sensitive presentations prepared for GM's most senior management.   Several of these documents were printed to non-GM printers, and Iacobelli also used certain non-GM external drives in connection with copying GM's highly-confidential documents.  Further responding, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 9:**

Produce all documents that in any manner reflect the factual basis for, evidence and/or support the allegation at Second Amended Complaint ¶152 that Mr. Iacobelli provided FCA and other conspirators with "confidential GM information" (as that phrase is used at Second Amended Complaint ¶152).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

GM objects to the extent that documents responsive to this Request are in Defendants'

**EXHIBIT 4**

possession or equally available to Defendants.  It is Defendant and his co-conspirators—not GM—who have direct access to and control over the documents and information that relate to Defendant's participation in the secret bribery scheme underlying GM's Second Amended Complaint.  In short, it is Defendants Iacobelli, FCA, and FCA NV who are aware of what documents and information regarding GM Iacobelli provided to the co-conspirators.  GM also objects to this Request to the extent it calls for the production of documents protected from disclosure by any applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege and the work product doctrine. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM states that during the last several months of Iacobelli's employment with GM (including when Iacobelli would have been aware that the indictment against him was going to be unsealed), he printed an unusually high number of highly confidential GM documents on the printer located in his private GM office.   Moreover, from November 2016 through his departure from GM shortly after his July 26, 2017 indictment was publicized, Iacobelli printed an unusually and unreasonably large number of documents—far beyond any reasonable limit to perform his job function in good faith.  The majority of these documents contained highly confidential and commercially sensitive information including forward-looking strategy documents and sensitive presentations prepared for GM's most senior management.   Several of these documents were printed to non-GM printers, and Iacobelli also used certain non-GM external drives in connection with copying GM's highly-confidential documents. Further responding, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 10:**

Produce all documents containing "confidential labor strategy information" (as that phrase is used at Second Amended Complaint ¶157) that Mr. Iacobelli allegedly passed "to the UAW, FCA, and FCA NV."

**EXHIBIT 4**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have direct access to and control over documents that relate to Defendant's participation in the secret bribery scheme underlying GM's Second Amended Complaint. In short, it is Defendants Iacobelli, FCA, and FCA NV who are aware of what documents and information regarding GM that Iacobelli provided to the co-conspirators. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM states that during the last several months of Iacobelli's employment with GM (including when Iacobelli would have been aware that the indictment against him was going to be unsealed), he printed an unusually high number of highly confidential GM documents on the printer located in his private GM office. Moreover, from November 2016 through his departure from GM shortly after his July 26, 2017 indictment was publicized, Iacobelli printed an unusually and unreasonably large number of documents—far beyond any reasonable limit to perform his job function in good faith. The majority of these documents contained highly confidential and commercially sensitive information including forward-looking strategy documents and sensitive presentations prepared for GM's most senior management. Several of these documents were printed to non-GM printers, and Iacobelli also used certain non-GM external drives in connection with copying GM's highly-confidential documents. Further responding, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 11:**

Produce all documents that in any manner reflect the factual basis for, evidence and/or support the allegation at Second Amended Complaint ¶157 that Mr. Iacobelli passed "to the UAW, FCA, and FCA NV the confidential labor strategy information he obtained at GM."

**EXHIBIT 4**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

GM objects to this Request as duplicative of Request Nos. 8-10 and hereby incorporates its responses to those requests by reference.

**REQUEST FOR PRODUCTION NO. 12:**

Produce all documents containing the "GM's confidential information" (as that phrase is used at Second Amended Complaint ¶185) that Alphons Iacobelli allegedly "funneled" to FCA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

GM objects to this Request as duplicative of Request Nos. 8-11 and hereby incorporates its responses to those requests by reference.

**REQUEST FOR PRODUCTION NO. 13:**

Produce all documents that in any manner reflect the factual basis for, evidence and/or support the allegation at Second Amended Complaint ¶185 that Mr. Iacobelli allegedly "funneled" to FCA and other alleged conspirators "GM's confidential information" (as that phrase is used at Second Amended Complaint ¶185).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

GM objects to this Request as duplicative of Request Nos. 8-12 and hereby incorporates its responses to those requests by reference.

**REQUEST FOR PRODUCTION NO. 14:**

Produce all documents that identify, evidence and/or reflect the documents alleged at Second Amended Complaint ¶158 to have been saved to "certain non-GM external drives."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have direct access to and control over documents that relate to Defendant's participation in the secret bribery scheme underlying GM's Second Amended Complaint. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

**EXHIBIT 4**

Subject to and without waiving the foregoing and the General Objections, GM will conduct a

reasonable search and produce non-privileged documents responsive to this Request that are located

through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 15:**

All documents that identify, evidence and/or reflect the "documents printed by
Iacobelli [that] were not accounted for in his office, i.e., … documents [that] were not found in hard
copy format in his office at the time of his termination…" as alleged at Second Amended Complaint
¶159.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

GM objects that documents responsive to this Request are necessarily in Defendants'

possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have

direct access to and control over documents that relate to Defendant's participation in the secret bribery

scheme underlying GM's Second Amended Complaint. GM further objects to this Request to the extent

it calls for GM to produce documents that are proprietary and confidential to GM and therefore must

be subject to a protective order.  GM further objects to this Request to the extent it seeks information

protected from disclosure by the attorney-client privilege, the attorney work product, or any other

applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM

has not and will not waive.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a

reasonable search and produce non-privileged documents responsive to this Request that are located

through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 16:**

All documents provided by and/or on behalf of Plaintiffs, or either of them, on the one
hand, to the United States or any agency thereof including, but not limited to, the United States
Department of Justice, the United States Internal Revenue Service, and/or the United States
Attorneys' Office for the Eastern District of Michigan, that mention, refer to, and/or relate to
Alphons Iacobelli.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

**EXHIBIT 4**

GM objects to this Request to the extent it calls for Plaintiffs to produce documents that are proprietary and confidential to Plaintiffs and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, Plaintiffs will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 17:**

All documents provided by and/or on behalf of Plaintiffs, or either of them, on the one hand, to the United States or any agency thereof including, but not limited to, the United States Department of Justice, the United States Internal Revenue Service, and/or the United States Attorneys' Office for the Eastern District of Michigan, that mention, refer to, and/or relate to Joseph Ashton.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

GM objects to this Request to the extent it calls for Plaintiffs to produce documents that are proprietary and confidential to Plaintiffs and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, Plaintiffs will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 18:**

Documents provided by and/or on behalf of Plaintiffs, or either of them, on the one hand, to the United States or any agency thereof including, but not limited to, the United States Department of Justice, the United States Internal Revenue Service, and/or the United States Attorneys' Office for the Eastern District of Michigan, that mention, refer to, and/or relate to FCA US.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM does not have non-privileged documents responsive to this Request in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 19:**

14

**EXHIBIT 4**

All documents provided by and/or on behalf of Plaintiffs, or either of them, on the one hand, to the United States or any agency thereof including, but not limited to, the United States Department of Justice, the United States Internal Revenue Service, and/or the United States Attorneys' Office for the Eastern District of Michigan, that mention, refer to, and/or relate to Stellantis NV.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

GM objects to this Request to the extent it calls for GM to produce documents that are

proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM does not have

non-privileged documents responsive to this Request in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 20:**

All documents provided by and/or on behalf of Plaintiffs, or either of them, on the one hand, to the United States or any agency thereof including, but not limited to, the United States Department of Justice, the United States Internal Revenue Service, and/or the United States Attorneys' Office for the Eastern District of Michigan, that mention, refer to, and/or relate to Jerome Durden.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

GM objects to this Request to the extent it calls for GM to produce documents that are

proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM does not have

any non-privileged documents responsive to this Request in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 21:**

All documents considered by Plaintiffs, or either of them, to be confidential and/or propriety, and claimed by Plaintiffs, or either of them, to have been improperly disclosed by Defendant Iacobelli to any third party.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

GM objects to this Request as duplicative of Request Nos. 8-13 and hereby incorporates its

responses to those requests by reference.

