UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**GENERAL MOTORS LLC,**
**GENERAL MOTORS COMPANY,**

Plaintiffs,

**v.**

**No. 22-mc-50034**
**HON. GEORGE CARAM STEEH**

**JOSEPH ASHTON,**

Defendant.
_________________________/

**PLAINTIFFS' MOTION TO ENFORCE SUBPOENA**
**(Held via Teleconference)**

**BEFORE MAGISTRATE JUDGE DAVID R. GRAND**
United States Magistrate Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
**Tuesday, September 20, 2022**
**10:04 a.m.**

APPEARANCES:

For the Plaintiffs:

**JEFFREY L. WILLIAN**
Kirkland & Ellis
200 E. Randolph Drive
Suite 6000
Chicago, Illinois 60601
(312) 861-2000

**JEFFREY K. LAMB**
Honigman LLP
2290 First National Building
Detroit, Michigan 48226
(313) 465-7404

(Appearances continued)

Transcribed by Leann S. Lizza, CSR-3746, CRR, RMR, CRC, RDR

(Transcript produced from digital voice recording.
Transcriber not present at live proceedings.)

APPEARANCES (Continued):

For Respondent Alphons Iacobelli:

**MICHAEL A. NEDELMAN**
Nedelman Legal Group PLLC
28580 Orchard Lake Road
Suite 140
Farmington Hills, Michigan 48334
(248) 855-8888

**TABLE OF CONTENTS**


| Proceeding | Page |
|---|---|
| Plaintiffs' Motion To Enforce Subpoena | 4 |
| Ruling | 37 |

| Exhibits: | Received |
|---|---|
| (None offered.) | |

September 20, 2022

Detroit, Michigan

\- - -

(Court and Counsel present; 10:04 a.m.)

THE COURT CLERK: The Court calls Case Number 22-50034, General Motors LLC versus Ashton.

THE COURT: Thank you. If I could have appearances, please, starting with plaintiff.

MR. WILLIAN: Jeff Willian on behalf of the plaintiff, General Motors.

MR. LAMB: Jeff Lamb for GM.

MR. NEDELMAN: Michael Nedelman for Alphons Iacobelli, Your Honor.

THE COURT: Okay. All right. Thank you all for being here. So we're here on General Motors' motion to enforce the subpoena and for, I guess, other related relief, I would say, which I've reviewed all of the briefing. And I'm happy to hear any additional arguments that either side wishes to make although I guess the first thing I'd like to ask about just before we get too deep into it, because it might save us some time, is whether Mr. Iacobelli has in this interim, I don't know, 45 or 60 days or so since all these briefs have been filed, conducted the ESI third-party search which was referenced in his response that he indicated that he was going to do.

MR. NEDELMAN: If I may, Your Honor, we have engaged the third-party vendor. We are still in discussions with General Motors regarding -- and this is all in the Wayne County action. We're engaged in discussions with General Motors regarding the completion of agreed-upon search terms as Judge Popke, who is the discovery facilitator, is overseeing.

And so the short answer is no actual search has been conducted because there has been no final agreement on the search terms. We expect that to be within the next week or two. Judge Popke has set a deadline and then she's going to bring everybody in, including FCA, and sit everybody down if there's still disagreement, at which point all of the parties then intend to conduct the appropriate searches.

THE COURT: All right.

MR. WILLIAN: Your Honor, if I may, that's a completely separate issue, so Mr. Iacobelli, in response to your court order, was required to conduct a thorough search which necessarily involves ESI search and that was obviously not done without even notice to us, so. And we need full compliance with this subpoena. So what's going on in that court actually does not and should not really bear on compliance with your court order of April 28th, 2022.

MR. NEDELMAN: If I could respond, Your Honor. We conducted, Mr. Iacobelli together with myself, what was an appropriate search in relation to the outstanding subpoena in

this action. General Motors in its motion has conflated the actions, and to some degree I understand why General Motors is running parallel discovery both in this action and in the Wayne County action. The search we conducted was appropriate and reasonable under these circumstances with respect to these particular requests.

There is going to be a different -- I don't think it's going to be any more comprehensive, but it will certainly be more specific -- search in the Wayne County action. That's what I was referring to, but I did so because General Motors throughout these papers references what is said and done in the Wayne County action and I'm not sure that this action can really be treated independent of what's going on in Wayne County.

THE COURT: Right. And, you know, I understand that there are the two actions going on, and I have no desire to have any side engage in duplicative discovery or partially duplicative. You know, it makes all the sense in the world to do one kind of full search that covers both. Obviously it needs to cover both.

But in terms of responding, Mr. Willian, to your comment, I'm just looking more at the, you know, at the substance and making sure that GM at the end of the process has full compliance with the discovery, and to the extent that the full compliance cannot take place because of the Fifth

Amendment issues, you know, those are like the more meaty issues, and some of the information it seems to me that GM is seeking Mr. Iacobelli is saying he does not have. And, you know, so some of those I think can be addressed through cooperation.

And, for instance, in the foreign bank accounts, Mr. Iacobelli's position is that he had no involvement whatsoever in any foreign bank accounts. That's my interpretation of his -- of the briefs. And when I say that, I mean I'm not talking about wordsmith playing games in terms of how he phrased it or anything. It would be my -- my impression and understanding of his position is he's had nothing whatsoever to do with any foreign bank account, not one that he opened, not one that someone opened in his name, not one for which he's some sort of trustee or, you know, beneficiary. You know, my impression is he's had no connections to any foreign bank account.