**REQUEST FOR PRODUCTION NO. 22:**

15

**EXHIBIT 4**

All documents considered by Plaintiffs, or either of them, to be confidential and/or propriety, and claimed by Plaintiffs, or either of them, to have been improperly disclosed by any person, firm and/or entity alleged to be a co-conspirator with Defendant Iacobelli, to any third person.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have direct access to and control over documents that relate to Defendant's participation in the secret bribery scheme underlying GM's Second Amended Complaint.  In short, it is Defendant and his co-conspirators who are aware of what documents and information regarding GM Defendant or his co-conspirators improperly disclosed to third-parties. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 23:**

All documents that evidence and/or support the alleged establishment, creation and/or origination by and/or on behalf of any person, firm and/or entity other than Defendant Iacobelli, of any bank account in the name of, for the benefit of and/or under the control of Defendant Iacobelli.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges.  GM expects that evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM

**EXHIBIT 4**

has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant.  GM will not produce, however, documents concerning its investigation into Defendant's foreign accounts that are protected by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 24:**

All documents in the possession, custody and/or control of Plaintiffs, or either of them, that evidence and/or support the existence of any bank account in the name of, for the benefit of and/or under the control of Defendant Iacobelli.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have access to and control over Defendants' foreign bank accounts.  Accordingly, GM's allegations relating to these accounts were made on "information and belief" as informed by an investigation that is protected by the work product doctrine and other privileges.  GM expects that evidence relevant to these allegations will be produced by Defendants and/or relevant third parties in discovery, and GM has sought such evidence through discovery requests served in this litigation.  GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

Subject to and without waiving the foregoing and the General Objections, GM will produce the non-privileged GreyList reports reflecting factual findings related to Defendant.  GM will not produce, however, documents concerning its investigation into Defendant's foreign accounts that are protected

**EXHIBIT 4**

by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 25:**

   The employment file maintained by Plaintiffs, or either (or both) of them, concerning Alphons Iacobelli including, but not limited to, all documents evidencing and/or reflecting any investigation and/or "background check" conducted by and/or on behalf of and/or for the benefit of Plaintiff(s) prior to his employment, discussions and/or communications preceding his employment, the terms and conditions of his employment, and/or the termination of Defendant Iacobelli's employment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

  GM will produce non-privileged documents relating to its employment of Alphons Iacobelli

and documents consisting of any background check of Mr. Iacobelli prior to his employment subject

to the following objections:  GM objects to this Request on the grounds that it is overly broad and

unduly burdensome in that it seeks "discussions and/or communications preceding his employment,

the terms and conditions of his employment, and/or the termination of Defendant Iacobelli's

employment" without proper limitations as to time, scope, and relevancy. GM will not conduct a search

of every potential employee seeking relevant documents in response to this Request. GM also objects

to the term "employment file" as vague and ambiguous.  GM further objects to this Request to the

extent it calls for the production of documents protected from disclosure by any applicable privilege

and/or legal obligation, including, without limitation, the attorney-client privilege and the work product

doctrine.

**REQUEST FOR PRODUCTION NO. 26:**

   All documents reflecting and/or evidencing contributions by and/or on behalf of, or for the benefit of, Plaintiffs, or either (or both) of them, or any of their predecessors in interest, to the Center for Human Resources.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

  GM objects that this Request seeks documents that are not relevant or proportional to any

parties' claims or defenses. GM further objects to this Request to the extent it seeks information

protected from disclosure by the attorney-client privilege, the attorney work product, or any other

**EXHIBIT 4**

applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.  GM also objects to this request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST FOR PRODUCTION NO. 27:

All documents reflecting and/or evidencing the use and/or disposition of funds by the Center for Human Resources, for the benefit of any officer and/or director of the International Union United Automobile, Aerospace and Agricultural Implement Workers of America.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 27:

GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.  GM also objects to this request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST FOR PRODUCTION NO. 28:

All complaint(s) filed by Robert Cleghorn, including but not limited to those relating to alleged improprieties in the GM procurement process and the requirement that donations to Joseph Ashton's charity(ies) were required to be made by vendors and/or prospective vendors in order for such vendor(s) to remain and/or be added to the GM approved vendor list(s); and GM's investigation into those alleged improprieties.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 28:

GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other

**EXHIBIT 4**

applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.  GM also objects to this Request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

### REQUEST FOR PRODUCTION NO. 29:

   All documents that evidence and/or reflect approval by Plaintiffs, or either of them, or their predecessors in interest, of a contract and/or agreement between the Center for Human Resources (the "CHR") and Disneyworld, EPCOT Center and any Disney-owned, branded and/or managed hotels.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 29:

  GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.  GM also objects to this Request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

### REQUEST FOR PRODUCTION NO. 30:

   All documents that evidence and/or reflect approval by Plaintiffs, or either of them, or their predecessors in interest, of payments made by the CHR to and/or for the benefit of NASCAR.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 30:

  GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM

**EXHIBIT 4**

has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order. GM also objects to this Request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 31:**

All documents that evidence and/or reflect approval by Plaintiffs, or either of them, or their predecessors in interest, of payments made by the CHR in connection with the sponsorship of NASCAR and/or NASCAR-related events.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order. GM also objects to this Request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 32:**

All Memorandum(s) of Understanding, both published and unpublished, between Plaintiffs, or either of them, or their predecessors in interest, and the International Union, United Automobile, Aerospace and Agricultural Workers of America (the "UAW") relating to each collective bargaining agreement between Plaintiffs (or either of them, or their predecessors in interest) and the UAW since and including that collective bargaining agreement ratified in 2007.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

GM objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are

**EXHIBIT 4**

proprietary and confidential to GM and therefore must be subject to a protective order.  GM also objects

to this Request as overbroad and unduly burdensome in seeking documents from 2007 as the 2007

CBAs are not at issue in this case and are not reasonably calculated to lead to the discovery of

admissible evidence.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a

reasonable search and produce non-privileged documents from no earlier than 2009 responsive to this

Request that are located through that search pursuant to a protective order.

### REQUEST FOR PRODUCTION NO. 33:

All agreements, including but not limited to the so-called "drawer letters," both
published and unpublished, between Plaintiffs, or either of them, or their predecessors in interest, on
the one hand, and the UAW and/or any local thereof, on the other, relating to each collective
bargaining agreement since and including that 2007 collective bargaining agreement between
Plaintiffs (or either of them, or their predecessors in interest) and the UAW.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 33:

GM objects to this Request as duplicative of Request No. 32 and incorporates its response to

that request herein.