Is that -- is that correct, Mr. Nedelman, in my understanding of his position?

MR. NEDELMAN: Absolutely, Your Honor.

THE COURT: Okay. So if that is true, then can't that particular issue be resolved by Mr. Iacobelli signing an authorization for GM to obtain records from whatever foreign bank account they think he has? So, in other words, if they think he has a foreign bank account at, I don't know, Deutsche

Bank just to pick one, and I think that GM identified specific foreign banks. Is that right, Mr. Willian?

MR. WILLIAN: We did, Your Honor.

THE COURT: Right? So what's -- can't that be resolved by saying, okay, here's an authorization to -- here's an authorization to go and get any bank account, you know, in my name from those banks, and based on his -- based on his position, there should be no such document. So it's like I give you a quitclaim deed to the Brooklyn Bridge; it's meaningless. So can't -- and, again I'm just trying to look at practically to resolve these things without everyone spending all this time and money on these briefs and -- why can't he do that?

MR. NEDELMAN: I guess in theory, Your Honor, that is a possible alternative way to do it. I am concerned that whatever authorization General Motors would proffer would imply that such accounts exist because one can't give authorization -- General Motors has been unable to identify other than a blank reference to a bank, has no identity -- has no indication of account numbers or --

THE COURT: Then the bank will return no documents. It's like when you serve a writ to a bank to obtain a judgment, the bank is going to write back and say, so sorry, the person doesn't have an account here. And in this case, if Mr. Iacobelli's position is accurate, they will write a letter

and say we did a search and we don't see any documents reflecting Mr. Iacobelli. And it's -- you know, again, I'm just trying to make it easy so I don't have to -- I mean these briefs with the exhibits is hundreds of pages long, each of them, and I got 100 motions and I'm just trying to kind of get through this.

MR. NEDELMAN: Your Honor's suggestion may be a good one. I'd like to confer with Mr. Iacobelli, but that may be an appropriate or -- depending on the way that the authorization is framed, because I don't want to imply that any such account exists, but in the nature of a quitclaim authorization, for lack of a better description, that is something that I would seriously discuss with Mr. Iacobelli. Because I agree with Your Honor. We have taken a very clear position, and I'm not concerned about it, that no such accounts exist. Certainly General Motors can --

THE COURT: And not just exist, but have ever existed, correct?

MR. NEDELMAN: But have ever.

THE COURT: All right?

MR. NEDELMAN: No. I don't think there's any ambiguity in Mr. Iacobelli's declaration at all, or in his position. I recognize General Motors could issue discovery to those institutions. It may already have done so. We're not --

THE COURT: Well, I don't know, some foreign accounts

you can't just issue a subpoena. You've got to do the letters rogatory, and I've done that before and sometimes it's fairly straightforward and other times it's virtually impossible.

And so, again, there's just, you know, these are -- many of these topics are ones where they really didn't need to get to this level where there could be ways of getting GM what it needs without violating Mr. Iacobelli's rights and avoiding all this unnecessary motion practice. But I mean that's -- but I need to deal with the motion, and so -- I guess, you know, with that, why don't I just turn it over.

Mr. Willian, if you want to go through whatever you believe is remaining in the motion, we can -- I'll make a ruling on it.

MR. WILLIAN: Sure. And as to those -- the foreign financial consent, I hear Mr. Nedelman equivocating somewhat, for lack of a better word, but it should be crystal clear. These accounts don't exist, or they should be willing right now to submit to an order to sign such a record. We will note he continues to take the Fifth on these foreign accounts, but we think the appropriate order, of course, would be to require Mr. Iacobelli to sign a consent, and if he wants to invoke the Fifth in response to that, then that will be interesting and telling.

As to the remaining documents, look, the evidence is overwhelming that Mr. Iacobelli has flouted his discovery

obligations in your court order. The Butzel Long documents that he produced after he should have long ago produced those in response to your order are very telling including his affidavit. We're working separately with Butzel to get the additional documents, so I don't think the Court needs to concern itself with the Butzel Long documents even though those are under the law in the custody, control of Mr. Iacobelli.

He has not produced to date any documents sufficient to show the electronic communications devices that he has in his possession --

THE COURT: Okay. What would those be? And just let me say as a preface, too, he did say in his response that he'd be willing to -- I forget exactly what he said, but it was some sort of -- let's see, that he'd be willing to provide the information he said. So, I mean, I would assume that you could take a photograph of each device and say here's, you know, here's the device, its an Apple iPhone 12, here's a photo of it. Now, technically I don't think that is required under a subpoena because a subpoena, as Mr. Iacobelli argues in his response, does not require a party to create documents. But, again, this is another area where you can creatively resolve this, you know, this dispute.

MR. WILLIAN: Sure.

THE COURT: And maybe it's kind of like an interrogatory answer where he says, "Here's my devices and

here's a photo of them." Or serial number or, you know, something. I --

MR. WILLIAN: Understood.

THE COURT: Yeah. Go ahead.

MR. WILLIAN: I can address that. So we're not looking for a photo. Just like any other electronic device where you're called for documents, requires you to print out documents or produce it in electronic form, we're just asking for the electronic signature on the device. So that is called for by the subpoena. That's properly -- you need to provide that type of information.