In further response, GM objects to this Request to the extent it seeks information protected from

disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege,

doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not

waive. GM further objects to this Request to the extent it calls for GM to produce documents that are

proprietary and confidential to GM and therefore must be subject to a protective order.  Moreover, GM

objects to the term "drawer letters" as undefined and vague.  GM also objects to this Request as

overbroad and unduly burdensome in seeking documents from 2007 as the 2007 CBAs are not at issue

in this case and are not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a

reasonable search and produce non-privileged documents from no earlier than 2009 responsive to this

Request that are located through that search pursuant to a protective order.

**EXHIBIT 4**

**REQUEST FOR PRODUCTION NO. 34:**

All documents evidencing and/or reflecting payments (including any remittances designated and/or identified as "administrative fees" and/or the so-called "Gettlefinger Tax") by Plaintiffs, or either of them, or their predecessors in interest, to the CHR, whether or not thereafter remitted to the UAW and/or any other person, firm and/or entity.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order. GM also objects to this Request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 35:**

All documents evidencing and/or reflecting the employment by the CHR of all UAW leadership relatives and/or political appointees, and the knowledge and/or approval by Plaintiffs, or either of them, or their predecessors in interest, of such employment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order. GM also objects to this Request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

**EXHIBIT 4**

**REQUEST FOR PRODUCTION NO. 36:**

All documents evidencing and/or reflecting reference by Plaintiffs, or either of them, or their predecessors in interest, to the CHR as the "Center for Hidden Relatives."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

GM objects that this Request seeks documents that are not relevant or proportional to any parties' claims or defenses. GM further objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. Moreover, GM objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order. GM also objects to this Request because it is overbroad, vague, outside the scope of proper discovery, and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 37:**

All documents provided by Peter DeLorenzo to Plaintiffs, or either of them; and by and/or on behalf of Plaintiffs, or either of them, to Peter DeLorenzo.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

GM objects to this Request on the grounds that it is overly broad and unduly burdensome to the extent it requires GM to produce "all documents" provided by or sent to Mr. DeLorenzo on any topic whatsoever over a span of fourteen years. GM will construe this request to seek documents provided by or sent to Mr. DeLorenzo on GM's behalf that relate to GM's allegations in this litigation or related litigations.

Subject to and without waiver of the foregoing and the General Objections, GM refers Defendant to Mr. DeLorenzo's declaration attached as an exhibit to the Second Amended Complaint. Further responding, no other documents have been provided by or sent to Mr. DeLorenzo by GM or on its behalf relating to GM's allegations in this litigation or related litigations.

**EXHIBIT 4**

**REQUEST FOR PRODUCTION NO. 38:**

All documents that evidence, mention and/or reflect any all agreement(s) between Plaintiffs, or either of them, on the one hand, and Peter DeLorenzo, on the other.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

GM objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.  In addition, GM objects to this request on the grounds that the request for "all documents" renders the request unduly broad and burdensome.

Subject to and without waiving the foregoing and the General Objections, Plaintiffs state that Mr. DeLorenzo, through his affiliated company AutoExtremist Agency, Inc., was first retained by General Motors LLC as an outside consultant on the product strategy and design of GM's Cadillac vehicles and electric car programs in May 2019 and the consulting agreement was renewed in subsequent years.  Although none of the consulting agreements relate in any way to the allegations in the SAC or to Mr. DeLorenzo's interactions with Defendant Iacobelli, GM will produce documents sufficient to show the terms of the consulting agreements entered into with Mr. DeLorenzo pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 39:**

All drafts of the Affidavit of Peter DeLorenzo, attached to the Second Amended Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

GM objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

**EXHIBIT 4**

Subject to and without waiving the foregoing and the General Objections, GM does not have any non-privileged documents responsive to this Request in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 40:**

All documents that reflect the value of the services provided by the employees represented by the UAW, to and/or for the benefit of Plaintiffs, or either of them, pursuant to the 2011 GM-UAW Collective Bargaining Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes "the value of the services provided by the employees represented by the UAW, to and/or for the benefit of Plaintiffs, or either of them, pursuant to the 2011 GM-UAW Collective Bargaining Agreement."

Provided that Defendant is able to offer more specificity as to what types of documents he is referring to in this Request, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search.

**REQUEST FOR PRODUCTION NO. 41:**

All documents that reflect the value of the services provided by the employees represented by the UAW, provided to and/or for the benefit of Plaintiffs, or either of them, pursuant to the 2015 GM-UAW Collective Bargaining Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes "the value of the services provided by the employees represented by the UAW, to and/or for the benefit of Plaintiffs, or either of them, pursuant to the 2015 GM-UAW Collective Bargaining Agreement."

Provided that Defendant is able to offer more specificity as to what types of documents he is referring to in this Request, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search.

**REQUEST FOR PRODUCTION NO. 42:**

All documents that reflect the difference in the <u>cost</u> to Plaintiffs of the services provided to and/or for the benefit of Plaintiffs, or either of them, and the <u>value</u> of the services provided by the employees represented by the UAW to and/or for the benefit of Plaintiffs, or either of them,

**EXHIBIT 4**

pursuant to the 2011 GM-UAW Collective Bargaining Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes "the difference in the <u>cost</u> to Plaintiffs of the services provided to and/or for the benefit of Plaintiffs, or either of them, and the <u>value</u> of the services provided by the employees represented by the UAW to and/or for the benefit of Plaintiffs, or either of them, pursuant to the 2011 GM-UAW Collective Bargaining Agreement."   As written, GM is unable to respond to this Request.

**REQUEST FOR PRODUCTION NO. 43:**

All documents that reflect the difference in the cost of the services provided to and/or for the benefit of Plaintiffs, or either of them, and the value of the services provided by the employees represented by the UAW to and/or for the benefit of Plaintiffs, or either of them, pursuant to the 2015 GM-UAW Collective Bargaining Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

GM objects to this Request as duplicative of Request No. 42 and hereby incorporates its response to that request by reference.

**REQUEST FOR PRODUCTION NO. 44:**

All documents that assert, mention or reflect that the conduct of the UAW in connection with the negotiation and/or implementation of the 2011 GM-UAW collective bargaining agreement constituted, or the UAW was engaged in, an unfair labor practice.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 44:**

GM further objects to this Request on the grounds that it is vague and ambiguous as to what constitutes an "unfair labor practice." GM further objects to this Request to the extent it calls for GM to produce documents not within its possession, custody, or control, and to the extent the documents are publicly available and thus equally accessible to Defendant.  GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have primary access to and control over information regarding actions taken in furtherance of their conspiracy to harm GM. GM also objects to this Request to the

27

**EXHIBIT 4**

extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 45:**

All documents that assert, mention or reflect the conduct of the UAW in connection with the negotiation and/or implementation of the 2015 GM-UAW Collective bargaining agreement constituted, or the UAW engaged in, an unfair labor practice.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes an "unfair labor practice." GM further objects to this Request to the extent it calls for GM to produce documents not within its possession, custody, or control, and to the extent the documents are publicly available and thus equally accessible to Defendant. GM objects that documents responsive to this Request are necessarily in Defendants' possession, custody, and/or control. It is Defendant and his co-conspirators—not GM—who have primary access to and control over information regarding actions taken in furtherance of their conspiracy to harm GM.  GM also objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which protections GM has not and will not waive. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a

**EXHIBIT 4**

reasonable search and produce non-privileged documents responsive to this Request that are located

through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 46:**

All documents that evidence agreement by the UAW with GM, as of September 13, 2015, to the terms of a collective bargaining agreement to govern the period commencing September 15, 2015.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes

"evidence agreement." GM further objects to this Request to the extent it calls for GM to produce

documents not within its possession, custody, or control, and to the extent the documents are publicly

available and thus equally accessible to Defendant. GM further objects to this Request to the extent it

seeks information protected from disclosure by the attorney-client privilege, the attorney work product,

or any other applicable privilege, doctrine, immunity, exemption, or limitation on discovery, which

protections GM has not and will not waive. GM further objects to this Request to the extent it calls for

GM to produce documents that are proprietary and confidential to GM and therefore must be subject

to a protective order.  As written, GM is unable to respond to the Request.