THE COURT: What do you mean electronic signature of the device?

MR. WILLIAN: In other words, any device, let's take our -- you know, any phone that you have. So let's say that I have an iPhone 12. You can print out the page of information that says this is an iPhone 12, it was put into service on X date, here's the email under which it operates and the like. That's all on the device itself. And so just like a document that's on a communication device, that can be easily printed out and given to us. That's all we're asking for, so straight from the device. So that's the electronic device.

We've noted before he's produced no personal emails whatsoever despite having used his Wowway -- al.iacobelli@wowway.com email to communicate directly with

Mr. DeLorenzo. We believe he's sending email to communicate directly with banks yet not one personal email has been produced. In response, we heard some excuse about Wowway changing its service while Mr. Iacobelli was in prison. I don't know exactly what that is. But, Your Honor, there just has been no search of emails as far as we can tell or there's been spoliation.

THE COURT: But does Wowway even exist anymore? I thought he said it no longer exists.

MR. WILLIAN: I'll let Mr. Nedelman explain what happened to Wowway. I don't know.

THE COURT: Mr. Nedelman?

MR. NEDELMAN: Would you like me to respond, Your Honor?

THE COURT: Sure.

MR. NEDELMAN: The Wowway account that Mr. Iacobelli was using prior to his incarceration, the service, while Mr. Iacobelli was incarcerated, was terminated by his wife, and she moved the ISP to Comcast. As a consequence, when Mr. Iacobelli returned from incarceration, he no longer had access to the email account that had previously existed at Wowway. He didn't participate in the termination. His wife did it. And not to disparage Mrs. Iacobelli, but she suffers from unfortunately what my wife does which is severe operator error when it comes to electronics, and she did it without his

knowledge or cooperation. And he simply just doesn't have access to it. It's as simple as that.

THE COURT: Can he regain access to it? I mean does it exist in some -- I don't know, where he could write a letter requesting that it be reopened, whether as a Comcast account, or has he attempted to do that?

MR. NEDELMAN: He has not, Your Honor. Wowway and Comcast to my knowledge are independent ISPs. They are -- one is not a continuation of the other. If it were, that would be easy. Wowway is a different service provider entirely. He has not requested to regain access. To his knowledge, he doesn't have it, but if Your Honor directs him to try and regain access, we will certainly try and do that. I do know that General Motors has issued a subpoena to Wowway seeking to determine that. They may already know the answer.

MR. WILLIAN: I can address that. That's incorrect.

THE COURT: Well, he should -- see, this is -- my expectation is that for, you know, possession, custody, and control, right, means not just what you have at your fingertips but that you -- that you also have to engage with the party that does actually have the possession that you can control. And so with a service provider, if he is able through his own reasonable efforts to regain access, he has to try to do that. If he can't -- if he writes them a letter and says "I want to regain access to my old account" and they say "I'm sorry,

there's no way to do that, after such and such period of time your account is terminated and it's just gone," then okay, I would completely accept that.

MR. NEDELMAN: We will --

THE COURT: If they say, "Oh, sure, you confirm your identity and we'll send you a new password and you're up and running and all your old sent emails are all still there," of course, he should do that.

MR. NEDELMAN: We will do that, Your Honor.

MR. WILLIAN: All right. Just going down the list, Your Honor. So the DeLorenzo document says you noted at the last hearing Mr. DeLorenzo in an affidavit described in detail documents that Mr. Iacobelli showed to him. Those have not been produced. There was a suggestion by Mr. Nedelman that, well, perhaps the government took them in response to a search warrant.

We've -- first of all, that search warrant was clearly executed before the DeLorenzo meeting, so they wouldn't have grabbed the documents, those documents, because Mis -- they were shown to Mr. DeLorenzo at the meeting. And secondly, we since obtained the government documents and the DeLorenzo documents as described are not in there. So we're missing the DeLorenzo documents.

MR. NEDELMAN: Your Honor, General Motors misunderstands what -- I'm not even sure I understand the

reference of the search because there's been no claim that any documents that were shown -- or I won't say shown. Any documents in the possession of Mr. Iacobelli at the time of his meeting with Mr. DeLorenzo were taken by the government pursuant to the search warrant. What we explained to General Motors is that Mr. Iacobelli had with him at the time a number of documents in a folder. All of the nonprivileged documents that Mr. Iacobelli may have had with him at the time of his meeting with Mr. DeLorenzo have been provided to General Motors in response to the subpoena. What we've explained is that those folders after the meeting were not kept intact. Documents were added to that folder, so what was produced may have been beyond what Mr. Iacobelli had in his possession at the time. But all nonprivileged documents in the possession of Mr. Iacobelli at the time of his meeting with Mr. DeLorenzo have already been provided to General Motors.

MR. WILLIAN: That's clearly not --

MR. NEDELMAN: Whether they meet Mr. DeLorenzo's description we can't control. What we can tell you is the documents in Mr. Iacobelli's possession were provided.

MR. WILLIAN: Look, that's clearly not the case.