**REQUEST FOR PRODUCTION NO. 47:**

All documents that evidence, mention and/or support "GreyList's analysis and results" referenced at Second Amended Complaint ¶74.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47:**

GM objects to this Request to the extent it seeks information protected from disclosure by the

attorney-client privilege, the attorney work product, or any other applicable privilege, doctrine,

immunity, exemption, or limitation on discovery, which protections GM has not and will not waive.

GM further objects to this Request to the extent it calls for GM to produce documents that are

proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will produce the

**EXHIBIT 4**

non-privileged GreyList reports reflecting factual findings related to Defendant.  GM will not produce,

however, documents concerning its investigation into Defendants' foreign accounts that are protected

by the attorney work product or other privileges.

**REQUEST FOR PRODUCTION NO. 48:**

>          All documents that evidence and/or support Plaintiff's assertion that the purpose of the
> improper payments by and/or for the benefit of FCA US LLC to officials of non-party International
> Union, United Automobile, Aerospace and Agricultural Workers of America (the "UAW"), which
> payments were made to "obtain benefits, concessions, and advantages *for FCA* in its dealings with
> the UAW," was to "harm GM."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48:**

GM objects to this Request on the grounds that it calls for GM to produce documents not within

its possession, custody, or control. It is Defendant and his co-conspirators—not GM—who have direct

access to and control over documents that relate to Defendant's participation in the secret bribery

scheme underlying GM's Second Amended Complaint. GM also objects to this Request to the extent

it calls for the production of documents protected from disclosure by any applicable privilege and/or

legal obligation, including, without limitation, the attorney-client privilege and the work product

doctrine. Responsive documents may exist but are protected by the work product privilege and other

privileges; such documents will not be produced. GM further objects to this Request to the extent it

calls for GM to produce documents that are proprietary and confidential to GM and therefore must be

subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM refers Defendant

to Mr. DeLorenzo's declaration attached as an exhibit to the Second Amended Complaint.   Further

responding, GM will conduct a reasonable search and produce non-privileged documents responsive

to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 49:**

>          All documents that evidence and/or support Plaintiffs' assertion at Second Amended
> Complaint ¶91 that the "primary purpose" of the improper payments by and/or for the benefit of FCA
> US LLC to officials of non-party UAW, which payments were made to "obtain benefits, concessions,

**EXHIBIT 4**

and advantages *for FCA* in its dealings with the UAW," <u>was to "harm GM</u>."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

GM objects to this Request as duplicative of Request No. 48 and hereby incorporates its responses to that request by reference.

**REQUEST FOR PRODUCTION NO. 50:**

All documents that evidence the number of documents that in the "last several months" of Defendant Iacobelli's employment with GM would have reasonably been expected to have been printed by Iacobelli to perform his job functions, and the documents that establish and/or set forth the number of documents reasonably expected to have been printed.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

GM objects to this Request to the extent it calls for the production of documents protected from disclosure by any applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege and the work product doctrine. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 51:**

All documents that evidence the date, method and extent of Plaintiffs' review of Iacobelli's office following Iacobelli's termination of employment with GM, and the identity of the person(s) who conducted and/or participated in such review.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51:**

GM objects to this Request to the extent it calls for the production of documents protected from disclosure by any applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege and the work product doctrine. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must

**EXHIBIT 4**

be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 52:**

All documents that evidence, date and results of the "analysis of Iacobelli's GM-issued laptop" as referenced at Second Amended Complaint ¶173, and the identity of the person(s) who conducted and/or participated in such analysis.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52:**

GM objects to this Request to the extent it calls for the production of documents protected from disclosure by any applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege and the work product doctrine. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 53:**

All documents that evidence, reflect and/or mention the effect upon FCA US (or its predecessor in interest) of the 2007, 2009, 2011, and 2015 collective bargaining agreement between GM and the UAW, taking into account all "memorandums of understanding," "side letters" and "drawer letters" with respect to that agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 53:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes "the effect upon FCA US (or its predecessor in interest) of the 2007, 2009, 2011, and 2015 collective bargaining agreement between GM and the UAW" and the terms "side letters" and "drawer letters." GM also objects to this Request to the extent it calls for the production of documents protected from

**EXHIBIT 4**

disclosure by any applicable privilege and/or legal obligation, including, without limitation, the

attorney-client privilege and the work product doctrine. GM further objects to this Request to the extent

it calls for GM to produce documents that are proprietary and confidential to GM and therefore must

be subject to a protective order.  GM also objects to this request as overbroad and unduly burdensome

in seeking documents from 2007 as the 2007 CBAs are not at issue in this case and are not reasonably

calculated to lead to the discovery of admissible evidence.

      Subject to and without waiving the foregoing and the General Objections, GM will conduct a

reasonable search and produce non-privileged documents from no earlier than 2009 that are responsive

to this Request that are located through that search pursuant to a protective order.

## REQUEST FOR PRODUCTION NO. 54:

      All documents that evidence, reflect and/or mention the effect upon FCA US (or its
predecessor in interest) of the 2007 collective bargaining agreement between GM and the UAW,
taking into account all "memorandums of understanding," "side letters" and "drawer letters" with
respect to that agreement including, but not limited to, agreements relating to the number of pay tiers.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 54:

      GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes

"the effect upon FCA US (or its predecessor in interest) of the 2007 collective bargaining agreement

between GM and the UAW" and the terms "side letters" and "drawer letters." GM also objects to this

Request to the extent it calls for the production of documents protected from disclosure by any

applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege

and the work product doctrine. GM further objects to this Request to the extent it calls for GM to

produce documents that are proprietary and confidential to GM and therefore must be subject to a

protective order.  GM also objects to this request as overbroad and unduly burdensome in seeking

documents from 2007 as the 2007 CBAs are not at issue in this case and are not reasonably calculated

to lead to the discovery of admissible evidence.  Furthermore, the request is nonsensical as written

because the 2007 CBA was between UAW and General Motors Corp. (Old GM), which no longer

**EXHIBIT 4**

exists and was a separate legal entity from GM.