Putting aside the description by Mr. DeLorenzo, Mr. Iacobelli references an outline that he was -- that he was working on regarding this very issue, the biggest corporate corruption in the history of America. That outline has not

been produced. Putting aside the DeLorenzo documents that he describes with specificity under oath that have not been produced, if Mr. Iacobelli wants to provide an affidavit as to which documents he showed and how they've been produced, that would be helpful. But, you know, it's pretty plain they have not been produced, and we have an affidavit they have just a word of, I guess, Mr. Iacobelli through Mr. Nedelman.

THE COURT: So, Mr. Nedelman, what about this outline?

MR. NEDELMAN: I don't know what prompts Mr. DeLorenzo to say that there was an outline. The documents in Mr. Iacobelli's possession -- first of all, Mr. Iacobelli showed Mr. DeLorenzo a single document which has -- which is within the documents provided. We can't control Mr. DeLorenzo's description of what he believes he saw, but we can represent to the Court that the documents that were in Mr. Iacobelli's possession at the time of his meeting with Mr. DeLorenzo have been provided to General Motors in response to the subpoena.

MR. WILLIAN: On the outline, Your Honor --

MR. NEDELMAN: I don't know what else to do --

THE COURT: I thought GM was saying that Mr. Iacobelli admitted that there was such a document. Is that right, Mr. Willian, or does that come from Mr. DeLorenzo?

MR. WILLIAN: No, no. That comes directly from Mr. Iacobelli's email, again, the Wowway email, to

Mr. DeLorenzo July 30, 2018. He says, "I am currently working on the outline that is more chronologically driven for now but will undoubtedly change to accommodate a reader's interest. I love the idea of opening the book with the day the feds came to the house and then going back, then on and on."

So that's Mr. Iacobelli who has identified the outline that has not been produced.

THE COURT: What does Iacobelli say about that? Just that he can't find it, or is he saying it's the one document that has been produced?

MR. NEDELMAN: No. There were -- there was a -- probably several hundred pages of documents that were produced in the response to a request for the information Mr. Iacobelli had with him at the time of his meeting with Mr. DeLorenzo. All of those have been produced.

The outline to my knowledge doesn't exist as described. I can inquire of Mr. Iacobelli again, but to my knowledge, there is no -- certainly no nonprivileged information that has not been provided.

MR. WILLIAN: The outline has not been provided. The DeLorenzo documents as described by Mr. DeLorenzo under oath have not been provided, so we would ask for a direct order and affidavit on this, Your Honor.

THE COURT: Well, he -- where would they have been stored, on a device that still exists or --

MR. NEDELMAN: There was an actual physical folder, Your Honor.

MR. WILLIAN: No, for the outline, where -- what device was the outline on? Where is that device?

MR. NEDELMAN: I don't know if there was an outline, Your Honor, but the balance of the documents was a physical folder.

THE COURT: Well, if he said "outline," there -- there's got to be some explanation, either -- I don't know. You know, sometimes you have -- you say "outline" and it's a formal document that's titled Outline and it's got Roman numerals and that, and other times you can say "outline" and it can be like a chicken scratch-type document that is maybe even in your head although it sounds to me that's not the case. It sounds to me there was some sort of physical document or -- when I say physical document, I mean actual document, whether a Microsoft Word document or an email or something.

And so I think that GM is entitled to some more specificity about what Mr. Iacobelli's position is as to what he was referring to when he said "outline" and what efforts he has made to locate that document, to the extent it was a document, and provide that to GM in some sort of affidavit. And if it, you know, if it doesn't exist, then it doesn't -- you know, it doesn't exist. You know, maybe it was emailed in that Wowway account and through -- if he's able to get access

to that, you know, this could easily be resolved that way. I don't know.

But, you know, but the bigger point here is GM is asking for, you know, the most extreme type of relief, right? To -- for me to order that all of Mr. Iacobelli's electronic devices be turned over to this third-party vendor for a 48-hour period to download everything, and to me that's just the kind of -- the kind of relief that only comes like once you've proved that there has been some sort of intentional egregious spoliation to subvert the process here. And all that's -- I've been shown so far is, frankly, it's like run-of-the-mill discovery disputes, and maybe this one has a little more to it, but there's more on the line here with the Fifth Amendment issues.

And so, you know, I just feel like most all of these issues are ones that are not at a stage that would -- well, most all these issues are ones that very clearly to me are not at the stage where I would order the turning over of his electronic devices. You know, some of them are more, you know, as I said, more concerning than others like the Wowway account. I think that there -- that he should have already made those overtures to Wowway to see if he could get access. And so I'm perturbed that that hasn't happened yet. But the fact that that hasn't happened yet doesn't mean that he's destroyed those documents. It doesn't mean that they can't be fairly easily

obtained assuming Wowway is able to give him access.

And so before I would, you know, reach the conclusion that the most severe sanction is warranted, I want to explore all these other avenues with, you know, all of these categories. You know, same with the foreign banks. You know, there's a way of pursuing it without turning over his electronic devices. We can go through these one by one if necessary, but that's just how I've, you know, kind of intend to -- intend to rule on all of these as to, you know, along the same lines.

So, Mr. Willian, I don't know how you want to go from here.

MR. WILLIAN: Yeah.

THE COURT: You had a dozen or so categories.

MR. WILLIAN: Yeah, understand, Your Honor. We understand that the Court's inclined to issue, I'll call it, an interim order requiring for the compliance on these specific matters which we understand and accept that.