Subject to and without waiving the foregoing and the General Objections, GM does not have

non-privileged documents responsive to this Request in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 55:**

All documents that evidence, reflect and/or mention the effect upon FCA US (or its predecessor in interest) of the 2011 collective bargaining agreement between GM and the UAW, taking into account all "memorandums of understanding," "side letters" and "drawer letters" with respect to that agreement including, but not limited to, agreements relating to the number of pay tiers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 55:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes

"the effect upon FCA US (or its predecessor in interest) of the 2011 collective bargaining agreement

between GM and the UAW" and the terms "side letters" and "drawer letters." GM also objects to this

Request to the extent it calls for the production of documents protected from disclosure by any

applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege

and the work product doctrine. GM further objects to this Request to the extent it calls for GM to

produce documents that are proprietary and confidential to GM and therefore must be subject to a

protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a

reasonable search and produce non-privileged documents responsive to this Request that are located

through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 56:**

All documents that evidence, reflect and/or mention the effect upon FCA US (or its predecessor in interest) of the 2015 collective bargaining agreement between GM and the UAW, taking into account all "memorandums of understanding," "side letters" and "drawer letters" with respect to that agreement including, but not limited to, agreements relating to the number of pay tiers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 56:**

GM objects to this Request on the grounds that it is vague and ambiguous as to what constitutes

"the effect upon FCA US (or its predecessor in interest) of the 2015 collective bargaining agreement

**EXHIBIT 4**

between GM and the UAW" and the terms "side letters" and "drawer letters." GM also objects to this Request to the extent it calls for the production of documents protected from disclosure by any applicable privilege and/or legal obligation, including, without limitation, the attorney-client privilege and the work product doctrine. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 57:**

All documents that evidence and/or reflect the damages allegedly suffered by Plaintiffs, or either of them, and sought to be recovered in this action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 57:**

GM objects to this Request on the grounds that it is overly broad, vague, ambiguous, and premature, as discovery is ongoing and has not yet been completed. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.  GM also objects to this Request as premature as it seeks information that will be the subject of expert disclosure.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 58:**

All documents that Plaintiffs have identified as the basis for their claim, and/or will be used to substantiate their claim, that they (or either of them) have suffered damages by reason of the alleged wrongful conduct of Alphons Iacobelli.

**EXHIBIT 4**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 58**:

GM objects to this Request on the grounds that it is overly broad, vague, ambiguous, and premature, as discovery is ongoing and has not yet been completed. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order.  GM also objects to this Request as premature as it seeks information that will be the subject of expert disclosure.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**REQUEST FOR PRODUCTION NO. 59**:

All documents that Plaintiffs have identified as the basis for their claim, and/or will be used to substantiate their claim, that they (or either of them) have suffered damages by reason of the alleged wrongful conduct of any of the defendants in this action other than Alphons Iacobelli.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 59**:

GM objects to this Request on the grounds that it is overly broad, vague, ambiguous, and premature, as discovery is ongoing and has not yet been completed. GM further objects to this Request to the extent it calls for GM to produce documents that are proprietary and confidential to GM and therefore must be subject to a protective order. GM also objects to this Request as premature as it seeks information that will be the subject of expert disclosure.

Subject to and without waiving the foregoing and the General Objections, GM will conduct a reasonable search and produce non-privileged documents responsive to this Request that are located through that search pursuant to a protective order.

**EXHIBIT 4**

Dated:  May 25, 2022

Respectfully submitted,

**HONIGMAN LLP**

By: */s/ Jeffrey K. Lamb*
Jeffrey K. Lamb (P76738)
J. Michael Huget (P39150)
Adam M. Wenner (P75309)
Shirin S. Goyal (P82528)
2290 First National Building

660 Woodward Avenue
Detroit, MI 48226 Telephone:
(313) 465-7000
jlamb@honigman.com
mhuget@honigman.com
awenner@honigman.com
sgoyal@honigman.com

**KIRKLAND & ELLIS LLP**
Hariklia Karis, P.C. (*pro hac vice*)
Jeffrey Willian, P.C. (*pro hac vice*)
Stacey G. Pagonis (*pro hac vice*)
Casey McGushin (*pro hac vice*)
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
stacey.pagonis@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris (*pro hac vice*)
2049 Century Park East
Los Angeles, CA 90067
Telephone: (213) 680-8400
austin.norris@kirkland.com

Maisie Allison (*pro hac vice*)
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs*

**EXHIBIT 4**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date, May 25, 2022, I caused a true and correct copy of the foregoing to be served, by electronic mail, upon the following counsel for Defendant Alphons Iacobelli, with electronic copies to counsel for all Defendants.

**Michael A. Nedelman**
NEDELMAN LEGAL GROUP PLLC
28580 Orchard Lake Road, Suite 140
Farmington Hills, MI 48334
Email: mnedelman@nglegal.com

*/s/ Jeffrey K. Lamb*
Jeffrey K. Lamb

**EXHIBIT 4**

**CHASE**

RCO Centralized Mail
Mail Code LA4-7300
700 Kansas Lane
Monroe, LA 71203-4774

7/28/2022

ROBERT IACOBELLI
1749 PICCADILLY CT
ROCHESTER HILLS, MI 483094502

**Important**: We received a legal request for the matter below

**Case Name:  GENERAL MOTORS LLC, GENERAL MOTORS CO V. JOSEPH ASHTON**
**Case No.:  1:20-CV-12659**
**JPMorgan Chase File No:  SB1347438-F1**

Dear ROBERT IACOBELLI :

JPMorgan Chase Bank, N.A. received a legal request in connection with the above case seeking information that concerns you and/or your account(s).  This is a notification only.

As required, JPMorgan Chase Bank, N.A. will comply timely with this legal request unless it receives documentation that legally obligates it to halt production.  If you would like to submit such documentation for our review, please fax it to 1-866-859-8592; it's free from any Chase branch.

If you have legal representation, please provide them with a copy of this letter.  We are unable to provide legal guidance.

If you have questions or would like a copy of the legal request, you can call the issuing party, WILLIAM T WALSH JR at 973-757-1100 .

Sincerely,

National Subpoena Processing

SUBP59

**EXHIBIT 5**

**RCO Centralized Mail**
**Mail Code LA4-7300**
**700 Kansas Lane**
**Monroe, LA 71203-4774**

7/28/2022

SUSANNE IACOBELLI
1749 PICCADILLY CT
ROCHESTER HILLS, MI 483094502

**Important**: We received a legal request for the matter below

**Case Name:  GENERAL MOTORS LLC, GENERAL MOTORS CO V. JOSEPH ASHTON**
**Case No.:  1:20-CV-12659**
**JPMorgan Chase File No:  SB1347438-F1**

Dear SUSANNE IACOBELLI :

JPMorgan Chase Bank, N.A. received a legal request in connection with the above case seeking information that concerns you and/or your account(s).  This is a notification only.

As required, JPMorgan Chase Bank, N.A. will comply timely with this legal request unless it receives documentation that legally obligates it to halt production.  If you would like to submit such documentation for our review, please fax it to 1-866-859-8592; it's free from any Chase branch.

If you have legal representation, please provide them with a copy of this letter.  We are unable to provide legal guidance.

If you have questions or would like a copy of the legal request, you can call the issuing party, WILLIAM T WALSH JR at 973-757-1100 .

Sincerely,

National Subpoena Processing

SUBP59

**EXHIBIT 5**

**CHASE**

**RCO Centralized Mail**
**Mail Code LA4-7300**
**700 Kansas Lane**
**Monroe, LA 71203-4774**

7/28/2022

ALPHONS A IACOBELLI
1749 PICCADILLY CT
ROCHESTER HILLS, MI 48309

**Important**: We received a legal request for the matter below

**Case Name:  GENERAL MOTORS LLC, GENERAL MOTORS CO V. JOSEPH ASHTON**
**Case No.:  1:20-CV-12659**
**JPMorgan Chase File No: SB1347438-F1**

Dear ALPHONS A IACOBELLI :

JPMorgan Chase Bank, N.A. received a legal request in connection with the above case seeking information that concerns you and/or your account(s).  This is a notification only.

As required, JPMorgan Chase Bank, N.A. will comply timely with this legal request unless it receives documentation that legally obligates it to halt production.  If you would like to submit such documentation for our review, please fax it to 1-866-859-8592; it's free from any Chase branch.