So I'll just tick through them, Your Honor. I think I see where the Court is going. And that is a safe deposit box. No records have been produced of that yet we now know there are records of a safe deposit box. We'd like him to produce those records.

Domestic bank records --

THE COURT: Now, when you say you know that you're

aware, is that -- I've read the motion and papers regarding Miss Iacobelli. My intention is at the end of this hearing today to pick a day in the near future to hold that hearing, and I know that motion dealt more directly with a safe deposit box. Is that the one you're referring to or is there something else when you say "We've got evidence of a safe deposit box"?

MR. WILLIAN: There may be another one. Candidly, I was just reviewing government records that were produced. They were of Mr. Iacobelli's records, and there was evidence of another safe deposit box. I don't know of a separate one or the same one. But regardless, there's an Iacobelli safe deposit box out there --

THE COURT: At what bank account?

MR. WILLIAN: Pardon me?

THE COURT: What bank?

MR. WILLIAN: I don't know off the top of my head, Your Honor. I apologize. I was just looking at this. I could find out within, you know, shortly after the hearing and send a letter to you or something of that nature, but there is such an account -- or box.

THE COURT: And what are you asking me to order Mr. Iacobelli to do that he hasn't already done regarding safe deposit box?

MR. WILLIAN: Comply -- so the request is documents sufficient to show all safe deposit boxes they used back to

2009, and, again, we would ask that -- your prior order required this, but once again, the order require production of such records that we now know exist.

On domestic bank --

MR. NEDELMAN: And, Your Honor, I apologize for interrupting. Let me -- we produced to General Motors all of the documents relating to the bank accounts that were in Mr. Iacobelli or -- and Mrs. Iacobelli's custody. We have coupled that with an indication in writing that we would cooperate, and my understanding is that's the path General Motors was going down. And we cooperate in GM getting whatever information from the banks that they desire. They have issued subpoenas to the -- to JP Morgan Chase and to Comerica. So we didn't stand in the way of General Motors getting those documents. We offered our cooperation. And Mr. Iacobelli -- I did that because I saw Mr. Iacobelli incurring the expense of ordering documents back to 2009 to be a waste of resources when General Motors was going to issue subpoenas anyway for the same information. So --

THE COURT: So has Mr. Iacobelli identi -- GM only knows which banks to subpoena based on Mr. Iacobelli telling GM these are the places where, for instance, I had safe deposit boxes. Has he identified for GM all safe deposit boxes or all banks at which he had safe deposit boxes?

MR. NEDELMAN: Yes, Your Honor.

THE COURT: All right. And does GM -- do you disagree?

MR. WILLIAN: [Indiscernible].

THE COURT: I'm sorry?

MR. WILLIAN: That is news to us, Your Honor. So what Mr. Iacobelli has not done is he has not identified all the banks in which he's had some sort of financial account since 2009. So we need a complete list under oath, and then that's fine. We'll take care of getting the subpoena and we'll take care of getting the documents. But under the law Mr. Iacobelli was required to do that, but we're happy to do that as long as we have a list under oath with Mr. Iacobelli.

THE COURT: Okay. So, Mr. Nedelman, is he willing to provide that list under oath? The other alternative is for GM to depose him and ask him those questions under oath. You know, and I'm hoping it can be done the easier route of him identifying them.

MR. NEDELMAN: Your Honor, if Your Honor orders Mr. Iacobelli to provide a list, then obviously we're going to honor Your Honor's order. The issue was, as I viewed it, was this was a subpoena for documents. We provided documents that reflected all of the account numbers of the banks and identity of the banks. So what General Motors has done in the -- connection with these subpoenas is turned them into -- attempt to turn them into interrogatories.

THE COURT: Understand. But instead of just giving him this short affidavit that says "Here are the following, you know, seven banks or five banks, whatever at which I had accounts and I'm willing to sign an authorization," I got 100 pages of briefing and 700 pages of exhibits and almost all of these issues could have been dealt with in that type of fashion.

MR. NEDELMAN: I --

THE COURT: So I don't disagree with you, but it's been a huge waste of everyone's time and money.

MR. NEDELMAN: And I agree. And perhaps the best illustration of that is -- and I don't want to get ahead of ourselves, but Mrs. Iacobelli's passport which, you know, and I realize this is for another day, but I told Mr. Willian that there was no passport beyond the expired passport we gave him a copy of and yet General Motors doesn't want to accept the answer because they want there to be a different one. And so --

THE COURT: I understand, but as to these issues that are in this motion, this could have been advanced so much more quickly and, you know, one of the reasons I held this motion hearing now as opposed to much sooner is because there was an indication in the response brief that you all were working on the ESI review and I was just really hoping things would be much further along at this stage, but...

MR. NEDELMAN: I'm happy to sit down with Mr. Willian and work through these, Your Honor, in the spirit of what I clearly understand Your Honor wanting us to do and come up with some reasonable way of addressing these issues.

MR. WILLIAN: We would like an order, Your Honor. It's been too long, as you can see. We've got multiple letters from Mr. Nedelman with promises and objections, and we would like an order to make it super clear as to what Mr. Iacobelli needs to do including the affidavit of compliance. That's very important to us. So we're happy to continue to work with Mr. Nedelman in connection with an order as you've indicated that the Court might be willing to issue, the interim order as to these specific documents at issue.