If you have legal representation, please provide them with a copy of this letter.  We are unable to provide legal guidance.

If you have questions or would like a copy of the legal request, you can call the issuing party, WILLIAM T WALSH JR at 973-757-1100 .

Sincerely,

National Subpoena Processing

SUBP59

**EXHIBIT 5**

CHASE 🅾

**RCO Centralized Mail**
**Mail Code LA4-7300**
**700 Kansas Lane**
**Monroe, LA 71203-4774**

7/28/2022

SHIRLEY A PIWINSKI
1749 PICCADILLY CT
ROCHESTER HILLS, MI 483094502

**Important:** We received a legal request for the matter below

**Case Name:  GENERAL MOTORS LLC, GENERAL MOTORS CO V. JOSEPH ASHTON**
**Case No.:  1:20-CV-12659**
**JPMorgan Chase File No:  SB1347438-F1**

Dear SHIRLEY A PIWINSKI :

JPMorgan Chase Bank, N.A. received a legal request in connection with the above case seeking information that
concerns you and/or your account(s).  This is a notification only.

As required, JPMorgan Chase Bank, N.A. will comply timely with this legal request unless it receives documentation
that legally obligates it to halt production.  If you would like to submit such documentation for our review, please fax
it to 1-866-859-8592; it's free from any Chase branch.

If you have legal representation, please provide them with a copy of this letter.  We are unable to provide legal
guidance.

If you have questions or would like a copy of the legal request, you can call the issuing party, WILLIAM T WALSH
JR at 973-757-1100 .

Sincerely,

National Subpoena Processing

SUBP59

**EXHIBIT 5**

**CHASE**

**RCO Centralized Mail**
**Mail Code LA4-7300**
**700 Kansas Lane**
**Monroe, LA 71203-4774**

7/28/2022

SHIRLEY A PIWINSKI IRR ASSET PRES TRUST
1749 PICCADILLY CT
ROCHESTER HILLS, MI 483094502

**Important:** **We received a legal request for the matter below**

**Case Name:  GENERAL MOTORS LLC, GENERAL MOTORS CO V. JOSEPH ASHTON**
**Case No.:  1:20-CV-12659**
**JPMorgan Chase File No:  SB1347438-F1**

Dear SHIRLEY A PIWINSKI IRR ASSET PRES TRUST :

JPMorgan Chase Bank, N.A. received a legal request in connection with the above case seeking information that concerns you and/or your account(s).  This is a notification only.

As required, JPMorgan Chase Bank, N.A. will comply timely with this legal request unless it receives documentation that legally obligates it to halt production.  If you would like to submit such documentation for our review, please fax it to 1-866-859-8592; it's free from any Chase branch.

If you have legal representation, please provide them with a copy of this letter.  We are unable to provide legal guidance.

If you have questions or would like a copy of the legal request, you can call the issuing party,WILLIAM T WALSH JR at 973-757-1100 .

Sincerely,

National Subpoena Processing

SUBP59

**EXHIBIT 5**

**RCO Centralized Mail**
**Mail Code LA4-7300**
**700 Kansas Lane**
**Monroe, LA 71203-4774**

7/28/2022

STEPHANIE IACOBELLI
1749 PICCADILLY CT
ROCHESTER HILLS, MI 483094502

**Important:** We received a legal request for the matter below

**Case Name:  GENERAL MOTORS LLC, GENERAL MOTORS CO V. JOSEPH ASHTON**
**Case No.:  1:20-CV-12659**
**JPMorgan Chase File No:  SB1347438-F1**

Dear STEPHANIE IACOBELLI :

JPMorgan Chase Bank, N.A. received a legal request in connection with the above case seeking information that concerns you and/or your account(s).  This is a notification only.

As required, JPMorgan Chase Bank, N.A. will comply timely with this legal request unless it receives documentation that legally obligates it to halt production.  If you would like to submit such documentation for our review, please fax it to 1-866-859-8592; it's free from any Chase branch.

If you have legal representation, please provide them with a copy of this letter.  We are unable to provide legal guidance.

If you have questions or would like a copy of the legal request, you can call the issuing party, WILLIAM T WALSH JR at 973-757-1100 .

Sincerely,

National Subpoena Processing

SUBP59

**EXHIBIT 5**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of New Jersey

| | |
|---|---|
| GENERAL MOTORS LLC et al. | ) |
| *Plaintiff* | ) |
| v. | )  Civil Action No.  Civil No. 20-12659 (RBKISAK) |
| JOSEPH ASHTON | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:       Comerica Incorporated, 350 N. Saint Paul St., Dallas, TX 75201
c/o Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, TX 77056

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Subpoena Attachment

| Place: James Marina | Date and Time: |
|---|---|
| Kirkland & Ellis LLP | |
| 4550 Travis St., Dallas, TX 75205 | 07/18/2022 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    06/17/2022

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ James E. Marina |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

General Motors LLC and General Motors Company _____ , who issues or requests this subpoena, are:

James Marina, Kirkland & Ellis, 601 Lexington Ave., New York, NY 10022, james.marina@kirkland.com, 212-446-4800

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT 6**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   Civil No. 20-12659 (RBKISAK)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                                                *Server's signature*

                                                        _____
                                                                *Printed name and title*

                                                        _____
                                                                *Server's address*

Additional information regarding attempted service, etc.:

**EXHIBIT 6**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT 6**

## EXHIBIT A

## INSTRUCTIONS

1.    In accordance with Rule 45 of the Federal Rules of Civil Procedure, the documents and things to which this Subpoena and the Requests herein relate include any and all documents and things that are in your "possession, custody or control."

2.    Any document to which you claim privilege or exemption from discovery shall be identified by the document's title, date, author(s), recipient(s), length, general subject matter, the nature of the privilege asserted, the holder of the privilege, and the factual and legal basis for asserting the privilege or exemption from discovery.

3.    If a document contains both privileged and non-privileged material, the non-privileged material should be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, you must clearly indicate the portions as to which the privilege is claimed, in accordance with the procedure outlined above, and produce all portions of the document as to which no privilege is claimed.

4.    You may produce an electronic copy of a document in lieu of producing the original. When so doing, the electronic copy should be legible and in the same format as the original, and you should preserve the original.

1

**EXHIBIT 6**

5.     Documents attached to each other in their original form should not be separated when produced. Any attachments to electronic mail messages should be produced with, and linked to, the attaching email.

6.     The singular form of a word means and includes the plural, and the plural form of a word means and includes the singular, whenever necessary, to bring within the scope of these Requests any and all documents that might otherwise be construed to be outside their scope.

7.     Unless otherwise set forth herein, the Requests are for the period commencing January 1, 2010 to present.

8.     These Requests are without prejudice to, or waiver of, plaintiff GM's right to conduct further discovery.

## **DEFINITIONS**

These Requests use terms that shall have the following meanings:

1.     "Communications" means any transmission or exchange of information between two or more persons, orally or in writing, and includes, without limitation, any conversation or discussion, whether face-to-face or by means of any telephone, telecopies, electronic or other online media, including but not limited to text messages, messages sent through applications and other electronic means, and postings and messages on Internet social media.

**EXHIBIT 6**

2.      "Documents," as used herein, shall have its broadest possible meaning under Federal Rules of Civil Procedure and the caselaw interpreting it. The term "document" shall also include all "electronically stored information" as defined below. The term "document" shall also include all copies of each document if the copies contain any additional matter or are not identical copies of the originals.