THE COURT: All right. Well, I do think an order -- I mean I have to enter an order anyways, and I think it's appropriate for -- to specify exactly what needs to be done so that there's no dispute, and, you know, hopefully this is going to be the end of it.

So I'll just order Mr. Iacobelli to identify all banks at which he had bank accounts since 2009 under oath. And just so it's clear, I think that technically I can't order him to do that in response to a subpoena for documents. It's just it's much easier for me -- for us all to agree that he's willing to go down that route than have him be subjected to a deposition. And so I just want to get on -- clarity, Mr. Nedelman, you are

agreeing that he will provide that information, correct?

MR. NEDELMAN: Your Honor, and --

THE COURT: I don't want to do this and then have there been objections and say, no, Judge Grand ordered him to do this in response to a subpoena but you can't order someone to give, you know, give information in their head in response to a subpoena for documents. I just -- I'm trying to avoid that.

MR. NEDELMAN: So here's the problem, Your Honor, and let me start at the end and I'll work my way back. I cannot agree, as I sit here today, to provide that affidavit. The reason is I think there -- given the nature of General Motors' allegations, that there is a significant Fifth Amendment issue that arises in the context of providing that affidavit as Your Honor would prefer we do because one of the issues, and it's likely to be addressed by Judge Popke in the near -- in the next several days in her report and recommendation. One of the issues is the scope of the Fifth Amendment privilege and whether or not inquiries into these accounts would prompt and permit Mr. Iacobelli to assert his Fifth Amendment privilege given the nature of General Motor's allegations in both this action and in the Wayne County action. And so I can't agree to it without conferring with Mr. Iacobelli and probably Mr. DuMouchel as well about the effect. I have some concerns that we can't provide it under the circumstance.

MR. WILLIAN: Your Honor, that is --

MR. NEDELMAN: Which is why we provided the bank records. I recognize the Fifth Amendment doesn't protect the production of those, and we've done what we are obligated to do and perhaps as much as we can do in response to the subpoena.

MR. WILLIAN: Your Honor, this is absolutely telling that Mr. Iacobelli will not provide an affidavit, again, a narrow one, regarding his compliance with the subpoena. That's all we're asking for, nothing about the existence of foreign accounts and the like. So that's telling that he can -- he is not willing to supply such an affidavit, and that's been signaled before. And there's no reason he shouldn't be able to provide it because we just want it to be narrow as to this case and these documents alone.

THE COURT: But what -- we're talking right now about the safe deposit box. What documents are you in receipt of from Mr. Iacobelli regarding safe deposit boxes, anything?

MR. WILLIAN: Nothing from Mr. Iacobelli, Your Honor.

THE COURT: Okay. So does -- you know, that's what the subpoena requires. The subpoena requires him to produce all documents sufficient to show what safe deposit boxes he's had back to 2009. You know, he can either do that by requesting documents from the bank -- well, number one, he can do that by just simply producing documents that are in his present custody, right? So he can either produce documents in

his custody or to the extent he is aware of safe deposit boxes for which he has no -- for which he presently has no documents, his obligation is to either contact -- or request each such bank to produce the documents, right? You know, it would be -- and really it would only be one document. It would be like a document of either the account opening or the safe deposit box opening with, you know, some sort of account number or box number or something, but he has to request that. In order to comply with the subpoena, he has to request that of the bank.

If he does not do that, then I imagine General Motors will file a motion to hold him in contempt for -- because I'm going to order him to do that. If he does not do that, does not either produce all such documents or request the bank to produce the documents if he doesn't have them and he fails to do that, then I assume GM will move this court to -- for an order finding him in contempt, and if at that point he wants to raise as a defense to that motion the contention that compliance with the Court's order would have required him to violate the Fifth Amendment, you know, then it will be teed up. I'm not sure that it does to just identify a bank account or a safe deposit box. I'm not -- I guess I'm not -- I'm certainly not making any sort of determination as to that issue. But at least then it would be teed up.

And I just think that's the proper approach to deal with this issue. I'd love to short-circuit it and have him

just give this affidavit and me order him to do it so that I know that it's done, but I just think that that's going to create more, you know, more issues and objections and more delay. So this is what he's required to do under the subpoena, and to the extent, you know, again, he believes he does not need to comply because compliance would violate his constitutional rights in some way, we can tee that up in kind of a more discrete, more direct way than it presently has been presented. All right?

MR. WILLIAN: Understood. And just to clarify, does that order also apply to identification of domestic financial institutions where he had accounts? I assume so that we understand where he had financial accounts?

THE COURT: Well, again, I'm not requiring him to identify in some sort of like interrogatory response. His obligation is to comply with the subpoena and to -- you know, I think I can order him to provide an affidavit of compliance.

MR. WILLIAN: We agree. We cited that law.

THE COURT: And if he states in the affidavit that he has not complied, he must, you know, explain why. And if it's because he believes the Fifth Amendment protects him from complying with any particular part, at least we'll then know exactly what parts have not been complied with and why, and I can make a determination that either that noncompliance for those reasons is appropriate and, therefore, not subject to any

sort of sanction. And if I determine that the noncompliance -- that the grounds for the noncompliance were improper, I can then make that finding and, you know, kind of go from there, and we'll just have to see how that unfolds. But that's my intention, is to issue an order along those lines.