3.      "SWIFT" means S.W.I.F.T. SCRL (the Society for Worldwide Interbank Financial Telecommunication)

4.      "You" or "Your" means Comerica Bank, including any and all of its current and former affiliates, subsidiaries, funds, accounts, directors, officers, employees, agents, and other persons acting on its behalf.

5.      "All" and "each" shall be broadly construed as all and each.

6.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## **DOCUMENTS REQUESTED**

1.      All Documents or Communications identifying financial accounts in which Alphons Iacobelli (D.O.B. ███████████ ; SSN ██████████ ) and/or Susanne Iacobelli (D.O.B. ██████████ ; SSN ██████████ ) is a signatory, account holder, and/or has a beneficial interest in such account (hereinafter, the "Iacobelli Accounts").

3

**EXHIBIT 6**

2.     All Documents relating to, including all financial records for, the Iacobelli Accounts, including all Documents reflecting deposits, wires, or transfers of money into those accounts.

3.     Logs or spreadsheets of all SWIFT payment messages (in their entirety) regarding and/or accompanying any funds transfer sent from or received by any of the Iacobelli Accounts.

4.     All Documents and other financial records relating to the opening or closing of any of the Iacobelli Accounts.

5.     All Documents sufficient to identify all safe deposit boxes in Alphons Iacobelli (D.O.B. ███████████; SSN ██████████)'s control (including as title holder, beneficiary, proxy, or with the capacity to direct or control or deposit, withdraw, or transfer funds or contents), including the contents of each such safe deposit box.

6.     All Documents sufficient to identify all safe deposit boxes in Susanne Iacobelli (D.O.B. ███████████; SSN ██████████)'s control (including as title holder, beneficiary, proxy, or with the capacity to direct or control or deposit, withdraw, or transfer funds or contents), including the contents of each such safe deposit box.

4

**EXHIBIT 6**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
District of New Jersey

| | |
|---|---|
| GENERAL MOTORS LLC et al. | ) |
| _Plaintiff_ | ) |
| v. | ) |
| JOSEPH ASHTON | ) |
| | ) |
| _Defendant_ | ) |

Civil Action No.   Civil No. 20-12659 (RBKISAK)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Bank of America Corporation, 100 N. Tryon St., Charlotte, NC 28255
c/o CT Corporation, 160 Mine Lake Ct., Ste 200, Raleigh, NC 27615

_(Name of person to whom this subpoena is directed)_

✔ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Subpoena Attachment

| Place: James Marina, Kirkland & Ellis LLP<br>c/o Planet Depos<br>525 North Tryon St., Ste.1600, Charlotte, NC 28202 | Date and Time:<br><br>07/18/2022 5:00 pm |
|---|---|

❐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   06/17/2022

| _CLERK OF COURT_ | OR | /s/ James E. Marina |
|---|---|---|
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
General Motors LLC and General Motors Company , who issues or requests this subpoena, are:
James Marina, Kirkland & Ellis, 601 Lexington Ave., New York, NY 10022, james.marina@kirkland.com, 212-446-4800

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT 7**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  Civil No. 20-12659 (RBKISAK)

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**EXHIBIT 7**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d)  Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e)  Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)  Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT 7**

## **EXHIBIT A**

## **INSTRUCTIONS**

1.     In accordance with Rule 45 of the Federal Rules of Civil Procedure, the documents and things to which this Subpoena and the Requests herein relate include any and all documents and things that are in your "possession, custody or control."

2.     Any document to which you claim privilege or exemption from discovery shall be identified by the document's title, date, author(s), recipient(s), length, general subject matter, the nature of the privilege asserted, the holder of the privilege, and the factual and legal basis for asserting the privilege or exemption from discovery.

3.     If a document contains both privileged and non-privileged material, the non-privileged material should be disclosed to the fullest extent possible without thereby disclosing the privileged material.  If a privilege is asserted with regard to part of the material contained in a document, you must clearly indicate the portions as to which the privilege is claimed, in accordance with the procedure outlined above, and produce all portions of the document as to which no privilege is claimed.

4.     You may produce an electronic copy of a document in lieu of producing the original.  When so doing, the electronic copy should be legible and in the same format as the original, and you should preserve the original.

**EXHIBIT 7**

5.     Documents attached to each other in their original form should not be separated when produced.  Any attachments to electronic mail messages should be produced with, and linked to, the attaching email.

6.     The singular form of a word means and includes the plural, and the plural form of a word means and includes the singular, whenever necessary, to bring within the scope of these Requests any and all documents that might otherwise be construed to be outside their scope.

7.     Unless otherwise set forth herein, the Requests are for the period commencing January 1, 2009 to present.

8.     These Requests are without prejudice to, or waiver of, plaintiff GM's right to conduct further discovery.

## **DEFINITIONS**

These Requests use terms that shall have the following meanings:

1.     "Communication" means any transmission or exchange of information between two or more persons, orally or in writing, and includes, without limitation, any conversation or discussion, whether face-to-face or by means of any telephone, telecopies, electronic or other online media, including but not limited to text messages, messages sent through applications and other electronic means, and postings and messages on Internet social media such as Facebook, Twitter, or LinkedIn.

2

**EXHIBIT 7**

2.      "Complaint" refers to the First Amended Complaint filed by GM against Joseph Ashton on September 24, 2020 in the United States District Court for the District of New Jersey, Case No. 1:20-cv-12659.

3.      "Documents," as used herein, shall have its broadest possible meaning under Federal Rules of Civil Procedure and the caselaw interpreting it.  The term "document" shall also include all "electronically stored information" as defined below.  The term "document" shall also include all copies of each document if the copies contain any additional matter or are not identical copies of the originals.

4.      "Electronically stored information" ("ESI") includes all electronic information permitted under the Federal Rules of Civil Procedure and the caselaw interpreting it.

5.      "FCA" means FCA US LLC and/or Stellantis N.V., including any and all of its current or former affiliates, subsidiaries, predecessor entities, directors, officers, employees, agents, and other persons acting on their behalf.

6.      "GM" means General Motors LLC and General Motors Company.

7.      "Joseph Ashton" means the Defendant Joseph Ashton.

8.      "NTC" means the UAW-Chrysler National Training Center, including any and all of its current or former affiliates, subsidiaries, directors, officers, employees, agents, and other persons acting on its behalf.

3

**EXHIBIT 7**

9.     "Operation Cylinder" means any effort, attempt, strategy, or plan by FCA and its affiliates, including FCA NV, Sergio Marchionne, and Alphons Iacobelli, to take over GM through a merger.

10.     "Tier Two" means employees hired by FCA or GM who are generally referred to as being paid "New Hire" wages or as "In Progression" workers in summaries of the 2011 and 2015 collective bargaining agreements distributed by the UAW.

11.     "UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, including any and all of its current or former affiliates, subsidiaries, directors, officers, boards, employees, agents, members, and other persons acting on its behalf.

12.     "UAW Trust" or "VEBA" means the Voluntary Employee Beneficiary Association established in 2007 as the UAW Retiree Medical Benefits Trust, including any and all of its current and former affiliates, subsidiaries, funds, accounts, directors, officers, employees, agents, and other persons acting on its behalf.

13.     "U.S. Attorney" means the United States Attorney for the Eastern District of Michigan and shall include the Department of Justice or any federal investigatory agency or body working with the U.S. Attorney.