MR. WILLIAN: Understood, Your Honor. Would it help to have us take this transcript and draft an order to submit to you?

THE COURT: Well, are we all done with -- or is there any --

MR. WILLIAN: Well, I guess the clean-up items would be the Business Advisory Group documents which would be Requests 22 and 23. No such documents have been produced yet. Mr. Iacobelli's advertized the activities of this entity he created called the Business Advisory Group. So we would ask for orders of production on 22 and 23.

MR. NEDELMAN: Your Honor, Business Advisory Group is an entity that Mr. Iacobelli caused to be formed prior to his incarceration. It never conducted any business. It had a single bank account with respect to which all of the documents have been provided to General Motors. I think it had an initial 100 and some odd dollars in the account. And those documents have been provided to GM. So it never conducted any business. There's nothing more to produce with respect to Business Advisory Group.

THE COURT: All right. Then I mean as to that, you know, GM has his position. I mean I can't order him to produce something that doesn't exist.

MR. WILLIAN: Understood. But we would ask that that go into the affidavit of compliance, what Mr. Nedelman's just stated.

THE COURT: All right. Mr. Nedelman, any problem with that?

MR. NEDELMAN: I'm not sure, Your Honor, what we're being asked to attest to. The documents were -- the responsive documents to the subpoena were provided. If General Motors isn't entitled to any additional relief, which I suggest to the Court they're not entitled to anything more than production, then there's nothing to attest to.

THE COURT: Well, he can attest that he made a good faith effort to locate responsive nonprivileged -- I'm sorry, that he made a good faith effort to locate responsive documents and has produced any such documents found that are not subject to a privilege. I don't think there's anything improper about asking him to make that attestation in an affidavit.

And as to the issues like the safe deposit box and the bank accounts, the good faith effort, you know, I'm being real clear, means not just looking through your own drawers and saying, well, I don't have any documents therefore I'm not producing anything. It means either, in that case if you don't

have -- it means -- well, it means a couple things. It means, one, producing what you have. It also means, whether you have some or not, producing -- it means to the extent you know you don't have them, either signing a -- an authorization so that GM can get the documents at its own expense from the banks or contacting the banks himself and obtaining responsive documents. That's the only way that GM can be reasonably assured that it has all responsive documents.

And if Mr. Iacobelli is not willing to do that based on an assertion that to do so would require him to violate his Fifth Amendment rights, then he has to tell GM that so that GM is able to then tee that issue up and decide whether he's right or wrong. And, you know, to the extent he's right about that, then okay. Then I haven't required him to violate his Fifth Amendment rights. And to the extent he's wrong about that, we're not spinning our wheels here wondering what's been produced and not produced and at least we know why.

MR. NEDELMAN: I would agree with Your Honor, and we had -- I'll go back and look at our correspondence. But I believe we had offered to cooperate with allowing General Motors to get those documents. So I think we're on the right path.

MR. WILLIAN: Finally, again, we don't know what we don't know, as far as what hasn't been produced, but clearly that's still in Mr. Iacobelli's possession and control.

But the final one that we've been able to identify are USB drives that he used while he was employed by GM. We know that he used certain USB drives to download GM confidential documents. We're after those USB drives; none of them produced. So we would ask those be produced and, if not, those be included in Mr. Iacobelli's affidavit as to why not or where those USB drives are.

THE COURT: And --

MR. NEDELMAN: We're not aware of any USB drives, Your Honor. So there was nothing to produce in response to the request.

MR. WILLIAN: We would like that in his affidavit, Your Honor.

THE COURT: Okay. Then he can simply, in his affidavit, say I have made a, you know, a reasonable, good faith search for the USB drives that are the subject of request number whatever and, you know, did not find any, period, and then at least GM will know, okay, he didn't -- he says he doesn't have them as opposed to wondering, whether, well, he found them but didn't produce anything because -- because he believes it would violate his Fifth Amendment right or he found them but doesn't want to say because it would violate his Fifth Amendment right. I mean, they need to know on what basis the production or lack of production is being made, and that way they can challenge it and the issue can be resolved on its

merits.

MR. NEDELMAN: Fair enough, Your Honor.

MR. WILLIAN: Your Honor, I think that covers everything. I do want to go back to the consent rights for the foreign accounts. I do believe Mr. Nedelman has agreed that those consents will be signed, but I just -- I'm not sure I heard that clearly so I just want to make sure that's resolved before the hearing's over.

MR. NEDELMAN: Your Honor, I think that issue is the same issue that I -- and the same concern I have with respect to Your Honor's suggestion on an affidavit. I do need -- I do need to think about it, if I could indulge Your Honor. My inclination is that there is no problem in signing an appropriately worded consent that does not even imply Mr. Iacobelli's representation that he has such an account at that institution. I think it --

THE COURT: Okay.

MR. NEDELMAN: -- is an important -- it's an important distinction because the *CFTC/Schroeder* case that General Motors cites as authority for ordering such a consent was itself a consent order to which the defendant in that case agreed to provide the consent. There is no -- at least I haven't found any case law to suggest that absent consent, a defendant, let alone in this case a nonparty, can be ordered to provide a consent under these circumstances.

So it's not a consent that I can agree on the record at this point to provide, but perhaps there is a means of providing something that gives General Motors the ability to move forward without waiving or causing a waiver of Mr. Iacobelli's Fifth Amendment rights.