**EXHIBIT 7**

14.     "You" or "Your" means the Bank of America, N.A., including any and all of its current and former affiliates, subsidiaries, funds, accounts, directors, officers, employees, agents, and other persons acting on its behalf.

15.     "All" and "each" shall be broadly construed as all and each.

16.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

**EXHIBIT 7**

## DOCUMENTS REQUESTED

1.     Documents and Communications containing or discussing any analysis or conclusions of the potential impact on the UAW and its membership that would be caused by a merger between FCA and GM.

2.     Documents and Communications related to Operation Cylinder.

3.     Documents and Communications relating to FCA's decision to pursue a merger with GM, including but not limited to minutes, summaries, or presentation materials from any meeting where such potential merger was discussed.

4.     All Documents and Communications relating to any potential merger between FCA and GM, including but not limited to any analysis of the benefits or synergies of such a merger and any analysis of other potential merger targets considered by FCA.

5.     Documents and Communications relating to, analyzing, or discussing the acquisition by FCA of the UAW Trust's stake in Chrysler as announced on January 1, 2014, including but not limited to any agreements entered into between or among the UAW Trust, the UAW, and/or FCA.

6.     Documents and Communications related to the "legally enforceable Memorandum of Understanding" entered into between FCA and the UAW as reflected in FCA's 2014 Annual Report.

**EXHIBIT 7**

7.      Communications between You and FCA or Joseph Ashton regarding the UAW, GM, or any collective bargaining agreements.

8.      Documents and Communications related to any expenditure of funds made by You in relation to FCA or Operation Cylinder.

9.      Documents sufficient to identify any individuals working for You, including but not limited to Your employees, consultants, agents, or contractors, who worked for You in relation to FCA or Operation Cylinder.

10.     Documents and Communications relating to any effort by the NTC, FCA, Alphons Iacobelli, or Joseph Ashton to impose higher costs or other financial harm on GM by the NTC, FCA, or any person acting on their behalf providing bribes or unlawful payments of money or things of value to the UAW, its current or former officers or employees, and/or current or former managers, directors, or employees of FCA, either directly or indirectly.

11.     All Communications between You and John Elkann, Exor N.V., or any member of the Agnelli family concerning FCA, the UAW, or the UAW Trust.

12.     Documents and Communications relating to the NTC, FCA, Alphons Iacobelli, or any person acting on their behalf providing any "money or other thing of value" (within the meaning of that phrase as set forth in Section 302 of the Labor Management Relations Act) to the UAW, its current or former officers, employees, or their relatives, or any charitable organization or other entity associated with the

7

**EXHIBIT 7**

UAW or its current or former officers, employees, or their relatives, either directly or indirectly.

13.     Documents reflecting, referencing, or describing Sergio Marchionne's knowledge that any money or other thing of value (including but not limited to cash, debts paid, home improvements, gifts, automobiles, entertainment, travel, meals, retirement and other parties, personal items, and promises of future items of value) were provided by the NTC, FCA, Alphons Iacobelli, or any person acting on their behalf to the UAW, its current or former officers, employees, or their relatives, either directly or indirectly (including but not limited to Joseph Ashton, Dennis Williams, Gary Jones, Norwood Jewell, and General Holiefield).

14.     Documents relating to the NTC, Alphons Iacobelli, FCA, or any person acting on their behalf paying or directing the payment of funds or proceeds in foreign bank accounts to FCA's current or former managers, directors, employees, or their relatives (including Alphons Iacobelli, Jerome Durden, Colin Lightbody, Linda Knoll, and Peter Glenn Shagena), or any charitable organization or other entity (including JAD Enterprises and Business Advisory Group) associated with any of FCA's current or former managers, directors, employees, or their relatives (other than ordinary compensation and benefits paid for service as a manager, director, or employee or legitimate charitable donations), either directly or indirectly, including

8

**EXHIBIT 7**

but not limited to Documents relating to opening, closing, or depositing funds in foreign bank accounts.

15. Documents relating to the NTC, FCA, or any person acting on their behalf paying or directing the payment of funds or proceeds in foreign bank accounts to the UAW, its current or former officers, employees, or their relatives (including Joseph Ashton and Dennis Williams), or any charitable organization or other entity (including the Ashton Fund and Williams Charity Fund) associated with the UAW or any of its current or former officers, employees, or their relatives, either directly or indirectly, including but not limited to Documents relating to opening, closing, or depositing funds in foreign bank accounts.

16. Documents relating to any foreign bank accounts held by Joseph Ashton and/or his alleged co-conspirators (including Jerome Durden, Alphons Iacobelli, and Dennis Williams) in Switzerland, Luxembourg, Liechtenstein, Italy, Singapore, Panama, Japan, and the Cayman Islands, including any payments or transfers of funds into or that ended up in such accounts, whether directly or indirectly.

17. Documents and Communications You provided to the U.S. Attorney's Office for the Eastern District of Michigan in connection with that office's investigation into the UAW, FCA, and Joseph Ashton.

**EXHIBIT 7**

18.     Documents and Communications in Your possession that relate to any investigation conducted by any government authority or agency into the UAW, FCA, and Joseph Ashton.

19.     Documents and Communications discussing or responding to the U.S. Attorney's Office for the Eastern District of Michigan investigation into the UAW, FCA, and Joseph Ashton.

20.     Documents and Communications relating to any investigation done in response to the U.S. Attorney's Office for the Eastern District of Michigan investigation into the UAW, FCA, and Joseph Ashton.

21.     Documents and Communications relating to any internal investigation You performed in response to the U.S. Attorney's Office for the Eastern District of Michigan investigation into wrongdoing at FCA, the UAW, You, or with Joseph Ashton.

22.     Communications in Your possession to or from Joseph Ashton, Sergio Marchionne, Alphons Iacobelli, Jerome Durden, Michael Brown, Nancy Johnson, Virdell King, or Norwood Jewell that relate, in any way, to any of the allegations in the Complaint.

23.     Documents and Communications relating to the UAW Trust's decision to appoint Joseph Ashton to the GM Board of Directors.

10

**EXHIBIT 7**

24.     Documents and Communications regarding Joseph Ashton's term on the GM Board of Directors.

25.     Communications in Your possession to or from Joseph Ashton while he was serving on the GM Board of Directors.

26.     Documents and other information You received from Joseph Ashton while he was serving on the GM Board of Directors.

27.     Communications to or from Joseph Ashton regarding GM's response to a potential merger between FCA and GM.

28.     Documents and Communications with FCA or the UAW concerning any provision, terms, interpretation, or aspects of the collective bargaining process or the negotiation of any collective bargaining agreement between the UAW and FCA, including but not limited to the negotiation of caps and terms for Tier Two workers or temporary employees, World Class Manufacturing, profit sharing, formulary, or grievances.

29.     Documents containing or discussing any financial or economic analysis of the 2009, 2011, or 2015 collective bargaining agreements between the UAW and FCA.

30.     Documents and Communications with FCA or the UAW concerning any provision, terms, interpretation, or aspects of the collective bargaining process or the negotiation of any collective bargaining agreement between the UAW and

**EXHIBIT 7**

GM, including but not limited to the negotiation of caps and terms for Tier Two workers or temporary employees, World Class Manufacturing, profit sharing, formulary or grievances.

31.    Documents containing or discussing any financial or economic analysis of the 2009, 2011, or 2015 collective bargaining agreement between the UAW and GM.

**EXHIBIT 7**