MR. WILLIAN: Perhaps the way we should go on this one, Your Honor, is we'll send a consent over to Mr. Nedelman and either he'll sign it or they won't or propose revisions that we can agree to or not. And if we need to brief it, I promise we'll keep it short. But we can then perhaps bring it to Your Honor's attention and get a ruling on that.

THE COURT: All right. And I mean it's -- I'm not aware of why he wouldn't -- why I could not require him to provide an authorization for documents that are within his custody or control but not his immediate possession.

MR. NEDELMAN: I [indiscernible] --

THE COURT: I know you said, well, GM only cited that one 1965 case that didn't necessarily say that, but I'm certainly not aware of any case law that says I can't do that as part of enforcing a subpoena, and it's always been my understanding that I can and I've certainly done that on many cases. That's how these are very typically resolved because very often people don't have the documents themselves, but the entities that -- over which they have control as being an account holder do.

MR. NEDELMAN: And therein lies the problem, Your Honor. In those cases I don't think there's been any disagreement that those accounts existed for the benefit of the person who is required to provide the consent. What I don't -- what I want to ensure I avoid is that there is any implication that we have custody or control over accounts that we say don't exist.

THE COURT: Right. So you could -- I mean that is so eas -- I'm not going to put you on the spot here because I know it's obviously a very significant issue in terms of potential criminal responsibility, but just from my general impression is that that could so easily be addressed by saying notwithstanding anything in this authorization, Mr. Iacobelli unequivocally asserts he is unaware of any such account and disclaims any connection to any such account, you know, however you want to word it. I would think that can be addressed, but again, I'm not going to ask you to address that right now until you've had a chance to look into it. But I sure hope it can be resolved in that kind of approach.

So why don't we do that. Mr. Willian, why don't you work -- try to work on that issue very promptly with Mr. Nedelman. You can then submit to the Court a proposed order that incorporates the rulings from today's hearing. And, you know, I'm not promising I'll enter it just as submitted. And I guess, Mr. Nedelman, if you want a chance to very briefly

weigh in on anything, that's --

MR. NEDELMAN: I would like that, Your Honor.

THE COURT: -- you know, that's fine. But my hope would be you can agree on a proposed stipulated order based on the Court's ruling today.

And how much time do you think, Mr. Nedelman, you need to talk through this issue with your client on whether he's willing to give this, you know, statement -- or this kind of quitclaim authorization that we've described it as?

MR. NEDELMAN: I would like through the end of the week if I could, Your Honor, only because I do want to confer with Mr. DuMouchel as well.

THE COURT: All right. That's fine. So let's just say I'll look for a -- either a stipulated order by one week from today or, if not, a proposed order from General Motors within one week from today.

MR. NEDELMAN: If I could, Your Honor, if we could push it another day. One week from today is Rosh Hashanah.

THE COURT: Yep. Thank you for that. Let's see. Is Rosh Hashanah the -- I thought it was Monday?

MR. NEDELMAN: It's Monday and Tuesday, Your Honor.

THE COURT: Ah, okay. I'm picking a jury on Tuesday. Dang it. All right. Well.

All right. So one -- does that give you enough time, till the 28th?

MR. WILLIAN: Yes, for GM.

THE COURT: All right. So within one week from today I'll look for hopefully a stipulated order from you all. If not, GM can submit its proposed order, and then Mr. Nedelman, you can have, what, till Friday if you can't agree to submit your proposal and I'll just enter an order shortly thereafter one way or another.

MR. NEDELMAN: Very well, Your Honor. Thank you.

THE COURT: All right. Give me one second. I'm just going to make some notes on this.

(Short pause.)

THE COURT: All right. Now, as to the motion with respect to Mrs. Iacobelli, all the briefing is done. I've read it although I'm not going to -- I didn't notice it up for hearing today. I was kind of hoping that through this hearing we might be -- it might give you some guidance on some of those issues and that you might be able to talk through them. Why don't we give you the week to do so also, and we could set it for, let's see -- I'm looking at maybe one day the week of the 3rd. What about -- oh, no, that's Yom Kippur is on --

MR. NEDELMAN: Yom Kippur is on the [indiscernible].

THE COURT: What about -- let's see. What about the 13th of October for a hearing if you've not been able to resolve that motion?

MR. NEDELMAN: That's fine, Your Honor.

MR. WILLIAN: That works for GM, Your Honor.

THE COURT: All right. So October 13th. It will be at 1:00. I'll have to check with my case manager, but I think that should work.

All right. But as I said, hopefully the best would be if you can submit a stipulated order as to the resolution of that one too, taking into account the Court's rulings on the motion we heard today.

MR. NEDELMAN: Very well, Your Honor. Thank you very much.

MR. WILLIAN: [Indiscernible]. We'll work on it.

THE COURT: All right. Thank you all, everybody. Take care.

MR. NEDELMAN: Thank you, Your Honor.

MR. WILLIAN: Thank you, Judge Grand.

THE COURT: Bye.

(Proceedings concluded, 11:04 a.m.)

\- - -

**CERTIFICATE OF TRANSCRIBER**

I certify that the foregoing is a correct transcription from the official electronic sound recording of the proceedings in the above-entitled matter.

S/Leann S. Lizza 9-20-2022
Leann S. Lizza Date